**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DL, *et al*.,                              ) | |
|                                            ) | |
|            Plaintiffs,                      ) | |
|                                            ) | |
|        v.                                  )          Civil Action No. 05-1437 (RCL) | |
|                                            ) | |
| DISTRICT OF COLUMBIA, *et al*.,            ) | |
|                                            ) | |
|            Defendants.                      ) | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**INTRODUCTION**

The very first page of Plaintiffs' Memorandum of Law in Support of their Motion

for Class Certification (hereinafter "Pl. Memo.") shows in a nutshell why their effort at

class certification is so problematical and dubious.

Unlike other leading class action cases in this jurisdiction, such as this Court's

decision in Bynum v. District of Columbia, 214 F.R.D. 27 (D.D.C. 2003) (Lamberth, J.),

the present application sprawls all over the map both factually and legally.  It asserts at

least four separate and distinct factual theories---defendants' alleged failures to

(1)identify, (2) locate, (3) evaluate, and (4) offer special education services to

preschoolers.  It alleges no fewer than six separate and different legal theories---

violations of two federal statutes, the IDEA and Section 504 of the Rehabilitation Act;

the implementing regulations of each statute; the Due Process Clause of the Fifth

Amendment to the U.S. Constitution; and several provisions of District law, both statute

and municipal regulations.  It alleges that the named plaintiffs have one or more of at

least five separate and distinct kinds of disabilities, "sensory, emotional, physical, cognitive or language." (Pl. Memo. at 1).

When this scattershot application is laid against plaintiffs' proposed class certification order, the difficulties of certification are multiplied exponentially. The proposed order is wholly open-ended in at least two respects: it purports to cover (1) all pre-schoolers who "are or <u>may be</u> eligible" for special education services, leaving much to the imagination and speculation, and (2) all of those whom defendants "have not or <u>will not</u> identify, locate, evaluate, or offer special education services to" when they are pre-schoolers, with no end or cutoff point specified or in sight, and presumably encompassing those who are yet unborn into the indefinite future. (Emphasis supplied to Pl. Proposed Order).

If this application is compared with this Court's decision in <u>Bynum,</u> for example, the differences are stark. Indeed, they are at opposite ends of the spectrum for certifiability as a class action. <u>Bynum</u> involved a focused and narrowly defined class based on a single factual theory—overdetention of inmates by the D.C. Department of Corrections—and a single legal theory—violation of their federal constitutional rights by such overdetention. The <u>Bynum</u> class was not open-ended, vague, and amorphous; rather, its members were readily identifiable and ascertainable.

In the sections that follow, we will show how each of the essential elements of a Rule 23 class action is either absent or doubtful and unproven here. We follow, as must this Court, the mandate of the Supreme Court in <u>General Telephone Co. v. Falcon</u>, 457 U.S. 147, 161 (1982), that "rigorous analysis" is required to certify a class, not simply sympathy or empathy for the putative class members.

## ARGUMENT

**I.    The Essential Elements of a Class Action Are Not Established Here with the Requisite Rigor and Clarity.**

Rule 23(a) specifies four prerequisites to the maintenance of any class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

As Judge Flannery has stated, "[a]ll four elements must be present before the Court may certify the proposed class." Williams v. Glickman, 1997 U.S. Dist. LEXIS 1683, opinion at 11-12 (D.D.C. 1997). See also Bynum, supra, 214 F.R.D. at 30-31; Eubanks v. Billington, 110 F.3d 87, 92 n. 6 (D.C. Cir. 1997).

Additionally, the proponents of class action treatment must show that their putative class satisfies the criteria for at least one of the categories described in Rule 23(b). In re Veneman, 309 F.3d 789 (D.C. Cir. 2002).

