UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

MARCUS BYNUM, et al.　　　　　)
　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
On behalf of all others　　)
similarly situated,　　　　)
　　　　　　　　　　　　　　)
　　　Plaintiffs　　　　　　)
　　　　　　　　　　　　　　)
　　　　　v.　　　　　　　　)
　　　　　　　　　　　　　　)
GOVERNMENT OF THE DISTRICT OF COLUMBIA)
_____Defendant)

CLASS ACTION

THIRD AMENDED COMPLAINT FOR MONEY DAMAGES AND INJUNCTIVE RELIEF
AND PRELIMINARY INJUNCTION AND JURY DEMAND

Introduction

This is an action brought by each of Marcus Bynum, Kim Nabinette, Leroy Thomas, Dianne Johnson and Julian Ford (the "Overdetained Named Plaintiffs") on his or her own behalf and on behalf of the class defined below injured by the Government of the District of Columbia's pattern and practice of allowing its Department of Corrections to overdetain inmates, and by Odie Washington's deliberate indifference to the overdetentions. To overdetain means holding a detainee or prisoner in a District of Columbia Department of Corrections ("Department of Corrections") facility past midnight of his or her release date, as defined below.

1



PLAINTIFF'S
EXHIBIT

10

ALL-STATE LEGAL®

2.  This is also an action brought by Kim Nabinette, Leroy Thomas and Julian Ford (the "Strip Search Named Plaintiffs") on his or her own behalf and on behalf of a Strip Search Class of overdetained individuals who were injured by Defendant District of Columbia's conduct in subjecting them to blanket strip searches and visual body cavity searches (both described below) after they were returned to a Department of Corrections facility after a judicial determination that there was no longer a basis for their detention, other than to be processed for release, and by Odie Washington's deliberate indifference to the policy and practice of blanket strip searches and visual body cavity searches.

3.  The Overdetained Named Plaintiffs bring this action against the Government of the District of Columbia under Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, to enforce the Fourth, Fifth and Eighth Amendments, for injuries suffered by them, because defendant overdetained them and other members of the class at a Department of Corrections facility.

4. The Strip Search Named Plaintiffs bring this action against the Government of the District of Columbia under Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, to enforce the Fourth and Fifth Amendments, for injuries suffered by them,

2

because defendant subjected them and the class to the blanket
strip searches.

### Jurisdiction and Venue

5. This Court has jurisdiction over the Overdetained Named
Plaintiffs and Strip Search Named Plaintiffs' § 1983 claims
pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

6. Venue is appropriate in this District.  Each of the claims for
relief arose in this judicial district.

### Class Action Allegations

7. The Overdetained Named Plaintiffs bring this action under
Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of
Civil Procedure on behalf of a class consisting of: (a) Each person
who has been, is, or will be incarcerated in any District of Columbia Department of Corrections
facility in the three years preceding the filing of this action up to and until the date this case is
terminated; and (b) who was not released, or, in the future, will not be released by midnight on
the date on which the person is entitled to be released by court order or the date on which the
basis for his or her detention has otherwise expired.

8. The Strip Search Named Plaintiffs also bring this action under
Rules 23(a), 23(b)(2), and 23(b)(3) and (4)(B) of the Federal
Rules of Civil Procedure on behalf of a class consisting of each
member of the class who was, or will be, in the three years

preceding the filing of this action, up until the date this case
is terminated: (i) in the custody of the Department of
Corrections; (ii) taken to court from a Department of Corrections
facility; (iii) ordered released by the court or otherwise became
entitled to release by virtue of the court appearance because the
charge on which he had been held was no longer pending or was
dismissed at the hearing, was ordered released on his own
recognizance, or had posted bail, was sentenced to time served,
was acquitted or was otherwise entitled to release; (iv) was not
the subject of any other pending case or cases which imposed any
condition of release other than personal recognizance; (v) was
not the subject of any detainer or warrant; (vi) was returned to
the DC Jail or CTF from court, to be processed out of Department
of Corrections custody; and (vii) was subjected to a strip search
and/or visual body cavity search without any individualized
finding of reasonable suspicion or probable cause that he was
concealing contraband or weapons; before being released,
regardless of whether he was overdetained.

9. Certification of these two classes under Federal Rule of Civil
Procedure 23(b)(2) is appropriate, because defendant District of
Columbia has a pattern and practice that has uniformly affected
all members of both classes, and injunctive relief against
Defendants will benefit each and every plaintiff and class
member.

4

10.  The classes are entitled to injunctive relief, for example, setting up an independent monitor to supervise the Department of Corrections' inmate management system to ensure that all inmates are released on or before their release dates, and other relief as specified below.

11.  Certification of the classes under Federal Rule of Civil Procedure 23(b)(3) is also appropriate, in that common questions of law and fact predominate over any individual questions, and a class action is superior for the fair and efficient adjudication of this controversy as detailed below.

12.  Regarding the Overdetained Named Plaintiffs, and members of the class, there are no individual questions on the issue of liability other than whether an individual has been overdetained, and the answer to that question can be determined by ministerial inspection of the Department of Corrections' records.

13.  Records available for inspection on the overdetentions include the Superior Court computer system and the Department of Corrections computer systems (JACCS, CRISYS and the "Count" computer, all defined below), R&D logbook of commitment and release orders and U.S. Marshall Forms 40, and files, logbooks and other paper records maintained by the Corrections Department.

14.  Regarding the Strip Search Named Plaintiffs, and members of the Strip Search Class, there are no individual questions on the

5

issue of liability, because neither the DC Jail nor CTF keeps records of the searches and therefore neither the DC Jail nor CTF can show that any of the searches were conducted based on an individual determination of reasonable suspicion.

15.  Furthermore, it is per se unreasonable to subject any person to a strip search and visual body cavity search once the person has been ordered released.

