[Dated June 18, 2002]

AUG 0 5 2005

Honorable Paul L. Vance
Superintendent
District of Columbia Public Schools
825 North Capitol Street, NE, 9th Floor
Washington, DC 20002

Honorable Carolyn W. Colvin
Director
Department of Human Services
P. O. Box 54057
2700 Martin Luther King, Jr. Avenue, SE
Washington, DC 20032-0247

Dear Dr. Vance and Director Colvin:

The U.S. Department of Education's Office of Special Education Programs (OSEP)
conducted a review in the District of Columbia ending the week of March 26, 2001, for
the purpose of assessing compliance in the implementation of the Individuals with
Disabilities Education Act (IDEA) and assisting the District in developing strategies to
improve results for children with disabilities. The IDEA Amendments of 1997 focus on
"access to services" as well as "improving results" for infants, toddlers, children and
youth with disabilities. In the same way, OSEP's Continuous Improvement Monitoring
Process is designed to focus Federal, State and local resources on improved results for
children with disabilities and their families through a working partnership among OSEP,
the District of Columbia Public Schools (DCPS), the District of Columbia Department of
Human Services (DHS), parents, and advocates for children with disabilities in the
District.

A critical aspect of the Continuous Improvement Monitoring Process is the work of the
District's Steering Committee which included representatives from a broad array of
stakeholders from DCPS, DHS and OSEP. The Steering Committee assessed the
effectiveness of the District's systems for ensuring improved results for children with
disabilities and protection of their individual rights under the IDEA. In addition, the
Steering Committee will be designing and coordinating implementation of concrete steps
for improvement. Please see the Executive Summary to the report for a more detailed
description of this process in the District.

OSEP's review placed a strong emphasis on those areas of compliance within the IDEA
most closely associated with positive results for children with disabilities. In this review,
OSEP clustered the Part B (services for children aged 3 through 21) requirements into
four major areas: Parent Involvement; Free Appropriate Public Education in the Least

Plaintiffs' Exhibit
1

Page 2 – Dr. Vance and Director Colvin

Restrictive Environment; Secondary Transition; and General Supervision. Part C (services for children aged birth through 2) requirements were clustered into five major areas: Child Find and Public Awareness; Family-Centered Systems of Services; Early Intervention Services in Natural Environments; Early Childhood Transition; and General Supervision. Components of each major area were identified by OSEP as a basis to review the District's performance through an examination of indicators as they apply to DCPS and DHS.

The enclosed Report addresses strengths noted in the District; improved practices since initiation of the 1998 Compliance Agreement; areas needing corrective action because they represent noncompliance with the requirements of IDEA; and suggested areas to improve results for infants, toddlers, children and youth with disabilities and their families. Enclosed you will find an Executive Summary of the Report, an Introduction including background information, and a description of issues and findings.

DCPS's Fiscal Year 2001 IDEA Part B grant award was released subject to Special Conditions resulting from the expiration of the Compliance Agreement on March 10, 2001. Specifically, OSEP determined that DCPS had not ensured that:

(a) initial evaluations; placements and reevaluations are completed in a timely manner;
(b) all children with disabilities receive the related services specified on their individualized education programs (IEPs);
(c) hearing officer determinations are implemented within the time frame required by the hearing officer;
(d) children with disabilities receive services in the least restrictive environment;
(e) the requirements for successful transition of children with disabilities from secondary programs to post-secondary activities; and
(f) the procedure for determining whether a child needs a surrogate parent and for assigning a surrogate parent are implemented.

The Special Conditions specified in DCPS's 2001 grant award letter, as well as the findings included in this Report, must be addressed in DCPS's Improvement Plan. Specifically, the issues included in the Special Conditions letter must be resolved by June 30, 2002 in order for DCPS's to be eligible for its Fiscal Year 2002 IDEA Part B grant award. Given the serious and systemic nature of the findings included in this report, OSEP has grave concerns about DCPS's ability to resolve these issues in a timely manner.

This Report reflects OSEP's first monitoring review of the District's Part C system. The Report documents strengths of the program and suggestions to improve results for infants and toddlers with disabilities and their families. In addition, this Report documents significant areas of noncompliance that must be aggressively addressed by DHS through an Improvement Plan.

DCPS and DHS have indicated that this Report will be shared with members of the Steering Committee, the District's Interagency Coordinating Council and the District's Advisory Panel. OSEP will work with your Steering Committee to develop improvement

Page 3 – Dr. Vance and Director Colvin

strategies to ensure improved results for infants, toddlers, children and youth with disabilities and their families.

Thank you for the assistance and cooperation provided by your staff during our review. Throughout the course of the review, Anne Gay and Joan Christopher were responsive to OSEP's requests for information, and provided access to necessary documentation that enabled OSEP staff to work in partnership with the Steering Committee to better understand the District's systems for implementing the IDEA. We appreciate the effort made by District staff to arrange the public input process during the Validation Planning week and, as a result of their efforts, OSEP obtained information from parents, advocates, service providers, school and agency personnel, and school and agency administrators.

Thank you for your continued efforts toward the goal of achieving better results for infants, toddlers, children and youth with disabilities in the District of Columbia. Since the enactment of the IDEA and its predecessor, the Education for All Handicapped Children Act, one of the basic goals of the law, ensuring that children with disabilities are not excluded from school, has largely been achieved. Today, families can have a positive vision for their child's future.

While schools and agencies have made great progress, significant challenges remain. Now that children with disabilities are receiving services, the critical issue is to place greater emphasis on attaining better results. To that end, we look forward to working with you in partnership to continue to improve the lives of individuals with disabilities.

Sincerely,

Stephanie S. Lee
Director
Office of Special Education
 Programs

Enclosures

cc: Joan Christopher
 Anne Gay

# DISTRICT OF COLUMBIA MONITORING REPORT
## TABLE OF CONTENTS

| | |
|---|---|
| Introduction | 1 |
| I.  Part C: Child Find/Public Awareness | 3 |
|     A.  Area of Noncompliance | 4 |
| II.  Part C: Early Intervention Services in Natural Environments | 6 |
|     A.  Strength | 7 |
|     B.  Areas of Noncompliance | 7 |
| III. Part C: Family-Centered System of Services | 12 |
|     A.  Strength | 13 |
|     B.  Area of Noncompliance | 13 |
| IV.  Part C:  Early Childhood Transition | 15 |
|     A.  Area of Noncompliance | 16 |
| V.  Part C: General Supervision | 18 |
|     A.  Strengths | 19 |
|     B.  Area of Noncompliance | 19 |
|     C.  Suggested Area for Improved Results for Children and Youth with Disabilities | 21 |
| VI.  Part B: Parent Involvement | 22 |
|     A.  Strength | 23 |
|     B.  Area of Noncompliance | 23 |
|     C.  Suggested Area for Improved Results for Children and Youth with Disabilities | 23 |
| VII.  Part B: Free Appropriate Public Education in the Least Restrictive Environment | 25 |
|     A.  Strengths | 28 |
|     B.  Improved Practices since Initiation of the Compliance Agreement | 28 |
|     C.  Areas of Noncompliance | 28 |
|     D.  Suggested Areas for Improved Results for Children and Youth with Disabilities | 36 |
| VIII.  Part B: Secondary Transition | 37 |
|     A.  Strength | 38 |
|     B.  Improved Practices since Initiation of the Compliance Agreement | 38 |
|     C.  Areas of Noncompliance | 39 |
|     D.  Suggested Areas for Improved Results for Children and Youth with Disabilities | 40 |
| IX.  Part B: General Supervision | 42 |
|     A.  Strengths | 44 |
|     B.  Improved Practices since Initiation of the Compliance Agreement | 44 |
|     C.  Areas of Noncompliance | 45 |
|     D.  Suggested Areas for Improved Results for Children and Youth with Disabilities | 47 |

# INTRODUCTION

## The Part C Program in the District of Columbia

The Department of Human Services (DHS) is the lead agency responsible for ensuring the provision of early intervention services to infants and toddlers with disabilities ages birth to three and their families under Part C of the Individuals with Disabilities Education Act (Part C of IDEA) and Act 212 of the DC Code. The District of Columbia Early Intervention Program (DCEIP) is an administrative division of the Office of Early Childhood Development (OECD) that administers the District's child care subsidy program. The positioning of early intervention within the child-care agency has enabled the Part C program to promote early intervention in natural environments by assisting early intervention agencies in becoming licensed child care providers. In addition, DCEIP can access OECD training dollars to provide training to early childhood educators and family members on serving young children with disabilities in child care settings with typically developing children.

DCEIP has over 40 contracts with approximately 28 public and private service providers, universities and hospitals to assist with implementation of the various components of the Part C Program. The contracts address issues related to the implementation of the early intervention program including direct service delivery, evaluation and assessment, child find, service coordination/family support, staff development, promoting inclusive child care settings, mediation and due process hearings. On December 1, 1998, DCEIP reported that 249 infants and toddlers with disabilities (1.4 percent of children in the general population) were served by the direct service providers in the District.

One part-time and eleven full-time employees administer Part C. The Part C Coordinator is assisted by a part-time Special Assistant who works primarily on compliance with Federal requirements including personnel development, data collection and reporting, state application and assurances, and financing issues. The other staff positions include a child find/public awareness coordinator, an intake assistant, a parent liaison, a transition coordinator, a procurement assistant, and four early intervention specialists/service coordinators including one who is bilingual in Spanish and English.

## The Part B System in the District of Columbia

The District of Columbia is a unique city in that it is the nation's capitol and the seat of our Federal government. The city is divided into four quadrants, with further divisions that reflect diversity in ethnicity, business and historic relevance. The beauty of the city is in the blending of its architecture, monuments and museums, parks and restaurants. Until recently the city's public schools operated as the state educational agency (SEA) and a local educational agency (LEA). The mayor recently appointed individuals to implement a state education office (SEO) with certain limited responsibilities including the responsibility to recommend what State functions, including what Federal programs, should be moved to a SEO. The law establishing the SEO (the SEO Establishment Act of 2000) makes clear that State agencies, including the District of Columbia Public Schools (DCPS), currently performing State level functions must continue to perform such functions until the date those functions are transferred away pursuant to an approved transition plan. Therefore, during the time of the monitoring visit, DCPS was functioning as both the LEA and the SEA.

DCPS is responsible for the administration of all laws of the District regarding the establishment, maintenance, and conduct of the public schools pursuant to the D.C. Code and the District of Columbia Municipal Regulations (DCMR). DCPS, as the SEA, is responsible for ensuring the provision of a free

appropriate public education to all children and youth with disabilities, ages three to 21, residing in the District.

According to the District's 2001 June Enrollment Report there are 68,925 students whose residence is the District of Columbia, and who are enrolled in programs for grades K-12, in public schools. Approximately 11,488 students, ages three to 21, receive services in the District under Part B of the Individuals with Disabilities Education Act (Part B of IDEA).

Educational services for children and youth with disabilities are provided through one of two avenues, the DCPS's local educational agency or the charter schools that elect to be treated as LEAs for the purpose of Part B of IDEA. As of the 2001 June Enrollment Report, there were 150 public schools, serving grades K-12, in the District. In addition, there are four Department of Human Services (DHS) schools providing direct instructional support and related services. Children with disabilities also attend and participate in area charter schools (39), and non-public schools (83). There are two government agencies and eleven private providers that provide services to students eligible for special education, ages three through five. In Fiscal Year 1998-99, approximately 560 children with disabilities ages three to five were served in these programs.

# I. PART C: CHILD FIND/PUBLIC AWARENESS

The needs of infants and toddlers with disabilities and their families are generally met through a variety of agencies. However, prior to the enactment of Part C of IDEA, there was little coordination or collaboration of service provision, and many families had difficulty locating and obtaining needed services. Searching for resources placed a great strain on families.

With the passage of Part C in 1986, Congress sought to assure that all children needing services would be identified, evaluated, and served, especially those children who are typically underrepresented, (e.g., minority, low-income, inner-city, Indian and rural populations) through an interagency, coordinated, multidisciplinary system of early intervention services.

The District's early intervention system must include child find and public awareness activities that are coordinated and collaborated with all other child find efforts in the District. Part C recognizes the need for early referral and short timelines for evaluation as development occurs at a more rapid rate during the first three years of life than at any other age. Early brain development research demonstrates what early interventionists have known for years: children begin to learn and develop from before birth. Therefore, facilitating early learning and providing timely early intervention services to infants and toddlers with disabilities is critical.

**Validation Planning and Data Collection**

The District's Part C Self-Assessment identified some promising Child Find activities. Those activities included: hiring a Part C Intake Assistant; producing literature in six languages; securing contracts with eight local hospitals for child find, public awareness, evaluation, and/or providing services; training local physicians to increase awareness of early intervention; establishing stronger relationships between State agency representatives, Medicaid Managed Care Organizations, parents, and service providers to expedite early identification and referrals; and increasing the number of service coordinators on the DCEIP staff. Several areas were identified in the Self-Assessment as needing improvement: providing more culturally appropriate material and staff fluent in languages other than English and Spanish; increasing the number of children identified and referred for services; managing information; coordinating across agencies; and ensuring interagency agreements address all child find and public awareness system needs.

One of the focus questions about child find/public awareness asked during the public input meetings was: "Are there any barriers to the process of referring infants and toddlers to the Early Intervention (EI) system, or in obtaining evaluations?" Responses during the public input meetings generally confirmed those identified by the District's Steering Committee in the Self-Assessment and added others. Concerns included: materials are not always available in languages other than English; referrals from primary referral sources typically occur near the child's third birthday; public awareness materials are not available at all primary referral sites; and physicians, foster care workers, and child care personnel are not always aware of early intervention.

Based on information from the Self-Assessment completed by the Steering Committee, the public input sessions, DCEIP monitoring reports, and the annual report, OSEP staff determined that additional data should be collected. During the Validation Data Collection week, the following areas were emphasized: 1) sufficiency of public awareness materials; 2) coordination of child find efforts across agencies; and 3) timely referrals by primary referral sources.

To investigate these child find and public awareness issues, OSEP collected data from parents, service providers, administrators, interagency collaborators, and central office personnel throughout the District. Following are identified areas of non-compliance.

## A.  **AREA OF NONCOMPLIANCE**

**Child Find and Public Awareness activities are not sufficient to ensure that all infants and toddlers who are eligible for services are identified, located and evaluated**

The lead agency, with the advice and assistance of the State Interagency Coordinating Council, must implement a comprehensive child find system that includes the policies and procedures that the District will follow to ensure that all infants and toddlers who are eligible for services are identified, located and evaluated. 34 CFR §303.321.  In addition, the lead agency must ensure that its child find efforts are coordinated with all other major efforts to locate and identify children conducted by other state agencies responsible for administering the various education, health, and social service programs.  34 CFR §303.321(c)(1).  Public awareness materials must be prepared and disseminated by the lead agency to all primary referral sources to inform the public about the early intervention program, child find system, and the central directory.  34 CFR §303.320.  An effective early intervention program must meet the needs of historically underrepresented populations, particularly minority, low-income, inner-city and rural populations (34 CFR §303.1(d)) and must ensure that families of traditionally underserved groups have access to culturally competent services within their geographical area.  34 CFR §303.128(b).

DCEIP has not ensured that all children who may be eligible for early intervention services are identified, located and evaluated and that DCEIP's child find activities are coordinated with other major efforts to locate and identify children.  In addition, DCEIP has not ensured that its public awareness activities adequately inform the general public, including families, physicians and traditionally underserved populations, about the early intervention program.

