UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

Honorable Clifford B. Janey, Ed.D.  
Superintendent  
District of Columbia Public Schools  
825 North Capitol Street, 9th Floor  
Washington, DC 20002

NOV - 2 2005

Dear Superintendent Janey:

The purpose of this letter is to respond to the District of Columbia's May 20, 2005 submission of its Federal Fiscal Year (FFY) 2003 Annual Performance Report (APR) under the Individuals with Disabilities Education Act (IDEA) Part B for the grant period July 1, 2003 through June 30, 2004. The APR reflects actual accomplishments that the District of Columbia Public Schools (DCPS) made during the reporting period, compared to established objectives. The Office of Special Education Programs (OSEP) has designed the APR under the IDEA to provide uniform reporting from States and result in high-quality information across States. The APR is a significant data source for OSEP in the Continuous Improvement and Focused Monitoring System (CIFMS).

The State's APR should reflect the collection, analysis, and reporting of relevant data, and include specific data-based determinations regarding performance and compliance in each of the cluster areas. OSEP has set out its comments, analysis and determinations by cluster area.

*Background*

OSEP's March 18, 2005 letter, responding to DCPS' FFY 2002 Part B APR, directed DCPS to submit a final Progress Report, as part of the FFY 2003 APR, demonstrating that the following areas of noncompliance identified in the OSEP's June 18, 2002 Monitoring Report were corrected:

1. Documentation demonstrating that the Edison Charter Schools LEA has approved policies and procedures on file with DCPS (34 CFR §300.220(b)); and

2. Monitoring data and analysis demonstrating that the following areas of identified noncompliance were corrected: (a) providing an adequate number of qualified personnel to provide a free appropriate public education (FAPE) (34 CFR §300.380); (b) required participants attend individualized education program (IEP) meetings (34 CFR §300.344(a)(2), (4) and (6)); (c) availability of extended school year (ESY) services (34 CFR §300.309); (d) consideration and provision of assistive technology devices and services (34 CFR §§300.308 and 300.346(a)(2)(v)); and (e) inviting representatives of agencies likely to be responsible for providing or paying for transition services (34 CFR §300.344(b)(3)).

Plaintiffs' Exhibit  
2

Page 2 - Honorable Clifford B. Janey

On December 3, 2004, DCPS submitted documentation that the required, DCPS-approved policies and procedures from the Edison Charter Schools LEA were on file with DCPS, as required by 34 CFR §300.220(b).

OSEP's March 2005 letter also required DCPS to include the following in the FFY 2003 APR:

1. In addition to completing Attachment 1 of the FFY 2003 APR for the reporting period July 1, 2003 - June 30, 2004, OSEP directed DCPS to submit data from June 2004 through February 2005 for both formal written complaints and due process hearings.
2. Data and analysis on the number of children exiting Part C during the reporting period (July 1, 2003 - June 30, 2004) who were determined eligible for Part B services, and had an IEP developed and implemented by their third birthdays, along with an explanation for any eligible children who did not have an IEP developed and implemented by their third birthdays in accordance with 34 CFR §300.132(b).
3. An analysis of the disproportionality data and, if significant disproportionality is identified, evidence of DCPS' review of policies, procedures and practices in the affected LEA and resulting actions to correct identified problems.
4. Data on whether suspension and expulsion rates for children with disabilities are comparable among LEAs within DC, or to the rates for nondisabled children within the agencies; and if significant discrepancies are identified, a review and, if appropriate, a revision of its policies, procedures and practices consistent with 34 CFR §300.146(b).
5. Data and analysis relative to graduation and drop-out rates.
6. Whether children with disabilities performed at a comparable level to children without disabilities on District-wide assessments or whether there is a gap between the performance of children with and without disabilities.
7. Documentation of data on preschool outcomes (whether collected through sampling, monitoring, individual IEP review, or other methods), targets for improved performance and strategies to achieve those targets for this area, or a plan to collect the data, including a detailed timeline of the activities necessary to implement that plan.
8. Clarification of whether any noneducational public agencies in DC are required, under Federal or DC law or assigned responsibility under DC policy, to provide or pay for transition services that are needed to ensure FAPE. If they are, DCPS was required to submit documentation that an interagency agreement or other mechanism for interagency coordination is in effect in accordance with 34 CFR §300.142. If DCPS is not complying with 34 CFR §300.142, DCPS was required to include a plan in the FFY 2003 APR, with strategies, proposed evidence of change, targets and timelines designed to achieve compliance as soon as possible but not later than one year after OSEP accepts the plan.

DCPS' FFY 2005 Grant Award was released subject to four Special Conditions set forth in Enclosure D of the August 5, 2005 Grant Award letter. DCPS' failure to ensure compliance in the following four areas resulted in the US Department of Education (Department) imposing Special Conditions:

Page 3 - Honorable Clifford B. Janey

1. Provide timely initial evaluations and reevaluations. (§614(a)(1), (b) and (c)[1]) and (§614(a)(2), (b), and (c) [2]);
2. Implement due process hearing decisions in a timely manner (§615(f) and (i));
3. Ensure placement in the LRE (§612(a)(5)(A)); and
4. Identify and correct, in a timely manner (i.e., within one year of identification), noncompliance with the requirements of Part B of IDEA (34 CFR §300.600, §612(a)(11), and 20 U.S.C. 1232d(b)(3).

