

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

Honorable Clifford B. Janey, Ed.D.
Superintendent
District of Columbia Public Schools                    **MAR 1 8 2005**
825 North Capitol Street, 9th Floor
Washington, DC  20002

Dear Dr. Janey:

The purpose of this letter is to respond to the District of Columbia's April 16, 2004 submission
of its Federal Fiscal Year (FFY) 2002 Annual Performance Report (APR) for the Individuals
with Disabilities Education Act (IDEA) Part B funds used during the grant period July 1, 2002
through June 30, 2003. The APR reflects actual accomplishments made by the State during the
reporting period, compared to established objectives. The APR for IDEA is designed to provide
uniform reporting from States and result in high-quality information across States.

The APR is a significant data source utilized in the Continuous Improvement and Focused
Monitoring System (CIFMS) implemented by the Office of Special Education Programs (OSEP),
within the U.S. Department of Education. The APR falls within the third component of OSEP's
four-part accountability strategy (i.e., supporting States in assessing their performance and
compliance, and in planning, implementing, and evaluating improvement strategies) and
consolidates the self-assessing and improvement planning functions of the CIFMS into one
document. OSEP's Memorandum regarding the submission of Part B APRs directed States to
address five cluster areas: General Supervision, Early Childhood Transition, Parent Involvement,
Free Appropriate Public Education in the Least Restrictive Environment, and Secondary
Transition.

*Background*

OSEP conducted a review in the District of Columbia, ending the week of March 26, 2001, for
the purpose of assessing compliance in the implementation of IDEA and assisting the District in
developing strategies to improve results for children with disabilities.  The report was issued on
June 18, 2002 and identified the following areas of noncompliance:  (1) Individualized education
programs (IEPs) did not include how parents would be informed of their child's progress (34
CFR §300.347(a)(7)); (2) untimely initial evaluation and placement (34 CFR §300.343(b)(1));
(3) untimely reevaluations (34 CFR §§300.536(b) and 300.532-300.535); (4) failure to provide
related services in a timely manner (34 CFR §300.350); (5) placements based on factors other
than individual children's needs (34 CFR §300.550(b)); (6) inadequate supply of qualified
personnel to provide a free appropriate public education (FAPE) (34 CFR §§300.300 and
300.380); (7) required participants did not attend IEP meetings (34 CFR §300.344(a)(2), (4) and
(6)); (8) lack of availability of extended school year services (34 CFR §300.309); (9) lack of
participation in District-wide assessments (34 CFR §§300.138(b) and 300.347(a)(5)); (10) failure
to ensure consideration and provision of assistive technology devices and services (34 CFR
§§300.308 and 300.346(a)(2)(v)); (11) failure to include a statement of transition services needs
for students by the age of 14 (34 CFR §300.347(b)(1)); (12) failure to invite representatives of

**Plaintiffs' Exhibit**
**4**

Page 2 - Honorable Clifford B. Janey, Ed.D.

agencies likely to be responsible for providing or paying for transition services (34 CFR §300.344(b)(3)); (13) failure to require and consider local educational agency (LEA) charter school policies and procedures (34 CFR §300.220(b)); (14) failure to consult with private schools to provide services consistent with the location and number of private school children with disabilities (34 CFR §§300.125(a)(1)(i) and 300.450-300.462); (15) lack of implementation of surrogate parent procedures (34 CFR §300.515); (16) failure to identify and correct deficiencies (monitoring) (34 CFR §300.600 and 20 U.S.C.1232d(b)(3)); and (17) failure to implement hearing officer decisions in a timely manner (34 CFR §§300.510(a) and 300.300).

In February 2003, DCPS submitted an initial Improvement Plan (IP) (referenced in the General Supervision cluster of the FFY 2002 APR, on page three, as an "Implementation Plan") to address these areas of noncompliance and, subsequent to a three-day meeting in July 2003 with staff from OSEP, DCPS and the Mid-South Regional Resource Center, submitted a revised IP on November 13, 2003. OSEP approved the IP in a letter dated February 27, 2004. In that letter OSEP stated that: (1) except for the Special Conditions which must be met within the timelines established in the [September 17, 2004 FFY 2004] grant award letter, the District must ensure that all of the areas of noncompliance identified in the Monitoring Report are corrected within the timelines established by DCPS in the IP, which cannot exceed one year from February 27, 2004; and (2) Progress Reports were due on March 31, 2004 as part of the FFY 2002 APR; July 16, 2004; October 29, 2004; and a final report was due on February 27, 2005. DCPS submitted the FFY 2002 APR on April 16, 2004, but did not submit a Progress Report on July 16, 2004 or October 29, 2004. Therefore, DCPS must submit the final Progress Report demonstrating that all of the areas of noncompliance identified in the Monitoring Report have been corrected as part of the FFY 2003 APR, due no later than 60 days from the date of this letter.

Between May and September 2003, OSEP conducted verification activities in the District to verify the effectiveness of the State's systems for general supervision, data collection under Section 618 of IDEA, and District-wide assessment. The results of the verification visit were documented in a letter dated June 8, 2004. In that letter, OSEP required DCPS to submit, within 60 days of that letter: (1) for each month, from January 2003 until June 2004, the number of hearing decisions that became overdue during that month (hearing decisions reached outside the 45-day timeline because of an appropriately granted extension were not considered overdue if the hearing decision was reached within the extended timeline). Along with this data, if necessary, DCPS was required to provide an explanation for overdue hearings; and (2) a plan for ensuring that (a) data submitted by charter schools, which the Special Education Tracking System (SETS) data manager compiles and submits to OSEP, are accurate and reliable; and (b) data required under section 618 of IDEA, including data from charter schools, beginning with data collected for the 2003-2004 school year, are accurate, reliable, valid, complete and submitted to OSEP in a timely manner. DCPS requested and was granted a two-week extension of the 60-day timeline. The submission was received by OSEP on August 20, 2004.

The District's FFY 2004 grant award was released subject to Special Conditions set forth in Enclosure C attached to DCPS' September 17, 2004 grant award letter. OSEP determined that DCPS remained out of compliance in the four areas where special conditions were imposed as part of DCPS' FFY 2003 grant award letter, including failure to: (1) provide timely initial evaluations and reevaluations; (2) implement due process hearing decisions in a timely manner; (3) ensure placement in the least restrictive environment (LRE); and (4) report publicly on

Page 3 - Honorable Clifford B. Janey, Ed.D.

alternate assessments. DCPS was required to submit Special Condition Reports on October 29, 2004; January 14, 2005; April 15, 2005; and a final report on June 17, 2005 demonstrating that it has met the Special Conditions. DCPS submitted a Special Conditions Report on November 1, 2004 and January 18, 2005.

