UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

Honorable Yvonne Gilchrist
Director
Department of Human Services                DEC 2 2 2004
P.O. Box 54047
2700 Martin Luther King, Jr. Avenue, SE
Washington, DC 20032-0247

Dear Director Gilchrist:

The purpose of this letter is to respond to the District of Columbia's (DC) March 31, 2004 submission of its Federal Fiscal Year (FFY) 2002 Annual Performance Report (APR) for the Individuals with Disabilities Education Act (IDEA) Part C funds used during the grant period July 1, 2002 through June 30, 2003. The APR reflects actual accomplishments made by the State during the reporting period, compared to established objectives. The APR for IDEA is designed to provide uniform reporting from States and result in high-quality information across States.

The APR is a significant data source utilized in the Continuous Improvement and Focused Monitoring System (CIFMS) implemented by the Office of Special Education Programs (OSEP), within the U.S. Department of Education. The APR falls within the third component of OSEP's four-part accountability strategy (i.e., supporting States in assessing their performance and compliance, and in planning, implementing, and evaluating improvement strategies) and consolidates the self-assessing and improvement planning functions of the CIFMS into one document. OSEP's Memorandum regarding the submission of Part C APRs directed States to address five cluster areas: General Supervision; Comprehensive Public Awareness and Child Find System; Family Centered Services; Early Intervention Services in Natural Environments; and Early Childhood Transition.

*Background*

The District of Columbia Early Intervention Program (DCEIP) was monitored by OSEP in March 2001. The OSEP Monitoring Report of June 18, 2002 identified the following areas of noncompliance that DCEIP had to address in an Improvement Plan (IP): (1) child find and public awareness activities were not sufficient to ensure that all infants and toddlers who were eligible for services through Part C were identified, located and evaluated; (2) initial evaluations to determine eligibility were inadequate or incomplete; (3) lack of individualized decision-making by the individualized family plan (IFSP) team about needed early intervention services; (4) lack of all required content in IFSPs; (5) failure to complete evaluations within 45 days of referral; (6) failure of service coordinators to coordinate all services; (7) family supports and services were not identified or included on the IFSP; (8) lack of a smooth and timely transition

Plaintiffs' Exhibit
5

Page 2 - Honorable Yvonne Gilchrist

from Part C to Part B services; and (9) supervision and monitoring procedures did not ensure compliance. As noted below, DCEIP has provided data and information that addresses two of these findings (individualized decision making for IFSPs and family supports and services on IFSPs), and DCEIP must provide, in the next APR, data and information on the correction of the remaining seven issues, as requested in this letter.

DCEIP submitted a draft IP to OSEP in October 2001 and a revised IP to OSEP in March 2003. OSEP approved DCEIP's revised IP on June 26, 2003 with the requirement that all areas of noncompliance identified in OSEP's June 18, 2002 Monitoring Report be corrected within a reasonable period of time, not to exceed June 26, 2004. In response to the noncompliance, DCEIP submitted IP Progress Reports in August and December 2003. DCEIP also submitted its FFY 2001 APR in July 2003. OSEP responded to the August 2003 Progress Report and FFY 2001 APR in a February 27, 2004 letter to DCEIP[1]. DCEIP also submitted its FFY 2002 APR in March 2004, and its final Progress Report in June 2004. In this letter, OSEP is responding to DCEIP's December 2003 Progress Report, FFY 2002 APR, and June 2004 final Progress Report.

OSEP also conducted a verification visit to the District of Columbia during the week of September 1, 2003. OSEP commented on its verification visit in a letter to DCEIP dated December 12, 2003. During the verification visit, OSEP found that DCEIP's prior written notice did not include the required content in 34 CFR §303.403(b). A March 15, 2004 OSEP letter instructed DCEIP to submit to OSEP, by May 15, 2004, revised prior written notice materials or a written assurance that DCEIP had corrected the prior written notice to address all of the issues identified in the letter and had redistributed the prior written notice broadly and as required under 34 CFR §303.403. OSEP received the assurance from DCEIP on May 17, 2004.

The State's APR should reflect the collection, analysis and reporting of relevant data, and document data-based determinations regarding performance and compliance in each of the cluster areas (as well as any other areas identified by the State to ensure improvement). OSEP's comments regarding DCEIP's December 2003 IP Progress Report, FFY 2002 APR, and June 2004 IP final Progress Report are listed below by cluster area.

*General Supervision*

The June 2002 OSEP Monitoring Report included data and information that indicated the following area of noncompliance: DCEIP's supervision and monitoring procedures did not ensure the identification and correction of noncompliance among participating programs and agencies in the State-wide Part C early intervention program. See 34 CFR §303.501. DCEIP's March 2003 revised IP proposed strategies to address the noncompliance in this area.

