UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

DL, XY, HW, TL, JB, FD, TF,                    )
by their parents and next friends:             )
                                               )
Tameka Ford                                    )
2412 Elvans Road, S.E., Apt. 403               )
Washington, DC 20020,                          )
                                               )
Tammika and BryanYoung                         )
428 Randolph Street, N.W.                       )
Washington, DC 20011,                          )
                                               )
Kerianne Piester and Ronald Wisor              )
6200 29th Street, N.W.                          )
Washington, DC 20015,                          )
                                               )
Arlette Mankemi and Timothy Lantry             )
1305 Maryland Avenue, N.E.                      )
Washington, DC 20002,                          )
                                               )
Leah Bland                                     )
2413 Alabama Avenue, S.E.                       )
Washington, DC 20020,                          )
                                               )
Frederick and Monica Davy                      )
6933 9th Street N.W.                            )
Washington, DC 20012,                          )
                                               )
Angelique Moore                                )
2436 Wagner Street, S.E., Apartment B          )
Washington, DC 20020,                          )
                                               )
on their own behalf and on                     )
behalf of a class of similarly situated individuals, )
                                               )
                    Plaintiffs,                )
                                               )
              v.                               )
                                               )
THE DISTRICT OF COLUMBIA,                       )

1

a municipal corporation )
1350 Pennsylvania Ave, N.W., Suite #419 )
Washington, DC 20004, )
  )
      and )
  )
CLIFFORD B. JANEY in his )
official capacity as Superintendent )
of District of Columbia Public Schools )
825 North Capitol Street, N.E., )
9th Floor )
Washington, DC 20002, )
  )
      Defendants. )
_____ )

## FIRST AMENDED COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

### INTRODUCTION

1.  Plaintiffs, on behalf of themselves and others similarly situated, bring this action under 42 U.S.C. 1983 for declaratory, injunctive, and compensatory relief to challenge defendants' policy, pattern, and practice of failing to identify, locate, evaluate, and offer special education and related services to children with disabilities in the District of Columbia who are between the ages of three and five years old, inclusive (hereinafter "preschool children").   Defendants' actions violate the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. 1400, *et seq*., Section 504 of the Rehabilitation Act, 29 U.S.C. 794(a), implementing regulations, the Due Process Clause of the Fifth Amendment, and District of Columbia law.

2.  Named plaintiffs are current or former preschool children with sensory, emotional, physical, cognitive, developmental, or language disabilities who tried to obtain special education and related services from the District of Columbia Public Schools ("DCPS") or wanted to obtain these

services as preschool children, but have been denied, delayed, or otherwise deprived of access to these services because of defendants' systemic failures to comply with federal and District of Columbia law.

3.   The IDEA, the Rehabilitation Act, federal implementing regulations, and District of Columbia law require that the District of Columbia offer a "free appropriate public education" ("FAPE") to children identified as disabled, including to preschool children.  To that end, these laws require that the District of Columbia take concrete steps to identify, locate, evaluate, and offer special education and related services to all preschool children in the District of Columbia with disabilities who need these services.  Known as the "Child Find" duty, this mandate includes ensuring that disabled infants and toddlers who received special education services under Part C of the IDEA continue to receive them after their third birthday under Part B of the IDEA.  Defendants have a policy, pattern, and practice of failing to comply with their Child Find duty.  Defendants' failures are numerous, knowing, pervasive, and systemic.  Defendants' actions demonstrate gross misjudgment and have caused substantial harm to hundreds of young children in the District of Columbia by jeopardizing their educational opportunities and by denying them a right to a free appropriate public education.

JURISDICTION AND VENUE

4.   This action is brought under 42 U.S.C. 1983 to enforce the IDEA, 20 U.S.C. 1400, *et seq*., and the Due Process Clause of the Fifth Amendment, and under Section 504 of the Rehabilitation Act, 29 U.S.C. 794(a).  The Court has jurisdiction under 28 U.S.C. 1331, 1343, and 1367.  Venue is proper under 28 U.S.C. 1391.

PARTIES

Plaintiffs

DL

5.  DL[1] is a five-year-old boy who was born in 2001.  He resides in Washington, D.C.  He sues by his mother and next friend, Tameka Ford.

6.    DL suffers from a qualifying disability under the IDEA. He has documented developmental delays and has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD").  He exhibits significant behavioral and emotional problems, as well as speech and language delays.  He has had a history of aggressive behavior, which includes hitting, bitting, and fighting with his teachers and with other children.  In the past, he has punched himself in the face repeatedly until he falls down exhausted, often lying still for long periods of time after these incidents.

7.  Defendants have known since at least June 2004 that DL has had a qualifying disability and nevertheless failed for over a year to take steps to comply with their Child Find and FAPE requirements.

8.  When DL was three years old, he began attending Bright Beginnings, a daycare center for transitional and homeless children in the District of Columbia.  Soon thereafter, he was evaluated at Georgetown Medical Center for developmental delays.  The evaluations confirmed that DL needed speech, language, occupational and cognitive therapies.

9.  In June 2004, Bright Beginnings convened a meeting, known as an Individualized Education Program ("IEP") meeting.  The purpose of the meeting was to discuss the evaluations and

_____

[1] Pursuant to Local Rule 5.4(f)(2), minors are identified by their initials in this Complaint.

4

to determine what type of special education services DL needed. Bright Beginnings sent a formal request to DCPS to attend the IEP meeting. DCPS refused to attend. During the meeting, the participants agreed that DL should receive speech, language, occupational therapy and counseling services.

10. In December 2004, DL was removed from Bright Beginnings. DL's mother, Tameka Ford, attempted to re-enroll DL in Bright Beginnings, but the center would not accept him because of his behavioral problems.

11. In February 2005, DL's mother and social worker registered DL with DCPS at the Central Assessment Referral and Evaluations ("CARE") Center of the DCPS. They requested special education and related services for DL. They gave DCPS prior evaluations of DL and signed papers consenting to have DL evaluated by DCPS. DCPS did not act on this request for special education and related services.

12. In the spring of 2005, an advocate with For Love of Children ("FLOC"), a non-profit organization that provides services to at risk families in the District of Columbia, contacted DCPS on numerous occasions to urge DCPS to act on Ms. Ford's request for special education services. DCPS did not respond to these requests.

13. In the spring of 2005, Ms. Ford enrolled DL in two private preschools while waiting for DCPS to identify, locate, evaluate, and offer DL special education and related services. Both preschools expelled DL for behavioral problems.

