UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NIKITA PETTIES, et al.,            )
                                   )
Plaintiffs,                        )
                                   )
        v.                         )  Civil Action No. 95-0148 (PLF)
                                   )
THE DISTRICT OF COLUMBIA, et al.,  )
                                   )
Defendants.                        )

REPORT OF THE SPECIAL MASTER
REGARDING REQUESTS FOR INFORMATION AND
AN ORDER REQUIRING DEFENDANTS TO SHOW CAUSE

Contemporaneous with the filing of this report[1], public education in the District of Columbia is undergoing the most significant transformation in several decades. As of October 1, 2007, the Office of the State Superintendent ("OSSE") will assume major responsibilities for the education of children and adults. From the District of Columbia Public Schools ("DCPS") alone, OSSE will take over the Office of Compliance, Federal Grants, Credentialing, the Board of Education, Human Resources, Workforce and Professional Development, Resource Allocation, Student Residency, State Enforcement Investigative Division, Office of Accountability, Office of Testing and Research, Chief Academic Officer, Standards and Curriculum, State Office of Career and Technical Education, Bilingual Education -- English Language Learners, and Information Technology. Certain offices in the University of the District of Columbia will also move and, in January 2008, offices from the D.C. Department of Human Services will move to OSSE as well. *Building a Model State Education Agency for the People of the District of*

---

[1] This is a corrected version of the Special Master's Report of the same title filed on October 1, 2007.


PLAINTIFF'S EXHIBIT 2

*Columbia*, OSSE, September 10, 2007 ("September OSSE paper").[2]

Dozens of employees and independent contractors have been working virtually around the clock for six months to implement the vision laid out in the District of Columbia Public Education Reform Amendment Act of 2007 ("Reform Act"). This report is not meant to denigrate their efforts or dampen their enthusiasm for the task ahead. It is, however, a warning that in planning for a bright tomorrow, one can not ignore the obligations of today, or the lessons of yesterday.

This report will provide information to the Court on four topics: 1) OSSE's apparent lack of familiarity with the Petties litigation; 2) the defendant's inability to accomplish meaningful rate-setting within the time allowed by D.C. law; 3) the opportunities that have been missed as a result of the system's lack of focus; and 4) the current requests for information that remain outstanding. Finally, the report requests that the defendant be ordered to produce the information requested by the Special Master and that, absent that production of the information, the Court enter an Order setting a date for a hearing at which time the counsel for defendant should be required to show cause as to why they should not be held in contempt.

1.   OSSE's lack of familiarity with Petties

On September 9, 2007, the American Institutes for Research submitted the draft of a report entitled "Special Education Financing Study for the District of Columbia."

---

[2] Prior to June 12, 2007, the Office of the State Superintendent for Education was known as the State Education Office ("SEO"), a city agency established by the State Education Office Establishment Act of 2000, The SEO had relatively limited responsibilities until the 2007 Reform Act. The SEO should not be confused with the State Education Agency ("SEA"), an office within DCPS that reported to the DCPS Superintendent. Until the Reform Act, the SEA was responsible for most special education state-wide functions. All SEA functions transferred to the OSSE on October 1, 2007.

The draft report begins:

> The American Institutes for Research (AIR) is pleased to submit a draft of our final report in which we synthesize findings from a six-month study of special education finance in the District of Columbia.

In a section entitled Special Education Context in the District, the report states:

> Special education litigation against DCPS has led to two prominent cases and subsequent settlements. First, in a 1995 class action lawsuit (Petties et al v DC et al) plaintiffs alleged that DCPS did not provide safe, timely, and appropriate transportation for students with disabilities, resulting in a number of orders and in 2003 the appointment of an independent Transportation Administrator.

