1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - -x

4    DL, et al., on behalf of        :

5    themselves and others similarly :

6    situated,                       :

7            Plaintiffs,             :

8                                    :

9    v.                              : Civil Action No.

10                                   : 05-1437 (RCL)

11   THE DISTRICT OF COLUMBIA, et al :

12                                   :

13       Defendants.                 :

14   - - - - - - - - - - - - - - -x

15

16           Deposition of ZONDRA JOHNSON

17              Washington, D.C.

18        Wednesday, January 15, 2008

19              11:16 a.m.

20

21           *      *      *      *

22

23

24

25

26

27

28   Reported by:  Okeemah S. Henderson, LSR

29

**Plaintiffs' Exhibits K**

1           Deposition of ZONDRA JOHNSON, held at the

2    offices of:

3

4           TERRIS, PRAVLIK & MILLIAN, LLP

5           1121 12th Street, Northwest

6           Washington, D.C.  20005

7           (202) 682-2100

8

9

10

11           Pursuant to agreement, before Okeemah S.

12   Henderson, Licensed Shorthand Reporter and Notary

13   Public in and for The District of Columbia.

14

15                 *      *      *      *      *

16

17

18

19

20

21

22

```
 1                    A P P E A R A N C E S

 2

 3    ON BEHALF OF PLAINTIFF, DL, ET AL:

 4

 5         BRUCE J. TERRIS, ESQUIRE

 6         EMILY BENFER, ESQUIRE

 7         TERRIS, PRAVLIK & MILLIAN, LLP

 8         1121 12th Street, Northwest

 9         Washington, D.C.  20005

10         (202) 682-2100

11

12    ON BEHALF OF DEFENDANT THE DISTRICT OF COLUMBIA:

13

14         EDEN MILLER, ESQUIRE

15         OFFICE OF THE ATTORNEY GENERAL

16         Senior Assistant Attorney General

17         for the District of Columbia

18         441-4th Street, Northwest, 6th Floor South

19         Washington, D.C.  20001

20         (202) 724-6614

21

22    ALSO PRESENT:

23              CHRISTAL MIMS WILLIAMS

24              JANICE GORIM

25

26

27

28

29

30

31

32
```

1                              I-N-D-E-X

2

3                    Deposition of ZONDRA JOHNSON

4                         January 15, 2007

5     EXAMINATION BY:                          PAGE:

6     Mr. Terris                                5

7

8     CARE EXHIBITS                            PAGE

9     41    2003-2004 Annual performance report  117

10    42    Annual performance report          119

11    51    2005-2006 strategic plan            74

12    52    2006-2007 strategic plan            74

13    53    Document                            77

14    54    Document                            77

15    55    Responses to interrogatories        77

16    56    Job description                     125

17

18

19          (Exhibits retained by Mr. Terris.)

20

21

22

1                    P-R-O-C-E-E-D-I-N-G-S

2                         (11:16 a.m.)

3      Whereupon,

4                    ZONDRA JOHNSON,

5      called as a witness, having been first duly sworn

6      to tell the truth, the whole truth, and nothing

7      but the truth, was examined and testified as

8      follows:

9                    DIRECT EXAMINATION

10     BY MR. TERRIS:

11          Q.    I am Bruce Terris.  I represent

12     plaintiffs in this case.  The plaintiffs are

13     current or former preschool children with

14     disabilities who are eligible for special

15     education services for the District of Columbia.

16     The case involves violations of the Individuals

17     with Disabilities and Education Act which I'll

18     refer to as IDEA and Section 504 of The

19     Rehabilitation Act and some other requirements as

20     well.  What is your full name?

21          A.    Zondra Johnson.

22          Q.    And what is your address?

1          A.     4901 Suitland -- I'm sorry.  4901

2     Dublin, D-U-B-L-I-N, Drive, Suitland, Maryland.

3          Q.     Have you ever had your deposition

4     taken before?

5          A.     Yes.  When I was with Prince George's

6     County Public Schools.

7          Q.     What kind of lawsuit was that?

8          A.     It was in regards to an employment.

9          Q.     An employment discrimination case; is

10     that right?

11          A.     Yes.

12          Q.     Were you the person who was claiming

13     discrimination?

14          A.     Yes.

15          Q.     Have you ever had your deposition

16     taken in any other case?

17          A.     No.

18          Q.     You've been sworn in to tell the

19     truth.  Do you understand that?

20          A.     Yes.

21          Q.     And your testimony is being recorded

22     by a Court Reporter.  If you don't understand any

1    question, would you, please, ask me to clarify my

2    question?

3          A.    I will.

4          Q.    And, please, give oral answers because

5    the Reporter can't write down nods of the head

6    even though I might understand and try to avoid

7    talking about the same time as you're talking

8    again because the Reporter can't deal with that

9    and if you will try also to avoid when I'm

10   talking, I think that would help.  If you need a

11   break, please, tell me.  At the end of the

12   deposition, you'll have the opportunity to read

13   the transcript and to sign it if that's what you

14   desire.

15         Let me go back and just ask you what is your

16   home telephone number?

17         A.    It is (240) 392-2774.

18         Q.    Do you have plans to leave the

19   District Government employment?

20         A.    No, by no means.

21         Q.    Are you taking any medication that

22   would affect your memory today?

1          A.     No.

2          Q.     Is there anything else that would

3     affect your testimony today?

4          A.     No.

5          Q.     After you learned that you were going

6     to be deposed, did you talk to anyone about

7     your -- about the deposition?

8          A.     Eden and Dan Rezneck, those were the

9     only two.

10         Q.     Did you look at any documents to

11    prepare for today's testimony?

12         A.     Just briefly looked at the Child

13    Find -- a draft Child Find menu.

14         Q.     Let me show you a document.  Is this

15    the document which is labeled Exhibit 10.

16    Deposition Exhibit 10, is that the document that

17    you looked at before today's testimony?

18         A.     Correct.

19         Q.     Have you been involved in any way in

20    collecting documents to be provided to the

21    plaintiffs in response to discovery in this case?

22         A.     Yes, I have.

1          Q.     And would you tell me what your role

2     was?

3          A.     To respond to those documents that

4     were requested that were in the custody of early

5     childhood special education.

6          Q.     I couldn't hear the end of that.  In

7     the custody of whom?

8          A.     Early childhood special education.

9          Q.     Does that mean the documents that were

10    at The Care Center?

11         A.     Yes.  Early childhood at the Care

12    Center.

13         Q.     And did anybody else participate in

14    locating those documents?

15         A.     My staff, Ginny Johnson and Shanda

16    King.

17         Q.     Did anybody who was higher than you in

18    hierarchy participate in locating the documents?

19         A.     I couldn't speak to documents that

20    were not at The Care Center.  I was responsible

21    for those documents that were housed at The Care

22    Center.

1     Q.     And how did you know what documents to

2     look for?

3     A.     The ones that were requested by our

4     attorney.

5     Q.     Were you given a list of documents by

6     the attorney?

7     A.     Yes.

8     Q.     Was the document you were given a

9     document that was prepared by the plaintiffs?

10     A.     I couldn't tell where the origin came

11     from.

12     Q.     Did it have on the first page, did it

13     have a caption of a case in court?

14     A.     I can't recall.  It's been a while

15     since I did that.

16     Q.     Do you know who the signatory was on

17     the document?

18     A.     I can't recall.

19     Q.     Do you recall who the signatory was

20     not in the sense of individual person but in

21     their, what role they had?  In other words,

22     whether they represented the plaintiffs or they

1     were somebody else?

2          A.     I'm not understanding your question.

3          Q.     Did the document purport to be a

4     document of somebody else who worked for the

5     District Government?

6          A.     The request?

7          Q.     Yes.

8          A.     I can't say for sure but I would

9     imagine.

10          Q.     Was it a memorandum?

11          A.     It was in an E-mail form.

12          Q.     Do you still have that document?

13          A.     No, I would not because the District

14     Government had a new rule that you wipe out

15     everything in your E-mails after.

16          Q.     You do what?

17          A.     The District had a rule where they

18     deleted all of the E-mails after a certain period.

19          Q.     Was the E-mail printed out?

20          A.     No.

21          Q.     How long was the portion specifying

22     what documents you should look for?

1        A.    I couldn't tell you, sir.

2        Q.    Could you estimate?  In other words,

3    was it 1 page or 30 pages long?

4        A.    Well, there were more than one, so

5    which one?

6        Q.    There were more than one E-mail?

7    There were multiple E-mails asking you for

8    documents; is that correct?

9        A.    Correct.

10        Q.    How many were there approximately?

11        A.    This would be a guess.  Approximately

12    five.

13        Q.    In what period of time did you receive

14    them?

15        A.    The first part of 2007.

16        Q.    That's when the first E-mail

17    approximately came to you; is that right?

18        A.    That's the best of my recollection.

19        Q.    When's the last E-mail on this subject

20    approximately came to you?

21        A.    I couldn't give you a certain date.

22        Q.    Was it within the last few months?

1          A.     In the last few months.  Yes.

2          Q.     And if we added all those E-mails

3    together, how long would you estimate those

4    E-mails were?

5          A.     I wouldn't begin.

6          Q.     Did each of the E-mails list the

7    documents you should be looking for, like, 1, then

8    they would describe a category; 2, describe a

9    category; 3, describe a category, is that how they

10   were set up?

11         A.     I don't remember, sir.

12         Q.     Do you remember whether they said and

13   just in general terms would you give us all the

14   documents that related to some one general topic?

15         A.     I can't recall.

16         Q.     You said that the documents were

17   deleted because of the District's policy.  Who

18   does the deletion according to the policy?

19         A.     I do not know.

20         Q.     Are the E-mails deleted on your

21   computer, then by somebody else and not by you?

22         A.     Correct.

1          Q.     Did you ever receive any instruction

2     for you to retain the E-mails that you had that

3     related to this case?

4          A.     No, I did not.

5          Q.     To the best of your knowledge, did the

6     District attempt to retain the E-mails that are

7     related to this case?

8          A.     I do not know, sir.

9               MR. TERRIS:  Is it possible for us to

10    get the policy of the District on deleting

11    E-mails?

12               MS. MILLER:  Yes.

13               BY MR. TERRIS:

14         Q.     Do you know who else in the District

15    Government was asked to locate documents with

16    relation to this case?

17         A.     My staff.

18         Q.     Besides you and your staff, do you

19    know of anyone else?

20         A.     No.  I don't have any direct knowledge

21    of who else.

22         Q.     Did you and your staff provide

1     documents in response to the request?

2          A.     To the best of our ability we did.

3          Q.     Can you give an estimate of how many

4     pages you supplied to whomever requested them?

5          A.     No.  I couldn't give an estimate and

6     it was because it also included the children, some

7     of the children's folders which could be numerous

8     amounts of paper or documents.

9          Q.     Were there several feet of documents?

10          A.     I haven't the faintest idea, sir.

11          Q.     Are you the person who ended up with

12     them before they were given over to somebody else?

13          A.     Sometimes but not all.

14          Q.     So let's see if I understand.

15     Sometimes you collected them from the two people

16     that worked for you and you gave them to somebody

17     else; is that correct?

18          A.     No.  Could you repeat the question

19     because I think you were.

20          Q.     There were five different times that

21     you handed documents to somebody else?

22          A.     Or about that many times.  That's my

1    guess.

2         Q.    Let's use five as the best estimate we

3    can.

4         A.    Okay.

5         Q.    So some of those five times was it did

6    you collect the documents from the two other

7    people you mentioned and then you were the one who

8    provided them to somebody else in the District

9    Government?

10        A.    Some of the times, you're correct.

11        Q.    Some of the times one of the other two

12   people collected the documents and provided them

13   to somebody else in the District Government; is

14   that correct?

15        A.    That's correct.

16        Q.    Now, the times that you provided

17   documents to someone else in the District

18   Government, who did you provide them to?

19        A.    Our attorneys, Eden and Dan.

20        Q.    And the times that was one of the

21   other two people that work for you provided the

22   documents, who did they provide them to?

1          A.      Eden and Dan.

2          Q.      Now, when you were looking for

3     documents, did you look for E-mails?

4          A.      Did I look for E-mails?

5          Q.      I assume -- now, tell me if I'm wrong,

6     what you were asked for is documents related to

7     certain subjects; is that correct?

8          A.      Correct.

9          Q.      And so let's assume there was a

10    particular subject and when you were looking for

11    documents, were you looking among other things for

12    E-mails on that subject?

13         A.      Yes.

14         Q.      Did you supply E-mails on the subjects

15    that were listed?

16         A.      To the best of my recollection, I did

17    not because of the subjects that were listed there

18    were no E-mails but I did search.

19         Q.      And where did you search for the

20    E-mails?

21         A.      In the available E-mails that were on

22    my database.

1      Q.    And when you say on your database,

2    would that include all of the people that worked

3    at The Care Center on the subjects that were

4    listed?

5      A.    No.  Just mine.  Just my E-mail.

6      Q.    Did the two people that work for you,

7    did they search their databases for E-mails in

8    which they were involved?

9      A.    I cannot say.

10      Q.    The request for documents came to you;

11    is that correct?  Let me restate that.  The

12    request that was made by whomever and you couldn't

13    remember who but the request for documents in

14    these roughly five times, did that request come to

15    you and then you also asked the two people who

16    worked for you?

17      A.    The request for the document came from

18    our attorneys, Eden and Dan.

19      Q.    And did it come to you?

20      A.    Yes.

21      Q.    And you then in some cases delegated

22    that responsibility to the two people that worked

1    for you; is that correct?

2        A.    That is correct.

3        Q.    And when you asked the two people that

4    worked for you what they should do to look for

5    documents, did you instruct them that they should

6    look for E-mails?

7        A.    No, I did not instruct them.

8        Q.    Did the documents that came to you

9    about looking for documents, did they instruct you

10   to look for E-mails?

11       A.    I believe so, there was a request.

12       Q.    Now, I think you said that the, you

13   didn't print out the E-mails, correct?

14       A.    No, I did not.

15       Q.    How did the two people that work for

16   you know what they should be looking for?

17       A.    I forwarded.

18       Q.    You forwarded the E-mails to them?

19       A.    The E-mails that I received from Eden

20   and Dan if I felt that the documents that I

21   couldn't retrieve or did not have knowledge of and

22   that possibly they would have knowledge of, I

1    forward the E-mails to them and said --

2        Q.    I'm sorry.  Did you forward them the

3    entire E-mail or only the portions you thought as

4    to which they might have some documents?

5        A.    I forward the entire E-mails.

6        Q.    Did you forward the entire E-mails for

7    all of the E-mails that you received from the

8    attorneys on this subject?

9        A.    No.  Only those that were relevant to

10   my subordinates.

11       Q.    So for those E-mails, the only search

12   that was made as far as The Care Center was

13   concerned was made by you personally, correct?

14       A.    Correct.

15       Q.    Now, I asked you a series of questions

16   on E-mails.  Did you also look for notes of

17   meetings or telephone conversations on the

18   subjects that were the subject of the E-mails?

19       A.    I did look.

20       Q.    Does that suggest you didn't find

21   anything; is that correct?

22       A.    Did I find anything, any notes?  No.

1    No, notes.

2         Q.    There were no such notes that related

3    to those subjects; is that correct?

4         A.    That's correct.

5         Q.    Did you search for memoranda on those

6    subjects?

7         A.    Yes, I did.

8         Q.    And did you search for minutes of

9    meetings on those subjects?

10        A.    Yes, I did.

11        Q.    Did you search for computer files on

12   the subjects?

13        A.    No, I didn't.  Well, let me ask you to

14   clarify.  What do you mean by computer files?

15        Q.    Well, were there materials on those

16   subjects that wouldn't be memoranda and they

17   wouldn't be E-mails, etc. but which they would

18   have data that related to the transition process,

19   for example?

20        A.    Can you give me an example, please?

21        Q.    Does the District not have data on

22   these subjects?

1          A.     Which subjects, the subjects that were

2     requested?

3          Q.     Well, was there no data on any of the

4     subjects that were requested, let me ask you that.

5          A.     Data was provided on the subjects that

6     were requested.

7          Q.     So you looked for data -- for example,

8     did you look, for example, for compilations of

9     children that were in the transition process?

10          A.     On the computer, computer files?

11          Q.     Yes.

12          A.     I didn't search for them.  No.

13          Q.     Well, did you provide any?

14          A.     Yes.

15          Q.     I'm not sure I understand on why you

16     didn't search but yet you provided.  Is that

17     because it was so obvious where they were?

18          A.     Correct.

19          Q.     Is that what you're saying?

20          A.     Yes.

21          Q.     Were any case files reviewed in this

22     process in looking for documents?

1          A.     No, we didn't review the cases.

2          Q.     Would there not have been some

3    information relating to the, for example, the

4    transition process and case files?

5          A.     We provided a copy of the entire case

6    file.  We did not review it.

7          Q.     Are the case files you're talking

8    about the case files of the named plaintiffs?

9          A.     Correct.

10          Q.     Was there anything in the case files

11   of unnamed plaintiffs that bore on the subjects

12   about which you were asked?

13          A.     Because we didn't review the case

14   files of the other unnamed plaintiffs.  I could

15   not answer that with certainty.

16          Q.     Were you instructed not to look at the

17   case files of unnamed plaintiffs?

18          A.     No, I was not.

19          Q.     Why did you decide to look at the case

20   files of named plaintiffs but not unnamed

21   plaintiffs?

22          A.     Because the request that we received

1    was for the named plaintiffs.

2        Q.    The E-mail that was sent to you asked

3    only for information about the named plaintiffs;

4    is that correct?

5        A.    Well, the E-mail.  It may have been in

6    the E-mail and it may have been by phone, the

7    request.

8        Q.    Were some of the requests then given

9    to you orally on the telephone and not be E-mail?

10       A.    Yes.

11       Q.    So let's see so I understand this.  I

12   think you testified that there were approximately

13   five separate E-mail requests to you to look for

14   documents, correct?

15       A.    To the best of my memory.  Yes.

16       Q.    That's why I used the word

17   approximately.  Now, were there additional

18   requests that were oral on the telephone?

19       A.    Yes.

20       Q.    How many of those approximately were

21   there?

22       A.    I cannot say, sir.

1        Q.     Were there several?

2        A.     Yes.

3        Q.     Were they over approximately the same

4    time period that you described before as the

5    E-mails?

6        A.     Best of my memory, approximately about

7    a year and a half.  This has been going on for

8    about a year and a half.  Since the beginning.

