Case 1:05-cv-01437-RCL   Document 91-19   Filed 02/04/2008   Page 1 of 12

DL, et al. v. D.C., et al.   December 17, 2007   JOAN CHRISTOPHER

Page 1

```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
```

DL, et al., on behalf of themselves  x
and others similarly situated,       :
                                     :
                Plaintiffs,           :
    vs.                              : Civil Action
                                     : No. 05-1437
THE DISTRICT OF COLUMBIA, et al.,    :
                                     :
                Defendants.          x

Washington, D.C.

Monday, December 17, 2007

DEPOSITION OF:

JOAN CHRISTOPHER,

a witness, was called for examination by counsel for the plaintiffs in the above-entitled matter, pursuant to Notice and agreement of the parties as to time and date, taken at the law offices of Terris, Pravlik & Millian, Esquires, 1121 12th Street, Northwest, Washington, D.C. 20005, convened at approximately 9:18 o'clock, a.m., before Catherine B. Crump, a court reporter and Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

Plaintiffs' Exhibit Q

Case 1:05-cv-01437-RCL   Document 91-19   Filed 02/04/2008   Page 2 of 12

DL, et al.  v. D.C., et al.   December 17, 2007        JOAN CHRISTOPHER

Page 66

1   joint panels and community members review how we
2   were doing and they had performance measures to look
3   at and they were also charged with giving us some
4   ideas about how we could do it better.  I imagine
5   you've probably seen all of those kind of reports.
6        Q.   You said that there were people working
7   with you.  Who was working with you besides OSEP?
8        A.   I mean, the contractors that we had.  We
9   had the Georgetown Child Development Center.  We had
10  zero to three.  Who else?  Many of the providers
11  around town.  We had a grant with Children's
12  Hospital, but that was actually performing
13  evaluations and those kind of services, but in terms
14  of like research and trying to help us figure out
15  how to do better practices, we had primarily
16  Georgetown and Zero to Three.
17       Q.   Who at Georgetown was doing this kind of
18  consulting for you?  I'm not talking about people
19  necessarily.  Georgetown's a big place.
20       A.   They have an actual, under the
21  Department of Pediatrics -- at least there used to
22  be.  I guess there still is -- the Georgetown

Case 1:05-cv-01437-RCL   Document 91-19   Filed 02/04/2008   Page 3 of 12

DL, et al. v. D.C., et al.   December 17, 2007   JOAN CHRISTOPHER

Page 67

1    University Child Development Center, and they now

2    have a new name, the Georgetown University Center

3    for Child and Human Development.  So they had a

4    contract with us to provide training and we had

5    conferences every year and they would do a lot of

6    the brain work and help us figure out best

7    practices, and then in the later years, Zero to

8    Three took over that function, but Georgetown was

9    still helping us with that.

10        Q.   So you're saying that the Georgetown

11   people were actually making recommendations for best

12   practices for Part C; is that correct?

13        A.   Yeah.  I don't know how formal they

14   were, but they would -- yeah.  They would tell us

15   this is not the way to do it, do it this way.  So

16   they were more practical.

17        Q.   Were they doing that for Part B too?

18        A.   I don't know.

19        Q.   Were they doing it on the issue of child

20   find?

21        A.   With us, were they doing it, you're

22   saying?

Case 1:05-cv-01437-RCL    Document 91-19    Filed 02/04/2008    Page 4 of 12
DL, et al.  v. D.C., et al.    December 17, 2007        JOAN CHRISTOPHER

Page 68

1       Q.   Yes.  Were they consulting with you on
2   issues of child find?
3       A.   I think it would be fair to say yes,
4   loosely speaking, because they were working with us
5   on improving the whole system.
6       Q.   So I take it that would also include the
7   transition process to Part B; is that correct?
8       A.   Um-hum.  I think so.
9            MR. TERRIS:  I don't think we've got any
10  materials, any documentation that came out of that,
11  and we'd like to request it.
12           MS. MILLER:  What was that document?
13  Can you clarify that?
14           THE WITNESS:  Well, the documentation,
15  whatever documentation -- the only documentation I
16  think that there would have been would have been
17  reports that they submitted.  We required vendors to
18  submit either monthly or quarterly reports about
19  what they've been doing and what their progress is.
20  I don't know that any recommendations would have
21  been contained in that, but they met with us on a
22  frequent basis.  Not frequently, but they met with

Case 1:05-cv-01437-RCL    Document 91-19    Filed 02/04/2008    Page 5 of 12

DL, et al.  v. D.C., et al.   December 17, 2007         JOAN CHRISTOPHER

Page 213

1   mentioned in the proposed agreement was a new

2   addition.