Moreover, before the Court even reaches the four essential elements under Rule 23(a) and the categories under Rule 23(b), it must first determine whether a class exists which may be certified, a doctrine known as "ascertainability." See Bynum, supra, 214 F.R.D. at 31, and cases therein cited. That is, there must be a "meaningful definition of the proposed class" at the outset, sufficient to make it administratively feasible for the Court to determine whether a particular individual is a member. Id. The proposed class must be "neither amorphous or imprecise". Lewis v. National Football League, 146 F.R D. 5, 8 (D.D.C. 1992) (Lamberth, J.). We now discuss each of these prerequisites in turn.

A.    <u>Ascertainability.</u>

To meet this requirement, the Court must be "satisfied that an individual would be able to determine, simply by reading the definition, whether he or she was a member of the proposed class." 214 F.R.D. at 32.  Thus, in <u>Bynum,</u> if a person was incarcerated in a Corrections facility, "all that he or she would need to determine is whether he or she was not released by midnight on the date he or she was entitled to be released . . . . " <u>Id.</u> There were "no terms in the [class definition] that require further clarification." <u>Id.</u>  And the definition "would not require the Court to hold individualized hearings to decide whether a particular individual fell within the scope of the definition." <u>Id.</u>  When it becomes necessary to reach "the merits of the individual claims to determine whether a particular person is a member of the class", the class is not adequately defined. 5 Moore's Federal Practice, Section 23.21[3][c], at 23-51 (3rd ed. 2005).

Here, by contrast with <u>Bynum,</u> the requisite clarity and ease of administration are sorely lacking.  There are at least two fatal flaws in plaintiffs' proposed definition: (1) it covers all those pre-schoolers who "are or may be eligible" for special education services, and (2) it is without limit into the future, purporting to cover pre-schoolers yet unborn who will be denied such services.

The determination of those pre-schoolers who "are or may be eligible" for special education services appears to require just the kind of "individualized hearings" and decisions that defeat ascertainability under this Court's approach in <u>Bynum.</u>  <u>Cf.</u> <u>Adashunas v. Negley,</u> 626 F.2d 600, 603-04 (7th Cir, 1980) (task of identifying learning disabled children whose education was "inadequate" defeated certification); <u>Mueller v. CBS,</u> 200 F.R.D. 227, 233-34 (W.D. Pa. 2001); <u>Hagen v. City of Winnemucca,</u> 108

F.R.D. 61, 63 (D. Nev. 1985).  How is such an individual, or his or her parent or

guardian, to know whether he or she "is or may be eligible" without such an

individualized inquiry and determination?  Certainly a mere reading of the definition does

not supply the answer.  Cf.  In re Copper Antitrust Litigation, 196 F.R.D. 348, 350 (W.D.

Wisc. 2000).

The closest authority on this point we have found is Adashunas v. Negley, supra.

There, the Seventh Circuit upheld the denial of certification of a class defined as all

children in Indiana entitled to a public education "who have learning disabilities" and

"who are not properly identified and/or who are not receiving such special instruction as

to guarantee them of minimally adequate education."  626 F.2d at 601.  The Court asked:

> How does one identify class members consisting of persons
> not identified?  This might be conceivably possible if
> identification were a simple process.  However, the record
> abundantly demonstrates that identifying learning disabled
> children is a gargantuan task.

626 F.2d at 603.The Court continued, "Those who have not been identified either may

not exist or are exceedingly difficult to identify if they do exist." 626 F.2d at 604.  And

the Court concluded (id.):

> In summary, the proposed class of plaintiffs is so highly
> diverse and so difficult to identify that it is not adequately
> defined or nearly ascertainable.  Hence, for that reason, the
> plaintiff class cannot be maintained. [citations omitted]
> The second deficiency in the class action claims is that
> since the proposed class is so amorphous and diverse, it
> cannot be reasonably clear that the proposed class members
> have all suffered a constitutional or statutory violation
> warranting some relief.