16.  Among the questions of law and fact common to the classes are:

   a)  whether the Constitution provides a bright line, maximum length of time measured in hours beyond which Defendants cannot hold a person to perform administrative tasks incident to release before releasing that person from jail;

   b)  whether Defendants have exceeded that maximum for each class member;

   c)  whether Defendant District of Columbia has a pattern and practice of holding detainees and inmates past their release dates;

   d)  whether Defendant District of Columbia has a pattern and practice of being deliberately indifferent to the

rights of detainees and inmates by holding them past
their release dates;

e) whether Defendant District of Columbia's acts as
alleged herein violate the Constitution of the United
States by holding detainees and inmates past their
release dates;

f) whether Defendant District of Columbia has a policy of
and practice of subjecting persons to blanket strip
searches and visual body cavity searches after they
have become entitled to release;

g) whether such policy, if found to exist, violates the
Fourth and/or Fifth Amendments;

h) whether Odie Washington was deliberately indifferent to
the rights of inmates and detainees in the custody of
the Department of Corrections;

i) whether plaintiffs and the members of the Overdetention
Class and the Strip Search Class have sustained damages
and, if so, the proper measure of such damages; and

j) whether plaintiffs and the members of the Overdetention
Class and the Strip Search Class and future members are
entitled to equitable relief, and, if so, what is the
nature of that relief.

7

17.  Each of the Overdetention Class and the Strip Search Class is so numerous that joinder of all members is impracticable.  The exact number of Overdetention Class and Strip Search Class members is unknown to plaintiffs at this time, but is likely to consist of at least several hundred people.

18.  Defendant District of Columbia has within its records the names and addresses of all the current and past Overdetention Class and Strip Search Class members.

19.  Another factor making joinder impracticable is that the Overdetention Class and Strip Search Class include future inmates at Department of Corrections facilities, and the future population of such facilities is a group with fluid membership.

20.  The Overdetained Named Plaintiffs' claims are typical of the claims of the other members of the class, as plaintiffs and all other members of the class were injured by exactly the same means, that is, by the overdetentions.

21.  The Strip Search Named Plaintiffs' claims are typical of the claims of the other members of the Strip Search Class, as the Strip Search Named Plaintiffs and all other members of the Strip Search Class were injured by exactly the same means, that is, by the blanket strip searches.

8

22.  The Overdetained Named Plaintiffs and the Strip Search Named Plaintiffs will fairly and adequately protect the interests of the members of the Overdetention Class and Strip Search Class and have retained counsel who are competent and experienced in complex federal civil rights class action litigation and/or complex federal prisoner rights litigation.

23.  The Overdetained Named Plaintiffs and Strip Search Named Plaintiffs have no interests that are contrary to or in conflict with those of the class or Strip Search Class.

24.  The Overdetained Named Plaintiffs and Strip Search Named Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  The class action will be manageable because so many different records systems exist from which to ascertain the members of the putative Overdetention Class and Strip Search Class.

<u>Parties</u>

25.  Plaintiff Marcus Bynum is an adult resident of the District of Columbia.

26.  Plaintiff Kim Nabinette is an adult resident of the District of Columbia.

27.  Plaintiff Leroy S. Thomas is an adult resident of the District of Columbia.

28.  Plaintiff Dianne Johnson is an adult resident of the District of Columbia.

29.  Plaintiff Gloria Scarborough is an adult resident of the District of Columbia.

30.  Plaintiff Julian Ford is an adult resident of the District of Columbia.

31.  Defendant Government of the District of Columbia (hereinafter the District of Columbia or Defendant District of Columbia) is a municipal corporation capable of being sued under D.C. Code § 1-102.

<u>FACTUAL ALLEGATIONS</u>

<u>District Of Columbia's Pattern And Practice Of Overdetention and Illegally Strip Searching</u>

<u>Introduction and Description of the Overdetention Problem</u>

32.  The Department of Corrections has a long and documented history of overdetaining detainees and inmates past their release dates.

33.  "Overdetain" means holding a detainee or prisoner in Department of Corrections' custody past the person's release date.

34.  "Release Date" for each detainee or inmate is the day on which the person is entitled to be released by court order or the date on which the basis for his or her detention has otherwise expired.

35.  D.C. Code § 24-201.06 requires that a prisoner shall be released by the Department of Corrections on the date of the expiration of the prisoner's term of imprisonment, less any time credited toward the service of the prisoner's sentence. The federal rule is the same.  18 USCA § 3624(a).

36.  "Exit Date" for each detainee or inmate means the date on which he or she was actually released from the custody of the Department of Corrections.

### Odie Washington's Responsibilities for prisoners at the Department Of Corrections

37.  Odie Washington is Director of the Department of Corrections.

38.  Odie Washington has been the Director of the Department of Corrections since March, 1999.

39.  Odie Washington's duties include implementing and executing policies concerning the operation of the Department of Corrections facilities.

40.  Odie Washington has ultimate supervisory authority for all operations of the Department of Corrections.

41.  Odie Washington is ultimately responsible for the functioning of the Department of Corrections' records office, as defined below, and all other Department of Corrections facilities.

42.  Odie Washington is also responsible for ensuring that each employee of the Department of Corrections discharges his or her duties in accordance with the law and court orders.

43.  Odie Washington had and continues to have the duty to establish procedures and policies, and to train and to monitor Department of Corrections employees, to ensure the release on their Release Dates of all detainees and inmates in Department of Corrections' custody.

44.  Odie Washington had and continues to have the duty to establish procedures and policies, and to train and to monitor Department of Corrections employees, to prevent unreasonable strip and visual body cavity searches of individuals who are in Department of Corrections custody.

## Components of the Department of Corrections

45.  The District of Columbia Central Detention Facility ("DC Jail") is the primary facility used by the Department of Corrections to house inmates in the District of Columbia.