In the District, child find activities are conducted by agencies with responsibility for implementing an array of health, education, and social services to children.  Both the DCPS Special Education Program and the Department of Health, Maternal and Child Health Program are responsible for child find activities in the District designed to locate children with specific developmental or medical concerns.  DCEIP child find activities are conducted within individual programs by numerous direct service grantees that are responsible for child find and dissemination of public awareness information within the agency. DCEIP has initiated three contracts for agencies to conduct child find activities and disseminate public awareness materials in child-care and other community centers that do not provide direct early intervention services. OSEP was unable to determine what linkages, if any, had been formed between the direct service grantees, the community contractors and other major child find initiatives, specifically DCPS.

None of the parents OSEP spoke with reported receiving materials nor were they informed about the availability of early intervention services from primary referral sources, such as hospitals and physicians. Instead, parents said the primary method of learning about the early intervention program is from other parents of children with disabilities.  According to parents and service providers, physicians are not aware of the early intervention program and recommend that parents "wait and see" if the child "outgrows" the concern expressed by parents regarding their child's development.  One parent reported that she talked to her child's pediatrician on three occasions about her son's delayed language development.  The pediatrician said that it was normal for a male with an older sister to experience delayed language.  Some parents told OSEP that only after their children began receiving early intervention services did the parents realize that there had, in fact, been public awareness materials posted in clinics, hospitals and other

service provider locations. Because staff from these facilities had not called these materials to the attention of parents, the parents did not understand that referral for early intervention services was an option for their families.

Service providers and administrators interviewed by OSEP stated that when programs are operating at capacity, efforts to find eligible children are less likely to occur. These staff members also told OSEP that when it is known that needed services will not be available, children may not be formally identified.

The District's Self-Assessment acknowledges that public awareness materials are not culturally and linguistically representative of all ethnic populations in the District. Some materials are available in English, Spanish, Vietnamese, Amharik, Chinese, and French. Administrators and service providers at most of the sites visited said that materials are not available at their facility in languages other than English or Spanish, although a small number of children whose first language is Vietnamese or Cantonese, or who speak African dialects are coming in for evaluations. One program administrator stated that their agency developed and distributed information about their services since they did not have DCEIP information to distribute.

## II. PART C: EARLY INTERVENTION SERVICES IN NATURAL ENVIRONMENTS

In creating the Part C legislation, Congress recognized the urgent need to ensure that all infants and toddlers with disabilities and their families receive early intervention services according to their individual needs. Three of the principles on which Part C was enacted include: (1) enhancing the child's developmental potential, (2) enhancing the capacity of families to meet the needs of their infant or toddler with disabilities, and (3) improving and expanding existing early intervention services being provided to children with disabilities and their families.

To assist families in this process, Congress also requires that each family be provided with a service coordinator to act as a single point of contact for the family. The service coordinator assures that parents are informed of the rights of children and families under Part C, arranges for assessments and IFSP meetings, and facilitates the provision of needed services. The service coordinator coordinates required early intervention services, as well as medical and other services the child and the child's family may need. Service coordination is an active, ongoing process. With a single point of contact, families are relieved of the burden of searching for essential services, negotiating with multiple agencies, and trying to coordinate their own service needs.

Part C requires the development and implementation of an IFSP for each eligible child. The evaluation, assessment, and IFSP process is designed to ensure that appropriate evaluation and assessments of the unique needs of the child and of the family, related to enhancing the development of their child, are conducted in a timely manner. Parents are active members of the IFSP multidisciplinary team. The team must take into consideration all the information gleaned from the evaluation and child and family assessments, in determining the appropriate services needed to meet identified needs.

The IFSP must also include a statement of the natural environments in which early intervention services will be provided for the child. Children with disabilities should receive services in community settings and places where typically developing children would be found, so that they will not be denied opportunities that all children have - to be included in all aspects of our society. In 1991, Congress required that early intervention services be provided in natural environments. This requirement was further reinforced by the addition of a new requirement in 1997 that early intervention can occur in a setting other than a natural environment only when early intervention cannot be achieved satisfactorily for the infant or toddler in a natural environment. In the event that early intervention cannot be satisfactorily achieved in a natural environment, the IFSP must include a justification of the extent, if any, to which the services will not be provided in a natural environment.

### Validation Planning and Data Collection

The District's Part C self assessment identified the following areas of concern: service coordinator responsibilities are not clear or monitored; most IFSP's reviewed identify only an interim service coordinator; families are not aware of the service coordinator or if service coordination is occurring; the need (or demand) for evaluation sites and evaluators is not clear; families are usually not involved in the evaluation process; family needs are not identified or addressed; data documenting service settings are not available; and services are not available in all geographic areas of the District.

Focus questions asked during the public input meetings were, "Do all infants and toddlers with disabilities and their families receive all the services they need, including service coordination," and "Where do

children receive their services (community settings, day care, homes, libraries)?" The concerns identified at the public input meetings are: family needs are not identified or addressed in the IFSP process; services are not coordinated across agencies; and services may be delayed due to staffing issues, conflicts with the payment source, and/or lack of transportation.

From the District's monitoring reports, public input meetings, and other information, it was determined that additional data should be collected during the Validation Data Collection week in the following areas: (1) service coordinator assignment and responsibilities; (2) timeliness of evaluations and accessing services; and (3) the IFSP process. To investigate these issues, OSEP collected data from local programs and service providers, parents, case managers/service coordinators, interagency collaborators, and central office staff. OSEP reviewed and analyzed the data and identified the following areas of non-compliance.

## A. **STRENGTH**

### **Coordinated efforts with the Child Care Services Division**

DCEIP has established an excellent working relationship with staff of the Child Care Services Division of the Office of Early Childhood Development. One of the results of the coordinated efforts has been to encourage centers that historically provided early intervention services to infants, toddlers and children with disabilities to become licensed as child care providers; thus, the overall capacity for child care services for infants and toddlers with disabilities has been increased in the District. In addition, the Child Care Services Division has provided training funds to DCEIP to support training of child care providers, parents and others in an effort to improve the quality of childcare for infants and toddlers with disabilities. The Child Care Services Division has also made available incentive grants to child care providers to encourage the increased enrollment of infants and toddlers with disabilities.

## B. **AREAS OF NONCOMPLIANCE**

### **1. Initial evaluations to determine eligibility are inadequate or incomplete**

Each early intervention system must include the performance of a timely, comprehensive, multidisciplinary evaluation of each child, birth through age two, referred for evaluation. 34 CFR §303.322(a)(1). The evaluation and assessment of each child must include an evaluation of the child's level of functioning in each of the following developmental areas: cognitive development; physical development, including vision and hearing; communication development; social or emotional development; and adaptive development. 34 CFR §303.322(c)(3)(ii).

DCEIP has not ensured that children receive a comprehensive multidisciplinary evaluation that includes an evaluation of the child's level of functioning in each of the developmental areas listed in the regulations.

Evaluation personnel, program staff and parents in all areas visited told OSEP that not all children received evaluations and assessments in all five developmental areas as required by Federal regulations. Even though professionals from at least two different disciplines evaluated children in the areas of their specific discipline (e.g. speech), staff at evaluation sites stated that not all children were evaluated in all five developmental areas. Program staff from all programs visited told OSEP that not all children received evaluations in vision and hearing. Parents concurred that their children did not receive evaluations in all developmental areas. Of the 40 IFSPs reviewed, 28 did not indicate an evaluation in either vision or hearing. See 34 CFR §303.344(a)(1).

When OSEP presented this data to DCEIP staff, they stated that it was their understanding that evaluations were to be multidisciplinary, but did not understand that the evaluation must address all five developmental areas.

## 2. Lack of individualized decision making by the IFSP team about needed early intervention services

The Part C regulations require, at 34 CFR §303.344(d)(1), that the IFSP for each infant or toddler with a disability include "a statement of the specific early intervention services necessary to meet the unique needs of the child and the family." An IFSP team, that includes the participants specified at 34 CFR §303.343[1], must develop all of the content of each child's IFSP, including the statement of specific early intervention services; the frequency, intensity and method of delivering the services, and any applicable payment arrangements. 34 CFR §303.344(d)(1). Types of early intervention services include (not an exhaustive list): assistive technology devices; audiology; family training, counseling, and home visits; health; medical services (only for diagnostic or evaluation purposes); nursing; nutrition; occupational therapy; physical therapy; psychological; service coordination; social work; special instruction; speech-language pathology; transportation and related costs; and vision. 34 CFR §303.12(d).

DCEIP has not ensured that decisions related to early intervention services are based on evaluations and assessments related to the unique needs of the child and family, and that decisions are made by all required members of the IFSP team.

As explained below, many individuals that OSEP interviewed in the District informed OSEP that decisions about needed early intervention services are based on provider availability and/or payment policies rather than the unique needs of the infant or toddler.

Administrators and providers in all sites visited told OSEP that most decisions regarding services were based on program capacity (current services offered) in a program geographically convenient for the family, rather than a determination by the IFSP team of the services most appropriate for the child and family. The administrators and providers stated that parents generally determine the program location after learning about a program from a variety of sources (for example, physicians, neighbors, friends). After the parents enroll their child in the program, the child is provided with the services available at that location if the services are supported by the primary payment source (usually the child's public and/or private insurance). If the program does not provide a service (i.e., speech) the child generally does not receive a discipline-specific evaluation or receive a service in that area even if concerns about that area were expressed at the time of referral. In addition, a service provided by the program will not be provided to the child if the child's insurance will not support the service provision. Determining services based on program availability does not ensure that the unique needs of the child and family are addressed. In

---

[1]  Consistent with 34 CFR §303.343(a)(1), "Each initial meeting and each annual meeting to evaluate the IFSP must include the following participants: (i) The parent or parents of the child. (ii) Other family members, as requested by the parent, if feasible to do so; (iii) An advocate or person outside of the family, if the parent requests that the person participate. (iv) The service coordinator who has been working with the family since the initial referral of the child for evaluation, or who has been designated by the public agency to be responsible for implementation of the IFSP. (v) A person or persons directly involved in conducting the evaluations and assessments in Sec. 303.322. (vi) As appropriate, persons who will be providing services to the child or family."

addition, the decision about service location may be guided by physicians' orders that specify a location, thereby limiting IFSP team options to consider other, perhaps more appropriate, service locations.

The DCEIP staff stated that "parent choice" was a primary determining factor throughout the processes of evaluation, assessment and development of the IFSP. Part C requires that parents be a part of the IFSP team making decisions about early intervention services; however, those decisions cannot be based solely on parent choice. Early intervention services must be based on the unique needs of the child and family and be determined by the IFSP team through the evaluation and assessment process.

Most parents told OSEP that they were able to choose the service provider for their child and family. OSEP was told by parents that when they chose to have services provided at home, the agency providing home services did not have any openings. Parents also stated they were not told of the availability of center-based service when home-based service was not available. In that situation, children waited for service until a home provider was available. One parent waiting for home-based service learned from a neighbor about center-based service. She did not hear about the possibility of services in a center from her service coordinator. In a different area of the city, a parent told OSEP that she wanted services in the home, but was instead offered center-based services that required a bus ride for her child. Service coordinators also stated that it was not possible for families to receive services in the home as often as recommended because the services were not always available. In those cases where home-based services were not available, families would receive services provided by center-based programs.

## 3.  Lack of all required content in IFSPs

The IFSP must contain a statement of specific early intervention services necessary to meet the unique needs of the infant or toddler and the family, including the frequency, intensity, and method of delivering services, as well as the projected dates for initiation of services.   To the extent appropriate, the IFSP must also include medical and other services that the child needs, but are not required under Part C.  34 CFR 303.344(d)-(e)

DCEIP has not ensured that the IFSP includes the frequency, intensity and method of delivering services, the projected dates for initiation of services, specific early intervention services including nursing, audiology and transportation needed by the child and family, and medical and "other" services not required under Part C.

In 20 of 40 IFSP records reviewed, the frequency, intensity, and method of delivering services, projected dates for initiation of services and, as appropriate, other services were not described.  Service providers reported that some information regarding early intervention services, including nursing, audiology and transportation, would be found in nurses' notes, rather than included in the child's IFSP.  They also reported that the need for assistive technology equipment for home use is not noted on IFSPs.  The service providers confirmed that frequency, intensity and method of delivering services and the projected dates for initiation of services would be found in service provider notes, but not recorded in IFSPs.  Other services the child or family may be receiving from another agency would be noted in the social history of the child but not included on the IFSP.  Administrators also told OSEP that frequency, intensity and method, projected date for initiation of services, and other services are not included in IFSPs.

## 4.  Failure to complete evaluations within 45 days of referral

The Lead Agency must ensure the "…performance of a timely, comprehensive, multidisciplinary evaluation of each child referred for evaluation…" 34 CFR §303.322(a). Unless exceptional

circumstances exist, the evaluation and initial assessment of each child must be completed within 45 days after the child is referred for an evaluation. In the event of exceptional circumstances that make it impossible to complete the evaluation and assessment within 45 days (e.g., if a child is ill), public agencies will document those circumstances and develop and implement an interim IFSP, to the extent appropriate and consistent with §303.345(b)(1) and (b)(2). 34 CFR §303.322(e).

DCEIP has not ensured that all children who are referred are evaluated within the 45-day timeline. In three of the five sites visited, parents and staff members indicated that when programs were operating at capacity, children were not evaluated and were instead placed on waiting lists. Many of the children on the waiting lists are children who are "known" to be eligible for Part C services (i.e. have a condition or syndrome that automatically makes a child eligible), but who do not have IFSPs. Program administrators told OSEP that a child known to be eligible who is receiving child care services from a program that also offers early intervention services will be placed on a waiting list for an evaluation until an early intervention service slot becomes available. In one program site, the administrator reported that when there is a waiting list, children with the most significant developmental delays are evaluated and provided services before children with less severe delays. In 15 of the 40 IFSPs reviewed by OSEP, evaluations were not completed within the 45-day timeline.

OSEP identified two other factors that contributed to delays in conducting evaluations within the 45-day timeline. Four out of seven child find grantees interviewed by OSEP stated that it was their current practice to have consent forms signed by parents before a referral to DCEIP is made. Once a referral is made, DCEIP does not initiate contact with families; rather, DCEIP waits for parents to contact them. Both of these practices contribute to delays in conducting timely evaluations.

## 5. <u>Failure of service coordinator to coordinate all services</u>

Service coordination is an active, ongoing process that involves assisting families in gaining access to needed early intervention services and other services identified on the IFSP, coordinating those services, and facilitating the timely delivery of available services. Service coordination means "…the activities carried out by a service coordinator to assist and enable an eligible child…and the child's family to receive the rights, procedural safeguards, and services that are authorized to be provided…" by the early intervention program. One service coordinator is responsible for coordinating all services across agency lines and serves as the single point of contact in helping parents obtain the services and assistance they need. Service coordination involves "…continuously seeking the appropriate services and situations necessary to benefit the development of each child being served for the duration of the child's eligibility." 34 CFR §303.23.

Service coordination activities include: coordinating the performance of evaluations and assessments; facilitating and participating in the development, review, and evaluation of the IFSP; assisting families in identifying available service providers; coordinating and monitoring the delivery of available services; informing families of advocacy services; coordinating with medical and health providers; and facilitating the development of a transition plan to preschool services, if appropriate. 34 CFR §303.23(b).