*General Supervision*

Identification and timely correction of noncompliance

OSEP's March 2005 letter required DCPS to submit data and analysis in the FFY 2003 APR demonstrating that the noncompliance identified in the June 18, 2002 monitoring report with the requirement in 34 CFR §300.600 and 20 U.S.C. 1232d(b)(3) to identify and correct deficiencies had been corrected. The March 2005 letter directed DCPS to include monitoring data and reports from the high school and middle/junior high divisions, corrective actions imposed and activities undertaken by DCPS to ensure the implementation of those corrective actions to correct identified noncompliance within one year of identification, including mechanisms that it had in place for persistent noncompliance (sanctions) and how/when they will be imposed.

In the FFY 2003 APR, DCPS did not provide data that demonstrated that it identified noncompliance with the requirements of Part B of IDEA and corrected the identified noncompliance in a timely manner (i.e., within one year of identification), in accordance with 34 CFR §300.600, §612(a)(11), and 20 U.S.C. 1232d(b)(3). On pages 10-11 of the General Supervision Cluster of the FFY 2003 APR, DCPS reported that as part of the realigning of special education in DCPS, some of the special education functions, including the monitoring office, had been placed under the newly created State Enforcement & Investigation Division for Special Education Programs. On page 11 of the General Supervision cluster of the FFY 2003 APR, DCPS reported that 20 DCPS schools were monitored, but did not provide any monitoring data or analysis. Therefore, OSEP attached a Special Condition to DCPS' FFY 2005 grant award regarding identification and correction of noncompliance. The basis and nature of the Special Condition, in addition to the quarterly reporting requirements, are explained in detail in Enclosure D to the FFY 2005 Grant Award letter.

This is an indicator in the SPP under §616 that is due December 2, 2005. In preparation for the submission of the SPP on December 2, 2005, DCPS should carefully consider its current data collection against the requirements related to indicator 15 in the SPP packet to ensure that data will be responsive to those requirements. DCPS must submit responsive baseline data regarding

---

[1] Section 614(a)(1)(C)(i)(I) requires that an initial evaluation be conducted within 60 days of receiving parental consent for the evaluation, or, if the State establishes a timeframe within which the evaluation must be conducted within such timeframe. Page 5 of the Procedural Manual for Parents (as revised July 2005) states that "under District of Columbia law, the LEA has no more than 120 calendar days after the date a child is referred for evaluation to determine his/her eligibility for special education services, develop the individualized education program (IEP) and begin delivery of appropriate special education and related services".

[2] Section 614(a)(2)(B)(ii) requires that a reevaluation occur at least once every three years, unless the parents and the local educational agency agree that a reevaluation is unnecessary.

Page 4 - Honorable Clifford B. Janey

the percent of noncompliance related to monitoring priority areas and indicators corrected within one year from identification; the percent of noncompliance related to areas not included in the monitoring priority areas and indicators corrected within one year of identification; and the percent of noncompliance identified through other mechanisms corrected within one year of identification. The absence of data in this area will be considered in OSEP's decision about approval of DCPS' SPP.

### Formal written complaints

In addition to completing Attachment 1 of the FFY 2003 APR for the reporting period July 1, 2003 - June 30, 2004, OSEP's March 2005 letter required DCPS to submit data from June 2004 through February 2005 in the FFY 2003 APR. On page 9 of the General Supervision cluster of the FFY 2003 APR, DCPS reported that, in June 2003, the State Complaint Office was formally created and an executive director was hired. (DCPS reported that the director resigned from employment with DCPS in January 2005.) In Attachment 1 (the revised table submitted on September 30, 2005), DCPS reported that two complaints were received from July 1, 2003 to June 30, 2004 one was issued with findings, one was issued with no findings, and one was not investigated due to withdrawal or lack of jurisdiction[3]. While DCPS reported that two complaints were received, the data indicated that three complaints were received. Second, the data indicated that 1 complaint was not resolved within the 60-daty timeline or a properly granted extension.

From July 1, 2004 to February 28, 2005, DCPS reported that 19 complaints were received. Data presented in Attachment 1 reported that ten complaints were issued with findings, four complaints were issued with no findings and two complaints were not investigated. There was no explanation regarding the remaining three complaints. Of the 19 complaints, DCPS reported that 17 were issued within 60 calendar days and two were resolved beyond 60 days with a documented extension. However, in cells 2 and 3 of Attachment 1, DCPS reported that only 14 complaint decisions were issued.

In the SPP, indicator 16 requires DCPS to report the percent of signed written complaints with reports issued that were resolved within 60-day timeline or a timeline extended for exceptional circumstances with respect to a particular complaint. DCPS must complete Attachment 1, as part of the SPP, and describe the results of the calculations and compare the results to its target. If there are discrepancies in the data, DCPS must provide an explanation for those discrepancies. The absence of data in this area will be considered in OSEP's decision about approval of DCPS' SPP.

### Mediation

In Attachment 1 (the revised table submitted on September 30, 2005) of the FFY 2003 APR, DCPS included data and information indicating that, from July 1, 2003 thorough December 31, 2004, there were 15 mediations not related to due process hearing requests and 138 mediations related to due process hearing requests. Of the 15 mediation hearings not related to due process

---

[3] DCPS noted that the State Complaint Office accepted unwritten complaints in order to afford parents and others the greatest possible access.

Page 5 - Honorable Clifford B. Janey

hearing requests, 8 resulted in mediation agreements. Of the 138 mediations held related to due process hearing requests, 70 resulted in mediation agreements.