In addition, DCPS assured OSEP in an August 17, 2004 letter that as soon as possible, but no later than July 1, 2005, the District would make the changes to its Chapter 30 of the District of Columbia Code of Municipal Regulations, and any applicable resulting changes to its policies and procedures, as specified in the July 13, 2004 memorandum from Stephanie Lee to interim superintendent Dr. Robert Rice, that are necessary to make them consistent with the following requirements of the IDEA and its implementing regulations in 34 CFR Part 300, and will provide the Secretary with a copy of the revised documents showing those changes:  34 CFR §§300.7(b)(1) and 300.122(a)(3).

In a December 15, 2004 letter to DCPS, OSEP determined that DCPS has failed to meet its responsibility under Part B of IDEA to establish and maintain a State advisory panel (SAP) as required under 34 CFR §§300.650-300.653.  Pursuant to 34 CFR §300.150, the District must have on file with the Secretary information to demonstrate that the State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State. DCPS has on file with OSEP established policies and procedures which state in Chapter IX (pp. 6-7) that "DCPS has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the District in accordance with this section." DCPS policies and procedures on file with OSEP also address appropriate membership of the SAP, advisory panel functions and procedures. DCPS is currently in violation of both Federal requirements and their own District policies by failing to establish and maintain a SAP.

In the December 15, 2004 letter, DCPS was required to provide documentation to OSEP by January 31, 2005 that (1) the Mayor's Order has been completed, (2) the advisory panel has been appointed by the Mayor, (3) the panel consists of members that meet the requirements in 34 CFR §300.651, and (4) a meeting has been scheduled.  By June 1, 2005, DCPS must submit (1) for any advisory panel meetings conducted, the announcements of meetings and agenda items required in 34 CFR §300.653(d) and (2) the official minutes required by 34 CFR §300.653(c). DCPS failed to submit the required documentation due to OSEP on January 31, 2005. Therefore, by June 1, 2005, DCPS must submit all of the documentation requested by OSEP in the December 15, 2004 letter.

On January 6, 2005, OSEP staff met with DCPS officials to review and update the IP relative to the correction of identified noncompliance. At the January 6, 2005 IP update meeting, all 17 areas of noncompliance identified in the June 18, 2002 OSEP monitoring report issued to DCPS (see above) and included in the IP approved by OSEP on February 27, 2004 were discussed. Based on previously submitted data and information provided by DCPS at this meeting, OSEP determined that DCPS corrected the previously identified noncompliance with the following: failure to provide related services in a timely manner (34 CFR §§300.350); lack of implementation of surrogate parent procedures (34 CFR §300.515), failure to include in IEPs how parents would be informed of their child's progress (34 CFR §300.347(a)(7)); failure to

Page 4 - Honorable Clifford B. Janey, Ed.D.

consult with private schools to provide services consistent with the location and number of private school children with disabilities (34 CFR §§300.125(a)(1)(i) and 300.450-300.462) and failure to include in the IEP a statement of any individual modifications in the administration of State or district-wide assessments of student achievement that are needed in order for the child to participate in the assessment; and if the IEP team determines that the child will not participate in a particular State or district-wide assessment of student achievement (or part of an assessment), a statement of why that assessment is not appropriate for the child; and how the child will be assessed (300.347(a)(5)). OSEP is unable, from the information included in the APR and from the January 6, 2005 IP meeting, to determine whether the remaining areas of noncompliance identified in the June 18, 2002 OSEP Monitoring Report have been corrected.

The State's APR should reflect the collection, analysis, and reporting of relevant data, and document data-based determinations regarding performance and compliance in each of the cluster areas (as well as any other areas identified by the State to ensure improvement). Because it is OSEP's intent to consolidate improvement planning and performance reporting activities, OSEP is commenting on DCPS' FFY 2002 APR, August 20, 2004 response to the verification letter, and the November 1, 2004 and January 18, 2005 Special Conditions Reports. OSEP is also commenting on data and information provided at the January 6, 2005 IP update meeting between OSEP and DCPS staff in this letter. OSEP's comments are listed by cluster area.

*General Supervision*

OSEP's June 2002 monitoring report identified five areas of noncompliance in this cluster: (1) failure to require and consider LEA charter school policies and procedures (34 CFR §300.220(b)); (2) failure to consult with private schools to provide services consistent with the location and number of private school children with disabilities (34 CFR §§300.125(a)(1)(i) and 300.450-300.462); (3) lack of implementation of surrogate parent procedures (34 CFR §300.515); (4) failure to identify and correct deficiencies (monitoring) (34 CFR §300.600 and 20 U.S.C. 1232d(b)(3)); and (5) failure to implement hearing officer decisions in a timely manner (34 CFR §§300.510(a) and 300.300).

In the September 30, 2003 grant award letter, OSEP found that DCPS submitted information in the FFY 2002 Special Conditions Reports that demonstrated that it had taken appropriate steps to implement its surrogate parent procedures in accordance with 34 CFR §300.515. At the January 6, 2005 IP update meeting, DCPS staff confirmed that DCPS consulted with private schools to provide services consistent with the location and number of private school children with disabilities in accordance with 34 CFR §§300.450-300.462. Consultation with private schools resulted in the signing of a DCPS-private/parochial school agreement in the summer 2004. During the January 6, 2005 IP meeting, DCPS informed OSEP staff that all charter school LEAs, with the exception of the Edison Charter Schools LEA, have policies and procedures on file in accordance with 34 CFR §300.220(b). In the next APR, in order to demonstrate that it has corrected the noncompliance identified in the monitoring report with 34 CFR §300.220(b), DCPS must submit documentation to demonstrate that the Edison Charter Schools LEA has policies and procedures on file in accordance with 34 CFR §300.220(b).

**Monitoring**. On pages 3 and 4 of the General Supervision cluster of the FFY 2002 APR, DCPS reported that during the period July 1, 2002 to June 30, 2003, DCPS had created a system for

Page 5 - Honorable Clifford B. Janey, Ed.D.

reviewing both IDEA requirements and requirements of the No Child Left Behind Act (NCLB) but could not ensure identification and timely correction of all IDEA-related noncompliance. DCPS created a comprehensive monitoring system that included a review of data from the Special Education Tracking System (SETS); a review of hearing decisions, local-level policies and procedures and student files; building-level staff interviews; and a cyclical process for monitoring all DCPS buildings (including charter schools that are DCPS schools for special education purposes), charter schools functioning as their own LEAs, nonpublic schools in which DCPS children with disabilities are placed by DCPS, and Department of Health and Human Services programs where DCPS provides the educational component. Beginning in October 2003, DCPS conducted monitoring academies to create a cadre of peer monitors and to prepare charter schools for the monitoring activities. On page 13 of the General Supervision cluster of the APR, DCPS reported that it has designated the SEA Monitoring Program Certification Unit as the State level agent for monitoring.