OSEP conducted a verification visit to the District of Columbia during the week of September 1, 2003. OSEP commented on its verification visit in a letter to DCEIP dated December 12, 2003. In that letter, OSEP continued to indicate that it could not determine whether DCEIP's revised monitoring process would result in the identification and correction of noncompliance, but recognized that DCEIP was in the process of implementing its IP and indicated that DCEIP must continue to report to OSEP in its IP Progress Reports. OSEP also explained in that letter that it

---

[1] OSEP did not include its analysis of DCEIP's December 2003 Progress Report in the February 27, 2004 letter.

Page 3 - Honorable Yvonne Gilchrist

had learned that child find and evaluation contractors were not included in DCEIP's revised monitoring process, and indicated that DCEIP must ensure that all programs and activities used by the State to carry out Part C of IDEA are monitored.

OSEP's February 2004 letter regarding DCEIP's FFY 2001 APR and Progress Report acknowledged DCEIP's progress in implementing activities identified in the IP and reported in the Progress Report; however, DCEIP did not provide data to demonstrate the impact of implementation. OSEP requested that DCEIP provide the following type of data: (1) the number of service providers that were monitored and were scheduled to be monitored; (2) the number of child find and evaluation contractors that were monitored and were scheduled to be monitored; (3) a copy of the monitoring reports that were issued; (4) the type of noncompliance identified, if any; (5) the corrective action plans developed to address identified noncompliance, including the timeline for implementation of the plan; and (6) evidence that the identified noncompliance was corrected. DCEIP's efforts at addressing the above-requested information are documented below.

Page 14 of the General Supervision section[2] of the APR indicated that, during and subsequent to the reporting period, supervision included the following methods: on-site provider visits; technical assistance; a review of provider monthly reports; and participation by DCEIP staff in IFSP meetings. In addition, on page 7, DCEIP reported that it established a requirement that all IFSPs (including 6 month and annual IFSPs) be sent to DCEIP, and be made available for review to determine consistency with the Part C requirements. Page 14 of the APR indicated that desk reviews of evaluations and IFSPs resulted in 15 formal requests for corrective action, and page 15 of the APR indicated that an evaluation of 29 provider agreements resulted in two agreements not being renewed due to poor evaluation results. Except for not renewing provider agreements, the APR did not provide data on the results of the other supervision methods mentioned above and did not provide data or information to demonstrate that the noncompliance had been corrected.

DCEIP reported in the APR that it was in the process of developing new monitoring instruments, and had completed four components of it, including a staff interview, record review, therapy observation and program observation (page 13). The June 2004 IP Progress Report indicated that the revised compliance monitoring instruments have been completed for direct service, evaluation and child find contractors (page 1). Attachment GS-1 of the June 2004 IP Progress Report explains that the monitoring process includes the following steps: desk audits completed by DCEIP staff, self-assessments completed by the providers, site visits (which may include record reviews, interviews, observations, or other components), exit reports sent to the programs with a compliance letter outlining areas on non-compliance, and corrective action plans.

The June 2004 IP Progress Report indicated that, as of June 2004, all 20 direct service providers, all eight child find contractors, and all five evaluation providers had been directed to implement the self-assessment component of the revised monitoring process (page 1). The June 2004 IP

---

[2] Several documents submitted by DCEIP have page numbers that start over at the beginning of each section. When referring to page numbers in this letter, we are referring to the page number in the section of the document that corresponds to the cluster area that is being discussed in this letter.

Page 4 - Honorable Yvonne Gilchrist

Progress Report further stated that the following steps in the monitoring process had been taken for direct service providers, eligibility evaluation contractors, and child find contractors:

*Direct Service Providers*
As of June 26, 2004, nine direct service providers had completed the self-assessment, and seven of the nine received on-site monitoring visits (page 1). Three of the seven received an exit report (Attachment GS-3). Attachment GS-3 of the June 2004 IP Progress Report indicated that all three direct service providers had noncompliance in the following areas: (1) prior written notice (34 CFR §303.403) – failure to give prior written notice when required; (2) procedures for IFSP development, review and evaluation (34 CFR §303.342) – failure to update IFSPs in a timely manner; (3) content of the IFSP (34 CFR §303.344) – including (a) vision and hearing status incomplete or not reported; (b) family priorities and concerns were identified but not addressed in other sections of the IFSP; (c) criteria, procedures, and timelines were sometimes contradictory in terms of how outcomes would be achieved; (d) progress towards achieving outcomes was not documented; and (e) outcomes were not consistently written in the family's language. One of the three direct service providers had noncompliance in the area of transition (34 CFR §303.344(h)) – failure to consistently include the steps to support transition on the IFSP. One of the three submitted a corrective action plan and was awaiting DCEIP's approval of the plan.