14. In June 2005, after receiving no response from DCPS, DL's *guardian ad litem* requested a due process hearing to challenge DCPS's failure to evaluate or offer special education services to DL.

5

15.   On August 24, 2005, and as a result of the scheduled due process hearing, DCPS convened an eligibility meeting for DL.  DCPS determined that DL qualified for special education and related services as a child with developmental delays.  DCPS drafted an IEP, which is an educational plan that set forth the learning goals and educational services that were to be provided to DL.  During the meeting and when drafting the IEP, DCPS refused to consider that DL had been diagnosed with ADHD by his doctor and that he exhibited significant socio-emotional and behavior problems.  DCPS placed DL at Van Ness Elementary School, which was not an appropriate placement given his socio-emotional and behavior problems.

16.  Van Ness Elementary School did not have sufficient staff to comply with DL's IEP or to accommodate his disability.  DL's behavior became increasingly aggressive, and he was sent home on numerous occasions.

17.   Due process hearings were held in DL's case in September and October 2005 regarding defendants' Child Find failures, including the failure and delays in identification, location, evaluation, eligibility, and placement of DL.  The Hearing Officer issued a decision in December 2005 in favor of DL and his mother, finding that DCPS had violated FAPE and Child Find for DL.  The Hearing Officer ordered DCPS to provide compensatory education for DL.

18.   In December 2005, notwithstanding his IEP and placement at Van Ness Elementary School, Van Ness  initiated suspension proceedings against DL because of his behavior problems.  With the intervention of counsel, DL was transferred to Moten Elementary School as a temporary, interim placement in lieu of suspension.  To date, DL remains at Moten Elementary School on an interim basis and is receiving some services.  He is awaiting development of a current and correct IEP and Notice of Placement to reflect his disabilities.  DL has exhausted his administrative

remedies.

## XY

19. XY is a four-year-old boy who was born in 2002. He resides with his mother, Tammika Thompson-Young, and his father, Bryan Young, in Washington, D.C.

20. XY is disabled. XY suffers from Autism Spectrum Disorder, which was diagnosed by Children's National Medical Center Hospital ("CNMC") in May 2005. XY is non-verbal, very active, not toilet trained, suffers from frequent tantrums, and sleeps for only short periods of time, even at night. In the past, he has hit his face and head against walls and against other objects. He is asthmatic and uses a Nebulizer daily.

21. Defendants have known that XY was disabled and in need of special education and related services since at least 2004. Nevertheless, defendants have failed repeatedly to comply with the Child Find and FAPE requirements for XY.

22. In January 2004, XY received a multi-disciplinary eligibility evaluation from CNMC, which concluded that XY suffered from numerous development delays. Shortly thereafter, and when he was two years old, XY was found eligible for the DC Early Intervention Program ("DCEIP"), which is administered by the District of Columbia Department of Human Services ("DHS") and authorized by Part C of the IDEA. Part C of the IDEA authorizes special education services for disabled infants and toddlers until they reach their third birthday. XY received Part C IDEA services, including speech therapy and special instruction, for eight months through the DCEIP.

23. In October 2004, when XY was two years and eight months old, DCEIP held a transition meeting and asked DCPS representatives to attend. The purpose of the meeting was to ensure that XY was transitioned from DCEIP (*i.e.*, Part C IDEA services) to DCPS (*i.e.*, Part B IDEA services)

by his third birthday. DCEIP terminates Part C IDEA special education services once a child reaches his or her third birthday. A DCPS representative attended the transition meeting and was apprised of XY's disability and need for a continuation of services following his third birthday. Nevertheless, DCPS did not take any steps after this meeting to identify, locate, evaluate, or offer XY special education services.

24. In February 2005, XY turned three years old, and DCEIP terminated his special education services. Because DCPS had failed to take any steps to identify, locate, evaluate, or offer XY special education or related services, DCPS did not continue these services after DCEIP terminated XY's services on his third birthday. XY's parents visited the CARE Center of DCPS on numerous occasions in order to request that DCPS take steps to identify, evaluate, and offer him services. XY's parents visited the CARE Center in June, August, and September 2005. DCPS failed to respond to any of these requests until XY's counsel requested a due process hearing in November 2005 to challenge defendants' Child Find failures.

25. In February and March 2006, two due process hearings were held for XY. The hearing officer determined orally during the hearings that defendants had violated, *inter alia*, the Child Find and FAPE provisions by failing to identify, locate, evaluate, and offer XY special education services within the time frames mandated by federal and District of Columbia law. The judge issued a written decision that ordered DCPS immediately to evaluate XY, develop an appropriate IEP, and offer an appropriate placement. The judge also ordered immediate relief, including compensatory education.

26. Because DCPS subsequently had failed to develop an appropriate IEP or offer an appropriate placement, the parties appeared for a third due process hearing on July 17, 2006. The

8

Hearing Officer ruled in favor of the parents during the hearing.   DCPS has not yet complied with

this decision.  XY and his parents have exhausted their administrative remedies.

HW

27.  HW is a six-year-old girl.  She resides with her mother, Kerianne Piester, and father,

Ronald Wisor, in Washington, D.C.

28.  HW is disabled.  She has speech and language delays which impair her ability to

participate in the classroom and communicate with others.   Speech and language testing revealed

that she presents significant receptive, expressive, and articulation delays.  She continues to present

these delays.

29.   DCPS has known about HW's disability since at least January 2005, when HW's

mother, Ms. Piester, visited the CARE Center of DCPS to request speech language, occupational,

and cognitive evaluations for HW.  Since January 2005, Ms. Piester has contacted the CARE Center

on numerous occasions to request that DCPS comply with the Child Find requirements and identify,

locate, evaluate, and offer HW special education and related services.  DCPS completed referral

forms for HW in March 2005, but since then, has failed to screen HW, evaluate her, determine her

eligibility, convene an IEP meeting, or offer an appropriate educational placement.

30.   HW's parents have waited one and a half years for DCPS to comply with its Child Find

requirements.   In the interim, HW's parents have mortgaged their house to pay privately for the

special education and related services she requires.  Today, HW's parents are still waiting for DCPS

to comply with the Child Find requirements and to evaluate HW, determine her eligibility, develop

an IEP, and offer her an appropriate placement.

TL

31.  TL is a three year-old boy who resides with his mother, Arlette Mankemi, and his father, Timothy Lantry, in Washington, D.C.