This statement -- that Petties began as a case involving the adequacy of transportation and is limited to that issue -- may come as a surprise to this Court. As the Court will recall, with some clarity no doubt, the Petties complaint was filed on behalf of District of Columbia students who were placed at nonpublic special education schools or were receiving related services from private providers. The impetus for the action was the fact that DCPS had consistently failed to pay the costs of the special education placements or related services to private providers, either fully or on a timely basis as required under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.§§1400 *et seq*. As a result of this failure, many of the private providers threatened to terminate the students' placements. On March 17, 1995, the Court granted plaintiffs' motion for a preliminary injunction, finding that:

> unless defendants fully and immediately fund all DCPS students currently in private special education placements and/or receiving related services from private providers and, in addition, give adequate written assurances that such payments will be made on a current basis in the future, many if not all of those students will lose those placements and/or services terminated, and there is no indication that appropriate alternative placement will be available to meet the students' individual needs. Petties v. District of Columbia, 881 F. Supp. 63, 64 (D.D.C. 1995). See also Petties Opinion,

November 22, 2002.

Since the date of the class certification, the Court has reviewed numerous issues involved in the provision of payment for special education services, such as questions associated with obligations to fund special education for students in foster care (<u>Petties</u> Opinion, July 21, 1995, <u>Petties</u> Order Modifying Class Certification, July 20, 1995, see also, <u>Petties</u> Order, December 24, 1996). Over the course of six (6) years, the Court directly supervised the negotiation of payment orders that established an automated payment system for nonpublic invoices (<u>Petties</u> Payment System Order of March 27, 1996, <u>Petties</u> Orders Supplementing and Modifying Payment System dated August 28, 1996, August 25, 1997, September 1, 1998, September 24, 1999, October 17, 2000, and August 2, 2001. More recently, the Special Master became involved in the payment process when, in October 2002, the Court ordered the implementation of dispute resolution mechanism (<u>Petties</u> Payment Order, October 11, 2002, <u>Petties</u> Payment Order, November 8, 2004). Under the dispute orders, the Court has issued no fewer than eight decisions regarding a variety of issues relating to the payment for special education services, including the application of the District's Administrative Procedure Act to changes in special education policies. Petties v. D.C., 298 F. Supp. 2d 60 (D.C.C. 2003). Finally, for approximately ten years the defendants have been required to file with the Court monthly reports on the payment status of invoices submitted by nonpublic providers.

While it is true that enunciated goals of the AIR study did not directly relate to this litigation, it is stunning that a six month review of **special education financing** -- in which the term "nonpublic schools" appears in at least sixty (60) instances -- did not stumble upon the Court's engagement, or the Special Master's role, in matters related to nonpublic tuition payments.

It is not entirely clear why the payment aspect of the <u>Petties</u> litigation was

overlooked or ignored. But it is clear that the consultant relied entirely on sources in, or recommended by, the OSSE. The draft report describes the consultant's sources of information thus:

> To help address some of the guiding policy issues we examined the unique context in which the District operates, with a particular focus on soliciting the perspectives of local stakeholders. We collected this information through two meetings with a study Advisory Committee of individuals identified by the Office of the State Superintendent of Education (OSSE) and interviews with an array of policy, administrative, and senior District, OSSE, and school staff as well as other stakeholders *identified by the OSSE* (emphasis added*)*.

Representatives from OSSE have been attending monthly <u>Petties</u> meetings with some regularity since the spring of 2007. While the AIR study has been mentioned to class counsel and the Special Master, apparently the reverse was not the case.

2.  Implementation of Rate-Setting Legislation

Regrettably, the AIR report is not the only indication that OSSE is not yet familiar with <u>Petties</u>, or subject to any obligation to take action that would move the case toward closure. The facts regarding the efforts to establish rates for nonpublic providers reinforce this concern.

In a Status Report to the Court, filed May 5, 2005 ("May 2005 Report"), the Special Master addressed prospects for ultimate resolution of that portion of the <u>Petties</u> litigation that relates to payment requirements. The report noted that as late as 2003, DCPS payment procedures were still inadequate due to, among other things, chronically lost or misplaced invoices. The report noted that by early 2005 improvements had been made through the increased supervision by DCPS counsel but noted that:

> this level of scrutiny is unlikely to continue once litigation has ended. What is essential is a credible manifestation that internal operations are sufficiently

5

routinized and monitored to withstand not only the withdrawal of judicial oversight, but also the turnover of personnel customary in large school systems.