9        Q.     You said that as to the E-mails that

10   approximately and I understand that you were not

11   giving a precise date, but that you said that the

12   first the E-mails approximately was in early 2007;

13   is that correct?

14       A.     It could have been earlier.  It could

15   have been in starting some time in 2006.

16       Q.     That's why then you said a year and a

17   half approximately?

18       A.     Correct.

19       Q.     So we're talking about for both the

20   written E-mails and for the oral requests on the

21   telephone, essentially the same period of time,

22   about a year and a half back from today; is that

1    your best testimony?

2        A.    That's my best testimony.

3        Q.    Were you instructed to look for only

4    documents that postdated 2004?

5        A.    No.  We were instructed to look at

6    documents from 2000 until present.

7        Q.    Did you provide documents from 2000 to

8    the present?

9        A.    To the best of our ability.  Yes.

10        Q.    Did you attempt to provide all the

11    documents that related to the topics that were

12    specified to you?

13        A.    To the best of my ability.  Yes.

14        Q.    Now, you talked about you didn't find

15    any E-mails, correct, because of the deletion

16    policy of the District Government; is that right?

17        A.    Could you restate the original

18    question?

19        Q.    I don't want to put words in your

20    mouth, so let me repeat my earlier question.  Did

21    you supply any E-mails?

22        A.    No, I did not, to the best of my

1    ability, memory.

2        Q.    And that's because am I right, that

3    you did not find any E-mails that related to the

4    topics for which you were to search?

5        A.    For the topics in which I was

6    requested to search, it was my judgment that there

7    were no E-mails that were related to the topic.

8    Yes.  Correct.

9        Q.    Now, in fact, were there E-mails on

10   those topics even though during this time period,

11   2000 up until the time you searched but they were

12   no longer able to be retrieved?

13       A.    Nope.  That was not my response.  No.

14   I didn't say not -- there were no E-mails, in my

15   judgment, that were related to the subject.

16       Q.    I think we're not communicating on

17   this particular --

18       A.    Okay.

19       Q.    I understand that when you looked,

20   there were no E-mails related to the subject but

21   was that because of the District's policy of

22   deleting E-mails or had there never been any

1    E-mails that had been sent or received on the

2    topic?

3         A.    Well, let me clarify my answer because

4    I was responding to what I thought your question

5    regarding request for documents.  Now, is that

6    your question?

7         Q.    No.

8         A.    Okay.  That's why we're --

9         Q.    I'm starting with your answer.  You

10   found no E-mails that related to the subject?

11        A.    In my opinion.  Correct.

12        Q.    I'm asking you, in fact, were E-mails

13   sent -- let me just make up a year.  Where E-mails

14   had been sent in 2006 that would and received at

15   The Care Center or sent by The Care Center, that

16   would have related to the subject but you couldn't

17   find them because they had been deleted?

18        A.    Let me ask for clarification.  E-mails

19   outside of the request that I received from Dan

20   and Eden?

21        Q.    No.  The same request.  In other

22   words, let's assume, I don't know what they asked

1    you but let's assume they asked you for documents

2    related to topic X.  You gave them the documents

3    you could find on topic X.  According to your

4    testimony as I understand it, you did not give

5    them any E-mails on topic X because you did not

6    find any E-mails that related to topic X.  Have I

7    stated that correctly?

8         A.    I didn't give them E-mails about --

9    they made a request for topic X and I did not give

10   them E-mails for topic X, did not send them the

11   request, the response to topic X via E-mail.  Yes.

12   I have done that.

13        Q.    You sent them E-mails that related to

14   topic X; is that what you're saying?

15        A.    For example, if the document that

16   they're requesting, if I have electronically, I

17   may have made that as an attachment and returned

18   and sent it to them.

19        Q.    I've got to admit to you, I'm

20   confused.

21        A.    So am I.

22        Q.    I thought you testified a while back

1    when I asked you in response to these variety of

2    requests, oral and E-mail requests that you

3    received from the District's attorneys, you did

4    not respond to them to those requests with any

5    E-mails, that you responded with documents but

6    because of the E-mail deletion policy, you found

7    no E-mails responsive to the request.  Now, have I

8    misunderstood you?

9         A.    Well, I guess I misunderstood you.  I

10   did not -- I may have attached a document and sent

11   it to -- if Eden had requested something that I

12   had electronically, I responded to Eden's request

13   with the electronic document attached and sent it

14   to her.

15        Q.    So are you saying that in response to

16   these requests that came from the attorneys, you

17   did find E-mails that related to these topics and

18   you sent those E-mails to the, and you gave those

19   E-mails to the attorneys?

20        A.    No, not E-mails, sir.  Documents,

21   electronic documents that I had in my possession

22   that were responsive to the request.  I attached

31

1    them via E-mail and sent it to Eden or Dan.

2        Q.    Let's separate between electronic

3    documents and E-mails.  I'm talking only E-mails

4    for the moment.  Let me, when you say electronic

5    documents, you mean documents that can be sent by

6    computer; is that what you mean?

7        A.    Correct.

8        Q.    Let's separate those out.  I'm talking

9    pure E-mails.  E-mails between different people,

10    the kind of people that are sending all the time

11    these days by the hundreds and thousands.  So I'm

12    talking only about those.

13        In response to the requests that were made

14    to you, did you send any documents, any E-mails

15    that related to those subjects?

16        A.    Let me make sure we're on the same

17    page.  E-mails that if Eden E-mailed me and said

18    Zondra, we need X, Y and Z, did I E-mail her back

19    and say in response to X, Y and Z here is my

20    response to X, Y, and Z?  That E-mail?

21        Q.    I think we're confusing that.  I'm not

22    talking about whether in your dealings with your

1    attorneys did you work with E-mails or did you not

2    work with E-mails.  Whether you sent materials by

3    electronically or did you send them in hard copy,

4    I'm not talking about that.  I'm talking about

5    E-mails that existed before.

6         Let's take 2005.  This case hadn't been

7    brought in 2005.  The case involves child care,

8    Child Find.  Okay.  Now, in their various topics

9    within Child Find, presumably there were people in

10   the child Care Center that were sending E-mails to

11   each other on some of these subjects?

12        A.    Oh, well --

13        Q.    Not E-mails to your attorneys, an

14   attorney within your -- let's say you and the

15   people who work for you or you and the people who

16   were above you, that E-mails were passing back and

17   forth between you on some of these subjects.

18        Did you provide any of those E-mails to your

19   attorneys in response --

20        A.    Oh, did I forward a pre-existing

21   E-mail to Eden?

22        Q.    Yes.  It's not so important to me

1    whether the word is forward or you printed them

2    out and you gave it to them in hard copy.  I'm not

3    distinguishing that.  What I'm interested in is

4    did you provide any pre-existing E-mails to them?

5         A.    No, not to my knowledge.

6         Q.    And I think you testified the reason

7    for that is because of the District's deletion

8    policy; is that correct?

9         A.    Well, let me correct myself, that

10   wasn't the reason.  The reason why is because in

11   my opinion, there were no E-mails that were

12   related to the subject that requests were made.

13   And the reason why I told you -- because I thought

14   your question was in relationship to my

15   conversation or my E-mail back and forth with our

16   attorneys.

17        Q.    So the E-mails that existed between --

18   let's take between you and the people who work for

19   you that were in 2004.  They've been deleted,

20   correct?

21        A.    Yes.  To the best of my knowledge.

22   Yes.

1       Q.    And that's true with 2005 and 2006 as

2  well, right?

3       A.    That's my understanding.  Yes.

4       Q.    Now, are you testifying that there

5  were never any E-mails, let's take a slice of it.

6  You and the two people who work for you never sent

7  E-mails back and forth on any of the subjects that

8  were set forth in the request that came from your

9  attorneys?

10      A.    No, I don't believe so.  We met twice

11  a week.  Any conversations that we needed to have

12  in regards to Child Find we did it verbally in our

13  staff, by our staff meetings that we had at least

14  twice a week did.

15      Q.    Did you and your two people that work

16  with you ever communicate on any subject by

17  E-mail?

18      A.    Sure.  We communicate on subjects by

19  E-mail.

20      Q.    How often would you say a day that you

21  would have sent an E-mail to the two people that

22  work for you normally?

1         A.      Normally, once a week.

2         Q.      Once a week you would send a -- how

3     often did you send E-mails to the people that you

4     reported to?

5         A.      Within what period of time, sir?

6         Q.      Let's take the period from 2004 to

7     2007.

8         A.      I would guess that maybe once a week.

9         Q.      And how often would they send E-mail

10    to the people with whom you reported would they

11    send E-mails to you?

12        A.      I would guesstimate about the same

13    period of time.  We're not very -- we like the

14    telephone.  We're not E-mail people.

15        Q.      And are you saying during this entire

16    period of time, 2004 to 2007 just to use that time

17    period, there were not a single E-mail between you

18    and your superiors that related to any of the

19    subjects that were listed on the various requests

20    that came from the attorneys?

21        A.      I'm saying that my -- when the request

22    was made, the E-mails that I have received from my

1     subordinates and from those individuals who are my

2     superiors in response to the questions and the

3     request that I was given, the answer is no.

4          Q.     Not a single E-mail in the whole

5     period, four years?

6          A.     Pardon me, sir?

7          Q.     There was not a single E-mail on this

8     subject in any of the subjects in four years?

9          A.     I haven't been employed with the

10    District for four yours.

11         Q.     When were you first employed?

12         A.     About three and a half years now.

13         Q.     In the three and a half years, are you

14    saying there was not a single E-mail on any of the

15    subjects that were listed in the request to you or

16    orally requested of you?

17         A.     That I thought that in my opinion were

18    responsive to the request.

19         Q.     So in that entire period that we were

20    just talking about, you never sent, for example,

21    an E-mail to anyone or received an E-mail from

22    anyone on Child Find; is that right?

1       A.      I did receive an E-mail for the Child

2   Find manual but that has been provided.

3       Q.      And that E-mail was provided; is that

4   what you're saying?

5       A.      The manual was provided.

6       Q.      I understand but was the E-mail

7   provided?

8       A.      The E-mail was forwarding the Child

9   Find manual to me to review it.

10      Q.      So the E-mail had no text in it; is

11  that what you're saying?

12      A.      It said, if my memory serves me

13  correctly, something to the sense of here is the

14  Child Find manual for your review.

15      Q.      When you did review it, did you

16  prepare an E-mail in response?

17      A.      Yes.

18      Q.      Did you provide that E-mail?

19      A.      No, I did not.

20      Q.      Why didn't you?

21      A.      The reason why is because I thought

22  that was already asked and given.  It was the

1    Child Find manual.

2        Q.    That response, that E-mail response

3    related to subjects as to which you were asked to

4    provide documents, correct?

5        A.    Yes.  The document that I provided.

6    The Child Find manual.

7        Q.    But your comments on manual also

8    related to the subjects as to which you were to

9    provide a response; isn't that correct?

10        A.    It wasn't -- my comments were not on

11    the manual.  I received the manual.  I'm sorry,

12    not in the E-mail.  It was on the actual document.

13    So I received the document, I went through it and

14    made any appropriate changes, attached the

15    document and sent it back.

16        So it wasn't the E-mail in where I made

17    comments or made changes, it was the document and

18    my understanding is that you said we're not

19    talking about documents, electronic documents,

20    only E-mails.

21        Q.    The E-mail that you sent back then was

22    simply saying attached are my revisions to the

1    manual; is that what you're saying?

2        A.    Correct, sir.

3        Q.    Now, the manual that you sent back

4    with your revisions, did you provide that to

5    counsel as responsive to their document request?

6        A.    Yes, I did.

7            MR. TERRIS:  Can we have a copy of

8    those comments?

9            MS. MILLER:  I think we would object to

10    that as a deliberative work process.  The draft

11    document -- we gave you the version of the draft

12    document that we were prepared to send out to you

13    with comments.  So any previous drafts of that

14    would input from other the other side I think we

15    would be objecting to giving you that, but I'll

16    note that you've requested it and I'll put it on

17    the privilege log if you think that's something

18    that needs to be done.

19            MR. TERRIS:  Yes.  And everybody else's

20    comments as well should be on there because there

21    is no possible way for us to know that whether we

22    should take that to the court.

1          MS. MILLER:  Can you clarify what you

2     just said?

3          MR. TERRIS:  If we don't know what

4     document exists, it's not put on a privilege log

5     so we know it exists, there's no way for us to go

6     to the court.

7          MS. MILLER:  We gave you our edits to

8     that document.  You've seen the documents with the

9     edits.

10          MR. TERRIS:  We don't have this.  We

11     don't have --

12          MS. MILLER:  You have our final edits

13     that we gave you --

14          MR. TERRIS:  I understand that but.

15          MS. MILLER:  Okay.  But what I'm saying

16     is that would be protective under deliberative

17     work product.

18          MR. TERRIS:  Perhaps it would and

19     perhaps it wouldn't but if we don't know the

20     document exists, there's no way for us to contest

21     it.

22          MS. MILLER:  Okay.  If that's what you

1    want to say.  Fine.  It's been through lots of

2    edits and then we gave you what the final edits

3    were.

4               MR. TERRIS:  I understand that but

5    those other documents are obviously relevant.

6    Whether they're protected by a privilege is --

7               MS. MILLER:  I understand what you're

8    saying.  I mean, I'm just telling you right now

9    there's several drafts because it went through

10   several different people.

11              MR. TERRIS:  I understand that.

12              MS. MILLER:  And sometimes the edits

13   are made on top of the edits so it might not be

14   clear whose comments were whose.

15              MR. TERRIS:  That's our problem if we

16   can't tell that but if we don't know it exists,

17   we -- I really would appeal to you to follow the

18   federal rules which is to require that you not

19   just deny us documents you claim are privileged

20   without telling us about them.

21              MS. MILLER:  Mr. Terris, I understand

22   what you're saying and I'm telling you I'll

1    provide you the privilege log that says we're

2    objecting to giving you those documents but I

3    understand what you're asking for.

4            MR. TERRIS:  We've been at this for a

5    long, long time and to be told that at this time

6    and to have dribbles of this kind of stuff, I

7    mean, this case is never going to stop if we don't

8    get definitively a response under the federal

9    rules.

10       I mean, it's totally inappropriate and

11   totally in violation of the federal rules.

12            BY MR. TERRIS:

13       Q.    Did you decide that documents were

14   relevant and shouldn't be produced because you

15   thought that they already, the content of them was

16   already in other documents?

17       A.    Which document are you referring to,

18   sir?

19       Q.    It seemed to me that you were

20   implying, and you can correct me if I'm wrong,

21   that you didn't supply this document because you

22   thought that the manual itself provided the

1    relevant information; is that correct?

2        A.    Which document are you referring to,

3    sir?

4        Q.    Your changes in the document.  Let me

5    separate.  There are two documents.  There was a

6    document that came to you and there was a document

7    as you were suggesting that it be modified;

8    correct?

9        A.    The document that I modified and

10   forward on.

11       Q.    So now, you did not supply the

12   document as you modified in response to your

13   attorney's request for relevant documents,

14   correct?

15       A.    No, I did not because I didn't print

16   that out.  Right.  No.

17       Q.    Well, did you provide no documents in

18   response to your attorney's request that hadn't

19   been printed out?

20       A.    Yes.  I did provide.  For example,

21   there were some documents that I sent

22   electronically as an attachment that had been

1    printed out.  So yes.

2         Q.    That had been printed or had not been

3    printed?

4         A.    That had been printed out.  So yes, I

5    have provided documents that have been printed

6    out.

7         Q.    Did you not provide response to your

8    attorneys documents that were not printed out?

9         A.    You're confusing me, sir.  Can you

10   repeat that and clarify that question?

11        Q.    You just said that you provided to

12   your attorneys documents that you deemed to be

13   relevant that had been printed out; is that

14   correct?

15        A.    Yes.

16        Q.    Did you provide to your attorneys

17   documents that you deemed to be relevant which had

18   never been printed out?

19        A.    Correct.

20        Q.    You did provide them?

21        A.    I have the manual, the corrections

22   that I made, I did it all electronically.  I

1  didn't print it out because I knew it was still in

2  draft form and that other people would be making

3  comments on it.

4       So when the document came to me, I made the

5  corrections relevant to early childhood and I

6  forward it on.

7       Q.   And you didn't print out your changes,

8  correct?

9       A.   No, sir.

10      Q.   Now, you did that approximately in the

11  summer of 2007, correct?

12      A.   I don't remember when I did that, sir.

13      Q.   Do you remember when the manual came

14  out, the document that you were shown?

15      A.   Sir, no.  I'm sorry.  Memory fails me.

16      Q.   You made your corrections, however,

17  before the document came out, correct?

18      A.   Yes.

19      Q.   If you will see that the draft, the

20  date on that is August, 2007, correct?

21      A.   Yes, sir.

22      Q.   So your comments were presumably made

1    before that date, correct?

2        A.    Yes, sir.

3        Q.    Did you in response to one or another

4    of these requests made by your counsel for

5    relevant documents, did you supply your comments,

6    your version of the manual with your comments on

7    it?

8        A.    There were not comments, sir.  I

9    changed those things that were relevant, that were

10   not correct but that were relevant to early

11   childhood on the Child Find manual.

12       Q.    Did you supply to counsel your version

13   of the manual with your changes on it?

14       A.    Yes, sir.

15       Q.    You provided that to counsel in

16   response to their request for document; is that

17   correct?

18       A.    No, that wasn't in response to the

19   request for documents, that was in response to

20   here is the draft version, please make changes

21   accordingly as it relates to early childhood.

22       Q.    Let me make this clear.  I am not

1    talking now about -- there were two different

2    points in time.  There was a point in time before

3    August, 2007 as I understand you that you provided

4    to someone the manual which is in front of you,

5    Exhibit 10, with your changes on it, correct?

6         A.    Correct.

7         Q.    I'm not talking about what you did

8    then.  I am talking about later on --

9         A.    Excuse me, sir.  Let me make a

10   correction, not with comments, sir, with my

11   changes.

12        Q.    I said changes?

13        A.    I thought you said comments.

14        Q.    No.  I said changes.

15        A.    I'm sorry.

16        Q.    Now, what I'm asking you is subsequent

17   to that time when counsel asked you for relevant

18   documents, did you give counsel the manual,

19   Exhibit 10, with your changes on it; counsel, not

20   the people that were writing the manual, counsel?

21        A.    The first time when I received the

22   manual and was instructed to look over it, it came

1    from my counsel.  So when I made the corrections,

2    I sent it back to my counsel.

3         Q.    So you're testifying that the manual

4    that came to you did not come from a person who

5    actually was an administrator or employee relating

6    to Child Find?