3        Q.   Now, was the system besides being able

4   to allow you to query for Mary Smith, where she was

5   in the process, would it also provide you -- would

6   you be able to look in one place and find out, for

7   example, how many children their third birthday is

8   going to come up in the next, let's say, six months?

9        A.   Sure.  It was supposed to.  We should

10  have been able to put -- yeah.  Yeah.  That was one

11  of the things I wanted to put in, dates and to say

12  so every child born between November 1st and

13  December 1st of 2004, I want you to give me a

14  listing with their birth dates, and so it should

15  have been able to give us that report.

16       Q.   Presumably, then would it also have done

17  something like say that I want a list of every child

18  that's within two months of their third birthday who

19  hasn't yet had a transition meeting?

20       A.   Yeah.  I don't remember whether it was

21  that precise, but in all fairness to the systems

22  analyst, that was part of the problem, because as we

Case 1:05-cv-01437-RCL   Document 91-19   Filed 02/04/2008   Page 6 of 12

DL, et al. v. D.C., et al.   December 17, 2007   JOAN CHRISTOPHER

Page 214

1  would go along, we would say we have to know about
2  everyone who has had this meeting, and if he hadn't
3  originally been told that, then that would make
4  everything all aflutter, because then he would have
5  to revisit the configuration of the system.
6           Now, a lot of times, we would come back
7  after we had a letter from OSEP or a conversation
8  and say, Oh, no, this is not going to drill down
9  deep enough; we have to know when the transition
10 meeting was held.  And we weren't collecting that.
11 We had that data in the child's file, but we might
12 not have it in the system.  So yeah.
13     Q.   Were there documents prepared that were
14 given to the people working on the data system as to
15 what it is you wanted, you meaning the Part C
16 administrators?
17     A.   Sure.  Initially, they were given all of
18 the documents that we used to collect the data and
19 told that we wanted -- we want this and we need to
20 be able to have a pretty flexible search capability
21 so we can figure out who is doing or getting what,
22 but somehow it didn't always translate as, Oh, you

Case 1:05-cv-01437-RCL   Document 91-19   Filed 02/04/2008   Page 7 of 12

DL, et al. v. D.C., et al.   December 17, 2007          JOAN CHRISTOPHER

Page 215

1   wanted that.

2           MR. TERRIS:  I think we'd like to get

3   the documents that have gone into this system as to

4   what people were asking the system to do for them,

5   because I think, as Ms. Christopher says --

6           MS. MILLER:  Was that in writing?

7   Because I know we produced what we had from the data

8   base system.

9           MR. TERRIS:  Well, if you've given us

10  what I just said, then obviously you've given it to

11  us.

12          MS. MILLER:  There's not anything like

13  that though.  That's why I'm asking you to clarify

14  that.

15          THE WITNESS:  When I was there, I had

16  started putting things in writing because I found

17  that we would have conversations and I would think

18  one thing was said and then somebody else would say

19  something else was said, and when I left, I kind of

20  had a file and said here, but I don't know what came

21  of it.

22          BY MR. TERRIS:

Case 1:05-cv-01437-RCL   Document 91-19   Filed 02/04/2008   Page 8 of 12

DL, et al. v. D.C., et al.    December 17, 2007           JOAN CHRISTOPHER

Page 216

```
 1      Q.   So let me see if I understand you.  You
 2   had a file when you left of the requests that you
 3   had made?
 4      A.   Just E-mails back and forth and
 5   clarification.
 6      Q.   But they related to what your needs were
 7   in the data system; is that correct?
 8      A.   Yeah.
 9      Q.   Okay.  And you gave that to somebody
10   inside; you didn't take it with you; is that right?
11      A.   Right.  I didn't want it.
12      Q.   So you gave it to somebody inside the
13   agency?
14      A.   Yeah.
15      Q.   If it could be found, I would like to
16   have it because I think it should identify better
17   that anybody's recollection can what was being asked
18   for.
19      A.   Let me clarify something.  I don't even
20   know -- I might have misstated.  I don't know that I
21   actually put it in somebody's hand and said here is
22   the file.
```