Moreover, the open-ended, amorphous, futuristic nature of the definition creates

additional problems. There can be nothing but speculation as to whether pre-schoolers yet

unborn are members of the class, because that will depend on events which have not even happened, beginning with their birth. In <u>Bynum</u>, the class had a beginning and an end (incarceration in a Corrections facility "in the three years preceding the filing of this action up to and until the date the case is determined.") 214 F.R.D. at 42. To the extent that it also looked to the future, it incorporated the simplicity, clarity, and ease of administration in the definition of the class—persons "not released by midnight on the date on which the person is entitled to be released . . . ." <u>Id.</u> No such simplicity, clarity, or ease of administration accompanies the futuristic class sought to be certified in the present case. <u>Cf. Amchem Products v. Windsor,</u> 521 U.S. 591, 603, 626 (1997). As Judge Gasch held in <u>Edwards v. Schlesinger,</u> 377 F. Supp. 1091, 1093 (D.D.C. 1974):

> Proceeding to the merits of certifying the class, it can be seen that the group of people sought to be included is ill-defined, particularly with respect to those "future" members of the class.

Because Judge Flannery would have had to answer "numerous fact-intensive questions" to determine class membership and because of the "overly broad" scope of the proposed class, he denied certification in <u>Williams, supra.</u>1997 U.S. Dist. LEXIS 1683, opinion at 13-14. In this respect, the present case is far closer to <u>Williams </u>than it is to <u>Bynum</u>. The proposed class cannot be certified in its present form.

**B.     Numerosity.**

Numerosity is generally one of the easier of the essential elements of Rule 23(a) to meet because of the presumption that it is satisfied by a proposed class consisting of at least 40 members. <u>Bynum, supra,</u> 214 F.R.D. at 32. Nevertheless,"mere conjecture" does not satisfy the requirement. <u>Id.</u> at 33; <u>Rodriquez v. U.S. Dep't of the Treasury,</u> 131 F.R.D. 1, 6 (D.D.C. 1990) (Robinson, C.J.); <u>Williams, supra,</u> opinion at 18. Judge

Flannery emphasized in <u>Williams</u> that the plaintiffs had the burden of showing numerosity, and despite the breadth of their proposed class, the Court "was not willing to assume that this group is sufficiently numerous to meet the requirements of Rule 23(a)." <u>Id.</u>

The question of numerosity is not easy in the present case. Although plaintiffs assert that "hundreds" of children are within the proposed class (Complaint, Para. 3), their papers also make clear that their purported class includes both those who "are or may be eligible" for special education services and those who" have not or will not" be "identified, located, evaluated, or offered special education services." <u>Id.</u>, Para. 69; see also Pl. Memo. at 5. That is, it includes as possible future members even those who may be as yet unborn. That invites speculation with a vengeance.

In <u>Bynum,</u> by contrast, the defendants provided a chart showing the number of detained prisoners who met the class definition and satisfying the numerosity requirement. The Court declined to "rely solely on plaintiffs' conjecture as to the number of persons who are being held later than their release date." 214 F.R.D. at  33. It made its finding of numerosity on the basis of the defendants' chart. There is no such evidence in the present record.

Furthermore, there is a serious flaw in the inferences plaintiffs draw (and want the Court to draw) from the statistics on which they rely to support their conjectural claim as to "hundreds" in the putative class. In their Exhibit 1, they set forth figures on the number of children between 3 and 5 in every state and the District of Columbia and in their Exhibit 3 the percentage of such children receiving special education services; they assert that because the District has the lowest percentage receiving such services, this

means that the District is not fulfilling its legal obligations to "hundreds" of these children. However, Exhibit 1 shows that the District had the largest decline of any jurisdiction in the country in its population of 3 to 5 year olds between 1993 and 2003, a drop of 28.28%. Between 2002 and 2003 alone, the District had the second largest drop in this population in the country, a fraction behind New Hampshire. The District also had the smallest number of children in that age group of any jurisdiction in the United States for all three of the years contained in Exhibit 1, 1993, 2002 and 2003.

Thus, the inference that plaintiffs ask the Court to draw—that because the District had the lowest percentage in the 3-5 age group of children receiving IDEA services (Pl. Exhibit 3), it must be because of failure to deliver those services to them in violation of the law—does not follow from their own statistics. And it certainly does not support the inference that such children must number in the "hundreds." It is simply impossible to tell with any degree of certainty or confidence what the absolute number of such children might be. Perhaps the old Scottish verdict best describes the outcome of this inquiry— "not proven."