46.  The DC Jail houses about 2,000 prisoners at any one time.

47.  Most of the prisoners at the DC Jail are either pre-trial detainees, misdemeanants serving sentences, or parole and probation violators.

48.  The Department of Corrections also houses prisoners in the District of Columbia in its Correctional Treatment Facility ("CTF").

49.  CTF is a freestanding, privately-run facility about 500 feet from the DC Jail building.

50.  Prisoners in CTF remain in the custody of the Department of Corrections.

51.  CTF houses about 700 individuals at any one time.

52.  Most prisoners detained in CTF are either pre-trial detainees, misdemeanants serving sentences, or parole and probation violators.

53.  The Department of Corrections also houses prisoners at various halfway houses located in the District of Columbia.

54.  On information and belief, approximately several hundred prisoners are housed at various Department of Corrections halfway houses at any one time.

55.  Inmates housed at Department of Corrections halfway houses remain in the custody of the Department of Corrections, although they are permitted to leave the facilities in order to work, obtain drug or other substance abuse treatment, or for other purposes.

The Inmate Management System

56.  The records office located at the DC Jail ("Records Office") is responsible for administering and maintaining the records, including the judgment and commitment files, of all persons housed at the DC Jail, CTF and the halfway houses.

57.  The Records Office is responsible for ensuring that all persons housed at the DC Jail, CTF and the halfway houses are released according to their Release Dates.

58.  The District of Columbia Superior Court and the United States District Court for the District of Columbia use different computer systems from the computer system used by the Records Office.

59.  Release and commitment data entered into the court computer systems by courtroom clerks do not appear in the computer system

14

used by the Records Office, the JACCS system ("JACCS"), nor do they appear in CRISYS, another jail computer system for tracking inmates.

60. As a result, all release and commitment orders generated by judges in the Superior and District Courts on paper must be hand carried to the Records Office by marshals as prisoners are bused from the courthouse to the DC Jail.

61. All processing of release and commitment orders must be done by hand at the Records Office located at the DC Jail.

62. Release and commitment data entered into the court computer systems by courtroom clerks must be entered again by hand into JACCS and/or CRISYS.

63. The name and DCDC number (unique jail identification number) of every inmate physically entering or leaving the DC Jail is also entered by hand into the "Count" computer, a MacIntosh/Apple computer used to maintain a census of all inmates in the DC Jail at any one time.

### The Department of Corrections Policy and Procedure for Booking Prisoners into and out of Department of Corrections' Custody

64. Currently, the Receiving and Discharge Offices ("R&D") located at the DC Jail and CTF are the only place where people are booked into and out of Department of Corrections' custody.

65.  Prior to late 2000 or early 2001, the Department of
Corrections followed a practice under which most inmates taken
from custody of the Department of Corrections to court and
ordered released by a judicial officer because the charge was no
longer pending or because of a change in conditions of release
was returned to the DC Jail or CTF for processing for release
rather than being released from the courthouse.

66.  In late 2000 or early 2001, the Department of Corrections
instituted a policy under which every inmates taken from custody
of the Department of Corrections to court and ordered released by
a judicial officer because the charge was no longer pending or
because of a change in conditions of release was returned to the
DC Jail or CTF for processing for release rather than being
released from the courthouse.

The Department of Corrections Policy and Procedure for Processing
Court Returns

82.  Every weekday about 100 to 150 inmates are transported to
the District of Columbia Courts for court appearances, and then
returned to the DC Jail or CTF after their court appearances
("court returns").

83.  The court returns are under the constant supervision of
either Department of Corrections employees or United States
Marshals while in transit and while at the courthouse.

16

84.  While at the courthouse, court returns are not allowed to have contact with anyone (apart from Department of Corrections employees and United States Marshals) except for non-contact visits in the lockups with attorneys subject to supervision by United States Marshals.

85.  Court returns whose cases have been discharged are not given the option of being discharged from the courthouse.

86.  Every court return transported to the court for a court date is sent back to the DC Jail or the CTF following his court appearance, even if there is a judicial determination that there is no longer a basis for his detention.

87.  The Department of Corrections returns court returns with release orders back to the DC Jail or CTF so the Records Office can check for any warrants, detainers or holds on them before releasing them.

88.  Court returns initially go to a booking area separate from the DC Jail or CTF's main housing units called R&D.

89.  Some court returns entitled to release are released from the R&D booking and receiving areas before being booked back into the DC Jail or CTF.

90.  Court returns entitled to release who are released from the R&D booking and receiving are not subjected to a strip and visual

17

body cavity search.

91.  Some court returns entitled to release are booked back into the DC Jail or CTF's general populations and not released until a later date.

92.  The Records Office policy is to process the day's commitments before beginning to process the day's releases, so all commitments are processed before any releases are processed.

### The Department of Corrections' Policy and Procedure of Strip Searching and Full-Body Cavity Searching

93.  Upon returning to the DC Jail or CTF, prisoners are separated by sex, males into one area and females into another area.

94.  The inmates are placed in bullpens in either the male or female receiving rooms at R&D with other inmates returning from the courthouse.

95.  One of the walls of each bullpen room is partially made of glass and people from outside the area can look in.

96.  The partially glass wall of the bullpen looks out onto a hallway that is frequently traversed by Department of Corrections employees and inmates.

97.  Staff at the R&D subject every court return booked back into

the DC Jail or CTF's general population housing units through R&D
to a strip search and visual body cavity search without any
individualized finding of reasonable suspicion or probable cause
that the person is concealing contraband or weapons.

98.   The court returns being booked back into general population
line up at the door of the bullpens and begin the "break down"
process of discarding their clothes in preparation for leaving
the bullpens one at a time to be strip searched and visual body
cavity searched at a table at one end of each R&D processing
rooms.

99.   The standard strip search procedure of the Department of
Corrections for all detainees and inmates booked into the DC Jail
or CTF, whether new inmates or court returns who have been
ordered released, is the complete removal of all clothing and a
visual body cavity search.