DCEIP has not ensured that each child's family is assigned one service coordinator who completes all the service coordination functions specified by Federal regulations.

Service coordination in the District is described as a multi-stage process by DCEIP staff. Initially, an interim service coordinator, usually a DCEIP staff member, is assigned at the time of the referral. The interim service coordinator assists the family in the evaluation process, including informing the family of

its rights, reviewing the evaluation results, and providing information about the IFSP if the child is eligible for Part C. DCEIP service coordinators report that they are not present during evaluation procedures, but do attend IFSP meetings. If a family need is identified during the child's evaluation, the interim service coordinator refers the family to the facility that can address that need. When the IFSP is developed, a permanent service coordinator is assigned.

When asked questions about the specific service coordination responsibilities as outlined in 34 CFR §303.23, parents and service providers in four of the five sites said service coordinators do not provide all the assistance required by Part C. Parents said service coordinators told them problems with determining or changing service settings, accessing transportation, accessing equipment, coordinating medical services, identifying family needs, and resolving issues with payors would have to be addressed by the family. In one facility, parents reported they must seek assistance in the above-stated areas; no service coordinators provide information or assist in resolving problems or concerns related to these areas. One parent reported that service coordination duties were carried out by six different staff; the social worker, the case manager, the advocate, the service provider, the teacher and the clinical coordinator. In some cases, information about non-required services was provided by the services coordinator, but this activity was not recorded in IFSPs. OSEP also learned from one service provider that service coordinators do not ensure that children and families have access to needed assistive technology devices; instead the service coordinator tells parents that it is their responsibility to obtain such devices.

OSEP asked service coordinators and program administrators to explain who is responsible for coordinating needed services. In four of five programs visited by OSEP, service coordinators and administrators stated that in some cases, services were coordinated by other program staff, not by the service coordinator. In one case, a service coordinator stated that the clinical coordinator is responsible for monitoring the delivery of services to children, and that she was not sure who is responsible for evaluating the IFSP. Both monitoring the delivery of services and evaluating IFSPs are duties of the service coordinators, as set forth by Part C. In two facilities, the administrators stated that service coordination is an external function and that program staff are responsible for internal service coordination duties, such as evaluating the IFSP. One service provider stated that she, rather than the service coordinator, was responsible for facilitating and participating in the development, review and evaluation of the IFSP. In another facility, the service providers said that the discipline-specific individual (e.g. occupational therapist) would coordinate with any outside providers.

## III.  PART C:  FAMILY-CENTERED SYSTEM OF SERVICES

Research has shown that improved outcomes for young children are most likely to occur when services are based on the premise that parents or primary caregivers are the most important factors influencing a child's development.  Family-centered practices are those in which families are involved in all aspects of the decision-making process, families' culture and values are respected, and families are provided with accurate and sufficient information to be able to make informed decisions.  A family-centered approach keeps the focus on the developmental needs of the child, while including family concerns and needs in the decision-making process.  Family-centered practices include establishing trust and rapport with families, and helping families develop skills to best meet their child's needs.

Parents and other family members are recognized as the linchpins of Part C.  As such, States must include parents as an integral part of decision-making and service provision, from assessments, to the development of the IFSP, and through transition activities before their child turns three.  Parents bring a wealth of knowledge about their own child and family's abilities and dreams for their future, as well as an understanding of the community in which they live.

In 1986, Part C of the IDEA was recognized as the first piece of Federal legislation to specifically focus attention on the needs of the family related to enhancing the development of children with disabilities.  In enacting Part C, Congress acknowledged the need to support families and enhance their capacity to meet the needs of their infants and toddlers with disabilities.  On the cutting edge of education legislation, Part C challenged systems of care to focus on the family as the unit of services, rather than the child.  Viewing the child in the context of her/his family and the family in the context of their community, Congress created certain challenges for States as they designed and implemented a family-centered system of services.

### Validation Planning and Data Collection

The District's Self-Assessment identified the following strengths in family-centered services: parents participate on policy advisory committees/boards; parents participate in co-training and establishing family support groups; bilingual services are available to families; the number of service coordinators has increased; more service centers are fully inclusive; and service providers complete a daily activity log for parents. Concerns identified on the Self-Assessment include: child count data show an annual decrease in children served from 1997 to 1999; the central directory was not updated for 1999-2000; brochures are only in English and Spanish; no data are available to determine effectiveness of collaboration, impact on family centered practices, and the geographical availability of services; the extent of information dissemination to families is not known; and parents do not typically participate in child evaluations.

The following focus questions were asked during the public input process:  "How are families included and supported in the process of developing the IFSP, and in making decisions about their child's services?" and, "What family support services are available in your community?"

Based on the information collected from the self assessment, public input sessions, and State documents, the following concerns were identified to be investigated during the Validation Data Collection week: inclusion of the parents in the IFSP process; identification of family supports and services; and assistance provided to parents in locating resources and coordination of family services.

To investigate the issues identified through the validation planning process, OSEP collected data from local programs, parents and providers throughout the District relative to the involvement of parents in the IFSP process.

## A. STRENGTH

### Increased family involvement in the early intervention program

During the last few years, DCEIP has made significant changes to enhance the family centeredness of the program. The employment of a full-time parent liaison and a full-time bilingual service coordinator ensures that families' views were represented in all phases of DCEIP program implementation. The family liaison assisted DCEIP grantees in developing family centered approaches and organized a DCEIP family support dinner group designed to provide information to families through featured speakers; child care services are provided to make family participation possible. The bilingual staff encourages Spanish speaking families to get involved in DCEIP family events. DCEIP also sponsors other family events: an annual "Get Acquainted Luncheon", Family Fun Day, attendance of several families at the National Parent-to-Parent Conference. DCEIP supported 10 families at the National Parent-to-Parent Conference in Las Vegas, NV in May, 2000.

## B. AREA OF NONCOMPLIANCE

### Family supports and services not identified or included on the IFSP

Each early intervention system must include the performance of a timely, comprehensive, multidisciplinary evaluation of each child and a family-directed identification of the needs of each child's family to appropriately assist in the development of the child. 34 CFR §303.322(a). Family assessments must be family directed and designed to determine the resources, priorities, and concerns of the family and the identification of the supports and services necessary to enhance the family's capacity to meet the developmental needs of the child." 34 CFR §303.322(d). The IFSP, with the concurrence of the family, must include a statement of the family's resources, priorities and concerns related to enhancing the development of the child and a statement of the major outcomes expected to be achieved for the family and the specific early intervention services necessary to meet the unique needs of the family to achieve those outcomes. 34 CFR §303.344(b)-(d).

DCEIP has failed to ensure that the assessment identifies the needs of the family related to enhancing the development of the child and that the supports and services necessary to enhance the family's capacity to meet the developmental needs of their child are included on the child's IFSP.

In four of the five sites visited by OSEP personnel, parents and service providers report family needs are not identified in the evaluation process. Even though some service providers told OSEP that they assist parents to access other "non-required" services that families reported that they need (i.e. housing assistance), none reported providing a service to parents to assist them in enhancing their ability to meet the needs of their child.

In some cases, when completing the family needs section of the IFSP, the family history was recorded, but the resources, priorities, or concerns of the family as related to the supports and services necessary to enhance the family's capacity to meet the developmental needs of the child were not identified. In seven of the ten IFSPs that indicated family outcomes, the outcomes were tasks for the family to do (i.e. support child in learning how to walk), rather than services that would be provided to the family by the program.

In 30 of the 40 child records reviewed by OSEP, there was an indication that family services and supports were needed. None of these 40 records indicated that the parents chose not to participate in a family assessment. In 20 of the 30 records, there were no services identified to address the indicated family need. In the remaining ten records, there were seven that did include information about family services; however (as stated in the paragraph above) these services were, in fact, activities that were to be carried out solely by the family, without any involvement on the part of the program. In only three cases did IFSPs actually include family supports and services that were to be provided by the program.

## IV:  EARLY CHILDHOOD TRANSITION

Congress included provisions to assure that preschool or other appropriate services would be provided to eligible children leaving early intervention at age three. Transition is a multifaceted process to prepare the child and the child's family to leave early intervention services and begin a preschool program or obtain other community-based services. Congress recognized the importance of coordination and cooperation between the educational agency providing preschool services and the early intervention system by requiring that a specific set of activities occur as part of a transition plan. Transition activities typically include: 1) identification of steps to be taken to prepare the child for changes in service delivery and to help the child adjust to a new setting; 2) preparation of the family (i.e., discussions, training, visitations); and 3) determination of other programs and services for which a child might be eligible. Transition planning for children who may be eligible for Part B preschool services must include scheduling a meeting, with approval of the family, with the lead agency, the educational agency and the family, at least 90 days (with parental permission up to six months) prior to the child's third birthday. Transition of children who are not eligible for special education also includes convening a meeting to assist families in obtaining other appropriate community-based services. For all Part C children, States must review the child's program options for the period from the child's third birthday through the remainder of the school year and must establish a transition plan.

**Validation Planning and Data Collection**

**Self-Assessment:**  The DCPS Self-Assessment addressed all cluster areas for Part C and Part B. The section on Early Childhood Transition indicated there is no existing system for parents to train other parents although interest has been expressed by parents in doing so and there is no system in place to ensure that staff training is provided by qualified individuals.

The Self-Assessment indicated that the tracking system for identifying and following children with disabilities through the transition process has been a manual system under Part C and a computerized system under Part B. Tracking is hindered by inconsistency in reporting and follow-through by some of the early intervention providers. Information is often lost after the child is registered with DCPS resulting in misinformation about what needs to be done to complete eligibility determination and placement. Currently, parents may register their children at their local elementary school as a "non-attending" child, beginning at age 2 years 8 months. Registration is the mechanism for identifying a child in need of evaluation for eligibility for Part B services. At some DCPS elementary sites, there is a lack of understanding regarding "non-attending" registration that may prevent some children from being identified by the system and receiving appropriate evaluation for Part B eligibility in a timely manner.

Further, the Self-Assessment reported that not all early intervention providers consistently follow established protocol for transition and that many children are not being placed and receiving services by their third birthday. Concerns were expressed that existing memorandum of understanding between DCEIP and DCPS is not sufficiently comprehensive to ensure a seamless transition process.

One of the focus questions asked during the Part C public input meetings was, "By the child's third birthday, does transition planning result in the timely provision of needed supports and services?" Comments received during the public input meetings indicated that transition plans are not consistently developed 90 days before the child's third birthday; transition meetings that occur do not include all appropriate personnel; transition plans that are developed are not implemented by the child's third

birthday; tracking information from Part C to Part B is inadequate; and children not eligible for Part B services were not transitioned into other appropriate services.

After evaluating information obtained through previous monitoring, the Self-Assessment, public input process, and other available data, OSEP determined that additional data would be collected regarding: 1) timeliness of transition planning; and 2) the availability and provision of services by the child's third birthday.

To investigate these issues, OSEP collected data from parents, service providers, service coordinators, program administrators, other interagency collaborators, and from central office staff personnel. OSEP reviewed and analyzed the data and identified the following.

## A.  AREA OF NONCOMPLIANCE

### Lack of smooth and timely transition from Part C services to Part B services

Each State must include in its application the policies and procedures to ensure a smooth transition for children receiving early intervention services under Part C to preschool or other appropriate services. 34 CFR §303.148. The State must also ensure that the IFSP includes the steps to be taken to support the transition of the child, in accordance with 34 CFR §303.148, to preschool services or other services that may be available, if appropriate. 34 CFR §303.344(h).

DCEIP has the responsibility of informing DCPS that a child will soon reach the age of eligibility for preschool services under Part B. 34 CFR §303.148 (b)(1). In addition, DCEIP has the responsibility to convene a transition conference, with the permission of the parents, at least 90 days prior to the child's third birthday, if a child is likely to be eligible for Part B services. Participants in the transition conference include personnel from the lead agency, DCPS, and the family. DCEIP must review the child's program options for the period from the child's third birthday through the remainder of the school year and establish a transition plan. 34 CFR §303.148(b)(2)-(4).

DCEIP has not ensured that children receiving early intervention services under Part C receive a smooth transition to preschool or other appropriate services and that steps to support this transition are included in the child's IFSP. DCEIP also has not ensured that DCPS is informed of children who will soon reach the age of eligibility for preschool services. In addition, DCEIP has not ensured that a transition conference is convened at least 90 days prior to the child's third birthday, if a child is likely to be eligible for Part B services, that includes the family and personnel from the lead agency and DCPS.

In the 40 records reviewed, seven children were less than 90 days from their 3rd birthday. The following table contains the results of OSEP's review of these seven records.

### Analysis of OSEP Record Review – Transition Requirements

| Required Activity | Record Review Results |
|---|---|
| Number with transition conference | 0 of 7 |
| DCPS personnel invited | not documented in records |
| DCPS personnel attended | not documented in records |
| Transition steps on IFSP | 2 of 7 |
| Transition plan developed | 0 of 7 |

It should be noted that in some of the seven records reviewed, there was an indication that a transition conference had been scheduled, but such meetings were not to occur until after the child had turned three years of age.

DCEIP personnel and program administrators indicated that DCEIP inconsistently notified DCPS staff of scheduled transition meetings. DCEIP's policy is for transition conferences to occur 90 days before the child's third birthday; however, it is DCPS' policy that children can begin registering as non-attending students when the child is two years, 10 months. DCEIP personnel indicated that it was their belief that DCPS failed to attend transition meetings because the meetings occurred before the children were registered with DCPS.

Service providers submit to the DCEIP transition coordinator, on a monthly basis, a list of children who will be turning three within the next six months. DCEIP, in turn, provides this list to DCPS. However, the DCEIP transition coordinator told OSEP that DCPS staff are not invited to any transition meetings that do occur.

## V: PART C:  GENERAL SUPERVISION AND ADMINISTRATION

The lead agency is responsible for developing and maintaining a Statewide, comprehensive, coordinated, multidisciplinary, interagency early intervention system.  Administration, supervision and monitoring of the early intervention system are essential to ensure that each eligible child and family receives the services needed to enhance the development of infants and toddlers with disabilities and to minimize their potential for developmental delay.  Early intervention services are provided by a wide variety of public and private entities.  Through supervision and monitoring, the District ensures that all agencies and individuals providing early intervention services meet the requirements of IDEA, whether or not they receive funds under Part C.

While each State must meet its general supervisory and administrative responsibilities, the State may determine how that will be accomplished.  Mechanisms such as interagency agreements and/or contracts with other State-level or private agencies can serve as the vehicle for the lead agency's implementation of its monitoring responsibilities.

The District's role in supervision and monitoring includes:  (1) identifying areas in which implementation does not comply with Federal requirements; (2) providing assistance in correcting identified problems; and (3) as needed, using enforcing mechanisms to ensure correction of identified problems.

**Validation Planning and Data Collection**

OSEP engaged in several activities during the validation planning process to analyze information from the District, key stakeholders, and the general public in the identification of potential areas of strength and concerns relative to the provision of general supervision for Part C of IDEA. OSEP staff reviewed District monitoring reports, the District's self assessment, grant contracts, and the application for Federal Part C funds.

The District's Self-Assessment document identified the following areas of concern in general supervision of Part C: funding source (payor) policies guide service frequency, duration, and location decisions; families are not included in the self-monitoring process; family surveys are collected by grantees, but not analyzed; no data collection system is in place to measure performance results; monitoring of  service coordination is minimal; and formal, signed memorandums of understanding to ensure appropriate EIS and supports have not been established or are not current.