On page 13 of the General Supervision cluster of the FFY 2003 APR, DCPS reported that a State-level Mediation and Early Dispute Resolution Office (MEDRO) was created. MEDRO would provide State-level technical assistance to LEAs in the form of conflict management training and workshops, facilitated IEP meetings, and crisis intervention teams. The goals were to: (1) assist LEAs in strengthening the relationship between parents, families and the schools; (2) educate and train school personnel on alternative dispute techniques; (3) improve IEP meetings and parental satisfaction with the IEP process; and (4) build programs for resolving special education disputes through more timely and satisfactory means than adversarial proceedings. OSEP appreciates the efforts and commitment of DCPS in attempting to reduce the number of due process hearings through mediation agreements.

In the SPP, under indicator 19, DCPS must report the percent of mediations held that resulted in mediation agreements. DCPS should describe the results of the calculations and compare the results to its target.

Due process hearings and reviews

In addition to completing Attachment 1 of the FFY 2003 APR for the reporting period July 1, 2003 - June 30, 2004, OSEP's March 2004 letter required DCPS to submit data from June 2004 through February 2005 in the FFY 2003 APR. DCPS submitted the requested data in Attachment 1 (revised table submitted on September 30, 2005). On page 5 of the General Supervision cluster of the FFY 2003 APR, DCPS reported that 100% compliance for timely issuance of hearing officer decisions was not achieved during the reporting period of July 1, 2003 - June 30, 2004. DCPS reported that despite the continued upward trend in hearing requests, DCPS was achieving significant improvement in issuing timely decisions. As explained below, OSEP is concerned that DCPS did not follow the instructions for completing Attachment 1 of the FFY 2003 APR.

DCPS included data in Attachment 1 from July 1, 2004 - January 31, 2005, indicating that of 2,312 hearing requests received (cell 2), 1,753 hearings were held (cell 3). Of the 1,753 hearings held (cell 3), 1,186 decisions were issued within required timelines (cell 4). Of the 1,186 decisions issued within required timelines (Cell 4), 567 were issued within an extended timeline (cell 5).[4] As the instructions to the FFY 2003 APR note, cell 3 minus cell 4 will equal the number of decisions issued late. Based on DCPS' data, 567 hearing were issued late. This is the number of hearing decisions that DCPS reported in cell 5 were issued within an extended timeline. This indicates that DCPS may not have carefully followed the instructions, which explain that cell (5) (number of decisions within timeline extended) is a subset of cell 4 (number of decisions issued within timeline).

Because it appears that DCPS did not complete Attachment 1 in accordance with the instructions in the FFY 2003 APR, OSEP cannot determine if DCPS is complying with the requirement that a

---

[4] DCPS reported that its data tracking system was not programmed to identify cases in which a valid extension of the 45-day timeline had been granted, but the final decision was not issued within the extended time period.

Page 6 - Honorable Clifford B. Janey

final decision is reached and a copy of the decision mailed to each of the parties not later than 45 days after the receipt of a request for a hearing, unless the hearing officer grants a specific extension of time at the request of a party consistent with 34 CFR §300.511(a) and (c). In the SPP, under indicator 17, DCPS must report the percent of fully adjudicated due process hearing requests that were fully adjudicated within the 45-day timeline or a timeline that is properly extended by the hearing officer at the request of either party. DCPS should describe the results of the calculations and compare the results to their target in accordance with the instructions for Attachment 1 of the SPP. (See August 9, 2005 OSEP Memorandum 05-12.) If the data demonstrate that DCPS is not complying with the requirement in 34 CFR §300.511(a) and (c), DCPS must submit a plan, including strategies, proposed evidence of change, targets and timelines for ensuring that this requirement is met within a reasonable period of time not to exceed one year from the date OSEP accepts the plan.

Other: Timely Implementation of due process hearings

OSEP attached a Special Condition to DCPS' FFY 2005 Grant Award regarding the timely implementation of due process hearing decisions (§615(f) and (i)). The basis and nature of the Special Condition, in addition to the quarterly reporting requirements, are explained in detail in Enclosure D to the FFY 2005 Grant Award letter.

Personnel

OSEP's March 2005 letter required DCPS to demonstrate that noncompliance identified in OSEP's June 2002 Monitoring Report with the requirement at 34 CFR §300.380 to provide an adequate number of qualified personnel to provide FAPE was corrected. On page 14 of the General Supervision cluster of the FFY 2003 APR, DCPS reported that it successfully recruited certified special education teachers from the Philippines with three to thirty years of experience in teaching children and youth with disabilities. DCPS reported that teachers were selected from nontraditional programs and provided with established mentors and alternate certification routes. DCPS also reported that it established a Memorandum of Understanding with Virginia State University and implemented an on-campus graduate certification program for teachers in need of further development. OSEP appreciates DCPS' efforts in this area.

Collection and timely reporting of accurate data

In the March 2005 letter, OSEP accepted DCPS' August 2004 plan for ensuring that: (1) data submitted by charter schools are accurate and reliable; and (2) data required under §618 of IDEA are accurate, reliable, valid, complete and submitted in a timely manner. The plan received in August 2004 contained a detailed and thorough analysis of steps required to meet OSEP's requirements. In the March 2005 letter, OSEP stated that it would review both the evidence of implementation of the plan, and its results through the required submissions under §618 of IDEA and in the FFY 2003 APR.

On page 3 of the FAPE in the Least Restrictive Environment (LRE) section of the FFY 2003 APR, DCPS reported that the Office of Special Education is transitioning in Fall 2005 to ENCORE, a new data tracking system. ENCORE will integrate DCPS Special Education

Page 7 - Honorable Clifford B. Janey

Tracking System (SETS), EZ forms and Encounter Tracking software packages into a web-based platform tool for DCPS. DCPS is also changing to DC Student Tracking and Reporting System (STARS), a statewide student information system.