Based on OSEP's review of the District's newly-created monitoring system during the verification visit, OSEP concluded in the June 8, 2004 verification letter that it could not yet determine whether the improvement strategies identified in the IP will result in a system for general supervision that is effective in identifying noncompliance with all Part B requirements and ensuring the correction of identified noncompliance. DCPS reported during the verification visit that beginning in January 2004, DCPS would begin monitoring all high schools in the District; Middle/Junior High Schools would be monitored in the fall of 2004 and elementary schools would be monitored during the spring and fall of 2005. On page 14 of the General Supervision cluster of the APR, DCPS reported that case record reviews had been conducted in all 19 of the DCPS high schools as of the submission date of the FFY 2002 APR. In the IP review meeting on January 6, 2005, DCPS stated that except for two public charter high schools, all high schools had been monitored. At this IP meeting, DCPS assured OSEP that the monitoring data regarding the high schools was almost complete and that the review of the middle and junior high division had started and would produce findings by April 2005.

Because of the recent implementation of the monitoring process in DCPS, no data was reported regarding the timely correction of identified noncompliance (i.e., within one year of identification). During OSEP's January 6, 2005 IP update meeting, DCPS explained that reports from monitoring were delayed when a need was identified to include two public charter high schools in the high school cycle. In the next APR, DCPS must submit data and analysis demonstrating that the noncompliance identified in the monitoring report with the requirement in 34 CFR §300.600 and 20 U.S.C. 1232d(b)(3) to identify and correct deficiencies has been corrected. DCPS must include monitoring data and reports from the high school and middle/junior high divisions, corrective actions imposed and activities undertaken by DCPS to ensure the implementation of those corrective actions to correct identified noncompliance within one year of identification. DCPS must provide documentation that public charter high schools and middle/junior high schools, including charter schools that are schools within DCPS and charter schools functioning as their own LEAs, have been monitored. In addition, DCPS must report mechanisms that it has in place for persistent noncompliance (sanctions) and how/when they will be imposed.

**Timely due process decisions.** In its June 2004 verification letter, OSEP informed DCPS that it could not determine whether DCPS's system for due process hearings was effective in ensuring

Page 6 - Honorable Clifford B. Janey, Ed.D.

compliance with the requirement that a final decision is reached and a copy of the decision mailed to each of the parties not later than 45 days after the receipt of a request for a hearing, unless the hearing officer grants a specific extension of time at the request of a party consistent with 34 CFR §300.511(a) and (c). The failure of DCPS to ensure that hearing officer decisions were reached within the required timeline has been a long-standing area of noncompliance in the District and was part of the Compliance Agreement entered into between the Department and DCPS. DCPS was in compliance with this requirement at the conclusion of the Compliance Agreement on March 10, 2001.

On page 3 of the General Supervision cluster of the FFY 2002 APR, for the reporting period of July 1, 2002-June 30, 2003, DCPS reported that 2,912 requests for due process hearings were received, 2,413 hearings were held, 1,490 had decisions issued after timelines and extensions expired and 42 hearings were pending as of 6/30/03. Thus, more than 60% of the decisions exceeded timelines. During the verification visit, DCPS confirmed reports from stakeholders that during the period following the relocation of the scheduling office in the fall of 2002 from the Office of Special Education to an office directly responsible to the Superintendent, due process decisions were not being issued within required timelines. However, since that time, DCPS staff reported that the backlog was reduced and hearing officer decisions were reached within 45 days of the request in the majority of cases (unless extensions are granted at the request of either party).

The June 2004 verification letter required that, within 60 days of the date of that letter, DCPS provide data to OSEP as follows: For each month, from January 2003 until June 8, 2004, the number of hearings decisions that became overdue during that month (hearing decisions reached outside the 45-day timeline because of an appropriately granted extension are not considered overdue if the hearing decision was reached within the extended timeline). Along with this data, if necessary, DCPS was to provide an explanation for overdue hearings. If, after reviewing the data, OSEP determined that DCPS was not meeting the requirement in 34 CFR §300.511(a) and (c), OSEP would require DCPS to submit a plan, including strategies, proposed evidence of change, targets and timelines for ensuring that this requirement is met within a reasonable period of time not to exceed one year from the date OSEP accepts the plan. OSEP received the data from DCPS on August 20, 2004. The data demonstrated that from February 2004 to June 2004, no due process hearings decisions were issued outside of the required timelines. In addition to completing Attachment 1 of the FFY 2003 APR for the reporting period July 1, 2003-June 30, 2004, DCPS must submit data from June 2004 through February 2005 in the next APR. OSEP will review DCPS' due process hearing decision timeline data and determine what, if any, further action is required.

**Timely implementation of due process decisions.** The DCPS Special Conditions Report submitted on November 1, 2004 for the reporting period of June 1, 2004 through September 30, 2004 and the Special Conditions Report submitted on January 18, 2005 for the reporting period of October 1, 2004 through December 31, 2004 demonstrated DCPS' continued failure to implement hearing officer decisions (HODs) in a timely manner (34 CFR §§300.510(a) and 300.300). DCPS reported the following data:

Page 7 - Honorable Clifford B. Janey, Ed.D.

| Data | 6/1/04 - 9/30/04 | 10/1/04 — 12/31/04 |
|---|---|---|
| (a) The number of children whose hearing officer determinations, as of the end of the previous reporting period, had not been implemented within the time-frame prescribed by the hearing officer | 1486 | 1320 |
| (b) The number of children whose hearing officer determinations had not been implemented within the time-frame prescribed by the hearing officer (became overdue) during this reporting period | 449 | 465 |
| (c) The number of children from (a) and (b) above whose hearings officer determinations were implemented during the reporting period | 615 | 290 |
| (d) The number of children whose hearing officer determinations had not been implemented in a timely manner at the conclusion of this reporting period | 1320 | 1495 |
| (e) The percentage of hearing officer determinations that were not implemented in a timely manner | 20% | 43% |

The DCPS January 18 Special Conditions Report stated that, "Pursuant to DCPS policy developed in response to OSEP's directive to impose timelines for certain HODs[1] where none were ordered (i.e., cases involving independent education evaluations)(see DCPS letter to OSEP dated April 5, 2004) such 'untimed' cases are, for the most part, included in the numbers set forth above. DCPS has been unable to disaggregate the 'untimed' cases from those ordered timelines." As part of the Special Conditions put on the 2004 FYY Grant Award, DCPS must ensure that all due process hearing determinations are implemented within the time-frame required by the hearing officer, or if there is no time-frame prescribed by the hearing officer, within a reasonable time-frame required by DCPS.