*Eligibility Evaluation Contractors*
Desk audits had been completed for all 5 contractors, and all 5 contractors were given the self-assessment to complete (June 2004 IP Progress Report, page 2). The June 2004 IP Progress Report also indicated that two of the five evaluation providers had completed their self-assessments, and received an on-site monitoring visit. Attachment GS-4 of the June 2004 IP Progress Report indicated that DCEIP expected to issue exit reports for the two contractors by mid-July 2004, and that the two evaluation providers had noncompliance in the following areas: (1) prior written notice (34 CFR §303.403) – both providers failed to consistently provide prior written notice for evaluations and IFSP meetings; (2) procedures for initial evaluation (34 CFR §303.322) – both providers were inconsistently including vision and hearing screenings results in the evaluation report; (3) IFSPs completed without all evaluation data available (34 CFR §303.344)(a)(1)) – both providers were conducting initial IFSPs without completing assessments; (4) 45-day timeline violations (34 CFR §303.342(a)) – both providers inconsistently met the 45-day timeline for completing the evaluation; and (5) content of the IFSP (34 CFR §303.344) – both providers failed to consistently include the required content on the IFSP, such as vision and screening information, developmental status, outcome information, target dates, identified needs and concerns of families, and identified services that matched the outcomes.

*Child Find Contractors*
All child find contractors were given Self-Assessments to complete (page 2). Two of the child find providers completed the self-assessment and one had an on-site monitoring visit, received an exit report and was to submit its corrective action plan within 30 days from the date of the exit report. DCEIP also conducted desk audits on all eight child find providers and, through the desk audit, identified the following areas of noncompliance: (1) all infants and toddlers who were eligible for Part C were not identified, located and evaluated (34 CFR §303.321(b)(1)) – six of

Page 5 - Honorable Yvonne Gilchrist

the eight child find providers were failing to identify children who were eligible for Part C services - one contractor failed to identify children, two contractors needed to increase identification efforts, and three contractors needed to increase the early identification of children identified with a diagnosed condition; (2) failure to ensure coordination with all other major efforts to locate and identify children (34 CFR §303.321(c)) – four of the eight were failing to effectively collaborate with other pediatric services and community programs to locate and identify children - one failed to collaborate to identify any children, and three needed to increase their collaboration efforts with the pediatric services provided through their facilities. (Attachment GS-4). DCEIP reported that the above-mentioned noncompliance identified through the desk audits would be validated by the on-site monitoring visits (Attachment GS-4).

Per OSEP's request, DCEIP included a few sample monitoring reports in the June 2004 IP Progress Report. OSEP appreciates DCEIP's efforts in reporting on its general supervision system, which appears to identify noncompliance. OSEP has not identified any further concerns regarding DCEIP's system for identifying noncompliance. However, OSEP is unable to determine the effectiveness of DCEIP's general supervision system because DCEIP did not provide information regarding correction of the noncompliance it identified.

DCEIP had very limited data to report on its revised monitoring process due to the initiation date of monitoring activities. It appeared that DCEIP would continue to utilize various methods of supervision in addition to its revised monitoring process. OSEP is concerned that the APR and the June 2004 IP Progress Report did not clearly explain how DCEIP would track noncompliance identified through the various methods of supervision mentioned in this letter and noncompliance identified through its revised monitoring process, in order to ensure that all noncompliance was corrected in a timely manner. In addition, due to a change in staff at DCEIP, there is a concern about whether exit reports are being issued in a timely manner. Accordingly, in the FFY 2003 APR, due March 31, 2005, DCEIP must provide to OSEP the following data and information (updated at least through March 1, 2005): (1) the status of the 15 areas of noncompliance identified through desk reviews of evaluations and IFSPs; (2) the number of exit reports that have been disseminated to providers since June 30, 2004; (3) the status of corrective action plans on all providers that received an on-site monitoring visit using the revised monitoring process, and had noncompliance identified; and (4) the criteria used by DCEIP to approve or disapprove corrective action plans.

No formal complaints, mediations, or due process hearing requests were received, as indicated on page 2 of the APR. In addition, DCEIP provided to OSEP the assurance requested in the March 2004 letter regarding prior written notice. Due to the recent revision of the prior written notice information, DCEIP had limited data to report on the impact of implementation of prior written notice.

Pages 6-10 of the APR identified the following three concerns involving Medicaid policy and procedures that DCEIP is working with Medicaid to resolve: (1) a need for clarity regarding Part C requirements because the Managed Care Organization's (MCOs) pre-authorization policy sometimes delayed timely evaluations, and in some instances procedures for Part C evaluations were unclear to the MCO providers; (2) the MCO policy prohibited MCO providers from working outside of their network and in some instances, caused a shortage of service providers to

Page 6 - Honorable Yvonne Gilchrist

serve Medicaid eligible infants and toddlers; and (3) the inability, in some instances, of DCEIP to collect child count data from some MCO providers. DCEIP included strategies that constituted a reasonable approach to resolving the concern regarding Medicaid policy and procedures. In the FFY 2003 APR, DCEIP must provide an update of its implementation of strategies, particularly as they may affect timely completion of evaluations and assessments, IFSP service provision, and collection of child count data on Medicaid-eligible infants and toddlers.