32.  TL is disabled.  TL was diagnosed in 2005 with a disorder of the vestibular system, including an underlying sensory integration and listening disorder, motor apraxia, and a profile consistent with Autism Spectrum Disorder.  He also suffers from communication deficits characterized by severe delays in the area of expressive and receptive language as well as delays in the area of pragmatics and social interaction skills.

33.  Defendants have known that TL was disabled since at least June 2005, when TL began receiving special education services through DCEIP, including occupational therapy and specialized instruction.  Nevertheless, DCPS has failed to comply with the Child Find and FAPE requirements as to TL.

34.  In November 2005, a transition meeting was held to discuss transitioning TL to DCPS following DCEIP's termination of services on TL's third birthday.  DCPS representatives attended the transition meeting.  DCPS learned about TL's disabilities and his need for continuation of services during that meeting.

35.  After the November 2005 meeting, TL's parents attempted on numerous occasions to contact the CARE Center of DCPS to ensure that TL would receive special education services once DCEIP terminated those services on TL's third birthday.

36.  DCEIP terminated TL's services in April 2006.  DCPS did not transition TL by the time DCEIP terminated him.

37.  In April 2006, the CARE Center held an initial meeting with TL's parents in which TL's

10

parents requested an evaluation, an eligibility determination, and an appropriate educational placement for TL.

38. On July 27, 2006, and more than eight months after TL's transition meeting, DCPS found TL eligible for special education services. DCPS wrote an IEP for TL but offered a program that is overly restrictive. TL and his parents are still waiting for an appropriate IEP and educational placement.

JB

39. JB is a six-year-old boy who was born in 1999. He resides with his mother, Leah Bland, and other family members in Washington, D.C. He sues by his mother and next friend, Leah Bland.

40. JB was diagnosed with autism in January 2004 and has a disability that would make him eligible for special education and related services.

41. Defendants have known since at least March 2004 that JB has a qualifying disability.

42. Nevertheless, defendants failed to identify, locate and evaluate him in a timely and adequate manner and failed to offer him any special education services during the 2004-2005 school year.

43. From 2002 to 2004, Ms. Bland tried to place JB in several preschool programs in the District of Columbia. JB exhibited behavioral problems almost immediately. He threw frequent tantrums and scratched and hit himself. He began drooling and refused to eat. Ms. Bland was forced to withdraw him from the preschools as a result of his behavioral problems.

44. From 2002 to 2004, when Ms. Bland was attempting to place him in preschool, she was unaware that special education and related services were available from DCPS. Defendants failed to inform or notify her or the private preschools that JB attended of the availability of special

education and related services.   Ms. Bland eventually learned through a private educational facility

that DCPS could provide special education and related services to preschool children.

45.   In March 2004, after learning that DCPS could provide services to preschool children

and after JB was diagnosed with autism by a psychiatrist, Ms. Bland registered him at Ann Beers

Elementary School, which is JB's neighborhood school.   She requested special education services

for JB.

46.   In the summer of 2004, DCPS conducted a speech evaluation of JB.   DCPS failed to

perform other critical evaluations to assess JB's behavioral problems, even though Ms. Bland had

requested these evaluations and had signed consent forms enabling DCPS to obtain information from

JB's psychiatrist and from his former preschools.

47.   In November 2004, DCPS told Ms. Bland that it would conduct a psycho-educational

evaluation.   DCPS did not conduct the evaluation.

48.   In December 2004, frustrated by DCPS's failure to schedule or perform a psycho-

educational evaluation, JB's family arranged for a private psychiatric evaluation at the Center for

Autism Spectrum Disorders of Children's National Medical Center.   The evaluation made extensive

recommendations for intervention, including educational intervention.

49.   In March 2005, DCPS performed an occupational therapy evaluation for JB.

50.   In June 2005, 15 months after JB's mother requested special education for JB,

defendants convened a meeting with JB's family.   During the meeting, DCPS representatives

concluded that JB should be receiving special education and related services as a child with autism.

Later that month, DCPS drafted an IEP.   The IEP included a full-time special education program

with small classes, two hours of speech language therapy weekly, and three 30-minute sessions of

occupational therapy weekly.

51. DCPS did not timely implement JB's IEP or offer an educational placement for the 2004-2005 school year until August 2005, 17 months after JB's mother requested these services. JB attended a private childcare at his mother's expense during this time.

52. In August 2005, DCPS offered JB an educational placement for the 2005-2006 school year at Hearst Elementary School. JB did not receive occupational therapy services for a period of time while he was at Hearst Elementary School.

53. In May 2006, DCPS offered JB's parents a compensatory education proposal for the 2004-2005 school year; the parties are in discussions regarding this proposal.

FD

54. FD is a three-year-old boy who was born in 2001. He resides with his parents and sisters in Washington, D.C. He sues by his parents and next friends, Monica and Frederick Davy.

55. FD has a disability that qualifies him for services under the IDEA. FD was born prematurely at 29 weeks. He was diagnosed with End Stage Renal Disease, which resulted in a renal transplant on March 31, 2004. As a result of his premature birth, FD suffers from a number of medical conditions, including Prune Belly Syndrome (a lack of muscle tone in the abdominal area), spastic diplegia, and developmental delay. He has also had a vesicostomy and is not toilet trained.

56. FD exhibits significant delays in gross and fine motor skills and visual motor skills. His visual-perceptual skills, problem-solving skills, and communication skills are delayed. FD uses a posterior walker at all times and wears ankle-foot orthoses. He also requires a special chair to support his torso for seated work.

57. DCPS delayed for months in offering special education and related services to FD. When

13

FD was two years and eight months, his mother registered him as a non-attending student at his neighborhood school and sought special education services for him from DCPS.

58. In August 2004, FD was cleared medically to attend a group- or school- based program and began attending the Easter Seals Child Care program. Prior to that time, he had received limited services at home through the Early Intervention Program. DCPS staff, who observed FD while he was at the Easter Seals Child Care program, advised his mother that the program was not meeting all of his needs and that he needed higher functioning peers.

59. In August 2004, DCPS concluded that FD was eligible for special education. DCPS drafted an IEP that required ten hours of specialized instruction and one hour each of occupational, physical, and speech language therapy on a weekly basis. Many of the necessary accommodations for FD were not integrated into the initial IEP, but were added after the parents engaged counsel and after DCPS agreed to revise the IEP. The revised IEP includes a nursing care plan, the services of a dedicated aide, an adaptive chair, and services in an accessible building to accommodate his walker. Services were to begin on September 1, 2004.

60. In December 2004, frustrated by DCPS's failure to provide the services set forth in the IEP and failure to offer an educational placement, FD's parents requested a due process hearing.