Despite the fact that closure was not imminent, the May 2005 Report advised the Court that:

> sufficient progress has been made to merit discussion of exit criteria for the portion of the case related to payments. At a meeting with the parties on April 20, 2005, the Special Master identified four indicators that would be necessary to ensure the execution of a reliable, fair and efficient payment process without judicial supervision.

One of the four indicators described in the Report was the following goal:

> DCPS can accurately project special education costs based on rates that 1) have been set in accordance with established policy; and 2) are commensurate with rates paid to that provider by surrounding jurisdictions.

At that time, rate-setting practices, to use that phrase loosely, varied widely from one nonpublic provider to another and from one DCPS special education administration to the next. DCPS had been attempting to regularize the process and was actively preparing for the implementation of rate-setting. In 2005 DCPS entered into a contract with Milliman, Inc., ("Milliman") to "calculate fair and reasonable fee-for-service (FFS) rates for certain related services as well as tuition rates for nonpublic schools." The Milliman report was completed in the spring of 2006.

In May 2006, both class counsel and the Special Master testified before Council Member Kathy Patterson's Committee on Education, Libraries and Recreation in support of Bill 16-668, legislation that would establish, among other things, a rate-setting process.[3] At the time of the hearing, the Committee Chair was still assessing whether the

---

[3] Both class counsel and the Special Master urged the Committee to make certain changes so that the legislation would conform to IDEA and United States Supreme Court decisions arising thereunder. Most, if not all, of the suggestions in language were incorporated in the final legislation.

responsibilities under the proposed legislation should rest with DCPS or the State Education Office. Finally, in December 2006, the District of Columbia City Council enacted the Placement of Students with Disabilities in Nonpublic Schools Emergency Amendment Act of 2006 ("the Act" or "the legislation"). According to the Committee notes, the purposes of the legislation were to standardize procedures, promote quality and control costs associated with the provision of special education services to students. Committee on Education, Libraries, and Recreation, Report on Bill 16-668 (July 7, 2006). The first part of the Act described the process for the issuance of Certificates of Approval to nonpublic programs with the primary purpose of serving students with disabilities. This aspect of the legislation represented a significant departure for the District of Columbia as prior to the Act there had been no mechanism for ascertaining the basic value of programs attended by students with disabilities. The responsibility for certification was placed with the DCPS State Education Agency ("SEA") and certification activities took place during the spring of 2007.[4]

With respect to rate-setting, the District's new law provided as follows:

> The mayor, or his designee, shall administer and implement a rate-setting process for the payment of tuition and related services to nonpublic special education schools and programs that provide special education and related services to students with disabilities funded by the District of Columbia.

---

[4] It is not at all clear that DCPS' implementation of certification process actually accomplished the purpose of promoting "quality" in nonpublic programs. To my knowledge, every nonresidential program that submitted an application was approved without conditions, except for a handful of schools that were rejected on technical grounds. Although DCPS claims that all schools were visited, no sample scoring sheet is apparently available. No visits were made to residential schools at all, although DCPS asserts that all residential schools were licensed by the state in which they are located. Ironically, within the last two months, the local press has reported on possible abuse at residential programs that had just been certified by DCPS. Even if some of reports are in error, it is disconcerting to realize that the certification process amounted to no more than a rubber stamp of approval.

As a result of this language, DCPS was no longer responsible for rate-setting; instead, the responsibility was given to the State Education Office ("SEO"). After the passage of the Act, the implementation of the certification and rate-setting provisions became topics of discussion at five out of the next six (6) monthly <u>Petties</u> meetings. During these meetings class counsel and the Special Master expressed concern over DCPS' and OSSE's slow pace in drafting regulations as well as the lack of substantive information provided by staff and counsel.[5] Moreover, throughout these meetings the tension between DCPS staff (particularly those from the "state" part of DCPS) and OSSE staff was palpable. The lack of cooperation and communication was such that the two agencies could not agree on which agency had the right, or duty, to design the seal that would be affixed to the Certificates of Approval.