7         A.    No.  Eden sent me the draft and said

8    Zondra, make your changes and I sent it back.

9         Q.    And who sent that to you?

10        A.    Eden, my counsel.

11        Q.    Now, so that was sent to counsel also.

12   Let's exclude that for a moment.  Later on when

13   counsel was asking you, not for your comments on

14   the manual or your changes in the manual but to

15   respond to a request for documents and you looked

16   for relevant documents, did you send back the

17   manual with your changes on it?

18        A.    I had already sent her the manual with

19   the changes.  Why would I give it to her again.

20        Q.    When you sent it to counsel the first

21   time, did you think you were responding to a

22   request for documents in this case?

1        A.    I was responding to my counsel's

2    request for documents, responding to my counsel's

3    request to update this document in accordance to

4    early childhood to make the changes.

5        Q.    So the first time you were asked how,

6    you were asked whether you thought that the

7    changes ought to be made in the document to

8    improve it, correct?

9        A.    Yes.

10       Q.    The second time you were asked not to

11   improve the document but to give counsel any

12   relevant documents, correct?

13       A.    I don't know that it was -- the

14   request for the relevant documents came prior to

15   this, my memory.

16       Q.    So you were never asked subsequent to

17   August of 2007 to provide documents that

18   Exhibit 10 would be relevant to; is that correct?

19       A.    I'm not understanding you.

20       Q.    After August, 2007, did you receive

21   any request for documents, to look for documents

22   as to which Exhibit 10 would have applied?

1      A.    But I have already given Exhibit 10.

2      Q.    Would you answer my question.

3      A.    Yes.  I a request was made for

4  additional information and the subjects that I

5  received the request for were provided and

6  considering that I had already given Exhibit 10,

7  it was already, in my opinion, given.

8      Q.    Did you note in your response that

9  this document had already been provided to them?

10     A.    It depends on which response, sir.

11     Q.    Any time.  At any time after August,

12  2007 in response to the request for documents, did

13  you ever note in responding that you were not

14  giving back in your changes to this document,

15  Exhibit 10 because you had already provided it to

16  counsel?

17     A.    Well, Exhibit 10 was not requested of

18  me any additional time after 2007, sir.

19     Q.    Was the subject listed after August,

20  2007 as to which Exhibit 10 and your changes to

21  Exhibit 10 would have been relevant?

22     A.    Not to my memory, sir.

1          Q.     Do you still have copies of the

2    request?

3          A.     Of which?  Of the E-mail request.

4          Q.     Yes.

5          A.     For what, sir?

6          Q.     For documents.

7          A.     I may have for the most recent ones in

8    the last 30 days.

9          Q.     And you don't have one before that

10   because of the District's deletion policy; is that

11   correct?

12         A.     The deletion policy was for, I

13   believe, it's 90 days and don't quote me but it

14   was 90 days, so it all depends.  I also delete to

15   keep my E-mail from going over size because if you

16   hold on to documents, you cannot E-mail.  So you

17   have to go through and delete documents in order

18   for you to -- delete E-mail, otherwise our size,

19   our E-mails it says you're oversize, you cannot

20   and I can't E-mail out.

21         Q.     So are you saying if you have too many

22   E-mails saved that it has the ramifications that

1    you just said?

2         A.    Yes.   It will say your E-mail is

3    oversized, over it's limit and it won't allow you

4    to E-mail out.

5         Q.    But you testified I think earlier that

6    you rarely used E-mails?

7         A.    No, sir.   I said I rarely use E-mail

8    with my subordinates.

9         Q.    Who did you use E-mails with, then?

10        A.    I have E-mails for -- my E-mails range

11   from other Head Start affiliates, my function as a

12   619 coordinator.   I have E-mails all day, every

13   day about different things.   I very seldom E-mail

14   my employees because I see them.

15        Q.    And how much of your superiors how

16   often do you see them?

17        A.    My superiors, I see, it depends on

18   what period of time because I have had several

19   superiors in the last --

20        Q.    Well, please, describe then for the

21   various periods of time?

22        A.    When Dr. Christian was my supervisor,

1    I would E-mail maybe twice a month because Dr.

2    Christian also prefers picking up the telephone.

3    Let's see --

4        Q.    How many E-mails do you receive a day

5    approximately?

6        A.    From 10 to 20.

7        Q.    How many do you send a day

8    approximately?

9        A.    Maybe two.

10       Q.    Is the people that send to you, you

11   rarely respond to; is that correct?

12       A.    No.  I use the telephone, sir.  I

13   think it is more personable to respond in person

14   than E-mails.

15       Q.    Who do you·deal with on these 15 to 20

16   that you receive approximately a day?

17       A.    Pardon me?

18       Q.    Who do you deal with on the

19   approximate 15 to 20 that you receive a day?

20       A.    When you say deal with, sir --

21       Q.    Who are they with?

22       A.    Who are they from?

1      Q.    Correct.

2      A.    Various people that are related to my

3  job.

4      Q.    Give me by categories who they are?

5      A.    Other supervisors.

6      Q.    Supervisors in what areas?

7      A.    Special education.

8      Q.    So many of those E-mails would deal

9  with some of the subjects of this litigation,

10  wouldn't they?

11      A.    No.  The other -- I'm the only

12  supervisor for early childhood special education.

13  The other supervisors are K through 12, so no.

14      Q.    So they sent you messages that had

15  nothing to do with the work you did; is that what

16  you're testifying?

17      A.    Of course they send me information in

18  regards to inquiry about what I do.

19      Q.    So your response to them -- strike

20  that.  If they were sending something to you on

21  work that you did, the subject of their E-mail

22  would, at least some of the time, be Child Find,

1    wouldn't it?

2        A.    The subject -- it all depends on how

3    we're defining Child Find, sir.  They may E-mail

4    me to say there's a little one at, that's in your

5    program that we received a call from a parent or

6    something, something and so if you're calling that

7    Child Find.  Sure.

8        If we, it all depends on how we're defining

9    Child Find because little one's point of entry, we

10   have the point of entry for our little ones.  The

11   supervisors through K through 12 those children

12   haven't even come known to them most of the time.

13       Q.    You gave us a number of documents that

14   relate to this case.  Are you saying that none of

15   the E-mails that you received related to any of

16   these documents?

17       A.    From whom, sir, from my colleagues?

18       Q.    From anybody.

19       A.    Sir, when I say supervisors, I mean my

20   colleagues.

21       Q.    Did any of the E-mails that you

22   received over a three-and-a-half-year period

1   relate to the documents that you provided as

2   relevant in this case?

3          A.    I'm sure, sir, over three and a half

4   years.

5          Q.    Did you provide those E-mails to us?

6          A.    Now, I'm also including those things

7   that are in -- you know what, could you -- because

8   I'm a little confused now.

9          Q.    You gave us a lot of documents that

10  relate to our case, correct?

11         A.    Yes, I did.

12         Q.    Are you saying that in the

13  three-and-a-half-year period, none of the 15 to 20

14  E-mails that you receive per day related to any of

15  those documents?

16         A.    Yes.  That is what I said.

17         Q.    Did any of those E-mails that go back

18  and forth to people that worked on Part B?

19         A.    We are Part B, sir.

20         Q.    I mean, Part C?

21         A.    I'm thinking over a

22  three-and-a-half-year period, sir.  Requests to

1    meet with Part C, that's it, sir.

2        Q.    Would any of the E-mails describe

3    problems of the transition was not going forward

4    on a timely basis?

5        A.    From Part C?

6        Q.    Children coming from Part C to Part B.

7        A.    Not that I recall.

8        Q.    Weren't there often problems of timely

9    transitions during this three-and-a-half-year

10   period?

11       A.    Yes, there were.

12       Q.    Not a single E-mail on that subject;

13   is that what you're saying?

14       A.    Sir, we talk.  We set up meetings.  We

15   E-mail the set up meetings and we talk and our

16   staff and Part C, we talk to each other.  We very,

17   very seldom, sir, talk via E-mail.

18       Q.    So tell me again the categories of

19   people that communicated with you who send you

20   those 15 to 20 E-mails a day?

21       A.    I receive all sort of categories.  My

22   colleagues who are other supervisors, I receive

1    E-mails from them.

2          Q.     Supervisors in what areas?

3          A.     K through 12.

4          Q.     And no supervisors in relating to

5    Part C communicate by E-mail; is that what you're

6    saying?

7          A.     Exactly.  Badiyah who is the

8    supervisor or Tracy who is the supervisor, we very

9    seldom communicate by E-mail with the exception to

10   set up meetings.

11         Q.     And those E-mails that set up

12   meetings, they never refer that some of the, that

13   there are problems of timeliness in some of these

14   situations; is that correct?

15         A.     It is because we have talked over the

16   phone.  We E-mail.  We talk over the phone.  I

17   don't know if that's our culture or what, sir, but

18   we are not E-mail people.

19         Q.     You just told me that sometimes there

20   were E-mails to set up meetings?

21         A.     Yes, sir.

22         Q.     I asked you a question as to whether

1    those E-mails, not over the phone, the E-mails,

2    deal with the subject of whether particular

3    situations there's a problem of timeliness?

4        A.    In the E-mail, sir, the only thing it

5    says is that we're trying to meet, are these good

6    days.  The subject is not there's a, we need to

7    meet because there is a problem with the

8    timeliness of transitions.  We know that.

9        Q.    And what other categories of people

10   are part of the 15 to 20?

11       A.    I receive E-mails from Regular Ed,

12   early childhood people and Head Start, and the

13   community Head Start and the DCPS Head Start.  I

14   receive E-mails from principals of the programs in

15   which we service.

16       Q.    You said something about 619.  What

17   does that mean?

18       A.    619 is the preschool grant.  That is a

19   supplementative grant that is awarded to the

20   District of Columbia public school.

21       Q.    What kind of E-mails did you have on

22   that subject?

1          A.     Oh, I am on the list, sir, for all of

2     the 419 coordinators for the, in all of the United

3     States.  So I receive daily E-mails from subjects

4     that are related to 619.

5          Q.     And 619 involves budgeting, correct?

6          A.     No.  It also involves programming.

7          Q.     Does it also involve budgeting?

8          A.     The E-mails that I receive from the

9     619, on the list, sir, does not involve budget.

10    But I also receive E-mails from the grants office

11    because I am the project manager for the 619

12    grant.

13         Q.     And the grants have to do with

14    budgeting, do they not?

15         A.     Yes.  I also -- do you want me to

16    continue with my list?

17         Q.     No.  Let's stick with this at the

18    moment.

19         A.     Okay.

20         Q.     So you received E-mails that had to do

21    with the grants process, correct?

22         A.     Yes.

1          Q.     And some of the subjects in which you

2      were asked to provide documents related to budget,

3      did it not?

4          A.     No.

5          Q.     So you were not asked anything about

6      Child Find, the resources available for Child

7      Find; is that right?

8          A.     No, I do not.  The 619 budget is a

9      very small budget for programs, it is not Child

10     Find.  So I am not privy to the Child Find budget

11     at all.

12         Q.     I didn't ask you whether you were

13     privy to it.  I was asking whether any of the

14     documents that you had involved a budget, any of

15     the E-mails involve a budget?

16         A.     The budget that I receive E-mails for

17     was in relationship to the Child Find.  The

18     budget, the 619 budget is not a Child Find budget.

19         Q.     What are the other categories that you

20     receive E-mails involving?

21         A.     Let's see.  How many have I listed?

22         Q.     I don't know how many you have listed.

1         A.    Can we go back so I'm not repeating

2    myself?  Is it possible.

3         Q.    If you can't -- just please, tell us

4    the categories.

5         A.    Well, those are the categories to my

6    memory right now.

7         Q.    Did you ever receive an invitation by

8    E-mail to attend a meeting related to children

9    ages 3 to 5 held by the mayor's office?

10        A.    Which one, sir, there have been

11   several.

12        Q.    Did you ever receive an invitation on

13   that subject to attend a meeting at the mayor's

14   office?

15        A.    Yes, I did.

16        Q.    And was it by E-mail?

17        A.    Yes.

18        Q.    And what was the subject of the

19   meeting?

20        A.    Early childhood.

21        Q.    And that subject related, did it not,

22   to the subjects in which you were asked to provide

1     documents?

2          A.    No, sir.  It was not early childhood

3     Special Ed, it was early childhood General Ed.

4          Q.    So were there several such meetings at

5     the mayor's office?

6          A.    I don't know.

7          Q.    How many do you remember?

8          A.    I remember seeing about three

9     invitations for early childhood.

10          Q.    So none of them were on the subject of

11     Child Find transition to be Part B or any other

12     subject to do with this lawsuit; is that right?

13          A.    None of the ones that I received, sir.

14          Q.    Were there any meetings on the subject

15     of this lawsuit with ISCICS?

16          A.    Pardon me?

17          Q.    Was there any meetings with regard to

18     any subject of this lawsuit with ISCICS?

19          A.    I'm not familiar with ISCI --

20          Q.    With any other Government agency

21     besides the mayor's office?

22          A.    I was not privy to it, sir.

1        Q.    What do you think Child Find means?

2        A.    Child Find is the responsibility of

3   the state to locate, identify and determine if

4   children who are suspected of having a disability

5   or have a disability meets the requirements to

6   receive special education services.

7        Q.    Is that the definition you applied in

8   looking for documents?

9        A.    I did not apply a definition.  I

10  responded to a request.

11       Q.    What did you do when you weren't sure

12  that a document either did or did not come within

13  the request?  What did you do?

14       A.    I'm not following you, sir.  I'm not

15  understanding.  What did I physically do?  What

16  did I mentally do?  I'm not understanding your

17  question, sir.

18       Q.    You were asked to provide documents on

19  certain subjects, correct?

20       A.    You're correct, sir.

21       Q.    And was it perfectly clear to you in

22  every instance when you looked at a document that

1   you, that was in your office as to whether it came

2   within the request?

3        A.    I responded to the requests to the

4   best of my ability, sir.

5        Q.    Were there any documents that you were

6   unsure of whether they came within the request?

7        A.    Those documents that I wasn't sure of,

8   I spoke with counsel and got clarification.

9        Q.    So did you talk to counsel about

10  numerous documents?

11       A.    Not numerous, sir.  For clarification,

12  is that what you're asking me?

13       Q.    Did you talk to counsel about whether

14  you needed, for clarification about numerous

15  documents?

16       A.    No, sir.  No, I did not.

17       Q.    So most of them were perfectly clear

18  as to whether they were requested or not; is that

19  what you're testifying?

20       A.    In my opinion, sir.  Yes.

21       Q.    We've received over the last few

22  months gradually new documents numerous different

1    times.  Is that the result of new requests made to

2    you or that you've changed your mind on whether

3    you would provided documents on earlier requests?

4          A.    Sir, you received a request from me or

5    my counsel?

6          Q.    Received it from the District.

7          A.    I can't speak on what the District has

8    all provided because I'm not the only person that

9    the documents were provided to our counsel.

10         Q.    Have you provided to counsel over the

11   last, let's say the last five months, suddenly

12   said to counsel, I think I found a new document

13   that might be relevant?

14         A.    Yes.

15         Q.    Has that ever happened?

16         A.    Yes, sir.

17         Q.    How did you happen to find that

18   document?

19         A.    It's not that I found it sir.  A

20   strategic plan that I provided recently.  It's an

21   internal document and it is not related

22   specifically to Child Find but it is something

1    that I spoke with Eden and said Eden, I think that

2    this may be relevant because it shows the

3    improvements that we have made overall in the

4    early childhood.  So I felt that that would be a

5    relevant document in retrospect.

6        Q.    Is the strategic document, does it

7    involve any of the subjects of this lawsuit?

8        A.    Yes.

9        Q.    When was it prepared?

10        A.    It was originally prepared in 2006.

11        Q.    So the document that was just supplied

12    to us has been in existence more than a year; is

13    that right?

14        A.    You're correct, sir.

15        Q.    Why did you not supply it earlier?

16        A.    Because it was a document I wasn't

17    sure of that met that requirement, sir, but I was

18    in error.

19        Q.    Did you ask for clarification on that?

20        A.    No, it was one that I did not ask for

21    clarification.

22        Q.    You weren't sure whether that came

1    within the request and yet you did not ask for

2    clarification and you did not provide it; is that

3    correct?

4         A.    I'll retrack.  I did not think that it

5    was relevant, it wasn't that I wasn't sure and

6    needed clarification but in retrospect, I was in

7    error.

8         Q.    This document, the strategic plan is

9    virtually entirely about this lawsuit, isn't it?

10        A.    No, sir.

11        Q.    Let me just read you one sentence,

12   "ECSC achieved the following accomplishments

13   during the 2006 to 2007 school year, increase in

14   the number of children transitioned from Part C to

15   Part B by their third birthday through 37 percent

16   to 62 percent."  That's a central issue in this

17   lawsuit, isn't it?

18        A.    Those are the reports that were

19   provided to OSEP in the APR, that's exactly right

20   out of it.

21        Q.    I didn't ask you that question, ma'am.

22   Isn't that sentence directly on point with regard

1      to this lawsuit?

2            A.     Yes, sir, and it was provided.

3            Q.     You didn't provide this document for a

4      year and I'm asking you why?

5            A.     Sir, your question to me was was that

6      document entirely about the lawsuit and my

7      response was no, it was not.

8            Q.     Aren't there substantial portions

9      about the lawsuit?

10           A.     There are portions about the lawsuit

11     that are in there under the goals and

12     accomplishments.  There are also those goals and

13     accomplishments were already provided in the APR

14     and the SPP that was provided to you.

15           Q.     If this document has portions about

16     this lawsuit, why did you not provide it?  Why

17     wasn't it clear to you that it had to be provided?

18           A.     I cannot answer that question, sir.  I

19     have already stated that it was in error, that my

20     judgment was in error.

21           Q.     There are other documents, too, that

22     have been provided more recently.  The first

1    document requests were more than a year ago,

2    weren't they?

3         A.    Yes.

4         Q.    And documents on those same requests

5    are still being provided to us, aren't they?

6         A.    I did.  I provided to my counsel that

7    document recently.

8         Q.    Have you provided any other documents

9    recently to your counsel over the last four

10   months?

11        A.    I provided information in regards to

12   the percentages of children in the United States

13   who receive, between the ages of 3 and 5 who

14   receive special education services.

15        Q.    And you provided that to counsel when?

16        A.    In the last 30 days.

17        Q.    And when did you first have that

18   document?

19        A.    The document I did not have it in my

20   possession.  I went on the website, the NECAT

21   website and pulled it up.