Case 1:05-cv-01437-RCL   Document 91-19   Filed 02/04/2008   Page 9 of 12

DL, et al. v. D.C., et al.   December 17, 2007   JOAN CHRISTOPHER

Page 217

1        Q.   I understand.  I understand.

2        A.   But I left files.

3        Q.   You left lots of materials that you

4   didn't hand to somebody.  I understand that.

5        A.   Okay.

6        Q.   Would you look further down in the same

7   document?  I think it's up on the top of page 6482,

8   I think the next page, and the second sentence at

9   the top of the page said she, meaning Ann Gaye:

10  "Stated there is a big focus around the

11  implementation plan which has started in conjunction

12  with Part C for overlapping issues."  What does that

13  mean?

14       A.   I think the implementation plan was a

15  plan that I believe Part B had to make to OSEP based

16  on the deficiencies that they found from their

17  monitoring of Part B, but it says which was started

18  in conjunction with Part C for overlapping issues.

19       Q.   Does that mean the implementation plan

20  dealt, among other things, with transition?

21       A.   Yes.  It sounds like it to me, yeah.  I

22  know there were certainly overlapping issues that

Case 1:05-cv-01437-RCL   Document 91-19   Filed 02/04/2008   Page 10 of 12

DL, et al. v. D.C., et al.   December 17, 2007   JOAN CHRISTOPHER

Page 246

1   and that the problems that were still outstanding
2   when you left were new problems?
3        A.   Probably to some degree.  Let's put it
4   like this:  All the problems they identified in the
5   early years had been addressed in an attempt to
6   remedy.  None of them were ignored, and as to
7   whether or not they were remedied to OSEP's
8   satisfaction, maybe not, but some were.
9        Q.   And to some degree, I'm addressing this
10  to continuing OSEP reports after your left.  I know
11  you don't know about those, but why is it that over
12  an extended period of time -- let's make an
13  assumption for a moment which I think is an accurate
14  one.  At least some of these problems that have
15  lasted for years were identified early in the
16  process.  What was the difficulty of the District
17  being able to fully remedy the problems within a few
18  years?
19       A.   I couldn't answer unless you can give me
20  an example of what problems you mean.
21       Q.   Okay.  Did you write any kind of
22  memorandum or closing report about the situation in

Case 1:05-cv-01437-RCL   Document 91-19   Filed 02/04/2008   Page 11 of 12

DL, et al.  v. D.C., et al.   December 17, 2007        JOAN CHRISTOPHER

Page 247

```
 1   Part C when you left?
 2       A.   Yes.
 3            MR. TERRIS:  We would like that.
 4            MS. MILLER:  Who was that addressed to?
 5            THE WITNESS:  I did a notebook for
 6   Kumara to close out, to give her the status on
 7   different things all the way from contracting to
 8   child find to OSEP status.
 9            BY MR. TERRIS:
10       Q.   Did it include a discussion of the
11   problems that existed?
12       A.   It was -- probably, yeah.  I mean,
13   right, because anything that was smooth, I just
14   said, you know -- because I didn't get to do it
15   until the last minute.
16       Q.   Does it also include suggestions as to
17   how some of these problems might be able to be
18   addressed?
19       A.   Probably, yeah.  I don't remember the
20   exact.
21       Q.   Was a closing report like that required
22   of exiting employees?
```

Case 1:05-cv-01437-RCL   Document 91-19   Filed 02/04/2008   Page 12 of 12

DL, et al.   v. D.C., et al.   December 17, 2007                    JOAN CHRISTOPHER

Page 248

1        A.   I don't know.  I don't know.  I did it.
2   She asked me to do it and I wanted to, you know,
3   make sure that the program didn't suffer.  So I did
4   it.
5             MR. TERRIS:  We're finished.
6             (Whereupon, at approximately 5:32 o'clock,
7             p.m., the above deposition was
8             concluded and signature was Not waived.)
9        *         *         *         *         *