**C.    Commonality and Typicality.**

The Supreme Court has observed:

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiffs' claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

Falcon, supra, 457 U.S. at 157 n. 13.

Nevertheless, the two elements are analytically separate, and each must be satisfied for class certification. Commonality focuses on the nature of the claims asserted on behalf of all the members of the putative class and typicality on the particular claims asserted by the would-be class representatives. Bynum, supra, 214 F.R.D. at 33-34. The more "wide-ranging" the proposed class, the more difficult it is for the would-be class representatives to establish either element. Williams, supra, opinion at 12.

1.    **Commonality.**

The problem of commonality in the present case arises from the scattershot nature of the Complaint. Rather than targeting claims clearly common to all class members, as was done by the plaintiffs in Bynum (all persons detained past their release dates in alleged violation of their federal constitutional rights), this Complaint sweeps so broadly, both as to factual and legal theories, that it is difficult to discern the requisite degree of commonality. This case, compared to Bynum, illustrates the difference between hunting with a shotgun and hunting with a rifle.

The factual gravamens of the claims asserted by plaintiffs here are multiplicitous, disparate, and diverse. They include alleged failures by defendants to "identify" eligible preschoolers, "locate" them, "evaluate" them, and "offer" them special education services. (Complaint, Para. 1). Moreover, this actually understates the number and diversity of the claims. The Complaint goes on to multiply the factual allegations, including alleged failures to determine eligibility for special education services (Complaint, Para.79); failure to implement IEPs ("Individualized Educational Programs") (Para. 80); failure to propose appropriate placements (Para. 80); failure to conduct public awareness and outreach activities (Para. 85); failure to inform those caring for pre-

schoolers about the availability of special education services (Para. 85); failure to distribute special education materials to the public (Para. 85); failure to screen or track potential participants in special education (Para. 86); failure to maintain an adequate intake and referral process (Para. 86); failure to evaluate in all areas (Para. 86); failure to convene timely IEP meetings and develop IEPs (Para. 89); and failure to offer appropriate placements (Para. 90).

Some of these may be restatements of the same theories in different ways.  But in toto they are a breathtaking example of throwing in everything but the proverbial kitchen sink in the hope that some of this proliferation of charges will stick.  It may be that individual members of the putative class could fairly assert one or more of these alleged failures and defects. It is hard to credit that any or all of these claims are common to all of the members of the putative class.

The asserted disabilities are likewise pleaded across-the-board, as "sensory, emotional, physical, cognitive, and language." (Complaint, Para. 2).  It is difficult to accept that all or any of them are common to all members of the would-be class.  Had plaintiffs exercised more restraint in pleading their claims, their case for commonality, while still dubious, would have more credibility.

The legal theories asserted also multiplicitious and diverse.  They include two federal statutes, the IDEA and Section 504 of the Rehabilitation Act; the regulations implementing each of these statutes; the Fifth Amendment Due Process Clause of the U.S. Constitution; and various provisions of District law, statutes and municipal regulations. Again, it is difficult to suppose that all of these legal theories and provisions of law apply to each and every member of the would-be class, except perhaps at a level of

generality that defies the purpose of the requirement of commonality. To assert, for example, that every member of the would-be class has in common an alleged violation of some provision of the IDEA is to divest the commonality element of any substance. One might as well say that because the defendants are accused of acting "unlawfully" toward each would-be class member, the element of commonality is satisfied. Surely some greater degree of specificity is required under the Rule. An "overly broad, unacceptably vague" class definition, such as we have here, also defeats the element of commonality. Mueller v. CBS, supra, 200 F.R.D. at 236.

Once again, the contrast with Bynum is striking. The Court's analysis there of commonality, 214 F.R.D. at 33-34, raises serious questions whether that element is satisfied here. Every class member there had the same factual claim—overdetention—and the same legal claim—alleged violation of federal constitutional rights. In the hodgepodge of factual and legal allegations in the present case, does any class member have common claims with any other, much less all of them with each other? The answer is certainly not clear or self-evident.