100. The male R&D strip search and visual body cavity search
process involves having the arrested person remove all of his
clothing and place them on the table.  The arrested person's
hands, mouth and underarms are searched.  The arrested person is
then asked to spread his legs, lift up his testicles, and spread
his buttocks and a corrections officer visually inspects these
areas and looks into the rectum for contraband.

101. The female R&D strip search and visual body cavity search process involves having the arrested person remove all of her clothing and place them on the table.  The arrested individual's hands, mouth and underarms are searched.  The arrested person is then asked to spread her legs, lift up her breasts, and spread her buttocks and a corrections officer visually inspects these areas and looks into the rectum for contraband.

102. The Department of Corrections does not keep any logs or other records of any individual strip searches or visual body cavity searches performed in the R&D booking areas.

### The Cause of the Overdetention - Collapse of the Inmate Management System

103. The cause of the overdetention and illegal strip search problem is a deliberate indifference by Defendant District of Columbia to the rights of detainees and prisoners to be released on their Release Dates, inasmuch as the Department of Corrections has no effective inmate management system that can ensure release of prisoners by their Release Dates.

104. The fact that the Department of Corrections has no effective inmate management system has been documented by a series of reports and recommendations dating back at least 20 years.

105. On October 5, 1999, John L. Clark, Corrections Trustee for the District of Columbia, prepared a Report to the United States Attorney General entitled, "Review of the Handling of Leo Gonzales Wright and Similar Offenders Sentenced by the U.S. District Court for the District of Columbia" (the "Wright Report").

106. The Wright Report documented a long pattern of systemic problems dealing with case management, classification and records office management at the Records Office.  (Wright Report, Major Findings, F-14).

107. Among the major findings of the Wright Report were a lack of adequate written policy and procedures resulting in out-of-date policies that either were being ignored or were ineffective, which resulted in an inmate records office management system that was "overwhelmed and in distress and suffering from years of prolonged inattention from top management."  (Wright Report, Major Findings, F-14 and F-20).

108. The Wright Report also listed an extensive series of studies and recommendations that were "not seriously implemented" including studies dating back as far as 1976.  The studies mentioned and some of their principal recommendations were as follows:

21

- <u>1976 RMC Research Corporation Analysis</u>.  Major
  Recommendations: reorganization of the Records Office
  and increased staffing in the office.

- <u>1985 BOP Evaluation</u>.  Major Recommendations: creation
  of a headquarters level position at the Department of
  Corrections to provide guidance and written policy to
  the Records Office; increased Records Office staff; and
  restricted access to the Records Office and files.

- <u>1986 DOC Security Workgroup Study</u>.  Major
  Recommendations: creation of a system of judgment and
  commitment files separate from central inmate files;
  restricted access to the Records Office and
  institutional files.

- <u>1989 NIC Study</u>.  Major Recommendations: creation of a
  new records coordinator position with the person being
  given technical responsibility for the Records Office;
  standardization and organization of Records Office
  files; development of a staff training program;
  development of written policies and procedures;
  increased Records Office staffing.

- <u>1997 BOP Re-Evaluation</u>.  Major Recommendations:
  establish a Records Administrator who reports to the
  Deputy Director (also recommended in 1985); establish
  an Inmate Training Officer; creation of a sentence
  computation manual; creation of a Records Office manual
  detailing policies and procedures.

109. The Wright Report stated that "most of the studies [have]

had similar recommendations with little or no follow through by

the DOC."  (Wright Report, "DOC Inmate Classification, Case

Management, and Record Keeping," Chapter 3, p. 56).

110. On July 28, 2000, in response to U.S. District Court Judge

Royce Lamberth's April 12, 2000 Order to Show Cause, independent

consultant John R Shaw prepared a Report and Recommendation

concerning the erroneous release of Oscar Veal Jr. (the "Shaw Report").

111. The Shaw Report indicated that major recommendations addressed in the Wright Report, and reiterated in the Shaw Report, were not addressed by the Department of Corrections.

112. According to the Shaw Report, the Department of Corrections had no Records Office Administrator at the Headquarters level to supervise operations and institute training at the Records Office (Shaw Report, Major Findings, F-3).

113. The Department of Corrections (according to the same report) has failed to provide the Records Office, charged with maintaining and processing inmate release and commitment orders, a written policy manual directing personnel how to perform their jobs. (Shaw Report, Major Findings, F-1).

114. Employees of the DC Jail Records Office make up rules on an ad hoc basis. (Shaw Report, Major Findings, F-1).

115. Employees in the DC Jail Records Office receive little or no training. (Shaw Report, Major Findings, F-2).

116. Record keeping and file management at the Records Office is chaotic and slovenly and has been in this state since at least 1976, the date of the RMC Research Corporation Analysis, if not longer. (Wright Report, "DOC Inmate Classification, Case

Management, and Record Keeping, Chapter 3, p.54; Shaw Report, Major Findings, F-25 and F-26).

117. The Shaw Report concludes that the Records Office "is in shambles. Records are strewn everywhere." "There seems to be no accountability for record and file management." (Shaw Report, Major Findings, F-26).

118. The Shaw Report concluded that in addition to systemic problems at the Records Office, the office is staffed with under-performing employees who have been "dumped" there because of problems elsewhere. (Shaw Report, Major Findings, F-27).

119. On many days, less than one-half of the regularly scheduled employees needed to run the office show up for work. (Shaw Report, Major Findings, F-30).

120. Many other needed employees who do show up are routinely assigned to other departments in the jail. (Shaw Report, Major Findings, F-30).

121. The Shaw Report stated that the Records Office was in need of a complete overhaul. (Shaw Report, Major Findings, F-22)

122. On information and belief, many of the overdetention problems at Department of Corrections facilities are caused in part by Records Office employees inaccurately entering, or

failing to enter, release or commitment data into the JACCS system.