Based on information obtained through the Self-Assessment, the public input process, review of monitoring reports, local applications, and local and State procedures, OSEP identified the following concerns to further review during the data collection week: 1) finance and funding issues that effect service plan implementation; 2) system issues (i.e. staffing shortages; geographical disparity in service availability; data management system); 3) personnel training on Part C components such as EC transitions; and 4) the comprehensiveness of DCEIP monitoring procedures and follow-up to address deficiencies.

During the Validation Planning week, OSEP collected additional information on the issues identified through the validation planning process, and data related to DCEIP's responsibility for supervision and administration of the early intervention program.  This data was collected from parents, service providers, DCEIP staff, local program providers and administrators, health maintenance organization administrators, Interagency Coordinating Council members, other staff involved in identification or provision of services

to infants and toddlers across the District, and through record review. Analysis of the data collected resulted in identification of the following area of noncompliance.

## A. STRENGTHS

### 1. DCEIP organizational structure

The DCEIP has an organizational structure that results in most staff having dual assignments: as liaison to a direct service grantee for the provision of technical assistance and training and responsibility for the improvement of a single aspect of the early intervention service system (e.g., services to low incidence children, transition, parent involvement, child find, personnel development, etc). This organizational structure allows the DCEIP to maintain excellent communication with direct service grantees, to monitor the implementation of grant activities and to engage in capacity-building activities around one area of the system. DCEIP has increased from a staff of seven to one part-time and 11 full-time positions over a three-year period making the organizational structure possible. The increased staff includes a parent coordinator, two service coordinators (one bilingual) and two early intervention specialists.

### 2. Training activities

DCEIP has developed and conducted excellent training activities for professional and paraprofessional personnel who deliver services to infants and toddlers with disabilities and their families. Working through contractual arrangements with Georgetown University Child Development Center and the Lt. Joseph P. Kennedy Institute, DCEIP has made significant progress in increasing in-service training opportunities for early intervention personnel. At the time of the monitoring visit, DCEIP had established in-service training requirements for all personnel and had instituted a two-day "Foundation Training" conference which is the first level of training required for all early intervention staff. DCEIP continues efforts in the development of an Early Intervention Credential system to be implemented as the second, more intensive phase of training requirements.   In addition to the Foundation Training, DCEIP sponsors an annual early intervention conference for parents, professionals and others in the early intervention community and a two day Provider Orientation conference to assist grantees to understand their contractual responsibilities.

## B. AREA OF NONCOMPLIANCE

### Supervision and monitoring procedures do not ensure compliance

Each lead agency is responsible for the general administration and supervision of programs and activities receiving assistance under Part C and the monitoring of programs and activities used by the State to carry out Part C, whether or not these programs or activities are receiving assistance under Part C. 34 CFR §303.501(a). To meet the general supervision requirements, DCEIP must adopt and use proper methods of administering each program, including monitoring agencies, institutions, and organizations used by the District to carry out Part C, enforcing any obligations imposed on those agencies under Part C, providing technical assistance, and correcting deficiencies that are identified through monitoring. 34 CFR §303.501(b).  As detailed below, DCEIP has not met these supervision and monitoring responsibilities to ensure that all programs providing early intervention services meet the requirements of Part C of IDEA.

OSEP found that DCEIP's supervision and monitoring procedures and processes do not ensure the identification and correction of areas of noncompliance among participating programs and agencies in the Statewide Part C early intervention system.

General supervision in the District for Part C is a two-phase process. The first part of the monitoring process is a requirement that each grantee (most early intervention services are provided through grantees) submit a monthly or quarterly report of activities. All grants are cost-reimbursable, so grantees must submit monthly invoices to receive payment for completed activities. Grant terms are monitored when the invoice is reviewed and confirmed by DCEIP staff. Grantees are occasionally unable to meet all the conditions of the grant with DCEIP (i.e. staff shortage decreased program capacity). Funding is released only after grant terms are completed. If a component of the grant is not completed, funding is not released by DCEIP.

The second part of general supervision for Part C involves announced and unannounced visits to grantee sites by DCEIP staff. DCEIP staff tour facilities, observe therapy sessions, review IFSPs, interview parents, review therapy schedules, read family needs/satisfaction surveys, and conduct an exit conference with program administrators. During the exit conference, the following items are discussed: strengths of and recommendations for the program; requests from the grantee to the District's Early Intervention program; DCEIP requests for follow-up information; and areas of technical assistance needed and/or requested. A written report is completed following the visit.

DCEIP provided OSEP with its FY 2000 monitoring schedule and the most recent monitoring reports from programs visited by DCEIP. Of the five sites visited by OSEP staff, four had current monitoring reports from DCEIP. A monitoring visit had recently been conducted for a fifth site, but at the time of OSEP's visit, DCEIP had not yet issued the report.

OSEP reviewed DCEIP's Part C monitoring reports for the programs visited by OSEP. OSEP then collected program data to determine whether: (1) DCEIP, in its most recent reports, had identified all program deficiencies; and (2) the deficiencies identified by DCEIP in its most recent reports had been fully corrected. The table below summarizes the results of OSEP's analysis of DCEIP's monitoring efforts. It should be noted that these data are specific to the individual program; the data will be included in systemic findings, if appropriate, and addressed in other sections of this report.

### DCEIP MONITORING FINDINGS and OSEP VERIFICATION DATA

| Site | DCEIP Finding | OSEP Verification Data (related to DCEIP finding) | OSEP Verification Data (issue not identified by DCEIP) |
|------|---------------|---------------------------------------------------|--------------------------------------------------------|
| 1 | Service linkage[2] not on IFSP | Corrected - 5/5 IFSPs did have service linkage. | • 2/5 children on waiting lists for services (Program administrator indicated that they maintained a waiting list at all times)<br>• Parent notifications of IFSP meetings not timely on 5/5 IFSPs |

---

[2] OSEP staff understood the term "service linkage" as used in the District to mean medical and other services that the child needs, but are not required under Part C (See 34 CFR 303.344(e)(1)). The service coordinator is responsible for coordinating the provision of early intervention and other services (such as medical services for other than diagnostic and evaluation purposes) that the child needs or is being provided (See 34 CFR 303.23(a)(3)(ii))

| | | | |
|---|---|---|---|
| 2 | Service linkage not on IFSP<br><br>No indication of intensity and duration of services | Not Corrected - 5/5 IFSPs had no service linkage<br><br>Corrected - Frequency, intensity, and duration of services were indicated | • Hearing and vision assessment not completed in 8/9 records<br>• Required six-month IFSP review not completed in 6/6 records<br>• 5/6 children did not have IFSPs within 45-day time line<br>• 5 children had no IFSPs on file<br>• 4/4 IFSPs did not have transition steps<br>• 6/6 IFSPs did not indicate start date for services |
| 3 | Service linkage not on IFSP | Not Corrected - 4/5 IFSPs did not list "other" services | • 8/8 IFSPs not developed in 45 days<br>• 8/9 IFSPs did not indicate frequency, intensity, method of delivering services, location of services<br>• 7/8 IFSPs had no hearing or vision assessment |
| 4 | Vision/hearing not assessed in 3/4 IFSPs | Not Corrected - 3/5 IFSPs indicated no vision & hearing assessment | Current IFSPs needed for 2 children |

DCEIP is responsible for identifying areas of non-compliance, providing technical assistance, and ensuring the correction of deficiencies. From the above analysis of the DCEIP monitoring reports, a total of five deficiencies were identified in four sites. OSEP determine that only two of the five deficiencies identified by DCEIP in its monitoring reports had been corrected by the time of OSEP's visit.

DCEIP requires correction of deficiencies it identifies in individual child records sampled during program monitoring visits. However, DCEIP does not determine whether deficiencies identified in its sample exist in records it did not review, and if so, require that those records be corrected as well. As such, DCEIP's monitoring methods do not ensure systemic correction of program deficiencies.

## C. SUGGESTED AREA FOR IMPROVED RESULTS FOR CHILDREN AND YOUTH WITH DISABILITIES

DCEIP does not have a computerized data system. At the time of the OSEP visit, child counts and other data was being computed by hand. This practice may lead to significant errors and does not permit effective tracking of children to be implemented. DCEIP needs to establish a computerized database/management information system. The availability of a computerized database would allow DCEIP to maintain accurate information and demographics of services; track infants and toddlers as they move through the intake, evaluation, IFSP development processes; determine children who are ready to exit Part C services; and perform other relevant functions. In short, a computerized database would assist DCEIP in making data driven decisions and in exercising their oversight responsibilities.

# VI. PART B:  PARENT INVOLVEMENT

A purpose of the IDEA Amendments of 1997 is to expand and promote opportunities for parents and school personnel to work in new partnerships at the State and local levels.  Parents must now have an opportunity to participate in meetings with respect to the identification, evaluation, and educational placement of their child, and the provision of a free appropriate public education to their child.  Parental involvement has long been recognized as an important indicator of a school's success and parent involvement has positive effects on children's attitudes and social behavior.  Partnerships positively impact achievement, improve parents' attitudes toward the school, and benefit school personnel as well.

## Validation Planning and Data Collection

**Monitoring:**  OSEP's 1994 monitoring report resulted in a finding of noncompliance related to the provision of prior written notice to parents.  DCPS did not provide prior written notice in each of the required circumstances described in then §300.504(a) (now §300.503(a)).

**Self-Assessment:**  The DCPS Self-Assessment addressed all cluster areas for Part B and Part C.  The section on Parent Involvement indicated that joint parent/staff training began for the first time during the 1999-2000 school year.  No data are maintained to identify numbers of participants, content of training or whether participant numbers are increasing or decreasing.  Anecdotal evidence, as reported in the Self-Assessment, indicates that parental involvement and attendance is very low.

DCPS' explanation of parental rights and responsibilities is available in multiple languages, including Chinese, Vietnamese, Amharic, Spanish and French, as well as other languages, as needed.

**Public Input Process:** **One** of the focus questions asked during the public input meetings was: "How are parents involved in the education of their children with disabilities?"  Responses from parents indicated that the schools often do not notify them in advance of IEP meetings, their concerns are not addressed, and the school staff is not interested in meeting their needs.  Parents also reported that they do not have a firm understanding of their rights and responsibilities and that the procedural safeguards notice is too long and legalistic to be easily understood.

After discussing information obtained through previous monitoring, the Self-Assessment, public input process, and other available data, OSEP determined that additional data would be collected regarding whether:  (1) parents receive meeting notices; (2) parents receive needed modifications and accommodations to ensure that they understand the proceedings at meetings; (3) IEP progress is reported to parents at least as often as it is reported for nondisabled children; and (4) parents provide evaluation information during initial evaluations and reevaluations.

To investigate the concerns identified during the Validation Planning process, OSEP collected information from the review of children's records and District policies and procedures, and interviews with District personnel, local building administrators, teachers, related service providers, students and parents.

OSEP reviewed and analyzed the data and identified the following strength, area of noncompliance and suggested areas for improved results for children and youth with disabilities.

## A. STRENGTH

### Creation of a Parent Affairs Office

DCPS has created a Parent Affairs Office to provide information and support to parents, including parents of children with disabilities. The Office serves as a clearinghouse for information about events and activities within the school system that might be of interest to parents, and staff members are available to serve as liaisons between the parent and the local school. The Office makes available to parents information regarding training opportunities offered by DCPS. Staff members are available to address questions and concerns of parents regarding the special education process. During the public input process, many parents who have utilized the services of the Parent Affairs Office reported that staff members were helpful and knowledgeable and made the special education process easier and more understandable.

## B. AREA OF NONCOMPLIANCE

### IEPs do not include how parents will be informed of their child's progress

34 CFR §300.347(a)(7) requires that the IEP include a statement of how the child's parents will be regularly informed (at least as often as the parent of a nondisabled child) of their child's progress toward the annual goals and the extent to which that progress is sufficient to enable the child to achieve the goals by the end of the year.

As discussed below, OSEP found that DCPS failed to ensure that IEPs include a statement, consistent with 34 CFR §300.347(a)(7), regarding how the child's parent will be regularly informed of their child's progress toward the annual goals and the extent to which their progress is sufficient to enable a child with a disability to achieve his or her annual goals by the end of the year. The parent must be informed at least as often as parents are informed of their nondisabled child's progress.

Of 189 IEPs reviewed, 138 did not contain a statement of how the child's parents will be regularly informed of their child's progress toward meeting annual goals and the extent to which that progress is sufficient to enable the child to achieve the goals by the end of the year. While 51 IEPs contained a statement that progress would be reported quarterly, none of these IEPs included that the child's parents would be regularly informed of the extent to which that progress is sufficient to enable the child to achieve the goals by the end of the year. Personnel were interviewed in 16 buildings regarding progress reporting. Teachers in three buildings, and related service providers and building administrators in two buildings reported that progress is not reported for children with disabilities at least as often as progress is reported for nondisabled children. Personnel in 12 buildings stated that progress was reported to parents at least as often as it was reported for nondisabled children; however, this reporting did not include the extent to which progress is sufficient to enable a child with a disability to achieve his or her annual goals by the end of the year.

## C. SUGGESTED AREAS FOR IMPROVED RESULTS FOR CHILDREN AND YOUTH WITH DISABILITIES

### 1. Parent participation in the IEP when parent does not attend the meeting

34 CFR §300.345(c) requires that if neither parent can attend an IEP meeting, other methods must be used to ensure parent participation, including individual or conference telephone calls. DCPS staff expressed a

clear understanding of the need to utilize multiple methods and attempts to obtain parent participation in the meeting; however, these same staff did not indicate that when the parent did not attend the meeting, other methods had to be used to ensure parent participation, including individual or conference telephone calls. OSEP was told that attempts were made to obtain parent signatures on IEPs, but that no other attempts were made to obtain participation in determining the actual content of the IEPs if the parent could not attend the meeting. OSEP suggests that DCPS provide training to ensure a clear understanding of the need to utilize other methods to obtain parent participation in the meeting if the parent cannot attend the meeting.

## 2.  Evaluation data are not obtained from parents and considered

In 99 of 189 records reviewed, no evidence was found of parent information in the evaluation information. In other cases, where evaluation documents include parentally-provided evaluation information, it consisted only of information related to birth and early childhood development (e.g., pregnancy was full-term, child met developmental milestones, etc.), even for children who were being evaluated at the high school level. Historically in DCPS, the primary mechanism for obtaining information from parents is through the "Social History," which consisted of information related only to birth and early childhood development and was part of a standard battery of assessments conducted for all children as part of initial evaluation and each subsequent reevaluation. In its attempt to comply with the 1997 amendments to Part B regarding evaluation and reevaluation, DCPS obtains either no "Social History," (and therefore, parent information is not obtained), or, in some schools, a "Social History" is obtained for every child as part of the reevaluation process; however, DCPS outlines no steps to obtain other information from parents. Other than the social history, there is no other mechanism for obtaining parent information and participation in the evaluation/reevaluation process. OSEP suggests that DCPS develop a consistent mechanism for obtaining information from parents during the evaluation/ reevaluation process and that this information be documented and included in the evaluation/reevaluation report.