On page 16-17 of the General Supervision cluster of the FFY 2003 APR, DCPS reported that training had been conducted throughout the year for new users, including charter schools, and current users in need of a refresher course and charter school managers are included in the dissemination of the "Top Ten Newsletter". On page 17 of the FFY 2003 APR, DCPS reported that it traditionally reported educational environments data by amount of services rather than locations of services. SETS codes were adjusted to match the §618 requirements. The on-line EZ IEP form would be modified to ensure it computes the correct information and training would be provided to all personnel continuing to use the paper/pencil IEP form to ensure that information is correctly completed and computed. On page 17, DCPS reported that it would identify a consistent method of computing graduation and drop-out rates for both children with and without disabilities and would communicate that process to all LEAs. DCPS also reported that there was no record or tracking within SETS to report disciplinary actions, but did list a number of strategies being implemented to track, collect and report these data. On page 18, DCPS reported that there was no SETS module to collect/compile data for children with disabilities aged 3-5. DCPS reported that SETS would be revised to include data on all children with disabilities. DCPS stated that, for all required reporting at the LEA or building levels, "data that is not reported in a timely manner will result in a letter or reprimand to the responsible Assistant Superintendent and building administrator."

Despite the approved August 2004 data plan and the additional strategies identified in the FFY 2003 APR, DCPS failed to report accurate data in a timely manner, required under §618, relating to the 2003-2004 exiting, personnel and discipline data. This information was due to WESTAT on November 1, 2004; however these data were not received until July 2005. Due to the late submission and the discrepancies in the data, WESTAT made special accommodations to accept the personnel and exiting data into the database. Even with the special accommodations, the required discipline data did not arrive with sufficient time to include it in the final report. This was the second year that DCPS' discipline data was not accurate or submitted in a timely manner and will not be reflected in the Annual Report to Congress.

On pages 16-17 of the General Supervision cluster of the FFY 2003 APR, DCPS identified some strategies for ensuring that data are accurate, reliable, valid and completed in a timely manner. In addition, DCPS is continuing to implement the plan submitted in August 2004.
In the SPP, under indictor 20, DCPS must report on the timeliness and accuracy of State-reported data (§618 and State Performance Plan and Annual Performance Report). DCPS must submit data that are accurate, on or before the due dates (February 1 for child count, including race and ethnicity, placement; November 1 for exiting, discipline and personnel.) Absence of this information at that time will be considered in OSEP's annual determination on the status of the State's performance and compliance required under section 616(d) of the IDEA. The State should carefully review the instructions to the SPP in developing its plans for this collection.

Page 8 - Honorable Clifford B. Janey

*Early Childhood Transition:*

Part B regulations require that an IEP, or if consistent with State policy, an IFSP, be developed and implemented for all children participating in the early intervention program under Part C of IDEA who are eligible for Part B services by their third birthdays (34 CFR §300.132(b)). OSEP's March 2005 letter required DCPS to submit data and analysis, in the FFY 2003 APR, on the number of children who exited Part C during the reporting period (July 1, 2003 - June 30, 2004) and were determined eligible for Part B services, and how many had an IEP (as required under DCPS policy) developed and implemented by their third birthdays, along with an explanation for any eligible children who did not have an IEP developed and implemented by their third birthdays.

On page 1 of the Early Childhood section of the FFY 2003 APR, DCPS reported that the number of referrals from the DC Early Intervention Program (DCEIP) was 58. Of the 58 referred, 47 were found eligible for Part B. Of the 47 eligible children, 35 had IEPs developed and implemented by their third birthdays. This is an area of noncompliance not previously identified by OSEP.

On page 2 of the Early Childhood section of the FFY 2003 APR, DCPS included strategies, but did not include proposed evidence of change, targets and timelines designed to ensure correction of the noncompliance. Therefore, with the SPP due December 2, 2005, DCPS must submit a plan including strategies, proposed evidence of change, targets and timelines designed to ensure correction of the noncompliance with 34 CFR §300.132(b) as soon as possible, not to exceed one year from the date OSEP accepts the plan. No later than six months from the date of this letter, the State must submit a Progress Report including data and analysis demonstrating progress toward compliance, and provide a report to OSEP, with data and analysis demonstrating compliance, as soon as possible, but not later than 30 days following the end of the one year timeline.

In the SPP, indicator 12 requires DCPS to submit responsive baseline data regarding the percentage of children referred by Part C prior to age 3, who are found eligible for Part B, and who have an IEP developed and implemented by their third birthday.

*Parent Involvement*

On page 1 of the Parent Involvement section of FFY 2003 APR, DCPS reported that the Parents' Special Education Service Center was established in June 2002 as a special education phone call center to facilitate parental involvement, improve communication and better customer service in resolving disputes and answering parent questions concerning special education. Information was available through the center in a number of different languages. A survey conducted by the Parents' Special Education Service Center was included in the Appendix of the FFY 2003 APR. DCPS reported that 88% of the respondents indicated that they were either "satisfied or somewhat satisfied with the quality of services provided."

On page 5 of the Parent Involvement section of the FFY 2003 APR, DCPS, through a commissioned study with the University of Maryland, conducted a statistical analysis of phone

Page 9 - Honorable Clifford B. Janey

calls received by the Parents' Service Center from September 2003 through October 2004. Generally, calls made to the Parents' Service Center revealed seven areas cited most often as reasons for the calls: placement (39%), evaluation (25%), IEP (13%), transportation (10%), school climate (7%) and other (5%). On page 6, DCPS reported that the Parent Training and Information Center trained over 541 parents.