DCPS also reported in the January 18 Special Conditions Report that "hearing requests filed (3420) during School Year 2003-2004 were up 13.8% from previous year's number and total dispositions (4190) were up 15.9% from numbers reported for the previous year. Total case closures reported for School Year 2003-2004 numbered 3,626, an increase of 35.7% from numbers reported in the previous year."

At the January 6, 2005 IP meeting, DCPS staff informed OSEP that, although most of the strategies identified in the IP to correct non-compliance involving timely implementation of hearing officer decisions had been implemented, the outcome did not result in compliance with this requirement. The Special Conditions imposed on the FFY 2004 Part B grant award require that by June 17, 2005, DCPS must submit data and analysis demonstrating full compliance in this area.

**Timely complaint decisions.** DCPS reported on page 2 of the General Supervision Cluster of the FFY 2002 APR that a system for gathering and reporting data about the complaint process did not exist during the reporting period. The complaint office was established in June 2003 and was therefore, not in existence during the reporting period and no data were reported for formal

---

[1] Hearing Officer Determinations

Page 8 - Honorable Clifford B. Janey, Ed.D.

written complaints. DCPS reported that it expects to include data in the next APR regarding formal written complaints and their use in the identification and remediation of noncompliance. OSEP expects DCPS to include, in the next APR, an analysis of the operation of the DC State Complaint Office. The FFY 2003 APR must include the information required in Attachment 1, including the number of written complaints received during the reporting period for the FFY 2003 APR, July 1, 2003 through June 30, 2004, the number of complaints with findings and the number of complaints issued within timelines. In addition to completing Attachment 1 of the FFY 2003 APR for the reporting period July 1, 2003-June 30, 2004, OSEP is requesting that DCPS submit more current data from June 2004 through February 2005 in the next APR.

**Sufficient numbers of administrators, teachers, related services providers, paraprofessionals, and other providers to meet the identified educational needs of all children with disabilities.** In its June 2002 Monitoring Report, OSEP identified an inadequate number of qualified personnel to provide a free appropriate public education (FAPE) to children with disabilities in the District of Columbia (34 CFR §§300.300 and 300.380). On page 9 of the General Supervision Cluster of the FFY 2002 APR, DCPS stated that baseline data were not available to determine whether DCPS had a sufficient number of administrators, teachers, related services providers, paraprofessionals, and other providers to meet the identified educational needs of all children with disabilities. DCPS did not include measurable targets on page 11 of the APR and indicated the completion of its 2000 Self-Assessment and the November 2003 IP as its explanation of progress or slippage. Only two activities from the 2000 Self-Assessment and the November 2003 IP were included, the development of a Comprehensive System of Personnel Development and the implementation of a new "tracking system."

At the January 6, 2005 IP meeting, DCPS stated, but did not provide specific data, that except for related service providers, DCPS had a sufficient number of qualified staff to meet the identified educational needs of all children with disabilities. DCPS did provide evidence of its implementation of strategies approved in the November 2003 IP at the January 6, 2005 IP meeting relating to the creation of a bilingual recruitment plan developed by bilingual providers with CEC, a joint program between DCPS and George Washington University for a degree in Bilingual Special Education and a copy of the tracking sheet for DCPS to assess accountability of related service providers. OSEP is unable, from the information included in the APR and from the January 6, 2005 IP meeting update to determine compliance or noncompliance with the requirement to ensure a sufficient number of qualified personnel, including related services personnel, to provide FAPE to children with disabilities in the District of Columbia. In the next APR, DCPS must demonstrate that the noncompliance identified in the monitoring report with the requirement in 34 CFR §300.380 to provide an adequate number of qualified personnel to provide FAPE has been corrected. DCPS must provide evidence of implementation of the following strategy identified in the IP, analysis of data from the needs assessment, its impact on FAPE (whether children with disabilities are not receiving FAPE because of shortages in qualified personnel), and if FAPE was impacted, evidence of correction of the noncompliance.

**Collection and reporting of accurate and timely data.** On page 9 of the General Supervision Cluster of the FFY 2002 APR, DCPS reported that the Special Education Tracking System (SETS) report is the current mechanism used to ensure the collection and reporting of accurate data. At the January 6, 2005 IP meeting, DCPS reported that the migration to the new system called ENCORE was completed in the Fall 2004. DCPS also reported that it had not yet

Page 9 - Honorable Clifford B. Janey, Ed.D.

implemented the IP strategy to include pre-school placements as part of the Encore/SETS data management system. In its June 2004 verification letter, OSEP required DCPS to submit, within 60 days of the date of the letter, a plan to OSEP for ensuring that: (1) data submitted by charter schools, which the SETS data manager compiles and submits to OSEP, are accurate and reliable and (2) data required under section 618 of IDEA including data from charter schools, beginning with data collected for the 2003-2004 school year, are accurate, reliable, valid, complete and submitted to OSEP in a timely manner. The plan received in August 2004 contains a detailed and thorough analysis of steps required to meet OSEP's requirements. OSEP accepts the plan and looks forward to reviewing both the evidence of implementation of the plan, and its results through the required submissions under Section 618 of IDEA and in the next APR.

### Early Childhood Transition

Part B regulations require that an IEP, or if consistent with State policy, an IFSP, be developed and implemented for all children participating in the early intervention program under Part C of IDEA who are eligible for Part B services by their third birthday. (34 CFR §300.132(b)). On page 1 of the Early Childhood cluster of the FFY 2002 APR, DCPS reported that data was not available on whether children transitioning from Part C to Part B programs were receiving special education and related services by their third birthday. During the January 6, 2005 IP meeting, DCPS provided data on many of the strategies listed in the IP plan, including the signed Memorandum of Understanding (MOU) between DCPS and the District of Columbia Early Intervention Program (DCEIP). In the next APR, DCPS must include data and analysis on the number of children who exited Part C during the reporting period (July 1, 2003 through June 30, 2004) and were determined eligible for Part B services, and how many had an IEP/IFSP developed and implemented by their third birthdays, along with an explanation for any eligible children who did not have an IEP/IFSP developed and implemented by their third birthdays.

### Parent Involvement

OSEP's June 2002 Monitoring Report included one finding of noncompliance in this cluster: IEPs did not include how parents would be informed of their child's progress (34 CFR §300.347(a)(7)). Under its November 2003 Improvement Plan, DCPS modified its on-line *EZ-FORM* IEP to require this information. Approximately 60% of IEPs in DCPS are currently completed on-line. The required hard-copy form also is designed to include this information.