*Comprehensive Public Awareness and Child Find System*

The June 2002 OSEP Monitoring Report included data and information that indicated the following area of noncompliance: child find and public awareness activities were not sufficient to ensure that all infants and toddlers who were eligible for services through Part C were identified, located and evaluated. See 34 CFR §§303.320-.321. In the Monitoring Report, OSEP found that DCEIP did not ensure that all children who may be eligible for services were identified, located and evaluated (34 CFR §303.321); child find activities were not coordinated with other major efforts to locate and identify children (34 CFR §303.321(c)(1)); and public awareness activities did not adequately inform the general public, including families, physicians and traditionally underserved populations, about the early intervention program (34 CFR §§303.1(d), 303.128(b) and 303.320). DCEIP's March 2003 revised IP proposed strategies to address this noncompliance.

DCEIP included information in its FFY 2002 APR and December 2003 and June 2004 IP Progress Reports that demonstrated progress and implementation of strategies to address the noncompliance identified in the June 2002 Monitoring Report. On page 3 of the Comprehensive Public Awareness and Child Find System section of the APR and page 1 of the December 2003 IP Progress Report, DCEIP reported completion of translated written materials in Spanish and Chinese. DCEIP reported that written and audio materials in Vietnamese and Amharic will be coordinated with the Department of Human Services (DHS) Limited English Proficiency (LEP) initiative. The June 2004 IP Progress Report indicated that translation of public awareness materials in Vietnamese and Amharic would begin July 1, 2004, and that DCEIP should be able to report full compliance with those translations in its FFY 2003 APR. In addition, the June 2004 IP Progress Report indicated that by August 2004, public awareness posters with child find information about Part C and Part B will be placed on Metro buses and that August–September 2004 is the target date for mass mailing of public awareness materials to physicians. In the FFY 2003 APR, DCEIP must confirm that the additional translations have occurred, that the public awareness materials have been placed on metro buses, and that the mass mailings of public awareness materials have been sent to physicians.

In addition, DCEIP desk audits identified noncompliance with child find requirements in all eight child-find providers. The areas of noncompliance identified in the desk audits included the same areas of noncompliance identified in the June 2002 OSEP Monitoring Report. The APR and the June 2004 IP Progress Report did not indicate whether all noncompliance identified in the desk audits had been corrected. As explained in the General Supervision section of this letter, in the next APR, DCEIP must provide to OSEP updated data and information regarding the correction of the noncompliance identified by DCEIP.

Page 7 - Honorable Yvonne Gilchrist

On pages 1-2 of the FFY 2002 APR, DCEIP reported that the December 1, 2003 child count was 249. The www.ideadata.org website reported the following information regarding DCEIP child count for December 1, 2002: the December 1, 2002 child count was 283, representing 1.27% of the general population of infants and toddlers in DC aged birth to three. The national percentage of infants and toddlers served on December 1, 2002 was 2.24%; the December 1, 2002 child count indicated 24 infants served under the age of one, representing 0.30% of the general population of infants in DC under the age of one; the national percentage of infants under age one served on December 1, 2002 was 1.03%. DCEIP provided in the FFY 2002 APR its analysis of primary referral sources and included strategies for increased referrals.

Pages 2 - 4 of the FFY 2002 APR contain ethnicity-based goals. The use of a goal for a racial or ethnic subgroup is inconsistent with Federal law. Please delete those goals as proposed targets in the FFY 2003 APR. Also, the FFY 2002 APR contains general numerical goals on pages 9 - 13. OSEP understands the basis for these goals, however, DCEIP must continue to monitor to ensure that eligibility decisions for all infants and toddlers are made in conformity with the individual evaluation and assessment requirements of Part C of IDEA (see 34 CFR §§303.320-.323), and not based upon a numerical goal.

### Family Centered Services

The June 2002 OSEP Monitoring Report included data and information that indicated the following area of noncompliance: family supports and services were not identified or included on the IFSP. See 34 CFR §§303.322(d) and 303.344(b)-(d). In the Monitoring Report, OSEP reported that DCEIP failed to ensure that the assessment identified the needs of the family related to enhancing the development of the child (see 34 CFR §303.322(d)), and that the supports and services necessary to enhance the family's capacity to meet the developmental needs of their child were included on the child's IFSP (see 34 CFR §303.344(b)-(d)). DCEIP's March 2003 revised IP proposed strategies to address this noncompliance.