61. In March 2005, the parties entered into a settlement agreement whereby DCPS agreed to provide a placement that included, *inter alia*, a classroom with no more than 15 students, a teacher and an instructional assistant, and a nurse in the building full-time. The settlement expressly excluded coverage of the parents' claims for compensatory education and for violations of the Child Find provisions of the IDEA.

62. FD began receiving services in March 2005, seven months after he was found eligible

to receive them. However, at that time, DCPS failed to offer compensatory education appropriate for the months during which time defendants failed to provide FD with appropriate classroom instruction with non-disabled age appropriate peers in an accessible environment. DCPS also failed to provide FD the special chair that he needs to perform seated activities.

63. On March 2, 2006, and because of defendants' continued Child Find and FAPE failures, the parties again attended a due process hearing. The purpose of the hearing was to resolve DCPS's failure to develop an appropriate IEP, offer an appropriate placement, provide a dedicated aide, and provide an appropriate chair for seated activities. The parties entered into a settlement agreement during the hearing regarding some of these matters.

64. FD's parents are waiting for an appropriate educational placement for FY 2006-2007. In March 2006, DCPS informed FD's parents that it would be changing FD's placement to Takoma Elementary School. Takoma is not a medically appropriate or safe placement for FD. The classroom is physically inaccessible for FD because the classroom is entered using stairs, and would require FD to climb steps, which he is unable to do. Even if a ramp were added, Takoma would not be an appropriate placement. FD has a suppressed immune system due to his kidney transplant. Takoma's open floor plan with no walls between the class rooms would potentially expose FD to every child in the school through airborne transmission. Both the Takoma Elementary School nurse and FD's doctors have advised DCPS of these dangers. For these reasons, FD's parents have objected to Takoma as a placement and believe it to be an inappropriate educational placement. Nevertheless, and despite repeated requests from the parents and parents' counsel, DCPS has yet to offer an appropriate educational placement for the 2006-2007 school year. FD has exhausted his administrative remedies.

TF

65.  TF is a six-year-old boy who was born in 1998.  He resides with his mother in Washington, D.C.  He sues by his mother and next friend, Angelique Moore.

66.  In September 2003, TF began kindergarten at the DCPS Garfield Elementary School.  TF's kindergarten teacher believed that he needed speech and language therapy.  Despite his teacher's recommendation, defendants failed to refer him for an evaluation.

67. At the end of the 2003-2004 school year, TF's kindergarten teacher recommended that TF repeat kindergarten because of his delays.  Defendants again failed to refer him for an evaluation.

68.  In August 2004, just days prior to the start of the 2004-2005 school year, TF's mother was notified that, due to her home address, TF and her other children would not be able to return to Garfield that school year, but, instead, would have to attend Stanton Elementary School.

69.  At the beginning of the 2004-2005 school year, Ms. Moore visited Stanton Elementary School to discuss TF's speech and language problems.  Ms. Moore informed staff at Stanton that TF had speech and language difficulties and that his Garfield Kindergarten teacher had told her that TF should repeat kindergarten.  Despite Ms. Moore's efforts, defendants failed to evaluate TF for speech and other education needs during the school year.

70.  In September 2004, staff at Stanton initially placed TF in the first grade, despite his kindergarten teacher's recommendation that he repeat kindergarten.  TF experienced significant academic and behavioral problems during his first months in the first grade, and was returned to kindergarten by the beginning of the second quarter of the school year.

71.  In January 2005, frustrated by DCPS's failure to evaluate TF, his mother arranged for

16

a private speech and language evaluation. The speech language pathologist concluded that TF had severe speech and language deficits and recommended that he receive intensive speech language services.

72. In April 2005, Ms. Moore, through counsel, sent DCPS copies of the evaluation recommending speech and language therapy and requested a full evaluation, including a psycho-educational assessment and an occupational therapy evaluation.

73. In June 2005, a due process hearing was conducted to challenge DCPS's failure to evaluate TF. During the hearing, DCPS agreed to provide TF with four 30-minute sessions of speech language therapy weekly during the summer of 2005. The administrative hearing officer found, *inter alia*, that DCPS had conceded that there had been a Child Find violation and ordered that DCPS evaluate TF on an expedited basis no later than July 8, 2005. DCPS was ordered to provide TF with a schedule for summer speech language services no later than June 24, 2005. DCPS failed to do so until July 19, 2005.

74. On September 19, 2005 (nearly two years after TF's kindergarten teacher first recommended that he be evaluated for special education), defendants found TF to be eligible for special education and related services. DCPS completed an IEP for him, which included 10 hours of specialized instruction and 1 hour of speech language therapy, at his neighborhood school, Stanton Elementary School.

75. On June 8, 2006, TF's mother attended an IEP Review meeting. During the meeting, defendants determined that TF continued to need special education and related services.

76. TF and Ms. Moore have exhausted their administrative remedies.

### Defendants

77. Defendant District of Columbia (hereafter "District") is a municipal corporation subject to 42 U.S.C. 1983. The District is a "state" within the meaning of the IDEA and the Rehabilitation Act. The District receives federal funds under IDEA and must therefore comply with the requirements of the IDEA and Section 504 of the Rehabilitation Act. Through its designated agency, DCPS, the District is required to make available a FAPE for all children with disabilities residing in the District who are ages 3 to 22. 5 D.C.M.R. 3002.1(a). It is also required to ensure that procedures are implemented to identify, locate, and evaluate all children with disabilities residing in the District. 5 D.C.M.R. 3002.1(d).

78. Defendant Clifford B. Janey is the Superintendent of the District of Columbia Public Schools and is sued in his official capacity. Pursuant to D.C. Code 38-105, the Superintendent is charged with directing and supervising all matters pertaining to instruction in all public schools. Dr. Janey serves as the chief executive of DCPS to the extent that it serves as the State Education Agency (SEA) and the Local Education Agency (LEA) for the District of Columbia.

### CLASS ACTION ALLEGATIONS

79. Named plaintiffs bring this action on behalf of themselves and all others similarly situated. Plaintiffs' class consists of all children who are or may be eligible for special education and related services, who live in, or are wards of, the District of Columbia, and (1) whom defendants did not identify, locate, evaluate or offer special education and related services to when the child was between the ages of three and five years old, inclusive, or (2) whom defendants have not or will not identify, locate, evaluate or offer special education and related services to when the child is between the ages of three and five years old, inclusive.