The first tangible indication that the rate-setting process was clearly "off-track" came when the Special Master was apprised, in late July, that a letter had been sent to perhaps as many as one hundred nonpublic providers. The letter was not from OSSE at all, but from the DCPS Budget Officer, who asked for "daily education costs" for the preceding four (4) school years. The letter was dated July 5, 2007 and directed nonpublic schools to submit the data by July 9. According to the letter, "immediate attention and response" was required. Almost inconceivably, the letters were mailed on July 24, 2007 rendering compliance impossible.[6]

---

[5] Because information about rate-setting for 2007-08 was so difficult to elicit, the Office of Attorney General ("OAG") counsel was asked to invite the State Superintendent to the meetings on two separate occasions. She did not attend on either.

[6] The letters were intended for schools in the District but apparently were mistakenly sent to the nonpublic programs in Maryland and Virginia that had already been informed that rates accepted by those states would be applied by DCPS. Moreover, almost all of the information sought by the letter had been provided to DCPS in the course of the 2005-2006 Milliman study, in the course of the certification process, and in 96 monthly invoices submitted over a 4 year period.

The July 5 letter typified the lack of organization within DCPS and OSSE. But efforts by the Special Master to call it to the attention of counsel did nothing to alter the confusion that continued into August. In a letter to defendants' counsel dated August 2, the Special Master noted that there was a

> dizzying number of outstanding issues that truly must be addressed and to which the defendants have no answers. At the July 28 meeting, for example, DCPS and OSSE representatives were unable to answer even the most fundamental question about the structures and processes that will govern the delivery of special education services by, and payments to, nonpublic schools when the school year begins in less than a month."

In mid-August, the OSSE sent letters to a more limited group of schools, the ten (10) nonpublic programs in the District of Columbia that do not serve students from surrounding jurisdictions and therefore have not had rates set by other jurisdictions. These letters set interim rates for 2007-2008 but, among other things, failed to include funding for speech therapy in some programs, and without any explanation cut tuition rates by up to twenty percent (20%) in other programs. While it may come to pass that some rates should be reduced, in this round there was no methodology whatsoever for the rate that was issued. The rates were not based on the methodology used in the Milliman study, or the Maryland rate-setting procedures (which have been made available to the District repeatedly), or any other process. Instead, data from one charter school was studied and its "apparent" rate was then applied to ten other schools.[7] This "methodology" was used simply because OSSE staff believed the law required that new rates be issued before the beginning of the school year.

---

[7] Not coincidentally, the charter school used as the template, St. Coletta PCS, features prominently in the study prepared by AIR.

Defendants counsel apparently did not notice the fact that the OSSE letter was both substantively and procedurally deficient either before or after it was sent. At a meeting on August 28, class counsel and the Special Master pointed out these problems and it was agreed that the letters would be retracted. The OSSE then sent letters that "clarified" the rates for these ten schools and notified them that the rates for the 2007-08 school year would remain the same as the rate paid by DCPS for 2006-07. In mid-September, a month after the first letter went out, and two weeks after the second, a third letter was sent, because the "clarification" letter had inadvertently failed to include a notice that the 07-08 rates would be adjusted to include a 2.86% consumer price index adjustment based on the Bureau of Labor Statistics.

3.  Opportunities lost as a result of the system's lack of focus

Between June 2006 and September 2007, the defendants lost a number of opportunities to make real progress toward closure in <u>Petties</u> and to realize savings of taxpayer funds:

1.  Whereas DCPS' Milliman Report might have been instructive on the methodology and basis for nonpublic rates, the Milliman study was dismissed, apparently without any further review. Obviously, if policy analysis staff within OSSE disagreed with the methodology adopted by Milliman to set rates, the agency had every right to use an alternative methodology. However, even in that event it would have been instructive to review the 2006 study to determine what the Milliman consultants overlooked or misinterpreted. As far as one can tell, the Milliman report has never been reviewed by OSSE; in the 73 page draft AIR Report there is no mention of it. Once again, another report on special

education costs goes on the shelf to join a dozen other internal and external reports on the subject.[8]

2. Whereas an efficient and well-prepared rate-setting process might have reduced the funds paid to some nonpublic providers, defendant's efforts were so late and so flawed that fundamental fairness required that past rates remain in effect. Accordingly, 2007-08 will be another year in which no savings are possible and all nonpublic providers will be subjected to allegations that they are plundering the District treasury. Programs that may be charging excessive rates are free to do so because defendants attempted to adjust rates using a hacksaw rather than a scalpel.