22        Q.    What other documents did you provide

1    in the last three or four months?

2        A.    A percentage of a number of children

3    with disabilities by child count, provided that by

4    a percentage.  I provided that by for the nation

5    and the District of Columbia and by actual count.

6    Also the number of children with disability for

7    2006 count for the District of Columbia public

8    schools, not inclusive of the charter schools that

9    showed a significant increase from last year.

10   Also we provided the logs, the tracking logs for

11   the children who have registered with The Care

12   Center, Early Childhood Care Center.

13       Q.    Now, you just mentioned several

14   documents.  For each of them, when did you first

15   have those documents?

16       A.    The two of the, three of the

17   documents -- well, I thought we've had the

18   strategic plan as I indicated for over a year.

19       Q.    I understand that but what about the

20   other ones?

21       A.    The other ones I retrieved off of the,

22   three of them, the ones that were related to the

1    percentages of children in the nation who receive

2    services from three to five, I got that off of the

3    internet from the NECAT website and --

4        Q.    Whose website was that?

5        A.    NECAT.  It is the National TA that is

6    funded by OSEP.

7        Q.    You also gave us a strategic plan for

8    2005 today, didn't you?

9        A.    Yes, sir.  No.  No.  No.  It was

10   created in 2006, September of 2006.

11       Q.    So the 2005 plan, correct?

12           MS. MILLER:  I haven't looked at those.

13           MS. BENFER:  There's two documents that

14   you gave us today, not one of them.  The other is

15   in the copy room.

16       A.    You'll have to show me and I can

17   confirm it.

18           BY MR. TERRIS:

19       Q.    Whether it's 2005 or 2006, you've had

20   it for well over a year?

21       A.    Yes, sir.

22       Q.    And that also was a mistake not given

1    to us; is that correct?

2          A.    A mistake.

3          Q.    Why was it given today instead of a

4    year ago?

5                MS. MILLER:  I'm going to object

6    because she's asked and answered that before.

7                MR. TERRIS:  No.  This is the second

8    time.

9                MS. MILLER:  There's two versions of

10   it.  There's one from last year and one from

11   September of this year.  She was talking about the

12   other document.

13               BY MR. TERRIS:

14         Q.    Let's take them separately.  The

15   earlier document's been in existence for at least

16   a year, right?

17         A.    Yes.

18         Q.    And that was a mistake not giving it

19   to us, right?

20         A.    In regards to my judgment.  My

21   judgment, yes, was in error.  Yes.  I think I said

22   that.

1        Q.     Then there's one in August of 2007,

2    correct?

3        A.     Correct, sir.  Yes, sir.

4        Q.     And that was a mistake not giving it

5    to us, too, correct?

6        A.     You're correct.  In my judgment.  My

7    error in judgment, yes, sir.

8        Q.     Now, the earlier one was what a

9    strategic plan for 2006; is that right?  Which

10   document is the strategic plan for 2006?

11       A.     You'll have to -- which one are you

12   referring to, sir?

13       (An off the record discussion was held.)

14   (Care Deposition Exhibit Nos. 51 & 51 were marked

15                  for identification.)

16            BY MR. TERRIS:

17       Q.    Care Exhibit 51 is the 2005 to 2006

18   version.  When approximately did you have this

19   document?

20       A.     This document was created in around

21   September of 2006, sir.

22       Q.    And Care Exhibit 52 which is the 2006

1   and 2007 version, when did you have a copy of this

2   document?

3        A.   This document was created in September

4   of 2007, sir.

5        Q.   So you've had it since that time,

6   correct?

7        A.   Correct, sir.

8        Q.   When did it first occur to you that

9   these documents were relevant to the request that

10  had been made to you by your counsel?

11       A.   This week.

12       Q.   And how did you happen to be thinking

13  about that subject?

14       A.   I was thinking about all of the

15  accomplishments that we had made that it appears

16  that DCPS was not being responsive, that we had

17  not completely did right by the children of the

18  District of Columbia.  These accomplishments shows

19  that we are doing, making progress, significant

20  progress to meet the needs of children with

21  disabilities.

22       Q.   Why did you think about that these

1    documents might have to be provided to us in the

2    last week, to the plaintiffs?

3        A.    Because I talked with Eden and asked

4    her did she think that these would be relevant and

5    she said yes.

6            MR. TERRIS:  Okay.  Why don't we break

7    for lunch.

8            (A break was taken at 12:47 p.m.)

9            (Deposition resumed at 1:36 p.m.)

10            BY MR. TERRIS:

11        Q.    Ms. Johnson, during the intermission,

12    were you given some instructions by counsel on how

13    to answer questions?

14        A.    No, sir, I was not.

15        Q.    Didn't you or didn't counsel tell you

16    the following:  "That if he shows you that

17    document," pointing to the document request, you

18    have seen it?

19        A.    No, sir.

20        Q.    She didn't say that?

21        A.    No, sir.

22        Q.    She didn't say that I have given it to

1    you, looking at the document request?

2        A.    No.

3        Q.    Counsel didn't say, "If you don't

4    recall, you can say you don't remember seeing it."

5        A.    Sir?

6        Q.    Did you have any discussion with

7    counsel concerning the document request.  This is

8    five minutes ago Ms. Johnson.  Did you have a

9    discussion five minutes ago with counsel about

10   plaintiff's document request?

11       A.    Sir, the documents -- which documents,

12   sir?  The strategic plan?

13       Q.    Yes.  They were sitting on top of this

14   desk right here, and I'm showing you -- why don't

15   you label it as an exhibit.

16    (Care Deposition Exhibit Nos. 53-55 were marked

17                 for identification.)

18            BY MR. TERRIS:

19       Q.    Ms. Johnson about five minutes ago,

20   was there a stock of documents, the small group of

21   documents sitting atop of this table?

22       A.    Are those documents that you provided

1    me, these were the documents that was on the table

2    but I didn't look at them, sir.

3        Q.    There were documents on the table,

4    correct?

5        A.    Yes.

6        Q.    Did counsel say to you approximately

7    "If he shows you that document," pointing to the

8    documents on the table, "you have seen it."  Did

9    counsel say something like that?

10       A.    She said, "You've seen it."  She

11   didn't make the statement that you've made.

12       Q.    What did she say?

13       A.    "You've seen those."

14       Q.    Instead of what I said, you have seen

15   it, she said, "You have seen those"?

16       A.    I'm not quite sure.  It could have

17   been what you said or.

18       Q.    Didn't your counsel say to you I have

19   given it to you?

20       A.    Or approximately.

21       Q.    Then did counsel say to you

22   approximately, "I have given it to you"?

1          A.    I don't remember that, sir.

2          Q.    Did counsel say to you, "If you don't

3     recall, you can say you don't remember seeing it."

4          A.    I don't remember hearing that from the

5     counselor, sir.

6          Q.    What did counsel say to you?

7          A.    I remember her saying, "You've seen

8     it" or approximately that, sir.  My mind was on

9     the deposition that I just had with you, sir.  I

10    leaned forward like this (indicating) and raised

11    back up, sir.

12         Q.    So you can't remember what she told

13    you five minutes ago, right?

14         A.    Sir, not verbatim.

15         Q.    Approximately?

16         A.    Approximately you've seen it but the

17    statement that you made.  No.

18         Q.    You don't remember it or you know that

19    it wasn't said?

20         A.    I don't remember, sir.

21         Q.    Have you seen these -- let's look at

22    the documents.  Look at 53.  Have you ever seen

1    that document before?  Do you have to read this

2    document entirely word for word to know if you've

3    seen it?

4         A.    Sir, if you're asking me if I have

5    seen the document, the complete document, I'm not

6    reading it word for word.  I'm perusing it.  (The

7    witness complies.) Yes, sir, I have seen this

8    document.

9         Q.    When did you see it?

10        A.    I don't recall the date, sir.

11        Q.    Did you see it -- approximately when

12    did you see it?

13        A.    I couldn't tell you, sir.

14        Q.    So you have no idea whether you saw it

15    a year and a half ago or whether you saw it last

16    week; is that right?

17        A.    Let me look at it again because I

18    think it may have some dates in it.

19        Q.    I can read the date of it.  I'm asking

20    when you saw it?

21        A.    This document was produced on December

22    of 2005, so I imagine sometime after that.

1   Q. Ms. Johnson, I asked you for the date.

2 Of course it was after that if it didn't exist

3 before that date.

4   A. Sir, I don't know the date that I saw

5 this document.

6   Q. So you have no idea whether it was a

7 year, it was two years ago or whether it was last

8 week; is that correct?

9   A. Sir, in my memory, it would have been

10 approximately within six months of this.  That's

11 the only thing I can say for certainty, sir.  It's

12 2005, two years ago, with certainty, sir, that I

13 would say that I have seen the document within a

14 six-month period after December the 28th.

15   Q. And did you read the document?

16   A. Yes, I did, sir.

17   Q. And did you use it in responding to

18 the document request?

19   A. I referred to it in response to the

20 document request.  Yes, sir, I did.

21   Q. And so you were relying on this

22 document and not what counsel sent you in order to

1    respond to the document request; is that right?

2        A.    Sir, counsel sent me this document.

3        Q.    So the E-mail that was sent to you was

4    this document; is that correct?

5        A.    What E-mail, sir, are you referring

6    to?

7        Q.    You told me that you got approximately

8    five E-mails from counsel asking you for

9    documents.  Was this one of them?

10        A.    Yes.  This document was in an E-mail

11    sent from counsel to me.  Yes, sir.

12        Q.    So are you now saying that the words

13    that were sent to you asking you for documents

14    were not composed by your counsel but were a

15    document that is actually with a court caption; is

16    that correct?

17        A.    Not all.

18        Q.    Didn't you testify earlier that you

19    did not get a document with a court caption?

20        A.    I don't remember.

21        Q.    You don't remember your testimony two

22    hours ago; is that right?

1          A.     If I said it.  I was in error.  I did

2     receive this document.

3          Q.     Are you attempting to tell the truth

4     today, Ms. Johnson?

5          A.     Absolutely, sir, to the best of my

6     ability in accordance to my memory.

7          Q.     The first request that came from

8     counsel for you to provide documents was

9     Exhibit 53?

10         A.     I don't recall, sir, what the first

11    request was.  It's been two years, sir.

12         Q.     When Exhibit 53 came to you, was there

13    also a separate request from your counsel?

14         A.     Sir, it's two years.  I don't recall.

15    I'm sorry.

16         Q.     Did you attempt to answer each and

17    every one of these document requests?

18         A.     To the best of my ability, sir.  Yes.

19         Q.     We discussed earlier Exhibits 51 and

20    52 and you said that it showed the accomplishments

21    of your office; is that correct?

22         A.     In the document, which one are you

84

1    referring to, sir.  If you can restate the

2    question now that I have the documents that you're

3    referring to?

4         Q.    You referring to these documents as

5    showing the accomplishments of your office,

6    correct?

7         A.    The documents include the

8    accomplishments of my office.  That is correct.

9         Q.    And one of the document requests is

10   all documents created from January 1st, 2000 to

11   the present that refer or relate to defendant's

12   compliance or failure to comply with 20 USC 1412

13   (A)(3)A and 34 CFR 300.125 (A)(1) with respect to

14   children age 2 through five years old?

15        A.    And what are you reading from, sir?

16        Q.    I'm reading from request No. 7 in

17   Exhibit 53?

18        A.    And what page, sir?

19        Q.    It's on page 6.

20        A.    This is the 2005 document.

21        Q.    I'm reading from Exhibit 53.

22        A.    Okay.  And Exhibit 53 is the one in

1    2005.

2         Q.    That's correct.

3         A.    Now, which number again, sir?

4         Q.    How did you possibly reason?

5         A.    Sir, sir, if you can tell me which

6    number again.

7         Q.    I said No. 7.

8         A.    Okay.

9         Q.    Could you, please, explain how

10   Exhibits 51 and 52 that you possibly could reason

11   they didn't come within request No. 7?

12        A.    The only thing that I could possibly

13   reason is that the document wasn't created in 2005

14   at the time of this initial request.

15        Q.    I understand that.  But these document

16   requests continue to be applicable, did you not

17   understand that?

18        A.    No.

19        Q.    So you never were informed the

20   document request that come out in 2005 you would

21   continue to be responsible to answer, to respond

22   to them when new documents are created; is that

1    right?

2        A.    I'm not sure at the time but yes, I

3    do.  Absolutely.  Yes, I did understand.  I did

4    understand and as I previously stated, that was an

5    error in my judgment for not producing that as I

6    previously stated.

7        Q.    Did you make any other errors in

8    judgment of this kind?

9        A.    Not that I know of.

10        Q.    Isn't the reason why you thought of it

11    this week is because the deposition was occurring

12    this week?

13        A.    No, sir.

14        Q.    So it was a pure coincidence that we

15    got this document immediately before your

16    deposition; is that what you're saying?

17        A.    I'm not saying it was a coincidence,

18    sir.  I only can respond to you that it was not

19    because of the deposition.

20        Q.    Let's look at Exhibit 54.  Have you

21    ever seen that document before?

22        A.    Just a second, sir.  (The witness

1    complies.) Yes, sir.  Yes, I have seen this.

2          Q.    When did you see that document?

3          A.    I'm sure in the fall of 2007.

4          Q.    And was it sent to you by counsel in

5    order for you to respond to it?

6          A.    Yes, it was, sir.

7          Q.    Would you look at Exhibit 55.  Have

8    you ever seen that document before?

9          A.    Yes, sir, I have.

10          Q.    What did you do in response -- was

11    this document sent to you by counsel?

12          A.    Yes, sir.

13          Q.    What did you do to respond to it?

14          A.    I respond to those requests that were

15    in my possession.

16          Q.    Did you draft a response to it?

17          A.    Pardon me?

18          Q.    Did you draft a response to this

19    document?

20          A.    Yes, I did.  To my memory, if these

21    are interrogatories.  Did I do interrogatories?

22    Yes, I did.

1      Q.     So you wrote the responses to that; is

2      that correct?

3      A.     Yes, sir.

4      Q.     When did you approximately write these

5      responses?

6      A.     I don't remember.  I think this says

7      plaintiff's first set of interrogatories and third

8      request for -- let's see.  Let me refer to the

9      date of the document, sir.  I don't remember

10     offhand.  So I'm not sure what the date was.

11     Q.     You said earlier today that you gave

12     these documents 51 and 52 because they showed the

13     accomplishments of your office, right?

14     A.     Yes.

15     Q.     Did you equally give us the documents

16     that show the deficiencies of your office?

17     A.     This document also includes the

18     deficiency of our office.

19     Q.     Did you give us other documents that

20     show the deficiencies of your office?

21     A.     I don't remember.  Yes.  I don't know.

22     No.  I didn't personally give documents but it is

1    my understanding that the APR, the Annual

2    Performance Report that was submitted to OSEP and

3    the SPP which is the State Performance Plan was

4    provided to counsel and they detailed the

5    deficiencies of our office.

6         Q.    When you were looking for documents to

7    respond, did you take into account whether they

8    showed good things or bad things?

9         A.    I respond to the best of my ability in

10   accordance to what was requested, sir.

11        Q.    You said you made some choices about

12   things that you consider not relevant.  What

13   categories of documents did you consider not

14   relevant?

15        A.    Sir, I didn't say not relevant.  I

16   said that it may not have applied to the request.

17        Q.    What categories did you find did not

18   apply to the request?

19        A.    There weren't categories, sir, they

20   were individual documents.  So when I look at all

21   of the documents that I have produced in the last

22   two years, in my three and a half years in my

1     position as the supervisor for early childhood,

2     there's thousands of documents.  So consequently I

3     had to make a judgment in regards to which one

4     that I felt responded to the request.  For

5     example, my employee schedule I did not feel, in

6     part, responded to the request.

7          Q.     Did you provide documents that show

8     that transitions were late?

9          A.     Yes, sir.

10         Q.     Did you provide every document that

11    you had --

12         A.     I'm sorry.  Excuse me, sir, let me

13    clarify.  I did not provide personally the

14    documents but they are in the SPR -- I'm sorry,

15    SPP and the APR and it states that we were late

16    with transition.

17         It states that in 2004, 2005 school year

18    that we only had only 17 percent of children who

19    transitioned from Part C to Part B did so in a

20    timely manner by their third birthday.

21         And then in 2005, 2006 school year, the

22    number, the percentage went up to 37.  So yes, I

1    provided those information, sir.  Not I, I wrote

2    the SPP and APR for the indicators relevant to

3    early childhood and those documents, as my

4    understanding, were provided to counsel.

5            Q.    Were there any documents besides the

6    ones that you've just said that discuss late

7    transitions?

8            A.    Not to my knowledge.  I don't

9    remember.  I don't recall.

10           Q.    If you had a document that described a

11   subject and then you had a second document that

12   described the same subject, did you give us both

13   documents?

14           A.    It's a hypothetical, sir, that I can't

15   respond to.  A second book, for example?

16           Q.    I don't own the documents.

17           A.    Neither do I, sir.

18           Q.    And you can't ask me questions.  I'm

19   asking you questions?

20           A.    Well, let me just rephrase it for

21   clarification, sir.  I'm not understanding that

22   question.

1      Q.    If that's your question, that is a

2  reasonable question to ask me.

3      A.    Yes, sir.

4      Q.    You just said to me a moment ago that

5  there were documents that were provided to us that

6  dealt with the question of late transitions?

7      A.    Yes, sir.

8      Q.    I'm asking you whether there were

9  other documents that were not given to us about

10  late transitions because you believed you had

11  already covered that subject by giving us the

12  documents that dealt with that subject?

13      A.    I don't recall, sir.  Not to my

14  knowledge, sir.  I'm sorry.  Let me rephrase it.

15      Q.    I'm asking the question about the

16  criterion you might have applied.  In deciding

17  what documents to give us, did you at any point

18  not give us documents because you had already

19  given us documents you regarded as adequate on

20  that subject?

21      A.    Yes.  For example, the Child Find

22  draft and the one in which I made the changes to

1    and submitted to Eden, I did not give you a second

2    document of what I had already forwarded to my

3    counsel because I felt that it was already

4    provided.  So under those circumstances, sure,

5    sir.

6         Q.    It had already been provided because

7    the manual without your changes have been

8    provided; is that what you mean?

9         A.    Sir?

10        Q.    You said that it had already been

11   provided.  What is it that was provided, the

12   manual without your changes or the manual with

13   your changes?

14        A.    Sir, I was just using that for an

15   example.  The manual with my changes was provided

16   in the final document.