> ## 2.    Typicality.

In view of the number and disparate nature of the factual and legal claims in the Complaint, it would be surprising if any of the would-be class representatives has asserted a claim which is typical of the claims of all class members. And, indeed, as we shall show, none has done so.

Here again, the Court's decision in Bynum is instructive. Every class member there was an overdetained prisoner. Plaintiffs were able to represent that "all members of the class are advancing the same legal theory based on the same set of facts, namely, that

their constitutional rights were violated when they were detained later than their release

period . . . ."  214 F.R.D. at 34.

In finding typicality in <u>Bynum,</u> the Court stressed that:

> if the named plaintiffs' claims are based on the same legal
> theory as the claims of the other class members, it will
> suffice to show that the named plaintiffs' injuries arise from
> the same course of conduct that gives rise to the other class
> members' claims.  In the present case, the claims of the
> named plaintiffs are founded upon the same legal theory as
> those of the other plaintiffs---that defendant violated
> Section 1983 when it held them in custody after their
> scheduled release date, in violation of the Fourth, Fifth, and
> Eighth Amendments. Additionally, the alleged injuries
> suffered by the named plaintiffs arise from the same
> conduct that gave rise to the claims of the other class
> members, namely, defendant's failure to release them by
> midnight of their scheduled date of release.

214 F.R.D. at 35.

These statements cannot be made here in support of typicality.  Without

consideration of the underlying merits of the individual plaintiffs' claims for purposes of

the class action inquiry, it is plain that the facts, theories, and alleged injuries of their

respective claims are highly individualized.  None has a claim that is typical of those of

the other would-be class representatives, much less of the unnamed class members whose

claims, like their numbers, are left to imagination and speculation as a result of the wide-

ranging character of the Complaint and the proposed class. We show this as to each

named plaintiff, as follows:

**Plaintiff DL**—He claims behavioral and emotional problems and speech and

language delays.  He alleges that defendants failed to "identify, locate, evaluate, or offer

him special education services," but he also acknowledges in his Complaint that he has

received evaluations and an IEP meeting.  (Complaint Paras. 5-15).

**Plaintiff JB**—He claims autism.  He alleges that defendants failed to "identify, locate, and evaluate him in a timely and adequate manner" and failed to offer him special education services.  But he acknowledges in his Complaint that his mother learned that special education services were available from DCPS.  He received a speech evaluation and an occupational therapy evaluation from DCPS.  DCPS also drafted an IEP for special education services to be offered to him.  (Complaint Paras. 16-29).

**Plaintiff OUL**—He claims delays in speech, cognitive, and gross motor development, physical difficulties in walking, and asthma. He alleges that defendants have failed to "identify, locate, evaluate or offer" him special education services. But he acknowledges in his Complaint that he began to receive occupational, physical and speech therapy for his disabilities, beginning at the age of two, provided by the D.C. Early Intervention Program of the D.C. Department of Human Services, an agency of defendant District of Columbia. He acknowledges attending a transition meeting with DCPS and has just turned three.  He is still receiving therapy. (Complaint Paras. 30-39).

**Plaintiff DC**—She claims speech, language, physical and cognitive delays.  She alleges that defendants failed to "identify, locate, evaluate, or offer" her special education services. But she acknowledges in her Complaint that she has had "numerous evaluations that reveal potential disabilities."  She has just turned three.  (Complaint Paras. 40-45.).

**Plaintiff FD**—He suffers from a number of medical conditions, and claims significant delays in gross and fine motor and visual motor skills, as well as delays in visual-perceptual, problem-solving, and communication skills.  But he acknowledges in his Complaint that he received services at home through the Early Intervention program of DHS.  He also acknowledges that DCPS drafted an IEP for him requiring specialized

instruction and occupational, physical and speech language therapy, as well as a nursing care plan, the services of a dedicated aide, an adaptive chair, and services in an accessible building to accommodate his walker. He began receiving special education services in March 2005. His claims appear to be limited to an alleged failure by DCPS to offer him compensatory education for a period of time in which he did not receive appropriate instruction and also a failure to provide him with the special chair he needs to perform activities while seated. (Complaint Paras. 46-54).