123. The Department of Corrections has recently aggravated the backlog of overdetained inmates by eliminating the midnight to 8:00 a.m. shift in the Records Office.

124. The Department of Corrections' policy of returning all court returns, even those whose cases have been dismissed, back to the DC Jail or CTF for processing swells the backlog of unprocessed inmates and is a major contributing cause of the Records Office's inability to process and release individuals on their Release Dates.

125. The Department of Corrections' policy of returning all court returns, even those whose cases have been dismissed, back to the DC Jail or CTF for processing costs taxpayers money, swells the population of the facilities unnecessarily, and causes inmate unrest.

126. The inability of the Department of Corrections to process and release individuals on their Release Dates leads to their being overdetained and illegally-strip searched.

<u>The Department of Corrections and Director Odie Washington's</u>

<u>Knowledge of the Collapse of the Inmate Management System</u>

127. Defendant District of Columbia has known of the slovenly and chaotic condition of the Records Office inmate management system for years.

128. A series of consultants to the Department of Corrections have detailed the problems in written reports, including the Wright Report, the Shaw Report and other reports listed above.

129. Moreover, jail officials have had personal knowledge of the problem for years.  For example, a 1998 memo by then Deputy Warden for Programs Mario L. Randle described the attitude of Records Office personnel as "a careless disregard for the public safety and the image and stature of the agency."

130. Former Warden Patricia Britton was the subject of an April 12, 2000 show cause order issued by Judge Lamberth that resulted in the Shaw Report.

131. Former Warden Patricia Britton was familiar with the findings in the Shaw Report when she was warden.

132. The Director of the Department of Corrections, Odie Washington, has been quoted in <u>The Washington Post</u> as stating he accepted the findings expressed in the Shaw Report.

26

<u>The Department of Corrections and Director Odie Washington's</u>

<u>Failure to Take Meaningful, Sustained Corrective Action</u>

133. Defendant District of Columbia, the Department of Corrections and Director Odie Washington have acquiesced in the Records Office's chaotic and slovenly procedures leading to the overdetention and strip search problems by failing to take any meaningful, sustained corrective action.

134. The Shaw Report found the Department of Corrections has no Record Office Administrator at the Headquarters level to analyze and implement the suggestions of consultants. (Shaw Report, Major Findings, F-3).

135. The Wright Report and the Shaw Report indicate that major recommendations of these reports and previous studies have not been implemented by the Department of Corrections.

136. The Shaw Report found that the Department of Corrections' "attention to the problems in the DC Jail Record Office is worse than the Consultant concluded after the initial Veal [Shaw] Report was written." (Shaw Report, Major Findings, F-22).

137. The Shaw Report found that the Department of Corrections has not yet decided "to devote the time and resources needed to resolve the many problems that manifest themselves almost daily" at the Records Office. (Shaw Report, Major Findings, F-22).

The Collapse of the Inmate Management System - A Longstanding, Pervasive and Continuing Problem Known to Jail Officials and City Officials

138. Recent notorious examples of overdetention show the overdetention and strip search problems persist.

139. Franklin Tyree, 44, was arrested November 13, 2001 on two bench warrants stemming from two misdemeanor charges of drinking in public and unlawful entry.

140. In the next 48 hours, the warrant on Franklin Tyree for unlawful entry was quashed, the charge of drinking in public was dropped, and he was ordered released on his own recognizance.

141. However, because of the Department of Corrections' chronic problems in handling inmate records, Mr. Tyree was not released from detention until April, 2002.

142. The most appalling recent example of overdetention in the DC Jail was the overdetention of Joseph Heard, a deaf-mute man, who was held for 669 days in 2000 and 2001 at the DC Jail after he was jailed even though a judge had ordered his immediate release.

143. Odie Washington, the Director of the District of Columbia Department of Corrections, said in an August, 2001 interview that responsibility for Heard's wrongful detention rested "solely on the Department of Corrections."

144. At least three dangerous felons have been mistakenly released from the DC Jail in recent years due to problems in the Records Office.

145. At least one D.C. Council member has recently acknowledged the gravity of the overdetention problem, and the consequences of erroneous release, and has conceded that an inadequate record-keeping department at the DC Jail is the cause.

146. D.C. Council member Kathy Patterson (D-Ward 3), who heads the D.C. Council committee that oversees corrections, is quoted in a May 2, 2002 Washington Post article as saying, "We are still not meeting even the basic minimum standards for record-keeping."

147. Referring to the Tyree and Hamilton releases by the Corrections Department, Patterson said, "It is outrageous from the standpoint of robbing someone of their freedom, but it is also outrageous from a public safety standpoint when you look at the [Hamilton] case."

148. A uniformed corrections officer told a person waiting for the release of an inmate at the jail on May 14, 2002 that one inmate had been intentionally overdetained for 24 hours because he allegedly talked back to a corrections officer processing his release.

149. Several attorneys recently calling the Records Office to obtain release for their clients held past their Release Dates have met with Records Office employees who do nothing about securing the release of an overdetained inmate even after being told by the attorney that the inmate is overdetained.

150. Many inmates cannot get out of jail on their Release Dates even after notifying their C&P officers (case managers) or jail officials in the Records Office that they are being overdetained.

151. Inmates routinely have to obtain attorneys or prisoner rights organizations on the outside to call the Records Office and fax over a certified copy of the judge's release order to the Records Office to obtain release in accordance with their Release Dates.

152. On information and belief, at any one time up to 5-20% of the Department of Corrections population is being held past their Release Dates.

153. Many inmates held at the District of Columbia Jail and CTF are overdetained by 24 hours or more because the breakdown of the inmate management system has resulted in a backlog of inmates awaiting release and so inmates who have been ordered released by a judge are held one or more days past their Release Dates.

154. Many inmates who have been ordered released by a court are detained for seven to nine hours past their Release Dates because the Department of Corrections has a written policy of not releasing inmates between midnight and 6:00 a.m.