## VII.  PART B:  FREE APPROPRIATE PUBLIC EDUCATION IN THE LEAST RESTRICTIVE ENVIRONMENT

The provision of a free appropriate public education in the least restrictive environment is the foundation of IDEA.  The provisions of the statute and regulations (evaluation, IEP, parent and student involvement, transition, participation in large-scale assessment, eligibility and placement decisions, service provision, etc.) exist to achieve this single purpose.  It means that children with disabilities receive educational services at no cost to their parents, and that the services provided meet their unique learning needs.  These services are provided, to the maximum extent appropriate, with children who do not have disabilities and, unless their IEPs require some other arrangement, in the school they would attend if they did not have a disability.  Any removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

The IDEA '97 Committee Reports of the Senate Committee on Labor and Human Resources and the House of Representatives Committee on Education and the Workforce emphasized that too many students with disabilities are failing courses and dropping out of school.  Those Reports noted that almost twice as many children with disabilities drop out as compared to children without disabilities.  They expressed a further concern about the continued inappropriate placement of children from minority backgrounds and children with limited English proficiency in special education.  The Committees stated their intention that "once a child has been identified as being eligible for special education, the connection between special education and related services and the child's opportunity to experience and benefit from the general education curriculum should be strengthened.  The majority of children identified as eligible for special education and related services are capable of participating in the general education curriculum to varying degrees with some adaptations and modifications.  This provision is intended to ensure that children's special education and related services are in addition to and are affected by the general education curriculum, not separate from it."

### Validation Planning and Data Collection

**Monitoring:**  In 1994, OSEP reported that DCPS did not fully meet its responsibility to ensure that: (a) evaluations and reevaluations are completed in accordance with Federal requirements and are not delayed; (b) extended school year services are provided as needed to ensure the provision of a free appropriate public education to children with disabilities; (c) all related services needed by children with disabilities were provided; (d) all children with disabilities are provided a free appropriate public education that meets the standards of the SEA (specifically, some children with disabilities were provided a shortened school day); (e) the IEP meeting includes a representative of the public agency who meets the requirements of IDEA; (f) IEPs are reviewed at least annually; (g) IEPs contain appropriate content regarding annual goals, short-term objectives and a statement of needed transition services for children with disabilities, beginning at age 16 (or younger, if considered appropriate by the IEP team); and (h) children with disabilities are placed in the least restrictive environment.

In preparation for monitoring activities in 1997, public meetings were held in the District of Columbia. As a result of these meetings, DCPS and OSEP agreed that long-standing issues of noncompliance existed which had not substantially changed since the previous monitoring report was issued in 1994 and, in fact, had been in existence for a number of years prior to that report.  DCPS requested a Compliance Agreement that was signed on March 10, 1998, by Secretary Richard W. Riley for the Department of Education, and on March 16, 1998 by General Julius W. Becton, Jr., Superintendent of DCPS.  The Compliance Agreement addressed the following areas of noncompliance related to a free appropriate

public education: (1) untimely initial evaluations and placements, and reevaluations; (2) failure to provide related services; (3) failure to place students in the least restrictive environment; and (4) inadequate child find procedures. Additional areas of noncompliance that were part of the Compliance Agreement can be found in the Secondary Transition and General Supervision sections of this report. The Compliance Agreement concluded on March 10, 2001.

**Self-Assessment:** The DCPS Self-Assessment indicated that, based on data collected from April-September 1999, DCPS was completing an evaluation and placing children within 120 days of referral (as required by Federal law governing DCPS) 85 percent of the time, and that for September 1999 through May 2000, the corresponding completion rate was 97 percent. DCPS continues to have a backlog of reevaluations (1,019 as of March 2001). It is uncertain whether the numbers of qualified staff available to conduct and interpret evaluations is adequate. The Self-Assessment stated that the method for capturing, tracking and maintaining these data is insufficient for sound management decision-making.

The Self-Assessment reported that DCPS publicly distributes Child Find information, maintains a Child Find Hotline and Child Find screenings are conducted throughout the city. In addition, it stated that there is no permanent Child Find site which limits parent access to child find services and limited Child Find staff. There is very limited sharing of information between DCPS and the Part C program.

The Self-Assessment reported that 7.46 percent of all children, ages three through 21, received Part B services during the 1998-1999 school year, compared with a national average of 8.2 percent. Because DCPS is an urban district, it would be expected to have an even greater percentage of its children identified as children with disabilities. Therefore, it is likely that children with disabilities in the District are underidentified.

According to the Self-Assessment, training is a significant area of difficulty for DCPS. There are no training standards; no evaluation reports on training, no indication of school-based training; no reports of training from 4GL, a vendor hired to do training; an insufficient training budget ($50,000); and a single person to coordinate training for special education (only one of this person's several training responsibilities).

Extended school year data cannot be substantiated, according to the Self-Assessment. The data are vague with respect to the type of disabilities evidenced by children who receive extended school year services.

The Self-Assessment reported that for 1999-2000 school, 1.94 percent of children with disabilities were suspended or expelled from school compared with a rate of 2.33 percent for nondisabled children. In-school suspension rates were 1.86 percent and 2.61 percent respectively.

The Self-Assessment reported that for children with disabilities, State performance indicators are being developed that will be consistent with high expectations and standards for nondisabled children. It further reported that children with severe disabilities had been excluded from District-wide testing on the Standford Achievement Test, 9th Edition, for school years 1996-1999. In the 1997-1998 and 1998-1999 school years, there was a ten percent exclusion rate of children with disabilities from the Stanford-9.

The Self-Assessment addressed several placement issues. In the 1998-1999 school year, the cost for nonpublic residential placements was approximately $12,700,000. In addition, approximately 21 percent of children with disabilities receive services in nonpublic and residential treatment facilities. DCPS has expanded current programs and developed new programs to extend the continuum of services; however, DCPS does not track movement of students along the continuum of services.

DCPS has a weighted student funding formula for all appropriated funds which includes a base figure plus add-ons for Title I, bilingual and special education services. When available, Part B funds are utilized for that purpose, as part of the special education add-on. In addition, funds are provided to schools when children need significant levels of service in order for those schools to fund those services directly rather than placing students outside their neighborhood schools. The Self-Assessment reported that schools do not uniformly capture necessary data in the Special Education Tracking System for appropriate implementation of the weighted formula.

**Public Input Process:** The focus questions for the public input meetings included: "How do students with disabilities receive the special education and related services that they need?" "Do schools and preschools ensure that students with disabilities, regardless of placement, have access to the same curriculum as their nondisabled peers?" and "How do students with disabilities participate with nondisabled students?" Responses indicated that children are not receiving the related services they need. Parents also reported delays in obtaining assistive technology devices and services that their children need.

Parents reported that placements are predetermined for children in preschool and school-age programs and that available options are not considered or discussed with the parents. Parents also reported that some general education teachers do not accept children with disabilities into their classrooms and that there is no support for children with disabilities when they are placed in general education classrooms. Children are placed in "inclusion" classrooms without appropriate training for special and regular educators.

After discussing information obtained through the Self-Assessment, public input process, and other available data, OSEP determined that additional data would be collected regarding whether: (1) personnel shortages contribute to problems in the delivery of special education and related services; (2) initial evaluations and reevaluations are appropriate and conducted in a timely manner; (3) child find is effective; (4) children with disabilities have access to the general curriculum, especially in segregated settings; (5) assistive technology devices and services are included in IEPs when needed and are provided as indicated; (6) functional behavior assessments are provided when required and behavior intervention plans included in IEPs when appropriate; (7) children with disabilities are appropriately included in the Stanford-9 or an alternate assessment; (8) extended school year services are available and provided to ensure a free appropriate public education for children with disabilities; and (9) children with disabilities are placed in the least restrictive environment.

To investigate the concerns identified during the Validation Planning process, OSEP collected information from the review of children's records and State and local policies and procedures, and interviews of State personnel, local program administrators, teachers, related service providers, students and parents.

OSEP reviewed and analyzed the data and identified the following strengths, areas of noncompliance and suggested areas for improved results for children and youth with disabilities.

## A. STRENGTHS

### 1. Programs/services created to reduce out-of-district placements and creation of nonpublic office

DCPS has created programs at different levels (preschool, elementary, middle, high school) to reduce the need for out-of-district placements. Several programs have been created as transitional programs to facilitate the return of DCPS children with disabilities from nonpublic placements. In addition, DCPS has created a nonpublic office with responsibility for attending IEP meetings for children with disabilities placed in out-of-district placements by DCPS, monitoring the implementation of IEPs for these children, participating in decisions with regard to extended school year services and facilitating the return of children with disabilities to DCPS placements, when appropriate. The work of these individuals represents a significant change for DCPS and has increased the ability of DCPS to ensure appropriate educational programs for children with disabilities in nonpublic placements while more efficiently managing the available resources of the District.

### 2. Movement toward inclusive practices

DCPS only recently moved the responsibility for children with disabilities to the building level. Historically (until the fall of 1998) identification, evaluation, IEP and placement had been the responsibility of central office staff. Ownership of the process and responsibility for children with disabilities by the child's neighborhood school has resulted in an expansion of available services within local school buildings and reduced the need for children with disabilities to be placed out of their neighborhood school for special education purposes. While placement decisions may often be made on factors other than the individual needs of the child, as addressed in the finding below, many schools have now incorporated the inclusion of children with disabilities more fully into regular education classrooms, affording these children more complete access to the general curriculum and more opportunities to be educated with their nondisabled peers. There are many additional steps to be taken in this process, but significant progress has been made under the current Director of Special Education, a former principal who understands the challenges facing building-level administrators.

## B. IMPROVED PRACTICE SINCE INITIATION OF THE COMPLIANCE AGREEMENT

### Increased numbers of children with disabilities identified and located

DCPS manages an average of 200 referrals per month for special education evaluation. By the end of school year 2000-2001, over 1,000 children with disabilities had been identified since the December 1, 2000 Child Count. This represents a significant effort to correct the problem of underidentification that was reported in the Self-Assessment and, given the increase in the number of children referred, affects DCPS's ability to conduct timely initial evaluations of children with disabilities.

## C. AREAS OF NONCOMPLIANCE

### 1. Untimely initial evaluation and placement

34 CFR §300.343(b)(1) requires that DCPS ensure that within a reasonable period of time following the agency's receipt of parent consent to an initial evaluation of a child, the child must be evaluated and, if determined eligible, special education and related services must be made available to the child in accordance with an IEP. Section 130 of the District of Columbia Appropriations Bill for Fiscal Year 2001, which was in effect at the time of the monitoring visit, required that DCPS evaluate and, if eligible,

place a child who is referred for a special education evaluation within 120 calendar days of the referral. Section 121 of the District of Columbia Appropriations Bill for Fiscal Year 2002 contains the same provision.

As discussed below, OSEP found that DCPS failed to ensure that initial evaluations and placements were completed within 120 days of the referral for evaluation.

Under the Compliance Agreement, DCPS was required to report on the number of initial evaluations and placements that had not been completed within 50 calendar days for children referred prior to October 21, 1998 and those not completed within 120 calendar days for children referred after October 21, 1998. The number was to be reduced to zero prior to the end of the Agreement in March 2001. The final quarterly report under the Agreement, for the period ending on March 30, 2001, 143 initial evaluations and placements were not completed within 120 days for children with disabilities referred for evaluation after October 21, 1998.

OSEP recognizes that during the course of the agreement, DCPS has made significant progress in addressing this area of noncompliance and that, given the magnitude of noncompliance that existed at the beginning of the Compliance Agreement, the progress that DCPS has made in this area represents a significant achievement; however, the progress was insufficient to permit a finding of compliance with Part B.

## 2.  Untimely and inappropriate reevaluations

34 CFR §300.536(b) includes the requirement that a reevaluation of each child, in accordance with §§300.532-300.535 is conducted if conditions warrant a reevaluation, or if the child's parent or teacher requests a reevaluation, but at least once every three years. 34 CFR §§300.532-300.535 include requirements that (1) a variety of assessment tools and strategies are used to gather relevant functional and developmental information about the child, including information provided by the parent, and information related to enabling the child to be involved in and progress in the general curriculum, (or for a preschool child, to participate in appropriate activities), that may assist in determining whether the child is a child with a disabilities and the content of the child's IEP (34 CFR §300.532(b)); (2) in evaluating each child with a disability, the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified (34 CFR §300.532(h)); (3) assessment tools and strategies are used that provide relevant information that directly assists persons in determining the educational needs of the child (34 CFR §300.532(j)); (4) DCPS notify the parent if no additional information is needed and of the parent's right to request an evaluation to determine whether the child continues to be a child with a disability (34 CFR §300.533(d)); and (5) DCPS provide a copy of the evaluation report to the parent (34 CFR §300.534(a)(2).

34 CFR §300.533(a) requires that, as part of a reevaluation for each child with a disability, a group that includes the individuals described in 34 CFR §300.344, and other qualified professionals, as appropriate, review existing evaluation data including current classroom-based assessments, information provided by the parents and observations by teachers and related services providers regarding the child and determine what additional data, if any, are needed as part of the reevaluation to determine: (1) whether the child has a particular category of disability, or, in the case of a reevaluation of a child, whether the child continues to have such a disability; (2) the present levels of performance and educational needs of the child; (3) whether the child needs special education and related services, or in the case of a reevaluation of a child, whether the child continues to need special education and related services; and (4) whether any additions

or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the IEP of the child and to participate, as appropriate, in the general curriculum. DCPS must then administer tests and other evaluation materials as may be needed to produce the required data.

As discussed below, OSEP found that DCPS failed to ensure that reevaluations were conducted at least every three years and that the reevaluations met Part B requirements discussed above. OSEP also found that DCPS does not ensure that a group that includes the individuals described in 34 CFR §300.344, and other qualified professionals, as appropriate, reviews existing evaluation data and determines what additional data are needed in accordance with the requirements of 34 CFR §300.533(a). OSEP also found that DCPS is not conducting the evaluations and assessments, if any, that may be needed to provide the required data.

Under the Compliance Agreement, DCPS was required to report on the number of reevaluations that had not been completed within three years for children with disabilities identified with overdue reevaluations prior to January 5, 1998 (baseline data) and those identified with overdue reevaluations after January 5, 1998. The number was to be reduced to zero prior to the end of the Agreement in March 2001. The final quarterly report under the Agreement, for the period ending on March 30, 2001, reported 113 reevaluations still not completed for children with disabilities identified as having reevaluations overdue more than three years prior to January 5, 1998 and 906 for children with disabilities identified after January 5, 1998.

Personnel in nine of 16 buildings that OSEP visited during the week of March 26 reported waiting lists of students who had not been reevaluated in more than three years. This included building administrators in seven schools, teachers in five schools and related services personnel in five schools. They reported that a major reason for these waiting lists is that itinerant personnel needed to implement assessment procedures are not sufficiently available to complete all reevaluations within required time lines. For example, a psychologist may only be in a building one day per week, and therefore cannot complete the psychological portion of reevaluations in time to meet the three-year reevaluation time line. Similarly, because speech-language pathologists have caseloads as high as 90 children with disabilities, they cannot provide both direct services and complete their portion of reevaluations within the three-year time line. This data suggests that DCPS does not understand the requirement that a group that includes the required participants must review existing evaluation data and determine what additional data, if any, are needed. Not every reevaluation will require a psychological or speech and language assessment. In some instances, no additional data may be necessary.