On page 9 of the Parent Involvement section of the FFY 2003 APR, DCPS reported it commissioned the University of Maryland to assist in the development of a comprehensive parent satisfaction survey on parent attitudes toward the substantive and qualitative aspects of special education services and programs in DC. In addition, DCPS, in an effort to collect data about underlying dynamics of parent involvement and interaction with local campuses through IEP teams, with the Parents' Service Center and the University of Maryland, would develop an IEP satisfaction survey specifically designed to measure parental satisfaction immediately after participating in an IEP meeting. The overall goals of the project were to: (1) better understand what parents liked and disliked about the IEP meetings; (2) identify quantitative data about practices or procedures that impeded more effective communication with parents; (3) identify parent dissatisfaction at individual schools or campuses; and (4) use the data to develop training that improves competency and proficiency in facilitating IEP meetings that are productive and effective in resolving conflicts. OSEP appreciates DCPS' efforts and planned future activities in this area.

The SPP instructions establish a new indicator in this area (7), for which DCPS must provide baseline data in the FFY 2005 APR, due February 1, 2007. DCPS should carefully review the instructions to the SPP in developing its plan for this collection. OSEP looks forward to reviewing DCPS' plan for collecting this data, in the SPP.

*Free Appropriate Public Education (FAPE) in the Least Restrictive Environment (LRE)*

Disproportionality

OSEP's March 2005 letter directed DCPS to include in the FFY 2003 APR, an analysis of its disproportionality data and, if significant disproportionality was identified, evidence of its review of policies, procedures and practices in the affected LEA and resulting actions to correct identified problems. On page 3 of the FAPE in the LRE section of the FFY 2003 APR, DCPS included a chart indicating that disproportionality (DCPS used the composition method to determine disproportionality) existed for Black children in the categories of mental retardation, emotional disturbance, orthopedic impairment, multiple disabilities, traumatic brain injury and developmental delay. On page 4, DCPS identified disproportionality for Black children who received services outside the regular education environment for more than 60% of the day. DCPS did not include analysis of the data or provide any plan or actions to determine the causes or remedies for the identified significant disproportionality.

At 34 CFR §300.755(b), Part B requires that, "in the case of a determination of significant disproportionality with respect to the identification of children as children with disabilities, or the placement in particular educational settings of these children, in accordance with [§300.755(a)], the State...must provide for the review and, if appropriate revision of the policies, procedures,

Page 10 - Honorable Clifford B. Janey

and practices used in the identification or placement to ensure that the policies, procedures, and practices comply with the requirements of Part B of the Act." DCPS included no information or data regarding a review of policies, procedures or practices to ensure that they comply with Part B of the IDEA and are race-neutral. With the SPP, DCPS must provide either: (1) the results of its review of policies, procedures and practices to ensure that they comply with Part B of the IDEA and are race-neutral; or (2) if this information is not available, a plan, including strategies, proposed evidence of change, targets and timelines to ensure that policies, procedures and practices are reviewed and, if necessary, revised, no later than one year from the date OSEP accepts the plan.

The SPP instructions establish two new indicators in this area (9 and 10), for which States must provide baseline data in the FFY 2005 APR, due February 1, 2007. DCPS should carefully review the instructions to the SPP in developing its plans for this collection. As the instructions indicate, States should consider using multiple methods in calculating disproportionality to reduce the risk of overlooking potential problems. DCPS also needs to describe the method(s) used to determine disproportionate representation in the cell labeled *Baseline/Trend Data.* OSEP looks forward to reviewing DCPS' plan for collecting this data, in the SPP

Graduation and drop-out rates

OSEP's March 2005 letter required DCPS to include data and analysis relative to the graduation and drop-out rates for children with disabilities and whether these rates were comparable to children without disabilities in the District of Columbia (including charter schools). On page 6 of the FAPE in the LRE section of the FFY 2003 APR, DCPS provided two charts with percentages; however, OSEP cannot determine from the information provided whether high school graduation and drop-out rates for children with disabilities are comparable to graduation and drop-out rates for children without disabilities in the District of Columbia. On page 7, DCPS stated that "State drop-out rates for DC continues in the planning mode. Data will be disaggregated in next year's report."

In the SPP, under Indicator 1, DCPS must report the percent of youth with IEPs graduating from high school with a regular diploma compared to percent of all youth in the State graduating with a regular diploma. DCPS must include a narrative that describes the conditions all youth must meet in order to graduate with a regular diploma and, if different, the conditions that youth with IEPs must meet in order to graduate with a regular diploma. If there is a difference, DCPS must explain why. DCPS must report the calculation used to determine graduation rate for youth with IEPs and all youth. The measurement for youth with disabilities should be the same measurement as for all youth. If the measurement is not the same for youth with and without disabilities, indicate the difference and explain why there is a difference.

In the SPP under Indicator 2, DCPS must report the percent of youth with IEPs dropping out of high school, compared to the percent of all youth in the State dropping out of high school. DCPS must include a narrative that describes what counts as "dropping out" for all youth and, if different, what counts as dropping out for youth with IEPs. If there is a difference, DCPS must explain why. DCPS must report the calculation rate used to determine drop-out rate for youth with IEPs and all youth. The measurement for youth with disabilities should be the same

Page 11 - Honorable Clifford B. Janey

measurement as for all youth. If the measurement is not the same for youth with and without disabilities, indicate the difference and explain why there is a difference.

In preparation for the submission of the SPP, DCPS should carefully consider its current data collection against the requirements related to this indicator in the SPP packet to ensure that data will be responsive to those requirements. The absence of data in this area will be considered in OSEP's decision about approval of DCPS' SPP.