On pages 1 through 6 of the Parent Involvement Section of the FFY 2002 APR, DCPS reported that the *EZ-Form* IEP will include a review of progress of annual goals and that the information would be sent to parents. At the January 6, 2005 IP meeting, DCPS provided the EZ-Form IEP, which included information for reviewing and reporting on the progress of annual goals and the forms sent to parents. Based on this information, OSEP has determined that DCPS has corrected the noncompliance identified in the monitoring report with 34 CFR §300.347(a)(7).

On page 1 of the Parent Involvement section of the FFY 2002 APR, DCPS reported that the Parent Special Education Service Center (PSESC) is a service of DCPS that assists parents with smooth transitions in the special education evaluation process. A survey conducted by the Parent Special Education Service Center was included in the Appendix of the APR. On page 12 of the survey, "a little more than half" of the respondents reported "their concern was resolved satisfactorily when they called." On page 1 of the Parent Involvement section of the FFY 2002

Page 10 - Honorable Clifford B. Janey, Ed.D.

APR, DCPS reported that the explanation of parent rights and responsibilities is available in multiple languages, including Chinese, Vietnamese, Amharic, Spanish and French, as well as other languages as needed. DCPS should continue to report in the next APR on its strategies to ensure compliance and performance in this cluster area.

### Free Appropriate Public Education in the Least Restrictive Environment

OSEP's June 2002 Monitoring Report included eight findings of noncompliance in this cluster, including: (1) untimely initial evaluation and placement (34 CFR §300.343(b)(1)); (2) untimely reevaluations (34 CFR §§300.344, 300.536(b) and 300.532-300.535); (3) failure to provide related services in a timely manner (34 CFR §300.350); (4) placements based on factors other than individual children's needs (34 CFR §300.550(b)) (see LRE section); (5) required participants did not attend IEP meetings (34 CFR §300.344(a)(2), (4) and (6)); (6) lack of availability of extended school year services (34 CFR §300.309); (7) lack of participation in District-wide assessments (34 CFR §§300.138(b) and 300.347(a)(5)) (see Performance and Reporting on District-wide Assessments section); (8) failure to ensure consideration and provision of assistive technology devices and services (34 CFR §§300.308 and 300.346(a)(2)(v)).

In the July 25, 2002 grant award letter, OSEP found that DCPS submitted information in the FFY 2001 Special Conditions Reports that demonstrated that DCPS was ensuring that all children with disabilities were receiving the related services specified in their IEPs in accordance with 34 CFR §300.350.

DCPS' FFY 2004 grant award contains Special Conditions regarding: (1) untimely initial evaluations and placements; (2) untimely reevaluations; (3) DCPS' continued failure to report, to the public and to the Secretary, on the participation and performance of children with disabilities on alternate assessments, in the same frequency and detail as it reports participation and performance of children without disabilities (34 CFR §300.139(a)) and (4) placements based on factors other than individual children's needs. In addition, DCPS had not reported on the participation and performance of children with disabilities attending public charter schools in the District.

In its November 2003 Improvement Plan, DCPS included activities and strategies to address noncompliance related to: untimely initial evaluation and placement (34 CFR §300.343(b)(1)) and untimely reevaluations (34 CFR §§300.344, 300.536(b) and 300.532-300.535). Information in the November 2004 and January 2005 Special Conditions Reports, and information gathered at the January 6, 2005 IP update meeting indicated that many initial evaluation and placements, and revaluations are not conducted within required timelines. The DCPS Special Conditions Report submitted on November 1, 2004 for the reporting period of June 1, 2004 through September 30, 2004 and the Special Conditions Report submitted on January 18, 2005 for the reporting period of October 1, 2004 through December 31, 2004 demonstrated DCPS' continued failure to ensure that all initial evaluations and placements and reevaluations were conducted in a timely manner. DCPS reported the following data:

Page 11 - Honorable Clifford B. Janey, Ed.D.

| DATA | 6/1/04 – 9/30/04 | 10/1/04 – 12/31/04 |
|---|---|---|
| **Initial Evaluations** | | |
| (a) The children who, as of the end of the previous reporting period, had been referred for, but not provided, a timely initial evaluation and placement. | 262 | 375 |
| (b) The number of children referred for initial evaluation and placement whose initial evaluation and placement became overdue during the reporting period. | 304 | 269 |
| (c) The number of children, from (a) and (b) above, who were provided initial evaluations and placements during the reporting period. | 127 | 330 |
| (d) The number of children who had not been provided a timely initial evaluations and placements at the conclusion of the reporting period. | 375 | 314 |
| (e) The percentage of timely initial evaluations and placements provided to children with disabilities whose initial evaluation deadlines fell within the reporting period. | 29% | 28% |
| (f) The average number of days the initial evaluations and placements that had not been provided in a timely manner were overdue for the reporting period. | 32 days | 20 days |
| **Reevaluations** | | |
| (a) The children who, as of the end of the previous reporting period, had not been provided a timely triennial reevaluation. | 573 | 887 |
| (b) The number of children whose triennial reevaluation became overdue during the reporting period. | 538 | 510 |
| (c) The number of children, from (a) and (b) above, who had been provided triennial reevaluations during the reporting period. | 224 | 852 |
| (d) The number of children who had not been provided a timely triennial reevaluation at the conclusion of the reporting period. | 887 | 545 |
| (e) The percentage of timely triennial reevaluations provided to children with disabilities whose reevaluation deadline fell during the reporting period. | 25% | 30% |
| (f) The average number of days the triennial reevaluations that had not been provided in a timely manner were overdue for the reporting period. | 27 days | 34 days |

At the January 6 IP meetings, DCPS staff informed OSEP that although most of the strategies identified in the IP plan to correct noncompliance involving timely implementation of initial evaluation and placements, and reevaluations have been implemented, the outcome did not result in compliance with this requirement. The Special Conditions imposed on DCPS' FFY 2004 Part B grant award require that by June 17, 2005, DCPS must submit data and analysis to demonstrating full compliance in this area.

At the IP meeting on January 6, 2005, DCPS staff informed OSEP that it has implemented the strategies identified in the IP to address the following areas of noncompliance identified in the June 2002 Monitoring Report:  required participants did not attend IEP meetings (34 CFR §300.344(a)(2), (4) and (6)); lack of availability of extended school year services (34 CFR §300.309); and failure to ensure consideration and provision of assistive technology devices and services (34 CFR §§300.308 and 300.346(a)(2)(v)).  However, without monitoring data and

Page 12 - Honorable Clifford B. Janey, Ed.D.

analysis, the evidence of change required in the IP, OSEP cannot determine whether implementation of the strategies resulted in correction of the noncompliance with these requirements. In the next APR, DCPS must submit monitoring data and analysis in order to demonstrate that the noncompliance identified in the monitoring report with these requirements has been corrected.