The February 2004 OSEP letter regarding the FFY 2001 APR and Progress Report requested that DCEIP provide, in its FFY 2002 APR and the final Progress Report, family assessment and family supports and services data and information. DCEIP reported the following data in its June 2004 Progress Report: between April and July 2003, 25 of 27 IFSPs reviewed included the required family assessment data (92%); between August and December 2003, 22 of 25 IFSPs reviewed included the family assessment data (88%); and between January and May 2004, 33 of 33 IFSPs reviewed included the family assessment data (100%) (Attachment FC-1). DCEIP also reported in its June 2004 Progress Report that in the three reviews described above (between April 2003 and May 2004), 100% of the IFSPs had parent or guardian signatures on the IFSP demonstrating the parents' participation in the development of the IFSP (Attachment FC-1). DCEIP also indicated that the following actions had been taken to address this issue: the Family Centered Practices/Family Support section of the provider orientation manual was updated to assist providers with family assessments (December 2003 Progress Report, page 20); a questionnaire was developed for families to help prepare them to answer questions about their concerns, priorities, and resources (June 2004 IP Progress Report, pages 1-2); and the monthly training topic for September 2003 was "family assessment: A Valuable Part C Requirement"

Page 8 - Honorable Yvonne Gilchrist

(December 2003 Progress Report, page 21). OSEP appreciates DCEIP's efforts to implement all IP strategies to address this area of noncompliance. OSEP did not identify additional concerns in this cluster area.

### Early Intervention Services in Natural Environments

The June 2002 OSEP Monitoring Report included data and information that indicated the following areas of noncompliance: (1) initial evaluations to determine eligibility were inadequate or incomplete – initial evaluations did not include an evaluation of the child's functional level in all five developmental areas and did not include vision or hearing information (34 CFR §§303.322(c)(2)(ii) and §303.344(a)(1)); (2) a lack of individualized decision-making by the IFSP team about needed early intervention services – decisions related to early intervention services were not based on evaluations and assessments related to the unique needs of the child and family, and that decisions were not made by all required members of the IFSP team (34 CFR §§303. 340(b)(2) and §303.343); (3) a lack of all required content in IFSPs – IFSPs did not include the frequency, intensity and method of delivering services, the projected dates for initiation of services, specific early intervention services including nursing, audiology and transportation needed by the child and family, and medical and "other" services not required by Part C (34 CFR §§303.344(d)-.344(f)); (4) failure to complete evaluations within 45 days of referral – not all children who were referred received an evaluation within the 45-day timeline (34 CFR §303.321(e)(2)); and (5) failure of the service coordinator to coordinate all services – DCEIP had not ensured that each child's family was assigned one service coordinator who completed all the service coordination functions specified by Federal regulations (34 CFR §303.23). The March 2003 revised IP proposed strategies to address this noncompliance.

The February 2004 OSEP letter regarding DCEIP's FFY 2001 APR and Progress Report requested that DCEIP provide, in its FFY 2002 APR and the final Progress Report, data and information regarding the correction of the noncompliance. DCEIP's efforts at addressing these areas of noncompliance are discussed below.

#### Initial Evaluations
In its June 2002 Monitoring Report, OSEP found that initial evaluations did not include an evaluation of the child's functional level in all five developmental areas and did not include vision or hearing information. To address this issue, DCEIP indicated in its IP that it would provide on-going in-service training for personnel about evaluation requirements, and would review randomly selected evaluation reports to ensure that the requirements are met. In its June 2004 IP Progress Report, DCEIP indicated that it has monitored providers for this requirement, identified some patterns as being carried out by specific providers, and identified one provider as being in noncompliance because it customarily did not complete a full adaptive or social assessment (Attachment NE-3). DCEIP reported that it has required corrective action plans for the provider that is not in compliance (Attachment NE-3). In the next APR, DCEIP must provide the corrective action plans submitted by the provider who DCEIP has determined is not conducting adaptive or social assessments, and the status of those plans (approved, implemented, etc.).

Page 9 - Honorable Yvonne Gilchrist

*Individualized Decision-Making by the IFSP Team*
In its June 2002 Monitoring Report, OSEP found a lack of individualized decision-making by the
IFSP team about needed early intervention services. On page 10 of the FFY 2002 APR, DCEIP
included a goal that decisions related to needed early intervention services would be made based
on evaluations and assessments related to the unique needs of the child and family. Under that
goal, DCEIP reported that in more than 96% of 50 randomly selected initial IFSPs and
evaluations reviewed, the outcomes were consistent with the unique needs of the child. OSEP
appreciates DCEIP's efforts to implement all IP strategies to address this area of noncompliance.
OSEP did not identify additional concerns regarding this issue.