18

80.   The requirements of Rules 23(a)(1)-(4) and (b)(2) of the Federal Rules of Civil Procedure are met as to the class because:

(a)  The class is so numerous that joinder of all members of the class is impracticable. On information and belief, hundreds of District children aged three through five, inclusive, have not been or will not be timely identified, located, evaluated or offered needed special education and related services and thereby have not or will not be afforded the opportunity to obtain a free appropriate public education.

(b)  There are questions of law and fact common to the class, namely whether DCPS's policies, procedures and practices related to identification, location, evaluation and offer of special education and related services to preschool children violate the IDEA, Section 504 of the Rehabilitation Act, implementing regulations, the Due Process Clause of the Fifth Amendment and District of Columbia law.

(c)  The claims of the named plaintiffs are typical of the claims of the class in that each of the named plaintiffs has a disability that would make him or her eligible for special education and related services but was not identified, located, evaluated or offered special education and related services as a preschool child, or faces an imminent threat of not being identified, located, evaluated or offered special education and related services as a preschool child.

(d)  The named plaintiffs will fairly and adequately represent and protect the interests of the class.  They have no interests that are antagonistic to the class and seek relief that will benefit all members of the class.  They are represented by counsel with significant experience with this type of litigation; and

(e)  The defendants have acted and continue to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

## STATUTORY BACKGROUND

81.  In 1975, Congress enacted the Education for All Handicapped Children Act ("EHA"), now known as the Individuals with Disabilities Education Act ("IDEA"), "to ensure that the rights of children with disabilities * * * are protected."  20 U.S.C. 1400(d)(1)(B).

82.  The IDEA is a federal grant program administered by the U.S. Department of Education ("DOE").  20 U.S.C. 1400, *et seq*.  States and other jurisdictions, including the District of Columbia,

that receive DOE funds must comply with the mandates contained in the IDEA and its implementing regulations.

83. The IDEA's primary mandate is the guarantee that all children with disabilities have available to them a "free appropriate public education ["FAPE"] that emphasizes special education and related services designed to met their unique needs * * * ." 20 U.S.C. 1400 (d)(1)(A). This is known as the duty to provide "FAPE."

84. In enacting the FAPE requirement, Congress originally only provided for children with disabilities who were between the ages of 5 and 21. However, in 1986, Congress amended the IDEA's FAPE protection to extend to children who were between three and five years of age. Pub. L. 99-457, Title II, Sec. 203(a). Accordingly, the IDEA declares that a "free appropriate public education," must be made available to "all children with disabilities residing in the State between the ages of 3 and 21 * * *." 20 U.S.C. 1412(a)(1)(A).

85. In order to ensure that all children ages three to twenty-one receive FAPE, one of the specific mandates of the IDEA is that "[A]ll children with disabilities residing in the State, * * * regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated * * * ." 20 U.S.C. 1412(a)(3)(A); 34 C.F.R. 300.125(a)(1). This is known as the "Child Find" duty. This duty extends to children ages three to five years old.

86. The specific requirements of the Child Find and FAPE duties and the process defendants must follow when identifying, locating, evaluating, and offering special education services to children with disabilities are clearly set forth in the IDEA, the Rehabilitation Act, the implementing regulations of the U.S. Department of Education, and District of Columbia law.

20

87. For example, defendants are required to put "in effect policies and procedures" to ensure that all children with disabilities who are in need of special education and related services are identified, located, and evaluated. 20 U.S.C. 1412(a)(3)(A); 34 C.F.R. 300.125(a); 5 D.C.M.R. 3002.1(d), 3002.3(a). Defendants must ensure that a "practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services." 20 U.S.C. 1412(a)(3)(A); 34 C.F.R. 300.125(a).

88. Defendants are required to identify and notify children with disabilities of the availability of special education and related services. Defendants have a duty to "identify and locate every qualified handicapped" child residing in the jurisdiction and to "[t]ake appropriate steps to notify handicapped persons and their parents or guardians of [this] duty * * *." 34 C.F.R. 104.32. *See* 29 U.S.C. 794(a); 34 C.F.R. 104.33.

89. Defendants are allowed 120 days from the date of a referral of a child to identify children with suspected disabilities, evaluate them, determine whether they are eligible for special education and related services, offer them a written educational program (known as an Individualized Education Program ("IEP")) and offer them an appropriate educational placement. D.C. Code 38-2501.

90. Defendants are required to evaluate children suspected of disabilities. 20 U.S.C. 1414(a) - (c). Defendants must conduct comprehensive "initial evaluations" to "determine whether a child is a child with a disability" and "to determine the educational needs of such child." 20 U.S.C. 1414(a)(1). *See* 34 C.F.R. 300.320(a), 34 C.F.R.300.532; 5 D.C.M.R. 3005.1. Defendants' evaluations must conform to the evaluation procedures set forth in the IDEA and implementing regulations. *See* 34 C.F.R. 300.530-300.536, 300.540-300.543. For example, defendants must

"assess[] in all areas related to the suspected disability, including * * * health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities." 34 C.F.R. 300.532 (g). *See* 20 U.S.C. 1414(b)(3). Defendants must conduct evaluations that are "sufficiently comprehensive to identify all of the child's special education and related services needs * * *." 34 C.F.R. 300.532(h). *See* 20 U.S.C. 1414(b); 300.320; 5 D.C.M.R 3005.1, 3005.3-3005.10.

91. After conducting evaluations, defendants are required to determine eligibility for services. Defendants must convene a team that includes parents, teachers, and other qualified individuals to review the results of the evaluations, along with other information, in order to determine whether a child is disabled and needs special education and related services. 20 U.S.C. 1414(b)(4); 20 U.S.C. 1414(d)(1)(B); 34 C.F.R. 300.534, 300.535; 5 D.C.M.R. 3003.1, 3003.3, 3006.1 - 3006.7.

92. After determining eligibility, defendants are required to offer special education and related services. Defendants must participate with parents, teachers, and other qualified professionals to draft a comprehensive instruction plan, the IEP, which must meet the child's unique needs and provide him or her with a free appropriate public education. 20 U.S.C. 1414(d); 34 C.F.R. 300.340 - 300.350, 300.535(b); 5 D.C.M.R. 3007.1- 3007.8. The IEP must be developed within 30 days of a determination that a child needs special education services. 34 C.F.R. 300.343(b)(2); 5 D.C.M.R. 3007.1. The IEP must include annual goals to serve as the roadmap for the child's educational development. 20 U.S.C. 1414(d)(1)(A); 34 C.F.R. 300.347; 5 D.C.M.R. 3009.1. The IEP must also include the specific special education and related services to be provided to the child. *Id*. Defendants must implement an IEP "as soon as possible," 34 C.F.R. 300.342(b)(ii), 5 D.C.M.R.