3. Whereas the Special Master had hoped to be able to certify to the Court that an efficient and fair rate-setting procedure was in place, the abysmal effort this year can only lead to the conclusion that it will be at least another year – and another round of rate-setting – before this element of closure can be satisfied.

These opportunities were missed, it may be argued, because of the distraction in OSSE and DCPS created by the Reform Act. Indeed, simply the number of offices mentioned in the opening of this report suggests the enormity of the task. But it must be stressed that OSSE did not assume responsibility for rate-setting through the Reform Act. It was a responsibility of that office even before the Mayor's inauguration; it simply was not a priority.

Moreover, many opportunities were missed as a result of what appears to the Special Master to be the OAG's obsession that the Petties class action, supposedly like

---

[8] The Special Master has not been informed of the cost of either the Milliman or the AIR reports.

every other class action, has or will engage in "mission creep." That is, that the scope and obligations created by the Petties case will expand. One example may suffice. At a recent meeting class counsel noted that they had been called by Prince George's County Public Schools regarding outstanding payments of several hundreds of thousands of dollars owed by DCPS for special education services provided to D.C. children in foster care in Prince George's County. Even the discussion of how this dispute might be resolved was, in the view of the OAG, an example of "mission creep." Whether the Court's 1996 Orders involving students in foster care are applicable to students in surrounding public schools, as well as nonpublic schools, will be brought the Court's attention if and when a dispute arises under the current Petties Payment Order. In the meantime, it is unfortunate that the OAG appears to be far more concerned with "mission creep" than with the defendants' "mission failure." The Petties case is replete with examples of "mission failure" but the defendants' haphazard and inadequate performance in certification and rate-setting is among the worst.

   4. Requests for information that remain outstanding.

By September 14, the lack of candid and accurate information from defendants was of such concern that the Special Master sent a memorandum to both Superintendent Deborah Gist and Chancellor Michelle Rhee regarding information that was expected from their staff at the next Petties meeting on September 25, 2007. The letter read:

> The Placement of Students with Disabilities in Nonpublic Placements Act of 2006 represented a significant change in special education policy for the District of Columbia, requiring the government to undertake two entirely new tasks: certification of special education programs and rate-setting for those programs. Moreover, the implementation of these two tasks has coincided with the reform efforts of the Mayor. Accordingly, within a six (6) month period, we will see: a) the certification of nonpublic

> programs by the State Education Agency of DCPS; b) rate-setting for those programs by OSSE; and c) the payment of invoices to these programs by the Local Education Agency of DCPS. Under the very best of circumstances, this trifurcated system poses the potential for misunderstandings and gaps in performance.
>
> On September 25, OSSE and DCPS should be prepared to demonstrate how information has been, and will be, passed from one department/agency to the next and then the next. Included in this demonstration should be written procedures which have been reviewed by management. Of particular importance at this time are the procedures that OSSE and DCPS have developed for provided the DCPS Billing Unit with the rates that OSSE has set for each program

Regrettably, at the September 25 meeting neither counsel for the defendants nor program staff could articulate the procedures that they would use to communicate information regarding approved rates to the Billing Unit in DCPS. Program staff from the DCPS Billing Unit did not participate in the discussion to any extent, perhaps because neither Dr. Marla Oakes, the DCPS Director of Special Education nor George Valentine, the acting DCPS General Counsel, nor Stephanie Ramjohn- Moore, the Petties liaison in the DCPS General Counsel's Office, were willing or able to attend the meeting.[9]

The Special Master's September 14 memorandum also requested information from the OAG and provided the following background:

> Another aspect of the [Act] is the requirement that nonpublic programs must enter into contracts with the District government. At the outset, it should be noted that this provision has been discussed at many, many Petties meetings, both before and after the passage of the Act. . . .
>
> I have suggested at several meetings that the defendants consider the incorporation of a provision by which the parties agree that with respect to disputes over invoices they will be bound by an alternative dispute resolution process. Such a provision would be meaningful because it would assure the Court that payment disputes in the future

---

[9] DCPS attorneys have been absent for two consecutive meetings; the attendance of Dr. Oakes at Petties meetings has been sporadic during her tenure at DCPS.

could be handled fairly, expeditiously, and without resort to Superior Court or U.S. Federal District Court.