17        Q.    Is that the basic rule applied that if

18   something in your view had already been adequately

19   provided to us, that you did not provide another

20   document on the same subject?

21        A.    No, sir, there was no basic rule,

22   there were no categories that I used to determine

1    what would be given.  Each individual document

2    that I provided was, my judgment was based on each

3    one, it wasn't based on a group, a category or a

4    subject.

5         Q.    I'm asking you whether in making that

6    judgment, document by document, one of the reasons

7    that you considered was whether substantially the

8    same information had already been provided in

9    another document?

10        A.    That was not the criteria that I used.

11   The criteria that I used was that the exact

12   information was given in another document, not

13   substantially.

14        Q.    Well, the example you gave me a moment

15   ago, you said that you thought the exact

16   information that was given when we were given the

17   final document; is that correct?

18        A.    Are you referring to the Child Find

19   manual?

20        Q.    Yes.  51 and 52.

21        A.    Sir, the exact information that I put

22   on that Child Find manual was provided in the

1    final documentation.

2        Q.    Isn't it true that that exact

3    information was not provided because you did not

4    provide us with the draft as it stood before you

5    made the changes?

6        A.    Sir, you were inquiring why -- the

7    document that was given to me was not something

8    that I produced.  The changes that I made, sir,

9    which is something I produced, which is something

10   that was in my privy as the early childhood as I

11   previously stated, I provided those documents that

12   were in the possession of early childhood.

13       So the document that I produced and that I

14   altered was given to you in the final draft in the

15   same manner and in the same manner that I sent it.

16       Q.    The draft of the document as it came

17   to you was not given to us, was it?

18       A.    I don't know, sir.

19       Q.    Did you provide --

20       A.    I did not create that document.

21       Q.    Were you only asked to provide to

22   counsel documents you created?

1          A.     No.  No.  No.

2          Q.     You provided to counsel documents you

3     created and documents other people created,

4     correct?

5          A.     Correct, sir.

6          Q.     And you had a document of 51 and 52

7     created by other people that was different than

8     the final document, correct?

9          A.     Yes.

10          Q.     And that wasn't provided to us, was

11     it?

12          A.     No, sir.  I didn't give that document.

13     I changed it and sent it back.  When the document

14     came to me, sir, I did not make a copy of the

15     document, then make changes on another copy, then

16     send the other copy back.  The copy that was

17     provided me, sir, I made the changes on it and

18     sent it back.  No, I did not keep a copy of the

19     original one that was sent to me and then copy

20     that, made the changes and sent it back.  No, sir.

21          Q.     So your computer did not have,

22     continue to have on it the original; is that

1    correct?

2            MS. MILLER:  I'm going object to this

3    because she's already testified to the fact that

4    it was sent to her by her counsel and then

5    returned to her counsel with her edits.  So

6    clearly counsel has the full versions of the

7    document.

8            MR. TERRIS:  I asked her, I have a

9    right to ask her whether she had the original

10   version.

11      A.    I made the copies from exactly from

12   the E-mail that was sent.  I opened up the E-mail,

13   sir, with the document, with the word document.  I

14   made the changes, closed it and sent it back.

15           BY MR. TERRIS:

16      Q.    So you didn't save the original

17   document?

18      A.    I don't think I did.  I can't recall,

19   but I don't see why I would have.

20      Q.    Did you have documents that were used

21   to write the APR?

22      A.    Yes.  Yes.

1      Q.     Did you provide those documents?

2      A.     Yes.  I used the tracks that we

3  provided to do the APR.

4      Q.     So you provided all the documents you

5  used to write the APR; is that right?

6      A.     For which indicator, the ones that

7  related to Child Find, correct?

8      Q.     Correct.

9      A.     Yes.  Because that was indicator 12 on

10  the APR speaks to the number of children who

11  transition out of, who were serviced in Part C and

12  transitioned into Part B.  The track provided that

13  information.

14      Q.     Did you give us all the materials of

15  the SPP?

16      A.     For indicator 12, the one related to

17  transition?

18      Q.     Correct.  And anything else related to

19  this Child Find?

20      A.     The SPP is the same as the APR.  The

21  indicator is the same.  So the information that I

22  needed in order to develop to respond to indicator

1    12 of the SPP, also came out of the track because

2    the SPP is the plan, it was just the original plan

3    with the baseline.

4         And the baseline was that information where

5    we only transition out 17 percent of the children

6    who were serviced in Part C.  So the track

7    information was used to come up with those

8    percentages.

9         Q.    Is that the only indicator you've

10   provided the underlying materials for?

11        A.    The underlying materials or, I didn't

12   provide -- provide to you?

13        Q.    That's correct.

14        A.    To counsel?

15        Q.    That's correct.

16        A.    The track information.

17        Q.    Did you give us all underlying

18   materials for indicator 7?

19        A.    Indicator 7 has not been implemented.

20   There are no materials related to indicator 7.  It

21   all depends on what document are you referring to,

22   and I can tell you specifically why there weren't

1    any documents for indicator 7 because it was never

2    implemented.

3         Q.    Well, even if indicators were not

4    implemented, were there any materials that relate

5    to that subject matter?

6         A.    Not produced by the District.  No.

7    No, sir.

8         Q.    So indicators that were implemented,

9    there was nothing other than a paragraph that

10    shows up in some other document; is that correct?

11        A.    For indicator 7, sir, there is a plan

12    and an SPP on how the District of Columbia intends

13    to implement it.

14        Q.    And are you testifying there are no

15    planning documents that existed on that subject?

16        A.    It is the plan.  No.  I did it myself,

17    sir, and I came up with for indicator 7 how the

18    District of Columbia plans to respond to indicator

19    No. 7.

20        Q.    Except for the paragraph that was

21    written on indicator 7, there was no planning

22    material separate from that, is that correct?

1          A.    No, sir.

2          Q.    Did you get us all the underlying

3    materials for indicator 11?

4          A.    I did not respond to indicator 11.

5          Q.    Who did?

6          A.    It all depends on what year, sir.

7          Q.    Let's take 2007?

8          A.    This year.

9          Q.    Yes.  Last year?

10          A.    I can only since that is now OSSE and

11    they are no longer, I don't meet with the state

12    group anymore, then I would have to defer that to

13    OSSE's office.

14          Q.    How about 2006?

15          A.    I'm not sure who did it.  It wasn't --

16    I was only responsible for the indicators related

17    to early childhood.  I don't know who did the

18    other ones and that was six, seven and twelve.

19          Q.    Did you provide all the underlying

20    materials for indicator 6?

21          A.    Indicator 6 was the tracking

22    information.  Yes, sir.  Indicator 6 was an

1    environment and the question was how many children

2    were being serviced in an inclusion setting and in

3    a self-contained setting and that is on the track.

4    Yes.

5         Q.    And there was no other material except

6    for that; is that correct?

7         A.    That is what I relied upon for

8    indicator 6.  That's the only information that I

9    relied upon, sir, for indicator 6.

10        Q.    Did you ever tell counsel what

11   documents you weren't providing?

12        A.    No.  Tell my counsel these are

13   documents that I'm not providing?  No, sir.

14        Q.    Did you ever tell counsel what

15   criteria you were using to determine what

16   documents you were providing?

17        A.    No.  We did not have a discussion on

18   that, sir.  I was relying on my professional

19   judgment.

20        Q.    Are you a lawyer?

21        A.    On my professional judgment, sir.

22        Q.    Are you a lawyer?

1           A.     No.  I was relying on my professional

2     judgment as the respondent.

3           Q.     Are you a lawyer?

4           A.     Oh, no, sir.  No.

5           Q.     Have you ever read, ever in your life

6     before requested a document request?

7           A.     Yes.

8           Q.     When?

9           A.     In my previous.

10          Q.     In your previous what?

11          A.     I have stated that in Prince George's

12    County I did respond to a suit for document

13    requests.  Yes, sir.

14          Q.     So how many document requests have you

15    read in your life?

16          A.     The document request there, I think it

17    was approximately three documents similar to this

18    (indicating), about this consistency which is

19    about 13 pages approximately.

20          Q.     Did counsel give you any instructions

21    on how to respond?

22          A.     General instructions.  Yes.  Don't be

1    nervous.  Take your time.

2        Q.    I didn't ask for --

3        A.    -- have a good night's sleep.

4        Q.    Not for the deposition.  Response to

5    document requests.  Did you get any instructions

6    from counsel as to how to respond?

7        A.    If you have it, provide it.

8        Q.    Anything more than that?

9        A.    No, sir.

10        Q.    So you were never told what the rules

11    are on responding to document requests; isn't that

12    right?

13        A.    I was told to provide everything that

14    we had that was in the request to the best of our

15    ability.

16        Q.    And that's it, right?  That's your

17    instructions, right?

18        A.    Yes, sir.

19        Q.    Were you instructed if you had any

20    doubts you should go back to counsel and ask?

21        A.    Well, I have done that, sir because as

22    I previously stated that there were times in which

1      I had questions and I did ask Eden.

2           Q.    Were you instructed to do that?

3           A.    No.  I was not but I have done it.

4           Q.    How many times did you do that?

5           A.    I think I said about a few times.

6           Q.    How many documents did you ask about?

7           A.    I can't recall, sir.

8           Q.    Would you estimate 5, 500?

9           A.    I can't estimate, sir.

10          Q.    You have no idea if it's 5 or 500; is

11     that right?

12          A.    I can say, sir, less than ten.

13          Q.    How many documents did you look at in

14     order to determine your responses to our document

15     request?

16          A.    I would say upwards of hundreds.

17          Q.    Thousands?  Was it thousands?

18          A.    It could have been because considering

19     we provide the documents from each one of the

20     files from each one of the children, so inclusive

21     of those children, it could.  Depends on how thick

22     their files were.

1   Q. You're talking about the few named

2 plaintiffs; isn't that correct?

3   A. I think it was 13.  So 13 files.

4   Q. That's the case files you're talking

5 about, right?

6   A. Yes, sir.  And I think was it 13 or I

7 think there were some additional names added.

8   Q. How many documents approximately did

9 you look at that weren't case files?

10   A. I can't even begin to guess, sir.

11   Q. Was it hundreds or thousands?

12   A. Possibly.  It wasn't thousands, sir.

13 No.

14   Q. How much time did you spend on

15 responding to document requests?

16   A. Sir, I can't tell you.  I know that I

17 spent quite a bit of time.

18   Q. Does that mean five hours or 50 hours?

19   A. It could be -- yes, as much as 50,

20 sir.  I can't tell you exactly, sir.

21   Q. Do you have any idea?

22   A. Yes, sir.

1          Q.     Well, then can you give me as close an

2    estimate as you can?

3          A.     Let's say 40.

4          Q.     Is that based on knowledge or on

5    speculation?

6          A.     It is not speculation.  It is

7    considering if I had about five of these and I do

8    believe it took me about going through and I'm

9    trying to be as thorough as I possibly could,

10   about eight per one of these documents.

11         Q.     Eight hours per document; is that

12   right?

13         A.     Approximately, sir.  I'm sorry that I

14   can't tell you exactly.

15         Q.     Well, we're talking about three

16   documents, so eight hours would be 25 hours,

17   right?

18         A.     Sir, I can't tell you.

19         Q.     You don't have any idea, do you?

20         A.     Sir, I know what I produced and the

21   mere fact that I produced quite a bit amount of

22   the documents clearly indicates that it was more

1    than just a couple of hours.  I'm sure that you

2    guys -- I'm sorry.  Sir.  Go ahead.

3         Q.    You and I can both reason from the

4    notion of how many documents you produced.  I'm

5    asking you if you have a recollection, a

6    recollection, not speculation, a recollection of

7    how many hours you spent?

8         A.    Sir, my recollection would probably be

9    around 40 hours, sir, and that's the best that I

10   can do, sir.

11        Q.    You said eight hours for each of the

12   three; is that right?

13        A.    No, sir, of the documents like this

14   that I received.

15        Q.    Excuse me?

16        A.    The documents of this consistency for

17   requests that I received.

18        Q.    But there are three of them, right?

19        A.    I don't know in total, sir.  Could

20   have been five it could have been seven.

21        Q.    And you spent the same amount of time

22   on the one that's I think two or three pages long

1    as the one that's --

2         A.    Sir, as I said, this consistency.

3         Q.    This consistency being exhibit what?

4    What's the number we're talking about?

5         A.    We're talking about No. 13 which has

6    42 requests.

7         Q.    That's Exhibit 53, right?

8         A.    Exhibit 53 with 43 requests.

9         Q.    So that one you estimate eight hours?

10        A.    Yes.  For the 43 requests.  Sure.

11        Q.    Does your office have copies of SPPs

12   for each year?

13        A.    My office does not create the APR and

14   SPP.  I sit on a committee that creates the APR,

15   SPP but it's the State that does the SPP and APR.

16        Q.    I asked you whether your office has

17   copies of each one?

18        A.    Yes.  I have a copy of the SPP and

19   APR.

20        Q.    For each, which year?

21        A.    For two years and I didn't do them for

22   the previous years, so I wasn't on that committee.

1       Q.    So did you give -- even though you

2   weren't on the committee, did you give us the APR

3   and SPP for those years?

4       A.    I did not.  Karen Griffin did is my

5   understanding.

6       Q.    Who's Karen Griffin?

7       A.    Karen Griffin is at the state level

8   who is the head of the committee who does the APR

9   and the SPPs.

10       Q.    What years did you have?

11       A.    What years did I create the SPP?

12       Q.    I'm asking the years you gave counsel

13   the copy.  I don't care who prepared them?

14       A.    I didn't give counsel the SPP, sir or

15   the APR, it was provided to counsel by Karen

16   Griffin is my understanding.

17       Q.    For all of the years.  You provided no

18   APRs and no SPPs; is that right?

19       A.    Correct, sir.

20       Q.    Your office had them for some years,

21   correct?

22       A.    I had a copy of it because I

1    participated in the committee.  I had a copy of

2    the SPP and the APR because I participated in the

3    committee.  Yes, sir.

4        Q.    For what years?

5        A.    For year 2000 -- the last two years.

6    The ones that were provided in year 2005, 2004 --

7    2004-2005 and 2005-2006 and we are currently

8    working on the 2006-2007.

9        Q.    So you had copies for two years,

10   correct?

11       A.    Yes, sir.

12       Q.    Did you give those to counsel?

13       A.    No, sir.  Karen Griffin did.

14       Q.    Do you know that?

15       A.    Yes, sir, she told me, unless she's

16   not telling me the truth, she told me she provided

17   the SPP and the APR.

18            MR. TERRIS:  Counsel, we only have 2005

19   and 2006.

20            MS. MILLER:  What document don't you

21   have, the APR and the SPP.

22            MS. BENFER:  Right.  I don't think we

1    have the SPP.

2              THE WITNESS:  There's only one SPP.  An

3    SPP you don't do every year.  So you have, it's

4    the APR.  So you have the SPP for the 2004-2005

5    and then the APR is for the 2005-2006.

6              MS. MILLER:  So can you clarify which?

7              BY MR. TERRIS:

8        Q.    What about 2006-2007?

9        A.    The document is not due to OSEP until

10   February 1.  So shortly after that, it will be

11   made public.

12       Q.    Your testimony is that Ms. Griffin

13   told you that all of these have been given to us;

14   is that correct?

15       A.    No.  She told me that she provided the

16   APR and the SPP to counsel.  I assume that she

17   gave for the years in which you requested.

18       Q.    You didn't ask her whether that was

19   true; is that correct?

20       A.    I don't have conversations about her

21   in regards to her document request.  No, sir, I

22   did not.

1          MS. MILLER:  I'm sorry.  Can you

2    clarify which one you are missing?

3          MR. TERRIS:  We only have one.

4          MS. BENFER:  We only have 2003-2004.

5          MS. MILLER:  2003-2004 what?

6          MS. BENFER:  APR and we have one SPP.

7          THE WITNESS:  There isn't but one SPP

8    and one APR.

9          BY MR. TERRIS:

10    Q.     There's only one APR?

11    A.     They changed the way in which you had

12    to submit the APR and the SPPs.  They changed the

13    requirements.  So you started two years ago with a

14    SPP and then an APR from that SPP, the initial

15    SPP, and then the third year which would be this

16    year, they are to submit another APR in February.

17    Q.     Let's go back and get this straight.

18    If I asked you how many SPPs exist in this case

19    world, there's one, is that what your testimony

20    is?  There's only one SPP.  They do not change

21    from year to year, so there's one; is that right?

22    A.     There's one SPP because this is the

1     State Performance Plan.  This is the plan that we

2     have at the District of Columbia to address the

3     indicators, the 21 or 22 indicators.

4          Now the APR, sir, is the Annual Performance

5     Report.  You said this is your plan.  Now, each

6     year you tell us how you are performing in regards

7     to the plan that you created.

8          Q.     I'm going to go back.  I'm going to

9     ask the question again.  How many SPPs exist?

10         A.     The SPP -- sir.

11         Q.     There should be a number.  Can you

12    just answer my question?  What's the number?

13         A.     To my knowledge, sir, there's one SPP

14    that I participated with, sir, since I have gotten

15    here.  If there were other SPPs before I came

16    here, I couldn't tell you.  So I cannot tell you,

17    sir, that there's only one SPP because in 2000

18    they could have did the District or the OSEP may

19    have required for SPP in 2000 but since my tenure

20    in 2004, there has only been one SPP that I

21    participated on and created that was sent to OSEP.

22         Q.     What's the date of that?

1          A.     I don't remember when it was sent.

2          Q.     Approximately what year was it?

3          A.     I would say that was year 2005.

4          Q.     And there was no new one after that;

5     is that correct?

6          A.     SPP, sir?

7          Q.     Yes.

8          A.     Not that I know of.

9          Q.     And you have never seen one before

10    that; isn't that correct?

11         A.     No.  I was not employed -- no, I have

12    never seen one before.  No.

13         Q.     Now, APR, are those supposed to come

14    out every year?

15         A.     They are.  Yes.  We are required, the

16    District of Columbia Public Schools and all LEAs

17    or all states are required to respond to the APR

18    annually.  Yes, sir.

19         Q.     And so the APR has two years on it,

20    doesn't it?  It has such as 2005-2006, correct?

21         A.     Yes.  It has -- well, it has one year.

22    It will say APR FFY 2005.

1      Q.    Okay.  So if we wanted to use -- those

2   are fiscal years, is that what --

3      A.    I'm assuming that.  I have never seen

4   it written out, sir, but if you go look on the

5   website and you saw the APR it will say FF 2005 or

6   FF 2004 or FF --

7      Q.    What's the earliest APR that you have

8   seen?