**Plaintiff TF**—He claims speech and language deficits. He alleges that defendants failed to evaluate him for special education services and to provide special education and compensatory education services. But he acknowledges in his Complaint that he received a private speech and language evaluation and that DCPS agreed to provide him with four sessions weekly of language services, which commenced in July of this year. (Complaint Paras. 55-65).

What emerges from this recital is the immense variety and uniqueness of each named plaintiff's claims. The disabilities and alleged injuries are different; the degree and nature of contacts with the defendants are different; the alleged deprivations and derelictions of duty by the defendants under the various statutes and regulations are different; the potential defenses arising on the face of plaintiffs' own statements of their claims are different. No plaintiff's claim is the same as any other's. In view of the broad and amorphous character of the proposed class, one can only guess at how the plaintiffs' claims may or may not resemble those of unnamed class members.

These are more than the minor "factual variations" between claims which the

Court in Bynum found insufficient to preclude a typicality finding.  214 F.R.D. at 35.

The differences in Bynum merely related to the number of days each putative class

member had been overdetained. Otherwise the claims of each class member were

identical, factually and legally, and the claims of the named class representatives typified

the claims of all class members, factually and legally.  This Court there said, "[f]or

purposes of the typicality inquiry, the fact that some class members may have been

overdetained for one day, and others for weeks or even months is not determinative." Id.

Likewise, in its second Bynum opinion, establishing a subclass of persons subjected to

strip searches, this Court said, "…all named plaintiffs and putative class members

advance the same legal theory based on the same set of facts…"  Opinion of August 11,

2003, at 7.

We do not believe that a finding of typicality can be supported on the mélange of

factual and legal claims of the would-be class representatives in the present case.  ". . .

typicality may be defeated if factual differences between the representatives' claims and

class claims predominate. If a court must make highly fact-specific or individualized

determinations in order to establish a defendant's liability to each class member,

typicality will not be met." 5 Moore's Federal Practice, supra, Section 23.24[4], at 23-94,

and cases therein cited.

**D.     Adequacy of Representation.**

We have no doubt or question as to the qualifications of plaintiffs' counsel to

represent the putative class.  We cannot say the same, however, as to the adequacy of the

would-be class representatives, who are the parents or guardians of the 6 child plaintiffs.

This is so for the following reasons:

Only two of the would-be class representatives (the parents of FD and the mother of TF) plead that they have exhausted administrative remedies.  See Complaint Paras. 54 and 65.  The IDEA provides comprehensive administrative remedies, including the right to a due process hearing before a Hearing Officer, an administrative decision within a prescribed period of time, and administratively mandated relief of various kinds, including compensatory education in appropriate cases. See, e.g., Cummings v.District of Columbia, Civil Act No. 04-1427(RMC), decided September 7, 2005, at 5-6 (Collyer, J.).

As to the four plaintiffs who have not exhausted administrative remedies, their claims are subject to dismissal.  Cummings, supra.  We are moving to dismiss their claims.  If we are right, they (or their parents or guardians) cannot be viewed as adequate class representatives.  See Rodriquez v. U.S. Dep't of the Treasury, supra, 131 F.R.D. at 11. (The availability of such a defense against their claims also argues against the typicality of these claims, since it is well settled that defenses unique to particular plaintiffs may preclude a finding of typicality.  See Hagen v. City of Winnemucca, supra,108 F.R.D. at 65.).

The remaining two plaintiffs may not be adequate (or typical) class representatives of all the class members sought to be covered by the Complaint's dragnet approach. Where typicality is lacking, so is adequacy.  Williams, supra, opinion at 13. There is also authority that, if a named plaintiff is receiving special education services, his claims for declaratory and injunctive relief are mooted. Adaskunas v. Negley, supra,626 F.2d at 605.  Since these named plaintiffs by their own statements in the Complaint are receiving such services, this appears to moot their claims and render them inadequate class representatives.