155. This written policy of not releasing inmates between midnight and 6:00 a.m. was promulgated by memorandum dated August 21, 2000 from Director Odie Washington to Patricia Britton, then Warden of the DC Jail.

156. Two particularly egregious examples of overdetention that have occurred since Plaintiffs Bynum, Ugarte and Nabinette filed their original complaint in this case on May 16, 2002 are the cases of Plaintiff Leroy Thomas, overdetained for almost four months, and Plaintiff Dwight Blue, overdetained for almost seven months, detailed below.

157. On Monday, June 24, 2002, three of the eight individuals released from the DC Jail had been overdetained for three days each.

<u>Plaintiff Marcus Bynum's Overdetention By The DC Jail</u>

158. On or about Friday, May 5, 2000 Plaintiff Marcus Bynum was detained in the DC Jail.

159. Plaintiff Bynum's Release Date was August 16, 2000.

31

160. Plaintiff Bynum's Exit Date was September 20, 2000.

161. Plaintiff Bynum was overdetained for 35 days at a Department of Corrections facility.

162. The moving force behind Plaintiff Bynum's overdetention was the collapse of the Department of Corrections' inmate management system.

163. Plaintiff Bynum suffered loss of employment opportunities, anxiety, loss of freedom and other damages as a result of the over detention.

<u>Lazaro Ugarte's Overdetention By The DC Jail</u>

164. On or about Friday, February 13, 2002, Lazaro Ugarte was committed to the DC Jail.

165. Ugarte's Release Date was March 16, 2002.

166. Lazaro Ugarte's Exit Date was May 14, 2002.

167. Lazaro Ugarte was overdetained for 59 days at a Department of Corrections facility.

168. The moving force behind Lazaro Ugarte's overdetention was the collapse of the Department of Corrections' inmate management system.

169. Lazaro Ugarte suffered loss of employment opportunities, anxiety, loss of freedom and other damages as a result of the overdetention.

### Plaintiff Kim Nabinette's Overdetention By The DC Jail

170. On or about Thursday night, May 9, 2002, Plaintiff Kim Nabinette was committed to the DC Jail.

171. Plaintiff Nabinette's Release Date was May 10, 2002.

172. Plaintiff Nabinette's Exit Date was May 14, 2002.

173. Plaintiff Nabinette was overdetained for four days at a Department of Corrections facility.

174. The moving force behind Plaintiff Nabinette's overdetention was the collapse of the Department of Corrections' inmate management system.

175. Plaintiff Nabinette suffered anxiety, loss of freedom and other damages as a result of the overdetention.

### Robert Whoie's Overdetention By The DC Jail

176. Robert Whoie's Release Date from the DC Jail was May 10, 2002.

177. Plaintiff Whoie's Exit Date was May 14, 2002.

178. Plaintiff Whoie was overdetained for four days at a Department of Corrections facility.

179. The moving force behind Plaintiff Whoie's overdetention was the collapse of the Department of Corrections' inmate management system.

<u>Plaintiff Leroy Thomas's Overdetention By The DC Jail</u>

180. On or about January 31, 2002, Plaintiff Leroy Thomas was committed to the DC Jail.

181. Plaintiff Thomas' Release Date was February 6, 2002.

182. Plaintiff Thomas' Exit Date was May 30, 2002.

183. Plaintiff Thomas was overdetained for almost four months (or 113 days) at a Department of Corrections facility.

184. The moving force behind Plaintiff Thomas' overdetention was the collapse of the Department of Corrections' inmate management system.

185. Plaintiff Thomas suffered loss of employment opportunities, housing, anxiety, loss of freedom and other damages as a result of the overdetention.

34

## Plaintiff Dianne Johnson's Overdetention By The DC Jail

186. Plaintiff Dianne Johnson was committed to the DC Jail on April 10, 2002.

187. Plaintiff Johnson's Release Date was May 24, 2002.

188. Plaintiff Johnson's Exit Date was May 28, 2002.

189. Plaintiff Johnson was overdetained for four days at a Department of Corrections facility.

190. The moving force behind Plaintiff Johnson's overdetention was the collapse of the Department of Corrections' inmate management system.

191. Plaintiff Johnson suffered loss of employment opportunities, anxiety, loss of freedom and other damages as a result of the overdetention.

## Plaintiff Gloria Scarborough's Overdetention By The DC Jail

192. On February 21, 2001, Plaintiff Gloria Scarborough was committed to the DC Jail.

193. Plaintiff Scarborough's Release Date was August 18, 2001.

194. Plaintiff Scarborough's Exit Date was January 8, 2002.

195. Plaintiff Scarborough was overdetained for almost five months (or 143 days) in a Department of Corrections facility.

196. The moving force behind Plaintiff Scarborough's overdetention was the collapse of the Department of Corrections' inmate management system.

197. Plaintiff Scarborough suffered loss of employment opportunities, anxiety and freedom and other damages as a result of the overdetention.

### Plaintiff Julian Ford's Overdetention By The DC Jail

198. Plaintiff Julian Ford was committed to the DC Jail on April 7, 2001.

199. Plaintiff Julian Ford's Release Date was April 13, 2001.

200. Plaintiff Ford's Exit Date was April 14, 2001.

201. Plaintiff Ford was overdetained for one day at a Department of Corrections facility.

202. The moving force behind Plaintiff Ford's overdetention was the collapse of the Department of Corrections' inmate management system.

203. Plaintiff Ford suffered anxiety, loss of freedom and damages as a result of the overdetention.

Strip Searches Performed By The Department of Corrections

204. On May 10, 2002 Plaintiff Kim Nabinette was booked back into the DC Jail or CTF's general population and subjected to a strip search and visual body cavity search without any individualized finding of reasonable suspicion or probable cause that she was concealing contraband or weapons even though a court had ordered her release.