Teachers and related service providers in all buildings visited by OSEP demonstrated a general lack of understanding regarding reviewing existing data. The following comments demonstrate that DCPS has not ensured that its personnel are accurately informed about current reevaluation requirements. In some cases, although previous evaluations do not exist, even though the child has been in special education for a number of years, the reevaluation "report" form indicates that no assessment is needed. In other instances, because there is previous evaluation information identifying the child as a child with a disability, there is a belief that no assessment is necessary. Teachers and providers reported no need for evaluation information in order to develop present levels of educational performance; identify the current educational needs of the child; or determine what special education and related services, supplementary aids and services or modifications and accommodations are needed to enable the child to be involved in and progress in the general curriculum, even though no current information was available to make these determinations. Most teachers interviewed by OSEP indicated that the psychologist determined what assessments would be conducted for a reevaluation. Again, this data suggests DCPS misunderstands the

requirements for conducting a reevaluation. The decision about what additional data, if any, is needed must be made by a group that includes the required participants. The requirement in 34 CFR §300.533(a) is to review existing evaluation data on the child, including not only previous evaluations, but information provided by the parents, current classroom-based assessments and observations by teachers and related services providers. On the basis of that review, and input from the child's parents, the group must identify what additional data are needed. The group may in fact determine that no additional data are needed. If the group determines that additional data are needed, DCPS must ensure that the evaluations necessary to produce the required data are conducted.

Although DCPS has determined that a vision evaluation, audiological evaluation, medical evaluation or neuropsychological evaluation is needed to collect additional data for a particular child, DCPS does not pay for these evaluations or ensure they are conducted. School personnel in nine of 16 buildings visited by OSEP indicated that parents are responsible for obtaining these evaluations. In one instance, a vision evaluation was recommended two years ago but has not been completed because the parent has not obtained it.

Teachers and related service providers in seven of 16 buildings that OSEP visited report that although they will complete a reevaluation report form that indicates what additional evaluation data are needed, often no evaluation is completed to collect those data.

Building administrators in another building reported not completing occupational or physical therapy evaluations in time for IEP meetings; evaluations, along with goals and objectives, are received later and stapled to the IEPs that are then sent home to the parents. Therefore, all information needed for the development of a child's present levels of educational performance, educational needs and IEP content are not available at the time the IEP is developed. Decisions must be made without sufficient data or decisions about IEP content are made outside the IEP meeting.

## 3. <u>Failure to provide required related services in a timely manner</u>

34 CFR §300.350 requires that all children with disabilities receive the related services specified in their IEP.

As discussed below, OSEP found that DCPS failed to ensure that related services identified in the IEP were provided in a timely manner, in accordance with the requirements of the IEP.

Under the Compliance Agreement, DCPS was required to report on the number of children not receiving the related services provided for in their IEPs. The number of children not receiving related services specified in their IEP was to be reduced to zero prior to the end of the Agreement in March 2001. The final quarterly report under the Agreement, for the period ending on March 30, 2001, reported 37 children with disabilities were not receiving all required related services specified in their IEP.

OSEP recognizes that during the course of the agreement, DCPS has made significant progress in addressing this area of noncompliance and that, given the magnitude of noncompliance that existed at the beginning of the Compliance Agreement, the progress that DCPS has made in this area represents a significant achievement; however, the progress was insufficient to permit a finding of compliance with Part B.

## 4. Placements based on factors other than individual student needs

34 CFR §300.550(b) requires that children with disabilities, including children in private or public institutions or other care facilities, are educated with children who are nondisabled to the maximum extent appropriate and that special classes, separate schooling or other removal from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

As discussed below, OSEP determined that children with disabilities are excluded from the regular educational environment for reasons other than that the nature or severity of the disability, even with the use of supplementary aids and services, is such that education in regular classes cannot be achieved satisfactorily.

Of 189 IEPs reviewed, 86 children were not placed in the regular classroom settings and no appropriate explanation was provided for the more restrictive setting. Personnel reported the following considerations in making placement decisions: in nine of 16 schools, staff availability; in five of 16 schools, options available in the school; in two of two preschool programs there was only a single option available and offered; in nine of 16 schools, category of disability determined placement; in five of 16, placement was determined based on the modifications needed by a child with a disability; and in seven of 16 schools, personnel said that placement is determined based on the fact that modifications and accommodations are not available in regular education classes. Personnel in 12 of 16 schools reported a lack of supports for general education teachers that affected placement decisions. This interview data supports the finding that decisions regarding the placement of children in the least restrictive environment are not based on the individual needs of the child, but rather on the factors specified above.

## 5. Inadequate supply of qualified personnel to provide a free appropriate public education

34 CFR §300.300 requires that a free appropriate public education be made available to all children with disabilities. In addition, 34 CFR §300.380 requires that each State must develop and implement a comprehensive system of personnel development that includes activities designed to ensure an adequate supply of qualified personnel, including special education, regular education and related services personnel necessary to carry out the purposes of IDEA.

As discussed below, OSEP determined that the procedures and activities that DCPS has undertaken have not ensured that an adequate supply of qualified special education and related services personnel are available to provide a free appropriate public education to all eligible children with disabilities.

Related services personnel in 11 of 18 (including the two preschool sites) buildings report that some children with disabilities do not receive all of the special education and related services in their IEPs, because of personnel shortages. They report choosing between providing direct services and completing evaluations and reevaluations in a timely manner. In two buildings, staff reported testing in classrooms while other students were "working on worksheets" in order to try to accomplish both tasks – services and assessments.

Of 189 IEPs reviewed, 64 did not contain services that were indicated as needed in the evaluation or reevaluation report. Personnel in 13 of 18 buildings reported that IEP services are identified based on staff availability rather than student need and that the types and amounts of related services depend on provider schedules rather than individual student needs. Teachers and related services personnel in eight of 18

buildings report that related services are not always provided as indicated in the IEP due to availability of staff (testing, absence due to illness, etc.).

Personnel in four of six buildings serving bilingual children with disabilities report that a lack of qualified bilingual staff results in lack of follow-up by the bilingual team, lack of availability of bilingual evaluators, and lack of availability of translators in specific languages.

In addition, personnel shortages have a negative impact on instructional programs. OSEP is concerned that shortages of personnel or the use of personnel on temporary certificates or waivers adversely affects the instruction provided to children with disabilities.

## 6. Required participants do not attend IEP meetings

34 CFR §300.344(a)(4) requires that the IEP team for each child with a disability include a representative of the public agency who is qualified to provide, or supervise the provision of, special education, is knowledgeable about the general curriculum, and is knowledgeable about the availability of resources of the public agency. 34 CFR §300.344(a)(2) requires that at least one regular education teacher participate in the IEP team when the child is participating, or may participate, in the regular education environment. The IEP team must also include, at the discretion of the public agency or the parent, other individuals who have knowledge or special expertise regarding the child, including related services personnel, as appropriate (34 CFR §300.344(a)(6)).

As discussed below, OSEP found that DCPS did not ensure that IEP meetings included a public agency representative and at least one regular education teacher, if the child is participating, or may participate, in the regular education environment. In addition, DCPS did not ensure that the IEP team includes, at the discretion of the public agency or the parent, related services personnel who may have knowledge or special expertise regarding the child.

Staff in nine of 16 buildings reported that regular education teachers do not participate in the IEP team when the child is participating in, or may participate in the regular education environment and staff in seven of 16 buildings report that a qualified public agency representative is unable to attend. At one building, IEP meetings are typically attended by only the special education teacher and the parent because other participants cannot be scheduled to attend. Staff in the nine buildings reported that a significant problem in IEP meeting attendance is that related services personnel are often only in the building one day (or sometimes less) per week to provide direct IEP services. It is nearly impossible to schedule all IEP meetings in which it would be appropriate for them to participate, at the request of the parent or public agency, when they are in the building. If the meetings are scheduled when they are in building and they attend those meetings, these providers fail to deliver services as specified on children's IEPs.

Of 189 IEPs reviewed, public agency representative attendance was not documented in 30 instances. In a few IEPs reviewed where the agency representative had signed the IEP, the teacher indicated that he/she had not been in attendance but had signed the IEP after the meeting. A regular education teacher did not participate as part of the IEP team in 45 cases of 137 where the child was, or might be, in the regular education environment.

## 7. Lack of availability and provision of extended school year services

34 CFR §300.309(a)(1) requires that each public agency must ensure that extended school year services are available as necessary to provide a free appropriate public education. Extended school year services

must be provided only if a child's IEP team determines, on an individual basis, that the services are necessary for the provision of a free appropriate public education to the child (34 CFR §300.309(a)(2)). In addition, 34 CFR §300.309(a)(3) states that a public agency may not limit extended school year services to children with particular categories of disability or unilaterally limit the type, amount or duration of those services. Also, 34 CFR §300.309(b)(1) requires that extended school year services be provided in accordance with the child's IEP.

As discussed below, OSEP determined that DCPS did not ensure that all children with disabilities who require extended school year services as part of a free appropriate public education are provided these services, in accordance with an IEP.

All personnel interviewed reported a significant level of confusion and lack of understanding of the relationship regarding the DCPS Summer Stars program, the compensatory education program (which is available to all children with disabilities upon request) and extended school year services. Central office staff stated that the compensatory education program was initially implemented to provide services to children with disabilities who had missed services due to transportation problems or lack of available personnel to provide all services in the IEP. It was opened for general enrollment to any parent who wanted their child included. The Summer Stars program is a summer school program for all children in DCPS, not just children with disabilities, although there is special education and related services support available in that program. There are also extended school year services available. Of 189 IEPs reviewed, the need for extended school year services was documented in only 47 IEPs although many more of the 189 received undocumented services through Summer Stars or the compensatory education program which were not identified as extended school year services on the IEP.

Teachers and related services providers in six of 16 buildings and the building administrator in two of those six buildings reported that all children who are in need of extended school year services to receive a free appropriate public education are not provided with those services. A related service provider in one building stated that she sent forward a list of children recommended for extended school year services but that the list came back with some children removed and others added although no IEP meetings had been held to discuss the services. Two other providers in this same school concurred. Teachers, related services providers and building administrators in two other buildings reported that children with disabilities attend Summer Stars, but may not receive special education and related services because they are not attending a building where special education and related services are available. Teachers in six of 16 buildings and the building administrator in four of those six buildings reported that children with disabilities attend Summer Stars but do not receive services in accordance with an IEP, regardless of need. Several related services providers in one building reported they believed children did not need extended school year services if they attended either Summer Stars or the compensatory education program, so they recommended that parents enroll their child in one or the other of these programs in lieu of providing extended school year services, with no determination as to whether they need extended school year services as part of a free appropriate public education. They did not know if parents followed up, whether special education and related services were provided, or if any provided services related to requirements of the children's IEPs.

## 8. Lack of participation in District-wide assessments

34 CFR §300.347(a)(5) requires that the IEP contain a statement of any individual modifications needed by a child to participate in District-wide assessments and that if the IEP team determines that a child will not participate in a District-wide assessment of student achievement (or part of an assessment), the IEP team must include a statement of why that assessment is not appropriate for the child and how the child

will be assessed. 34 CFR §300.138(b) requires that DCPS develop guidelines for participation of children with disabilities in alternate assessments when they cannot participate in District-wide assessment programs, develop alternate assessments and conduct the alternate assessments.

As discussed below, OSEP determined that DCPS did not ensure that the IEP for each child with a disability includes a statement of any individual modifications the child needs to participate in District-wide assessments, and if the IEP team determines that the child will not participate in a particular District-wide assessment of student achievement, why the assessment was not appropriate and how the child will be assessed.

Of 189 IEPs reviewed, in 51 instances, the IEP indicated modifications were needed for the child to participate in part or all of a District-wide assessment but the individual modifications needed were not identified on the IEPs. Seventy children with disabilities were exempt from participation but only 23 of these 70 IEPs included reasons why the assessment was not appropriate and only 16 of the 23 IEPs identified a method by which the child would be assessed.

Teachers, related services providers and building administrators in eight of 16 buildings reported that children with disabilities may be exempted from District-wide assessment based on category of disability. Personnel in one of six schools that serve bilingual children with disabilities indicated that children with second-language issues are exempted from participation because of their language differences.

Personnel in 13 of 14 buildings (two of 16 buildings were preschool programs and not included in District-wide assessment), including special educators in 12 buildings, regular education teachers in six buildings, related services personnel in four buildings and building administrators in 12 buildings reported that an alternate assessment is not available for those children who cannot participate in District-wide assessments. Personnel in four schools report the use of a form sent home two weeks before the District-wide assessment is administered that asks the parent to choose whether or not the child with a disability will be assessed. Such determinations are not made within the context of an IEP meeting. Building administrators in three other buildings stated that a child's participation in the Stanford-9 is based solely on parent choice, rather than on the determinations of an IEP team.

## 9. Failure to ensure consideration and provision of assistive technology devices and services

34 CFR §300.308(a) requires that assistive technology devices or assistive technology services, or both, are made available to a child with a disability if required as a part of the child's special education, related services, or supplementary aids and services. On a case-by-case basis, the use of school-purchased assistive technology devices in a child's home or in other settings is required if the child's IEP team determines that the child needs access to those devices in order to receive FAPE. 34 CFR §300.346(a)(2)(v) requires that the IEP team consider whether the child requires assistive technology devices and services.

As discussed below, OSEP determined that DCPS did not ensure that the IEP for each child with a disability who requires assistive technology devices or services includes a statement of assistive technology devices or services the child needs. OSEP also found that DCPS did not ensure that IEP teams consider whether the child requires assistive technology devices and services.

In 19 of 46 instances where a need for assistive technology devices was indicated in evaluation reports, the assistive technology device was not included in the child's IEP. In seven of sixteen buildings, building administrators, teachers and related services personnel reported that decisions about assistive

technology services and devices are made based on availability rather than individual student need.  In two additional buildings, staff indicated that when assistive technology devices are broken or batteries no longer function, they may not be replaced or repaired and additional batteries are not available.

## D. SUGGESTED AREAS FOR IMPROVED RESULTS FOR CHILDREN AND YOUTH WITH DISABILITIES

### 1. Functional behavior assessment and behavior intervention plans

Personnel in 14 of 16 buildings indicated a lack of understanding of when functional behavior assessments are required. Personnel in six secondary schools reported difficulties with behavior intervention plans, including that they are not developed when needed, not implemented when included in IEPs, and/or not individualized to the child. OSEP suggests that DCPS provide training to building administrators and building teams regarding the use of positive behavior supports, functional behavior assessment and behavior intervention plans and monitor to ensure the effectiveness of the training.

### 2. Child Find

While DCPS has created child find procedures and has instituted both a hotline and citywide, periodic screening activities for children from birth through age five, lack of personnel and coordination among agencies results in very few children with disabilities being identified soon enough to implement effective early intervention strategies. DCPS retains responsibility for child find from birth through age 21; however, the Part C agency, Department of Human Services, also undertakes child find activities for children from birth through age 2. These activities are not coordinated between the two agencies and no memorandum of understanding or interagency agreement defines the separate and joint responsibilities of the two agencies. In addition, while DCPS has initiated city-wide screening "events" on a periodic basis, there is no office or location where parents can refer their children or have them screened other than these events which the steering committee identified as a significant factor in preventing the identification of all children with disabilities under the age of five. OSEP suggests that DCPS coordinate child find efforts with those of the early intervention program in the District and identify the barriers that prevent the identification of children with disabilities under the age of five and develop strategies to address those barriers.