<u>Suspension and expulsion</u>

OSEP's March 2005 letter required DCPS to examine data for all LEAs to determine if significant discrepancies were occurring in the rate of long-term suspensions and expulsions of children with disabilities: (1) among LEAs in the State; or (2) compared to the rates for nondisabled children in the agencies. If the discrepancies described above were occurring, DCPS must review and, if appropriate revise (or require the affected public agency or LEA to revise) its policies, procedures and practices relating to the development and implementation of IEPs, the use of behavioral interventions, and procedural safeguards, to ensure that these policies, procedures and practices comply with IDEA. OSEP informed DCPS that if it did not report the above information consistent with 34 CFR §300.146 in the FFY 2003 APR, then OSEP would conclude that DCPS was not complying with the regulation.

On page 8 of the FAPE in the LRE section of the FFY 2003 APR, DCPS reported suspension rates for children without disabilities of 2.5% in DCPS schools and 13.6% in "charters" and rates for children with disabilities of 0.097% in DCPS and 4.4% in "charters". DCPS reported that, "indicators show students with disabilities in charter schools being suspended at much greater rate than students with disabilities in public [schools]." DCPS reported that DCPS suspension data did not show any significant disparity between students with and without disabilities. OSEP cannot determine whether the suspension data from "charters" was collected from charter schools established as LEAs, charter schools that are public schools of DCPS, or both. If the data from "charters" was collected from charter schools established as LEAs, DCPS' data for the charter schools LEAs was not disaggregated across the various LEAs, but were represented by a single, aggregated percentage.

In the FFY 2003 APR, DCPS provided no information regarding expulsions. For the rate of suspensions, DCPS did not describe which of the comparisons it did, whether it compared data among LEAs in the State (among DCPS, the LEA, and each charter school LEA; not DCPS, the LEA, and all charter school LEAs combined); or compared to the rates for nondisabled children in the agencies (compared to the rate of children with disabilities and children without disabilities within each LEA). DCPS also did not describe the method it used to determine significant discrepancies, the number of agencies with significant discrepancies and, if significant discrepancies were occurring, how DCPS planned to address them. With the SPP, due December 2, 2005, DCPS must submit either: (1) evidence demonstrating that it is meeting the requirements of 34 CFR §300.146, as described above; or (2) a plan, including strategies, proposed evidence of change, targets and timelines to ensure correction of the noncompliance with 34 CFR §300.146 as soon as possible but not later than one year from the date OSEP accepts the plan.

Page 12 - Honorable Clifford B. Janey

In order to respond to indicator 4A in the SPP, DCPS must report the percent of districts identified by DCPS as having a significant discrepancy in the rates of suspensions and expulsions of children with disabilities for greater than 10 days in a school year. In preparation for the submission of the SPP, DCPS should carefully consider its current data collection against the requirements related to this indicator in the SPP packet to ensure that data will be responsive to those requirements. The absence of data in this area, including expulsion data, will be considered in OSEP's decision about approval of DCPS' SPP.

The SPP instructions establish a new indicator in this area (4B), for which States must provide baseline data in the FFY 2005 APR, due February 1, 2007. Absence of this information at that time will be considered in OSEP's annual determination on the status of the State's performance and compliance required under §616(d) of the IDEA. DCPS should carefully review the instructions to the SPP in developing its plans for this collection.

<u>Statewide and districtwide assessment</u>

OSEP's March 2005 letter required DCPS to report on whether children with disabilities performed at a comparable level to children without disabilities or whether there is a gap between the performance of children with and without disabilities.

On pages 24 and 33 in Attachment 3 of the FFY 2003 APR, DCPS reported participation data that indicated 16% (math) and 17% (English/language arts) of children with disabilities did not participate in the assessments due to absences.[5] On pages 9 and 10 of the FAPE in the LRE section of the FFY 2003 APR, DCPS reported that performance results on District-wide assessments indicated the gap between children with and without disabilities decreased by 0.43% for English/language arts and by 1.78% for math, from 2002-2003 to 2003-2004. DCPS included future activities to achieve projected targets, including timelines and resources needed. OSEP looks forward to reviewing information regarding the implementation of DCPS' activities and the resulting data and analysis in this area in the SPP.

<u>Least restrictive environment (LRE)</u>

The instructions to the FFY 2003 APR required States to report on whether children with disabilities were educated with nondisabled peers to the maximum extent appropriate, including preschool children with disabilities. On page 12 of the FAPE in the LRE section of the FFY 2003 APR, DCPS reported placement data for children, aged 6-21. On page 13, DCPS reported that "the high number in nonpublic settings in part is due to hearing officer determinations frequently placing students in more restrictive settings." DCPS did not provide data on children with disabilities, aged 3-5.

OSEP attached a Special Condition to DCPS' FFY 2005 Grant Award regarding DCPS' failure to ensure placement in the least restrictive environment in accordance with the requirements of

---

[5] The regulations under the No Child Left Behind Act (NCLB) provide, at 34 CFR §200.20(c), that in order to make adequate yearly progress (AYP), a school or LEA must ensure that not less than 95% of its children with disabilities in the grades tested participate in the State assessments under 34 CFR §200.2.

Page 13 - Honorable Clifford B. Janey

34 CFR §§300.550-300.556. The basis and nature of the Special Condition, in addition to the quarterly reporting requirements, are explained in detail in Enclosure D to the FFY 2005 Grant Award letter.

Indicators 5 and 6 in the SPP under §616 that is due December 2, 2005 require DCPS to report placement data for children with IEPs aged 6 through 21 and for preschool children with IEPs. In preparation for the submission of the SPP, DCPS should carefully consider its current data collection against the requirements related to this indicator in the SPP packet to ensure that data will be responsive to those requirements. The absence of data in this area will be considered in OSEP's decision about approval of the SPP.