**Disproportionality.** The APR included a chart indicating that disproportionality (DCPS used the .20 factor to determine disproportionality) existed but the APR did not analyze disproportionality nor provide any plan or actions to determine the causes or remedies for disproportionality. Part B requires at 34 CFR 300.755(b) that "in the case of a determination of significant disproportionality with respect to the identification of children as children with disabilities, or the placement in particular educational settings of these children, in accordance with [§300.755(a)], the State…must provide for the review and, if appropriate revision of the policies, procedures, and practices used in the identification or placement to ensure that the policies, procedures, and practices comply with the requirements of Part B of the Act. The instructions to the APR require States that identify significant disproportionality to report on the results of that review of policies, procedures and practices.

When DCPS analyzes disproportionality in the future, OSEP cautions DCPS that the use of a numerical goal for any racial or ethnic subgroup raises serious concerns under federal civil rights laws and the United States Constitution and is not an appropriate way to address the potential compliance problems that significant disproportionality may indicate. If DCPS is concerned about the number of children with disabilities being served under Part B who were from a particular racial or ethnic subgroup or that some groups are being overidentified, DCPS should review, and if necessary revise, its policies, procedures and practices (including monitoring) to ensure that traditionally underserved groups are not being excluded by current policies, procedures and practices. For example, DCPS may want to review its eligibility procedures and practices to ensure that children suspected of having a disability were individually evaluated and assessed using tests and other evaluation methods consistent with 34 CFR §§300.531 through 300.535, including ensuring that nondiscriminatory procedures were used (see 34 CFR §300.532). In addition, DCPS may want to ensure that traditionally underserved groups were involved and informed of the Part B program and processes, consistent with 34 CFR §§300.125, 300.304 and 300.504.

In the next APR, DCPS must include an analysis of its disproportionality data and, if significant disproportionality is identified, evidence of its review of policies, procedures and practices in the affected LEA or DCPS school and resulting actions to correct identified problems. OSEP looks forward to reviewing this analysis, and any subsequent actions taken by DCPS, in the next APR.

**Graduation Rates and Dropout Rates.** The instructions to the APR require the State to provide data on whether high school graduation rates, and dropout rates for children with disabilities, are comparable to graduation rates and dropout rates for non-disabled children. DCPS did not address this probe and included no data in the APR. In the next APR, DCPS must address this probe, including both data and analysis relative to the graduation and dropout rates for children with disabilities and whether these rates are comparable to children without disabilities in the District of Columbia (including charter schools).

Page 13 - Honorable Clifford B. Janey, Ed.D.

**Suspension and Expulsion.** The instructions to the APR require States to provide data on whether suspension and expulsion rates for students with disabilities are comparable among LEAs within the State, or to the rates for nondisabled children within the agencies. DCPS did not address this probe and included no data in the APR. 34 CFR §300.146 requires that States examine data to determine if significant discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities either among LEAs in the State or compared to the rates of nondisabled children within the agencies. Where the State determines that significant discrepancies are occurring, it must review and, if appropriate, revise (or require the affected State agency or LEA to revise) its policies, procedures and practices relating to the development and implementation of IEPs, the use of behavioral interventions, and procedural safeguards to ensure that the policies, procedures, and practices comply with Part B.

The instructions of the FFY 2002 APR directed States to describe which of these comparisons it did, as well as the method the State used to determine possible discrepancies, what constitutes a discrepancy, the number of agencies with significant discrepancies and, if significant discrepancies are occurring, a description of those discrepancies and how the State plans to address them. In the next APR, DCPS must include the information required by these instructions. If the 2003 APR does not include information indicating that DCPS has examined all data for all LEAs to determine whether significant discrepancies are occurring in the LEAs based on either one of the comparisons described above, and that when it identifies significant discrepancies it reviews and, if appropriate, revises (or requires the affected State agency or LEA to revise) its policies, procedures and practices consistent with 34 CFR §300.146, then OSEP will conclude that DCPS is not complying with the regulation.

**Performance and Reporting on District-Wide Assessments.** DCPS has a Special Condition attached to its FFY 2004 grant award regarding the reporting of District-wide Assessment data to the public and to the Secretary. DCPS was to submit a plan, by December 1, 2004, about how it will meet those Special Conditions. OSEP received this plan on January 7, 2005 and looks forward to DCPS' implementation of the strategies identified in the plan in order to satisfy the Special Conditions attached to the FYY 2004 grant award. By May 30, 2005, DCPS must submit data and analysis to demonstrating full compliance in this area.

The June 18, 2002 OSEP monitoring report found DCPS out of compliance with 34 CFR §§300.347(a)(5) and 300.138(b). As stated in the September 17, 2004 Part B grant award letter, beginning in spring 2003, DCPS administered the alternate assessment to all children with disabilities who could not participate in the District-wide assessment program in accordance with 34 CFR §300.138(b). Part B regulations at 34 CFR §300.347(a)(5) require that the IEP must include a statement of any individual modifications in the administration of State or district-wide assessments of student achievement that are needed in order for the child to participate in the assessment; and if the IEP team determines that the child will not participate in a particular State or district-wide assessment of student achievement (or part of an assessment), a statement of why that assessment is not appropriate for the child; and how the child will be assessed.

In the January 6 IP meeting, DCPS informed OSEP that it amended the IEP forms to reflect the content required in 34 CFR §300.347(a)(5). Based on this information, OSEP has determined that DCPS has corrected the noncompliance identified in the monitoring report with 34 CFR §300.347(a)(5).

Page 14 - Honorable Clifford B. Janey, Ed.D.

Participation data indicated that a large majority of children with disabilities did not participate in the assessments.[2] Performance data were reported only for children with disabilities and no analysis of the data was included. The APR requires States to report on whether children with disabilities performed at a comparable level to children without disabilities or whether there is a gap between the performance of children with and without disabilities. In the next APR, DCPS must include an analysis of the data provided, along with measurable targets, explanation of progress or slippage and activities, timelines and resources to address any identified deficiencies.

**Least Restrictive Environment (LRE).** The instructions to the APR require States to report on whether children with disabilities are educated with nondisabled peers to the maximum extent appropriate, including preschool. DCPS did not address this probe or provide any data related to the placement of children with disabilities in the least restrictive environment. In the next APR, DCPS must address this probe.

With the implementation of DCPS' monitoring system, OSEP required, in the special conditions attached to DCPS' FFY 2004 grant award, that DCPS provide the results of its monitoring efforts highlighting any findings and required corrective actions related to placement of children with disabilities in the least restrictive environment, including information obtained from record reviews and staff and parent interviews. The November 1, 2004 Special Conditions Report submitted by DCPS stated that "DCPS has completed the Monitoring review of the High School highlighting findings and corrective action measures related to placement of children in the least restrictive environment. As we indicated, the parental involvement component of the review was extended to ensure that parents had adequate time to respond."