*IFSP Content*
In its June 2002 Monitoring Report, OSEP found a lack of all required content in IFSPs.
DCEIP's IFSP review data indicated that compliance with the content of the IFSP requirement
had increased over time. In its June 2004 final Progress Report, DCEIP reported the following
data: between April and July 2003, 15 of 27 IFSPs reviewed were in compliance (55%); between
August and December 2003, 19 of 25 IFSPs reviewed were in compliance (76%); and between
January and May 2004, 29 of 33 IFSPs reviewed were in compliance (88%) (Attachment NE-3).
DCEIP also reported in its June 2004 IP final Progress Report that corrective actions will be
taken by the providers who were not in compliance in the January – May 2004 review
(Attachment NE – 3). In the next APR, DCEIP must provide updated data regarding the
correction of the noncompliance for those providers found to be out of compliance during the
January – May 2004 review.

*Timeline for Completing Evaluations*
In its June 2002 Monitoring Report, OSEP found that not all children who were referred for early
intervention services received an evaluation within the 45-day timeline. In collecting data
regarding this issue, DCEIP discovered that one provider (CNMC) did not meet the deadline in
seven cases, and met it in six cases in the first data set, but by the third data set, the provider met
nine deadlines, and missed three (Attachment NE-4). DCEIP also discovered that two other
providers (Little Feet and HSC) had more failures than successes in meeting the deadline
(Attachment NE-4). DCEIP indicated that compliance letters and technical assistance would be
provided to those providers (Attachment NE-4). In the next APR, due March 31, 2005, DCEIP
must provide further information regarding the status of the corrective actions taken with regard
to those providers.

In its June 2004 IP final Progress Report, DCEIP also reported the following data: between
April and July 2003, 11 of 27 IFSPs reviewed were completed within the 45-day timeline (two
others completed within 48 days); between August and December 2003, 10 of 23 initial IFSPs
reviewed were completed within the 45-day timeline (two others were completed within 48
days); and between January and May 2004, 12 of 20 IFSPs reviewed were completed within the
45-day timeline (three others were completed within 48 days) (Attachment NE-4). The data
provided by DCEIP reports on completion of IFSPs, which presumably are completed after an
evaluation, but the data does not show the number of evaluations completed within the 45-day
timeline. Because DCEIP has identified providers that are completing IFSPs without having all
of the evaluation data available (June 2004 IP Progress Report, Attachment GS-4), OSEP cannot
determine whether this data represents the number of evaluations completed within the 45-day

Page 10 - Honorable Yvonne Gilchrist

timeline. In the FFY 2003 APR, DCEIP must clarify whether this data represents the number of evaluations completed within the 45-day timeline; and if it does represent that data, please provide OSEP with information regarding any additional steps DCEIP has taken to ensure that the evaluations are conducted in a timely manner.

*Service Coordination*
In its June 2002 Monitoring Report, OSEP found that DCEIP had not ensured that each child's family was assigned one service coordinator who completed all service coordination functions required by Part C. In order to address this issue, DCEIP indicated in its IP that it would: (1) develop and disseminate guidance on the requirements for service coordination; (2) modify monthly reports to require each provider to identify the service coordinator for each child enrolled in their program; (3) develop a survey for parents to determine their understanding of service coordination and whether they have a service coordinator; (4) develop a survey for providers to determine their understanding of service coordination and actual practices; and (5) contact families at least every two months to ensure they are receiving service coordination services.

DCEIP reported the implementation of several strategies to ensure that each child and family was assigned a service coordinator who functioned consistent with the requirements in 34 CFR §303.23. DCEIP reported in its FFY 2002 APR that the monthly report format for vendors was modified to identify the service coordinator for each child enrolled in their program (page 7). DCEIP also reported that it modified its service coordination model in that DCEIP staff continually monitor all children assigned to their caseloads until the child transitions out of Part C and DCEIP staff serve as service coordinators for any family not assigned a service coordinator. (FFY 2002 APR, page 1). DCEIP also reported that DCEIP staff contact families bi-monthly to ensure they are receiving service coordination services (December 2003 Progress Report, page 14).

DCEIP also reported the results of its parent satisfaction survey conducted by UDC, which included information on service coordination. The UDC report included the following data: 92% reported that their child had a service coordinator (3.6% reported not having a service coordinator); 85% felt that service coordinators respected their needs and concerns during development of the IFSP; 80% felt that service coordinators had a good understanding of their child's needs and services (7% said they did not); and 71% were satisfied with the coordination of their child's care among different providers and services (18% were not satisfied, 6% reported that they did not need coordinated services among different providers)(June 2004 IP Progress Report, Attachment NE-5).

Page 8 of the FFY 2002 APR indicated that DCEIP "will continue" to disseminate guidance regarding service coordination, and that a provider survey would be developed by the University of the District of Columbia (UDC). However, the June 2004 IP Progress Report did not indicate if DCEIP had developed and disseminated the guidance, nor did it provide data regarding the provider survey. In the FFY 2003 APR, DCEIP must provide an update on its implementation of the strategies to develop and disseminate service coordination guidance and the results of the provider survey.