22

3010.2, and must propose an appropriate placement for the child that can provide the special education and related services listed in the IEP. *See* 34 C.F.R. 300.350(a); 5 D.C.M.R. 3013.1.

93. Defendants' Child Find and FAPE obligations extend to children who are cared for or enrolled in any potential setting, including children enrolled in public, private, and charter schools and daycare facilities. *See* 20 U.S.C. 1412(a)(10)(A)(ii); 34 C.F.R. 300.125, 300.451. These obligations extend to children enrolled in kindergarten, pre-kindergarten, and Head Start programs at DCPS. The child find obligations also extend to "highly mobile children * * * such as migrant and homeless children * * *." 34 C.F.R. 300.125(a)(2)(i).

94. In addition, and in order to ensure that defendants are able to provide FAPE and comply with Child Find for all disabled children by the time they turn three years old, Congress added a program to serve children from birth to age three with disabilities, known as IDEA Part C. *See* 20 U.S.C. 1431-1455. Part C requires defendants to provide disabled children from birth to age three with "appropriate early intervention services" and to develop an Individual Family Service Plan ("IFSP"), which is similar to an IEP. 20 U.S.C. 1435(a).

95. Defendants' Child Find and FAPE duties extend to ensuring that infants and toddlers who are "participating in early intervention programs [under Part C of the IDEA], and who will participate in those preschool programs [once they turn three years old under Part B of the IDEA], * * * experience a smooth and effective transition to [Part B] in a manner consistent with" the IDEA by their third birthday. 20 U.S.C. 1412(a)(9). In order to ensure that all three year olds receive FAPE, the IDEA requires that defendants ensure that "by the third birthday of such a child [who is transitioning from Part C to Part B], an [IEP or IFSP] * * * has been developed and is being implemented for the child." 20 U.S.C. 1412(a)(9).

23

96. The IDEA further requires that defendants ensure that preschool children "remain in the then-current educational placement," including the IFSP, if an IEP has not been developed by a child's third birthday, or if there is a dispute concerning an IEP during the transition process. 20 U.S.C. 1415(j). This is known as the "stay-put" requirement.

FACTS

97. As described below, defendants are failing to comply with their Child Find and FAPE obligations to identify, locate, evaluate, and offer special education and related services to all preschool children with disabilities in the District of Columbia, including failing to ensure a "smooth and effective" transition from Part C to Part B for disabled children by their third birthday. Defendants' conduct discriminates against plaintiffs and demonstrates gross misjudgment because it departs from Child Find and FAPE standards that are accepted and followed by other jurisdictions and educational professionals. Defendants' failures are widespread and systemic and can be rectified only with injunctive and declaratory relief from this Court.

98. Defendants have not put into "effect policies and procedures" to ensure that all preschool children who may need special education services are identified, located or evaluated. Defendants have also failed to "develop[] and implement[]" a "practical method" to determine the children who are in need of special education and related services. For example, in contrast to other jurisdictions, defendants do not have a Child Find Program and have not established an Office of Child Find that identifies, locates and evaluates children for special education and related services. Defendants have no budget for Child Find activities. Defendants have failed to comply with the time lines in the IDEA and local laws that require defendants to identify and evaluate preschool children with suspected disabilities, determine their eligibility for services, develop their IEP's, and place them in an

24

appropriate educational program within a 120 days after a request is made.

99.  Defendants have failed to take basic steps to notify and locate disabled children in the District who are in need of services and who are not receiving them.  For example, defendants have failed to notify parents and other members of the public who work with preschool children that special education and related services are available through DCPS at no cost to the family.    In contrast to many other jurisdictions in the country, defendants have failed to conduct adequate public awareness activities to inform the public, including parents, health care providers, child care centers, advocates, community centers, and other members of the general public who work with preschool children who may need special education services.  Defendants have failed to inform, train and work with preschools, child care providers, and other groups who care for a majority of the District's preschool children about the availability of special education and related services through DCPS and about how parents and guardians may access these services.  Defendants have failed to develop and distribute sufficient materials to the general public about the availability of special education and related services for preschool children.  As a result, hundreds of preschool children with disabilities who need special education and related services do not know of the availability of services and are not identified, located, evaluated or offered these services.

100.  Defendants do not have an adequate method of identifying or locating children with suspected disabilities.  Defendants do not have an adequate method of screening or tracking children with suspected disabilities.   For example, defendants' data tracking systems, including ENCORE, are deficient and incapable of tracking adequately disabled children to ensure defendants' compliance with FAPE and Child Find.  Defendants also do not have an adequate intake and referral process that identifies and locates children who want special education and related services. For

example, defendants refuse to accept referrals from day care providers, doctors, neighbors, social workers, advocates, or other persons with knowledge about children who may qualify. They have a policy of accepting referrals only from parents or DCPS employees. Even when parents make referrals or requests for services on behalf of their children, defendants have delayed action for many months or failed to act at all. As a result, hundreds of preschool children with disabilities are not identified as disabled and are deprived of access to the special education and related services that they need.

101. Defendants are failing to evaluate preschool children for special education and related services or are performing these evaluations after months of delay, in violation of the IDEA's evaluation procedures, or not at all, despite parents' repeated requests for these evaluations. DCPS's own experts and staff have stated that DCPS does not have staff to conduct these evaluations in a manner required by the IDEA.

102. Defendants also fail to assess children in all areas related to suspected disabilities. Defendants do not routinely conduct medical or psychiatric evaluations when they are indicated and do not have the staff to perform these evaluations. Defendants often fail to conduct occupational or assistive technology evaluations, even when the need is apparent. DCPS's own experts and staff have stated that DCPS does not have the staff to conduct adequate assessments. As a result, many preschool children with disabilities are not properly evaluated and consequently are denied access to needed special education and related services.

103. Defendants have failed to convene timely "IEP meetings" to determine eligibility for special education services and to develop IEP's, which specify what services will be provided. Defendants delay IEP meetings for months or convene them without the required participants,

including teachers, parents, and other qualified professionals. As a result, many preschool children experience substantial delays before they are found eligible and receive services.

104. Defendants have failed to offer plaintiffs appropriate placements or have offered placements only after many months of delay. For example, defendants have proposed programs that do not have the staff, resources or capacity to implement IEP's for preschool children with disabilities. As a result, many preschool children who have been found eligible and in need of services do not receive special education and related services.