I have asked for, but not yet received, the following information on ADR:

1. Would disputes between DC and providers be covered by the Contracts Appeals Board?
2. Has DC entered into dispute resolution agreements with other schools? I have been told that St. Coletta's has such a provision but have not seen it.
3. Are there specific provisions in DC law would prohibit ADR procedures from being used?

As with the request for information from OSSE, the OAG office did not bring this information to the meeting.

5. Request for relief

In an effort to voice my concerns directly to the defendants, a meeting was requested with State Superintendent Gist in early September. The Superintendent was gracious and attentive. She acknowledged that the rate-setting process had not been as smooth as possible and accepted responsibility for the missteps within her agency. In what is eerily reminiscent of claims made in the early years of Blackman v. D.C., (C.A. 97-1629. (PLF)), the Superintendent explained that insufficient funds had been appropriated to accomplish the task given to the agency.

Despite this personal meeting, OSSE responsiveness to requests has not improved. Other meetings could, of course, be scheduled with the Chancellor, the Deputy Mayor, the Mayor, and their staff. As much as I would like to meet with these individuals to discuss substantive matters related to improvements in the delivery of special education, those discussions still appear to be something for the future.[10] In the

---

[10] In this regard, the Special Master notes that the September 10 OSSE paper includes the following: The State Superintendent and the Chancellor have committed to working together on a complete restructuring of education in the District of Columbia. That restructuring will include a deep analysis of the way we

meanwhile, it would not be a productive use of their time, or mine, to meet with them to alert them to the fact that the Petties case includes issues related to nonpublic tuition payments as well as transportation. That is why they have lawyers. Nor am I eager to distract the city's principal education leaders from their work to ask them to direct their staff to do what presumably counsel of record has already asked them to do -- comply with the Orders of this Court and the Special Master.

The July 8, 1997 Order of Reference, at page 8, describes the obligation of defendants as follows:

> The Special Master shall have the full cooperation of the parties and their counsel, who shall promptly provide any and all documentation and information requested by the Special Master, whether requested orally or in writing, and in whatever form requested, and shall afford the Special Master full access to the parties, including DCPS, DHS and other necessary District of Columbia officials, staff, facilities, records and documents.

See also, Petties Order of May 23, 2003.

If staff does not understand the reason for a request, counsel should make it clear. If staff does not understand the importance of a request, defendants' counsel should make it clear. If staff fails to act on the request, defendants counsel should notify the top officials of their clients. For all of this to happen, however, defendants counsel must believe that that their active involvement will result in progress toward closure.

It appears to the Special Master that DCPS, OSSE and the OAG are all either unwilling or unable to focus on Petties issues, much less focus on the initiatives

---

provide transportation and non-public tuition services to students in the District. We will consult with the District's court-appointed monitors and administrators of transportation and non-public school tuition to understand their current and optimal functioning and what it will take in introduce these functions into our state structures." The Special Master is committed to participating in this "deep analysis" and will make available the time and background material necessary to contribute to the success of this task.

15

necessary for case closure. Accordingly, it is the recommendation of the Special Master: 1) that the defendants be ordered to produce the information requested in the proposed Order accompanying this report; and that 2) absent full compliance with the Court Order the Court enter an Order setting a date for a hearing at which time the counsel for defendant should be required to show cause as to why they should not be held in contempt for failure to comply with the Court's Orders.

                                                RESPECTFULLY SUBMITTED,

                                                Elise T. Baach
                                                Special Master

Date: October 2, 2007