9      A.    The earliest APR that I have seen was

10  the one that was submitted last year in February.

11     Q.    The APR that has on it 2006-2007; is

12  that correct?

13     A.    There isn't a dash, sir.  It is just

14  FFY and then it has the year and I believe that

15  would say because their year is different from our

16  school year.  So the federal government I would

17  say that it said 2005 and it would have

18  represented data and information from the

19  2004-2005 school year.

20     Q.    And that came out in February of 2007;

21  is what you're testifying?

22     A.    Then it may have said 2006.  No.  It

1    said 2005 but it represented data from 2004, 2005

2    I believe.  Sir, I'm not quite sure.

3         Q.    And you're saying that came out in

4    February, 2007; is that your testimony?

5         A.    Sir, I know that the reports are a

6    year behind.  The data is a year behind from the

7    report year but they're different.

8         Q.    But this is two years, Ms. Johnson?

9         A.    Sir, if I saw the document in front of

10   me, I could tell you.  I'm doing this on my memory

11   but I do know that the data that your report is on

12   for February, for example, the document that is

13   going to go forward to OSEP in February, 2008 is

14   based on the data for 2006-2007 school year.

15              MR. TERRIS:  Mark this, please.

16       (Care Deposition Exhibit No. 41 was marked for

17                    identification.)

18              BY MR. TERRIS:

19        Q.    I'm showing you Exhibit No. 41.  What

20   is that?

21        A.    Hold on.  Let me go through it.  (The

22   witness complies.)  The document says the D.C. and

1      there's a dot here so I can't read it.  D.C.

2      schools something annual performance report for

3      July, 2003 through June, 2004.

4            Q.    Is that an APR?

5            A.    I'm assuming it is, sir, that was

6      prior to my tenure.

7            Q.    You know what an APR looks like, don't

8      you?

9            A.    They changed the format, sir.

10           Q.    You can't tell whether this is an APR;

11     is that what you sere saying?

12           A.    Sir, what I'm saying is that the

13     document that is before me is not the same format

14     of the APR that I participated in and assisted in

15     creating.

16           Q.    Have you ever seen this document?

17     Please, don't go page by page.  If you can't tell

18     by looking at it, then I'll go on?

19           A.    But sir, no, I have never seen this

20     document.

21           Q.    So you didn't supply this document to

22     counsel?

1          A.    No, I did not.

2          Q.    Somebody else must have done it; is

3     that right?

4          A.    I did not supply this to counsel.

5                MR. TERRIS:  Did you supply -- I'm

6     going to show you Exhibit 42.

7        (Care Deposition Exhibit No. 42 was marked for

8                      identification.)

9                BY MR. TERRIS:

10         Q.    Is that the format for the APR that

11    you're used to?

12         A.    No, sir.

13         Q.    Have you ever seen this document

14    before?

15         A.    No, sir.

16         Q.    So you never supplied this to counsel

17    either; is that right?

18         A.    No, I did not.  And the document says

19    the improvement plan.

20         Q.    It says on the page annual performance

21    plan?

22         A.    But any way.  No, sir, I have never

1    seen this document.  I did not supply you with

2    this document.

3        Q.    Have you ever seen any APR?

4        A.    Yes, sir.  As I previously stated, I

5    saw the APR that was submitted last year.

6        Q.    Did you give that to counsel?

7        A.    No, sir.  As I previously stated, I

8    was told by Karen that she provided the APR to

9    counsel and no, sir, I did not ask her

10   specifically which one.

11        MR. TERRIS:  We don't have any APRs

12   except for 41 and 42, assuming 42 is one which I

13   find incredible that we haven't got.

14        BY MR. TERRIS:

15        Q.    Let me go back to something I asked

16   before.  What documents did you look at that you

17   did not provide?  What categories?

18        A.    Sir, as I previously stated, I did not

19   have categories and it was individual and sir, I

20   don't recall which one I said that wouldn't be,

21   not relevant or that wouldn't apply to the

22   request, sir.

1          Q.    So you can't remember which kinds of

2     documents you said you discarded because they were

3     not relevant; is that right?

4          A.    I looked through hundred of documents,

5     sir, and there were a few but no, I don't

6     remember.

7          Q.    There were a few?

8          A.    It wasn't that many, sir.  Well, let

9     me take it back because it is, it was quite a few

10    because as I previously stated, my employee

11    schedule or there were -- no, sir.  I can't

12    remember.  Very honestly, sir, no, I can't.

13             THE WITNESS:  May I have a two-minute

14    break?

15             MR. TERRIS:  Sure.

16             (A break was taken at 2:38 p.m.)

17             (Deposition resumed at 2:39 p.m.)

18             BY MR. TERRIS:

19          Q.    What's your job history?

20          A.    My first job I was an intake

21    specialist and therapist for a therapeutic foster

22    home.  After that I worked for the ARC in

1    Montgomery County, Association for Retarded

2    Citizens.

3        Q.    Can you give us a date on those

4    approximately?

5        A.    Intake was '79, '80.  I worked with

6    the therapeutic foster home in Detroit as an

7    intake/therapist, provided therapeutic services

8    for children in specialized therapeutic foster

9    homes.  Then I relocated to this area and I worked

10   as a counselor for a group home with Montgomery

11   County, Association for Retarded Citizens and then

12   worked there for about two years and then I worked

13   for Metropolitan Health who had a contract with

14   the District of Columbia, MRDDA, Mental

15   Retardation and Developmental Disabilities

16   Association.

17       I was a psychologist and an IHP developer

18   and IHP stands for Individual Habilitation Plan

19   developer and I chaired the meetings.  I stayed

20   with them for about three and a half years.

21       Q.    Is that with children?

22       A.    There were children and adults.  And

1    then I in '89, I was employed with Prince George's

2    County Public School as a school psychologist and

3    I remained with them until 2004, but two years

4    prior to that, I was the program manager for the

5    Judy Hoyer Family Learning Center.

6         Q.    When did you start work for the

7    District?

8         A.    2004, August.

9         Q.    What was your job then?

10        A.    My job is, my current job, supervisor

11   for early childhood special education.

12        Q.    And how many people do you supervise?

13        A.    Directly approximately 27.

14        Q.    What's your education?

15        A.    I have a bachelors in psychology, a

16   master's in clinical psychologist, an EDS in early

17   childhood special education and I am in my third

18   year as a doctoral student in administration.

19        Q.    What institute did you graduate from?

20        A.    My bachelor was at Grambling State

21   University.  My masters was at Roosevelt

22   University in Chicago and my EDS is from George

1    Washington University and I'm currently at Bowie

2    State University for my doctorate.

3         Q.    When's the first time you started

4    working in the special education field?

5         A.    First time was in my first job, '78.

6    About '79, '80 is when I was the intake specialist

7    with the therapeutic foster home.  A lot of

8    children there -- oh, I forgot another job.  I

9    also worked as an educational coordinator and

10   social worker for a therapeutic foster home called

11   DC Charlie which is now called, I forgot what but

12   it was DC Charlie at the time that I worked in the

13   District of Columbia.

14        I started working with children with

15   disabilities in therapeutic foster homes because

16   the majority of those little ones and those

17   children were identified with some type of

18   disability.

19        Q.    Have you ever been terminated from any

20   job?

21        A.    Never.

22        Q.    Have you ever been in a job where it

1    was suggested that you might leave?

2        A.    No, sir.

3        Q.    What licenses do you have?

4        A.    I currently hold a license as a school

5    psychologist with the District of Columbia.

6        Q.    When was the position you were in

7    created?

8        A.    I don't know, sir.

9        Q.    What are your duties?

10       A.    My duties include Child Find for

11   children 3 to 5.  It also includes monitoring for

12   compliance of the programs, the early childhood

13   programs and also to supervise the assessment

14   teams that we have called early childhood at The

15   Care Center.

16           MR. TERRIS:  Mark this, please.

17      (Care Deposition Exhibit No. 56 was marked for

18                  identification.)

19           BY MR. TERRIS:

20       Q.   I'm going to show you Exhibit 1.  What

21   position does that relate to?

22       A.    This is the position that was

1    advertised for, my position although it isn't the

2    same name.  The name on here is educational

3    coordinator for early childhood.  My position

4    title is supervisor for early childhood special

5    education.

6          Q.    Is this the vacancy announcement for

7    when you filled the job?

8          A.    Yes, sir, it is.

9          Q.    Would you look at Exhibit 56?

10         A.    (The witness complies.) Yes.

11         Q.    That document was given to us today.

12    Why was that not given to us before?

13         A.    I don't know, sir.

14         Q.    Did you have anything to do with

15    giving it to us today?

16         A.    Yes.  As a request from Eden.

17         Q.    And when was that request given to

18    you?

19         A.    About a week ago.  A couple of weeks

20    ago.

21         Q.    When did you respond to her?

22         A.    I got this from HR the end of last

1    week.

2         Q.    Why didn't you give this document to

3    us two years ago?

4         A.    I don't know why, sir.

5         Q.    Well, did you -- one of the on

6    Exhibit 52, No. 37 --

7         A.    Can I have the document, please, sir

8    that you're referring to?

9         Q.    -- asks for job description?

10        A.    Can you refer to where you're reading

11   again?

12        Q.    I'm reading from page 12 item 37?

13        A.    Sir, I believe that I did provide the

14   information.  This position -- well, let me ask

15   you, can I see the time that this was requested?

16   This is the 2005 document?

17        Q.    Yes.

18        A.    In December of 2005 she had not, this

19   was the announcement but she had not been in the

20   position yet although it was the announcement,

21   there was a hiring freeze.

22        Q.    But it asks for the job descriptions

1       of all staff members.  This is a job description

2       of a particular position; isn't that correct?

3              A.     Sir, I was under the assumption, not

4       under the assumption but I believe that I had

5       provided the job description of Shanda at the time

6       which is educational specialist.  At the time that

7       this was requested, she was in the position of

8       educational specialist so that is why and my

9       recollection as to why it was not produced in 2005

10      in your initial request.

11             Q.     There was a position in April, 2005, a

12      position for an education program specialist,

13      right?

14             A.     That's the announcement, sir.  The

15      position was not filled until the following year.

16             Q.     Ma'am, will you answer my questions

17      and not give what you think you want to say on a

18      different subject?

19             A.     Sure, sir.

20             Q.     I'm asking you a question.  There was

21      a position in 2005?

22             A.     Yes, sir.

1          Q.     For an education program specialist;

2     isn't that correct?

3          A.     You are correct, sir.

4          Q.     And Exhibit 56 was a job description

5     of that position; isn't that correct?

6          A.     And let me read what I understood, all

7     documents created January, 2000 to the present

8     referring to the, relating to job description

9     responsibility and qualification of all staff

10    members involved.

11         This position was not filled by any of our

12    staff at the time of the initial.  Now

13    subsequently, no, we did not provide it, sir, but

14    the 2005 document, that position was not filled.

15         Q.     Are you saying to me that you looked

16    to Exhibit 56 subsequent to December of 2005,

17    looked at this document and decided not to give it

18    to us?

19         A.     No, sir, I didn't look at this

20    document because this document was in -- this is

21    an HR document.

22         Q.     So you never saw the job description;

1    is that correct?

2        A.    Yes, sir.  I have seen the job

3    description.

4        Q.    Did you see the job description when

5    it came out?

6        A.    Yes, sir.  I saw it online.

7        Q.    So you knew it existed, didn't you?

8        A.    Absolutely, sir.

9        Q.    And you were asked to respond to item

10    37, right?

11        A.    In 2005, this position -- I'm sorry.

12    In 2005 when it was initially requested, yes, I

13    was asked to produce.  You're correct.

14        Q.    So you knew this existed and you knew

15    item 37 covered it; didn't you?

16        A.    Sir, at that time Shanda was in, my

17    staff were in the position of educational

18    specialists.  So the way I read this document it

19    says to all staff.  At that point, they were not,

20    there was no educational program specialists on my

21    staff.

22        Q.    When was the position filled?

1        A.    It wasn't filled until early part of

2    2006.  I mean, not 6.  I'm not quite sure when

3    Shanda's was filled but it was past, way past 2005

4    from the announcements because we had a freeze.

5        Q.    So do you know approximately when it

6    was filled?

7        A.    I can't say approximately.  I'm sure

8    Shanda could tell you.

9        Q.    You don't have any idea when this

10   position was filled; is that right?

11       A.    Sir, it was, it's about around

12   sometime in 2006.  Like you said, about December,

13   2006.

14       Q.    What do you do to supervise programs

15   that serve students with disabilities age 3 to 5?

16       A.    What does supervision entail; is that

17   your question?

18       Q.    Yes.

19       A.    Well, I do not directly supervise.  I

20   have educational specialists who are the liaison

21   between my office and the programs.  They are

22   assigned schools and it is their responsibility to

1    visit the schools at least two times a month and

2    when they visit the school, they have a form that

3    they have to fill out and that the teacher has to

4    sign, and they go over those things in which the

5    teacher may need.

6         They observe the classroom and they observe,

7    they go through children records to make sure that

8    they are in compliance and then I meet with my

9    student support team at least twice a month.

10        Q.    Do you participate in the development

11   of policies regarding early childhood?

12        A.    Yes.  The ones that we have created.

13   Yes, I do participate in.

14        Q.    What policies have changed since you

15   have been employed by DCPS?

16        A.    Well, unofficial because I want to

17   make it clear that these policies that we have

18   created for early childhood have not been vetted

19   through the OGC's counsel, so it hasn't been

20   officially approved, but in order for us to have a

21   more productive organization, we have sat down

22   together and said okay, we need some real person

1    with some good policies, some policies and

2    procedures that we will adhere to within this

3    unit.

4        Q.    You started work in your present job

5    on what date?

6        A.    August I think the 19th of -- no, the

7    20 something of 2004.

8        Q.    So your testimony is that no policies

9    have significantly changed since that date up to

10   date but there's some in process; is that correct?

11       A.    No official policies have changed.

12   No, sir, that I know of.

13       Q.    And the policies that are in the

14   process of changing, what are they?

15       A.    We haven't got the official because as

16   part of this draft Child Find manual the screening

17   policy.  Prior to, I want to say around January of

18   2006 we had no screening process.  So we had to

19   develop a policy and a process on how to screen

20   children.  Prior to that, they just come and we

21   assess them with everything.

22       Q.    Although the policy hasn't changed, in

1    fact you have changed the new method of screening,

2    right?

3         A.    Pardon me?  Yes.  Yes.  Prior to me

4    coming, we did not screen children.  A parent

5    would come in and we would just give them a

6    psychological evaluation, a speech and language

7    evaluation and an educational evaluation in OT and

8    PT.  There was no screening process.

9         Q.    But there is a screening process

10   today; isn't that correct?

11        A.    Yes, sir.

12        Q.    And you say that hasn't been

13   officially approved yet; is that correct?

14        A.    It has not been officially approved

15   through OGC but it has, and it's a part of the

16   procedures of the document that is still in draft

17   form.  So as soon as it's the --

18        Q.    The August, 2007 draft manual; is that

19   what you're talking about?

20        A.    Yes, sir.  The Child Find manual, are

21   we talking about the same thing?  Yes, sir, it's

22   still in draft.  It hasn't been officially,

1    officially approved.

2        Q.    So these changes have been made

3    without general counsel's approval; is that what

4    you're saying?

5        A.    And OSEP's.

6        Q.    Is that required before policies are

7    changed?

8        A.    It may or may not.  I can't say.  OSSE

9    may determine that and I'm sure that their people

10   and their general counsel folks probably are

11   looking at it.  I don't know what that process is,

12   sir.

13       Q.    Any other policy changes in the time

14   that you've been at your present job?

15       A.    The screening process is when we're

16   talking about policy, I would say that the

17   screening process is the big one.  Now, prior to

18   my coming aboard, the centralization of the

19   children being referred.

20       Q.    Excuse me?

21       A.    I said prior to my coming aboard, The

22   Care Center, before The Care Center was open,

1    children went to their neighborhood school, a

2    parent had to go to their neighborhood school in

3    order to go through the Child Find and the

4    assessment determining eligibility for children of

5    preschool age nonattending.

6         Q.    The first document request that we

7    made, Exhibit 53, have you ever gone back to look

8    at it subsequent to your first response to it?

9         A.    Which one?  Could you show me the one?

10        Q.    53.

11        A.    Okay.  No, sir.  I have not gone back

12   truthfully.

13        Q.    So when you've given us new documents

14   recently, were you operating on your memory of

15   Exhibit 53 and what it requested?

16        A.    Sir, I did not consider exhibit, the

17   first exhibit when I was responding.  The one that

18   I responded to recently was that I provided the

19   strategic plan was not in response to a previous

20   documentation, I mean, request, it was something

21   that I thought would be helpful and not any

22   specific request, sir.  No, I did not review

1  previous requests from 2005 in my response to the

2  documents that I recently provided.

3         Q.    So do I understand you correctly that

4  the documents, for example, that you have given us

5  today you thought were not responsive to a

6  document request but you thought they would be

7  helpful?

8         A.    Sir, the document request in 2005, I

9  did not go back through them, sir. I repeated

10  several times, it was an error in my judgment,

11  sir.

12        Q.    But you have given us some documents

13  recently, correct?

14        A.    I gave you the strategic plan today.

15  Yes.

16        Q.    Now, in making that decision, were you

17  responding to a document request or were you

18  trying to be nice?

19        A.    Not nice, sir. I'm trying to show, as

20  I said, the accomplishments that we have made over

21  the last two years.

22        Q.    Would you have given us that document

1    had it been filled with things that you had failed

2    to accomplish in the last two years?

3        A.    As I previously stated, the documents

4    also includes our failure, so yes.

5        Q.    What if it only had failures, would

6    you have given it to us?

7        A.    Sir, I probably would have.  I can't

8    tell, that's hypothetical, sir, I can't tell you.

9        Q.    So you gave it to us today because you

10   wanted to show us your accomplishments; is that

11   right?

12       A.    Yes, I did, sir.

13       Q.    And not to respond to any document

14   requests?

15       A.    Yes.  This was not for a specific --

16   when I -- if you're asking me, sir, and this is my

17   assumption of what you and please, correct me or

18   maybe restate it for me, sir, so that I can

19   respond.

20       Q.    You didn't give the document to us in

21   respond to a document request; isn't that your

22   testimony?

1         A.    Not the strategic plan, no.  As I

2    previously stated, it was because to show our

3    accomplishment.

4         Q.    How much of your job is in monitoring

5    the transition program?