Here again, the Court's task would be easier if plaintiffs had not asserted such a wide variety of factual and legal claims and proposed such a broad and amorphous class. A more searching inquiry into the adequacy of these would-be class representatives may be required than we have thus far had the opportunity to conduct.  If this were the only essential element under Rule 23(a) open to question—which it is not—the Court might wish to reserve decision on that element until such an inquiry has been made.

### E.     Rule 23(b)(2)

Since plaintiffs bring this case solely as a Rule 23(b)(2) class action, the remaining inquiry is whether "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

If plaintiffs had limited their prayers for relief to injunctive and declaratory relief, this factor might be more readily analyzed.  However, they have not done so. In paragraph (6) of their prayer for relief, they seek, "[a]n order requiring defendants to reimburse plaintiffs for the funds expended to obtain evaluations, special education and related services as a result of defendants' violations of federal law."

Whatever terminology plaintiffs employ, such as "reimbursement of funds," this is a request for money from defendants.  It is money damages in substance, whatever label is attached to it.  See Eubanks, supra, 110 F.3d at 95.

As such, it raises the question whether the claims for damages predominate over the claims for equitable or declaratory relief. If they do, it may not be a proper Rule 23(b)(2) action, even if all the other essential elements under Rule 23 are established.  As our Court of Appeals cautioned in Eubanks, supra, 110 F.3d at 94-95:

> [T]he underlying premise of (b)(2) certification---that the
> class members suffer from a common injury that can be
> redressed by class-wide relief—begins to break down when
> the class seeks to recover back pay or other forms of
> monetary damages to be allocated based on individual
> injuries.

See also Williams, supra, opinion at 14.

This Court has referred to this as "an important threshold issue." Bynum, supra,
214 F.R.D. at 38. The Advisory Committee Notes to the 1966 amendment to Rule 23
explain that subsection (b)(2) "does not extend to cases in which the appropriate final
relief relates exclusively or predominantly to money damages."

Where individualized proof is necessary to determine money damages for each
class member—as appears to be the case here—the monetary damages are not incidental
to injunctive or declaratory relief, and class certification under Rule 23(b)(2) is
inappropriate. See Lonergan v. AJ's Wrecker Service, 1999 U.S. Dist. LEXIS 11190 at
19 (N.D. Tex. 1999). Cf. Lemon v. Int't Union of Operating Engineers, Local No.139,
216 F.3d 577, 580 (7th Cir. 2000). In Lemon, the Seventh Circuit reasoned:

> Rule 23(b)(2) operates under the presumption that the
> interests of the class members are cohesive and
> homogeneous such that the case will not depend on
> adjudication of facts particular to any subset of the class
> nor require a remedy that differentiates materially among
> class members. A suit for money damages, even if the
> plaintiffs seek uniform, class-wide equitable relief as well,
> jeopardizes that presumption of cohesion and homogeneity
> because individual claims for compensatory or punitive
> damages typically require judicial inquiry into the
> particularized merits of each individual plaintiff's claim.

At this point, we have no idea what the magnitude of the monetary claims of the
purported class in the present case is, making it exceedingly difficult, if not impossible,
for us to argue and for the Court to decide whether the monetary claims predominate.

18

We have received some of this information, about one individual named plaintiff in the initial disclosures made by plaintiffs to us.  But we still do not know any of this information as to unnamed members of this putative class of indeterminate size and amorphous scope.  If plaintiffs dropped this particular prayer for relief, the Court's task would be greatly simplified.  If they are not willing to do so, the Court's task is more complicated.  Once again, even if all the other elements under Rule 23 were established—which they are not—it might be necessary for the Court to reserve decision on this element required for certification until the contours and size of these claims become clearer.

## II.     The Court May Exercise Discretion to Deny Certification Even Where All the Elements Are Established under Rule 23.