205. On May 10, 2002 Norman Hinton Jones was booked back into the DC Jail's general population and subjected to a strip search and visual body cavity search without any individualized finding of reasonable suspicion or probable cause that he was concealing contraband or weapons even though a court had ordered his release.

206. On May 20, 2002 Clifton A. Browne was booked back into the DC Jail or CTF's general population and subjected to a strip search and visual body cavity search without any individualized finding of reasonable suspicion or probable cause that he was concealing contraband or weapons even though a court had ordered his release.

207. On May 13, 2002, Mellissa Hughes was booked back into the DC Jail or CTF's general population and subjected to a strip search and visual body cavity search without any individualized finding of reasonable suspicion or probable cause that she was concealing

37

contraband or weapons even though a court had ordered her release.

208. On February 6, 2002, Plaintiff Leroy Thomas was booked back into the DC Jail or CTF's general population and subjected to a strip search and visual body cavity search without any individualized finding of reasonable suspicion or probable cause that he was concealing contraband or weapons even though a court had ordered his release.

209. On June 21, 2002, Dwaine Bethea was booked back into the DC Jail or CTF's general population and subjected to a strip search and visual body cavity search without any individualized finding of reasonable suspicion or probable cause that he was concealing contraband or weapons even though a court had ordered his release.

210. On June 21, 2002, Devon Robinson was booked back into the DC Jail or CTF's general population and subjected to a strip search and visual body cavity search without any individualized finding of reasonable suspicion or probable cause that he was concealing contraband or weapons even though a court had ordered his release.

211. On April 13, 2001, Plaintiff Julian Ford was booked back into the DC Jail or CTF's general population and subjected to a strip search and visual body cavity search without any

38

individualized finding of reasonable suspicion or probable cause
that he was concealing contraband or weapons even though a court
had ordered his release.

212. On June 6, 2002, Bruce Battle was booked back into the DC
Jail or CTF's general population and subjected to a strip search
and visual body cavity search without any individualized finding
of reasonable suspicion or probable cause that he was concealing
contraband or weapons even though a court had ordered his
release.

SUBSTANTIVE ALLEGATIONS

Count 1

§ 1983 Respondeat Superior Liability of Defendant District of
Columbia for the Constitutional Violations of its Employees

213. The Overdetained Named Plaintiffs and Strip Search Named
Plaintiffs reallege and incorporate by reference all allegations
set forth in the preceding paragraphs of this Complaint.

214. District of Columbia employees caused the intentional,
unjustified overdetention of the Overdetained Named Plaintiffs
and unreasonable strip searches of the Strip Search Named
Plaintiffs and all other class members and Strip Search Class
members by deliberate indifference to the risk of constitutional
injury of overdetention in administering records relating to

39

inmates' detention and release, and maintaining and acquiescing in a policy and practice of strip searching certain inmates.

215. Overdetaining any person violates that person's Fourth and Fifth and Eighth Amendment rights.

216. Unreasonably strip searching an inmate violates his Fourth and Fifth Amendment rights.

217. District of Columbia employees continue in such conduct up to and including the present.

218. At all relevant times such District of Columbia employees were acting within the scope of their employment, their acts were motivated by a desire to further the interests of the District of Columbia, and such District of Columbia employees were acting in furtherance of the business of the District of Columbia.

219. Defendant District of Columbia is therefore liable by virtue of respondeat superior under 42 U.S.C. § 1983 for constitutional injuries to the Overdetained Named Plaintiffs and Strip Search Named Plaintiffs and all other class members and Strip Search Class members caused by the conduct of such employees.

Count 2

§ 1983 Monell Custom and Practice Direct Liability of District of
Columbia for Violation of Fourth, Fifth and Eighth Amendment
Rights of Overdetained Named Plaintiffs and Class Members

220. The Overdetained Named Plaintiffs reallege and incorporate
by reference all allegations set forth above in this Complaint.

221. District of Columbia employees caused the intentional,
unjustified overdetention of the Overdetained Named Plaintiffs
and all other class members by deliberate indifference to the
risk of constitutional injury of overdetention in failing to
provide an effective system to govern the timely release of
prisoners in its detention facilities.

222. District of Columbia employees continue in such conduct up
to and including the present time.

223. Defendant District of Columbia was at all times relevant the
municipality in charge of the DC Jail, CTF and other Department
of Corrections facilities.

224. Defendant District of Columbia deliberately failed to train,
supervise and discipline its employees charged with monitoring
and ensuring release of inmates in Department of Corrections
facilities in accordance with their Release Dates.

41

225. There was an obvious, clear and present need for Defendant District of Columbia to train, supervise and discipline employees charged with monitoring and ensuring release of inmates in Department of Corrections facilities in accordance with their Release Dates and Defendant District of Columbia did not train, supervise and discipline them.

226. The pattern of unconstitutional conduct the Overdetained Named Plaintiffs and all other class members complain of was so pervasive that Defendant District of Columbia and its policy makers had actual and constructive notice of the need for training, supervision and discipline.

227. Defendant District of Columbia had both actual and constructive knowledge that employees charged with monitoring and ensuring release of inmates in Department of Corrections facilities in accordance with their Release Dates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to the Overdetained Named Plaintiffs and all other individuals confined at a Department of Corrections facility.

228. Defendant District of Columbia's policymakers engaged in a pattern of continued inaction in the face of the deliberate indifference of employees charged with monitoring and ensuring release of inmates in Department of Corrections facilities in

accordance with their Release Dates in violation of the Fourth, Fifth and Eighth Amendment rights of such individuals.

229. Defendant District of Columbia's actions, and failure to act, as described above, and deliberate indifference, directly and proximately and affirmatively were the moving force behind the violations of the Overdetained Named Plaintiffs and all other class members' Fourth, Fifth and Eighth Amendment rights.