### 3. Eligibility determinations

There is no standard eligibility criteria across the district and eligibility, including at reevaluation, is often determined by the psychologist rather than a group of individuals, including the parent. A child may be eligible in one building, move to another and be determined ineligible, depending upon the individual psychologist's criteria. There is confusion regarding eligibility for special education and related services among individuals who participate in both evaluation determinations and IEP decisions. There is additional confusion about the use of evaluation information in developing IEP content because there is an assumption that the psychologist obtains that information and is the person who uses it to determine eligibility. The IEP team generally does not use this information nor is it fully explained by the psychologist. It is therefore usually not used by the IEP team to determine IEP content. OSEP suggests that DCPS establish consistent eligibility criteria across the District, train all building teams, including psychologists, in the use of relevant data to make eligibility determinations and monitor to determine the effectiveness of the training, as well as the consistency of the application of the eligibility criteria.

## VIII.  PART B:  SECONDARY TRANSITION

The National Longitudinal Transition Study states that the rate of competitive employment for youth with disabilities out of school for three to five years was 57 percent, compared to an employment rate of 69 percent for youth in the general population.  The Study identifies several factors that were associated with post-school success in obtaining employment and earning higher wages for youth with disabilities.  These include completing high school, spending more time in regular education, and taking vocational education in secondary school.  The Study also shows that post-school success is associated with youth who had a transition plan in high school that specifies an outcome, such as employment, as a goal.  The secondary transition requirements of IDEA focus on the active involvement of students in transition planning, consideration of students' preferences and interests by the IEP team, and the reflection, in the IEP, of a coordinated set of activities within an outcome-oriented process which promotes movement from school to post-school activities.  Through parent and student involvement, along with the involvement of all agencies that can provide transition services, student needs can be appropriately identified and services provided that best meet those needs.

### Validation Planning and Data Collection

**Monitoring:**  In 1994, OSEP found that DCPS had not implemented the requirement to identify needed transition services for children with disabilities beginning at age 16 (or younger if determined appropriate by the IEP team).  The Compliance Agreement required that DCPS develop effective procedures to ensure that (1) beginning at age 14, and younger, if appropriate, a statement of transition service needs or beginning at age 16 (or younger if determined appropriate by the IEP team) a statement of needed transition services is included in each student's IEP; (2) the student is invited to the IEP meeting and if the student does not attend, the student's preferences and interests will be considered; (3) an individual determination is made as to participating agency(ies) likely to be responsible for providing or paying for transition services and a representative of each participating agency(ies) is invited to the IEP meeting.  If the agency representative does not attend, other steps will be taken to ensure the participation of the agency in the planning of any transition services; and (4) the notice utilized by public agencies to inform parents and other individuals (e.g., students and participating agencies) contains all required content, if IEP meetings for which consideration of transition is a purpose.

**Self-Assessment:**  The DCPS Self-Assessment reported that high school completion rates are unavailable in DCPS.  Data were not captured prior to the 1999-2000 school year and disaggregated statistics are not available for comparisons of children with disabilities to nondisabled children.  The Self-Assessment indicated that while graduation data probably exists, those in charge of the Student Information System were unable to respond to a request for this information.  The Steering Committee was unable to ascertain whether drop-out data includes withdrawals, transfers to another jurisdiction or students who do not officially drop out.  Students in alternative programs are considered drop-outs.  No drop-out prevention programs were identified.

The Self-Assessment indicated that transition services activities are not included on students' schedules and that no data were provided regarding numbers of children participating in transition activities for nonpublic schools.

The Self-Assessment reports that the Director of Special Education has twice requested that building administrators appoint building-level transition coordinators but that no administrators have responded to her requests.

While a current and recently-developed memorandum of agreement exists among participating agencies, the Self-Assessment indicated that linkages among the agencies are not strong. Agencies do not routinely interact, share information or actively pursue recommendations under the agreement. In addition, the Self-Assessment stated that despite Federal funding, a viable linkage between DCPS and the Rehabilitative Services Agency has not been established.

The Self-Assessment reported that barriers continue to exist between general and special education resulting in students not being able to access all programs and services that impact their transition plans. There are not enough career technology education programs and there is a lack of information and understanding about the definition of transition services and how to include academy programs and co-curricular activities in transition planning and implementation.

**Public Input Process:** Two focus questions asked during the public input meetings were: "Describe the transition planning process for students with disabilities?" and "Are students receiving the services they need?" Responses indicated that participants did not know the transition requirements and therefore were unable to participate in the transition planning process. Parents expressed concern about limited opportunities available to their children, both during the transition process and after completion of high school.

After discussing information obtained through the Self-Assessment, public input process, and other available data, OSEP determined that additional data would be collected regarding whether: (1) agency linkages are identified and established; (2) appropriate transition goals, services and activities are addressed in IEPs for youth with disabilities beginning at age 14; (3) parents are informed when transition is a purpose of an IEP meeting as well as that the student will be invited and what representatives, if any, from outside agencies will be invited; and (4) agency participation is obtained when invited representatives do not attend the meeting.

OSEP reviewed and analyzed the data and identified the following strengths, areas of noncompliance, and suggested areas for improving results for children and youth with disabilities.

## A. <u>STRENGTH</u>

### <u>Proactive technical assistance in support of transition services</u>

A central office transition coordinator, along with supervisory coordinators responsible for groups of buildings, provides technical assistance, support and ongoing monitoring to high schools and middle schools. On at least a weekly basis, supervisors visit each assigned building to answer questions and provide any needed support. This structure allows for more immediate resolution of transition-related problems as well as a closer monitoring of building-level transition activities for individual children with disabilities. While transition requirements are not consistently met, as indicated in the findings below, significant improvement in this area has been made as a result of the immediate problem-solving.

## B. <u>IMPROVED PRACTICES SINCE INITIATION OF THE COMPLIANCE AGREEMENT</u>

### 1. <u>Ongoing internal monitoring of secondary transition requirements</u>

Under the Compliance Agreement, quarterly monitoring of transition plans and services was instituted under the direction of OSEP. Training was provided to building-level and central office staff regarding transition and monitoring for compliance. This monitoring continues and has been expanded to ensure

that IEPs are sampled and reviewed on a monthly, rather than on a quarterly, basis. While transition requirements are not consistently met, as indicated in the findings below, significant improvement in this area has been made as a result of the internal monitoring.

## 2. Transition memorandum of agreement

In cooperation with participants from all agencies within the District who might reasonably be expected to pay for or provide transition services, DCPS created a Memorandum of Agreement which includes all the required content of IDEA under §300.142 and outlines the responsibilities of each participating agency. The diversity among agencies is dramatic and coming to agreement was a major accomplishment for the signatory agencies. Currently, many of the participating agencies are under new leadership or are in receivership, a fact which has interrupted the implementation of the agreement; however, DCPS is making concerted efforts to overcome these barriers.

## C. AREAS OF NONCOMPLIANCE

## 1. Failure to include a statement of transition services needs

34 CFR §300.347(b)(1) requires that the IEP must include for each student with a disability beginning at age 14 (or younger, if determined appropriate by the IEP team), and updated annually, a statement of the transition service needs of the student under the applicable components of the student's IEP that focuses on the student's courses of study (such as participation in advanced-placement courses or a vocational education program).

As discussed below, OSEP found that DCPS did not ensure that the IEPs of students beginning at age 14 include a statement of transition services needs that focuses on the student's courses of study.

In 15 of 45 IEPs reviewed for youth with disabilities, ages 14-16, IEPs did not address transition services needs related to the student's courses of study. Personnel in seven of eight buildings reported a lack of understanding of the requirements for a statement of transition services needs for each student with a disability beginning at age 14. This included special educators in four buildings, general educators in one, related services providers in one, building administrators in four, parents in two, students in one and a transition coordinator in one building.

## 2. Failure to invite representatives of agencies likely to be responsible for providing or paying for transition services

34 CFR §300.344(b)(3)(i) requires that, if a purpose of an IEP meeting is the consideration of needed transition services for a student, the public agency shall invite a representative of any other agency that is likely to be responsible for providing or paying for transition services. 34 CFR §300.344(b)(3)(ii) states that if an agency invited to send a representative to a meeting does not do so, the public agency shall take other steps to obtain the participation of the other agency in the planning of any transition services.

As discussed below, OSEP found that DCPS does not ensure that agencies likely to be responsible for providing or paying for transition services are invited to IEP meetings for children with disabilities aged 16 and older (or younger if considered appropriate by the IEP team). DCPS also does not ensure that other steps are taken to obtain the participation of the other agency in the planning of any transition services when they do not attend IEP meetings.

In 24 of 36 student files reviewed for students aged 16 and older, the notice of IEP meeting provided to the parent did not identify any other agency that was likely to be responsible for providing or paying for transition services would be invited. Even fewer of the IEPs reviewed reflected participation of outside agency personnel and personnel reported that representatives were not invited until the students' senior year, even when agencies existed who were likely to be responsible for providing or paying for transition services as indicated by the linkages listed in the IEP. Five of 36 IEPs did not identify interagency responsibilities or linkages. Personnel in four of four buildings report that outside agencies are seldom invited to transition planning meetings. Personnel in three of the four buildings report a lack of understanding of linkages and the responsibility for making them. Central office staff reported that they have attempted for more than a year to obtain a list of agency representatives assigned to the buildings so that they could invite them to IEP meetings, but have not yet received the list. One agency has stated that it is in receivership and therefore is not obligated to fulfill the requirements of the memorandum of agreement.

### 3. Parent notification does not include all required content

34 CFR §300.345(b)(2) requires that for a student with a disability beginning at age 14, or younger if appropriate, parent notification of an IEP meeting must indicate that a purpose of the meeting will be the development of a statement of the transition services needs of the student and indicate that the agency will invite the student. For a student beginning at age 16, or younger, if appropriate, the parent notice must indicate that a purpose of the meeting is the consideration of needed transition services, indicate that the agency will invite the student, and identify any other agency that will be invited to send a representative.

As discussed below, OSEP found that DCPS did not ensure that the parent notification requirements were implemented consistent with Part B.

Parents were not notified that transition was a purpose of the meeting in 29 of 52 records reviewed and that the student would be invited in 28 of 52 records reviewed. In 24 of 36 notices reviewed by OSEP, the parent was not notified that other agencies would be invited to send a representative where other agencies were likely to be responsible for providing or paying for transition services. Building administrators in two of eight buildings, a transition coordinator in one of eight buildings, and parents in two of eight buildings reported that parents are not notified that transition is a purpose of the meeting. While the form that DCPS uses to meet the parent notice requirement contains a "check-off" for transition as a purpose of the meeting and labeled spaces for including agency participants who are invited, they are often left blank.

## D. SUGGESTED AREAS FOR IMPROVING RESULTS FOR YOUTH WITH DISABILITIES

### 1. Inclusion of appropriate services on the IEP and provision of services

Significant progress has been made in identifying students' preferences and interests and working toward including transition services in the IEP that are a coordinated set of activities within an outcome-oriented process that promotes movement from school to post-school activities. Progress has also been made in identifying what services will be necessary in order to accomplish those goals for individual students. Sometimes, transition services that are identified in general terms (e.g., community services, functional vocational evaluation, etc.) are not specifically identified on the IEP and, more often, when identified, are not provided as indicated. Reasons include lack of personnel, transportation issues, lack of available programs/services, exclusion of children with disabilities from available programs and lack of supports for youth with disabilities to participate in existing School-to-Work or other available vocational

programs and services. OSEP suggests that because the barriers to including appropriate transition services on students' IEPs have been identified, DCPS identify appropriate strategies to remove these barriers as part of the improvement planning process.

## 2. Training/coordination of services at building level

According to the Self-Assessment and to teachers interviewed by OSEP, DCPS staff do not have a full understanding of transition services, especially for youth beginning at age 14. Often, transition services seem to be identified with "getting RSA (Rehabilitation Services Agency) to come," or "getting the student hooked up with MRDD (Mental Retardation/Developmental Disabilities Agency)." DCPS has various vocational-related programs located on different campuses and many times, IEP team participants are not aware of the possibilities and opportunities that are available, nor are they aware of what is available across the city beyond DCPS. No consideration seems to be given to transitioning youth with disabilities to college. Throughout the monitoring process, various individuals reported to OSEP that "transition is defined too narrowly," and "people don't understand that transition is about possibilities." OSEP suggests that DCPS provide ongoing training to building teams regarding the purpose of transition services and the appropriate procedures for implementing transition services requirements. OSEP further suggests that DCPS monitor the effectiveness of that training, perhaps through the ongoing internal monitoring that currently exists for secondary transition.

## IX. PART B:  GENERAL SUPERVISION

IDEA assigns responsibility to State education agencies for ensuring that its requirements are met and that all educational programs for children with disabilities, including all such programs administered by any other State or local agency, are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities and that these programs meet the educational standards of the State educational agency.  State support and involvement at the local level are critical to the successful implementation of the provisions of IDEA.  To carry out their responsibilities, States provide dispute resolution mechanisms (mediation, complaint resolution and due process), monitor the implementation of State and Federal statutes and regulations, establish standards for personnel development and certification as well as educational programs, and provide technical assistance and training across the State.  Effective general supervision promotes positive student outcomes by promoting appropriate educational services to children with disabilities, ensuring the successful and timely correction of identified deficiencies, and providing personnel who work with children with disabilities the knowledge, skills and abilities necessary to carry out their assigned responsibilities.

**Validation Planning and Data Collection**

**Monitoring:**  In 1994, OSEP reported that DCPS did not ensure: (a) that the requirements of Part B were met for incarcerated youth with disabilities; (b) that effective methods were adopted and utilized to consistently identify deficiencies of public agencies providing services to children with disabilities; (c) that identified deficiencies were corrected in a timely manner; (d) that children were included in the child count only if they were enrolled in a school or program operated or supported by the public agency and were provided special education on December 1; (e) that prior written notice was provided, consistent with Part B requirements; (f) that procedural safeguards were provided in accordance with Part B; and (g) that due process hearing decisions were provided within 45 days of a request.

As documented in the Compliance Agreement, as of January 5, 1998, of the 655 hearing requests that had been received, a final decision had not been issued within 45 days of the request in 482 cases.  At the same time, there were 332 hearing determinations that had not been fully implemented within the time frame set out by the hearing determination.

**Self-Assessment:**  The DCPS Self-Assessment indicated that DCPS has not clearly identified itself as a local education agency and has not defined its role as a State education agency that exercises general supervisory responsibility over local education agency charter schools.  Also, DCPS has not developed effective methods for monitoring and ensuring the correction of identified deficiencies, either within DCPS public schools or other public agencies providing special education services.

The Self-Assessment also found that there is a breakdown in communication between Parts C and B that adversely affects children with disabilities.  Sharing of data between the systems is dependent upon individuals involved and their relationship; there is no consistent, coordinated mechanism for sharing information.

The Self-Assessment determined that parents and other interested parties do not understand how to use the formal complaint procedures.

According to the Self-Assessment, DCPS has no formal comprehensive system of personnel development and the determination of inter-departmental training needs is not coordinated across both the Parts C and

B systems. In addition, no data were available to identify whether training had occurred regarding the process of referral, identification, eligibility determination, IEP/IFSP development, and placement.

The Self-Assessment identified no data regarding the provision of a free appropriate public education for children with disabilities incarcerated in the District of Columbia jail. There is no person at the central office holding specific responsibility for oversight, coordination or tracking of children with disabilities incarcerated in the jail.

The Self-Assessment stated that, prior to implementation of the Special Education Tracking System, there was no system for tracking high school completion information or exit data. Information is not uniform, easily accessible, or easily analyzed. It is available only on special request by the Director of Special Education.