### Preschool performance outcomes

OSEP's March 2005 letter required DCPS to submit, in the FFY 2003 APR, either preschool performance data (whether collected through sampling, monitoring, individual IEP review, or other methods), targets for improved performance and strategies to achieve those targets for this area, or a plan to collect the data, including a detailed timeline of the activities necessary to implement that plan. On page 14 of the FAPE in the LRE section of the FFY 2003 APR, DCPS stated that it did not collect data in this area and that targets were not identified. DCPS did report that it would identify a special education early childhood committee to set targets for the 2004 - 2005 reporting period. DCPS listed the following strategies:

1. Identify and develop an appropriate assessment instrument to use with preschool children with disabilities that is capable of establishing entry level skills and monitoring progress in the areas of language communication, pre-reading and social-emotional functioning;
2. Identify an appropriate assessment instrument to evaluate and assist in improving the quality of preschool special education programs; and
3. Develop a system to collect and analyze the progress of preschool children in the areas of language communication, pre-reading and social-emotional functioning;

DCPS did not develop any timelines for implementation of this plan, but reported that the early childhood committee would set the timelines during the 2004-2005 reporting period.

The SPP instructions establish a new indicator in this area, for which States must provide entry data in the FFY 2005 APR due February 1, 2007. Absence of this information at that time will be considered in OSEP's annual determination on the status of the State's performance and compliance required under section 616(d) of the IDEA. The State should carefully review the instructions to the SPP in developing its plans for this collection.

### Other: Timely evaluations and reevaluations

OSEP attached a Special Condition to DCPS' FFY 2005 Grant Award regarding timely evaluations and reevaluations (§614(a)(1), (b) and (c) and §614(a)(2), (b) and (c)). The basis and nature of the Special Condition, in addition to the quarterly reporting requirements, are explained in detail in Enclosure D to the FFY 2005 Grant Award letter.

Page 14 - Honorable Clifford B. Janey

<u>Other: Findings from the June 2002 Monitoring Report</u>

OSEP's March 2005 letter required DCPS to submit monitoring data and analysis demonstrating that the following areas of noncompliance, initially identified in OSEP's June 2002 Monitoring Report, were corrected: (1) required participants attend individualized education program (IEP) meetings (34 CFR §300.344(a)(2), (4) and (6)); (2) availability of extended school year (ESY) services (34 CFR §300.309); and (3) consideration and provision of assistive technology devices and services (34 CFR §§300.308 and 300.346(a)(2)(v)). DCPS did not provide this information. Therefore, with the SPP, due December 2, 2005, DCPS must provide the required data, demonstrating correction of this noncompliance, to OSEP.

*Secondary Transition*

OSEP's March 2005 letter required DCPS to submit monitoring data and analysis demonstrating that the following area of noncompliance, initially identified in OSEP's June 2002 Monitoring Report, was corrected: inviting representatives of agencies likely to be responsible for providing or paying for transition services (34 CFR §300.344(b)(3)). DCPS did not report this information in the FFY 2003 APR. Therefore, with the SPP, DCPS must provide the required data, demonstrating full correction of this noncompliance, to OSEP.

Based on information provided during the January 6, 2005 Improvement Planning meeting, OSEP's March 2005 letter also required DCPS to clarify whether outside agencies are required under Federal or DC law, or assigned responsibility under DC policy, to provide or pay for transition services that are needed in order to ensure FAPE and, if such agencies exist, DCPS was to submit documentation that an interagency agreement or other mechanism for interagency coordination is in effect in accordance with 34 CFR §300.142. If DCPS was not complying with 34 CFR §300.142, DCPS was to include a plan, with strategies, proposed evidence of change, targets and timelines designed to achieve compliance as soon as possible but not later than one year after OSEP accepts the plan.

DCPS had previously provided OSEP with a copy of its *Memorandum of Agreement Among District of Columbia Public Schools and Service Providers for Transition from School to Post-School Activities*, signed between December 1998 and May 1999 by the following individuals/agencies: Arlene Ackerman for DCPS, Jearline F. Williams for the Department of Human Services, Scott H. Nelson, M.D. for the Commission on Mental Health, David Gilmore for the Housing Authority, Betty Jo Gaines for the Department of Recreation and Parks, and Odie Washington for the Department of Corrections. This agreement was effective upon signature and provisions established a process for annual review, amendment by mutual written consent of all parties, and an agreement that any party agrees to provide at least 90 days notice of intention to withdraw from the Agreement. On pages 8 and 10 of the Secondary Transition section of the FFY 2003 APR, DCPS indicated that it was revising the Memorandum of Agreement between DCPS and service providers in the District. However, DCPS did not specify what agreement it was revising. With the SPP due December 2, 2005, DCPS must indicate specifically whether the *Memorandum of Agreement Among District of Columbia Public Schools and Service Providers for Transition from School to Post-School*

Page 15 - Honorable Clifford B. Janey

*Activities*, signed between December 1998 and May 1999 is being revised, whether this agreement is currently in effect and is being implemented while the current agreement is being revised, or whether DCPS is referring to another agreement.