During OSEP's January 6, 2005 IP update meeting, DCPS explained that reports from monitoring were delayed when a need was identified to include two public charter high schools in the high school cycle. Thus, DCPS did not submit the results of the high school monitoring conducted during the spring and summer of 2004 in the Special Conditions Report. (The report was originally due to OSEP by October 8, 2004 and has still not been received as of this letter.) Further, the Special Conditions Report stated that the review of the middle and junior high division had started and would produce findings by April 2005. The January 18, 2005 Special Conditions Report stated that DCPS has no current information under LRE to submit in this report. DCPS must submit the information required in the Special Conditions attached to DCPS' FFY 2004 Part B grant award by June 17, 2005.

**Early Language/Communication, Pre-reading, and Social-Emotional Skills, of Preschool Children with Disabilities.** The APR did not include data about the outcomes of preschool children, indicating to OSEP that DCPS did not currently collect data on this issue and did not include a plan to collect the data. Under 20 U.S.C. 1418(a)(2) States are required to provide information that the Secretary requires. Moreover, under 20 U.S.C. 1232d(b)(4), States are required to cooperate in carrying out any evaluation conducted by the Secretary. Under the Government Performance and Results Act of 1993, 31 U.S.C. 1116, the effectiveness of the IDEA section 619 program is being measured based on the extent to which early language/

---

[2] The regulations under the No Child Left Behind Act (NCLB) provide, at 34 CFR §200.20(c), that in order to make adequate yearly progress (AYP), a school or LEA must ensure that not less than 95 percent of its children with disabilities in the grades tested participate in the State assessments under 34 CFR §200.2.

Page 15 - Honorable Clifford B. Janey, Ed.D.

communication, pre-reading, and social-emotional skills of preschool children with disabilities receiving special education and related services are improving. In the next APR, DCPS must either submit documentation of data (whether collected through sampling, monitoring, individual IEP review, or other methods), targets for improved performance and strategies to achieve those targets for this area, or a plan to collect the data for the FFY 2004 APR, including a detailed timeline of the activities necessary to implement that plan.

*Secondary Transition*

**Youth with Disabilities Participating in Post-School Activities.** The instructions to the APR require States to report on whether the percentage of youth with disabilities participating in post-school activities is comparable to that of nondisabled youth. On page 1 of the Secondary Transition cluster of the FFY 2002 APR, DCPS reported that it is in the initial stages of developing a student database to collect post-school outcome data, which would enable a comparison of the percentage of youth with disabilities participating in post-school activities with that of nondisabled youth.

OSEP's June 2002 Monitoring Report included two findings of noncompliance in this cluster: (1) failure to include a statement of transition services needs for students by the age of 14 (34 CFR §300.347(b)(1)); and (2) failure to invite representatives of agencies likely to be responsible for providing or paying for transition services (34 CFR §300.344(b)(3)). In its November 2003 IP, DCPS included activities and strategies to address this noncompliance. As indicated above, OSEP approved the IP in a February 2004 letter. Changes made to the IDEA by the IDEA Amendments of 2004, which take effect on July 1, 2005, eliminate the requirement to include a statement of transition services needs for students by the age of 14 (34 CFR §300.347(b)(1)). Therefore, although the State must continue to comply with this requirement through July 1, 2005, DCPS will not need to provide documentation addressing this requirement in the next APR.

In the January 6, 2005 IP meeting, DCPS acknowledged that in order to complete some of the identified strategies, a MOU was needed between outside agencies likely to be responsible for providing, or paying for, secondary transition services. Under 34 CFR §300.142(a), DCPS must ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each non-educational public agency obligated under Federal or State law, or assigned responsibility under State policy, to provide or pay for any services that are also considered special education and related services that are necessary for ensuring FAPE to children with disabilities within the District. In the next APR, DCPS must clarify whether these outside agencies are required under Federal or DC law, or assigned responsibility under DC policy, to provide or pay for transition services that are needed in order to ensure FAPE. If they are such agencies, DCPS must submit documentation that an interagency agreement or other mechanism for interagency coordination is in effect in accordance with 34 CFR §300.142. If DCPS is not complying with 34 CFR §300.142, DCPS must include a plan, with strategies, proposed evidence of change, targets and timelines designed to achieve compliance as soon as possible but not later than one year after OSEP accepts the plan.

In addition, OSEP informed DCPS at the January 6, 2005 IP meeting that monitoring data was needed to determine if outside agency representatives responsible for paying for transition services were being invited to participate in IEP meetings (34 CFR §300.344(b)(3)). In the next

Page 16 - Honorable Clifford B. Janey, Ed.D.

APR, DCPS must include monitoring data and analysis demonstrating that the noncompliance identified in the monitoring report with the requirement to invite representatives of agencies likely to be responsible for providing or paying for transition services (34 CFR §300.344(b)(3)) has been corrected.

*Conclusions*

OSEP approved the IP in a letter dated February 27, 2004. In that letter OSEP stated that: (1) except for the Special Conditions which must be met within the timelines established in the September 17, 2004 FFY 2004 grant award letter, the District must ensure that all of the areas of noncompliance identified in the Monitoring Report are corrected within the timelines established by DCPS in the IP, which cannot exceed one year from February 27, 2004. DCPS must submit the final Progress Report demonstrating that the following areas of noncompliance identified in the Monitoring Report have been corrected as part of the FFY 2003 APR, **due no later than 60 days from the date of this letter.** Failure to demonstrate the correction of these areas of noncompliance in the FFY 2003 APR may impact DCPS' FYY 2005 grant award under Part B of IDEA. Therefore, in the FFY 2003 APR, DCPS must include the following:

1. Documentation to demonstrate that the Edison Charter Schools LEA has policies and procedures on file in accordance with 34 CFR §300.220(b).
2. Data and analysis to show that DCPS is identifying and correcting deficiencies (monitoring) in accordance with 34 CFR §300.600 and 20 U.S.C. 1232d(b)(3)). DCPS must submit monitoring data and reports from the high school and middle/junior high school divisions, corrective actions imposed, and activities undertaken by DCPS to ensure the implementation of those corrective actions to correct identified noncompliance within one year of identification. In addition, DCPS must report mechanisms it has in place for persistent noncompliance (sanctions) and how/when they will be imposed. DCPS must also provide documentation that public charter high schools and middle/junior high schools, including charter schools that are schools within DCPS and charter schools functioning as their own LEAs, have been monitored.
3. Data and analysis demonstrating that the noncompliance identified in the monitoring report with the requirement in 34 CFR §300.380 to provide an adequate number of qualified personnel to provide FAPE has been corrected. DCPS must provide evidence of implementation of the following strategy identified in the IP, analysis of data from the needs assessment, its impact on FAPE (whether children with disabilities are not receiving FAPE because of shortages in qualified personnel), and if FAPE was impacted, evidence of correction of the noncompliance.
4. Monitoring data and analysis demonstrating that the following areas of noncompliance identified in the monitoring report have been corrected: required participants did not attend IEP meetings (34 CFR §300.344(a)(2), (4) and (6)); lack of availability of extended school year services (34 CFR §300.309); and failure to ensure consideration and provision of assistive technology devices and services (34 CFR §§300.308 and 300.346(a)(2)(v)).
5. Monitoring data and analysis demonstrating that the noncompliance identified in the monitoring report with the requirement to invite representatives of agencies likely to be responsible for providing or paying for transition services (34 CFR §300.344(b)(3)) has been corrected.