Page 11 - Honorable Yvonne Gilchrist

*Natural Environments*
Natural environments was not identified by OSEP in its 2002 Monitoring Report as an area of noncompliance. The FFY 2002 APR provided performance data and information on services in the natural environment. Page 3 of the APR indicated that, of 208 eligible children, 16% received services in childcare centers or childcare homes, and 30% received services in their own home. DCEIP's December 1, 2002 child count data indicated that 144 children received services in developmental delay programs, 79 received services in the home, 42 received services in typically developing programs, 1 received services in the hospital, and 17 received services in a service provider location. The APR indicated that DCEIP no longer has any center-based early intervention programs because its center-based programs have become licensed providers under the DC child care subsidy program and serve typically developing children as well as children with developmental delays and disabilities. (APR, Page 3). On pages 4 and 5 of the APR, DCEIP identified additional potential barriers to serving children in natural environments (including transportation and Medicaid policies and procedures). In the next APR, DCEIP must include strategies: (1) to address the barriers it continues to identify that impede the provision of early intervention services in natural environments; and (2) to improve performance within this area.

*Improved and Sustained Functional Abilities*
The Part C FFY 2001 and FFY 2002 APRs requested data on the percentage of children participating in the Part C program who demonstrated improved and sustained functional abilities (in the developmental areas listed in 34 CFR §303.322(c)(3)(ii). Page 5 of the APR reported that data were not currently available to respond to this issue and DCEIP plans to implement a strategy to document evidence of the child's improved and sustained functional abilities in all five developmental areas. In the FFY 2003 APR, DCEIP must submit, if available, responsive data (whether collected through sampling, monitoring, or other methods), targets for improved performance and strategies to achieve those targets for this area, or its plan to collect and report the data for the FFY 2004 APR (expected to be due March 31, 2006), including a detailed timeline of the activities necessary to implement that plan.

**Early Childhood Transition**

The June 2002 OSEP Monitoring Report identified one area of noncompliance in this cluster: a lack of smooth and timely transition from Part C services to Part B services. See 34 CFR §303.148. OSEP found that the IFSPs did not include the steps to support transition (34 CFR §303.344(h)); the District of Columbia Public Schools (DCPS) was not informed of children who would soon reach age of eligibility for preschool services (34 CFR §303.148(b)(1)); and for possible Part B-eligible children, transition conferences were not held at least 90 days, but not more than 6 months, prior to the child's third birthday and included the family and DCPS personnel (34 CFR §303.148(b)(2)-(4)). The March 2003 revised IP proposed to ensure a smooth transition from Part C to Part B or other appropriate programs; ensure that all Part C children would be identified at age two, or upon entry, if over age two, and reported to Part B; ensure that the transition conference was held within the required timeframe and DCPS representatives were notified and invited; and ensure that families were aware of all transition options.

Page 12 - Honorable Yvonne Gilchrist

OSEP's February 2004 letter regarding DCEIP's FFY 2001 APR and Progress Report requested that DCEIP provide, in this APR and the final Progress Report, data and information regarding transition conferences, notification of the LEA, and IFSP transition content. Data and information in the APR and December 2003 IP Progress Report showed progress in this cluster.

With regard to the transition content in IFSPs, on page 1 of the June 2004 IP Progress Report, DCEIP reported that it reviewed a randomly selected sample of IFSP Transition Plans for compliance with required content. DCEIP reported that 23 out of 25 IFSPs reviewed (92%) were identified as in compliance with content requirements. OSEP appreciates DCEIP's efforts to implement all IP strategies to address the IFSP transition content issue. OSEP has not identified any further concerns related to that issue.

With regard to transition conferences, page 4 of the June 2004 IP Progress Report indicated that, from October 2002 through June 2004, 292 children aged out of Part C, 255 children (or 87%) had transition conferences, and 176 conferences were in compliance. OSEP cannot determine from this data whether DCEIP is meeting the requirements of 34 CFR § 303.148(b)(2)(i). The Part C regulations require that, with the approval of the family, transition conferences be held at least 90 days, and at the discretion of the parties, up to 6 months before the child is eligible for preschool services, in cases that involve children who may be eligible for preschool services under Part B. 34 CFR § 303.148(b)(2)(i). In the FFY 2003 APR, DCEIP must clarify whether this data relates to the requirements of 34 CFR § 303.148(b)(2)(i) by providing the number of children who may be eligible for Part B services, and of those children, how many families agreed to have the transition conference, and of those families, how many had timely conferences. If the data continues to show noncompliance, DCEIP must also include in the next APR information regarding what additional steps it has taken to ensure compliance with those requirements.