105. Defendants have failed to ensure a "smooth and effective transition" for disabled infants and toddlers transitioning from Part C of the IDEA to Part B of the IDEA by their third birthday. As a result, scores of preschool children are terminated from special education and related services once they turn three years old or else experience a significant interruption in critical services. Many children who received Part C services and whose services were terminated at their third birthday receive no services at all from DCPS until after they reach mandatory school age at five years of age.

106. Defendants have conceded the central structural deficiencies and inadequacies underlying the numerous Child Find failures articulated above (paras 97-105). For example, the Executive Director of Special Education Reform for the DCPS, Mary Lee Phelps, stated this month in a sworn statement filed by defendants on July 14, 2006, in connection with the fairness hearing on remedy in *Blackman/Jones v. D.C.*, D.D.C., Civil Action No. 97-1629/97-2402 (PLF), that defendants have failed to put in place adequate staff or to train current staff to carry out activities related to Child Find. In particular, DCPS has a 50% vacancy rate for staff in several key areas and does not have sufficient staff to conduct assessments, evaluations, determine eligibility, hold IEP's, and offer placements in accordance with the IDEA's requirements. In addition, DCPS's own

27

statistical expert, Rebecca Klemm, submitted an affidavit in connection with the same fairness hearing stating that DCPS's tracking and computer system, called ENCORE, is deficient and fails to track and ensure timely compliance with IDEA mandates, including the completion of evaluations and IEP and multi-disciplinary team ("MDT") meetings. Dr. Klemm reported that such evaluations and meetings were consistently delayed by many months. Ms. Phelps also notified the Court that the deficiencies in the computer systems and tracking systems made coordination with other District agencies, such as the Child and Family Services Administration ("CFSA"), impossible.

107. Defendants' failures have resulted in a Child Find system that departs grossly from accepted standards in other jurisdictions and that is grossly inadequate when compared to those programs in comparable parts of the country. According to statistics maintained by the Department of Education, Special Education Office, the District of Columbia is consistently ranked last among 50 states in the provision of special education services to preschool children, ages three through five. In 2003, only 1.7% or 301 preschool children were provided special education services in 2003, less than one third of the national average of 5.56% and far less than the second worst state, Texas, which provides services to 3.96% of three to five year olds. In 2004, defendants were again ranked last among 50 states in special education services to preschool children. Only 579, or 3.16%, of preschool children received some type of special education or related services. This figure is again well-behind the national average of 5.87%.

108. It is critical that children with disabilities be identified in their preschool years or earlier so that their disabilities can be treated and managed to ensure that they have educational opportunities in elementary and secondary school. Defendants' actions have harmed hundreds of current and former preschool children in the District of Columbia by adversely affecting their

28

educational opportunities, learning, and well-being.

109.  Defendants' actions amount to a policy, pattern, practice or custom that violates federal law and shows deliberate indifference to plaintiffs' federal rights under the IDEA, Rehabilitation Act, and Due Process Clause of the Fifth Amendment.

## CLAIMS

## FIRST CLAIM

## INDIVIDUALS WITH DISABILITIES IN EDUCATION ACT

110.  The IDEA and its implementing regulations require that "[a] free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive * * *."  20 U.S.C. 1412(a)(1)(A).  *See* 20 U.S.C. 1400(d)(1)(A); 34 C.F.R. 300.121.

111.  The IDEA and implementing regulations require states to have "in effect policies and procedures" to ensure that "all children with disabilities residing in the State * * * regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and [that] a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services."  20 U.S.C. 1412(a)(3)(A).  *See* 34 C.F.R. 300.125.

112.  The IDEA requires that defendants ensure a "smooth and effective transition" from Part C to Part B services for disabled infants and toddlers by their third birthday.  20 U.S.C. 1412(a)(9).  Defendants must ensure that "by the third birthday * * * an individualized education program, or * * * an individualized family service plan has been developed and is being implemented for the child."  *Ibid.*  34 C.F.R. 300.121; 34 C.F.R. 300.132.  If defendants cannot ensure that an IEP is in

place for qualifying children by their third birthday, or if there is a dispute concerning the IEP, defendants must ensure that these children are permitted to remain in their "current educational placement," including an IFSP, at no cost to the parent if they chose.  20 U.S.C. 1415(j).

113.  As set forth in paragraphs 1- 109 above, defendants have a policy, pattern, and practice of failing to identify, locate, evaluate or offer special education and related services and of failing to ensure a smooth and effective transition for disabled preschool children before their third birthday. Defendants failures are numerous and systemic.

114.  Defendants' actions violate 20 U.S.C. 1412(a)(1)(A), 20 U.S.C. 1412(a)(3)(A), 20 U.S.C. 1412(a)(9), 20 U.S.C. 1415(j), 20 U.S.C. 1400 (d)(1)(A), and the implementing regulations.

SECOND CLAIM

REHABILITATION ACT

115.   Section 504 of the Rehabilitation Act, 29 U.S.C. 794(a), and its implementing regulations, forbid defendants from discriminating against or excluding an otherwise qualified child from participation in the federally funded program or activity because of the child's disability. Defendants are liable under 29 U.S.C. 794(a) for IDEA violations where they exercise gross misjudgment or depart grossly from acceptable standards among educational professionals.

116.  The regulations relating to Section 504 of the Rehabilitation Act provide that "a recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped" child in its jurisdiction. 34 C.F.R. 104.33.

117.  The regulations also provide that "[a] recipient that operates a public elementary or secondary education program or activity shall annually: (a) Undertake to identify and locate every

qualified handicapped" child residing in the jurisdiction; and "(b) [t]ake appropriate steps to notify handicapped persons and their parents or guardians of [this] duty * * *." 34 C.F.R. 104.32.

118.  Plaintiffs are qualifying individuals under the Rehabilitation Act.  Defendants have failed to offer a free appropriate public education to plaintiffs, which they have offered to non-disabled four and five year olds through DCPS pre-kindergarten, Head Start, and kindergarten programs.   Defendants have failed to identify, locate, evaluate, or offer special education and related services to plaintiffs.  Defendants' failures are numerous and systemic and discriminate against plaintiffs.   Defendants' actions are taken with gross misjudgment and depart grossly from accepted Child Find and IDEA standards and practices when compared to other jurisdictions.

119.  Defendants' actions violate Section 504 of the Rehabilitation Act and implementing regulations.

THIRD CLAIM

DUE PROCESS

120.   The Due Process Clause of the Fifth Amendment bars defendants from depriving plaintiffs of a protected liberty interest without due process of the law.