6         A.    I monitor the transition program in

7    the same manner, in a like manner that I monitor

8    the programs.  I do not attend transition

9    programs, attend the meetings.  I meet with my

10   staff weekly and go over the activities related to

11   transition.

12        Q.    There have been a lot of problems with

13   transition being done in the appropriate amount of

14   time; isn't that correct?

15        A.    Absolutely.  Yes.

16        Q.    Why is that?

17        A.    Staffing.

18        Q.    You have had inadequate staff for a

19   long time; is that correct?

20        A.    Yes, we did.

21        Q.    And you have fully adequate staff now?

22        A.    It is my professional opinion that we

1    should have four teams, we now have three and a

2    half.

3        Q.    Now, do you accomplish transitioning

4    in a timely manner for all children?

5        A.    We did not become, have three and a

6    half until August.  Prior to August, we only had

7    two and a half.

8        Q.    Since August, have the timeliness

9    requirements been met for all children?

10        A.    I have not looked at the data, so I

11    will have to refer to the data, sir.

12        Q.    So you don't know the answer to that;

13    is that correct?

14        A.    I know that we've made a significant

15    improvement.

16        Q.    Don't you monitor the data on a

17    regular basis to see whether you're fully

18    complying with the timeliness requirement?

19        A.    I monitor it on a quarterly basis,

20    sir.  So this is about the time that I'll be

21    looking at it.

22        Q.    So when quarter ended in September,

1    correct?

2         A.    It wasn't fully staffed.  Prior to

3    being, not fully staffed, having 3.5 a team.  Are

4    numbers were not good, sir.  We were not fully

5    staffed.

6         Q.    When do the quarters end?

7         A.    It isn't an official quarter.  It is

8    what I determine.  So starting at September, I

9    will look at the data from and because the school

10   year starts around September.  So really the data

11   doesn't fall through until like the end of

12   September, end of November, end of December.  So

13   now I'll start looking at how we're doing.

14        Q.    When you say quarterly, you mean three

15   months, don't you?

16        A.    Yes, sir.

17        Q.    And when did school start?

18        A.    School started in last week of August.

19        Q.    So three months were over at the

20   beginning of December, correct?

21        A.    That's my quarter.  This is not

22   determined by OSEP or determined by the policy,

1    this is determined by a supervisor and that's how

2    I look at it.

3        I look at it not from the first date of the

4    September because we haven't assessed the child

5    yet for the month of September.  So I look at the

6    data from the end of the month.  So the last day

7    of the September, you will have a window of 30

8    days of evaluations or transitions, activities

9    happening and then you have another 30 days at the

10    end of October.

11        You'll have another 30 -- I mean, November.

12    September, October -- any way, sir, it isn't until

13    December, end of December, the data from September

14    to the end of December is what I look at, sir.

15        Q.    Well, as you know, we're going to

16    resume this deposition in February.  Would you

17    normally expect to look at that data before then?

18        A.    I'm looking at it now and it will be

19    finished by the end of -- by mid February for

20    sure.

21        Q.    And will you have a specific

22    percentage of children that the timeliness

1    requirement has been satisfied?

2        A.    If that is a request from you or from

3    counsel, it will be made available.

4        Q.    Well, you gave us earlier in this

5    deposition some very specific numbers for other

6    years?

7        A.    That's from OSEP, sir.  This is

8    internally my numbers.  The numbers for OSEP will

9    not come out until February.

10       Q.    I understand that but would OSEP get

11   those numbers by itself looking through the files

12   or did they get them from the District of

13   Columbia?

14       A.    From the District of Columbia.  It is

15   inclusive of all LEAs, not just DCPS.

16       Q.    I understand that.  So the OSEP

17   numbers that you quoted came from the District of

18   Columbia, right?

19       A.    Partially.  Yes.  Because the numbers

20   that I quoted for OSEP are the numbers that are

21   provided by the State of the District of Columbia.

22   I'm an employee only of the DCPS.

1      Q.    Well, are there different numbers from

2   the state than from DCPS?

3      A.    Yes, sir.  There were 52 LEAs in the

4   District of Columbia.

5      Q.    So the numbers you gave me were not

6   DCPS numbers; is that right?

7      A.    No, they were not just DCPS, no, sir.

8      Q.    Are you fully staffed at the moment?

9   Is your office fully staffed?

10     A.    I believe my recommendation and

11  request is to have two additional individuals for

12  Child Find to do more outreach for Child Find and

13  a speech pathologist to complete our four teams.

14     Q.    Why is it important to have those two

15  additional positions?

16     A.    The three additional positions?

17     Q.    Why is it important to have those

18  three additional positions?

19     A.    The outreach, we need to do more

20  outreach activities and Child Find activities, so

21  that is why I believe we need those two positions.

22     Q.    How many positions?

1   A.  Two.

2   Q.  I thought we said --

3   A.  I just said one and then I will tell

4 you about --

5   Q.  Okay.

6   A.  -- the speech pathologist.  And the

7 speech pathologist, 99.9 percent of children that

8 come through have a suspected delay in the area of

9 speech, and the number of children that we are

10 seeing now, we're at approximately 60 children a

11 month that we are screening.

12   And so in order to do timely evaluations, in

13 order to do a very good, thorough job of screening

14 an evaluation, it is my opinion that practice, we

15 should have four complete teams and a speech

16 pathologist is a key individual on our teams.

17   Q.  Are you missing just one person to

18 make four complete teams?

19   A.  Yes, sir.

20   Q.  That's the only position you're

21 missing is the speech pathologist; is that right?

22   A.  Yes, sir.

1      Q.     And the other two positions that you

2    feel you need are for what positions?

3      A.     For Child Find specialists.

4      Q.     And their both for outreach; is that

5    correct?

6      A.     That would be both, they're outreach

7    and transition, they would do a combination of

8    both.

9      Q.     What is lacking now in the outreach?

10     A.     The public if -- can I refer to the

11   document, the Child Find document and I can tell

12   you instead of just my memory?

13     Q.     Sure.  If you tell us what it is.

14   Just so that the record is clear, it's Exhibit 10

15   we're looking at now?

16     A.     Okay.  And may I also add another

17   thing that we need is funding.

18     Q.     Another need you said?

19     A.     Yes.

20     Q.     Let's go back to that in a minute.

21     A.     For Child Find.

22     Q.     For the moment, I asked you the

1    question of what needs of outreach that you wanted

2    to satisfy?

3         A.    On page 4 and this is not related to

4    the staff but related to funding, we have not did

5    the public notice in local newspapers.

6         Q.    Where are you looking?

7         A.    No. 1.

8         Q.    So you need funding for what purpose?

9         A.    To implement No. 1 which is public

10   notice in local newspapers that describes DCPS

11   responsibilities, special education.  No. 2 --

12        Q.    Well, before you go on, let's deal

13   with one at a time.  No. 1, if you had adequate

14   funding, what would you do?

15        A.    Exactly that.  We would secure PO with

16   newspapers and we would do exactly what it says.

17        Q.    Just one public notice, you think that

18   would be adequate?

19        A.    No.  No.  No.  That's the minimum.

20        Q.    So that's what I'm asking you.  If you

21   had adequate funding, what would you do?

22        A.    First thing we would do is to sit down

1    and adequate funding and adequate staff.  We would

2    come up with, I always believe that before you

3    just start doing anything, you need to sit down

4    and plan.

5         We would come up with a comprehensive, we

6    would develop a comprehensive plan for

7    implementing all of these things that are in the

8    Child Find document related to public awareness

9    that we have not been able to complete and that's

10   what we would do, sir.

11        Q.    But you have a lot of experience in

12   outreach in your job over the last three and a

13   half years.  Tell me at least what some of the

14   components of what you would do with outreach?

15        A.    Well, some of components that we would

16   do is we would go out to the, in the manual

17   there's a list, I believe it's in this one, of

18   primary referral sources that we will be able to

19   go out and do the trainings with the primary

20   referral sources.

21        We will be able to develop, I wish for a

22   long time that we be able to develop a very good,

1     high-quality document that outlines Child Find and

2     where to go.  I would love for us to also do a

3     spread in the Washington Post on a Sunday which

4     was previous done a couple of years, three years I

5     believe ago with Part C that we do another one of

6     those where you do a whole spread on the programs

7     that are offered in the District of Columbia for

8     children for three and four year, at the three and

9     four year old level.

10         Again the trainings in the community.  We

11     will be able to respond more to churches and

12     especially those churches, large churches that

13     have a lot of individuals there.  We would be able

14     to do more of going out to the churches and

15     conducting fairs, health fairs and participating

16     in health fairs.  Yes.  It's quite a bit of things

17     that we would love to do.

18         Q.    Would you have some people working

19     more closely with child care centers and things

20     like that with children?

21         A.    Yes.  Yes.

22         Q.    Where children obviously come

1    regularly?

2        A.    Yes.

3        Q.    What would you do with them?

4        A.    We would call them and say hey, we're

5    from the District of Columbia Public Schools, we

6    have a Child Find presentation that we'd like to

7    meet with your parents, we'll make it convenient

8    for you with funding.  I would be able to pay my

9    people overtime because with child care, the best

10   time to get that information out is around the

11   6 o'clock hour, between 5 and 6 when parents are

12   coming to pick up their little ones so that we can

13   have someone there who would be able to hand out

14   the brochures, talk to them.

15       Now, we're doing those things but because of

16   funding, we are doing it at our own expense.  My

17   staff has done an excellent job, outstanding job

18   of their time and their own monies to do the

19   outreach that we have been doing and but with

20   adequate funding, appropriate funding and

21   appropriate staffing, we could do a whole, whole

22   lot more.

1      Q.    Let's go back the one.  Although it

2  says publishing one public notice that if you had

3  adequate funding you would do more than that.  Can

4  you tell me what you meant?

5      A.    Sure.  I would do quarterly because

6  we're new to a lot of people.  I'm going to get

7  the word out there quarterly.  I would do

8  quarterly.

9      Q.    Would you put it in more than let's

10  say the Washington Post or like, some of the

11  community newspapers?

12      A.    The Examiner, definitely.  The

13  Express, you know the one that they give out on

14  the metro, definitely.

15      Q.    And how about some of the neighborhood

16  newspapers?

17      A.    Yes.  Yes.

18      Q.    Now, you were going to go on and I

19  think you were going on and I interrupted you,

20  which I apologize for, but I wanted to emphasize

21  one for a moment.  I think you were going to go on

22  and talk about two?

1          A.     Yes, sir.

2          Q.     Would you tell me what you were going

3     to say about that?

4          A.     No.  We have not done public notice on

5     the local radio or television in the last year,

6     about the last 8 months.  We did do it in

7     conjunction with Part C and I have been on the

8     radio with Part C talking about Child Find.

9          I can't think of the radio station we were

10    at and Part C took the lead in the public

11    awareness.  They have done a lot of publications

12    and just publications and radio and TV

13    announcements, but kind of off in the last eight

14    months, it hasn't been as many.  So we would start

15    that up and increase those numbers again.

16         Q.     What other things would you do if you

17    had more staff and more money for outreach?

18         A.     In implementing this documentation,

19    this document?

20         Q.     Is The Care Center responsible for all

21    of the DCPS outreach for three to five year olds?

22         A.     No.  We're not solely responsible.  We

1    are responsible for nonattending students.  The

2    schools are responsible for the Child Find of

3    children that are in their school and that is

4    through the SST process.  It's outlined in, the

5    SST and MDT process is outlined in the manual.

6        Q.    Where is that?

7        A.    Under page 11.  It starts on page 26.

8    It's the process that the local schools use for

9    determining eligibility.

10       Q.    I'm confused.  Maybe I have confused

11   myself.  I think I was asking you whether you were

12   responsible for all the outreach activities for

13   children in the three to five year old category at

14   the Care Center?

15       A.    For three to five.  Yes.  That would

16   be us.  Not the Child Find responsibility but the

17   outreach responsibility, it falls on us.

18       Q.    Okay.  So let me see, you said that if

19   you had more staff, you would have four complete

20   teams?

21       A.    One is if I had a speech pathologist,

22   I would have four complete teams.  Yes, sir.

1          Q.     And how would that be an improvement?

2     What would that produce by having four teams

3     rather than three and a half that you don't now

4     have?

5          A.     Because 99 percent of the children who

6     come in have suspected delays in language.  So if

7     you don't have a speech pathologist, the team

8     cannot, then I'll have to use one of the other

9     speech pathologists to be on two teams as opposed

10    to one team.

11         Q.     Does that mean this is one of the

12    factors that is slowing down the transition

13    process?

14         A.     Is it one of the factors that the lack

15    of staff was one of the factors that slowed down

16    the transitioning process.  Yes.

17         Q.     So that it would be one factor then

18    that would make it more -- that would help you

19    meet the timeliness requirements for children; is

20    that correct?

21         A.     Yes, sir.

22         Q.     Now, you said that the two other

1    people would do a combination of outreach, at

2    least I think this is what you said, outreach and

3    evaluations; is that correct?

4          A.    No.  Transition.  So they would attend

5    the transition meetings.

6          Q.    Transition meetings?

7          A.    Right.  Yes.

8          Q.    And is there a shortage of people now

9    available to attend the transition meetings?

10         A.    Yes.  We -- Ginny Johnson is our only

11   Child Find person.  We are using our other people,

12   Ginny and Shanda, but that's not their job, that's

13   not their primary job, but we are short-staffed

14   for individuals who attend transition meetings.

15   Although we're doing 99 percent but it is a

16   hardship on us.  We would be able to do more if we

17   had two additional people.

18         Q.    When you say you could do more, what

19   could you do more?

20         A.    We could do more of, we would like to

21   implement things like registration at the

22   meetings.  We would be able to do a better job of

1    following up after the meeting and the parent

2    doesn't decide to come to the District of

3    Columbia.  It's their right to do so, but we would

4    be able to have the manpower to call each and

5    every one of those parents and say Hi, we met you

6    at the transition meetings and we see that you

7    have not come to the District of Columbia within

8    the 90 day period before the child turns three,

9    even though the transition meeting was held prior

10   to the 90 day period, how can we be of assistance.

11   So things like that.

12       Q.    Why is registration of importance at

13   the transition meeting?

14       A.    It's something that we could offer if

15   we had the manpower to do so.  It is an option

16   that we can offer the parent.  It isn't required

17   but it is an option that we would like to offer

18   the parent.

19       Q.    My question, though, is why does that

20   matter, in effect?  Why is that useful that you

21   would be able to offer registration at the

22   transition meeting?

1          A.    Because then we would be able to have

2     the parent, we could give the parent then after

3     the registration, after they have proved they are

4     residents of the District of Columbia and provide

5     all of the required documents, the health

6     certificates and all of those things that are

7     required, then we would be able to give them, we

8     need the staff and we need to coordinate it to be

9     able to give them a date to come in for the screen

10    assessment.

11         Q.    Is one of the reasons why that's

12    useful is because then you're not waiting for the

13    parent at some later time to register?

14         A.    With some parents absolutely.  Some

15    parents they're there and then they leave and it's

16    like can we get you to please, please, sign, sign.

17    So for some parents that is useful.  And we want

18    to provide our parents every opportunity to as

19    many ways as we possibly can to make this a easy

20    process for the parents to come in and bring their

21    little ones.  We want to do it.

22         Q.    You normally have somebody at the

1    transition meeting, correct?

2         A.    The person that's at the transition

3    meeting, yes, we do.  We are required by law to

4    have someone at the transition meeting.

5         Q.    So if you've got one there, why would

6    it help if you had a couple of extra people, why

7    does that help at registration?  Why can't the

8    person that's there now handle registration at the

9    meeting?

10        A.    Because the person that's there now,

11   they have, a registration is a process that takes

12   a while to do.  Because we are not only

13   registering, we are getting other information, we

14   are verifying, we may need to -- it's a process

15   that takes time.

16        This individual Ginny is going, and last

17   year we did 188 transition meetings.  She had to

18   go to the meetings, so she may have other meetings

19   scheduled on the same day, two or three, so it is

20   at this point, it is not conducive given that she

21   is primarily the only person that's going to all

22   of these meetings, it's just not enough time in

1    the day in order for her to do it.

2        Q.    Let's see if I can understand this

3    better.  Is the problem that if you're going to

4    register somebody at the meeting, that requires a

5    substantial amount of time after the meeting is

6    over to work with the parent to fill out the

7    various materials and to talk to the parent and

8    etc., and that one person that mostly does this

9    work at the moment doesn't have time to stay after

10   the meeting for a substantial length of time

11   rather than going on to other meetings or other

12   work that she has.  Have I stated that --

13       A.    Yes, sir.  Yes.

14            MS. MILLER:  Is now a good time to take

15   a break?

16            MR. TERRIS:  Sure.

17            (A break was taken at 3:33 p.m.)

18            (Deposition resumed at 3:45 p.m.)

19            BY MR. TERRIS:

20       Q.    You indicated that there were needs in

21   your office and more staff and budget would be

22   helpful for it?

1          A.     Yes.

2          Q.     Are there any other problems in your

3     office at the moment besides the ones that you've

4     described for me?

5          A.     Problems besides staffing and budget,

6     no.

7          Q.     Anything that you could do a better

8     job on if you had more staff or money or a change

9     in policy or whatever?

10         A.     The only other thing is that I can

11    think of is getting rid of the backlog.  Because

12    we have been under staffed, we have a backlog.

13         Q.     Backlog of what?

14         A.     Of assessments.  Evaluations that need

15    to be completed.

16         Q.     Are these children in transition?

17         A.     These children are -- what we would

18    want and for best practice and ideally if a parent

19    calls us and says that they want, they suspect

20    their child of having a disability, we will want

21    to be able to provide them with a day to come in

22    for screening within two weeks.  At this point

1    because of our backlog, we cannot do that for 60

2    days approximately at this point.

3         Q.    Am I right these are children that are

4    not in transition but they are children in the,

5    that are three to five years old and therefore the

6    question is whether they should be within Part B?

7         A.    These are children who are suspected

8    of having a disability, that the parents believe

9    that their child may have a disability.

10        Q.    So the issue is whether they should be

11   covered by Part B; isn't that correct?

12        A.    If they meet the criteria for

13   eligibility under Part B.  Yes, that's correct,

14   sir.

15        Q.    Then we're talking about three to five

16   year olds?

17        A.    Three to five, nonattending.  Children

18   who are not in a DCPS school or charter school.

19        Q.    If they were in a public or a charter

20   school, couldn't they also be in the same category

21   if they were not receiving special services,

22   special education services?