A further consideration must be introduced.  Where individual plaintiffs make claims and seek declaratory and injunctive relief which would inure to all members of the proposed class in any event—as appears to be the case here—the Court may exercise discretion to decline to certify the class as unnecessary and complicating the management of the litigation for no good reason.

Typical is the observation of the Court in Women's Health Center of West County v. Webster, 670 F. Supp. 845, 852 (E.D. Mo. 1987), aff'd, 871 F.2d 1377, 1384 (8th Cir.1989):

> Even if the Court were to find that plaintiffs had met their burden in satisfying the prerequisites to the maintenance of a class action, it would decline to certify the proposed classes.  When declaratory and injunctive relief is sought on behalf of a class, and when the benefits of the relief sought will benefit all members of a proposed class, a court may exercise its discretion and decline to certify the class [citations omitted].  As the relief requested by plaintiffs would inure to the benefit of all of the members of the

> proposed classes, the Court finds that no useful purpose
> would be served by permitting the case to proceed as a
> class action.

See also Local 1928, American Federation of Government Employees v. Federal Labor

Relations Authority, 630 F. Supp. 947, 948 n. 2 (D.D.C. 1986) (June Green, J.); Kansas

Health Care Ass'n v. Kansas Dep't of Social and Rehab. Services, 31 F.3d 1536, 1548

(10th Cir.1994).

   Denial of certification as unnecessary, or unnecessarily burdensome, has been

found particularly appropriate where requested relief would be directed to a government

entity which would be expected to implement the same relief for all similarly situated

persons.  See, e.g., Lincoln CERCPAC v. Health and Hosps. Corp., 920 F. Supp. 488,

493-94 (S.D.N.Y. 1996), and cases cited therein; Ad Hoc Committee to Save Homer G.

Phillips Hosp. v. City of St. Louis, 143 F.R.D. 216, 221 (E.D. Mo. 1992); Kow v. New

York City Housing Authority, 92 F.R.D. 73, 74 (S.D.N.Y. 1981), and cases cited therein;

Ruiz v. Blum, 549 F. Supp. 871, 878 (S.D.N.Y. 1982), and cases cited therein;  Stanton v.

Board of Education of Norwich Central School District, 581 F. Supp. 190, 195 (S.D.N.Y.

1983), and cases cited therein.

Thus, as Judge Gesell stated in Bradley v. Kissinger, 418 F. Supp. 64, 67 (D.D.C. 1976):

> . . . even in the absence of a class appropriate equitable
> relief can be fashioned, if warranted, which will as a
> practical matter protect those people plaintiffs seek to
> represent, and therefore it is unnecessary and inadvisable to
> encumber this suit with the burdens of a class action.

   As Chief Judge Jones said in Berlin Democratic Club v. Rumsfeld, 410 F.

Supp.144, 163-64 (D.D.C. 1976):

> A [Rule 23](b)(2) class action may be maintained where
> "the party opposing the class has acted or refused to act on

> grounds generally applicable to the class,", thereby making injunctive or declaratory relief "appropriate."  Where the burdens of maintaining a (b)(2) class action are substantial . . . and where injunctive relief will run to the class at any rate, there is no need for certification of the class.

See also Edwards v. Schlesinger, supra, 377 F. Supp. at 1093, and cases cited therein.

Of course, if we were wrong on this point and no such relief could be fashioned because the claims of the individual plaintiffs are so individualized and the relief sought is unique to each of them, our case against certification would only be reinforced. Several of the essential elements under Rule 23(a), including commonality, typicality and adequacy of representation would clearly be absent.  Either way, the case for certification has not been made here with the rigor and clarity required.

## CONCLUSION

For these reasons, the motion for class certification should be denied.

Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General of the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

**/s/ Edward P. Taptich**
EDWARD P. TAPTICH [#012914]
Chief, Equity Section 2

**/s/ Daniel A. Rezneck**
DANIEL A. REZNECK [#31625]
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001

**/s/ Eden I. Miller**
EDEN I. MILLER [#483802]
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001

October 31, 2005                      (202) 724-6614