230. Defendant District of Columbia's policy, custom and practice described above were the moving force behind the deprivations to the Overdetained Named Plaintiffs and all other class members' Fourth, Fifth and Eighth Amendment rights.

231. Defendant District of Columbia's actions, and failure to act, as described above, directly and proximately caused and was the moving force behind, the Overdetained Named Plaintiffs and all other class members' injury as described above.

Count 3

§ 1983 Monell Custom and Practice Direct Liability of District of Columbia for Violation of Fourth and Fifth Amendment Rights of Strip Search Named Plaintiffs and Strip Search Class Members for Illegal Strip Searches

232. The Strip Search Named Plaintiffs reallege and incorporate by reference all allegations set forth above in this Complaint.

43

233. District of Columbia employees conduct blanket strip and visual body cavity searches on all court returns booked back into Department of Corrections custody including those whose cases have been dismissed or who were sentenced to time served or were otherwise entitled to release.  The searches violate the Fourth and Fifth Amendment rights of such individuals.

234. Defendant District of Columbia's actions, and failure to act, as described above, directly and proximately and affirmatively were the moving force behind the violations of the Strip Search Named Plaintiffs and the Strip Search Class members' Fourth and Fifth Amendment rights.

235. Defendant District of Columbia's policy, custom and practice described above were the moving force behind the deprivations to the Strip Search Named Plaintiffs and the Strip Search Class members' Fourth and Fifth Amendment rights.

236. Defendant District of Columbia's actions, and failure to act, as described above, directly and proximately caused, and was the moving force behind the Strip Search Named Plaintiffs and the Strip Search Class members' injuries as described above.

## IRREPARABLE INJURY AND INJUNCTIVE RELIEF

237. Defendant is overdetaining members of the plaintiff class and unreasonably subjecting members of the Strip Search Class to strip searches and visual body cavity searches, which irreparably harms them, even if they are later able to recover compensatory damages.

238. Defendant's overdetaining members of the plaintiff class and performing illegally strip searches of the plaintiff Strip Search Class has irreparably harmed, and will continue to irreparably harm, members of the proposed plaintiff Overdetention Class and Strip Search Class, thus making declaratory and injunctive relief necessary.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court grant the following relief:

1.      grant a jury trial on all claims so triable;

2.      declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) and certifying the Overdetained Named Plaintiffs as the proper representative of the class consisting of each person:

(a) Each person who has been, is, or will be incarcerated in any District of Columbia Department of Corrections facility in the three years preceding the filing of this action up to and until the date

45

this case is terminated; and (b) who was not released, or, in the future, will not be released by midnight on the date on which the person is entitled to be released by court order or the date on which the basis for his or her detention has otherwise expired.

3.          declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) and (4)(B) and certifying the Strip Search Named Plaintiffs as the proper representative of the Strip Search Class consisting of each member of the class who was, or will be, in the three years preceding the filing of this action, up until the date this case is terminated:

a class consisting of each person who was, or will be, in the three years preceding the filing of this action, up until the date this case is terminated was:

(i) in custody of the Department of Corrections;

(ii) taken to court from a Department of Corrections facility;

(iii) ordered released by the court or otherwise became entitled to release by virtue of the court appearance because the charge on which he had been held was no longer pending or was dismissed at the hearing, was ordered released on his own recognizance, or had posted bail, was sentenced to time served, was acquitted or was otherwise entitled to release;

(iv) was not the subject of any other pending case or cases which

46

imposed any condition of release other than personal recognizance;

(v) was not the subject of any detainer or warrant;

(vi) was returned to the DC Jail or CTF from court, to be processed out of Department of Corrections custody; and

(vii) was subjected to a strip search and/or visual body cavity search without any individualized finding of reasonable suspicion or probable cause that he was concealing contraband or weapons;

(viii) before being released, regardless of whether he was overdetained.

4.      declare that defendants' acts alleged above violate the Fourth, Fifth and Eighth Amendments to the Constitution by overdetaining and illegally strip searching plaintiffs as alleged herein;

5.      preliminarily and permanently enjoin defendants from pursuing the course of conduct complained of herein;

6.      preliminarily and permanently enjoin defendants from pursuing settlement directly with any member of the putative Overdetention Class and Strip Search Class described herein unless that person is represented by counsel;

7.      award all plaintiffs compensatory and consequential damages in an amount to be determined;

8.      appoint an independent monitor to supervise the Records Office to ensure that all inmates are released on or before their Release Dates;

9.      appoint an independent monitor to supervise the R&D Offices to ensure that all detainees and inmates who have been ordered released are not strip searched or full-body cavity searched;

10.      award plaintiffs attorneys' fees and costs incurred in bringing this action under 42 U.S.C. § 1988; and

11.      grant such other relief as this Court deems just and proper.

Respectfully submitted,

_____

WILLIAM CLAIBORNE
D.C. Bar # 446579
Counsel for the Overdetained Named
Plaintiffs and Strip Search Named
Plaintiffs and the Class and the
Sub-class

717 D Street, NW
Suite 210
Washington, DC 20004
Phone 202/824-0700

48

Fax 202/824-0745


Respectfully submitted,


_____
LYNN CUNNINGHAM
D.C. Bar # 221598
Counsel for the Overdetained Named
Plaintiffs and Strip Search Named
Plaintiffs and the Class and the
Sub-class

Lynn E. Cunningham
Professor of Clinical Law
The George Washington University
Law School
2000 G Street, N.W.
Washington, D.C. 20052
Phone: (202)994-7659
Fax: (202)994-4693
email:
lcunningham@clinic.nlc.gwu.edu


JURY DEMAND

Plaintiffs demand a jury of six as to all claims so triable.


_____
WILLIAM CLAIBORNE
D.C. Bar # 446579
Counsel for the Overdetained Named
Plaintiffs and Strip Search Named
Plaintiffs and the class

DATED:  April 17, 2003