The Self-Assessment reported that children with disabilities in out-of-district placements are not uniformly participating in District-wide assessments of student achievement. Data are not currently tracked for these students.

**Public Input Process:** One of the focus questions asked during the public input meetings for Part B was: "How is DCPS involved in assuring that appropriate services are provided to children with disabilities?" Responses indicated significant concerns with DCPS' involvement with charter schools and private schools. Representatives from parochial and other private schools in the District indicated inconsistent identification and provision of special education and related services to children with disabilities enrolled by their parents in these schools. DCPS has never consulted with private school representatives for the purposes outlined in IDEA, including child find activities and development of services plans for identified children with disabilities. Parents reported insufficient oversight of the buildings to ensure the implementation of IEPs and expressed a lack of knowledge about the formal complaint procedures. A significant level of confusion was expressed regarding the relationship of DCPS to the charter schools for purposes of special education. While attorneys who represent parents expressed satisfaction with the new scheduling procedures and concurred that due process hearings are completed in a timely manner, there was a high level of dissatisfaction with the implementation of hearing decisions.

After discussing information obtained through the Self-Assessment, public input process, and other available data, OSEP determined that additional data would be collected regarding whether: (1) due process hearings are conducted in a timely manner; (2) due process hearing decisions are implemented in a timely manner; (3) the complaint management system is operational and effective; (4) surrogate parent procedures are implemented effectively; (5) cyclical monitoring is occurring and deficiencies are corrected in a timely manner; (6) DCPS implements IDEA requirements regarding children with disabilities who are placed by their parents in private schools; (7) DCPS is exercising general supervisory responsibility for charter schools; (8) DCPS has implemented effective procedures to ensure the provision of a free appropriate public education to children with disabilities who have limited English proficiency; and (9) the State Advisory Panel is functioning consistent with Part B requirements.

To investigate the concerns identified during the Validation Planning process, OSEP collected information from the review of children's records and District policies and procedures, and interviews of District personnel, local program administrators, teachers, and parents and found the following strengths, areas of noncompliance and suggested areas for improvement.

## A. STRENGTHS

### 1. Building-based responsibility and accountability

A significant change, not only in process but in philosophy, occurred when responsibility for a free appropriate public education was assigned to building administrators and included in their performance appraisals. Prior to this change, when children were suspected of having a disability, they were referred to the central office which had responsibility for evaluating the child, writing the IEP and placing the child. Buildings had very specific, often categorical, programs and children often were placed based on their category of disability. The assignment of building-based responsibility encourages the inclusion of children with disabilities in their neighborhood schools, expansion of services and programs at the building level to serve the children with disabilities who would attend those schools if not disabled, and accountability for all children who should attend that school, based on the location of their home, not whether or not the child has a disability.

### 2. Implementation of the Special Education Tracking System (SETS)

DCPS implemented the Special Education Tracking System in January 2000. This system represents a significant step forward in the interests of data-driven management for special education in the District. In the Spring 1998, the Division of Special Education did not have computer capabilities for central office staff, let alone on-line capabilities at the building level related to special education. The new tracking system allows real-time tracking of nearly all aspects of child-specific special education information, from evaluation through IEP and placement. Building administrators can access periodic, standard management reports by a variety of criteria as well as request and create customized reports, based on their individual building needs. Three years ago, DCPS could not accurately count the number of special education students it served. Now, these children can be tracked by a variety of criteria and sound management decisions can be made based on children's needs rather than speculation.

## B. IMPROVED PRACTICES SINCE INITIATION OF THE COMPLIANCE AGREEMENT

### 1. Stability of the central office staff/structure

Historically, the Division of Special Education has been plagued by frequent reorganizations: DCPS had undergone 25 reorganizations in the last 22 years. Under the current Director of Special Education, there has been no significant reorganization and the stability over the past two years has enhanced the ability of the central office to provide needed support to the building level. In addition, the structure and purpose of the central office has changed. In the fall of 1998, responsibility for the special education process and the provision of a free appropriate public education moved from the central office to the building level. Changes implemented by the current Director of Special Education have facilitated that transition.

### 2. Independent hearings and mediation

DCPS has created an office that manages requests for hearings and mediation. Hearing officers and mediators are contracted and have been trained. The creation of this office has now ensured that, unless hearing officers grant extensions at the request of either party, due process hearing decisions are reached within 45 days of a request. The backlog of over 482 due process hearings that were overdue at the inception of the Compliance Agreement (which rose, at one point during the life of the Agreement, to over 700), has been cleared and in the final quarterly report under the Compliance Agreement, only four

hearings had not resulted in a hearing officer decision within the required 45-days. In all four of these cases, extensions were granted based requests from the parents' attorneys.

## C. **AREAS OF NONCOMPLIANCE**

### 1. **Failure to require and consider LEA charter school policies and procedures**

Under the District of Columbia School Reform Act of 1995 (DC Charter School Act), a public charter school must elect whether to be treated as a local educational agency (LEA) or a District of Columbia public school for the purpose of Part B of IDEA. If a charter school elects to be treated as an LEA, the charter school is eligible for a subgrant under the Grants to States and Preschool Grants programs. 34 CFR §300.220(b) requires that local education agencies, including charter school LEAs, have on file with the State education agency, in this case, DCPS, the policies and procedures that are consistent with State policies and procedures providing for the education of children with disabilities.

DCPS officials informed OSEP that although charter school LEAs do not have policies and procedures on file with DCPS, consistent with §300.220, DCPS has made subgrants of Part B funds to those schools as local education agencies.

### 2. **Failure to consult with private schools to provide services consistent with the location and number of private school children with disabilities**

34 CFR §§300.450-300.462 include requirements that DCPS locate, identify and evaluate all private school children with disabilities (children with disabilities enrolled by their parents in private schools or facilities), including religious-school children residing in the District and that DCPS consult with appropriate representatives of private school children with disabilities on how to carry out these activities. (See also 34 CFR §300.125(a)(1)(i)). To the extent consistent with their number and location in the District, provision must be made for the participation of private school children with disabilities in the program carried out under Part B of IDEA. 34 CFR 300.452. In addition, consultation with representatives of private school children with disabilities is required to determine: (1) which children will receive services under §300.452; (2) what services will be provided; (3) how and where the services will be provided; and (4) how the services provided will be evaluated. For all children who will receive services, under §300.454(c), a meeting must be initiated and conducted to develop, review and revise a services plan in accordance with §300.455(b) which identifies the specific special education and related services to be provided to the child under the agreement reached during the consultation with the private schools.

As discussed below, OSEP found that DCPS does not: (1) provide for the participation of private school children with disabilities to the extent consistent with their number and location in the District; (2) consult with private schools where parents placed their children; (3) provide a services plan for children with disabilities enrolled by their parents in private schools that it elects to serve; and (4) conduct child find activities in private schools.

Representatives of private schools reported to OSEP, during public input meetings, that consultation with private schools has never occurred. In addition, some children with disabilities, enrolled by their parents in private schools, have IEPs and some do not. Whether or not children with disabilities are identified and provided with an IEP is not a matter of DCPS policy or procedure that applies to all private school children with disabilities, but rather the individual determination of building principals. Private school representatives were unaware of any meetings held to review or revise the existing IEPs and reported

great difficulty in obtaining evaluations for children suspected of having disabilities. The Director of Special Education confirmed that a system for locating, identifying and evaluating children with disabilities who are placed by their parents in private schools does not exist at this time. She also confirmed that consultation has not been held and that services plans are not developed.

### 3. Lack of implementation of surrogate parent procedures

34 CFR §300.515 requires that each public agency ensure the rights of a child are protected if: no parent can be identified; the public agency, after reasonable efforts, cannot discover the whereabouts of a parent; or the child is a ward of the State under the laws of that State. DCPS must have a method for assigning an individual to act as a surrogate for the parents, including a method for determining whether a child needs a surrogate parent and for assigning a surrogate parent to the child. Under the Compliance Agreement, DCPS was required to implement procedures that meet the requirements of 34 CFR §300.515.

As discussed below, OSEP found that while procedures have been developed, they have not been effectively implemented.

OSEP identified no surrogate parents for children with disabilities in the 16 buildings visited. Interviews with the Coordinator of the Surrogate Parent program and the Director of Special Education confirmed that the need for surrogate parents is not being identified by building administrators. A number of individuals were trained as surrogate parents within the past year; however, in all instances, these individuals came under the definition of "parent" in IDEA and were not surrogate parents for the purposes of IDEA. Interviews confirmed that case managers and social workers are serving as "parents" at IEP meetings although they have not been trained or appointed as surrogate parents.

### 4. Failure to identify and correct deficiencies (monitoring)

34 CFR §300.600 requires that each educational program for children with disabilities administered within the State is under the general supervision of the persons responsible for educational programs for children with disabilities in the State education agency and meets the educational standards of the State education agency, including the requirements of Part B.

As discussed below, OSEP found that DCPS does not exercise general supervisory responsibility by identifying deficiencies under IDEA and ensuring that they are corrected in a timely manner.

Personnel in all 16 buildings visited by OSEP were unaware of monitoring activities conducted by DCPS. DCPS provided OSEP with a monitoring report completed by the State of Delaware, on behalf of DCPS, in May 1999. DCPS had contracted with Delaware to pilot that State's new monitoring system in the District and to issue a report. There is no documentation that the deficiencies identified in the 1999 report were corrected. No monitoring activities have been undertaken since that 1999 report. The Director of Special Education told OSEP that DCPS is in the process of again contracting with Delaware to conduct monitoring activities and that the charter schools would be included in the sample of buildings visited as part of this activity.

DCPS, in its role as SEA, must ensure that DCPS and charter schools established as LEAs are monitored to ensure that the requirements of Part B of IDEA are met. It is permissible for DCPS to contract for its monitoring activities; however, DCPS must ensure that these activities provide a comprehensive, cohesive process that identifies systemic issues, ensures that identified deficiencies are corrected, and that

enforcement activities are available if deficiencies are not corrected in a timely manner. DCPS could not provide information on what areas would be monitored or what buildings would be monitored, or whether LEA charter schools would be monitored.

**5. Failure to implement hearing officer decisions in a timely manner**

34 CFR §300.510(a) states that a hearing decision is final unless it is appealed. Hearing decisions are binding on the parties involved and DCPS has general supervisory responsibility to ensure that they are implemented. The Compliance Agreement required that DCPS ensure the implementation of hearing officer determinations within the time frame prescribed by the determination.

As discussed below, OSEP found that DCPS does not ensure that hearing officer determinations and settlement agreements are implemented in a timely manner.

The final quarterly report under the Compliance Agreement indicated that 193 hearing officer determinations and settlement agreements had not been implemented within the required time frame; however, included in that number are decisions and settlement agreements that have not been implemented within 45 days of the determination, regardless of the time line included in the determination. The Director of Special Education set this time line to ensure that responsible personnel track the determinations and to protect the rights of children with disabilities to a free appropriate public education by following up on requirements of decisions and settlement agreements. Central office interviews indicated that the major problems remaining in implementing decisions and agreements relate to availability of services and placements. The major problems had been related to timeliness of initial evaluations; however, that is no longer a significant problem within the system, as indicated earlier in this report. Major factors in the availability of services and placements relate to: (1) personnel shortages (inability to recruit and retain qualified special educators and service providers); (2) accessibility of buildings (DCPS has only two fully accessible buildings out of 146); and (3) lack of available space in neighborhood buildings to provide services and programs to children with disabilities. These problems force DCPS to frequently make out-of-district placements that take longer to arrange. In addition, the inability to resolve these problems results in inefficient use of available resources because of the significantly higher cost of providing educational services (nonpublic tuition costs and transportation).

**D. SUGGESTED AREAS FOR IMPROVED RESULTS FOR CHILDREN AND YOUTH WITH DISABILITIES**

**1. Provision of services to children with disabilities who have limited English proficiency**

The Compliance Agreement required DCPS to identify the numbers of needed qualified staff to provide special education and related services to children with disabilities who have limited English proficiency, and, if sufficient numbers of staff were not available, develop a plan to acquire sufficient staff. DCPS developed a plan for acquiring staff to meet the needs of children with disabilities who have limited English proficiency. At the same time, the lack of a data system and the overall inability to accurately count students in DCPS rendered the provided data inaccurate. Over the life of the Compliance Agreement, DCPS has made consistent and concerted efforts to acquire sufficient numbers of qualified personnel. However, these efforts have not resulted in sufficient numbers of qualified staff to provide appropriate services to all children with disabilities who have limited English proficiency.

DCPS is in the process of responding to a complaint filed with the Office for Civil Rights regarding children with limited English proficiency, non-English proficiency and/or whose primary home language

is other than English. Part of the response to this complaint includes procedures for accurately identifying eligible children with disabilities who fall into these categories and ensuring the provision of appropriate services to these children, including interim and emergency services when qualified personnel are not immediately available. OSEP, the Office for Civil Rights and DCPS are working together to ensure an appropriate and effective plan to resolve remaining issues. The implementation of the Special Education Tracking System now provides accurate information regarding the numbers of children affected by these procedures. The Tracking System does not identify these children by teacher which makes it difficult to determine if appropriately qualified special educators are providing services to these children. OSEP suggests that DCPS revise the Tracking System to identify the children by teacher and monitor to ensure that qualified special educators are providing services to these children and that the OCR agreement is appropriately implemented for each child with a disability who has limited English proficency.

## 2. Functioning of State Advisory Panel

Under the Compliance Agreement, DCPS established a State Advisory Panel. Panel meetings were discontinued due to conflicts among its members. Within the last several months, the Panel has again been established under a Mayor's Order within the auspices of the Mayor's Office on Commissions and Panels. While the State Advisory Panel reports to DCPS and is responsible for advising DCPS, it is a significant accomplishment to receive such support from the Mayor's Office. While the Panel has begun regularly-scheduled meetings and discussions are occurring regarding the involvement of the Panel in the improvement planning process as part of OSEP's monitoring efforts in the District, the final version of the Mayor's Order had not been signed at the time of OSEP's monitoring, and the Panel has struggled to obtain needed administrative support. This has hindered communication among Panel members and the provision of information to Panel members. OSEP suggests that DCPS provide logistical and consultative support to the Panel and maintain an ongoing dialog around areas of concern to the Panel to ensure that they have current and sufficient information to conduct their business.

## 3. Utilization of formal complaint procedures

It was clear from public input, central office interviews, interviews with attorneys who represent parents and interviews with parents that there is a lack of understanding of formal complaint resolution procedures. Under the Compliance Agreement, DCPS developed and disseminated formal complaint procedures to parents and other interested individuals that included procedures for resolving any written complaints filed with the Ombudsman's office. Over the three years of the agreement, two complaints were received while over 1,000 due process hearings were requested each year. The Director of Special Education indicated that she receives many written complaints but that, because they are addressed to her, she believed it her obligation and responsibility to investigate and resolve these issues; these complaints were not recorded by DCPS as formal complaints and not formally investigated and resolved using its complaint management procedures. DCPS is developing a mechanism for ensuring that formal complaints that should be investigated by someone independent of the Division of Special Education are forwarded to the Ombudsman. In addition, DCPS is investigating more effective methods of disseminating information regarding the availability of complaint resolution as a viable mechanism for dispute resolution. OSEP suggests that DCPS implement more effective methods of disseminating information and develop criteria for discriminating between formal written complaints, which fall under the purview of the Ombudsman, and those complaints, which should be appropriately investigated by the Director of Special Education.