On pages 1-2 of the Secondary Transition section of the FFY 2003 APR, DCPS reported that it developed seven Performance Indicators in this area. On page 3, DCPS reported that it did not collect post-school information on children with disabilities. DCPS reported that the Office of Special Education would collaborate with regular education to create a system to collect data on post-school outcomes for all students exiting the DCPS educational system. On page 4, DCPS reported that the Career and Technology Center, serving youth with and without disabilities, conducted a post-school survey of youth attending the career and technology/vocational programs, but the survey did not distinguish between youth with and without disabilities. DCPS intended to conduct a similar survey for youth with disabilities every two years, for the purpose of obtaining employment and postsecondary information on students with disabilities that exit DCPS. In addition, DCPS reported that it was working with the National Center on Secondary Education and Transition to improve transition outcomes for students with disabilities in the District. On pages 4-10, DCPS provided data, including targets and future activities to address the performance indicators. OSEP appreciates DCPS' efforts in this area.

The SPP instructions establish two new indicators in this area (13 and 14). For indicator 13, States must provide baseline data in the FFY 2005 APR due February 1, 2007. For indicator 14, States must provide baseline data in the FFY 2006 APR, due February 1, 2008, based on students who exit during the 2005-2006 school year. Absence of this information at that time will be considered in OSEP's annual determination on the status of the State's performance and compliance required under section 616(d) of the IDEA. DCPS should carefully review the instructions to the SPP in developing its plan for this collection.

*Conclusion*

In the SPP, under indicator 17, DCPS must report the percent of fully adjudicated due process hearing requests that were fully adjudicated within the 45-day timeline or a timeline that is properly extended by the hearing officer at the request of either party. DCPS should describe the results of the calculations and compare the results to their target in accordance with the instructions for Attachment 1 of the SPP. (See August 9, 2005 OSEP Memorandum 05-12.) If the data demonstrate that DCPS is not complying with the requirement in 34 CFR §300.511(a) and (c), DCPS must submit a plan, including strategies, proposed evidence of change, targets and timelines for ensuring that this requirement is met within a reasonable period of time not to exceed one year from the date OSEP accepts the plan.

With the SPP, due December 2, 2005, DCPS must provide:

1. A plan including strategies, proposed evidence of change, targets and timelines designed to ensure correction of the noncompliance with the early childhood transition requirements at 34 CFR §300.132(b) as soon as possible, not to exceed one year from the date OSEP accepts the plan. No later than six months from the date of this letter, the State must submit a Progress Report including data and analysis demonstrating progress

Page 16 - Honorable Clifford B. Janey

    toward compliance, and provide a report to OSEP, with data and analysis demonstrating compliance, as soon as possible, but not later than 30 days following the end of the one year timeline.

2. Either (a) the results of its review of policies, procedures and practices related to disproportionality to ensure that they comply with Part B of the IDEA and are race-neutral; **or** (b) if this information is not available, a plan, including strategies, proposed evidence of change, targets and timelines to ensure that policies, procedures and practices are reviewed and, if necessary, revised, no later than one year from the date OSEP accepts the plan.
3. Either (a) evidence demonstrating that it is meeting the requirements of 34 CFR §300.146 related to suspension and expulsion, as described above; **or** (b) a plan, including strategies, proposed evidence of change, targets and timelines to ensure correction of the noncompliance with 34 CFR §300.146 as soon as possible but not later than one year from the date OSEP accepts the plan.
4. Monitoring data and analysis demonstrating that the following areas of noncompliance, initially identified in OSEP's June 2002 Monitoring Report, were corrected:
    (a) required participants attend individualized education program (IEP) meetings (34 CFR §300.344(a)(2), (4) and (6));
    (b) availability of extended school year (ESY) services (34 CFR §300.309);
    (c) consideration and provision of assistive technology devices and services (34 CFR §§300.308 and 300.346(a)(2)(v)); and
    (d) inviting representatives of agencies likely to be responsible for providing or paying for transition services (34 CFR §300.344(b)(3)).
5. Information on whether the *Memorandum of Agreement Among District of Columbia Public Schools and Service Providers for Transition from School to Post-School Activities*, signed between December 1998 and May 1999 is being revised, whether this agreement is currently in effect and is being implemented while the current agreement is being revised, or whether DCPS is revising another agreement.

DCPS' FFY 2005 Grant Award was released subject to four Special Conditions set forth in Enclosure D of the August 5, 2005 Grant Award letter. The basis and nature of the Special Condition, in addition to the quarterly reporting requirements, are explained in detail in Enclosure D to the FFY 2005 Grant Award letter:

1. Provide timely initial evaluations and reevaluations. (§614(a)(1), (b) and (c)) and (§614(a)(2), (b), and (c));
2. Implement due process hearing decisions in a timely manner (§615(f) and (i));
3. Ensure placement in the LRE (§612(a)(5)(A)); and
4. Identify and correct, in a timely manner (i.e., within one year of identification), noncompliance with the requirements of Part B of IDEA (34 CFR §300.600, §612(a)(11), and 20 U.S.C. 1232d(b)(3).

IDEA 2004, §616, requires each State to submit a State Performance Plan (SPP) that measures performance on monitoring priorities and indicators established by the Department. These priorities and indicators are, for the most part, similar to clusters and probes in the APR. OSEP

Page 17 - Honorable Clifford B. Janey

encourages DCPS to carefully consider the comments in this letter as it prepares its SPP and other data submissions with the SPP, due December 2, 2005.

OSEP remains concerned with DCPS' failure to correct noncompliance as documented in this letter and with DCPS' failure to provide the required data in the FFY 2003 APR. Continued failure to demonstrate compliance could have impact on DCPS' FFY 2006 grant award.

OSEP recognizes that the APR and its related activities represent only a portion of the work in DCPS and looks forward to collaborating with you as you continue to improve results for children and youth with disabilities and their families. If you have questions, please contact Paul Steenen at (202) 245-7397.

Sincerely,

Troy R. Justesen
Acting Director
Office of Special Education Programs

cc: Mary Lee Phelps