Page 17 - Honorable Clifford B. Janey, Ed.D.

In addition to the data related to previously identified non-compliance above, in the FFY 2003 APR, **due no later than 60 days from the date of this letter**, DCPS must also include the following:

1.  Information required in Attachment 1, including the number of written complaints received during the reporting period for the FFY 2003 APR, July 1, 2003 through June 30, 2004, the number of complaints with findings and the number of complaints issued within timelines. In addition to completing Attachment 1 of the FFY 2003 APR for the reporting period July 1, 2003-June 30, 2004, OSEP is requesting that DCPS submit more current data from June 2004 through February 2005.

2.  In addition to information in Attachment 1 of the FFY 2003 APR for the reporting period July 1, 2003-June 30, 2004, DCPS must submit data from June 2004 through February 2005 in the next APR regarding due process hearing decision timeline data. OSEP will review DCPS' due process hearing decision timeline data and determine what, if any, further action is required.

3.  Data and analysis on the number of children who exited Part C during the reporting period (July 1, 2003 through June 30, 2004) and were determined eligible for Part B services, and how many had an IEP/IFSP developed and implemented by their third birthdays, along with an explanation for any eligible children who did not have an IEP/IFSP developed and implemented by their third birthdays in accordance with 34 CFR §300.132(b).

4.  An analysis of the disproportionality data and, if significant disproportionality is identified, evidence of its review of policies, procedures and practices in the affected LEA or DCPS school and resulting actions to correct identified problems.

5.  Data on whether suspension and expulsion rates for students with disabilities are comparable among LEAs within DC, or to the rates for nondisabled children within the agencies; and if significant discrepancies are identified, a review and, if appropriate, a revision of its policies, procedures and practices consistent with 34 CFR §300.146.

6.  Data and analysis relative to graduation and drop-out rates. DCPS must address this probe, including both data and analysis relative to the graduation and drop-out rates for children with disabilities and whether these rates are comparable to children without disabilities in the District of Columbia (including charter schools).

7.  Whether children with disabilities performed at a comparable level to children without disabilities or whether there is a gap between the performance of children with and without disabilities. DCPS must include an analysis of the data provided, along with measurable targets, explanation of progress or slippage and activities, timelines and resources to address any identified deficiencies.

8.  Documentation of data on preschool outcomes (whether collected through sampling, monitoring, individual IEP review, or other methods), targets for improved performance and strategies to achieve those targets for this area, or a plan to collect the data for the FFY 2004 APR, including a detailed timeline of the activities necessary to implement that plan.

9.  Clarification of whether any noneducational public agencies in DC are required under Federal or DC law, or assigned responsibility under DC policy, to provide or pay for transition services that are needed in order to ensure FAPE. If they are, DCPS must

Page 18 - Honorable Clifford B. Janey, Ed.D.

submit documentation that an interagency agreement or other mechanism for interagency coordination is in effect in accordance with 34 CFR §300.142. If DCPS is not complying with 34 CFR §300.142, DCPS must include a plan, with strategies, proposed evidence of change, targets and timelines designed to achieve compliance as soon as possible but not later than one year after OSEP accepts the plan.

In addition, the District's FFY 2004 grant award was released subject to four Special Conditions set forth in Enclosure C attached to DCPS's September 17, 2004 grant award letter. Three of the four issues were also areas of noncompliance identified in the June 2002 Monitoring Report:

1. Provide timely initial evaluations and reevaluations; (34 CFR §300.343(b)(1) (34 CFR §§300.536(b) and 300.532-300.535).
2. Implement due process hearing decisions in a timely manner (34 CFR §§300.510(a) and 300.300).
3. Ensure placement in the LRE (34 CFR §300.550(b).

On **June 17, 2005,** the final Special Conditions Report is due to OSEP. In addition to the three Special Condtions above, DCPS has a Special Condition attached to its FFY 2004 grant award regarding the reporting of District-wide Assessment data to the public and to the Secretary. By **May 30, 2005,** DCPS must submit data and analysis demonstrating full compliance in this area. Failure to meet the Special Conditions within required timelines may impact DCPS' FYY 2005 grant award under Part B of IDEA.

By **June 1, 2005,** DCPS must submit all of the documentation requested by OSEP in the December 15, 2004 letter concerning DCPS' responsibility to establish and maintain a State advisory panel (SAP) as required under 34 CFR §§300.650-300.653. DCPS must submit documentation that: (1) the Mayor's Order has been completed, (2) the advisory panel has been appointed by the Mayor, (3) the panel consists of members that meet the requirements in 34 CFR §300.651, and (4) a meeting has been scheduled, (5) for any advisory panel meetings conducted, the announcements of meetings and agenda items required in 34 CFR §300.653(d) and (6) the official minutes required by 34 CFR §300.653(c). Failure to establish and maintain a SAP in accordance with 34 CFR §§300.650-300.653 within this timeframe may impact DCPS' FFY 2005 grant award under Part B of IDEA.

DCPS assured OSEP that as soon as possible, but no later than **July 1, 2005,** the District will make the changes to its Chapter 30 of the District of Columbia Code of Municipal Regulations, and any applicable resulting changes to its policies and procedures, as specified in the July 13, 2004 memorandum from Stephanie Lee to interim superintendent Dr. Robert Rice, that are necessary to make them consistent with the following requirements of the IDEA and its implementing regulations in 34 CFR Part 300, and will provide the Secretary with a copy of the revised documents showing those changes: 34 CFR §§300.7(b)(1) and 300.122(a)(3).

Page 19 - Honorable Clifford B. Janey, Ed.D.

OSEP recognizes that the APR and its related activities represent only a portion of the work in your State. We appreciate your work on the APR and we look forward to collaborating with the District of Columbia Public Schools as you continue to improve results for children with disabilities and their families. If you have questions, please contact Paul Steenen at (202) 245-7397.

Sincerely,

Patricia J. Guard

Patricia J. Guard
Acting Director
Office of Special Education Programs

cc: Dr. Raymond Bryant