With regard to notifying the LEA, Attachment TR-1 (a sample of the monthly report form used by DCEIP to inform DCPS on a monthly basis of children who have turned age 2) is one of the strategies reported on page 7 of the June 2004 IP Progress Report that DCEIP utilizes to ensure the reporting of transition information to DCPS. In addition, page 8 of the APR indicated that Part C and Part B now share data generated by Part C. OSEP assumes that any data tracking system that tracks children from Part C to Part B will be consistent with the IDEA and the Family Educational Rights and Privacy Act (FERPA). OSEP has enclosed, for your information, a copy of its February 11, 2004 Letter to Elder which describes the circumstances under which the limited disclosure of personally identifiable information from a child's education records may be made in order to meet IDEA's child find mandate. OSEP appreciates DCEIP's efforts to implement all IP strategies to address the LEA notification issue. OSEP has not identified any further concerns related to that issue.

*Conclusion*

DCEIP has provided data and information that addresses two of the findings of noncompliance from OSEP's June 2002 Monitoring Report (individualized decision making for IFSPs and family supports and services on IFSPs). As requested in this letter, DCEIP must provide, in the next APR, data and information on the correction of the remaining seven noncompliance issues.

Page 13 - Honorable Yvonne Gilchrist

Failure to provide the required information or demonstrate compliance may result in the designation of DCEIP as a high-risk grantee.

In the FFY 2003 APR, DCEIP must provide the following information to OSEP:

General Supervision (updated at least through March 1, 2005):
    (1) Status of the 15 areas of noncompliance identified through desk reviews of evaluations and IFSPs;
    (2) The number of exit reports that have been disseminated to providers since June 30, 2004;
    (3) The status of corrective action plans on all providers that received an on-site monitoring visit using the revised monitoring process, and had noncompliance identified;
    (4) The criteria used by DCEIP to approve or disapprove corrective action plans; and
    (5) With regard to DCEIP's concerns pertaining to Medicaid policies and procedures, an update on the implementation of strategies, particularly as they may affect timely completion of evaluations and assessments, IFSP service provision, and collection of child count data on Medicaid-eligible infants and toddlers.

Comprehensive Child Find and Public Awareness:
    (1) Confirm that the additional translations have occurred, that the public awareness materials have been placed on metro buses, and that the mass mailings of public awareness materials have been sent to physicians; and
    (2) As explained in the General Supervision section of this letter, updated data and information regarding the correction of the noncompliance identified by DCEIP.

Early Intervention Services in Natural Environments:
    (1) With regard to Initial Evaluation: the corrective action plans submitted by the provider who DCEIP has determined is not conducting adaptive or social assessments, and the status of those plans (approved, implemented, etc.);
    (2) With regard to IFSP content: updated data regarding the correction of noncompliance for those providers found to be out of compliance during the January – May 2004 review;
    (3) With regard to the timeline for completing evaluations: (a) further information regarding the status of the corrective actions taken regarding CNMC, Little Feet, and HSC, and (b) clarification regarding whether DCEIP's data represents the number of evaluations completed within the 45-day timeline; and if it does represent that data, information regarding any additional steps DCEIP has taken to ensure that the evaluations are conducted in a timely manner;
    (4) With regard to service coordination: an update on the implementation of strategies to develop and disseminate service coordination guidance and the results of the provider survey;
    (5) With regard to natural environments: strategies to address barriers that DCEIP continues to identify that impede the provision of early intervention services in natural environments, and strategies to improve performance within this area; and

Page 14 - Honorable Yvonne Gilchrist

(6) With regard to improved and sustained functional abilities: if available, responsive data (whether collected through sampling, monitoring, or other methods), targets for improved performance and strategies to achieve those targets for this area, or its plan to collect and report the data for the FFY 2004 APR (expected to be due March 31, 2006), including a detailed timeline of the activities necessary to implement that plan.

Transition:

(1) Clarification regarding whether DCEIP's data relates to the requirements of 34 CFR § 303.148(b)(2)(i) by providing the number of children who may be eligible for Part B services, and of those children, how many families agreed to have the transition conference, and of those families, how many had timely conferences; and

(2) If the data continues to show noncompliance, DCEIP must also include in the next APR information regarding what additional steps it has taken to ensure compliance with the requirements of 34 CFR § 303.148(b)(2)(i).

OSEP recognizes that the APR and its related activities represent only a portion of the work in your State and we look forward to collaborating with you as you continue to improve results for infants and toddlers with disabilities and their families. If you have questions, please contact Mary A. Williams at (202) 255-7586.

Sincerely,

*Patricia J. Guard for*

Stephanie Smith Lee
Director
Office of Special Education Programs

Enclosure

cc: Ellen M. Yung-Fatah