121.   Plaintiffs have a protected liberty interest in a free appropriate public education guaranteed by the IDEA, implementing regulations, and District of Columbia law.

122.  Defendants have deprived plaintiffs of a free appropriate public education by failing to comply in an adequate and timely manner with the IDEA, implementing regulations, the D.C. Code, and District of Columbia regulations.   Defendants' failures are numerous and systemic.

123.  Defendants' actions violate the Due Process Clause of the Fifth Amendment.

31

## FOURTH CLAIM

## D.C. CODE

124.  D.C. Code 38-2501 requires that defendants "shall assess or evaluate a student, who may have a disability and who may require special education services, within 120 days from the date that the student was referred for an evaluation or assessment."

125.  Defendants violate D.C. Code 38-2501 because they fail to evaluate preschool children who may have a disability within 120 days of referral for an assessment.

## FIFTH CLAIM

## DISTRICT OF COLUMBIA REGULATIONS

126.  District of Columbia regulations require that defendants make available "a free appropriate public education (FAPE) * * * to each child with a disability, ages three to twenty-two," who is a resident or ward of the District of Columbia.  5 D.C.M.R. 3002.1(a).

127.  District of Columbia regulations require that defendants "ensure that procedures are implemented to identify, locate and evaluate all children with disabilities" who reside in the District of Columbia and who are in need of special education and related services.  5 D.C.M.R. 3002.1(d). *See* 5 D.C.M.R. 3002.3(a).

128.  District of Columbia regulations require that defendants ensure that "beginning at age three, FAPE is available to any child with a disability who needs special education and related services, including * * * highly mobile children, such as migrant or homeless children * * *."  5 D.C.M.R.3002.1(e).

129.  Defendants have failed to identify, locate, evaluate and offer special education and related services and a free appropriate public education to plaintiffs.  Defendants' failures are

numerous and systemic.

130.  Defendants' actions violate 5 D.C.M.R.3002.1(a), (d), (e), 3002.3(a).

## RELIEF

Plaintiffs, on behalf of themselves and all other persons similarly situated, request that this Court grant the following relief:

(1)  Certification of this action, as a class action, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, consisting of:

> All children who are or may be eligible for special education and related services, who live in, or are wards of, the District of Columbia, and (1) whom defendants did not identify, locate, evaluate or offer special education and related services to when the child was between the ages of three and five years old, inclusive, or (2) whom defendants have not or will not identify, locate, evaluate or offer special education and related services to when the child is between the ages of three and five years old, inclusive.

(2)  A declaratory judgment that defendants have violated the following federal statutes and regulations:

> (a)  The IDEA, 20 U.S.C. 1400, *et seq*, namely 20 U.S.C. 1412(a)(3)(A), 20 U.S.C. 1412(a)(9), 20 U.S.C. 1400(d)(1)(A), 20 U.S.C. 1412(a)(1)(A) and implementing regulations by failing to identify, locate, evaluate, or offer a free appropriate public education to plaintiffs in accordance with the IDEA and implementing regulations and by failing to ensure a smooth and effective transition from Part C to Part B;
>
> (b)  Section 504 or the Rehabilitation Act, 29 U.S.C. 794(a), and the implementing regulations, 34 C.F.R.104.32 and 34 C.F.R.104.33, by exercising gross misjudgment in failing to identify, locate, evaluate and offer

33

plaintiffs a free appropriate public education;

(c)  The Due Process Clause of the Fifth Amendment by depriving plaintiffs of their rights and interests under the IDEA, implementing regulations, and District of Columbia law with respect to the identification, location, evaluation and offer of a free appropriate public education;

(d)  D.C. Code 38-2501 by failing to evaluate or assess plaintiffs within 120 days of a referral; and

(e)  5 D.C.M.R. 3002.1(a), (d), (e), and 3002.3(a) by failing to identify, locate, evaluate or offer a free appropriate public education to plaintiffs.

(3)  A preliminary and permanent injunction ordering defendants to:

(a)  develop and implement adequate and effective policies and procedures and a practical method of identifying, locating and evaluating plaintiffs for special education and related services;

(b)  notify and inform parents and members of the community that special education and related services are available to plaintiffs at no cost to the parent or family;

(c)  develop an adequate and effective intake and referral process that accepts referrals from any individual for a child who may need special education and related services;

(d)  conduct adequate and timely initial evaluations;

(e)  determine eligibility and develop and implement IEP's in an adequate and timely manner; and

(f)  offer adequate and timely education placements to implement IEP's

(g)  ensure a smooth and effective transition from Part C to Part B services for

34

plaintiffs by their third birthdays.

(4) An order enjoining defendants to maintain those services mandated by the IFSP at no cost to the parent as the current educational placement for those children in Part C programs who are eligible for Part B and who do not have an IEP in place by their third birthday.

(5) An order enjoining defendants to take appropriate affirmative actions to ensure that the violations of federal and District of Columbia law complained of above do not continue to be engaged in by defendants, their agents, successors, employees, subordinates, attorneys and those acting at their direction;

(6) An order enjoining defendants to provide compensatory education to plaintiffs whom defendants failed to identify, locate, evaluate or offer special education and related services when they were between three and five years old, inclusive;

(7) An order requiring defendants to reimburse plaintiffs for the funds expended to obtain evaluations, special education and related services as a result of defendants' violations of federal law;

(8) An order appointing a Special Master whose duties shall include, but not be limited to, monitoring and reporting to the Court regarding:

    (a) defendants' compliance with the Court's Order;

    (b) remedies necessary to bring about full compliance with the Court's order.

(9) An award of reasonable attorneys' fees and costs; and

(10) Such other relief as may be deemed proper by the Court.

Respectfully submitted,

/s/
BRUCE J. TERRIS (D.C. Bar No. 47126)
KATHLEEN L. MILLIAN (D.C. Bar No.412350)
SHINA MAJEED (D.C. Bar No. 491725)
TERRIS, PRAVLIK & MILLIAN, LLP
1121 12th Street, N.W.
Washington, DC 20005
(202) 682-2100


/s/
JEFFREY S. GUTMAN (D.C. Bar No. 416954)
The George Washington University Law School
2000 G Street, N.W.
Washington, DC 20052
(202) 994-7463


/s/
MARGARET A. KOHN (D.C. Bar No. 174227)
Attorney at Law
1320 19th Street, N.W., Suite 200
Washington, DC 20036
(202) 667-2330