1   A. Not necessarily.  If their teams

2 are -- and the school system isn't -- if that

3 school doesn't have a backlog, then they could

4 start the process sooner.

5   Q. Does that mean they don't have to

6 come -- let's say they're in a public school.  The

7 parent thinks that their child needs special

8 education services, does that mean they don't have

9 to come through your office in order to be

10 evaluated?

11   A. That's correct.

12   Q. The school will do the evaluation

13 itself; is that right?

14   A. That is correct.

15   Q. Is it optional which of those two

16 methods or is that the method for somebody in the

17 public school?

18   A. That is the method.  We only do

19 nonattending schools.  We'd really be understaffed

20 trying to go 100 elementary schools.  That is the

21 method.

22   Q. If they come through that public

1    school process, I'm using that for not coming to

2    your office, does the public school normally have

3    the kind of expertise that your office does?

4         A.    If they do not, they have been

5    instructed through the coordinators to contact our

6    office and we will send someone out to assist them

7    from our office.

8         Q.    So if that occurs, do you go through

9    something of the same process that I would do if

10   somebody who was not attending public school and

11   came to your office would go through?

12        A.    No, sir.  The tech, the person that we

13   would send from our office would help assist the

14   team, you know, through the process.  They would

15   not conduct the evaluation but they would assist

16   the team in regards to what's the most appropriate

17   assessments to use and things like that.

18        Q.    When you say the team, is there a

19   separate team for each public school that does

20   this?

21        A.    Yes.  Each public school has their own

22   MDT and SST schools.

1       Q.    Do they use the same criteria for

2  determining whether special services should be

3  provided as your office would?

4       A.    Sure do.  Yes, sir.

5       Q.    The same statutory and regulatory

6  authority applies, just done by a different group

7  of people; is that right?

8       A.    Yes, sir.

9       Q.    What is the situation in terms of

10  whether you're going to get the three additional

11  people you were talking about?

12       A.    That is out of my hand, sir.  That is

13  for the higher ups.

14       Q.    I understand that but I'm what I'm

15  trying to find out, I assume you know where in the

16  process this stands, not since you have the power,

17  but I mean, let's start at the beginning.  Has

18  your office made such a request to somebody?

19       A.    Yes.

20       Q.    Who have you made a request to?

21       A.    We have made it to Dr. Oaks.

22       Q.    Dr. Oaks when she was in her old

1     position or new position?

2          A.     Old position.

3          Q.     When did you make that request?

4          A.     We made the request I think about a

5     year ago.

6          Q.     And what happened to the request?

7          A.     It's my understanding budgetary

8     constraints will not allow for it.

9          Q.     So as far as you know, it has not been

10    approved; is that fair to say?

11         A.     Yes, sir.

12         Q.     When you made the request, was that

13    for the fiscal year, I always get confused.  Is

14    this 2007 or 2008 that we're in now?

15         A.     This is 2007-2008 school years.

16         Q.     But it's got one of those two numbers,

17    not both?

18         A.     We call this, it all depends.  For

19    financial purposes it's 8.

20         Q.     We'll use your method, 2007-2008.

21    When you made the request, it was to be included

22    in that budget, I take it, right?

1        A.     No.  We wanted it immediately.

2        Q.     You wanted it in the 2006-2007 budget;

3   is that right?

4        A.     Yes, sir.

5        Q.     But it wasn't put in that budget and

6   it isn't in the 2007-2008 budget, correct?

7        A.     I don't know because we have -- I

8   don't know.  There's been a freeze for hiring

9   districtwide, so I don't know.  It may have been

10  but Chancellor Reed (phonetic) has a freeze on all

11  hiring.

12       Q.     Let me start with this:  You have not

13  been informed by anyone that your budget request

14  for either 2006 to 2007 nor 2007 to 2008 has been

15  approved and that there was money available,

16  correct?

17       A.     Correct.

18       Q.     Now, was part of your budget request

19  also to get three additional positions, the three

20  that you've described?

21       A.     Yes, it was.

22       Q.     And I take it that that was not

1    approved, to the best of your knowledge, either;

2    is that right?

3         A.    Yes.

4         Q.    So even if there was not a freeze at

5    the moment, to the best of your knowledge, you

6    couldn't fill those three positions, right?

7         A.    If it wasn't a freeze, I can't say

8    that we couldn't.

9         Q.    Have the positions been approved?

10        A.    It has been not articulated to me that

11   the position has been approved.  It could have

12   been verbally approved but not -- it has not gone

13   through HR, been announced and publicized.

14        Q.    As far as you know?

15        A.    As far as I know, sir.

16        Q.    It hasn't been approved; is that

17   correct?

18        A.    As far as I know.  Now, we did request

19   for two additional -- a full-time speech

20   pathologist which was provided to us because we

21   had in the year, last year, 2005-2006 school

22   year -- no, 2006-2007 school year, we only had two

1    full-time speech pathologists.  So they did

2    provide us, Dr. Oaks' office did provide us with

3    another full-time speech pathologist.

4           Q.    But we're talking about a fourth,

5    right?

6           A.    Right.

7           Q.    And the fourth one, you have not

8    gotten any notice that it has been approved; is

9    that correct?

10           A.    Correct.

11           Q.    Nor the two outreach people that you

12    also talked about, right?

13           A.    Correct.

14           Q.    And so the freeze even if it were

15    lifted, unless you were told by somebody that

16    those three positions had been approved, you still

17    couldn't fill them; isn't that correct?

18           A.    Correct.  I have no power to

19    advertise.

20           Q.    I understand.  Has anybody told you

21    that, given you any indication when they, if ever

22    they would be approved, the three positions?

1          A.    I have been told as soon as possible.

2    As soon as the budget.  They feel now, I have been

3    informed that this is a priority and that they

4    know our needs and they are doing everything

5    within their power to get it done.

6          Q.    Did they say anything about the

7    increase to the budget?

8          A.    Yes.  What increase in the budget?

9          Q.    What did they tell you what the

10   prospects were for an increase in the budget?

11         A.    In our budget?

12         Q.    Your budget.

13         A.    Well, it wouldn't come out of our

14   budget.  We don't have -- we have the 619 budget

15   but our budget is incorporated in the Special Ed

16   budget.

17         Q.    The question, though, I'm asking you

18   is this:  You have asked for an increase in your

19   budget for your office, correct?

20         A.    Yes.  I have asked for those

21   positions.

22         Q.    Well, is the budget increase just for

1    those three positions or have you asked for a

2    budget increase that covers other expenses?

3         A.    No.  I did not request a budget.  I do

4    not have a budget.  So we are not, the supervisors

5    are not given a budget.  There is one budget for

6    special education.  My position is in the same

7    budget as all the other K-12 supervisors and

8    everyone else who works in special education.

9    There is no, how would I say it did we do, this

10   aggregates our budget by early childhood budget,

11   this is Care Center budget.

12        Q.    As I understood you before, maybe I

13   didn't understand correctly, that you felt you

14   needed more money, let's not use the word budget

15   which because you don't have a separate budget but

16   your office needed more money, in other words, to

17   do outreach and maybe other things as well?

18        A.    Yes, sir.

19        Q.    That's correct?

20        A.    Yes.

21        Q.    Has anybody given you any indication

22   that your office would, that there would be

1      approval of your office getting more money?

2          A.    Yes.  There was an indication that as

3      soon as the funds are available, that they will

4      provide us with what we requested.  Yes.

5          Q.    Do you know whether such funds were

6      included in the District's budget that went to

7      congress for the years 2007 to 2008?

8          A.    No, sir.  I wouldn't know.

9          Q.    Nobody told you that they were

10     included; is that correct?

11         A.    No.  I didn't have any discussion on

12     the budget that went up to congress.  No.

13         Q.    Have discussions started -- strike

14     that.  Do you have normally discussions with the

15     people in the District Government who work on

16     budgets --

17         A.    Not the Special Ed budget.

18         Q.    -- as to the budgetary needs of your

19     office during the time the District Government is

20     preparing its budget for the city counsel and for

21     office?

22         A.    No, sir.

1      Q.      Nobody consults you on that subject?

2      A.      No, they do not.

3      Q.      Have you communicated to anybody your

4  needs for a larger amount of money for your

5  office?

6      A.      Yes, I have, sir.

7      Q.      So you did that on your own; is that

8  correct?

9      A.      Yes.  Through the strategic plan.

10      Q.      So it isn't that budgetary people came

11  to you and said we'd like to know your needs, you

12  volunteered that; is that right?

13      A.      I figured that was the only way I was

14  going to get it done.  Yes.  You're correct, sir.

15      Q.      The answer would be the same for your

16  hopeful three new positions?

17      A.      I have made the request to Dr. Oaks

18  Dr. Oaks indicated that she has every intention in

19  the world to fulfill it as soon as when budget

20  will allow.

21      Q.      Why is there only one place for a

22  family to go to to register their child for

1   special education services in the District of

2   Columbia?

3       A.    Because we felt that this location

4   would make it easier for the parents.  It is a

5   centralized location.  As we stated before

6   previously, prior to the Care Center being open in

7   2004, that parents were going to their

8   neighborhood schools and that for various reasons

9   wasn't being effective, so Ray Bryant, our

10  previous, previous, previous director of special

11  education, decided, made the decision to create a

12  centrally-located place and that's what I was told

13  why they made that change.

14      Q.    Wouldn't it be more convenient,

15  though, for parents if there was a place within

16  let's say their ward?

17      A.    Yes.  It could be more convenient.

18  Yes.

19      Q.    Wouldn't that be a good idea?

20      A.    If the budget would allow.  Yes.

21  Because you would have to duplicate the Shanda's

22  and the Ginny's and everybody at each one of those

1    locations, but if the budget would allow it, yes,

2    we would want locations in each quadrant, the four

3    quadrants.  Yes.  Duplicating the staff would be a

4    budgetary concern.

5         Q.    If your request were granted, you

6    would have essentially four teams; isn't that

7    correct?

8         A.    Four assessment teams, not four

9    screening teams, not four teams that conduct

10   interviews with the parents, so it was more than

11   just or four other transition teams.

12        So it wouldn't be just duplicating it, it's

13   not just send one team over here.  Also and in

14   ward you may have a higher need, where in ward 7

15   and 8 is where almost twice the number of children

16   come out of ward 7 and 8 that the rest of the

17   wards.

18        So if you only have one team there, then

19   that team will be behind whereas in ward, say 5

20   where we don't have as many children, they could

21   be sitting around doing nothing.

22        Q.    In the last two or three years, have

1    any people that have been working on the subject

2    of this lawsuit -- let me strike that.  You said

3    you had 20 some people, I've forgotten the exact

4    number, that work for you.  Do they all work on

5    the transition or Child Find or outreach taking,

6    in other words, the subjects of this lawsuit?

7         A.    They work, the majority of my staff is

8    the assessment teams.

9         Q.    So the answer to that is yes?

10        A.    The assessment teams and then, yes,

11   they do the assessment.  That part of Child Find,

12   they conduct the assessment and the screening

13   team, they conduct the screening.  The other

14   members are student-support-related employees that

15   support the programs in the school buildings, the

16   early childhood programs.

17        Q.    So the answer to my question is

18   essentially all the people that work for you are

19   working on exactly what the subject of this

20   lawsuit is, there isn't some extraneous job

21   responsibility that you have and your employees

22   have?

1          A.     If we're including programs in the

2     school-based programs, then yes.

3          Q.     I thought that you said the school

4     based programs essentially are handled by the

5     schools?

6          A.     No.  The Child Find is handled by the

7     school.  We also have several school-based

8     self-contain and inclusion classrooms that we

9     monitor.  So I have staff that is assigned to

10    ensure the monitoring of those programs.

11         Q.     Well, let's take out those kinds of

12    programs that aren't the subject of this lawsuit.

13    So taking your other staff members, in the last

14    three years have there been people that have left

15    your organization?

16         A.     No.

17         Q.     Every single person is the same as

18    they were three years ago?

19         A.     Every -- we added but not lost.  They

20    love us.

21         Q.     I'm not talking about lost a position.

22    There's not even been a change of people; is that

1    correct in the last -- well, I should say not

2    three years, three and a half years since you've

3    been on the job?

4        A.    The person that was on the job when I

5    came is the same persons that are here today.

6    Now, we've added people of course.

7        Q.    I understand?

8        A.    But no one has left us.

9        Q.    Is there a formal procedure for

10   receiving complaints from parents who have some

11   problems with something in the processing?

12       A.    No.  There isn't a formal procedure

13   but believe me, my staff refer it all to me.

14       Q.    Is there a procedure in the sense that

15   there is, let's start with is there a form that

16   somebody fills out?

17       A.    No, sir.

18       Q.    It's done orally normally, is that

19   what happens?

20       A.    Yes.  I call the parent and respond

21   to, you know, I have received either something in

22   writing, ma'am, or it's my understanding that you

1    contact my case manager has informed me or one of

2    my staff has informed me that you're having some

3    problems, how can I be of assistance and we go on

4    from there.

5         Q.    Is a record kept of that?

6         A.    No, I do not keep a record of it.

7         Q.    Do you take notes of it?

8         A.    No, I do not.

9         Q.    So if somebody says to you in the last

10   three and a half years that you've held this job

11   I'd like to see what the complaints are that have

12   been made by parents, there's essentially no way

13   to do it; is that correct?

14        A.    That is correct.

15        Q.    Other than by asking you a question

16   that says what complaints have been made?

17        A.    Correct.  The majority or I would say

18   at least 80 percent, well, the majority of cases

19   in where I have complaints are where attorneys are

20   involved and the parent, it seems as if they've

21   been encouraged to write the letters.

22        Q.    So some of these complaints are made

1    in writing, is what you're saying.  They are in

2    the form of letters, right?

3         A.    Yes, they were.  I would say.  Yes.

4    Yes.  There were some that were in the form of

5    letters.  Yes.  The majority of them were from

6    attorney Marty Koontz' clients.

7         Q.    Regardless of who they are, there are

8    some letters that were written; is that correct?

9         A.    Yes.

10        Q.    Are those complaints or letters,

11   however you want to describe them, are they kept?

12        A.    No, I didn't keep them.

13        Q.    So they're discarded; is that right?

14        A.    Yes, I have.

15        Q.    Do any of these complaints involve the

16   transition process?

17        A.    Over the last three and a half years

18   there may have been a couple that related to the

19   transition process and I can understand the

20   parents considering we were so short staffed.  We

21   tried everything we could within our powers to

22   ameliorate the problem.

180

1       Q.    And were any of these letters in the

2    last since this lawsuit was brought?

3       A.    We did receive letters from attorney

4    Koontz clients since the lawsuit has been filed,

5    if memory serves me correctly.  We also received a

6    couple that were in related to the parent, not

7    related to transition, they didn't like the

8    placement that we offered, they wanted to

9    unilaterally place their child and wanted us to

10    pay for it, things like that.  So in those forms

11    is what we've had.

12       Q.    I think you said that there have been

13    such letters since this case has been filed, cases

14    that have involved transition or the Child Find

15    process for children coming into Part C, coming

16    into Part B with who hadn't been in Part C?

17       A.    Who have or have not been in Part C.

18       Q.    Both categories.  People that

19    transitioning and those who were coming in fresh

20    into Part B?

21       A.    We have had a few complaints, yes, sir

22    and few meaning less than three.  About three.

1          Q.     Were they supplied to counsel so that

2     you could provide them to us?

3          A.     No.

4          Q.     One of our requests it's in Exhibit

5     54, is all letters of complaints that have been

6     received about the Care Center received by

7     defendants.  Can you tell me why those weren't

8     given to us?

9          A.     The ones that we had were the ones

10    that I reference is that they did like the club,

11    didn't want the placement and that they wanted us

12    to, they wanted to unilaterally place their child,

13    it had nothing to do with transition.  They were

14    fine with the transition, they were fine with the

15    Child Find aspect, they wanted us to give them

16    another placement.  The recent ones that we

17    received.

18         Q.     Regardless of what they were, why were

19    these complaint letters as they would seem to come

20    rather clearly in this request not provided to us?

21         A.     They were -- let's see.  When is the

22    last one I received.  It was in the early part of

1    2007 around I think it was around January that I

2    received it, and it was not related to Child Find

3    or transition or the relevance of this case, it

4    was they wanted to unilaterally place the child in

5    another program that they were fine, we

6    transitioned the child, we found the child in the

7    appropriate time frame, the transition, we

8    developed the IEP in accordance to the time frame,

9    everything was fine.  They just wanted their child

10    to, the District of Columbia to pay for their

11    child to go to a private school.

12        Q.    Regardless of whether their complaint

13    was bona fide or let's assume totally without

14    foundation, why wasn't there a letter of

15    compliance that has been received about The Care

16    Center by defendants?

17        A.    Excuse me.  Since then that one

18    document because I thought it was not, it did not

19    relate to the Child Find.  That it was only -- it

20    was related to them wanting to unilaterally place

21    their child.

22        Q.    Are you saying in responding to our

1     request for documents that you didn't attempt to

2     follow the exact wording of the request but that

3     you decided whether a particular document was

4     relevant to the case?

5          A.     And that it was responsive.  Yes, sir.

6     I agree with you when you said that.

7          Q.     So if a document was covered by a

8     request but you didn't think that it was relevant

9     to the case, you didn't provide it; isn't that

10    right?

11         A.     That's correct, sir.

12              MR. TERRIS:  That's I think enough for

13    today.

14         (Deposition suspended at 4:15 p.m.)

15

16    _____

17    SIGNATURE OF WITNESS

18    SUBSCRIBED AND SWORN TO before me this _____ of

19    _____, 2007.

20

21    _____ _____

22    NOTARY PUBLIC

23    My Commission Expires:

24

1                    REPORTER'S CERTIFICATE

2          I, OKEEMAH S. HENDERSON, certify; that the

3     foregoing proceedings were taken before me at the

4     time and place therein set forth, at which time

5     the witness was put under oath by me;

6          That the testimony of the witness, the

7     questions propounded, and all objections and

8     statements made at the time of the examination

9     were recorded stenographically by me and were

10    thereafter transcribed; that the foregoing is a

11    true and correct transcript of my shorthand notes

12    so taken.

13         I further certify that I am not a relative

14    or employee of any attorney of the parties, nor

15    financially interested in the action.

16         I declare under penalty of perjury under the

17    laws of District of Columbia that the foregoing is

18    true and correct.

19

20         _____ _____

21         Okeemah S. Henderson

22         Notary Public in and for the

23         District of Columbia

24         My Commission Expires:

25         February 28, 2010