**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ) | |
| DL, *et al*., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 05-1437 (RCL) |
| ) | |
| DISTRICT OF COLUMBIA, *et al*., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

### INTRODUCTION

The Court would never know from plaintiffs' prolix and over-reaching motion to compel that defendants have already produced in excess of 13,780 pages of documents in response to plaintiffs' discovery demands.

This production has enabled plaintiffs to explore every facet of Child Find, early childhood intervention and provision of special education services to preschoolers in the District of Columbia. Defendants have voluntarily produced many documents, even of the most dubious relevancy, in an effort to satisfy plaintiffs' demands and to move this litigation to resolution, preferably by settlement but by trial, if necessary.

Defendants have made 12 separate productions of documents. See Exhibit A, Defendants' Twelve Indices, attached hereto.[1] While plaintiffs have objected to producing documents created after their suit was filed in July of 2005 (see their General Objection 4 in their Responses to Defendants' First Request for Production of Documents

---

[1] Throughout this pleading, defendants may refer to produced documents by citing to Exhibit A and the corresponding Bates Stamp number. Should the Court want to inspect any of the referenced documents, defendants will produce them to the Court.

and Things to Plaintiffs, Exhibit B to defendants' pending Motion to Compel, filed

February 25, 2008), defendants have not done so.  Defendants' production covers more

than five years, from the present back to January 1, 2003.  It encompasses newly-created

documents through the present day, along with after-discovered documents produced

pursuant to the provision of the Federal Rules for supplementing and updating earlier

productions.  It also takes account of documents generated by a new District agency, the

Office of the State Superintendent of Education ("OSSE"), created under last year's

District legislation reforming the educational system.

It is rather odd of plaintiffs to complain about defendants' continuing production

of documents.  Plaintiffs' Memorandum ("Pl. Memo.") at 5-6.  They have continued to

serve documentary requests during and after each deposition, as well as sending a host of

letters requesting additional discovery, which in some instances demand an extremely

free-form reading of their formal requests, necessitating additional periodic production.

Moreover, as indicated, defendants have not drawn a line for production at the time of the

filing of the complaint, but have continued to produce documents created up to the

present time and to supplement earlier productions as after-acquired documents became

available.  Some documents may have been missed in the original searches by the client

agencies of defendants and would have been turned over earlier had they been found at

that time.  They are being turned over now whenever found.  Defendants assume that

plaintiffs want defendants to continue to do so, rather than halting production altogether

in order to respond to their motion to compel.  Indeed, we ask: what is the point of such

complaints, especially in view of the many thousands of pages of documents that

defendants have already produced?   Scoring rhetorical points will not advance the progress of the litigation.

This argument of plaintiffs reaches its most extravagant level when they complain that they had to revisit and reduce the scope of their Motion to Compel because they received additional documents shortly before filing their Motion.  See Pl. Memo. at 5-6. We are unable to fathom how receipt of documents arguably within the scope of their Motion to Compel gives rise to a grievance cognizable by this Court.  Once again we ask: would plaintiffs have preferred that we withhold such documents so that they could file an even longer Motion to Compel?   So much for plaintiffs' assertion that defendants have "seriously hindered" their attempts to complete discovery.  See Pl. Memo. at 5.   If anything has hindered these attempts, it is plaintiffs' seemingly insatiable appetite for more and more discovery, however remote from the issues to be tried in this case.  This is becoming a textbook example of out-of-control discovery, which commentators have frequently remarked on as a flaw in the Federal Rules of Civil Procedure.

As defendants have had previous occasion to observe, if plaintiffs cannot make out their case on the voluminous production they have already received, which followed approximately two years of preparation to sue, the validity of their charges is much in doubt.  With all due respect, this is not a complex antitrust or securities case in which the parties seek hundreds of thousands of documents so as to leave no stone unturned in the eyes of their clients.  Although the present litigation is not a simple case, it lacks the characteristics of "big case" litigation requiring massive discovery, which has so burdened the courts in recent years.

Underlying the large volume of discovery production in this case by defendants are the prodigious efforts of defendants' counsel to secure responses to even the most far-fetched of plaintiffs' demands.  These efforts have not been limited to furnishing copies of plaintiffs' formal discovery demands to the client agencies and asking them to search and comply, which we have done immediately on receipt.  In addition, the undersigned counsel have identified in excess of 100 specific requests we have made to various client agencies in an effort to satisfy plaintiffs' demands, many of which were communicated in letters from plaintiffs and at depositions.

These requests have been targeted to particular discovery demands.  They have required personnel of the client agencies to spend large amounts of time away from their regular duties of helping children to finding possibly responsive documents so that undersigned counsel may produce them to plaintiffs.  Plaintiffs' letters to us (referred to in Pl. Memo. at 7), have engendered a search for and production of many new documents by defendants.  We found that to be a more productive approach than engaging in a letter-writing campaign in response to plaintiffs.   Such a competition may lead to increased attorney's fees applications, but it scarcely advances the litigation.

Since these requests to the client agencies constitute attorney-client communications and work product of attorneys, the undersigned counsel have not put them into an exhibit to this Memorandum.  But we have collected them, and they are available for in camera inspection by the Court, or by a U.S. Magistrate Judge if the Court prefers, to confirm the intensity and thoroughness of the searches conducted to comply with plaintiffs' demands.

Plaintiffs devote a substantial portion of their supporting Memorandum to an assault on the general objections we have made to their discovery demands. Pl. Memo. at 7-9. This assault is misplaced and misguided, as well as a distraction from the remaining discovery issues in this case, for a number of reasons.

First, it is standard practice for lawyers confronted with discovery demands to make general as well as specific objections, so as to avoid the possibility of claims of waiver asserted against them and their clients.

Second, it is noteworthy that plaintiffs have done exactly the same thing they assail defendants for doing—making "boilerplate general objections." Pl. Memo. at 7. If the Court will examine Exhibit B, attached hereto, which is the first three pages of Plaintiffs' responses to our Rule 34 Request, it will find 10 general objections asserted by plaintiffs. Id. at 1-3.[2] Most are virtually identical to defendants' general objections. Compare plaintiffs' General Objections 1, 2, 3, 4, 5, 6, 7, and 10 set forth in Exhibit B with defendants' General Objections 1, 4, 5, 6, 8, 9, 10, and 11, set forth in Plaintiffs' Exhibit D to their present Motion to Compel, at pages 1-3. We cannot avoid citing the old maxim: what is sauce for the goose is sauce for the gander. If plaintiffs seriously contend that our general objections should be summarily overruled, their general objections should meet the same fate.

Third, we made it clear, either in our general objections or in response to specific requests, those few instances in which we were objecting and withholding documents. For example, our General Objection 1 made clear that we were objecting to and not producing documents prior to January 1, 2003. Plaintiffs cannot claim that they were left

---

[2] Defendants attached the complete version of Plaintiffs' Responses to Defendants' Rule 34 Request to defendants' pending Renewed Motion to Compel, referenced above, at Exhibit B of the Motion.

in any doubt about that.  Likewise, when they demanded pre-decisional back-up documents constituting the deliberative processes of District of Columbia Public Schools ("DCPS") and other District agencies, we made it clear that we were objecting to and not producing such documents.  See, e.g., Pl. Memo., Exhibit K, at 39.  Plaintiffs also include in their complaints our original objection to production of documents relating to unnamed class members.  Pl. Memo. at 2.  This objection was made prior to the Court's grant of the motion for class certification, we made it explicit that we would re-evaluate our objection in the event of class certification, and we have done so, voluntarily making large quantities of such documents available to plaintiffs.  Exhibit A, Bates Stamp 7368-7409, 7410-7444, 7445-7457, 7458-7609, 7785-9050, 9615- 12255.

Rather than engaging in generalities and abstract propositions of law to refute these arguments by plaintiffs, defendants will now turn to specific demands by plaintiffs and specific objections we have made and maintain.  We will demonstrate that the objections are well-founded.  Where necessary, our arguments are supported by declarations of DCPS personnel and other District employees.  They are also supported by the applicable law in this jurisdiction.

Again, because of the voluminous nature of plaintiffs' submission—amounting to 432 pages, including exhibits—if the Court would prefer to refer these discovery disputes to a U.S. Magistrate Judge, defendants are content to make our case there in the first instance, subject to ultimate review by this Court. We respectfully suggest that such a course may not only save this Court's time, but may also cause plaintiffs to reevaluate their demands at the prospect of some good old-fashioned head-knocking by a U.S.

Magistrate Judge: "What do you need this for?" is a good antidote to such adventurous discovery demands.

## ARGUMENT

### I.    The Court should not compel discovery prior to January 1, 2003.

Defendants object to production of materials created prior to January 1, 2003. That is more than 2 ½ years before the Complaint was filed and more than 5 years from the present date. As indicated, defendants have not cut off their production of documents as of the date of the filing of the Complaint, but have continued to produce documents created since that time.[3]

We are aware that there are cases from all over the country imposing different temporal limits depending on the facts of individual cases. We prefer the law as it has evolved in the District of Columbia, in particular U.S. Magistrate Judge Facciola's approach in Glenn v. Williams, 209 F.R.D. 279 (D.D.C. 2002). This was a "pattern and practice" case, as plaintiffs here assert the present case is.

There, the plaintiffs sought discovery for a 10-year period, which Judge Facciola concluded was "an inordinate length of time to support plaintiffs' pattern of discrimination theory." 209 F.R.D. at 282. He held: "in order to establish a pattern of discrimination, three years is a reasonable time in which to allow discovery." Id.; see also Obiajulu v. City of Rochester, Dep't of Law, 166 F.R.D. 293, 296 (W.D.N.Y. 1996) (three year period prior to suit held reasonable in "pattern and practice" case); Finch v.

---

[3] It bears mentioning that defendants have given pre-2003 information where the documents reflect policies still in effect in 2003 and later. See, e.g., Exhibit A, Bates Stamp 6754-6757, Memorandum of Agreement, dated August 4, 1998. Further, despite plaintiffs' suggestion to the contrary (Pl. Memo. at 16), defendants have produced all documents in their files relating to the named plaintiffs and the listed students in plaintiffs' second document request, regardless of the time period. It should also be noted that, in their Motion, plaintiffs concede that defendants have produced documents that pre-date 2003 when it was not burdensome to do so. Pl. Memo. at 18, n. 6.

Hercules, Inc., 149 F.R.D. 60, 65 (D. Del. 1993) (two year period prior to claim arising

held reasonable in "pattern and practice" case); Hardrick v. Legal Services Corp., 96

F.R.D. 617 (D.D.C. 1983) (discovery for two years prior to complaint allowed in Title

VII case).

 As stated in a leading treatise on civil procedure:

> the courts will not be reluctant, under the 2000 amendments
> to Rule 26(b)(1), to place limits on the time period
> preceding the alleged injury for which they will allow
> discovery, if the burden of complying with the discovery
> request is too onerous.

Moore, Federal Practice (3rd edit.), ¶ 26.41[12] at 26-146.6 to 26-146.7.  We discuss in

detail the burdensomeness of plaintiffs' discovery requests to which we object in Section

V of this Memorandum below.

 In support of a longer period, plaintiffs urge that "[s]everal of the named plaintiffs

were disabled well before 2003", and "Consequently defendants' obligation to comply

with the Child Find requirements under the [Individuals with Disabilities Education Act

("IDEA")] and Section 504 of the Rehabilitation Act with respect to these children pre-

dates 2003."  Pl. Memo. at 24.  But we have produced to plaintiffs all the documents

relating to the six named plaintiffs, whenever created; this was a manageable task.  It is

hardly an argument for going back before January 1, 2003, for the records of hundreds of

other children or for documents relating to the conduct and administration of an evolving

program such as Child Find.  Prior to the creation of the DCPS Centralized, Assessment,

Referral and Evaluation ("CARE") Center at the end of 2004 (which centralized the

administration of Child Find for preschoolers), DCPS conducted and administered Child

Find for preschoolers separately at each of the many of individual schools comprising the

DCPS system.  Pl. Memo., Exhibit K, Zondra Johnson Deposition, at 173.  A search at each school for pre-2003 documents could be practically endless.

Moreover, an additional persuasive reason for the temporal limit we seek is that plaintiffs have expressly disclaimed seeking damages for the alleged violations on which they rely.  See Plaintiffs' Reply Memorandum in support of their Motion for Class Certification, at 19.  The whole thrust of their Complaint is to seek declaratory and prospective injunctive relief.  They say: "[t]he heart of this case is injunctive and declaratory relief." Id. at 20.  Because they have chosen to focus their case and their claims for relief on the present and the future, their argument for going back as far as 5 ½ years before they filed their Complaint (and over 8 years from the present date) is accordingly diminished.  Since they say they do not seek monetary damages, their argument even for going back to the beginning of the applicable statute of limitations— which may be deemed to be three years, see 12 D.C. Code § 301—disappears.

The period we have selected is a reasonable balance between past, present, and future.  If plaintiffs cannot prove their case on the voluminous evidence going back to January 1, 2003, which we have provided to them, we submit that their case is extremely weak.  When the burdensomeness of going back to an earlier time, as to which records and documents are scattered and not easy to come by, is factored in, the reasonableness of our General Objection 1 is manifest, and it should be upheld.

## II.    Defendants' deliberative process privilege should be upheld.

The drafts and related deliberative documents, containing advice, opinions, recommendations, evaluations and the like, are classic materials covered by the deliberative process privilege of governmental bodies.  Defendants' claim of deliberative

process privilege should be sustained and plaintiffs' effort to obtain such materials should be rebuffed.

Defendants have produced to plaintiffs the final current versions of three documents: (1) the Comprehensive Child Find Guide—Policy and Procedures ("Manual"); (2) the Memorandum of Agreement between the DCPS and other District government departments and agencies regarding Child Find ("DCPS MOA"); and (3) the Interagency Collaboration and Services Integration Commission Memorandum of Agreement Regarding Provision of Information ("ICSIC MOA").  Exhibit A, Bates Stamp 5743-5778, 5779-5796, and 7672-7713.

Defendants have objected, under the deliberative process privilege, to production of the earlier, predecisional drafts of these documents and of documents relating to their formulation which contain advice, opinions, recommendations, evaluations and the like from government agents and employees to those formulating the documents and to and from the decision-makers themselves.  See, e.g., Pl. Memo., Exhibit K at 39.

Defendants have presented detailed declarations by Dr. Phyllis B. Harris, the Deputy Chancellor for Special Education of DCPS, and Laura Kiesler, the Coordinator of ICSIC, demonstrating the applicability of the privilege to these documents (copies of the document listed above are exhibits to these declarations), attached here as Exhibit C, Declaration of Dr. Harris; Exhibit D, Declaration of Ms. Kiesler.  The withheld documents are, of course, available for in camera inspection by the Court, or, if it prefers, by a U.S. Magistrate Judge, to confirm the validity of the assertion of the privilege.

The contours and criteria of the deliberative process privilege are by now well established. As the U.S. Court of Appeals for the D.C. Circuit wrote in In re Sealed Case, 121 F.3rd 729, 737 (D.C. Cir. 1997):

> The most frequent form of executive privilege raised in the judicial arena is the deliberative process privilege; it allows the government to withhold documents and other materials that would "reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." [citations omitted].

The Court identified two criteria for the applicability of the deliberative process privilege:

> Two requirements are essential to the deliberative process privilege: the material must be predecisional and it must be deliberative. [citations omitted]. Both requirements stem from the privilege's 'ultimate purpose[, which] … is to prevent injury to the quality of agency decisions' by allowing governmental officials freedom to debate alternative approaches in private. [citation omitted].

121 F.3rd at 737. See also Judicial Watch of Florida v. U.S. Department of Justice, 102 F. Supp. 2d 6, 12-16 (D.D.C. 2000) (Urbina, J.) and cases therein cited; Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318 (D.D.C. 1966) (Robinson, J.).

Both these requirements laid down in In re Sealed Case, supra, are met in the present case, as the declarations, and in camera inspection if deemed necessary, will confirm. All the documents which have been withheld are "predecisional", i.e., they were created prior to the finalization of the three documents listed above. They all are also "deliberative" in nature, i.e., they contain the opinions, advice, recommendations, evaluations and similar materials from persons in the District government to the decision-makers in the District government, as well as to and from the decision-makers.

Individually and taken together, they form a continuum by which the Court can trace the government's decision-making process from inception to decision-making. They are classic examples of the government's deliberative process.   The declarations of Dr. Harris and Ms. Kiesler show a substantial, elaborate, and ongoing process of deliberation within the government on the documents listed above before they were promulgated, involving both District lawyers and nonlawyer program officials and employees,  who made detailed comments on the earlier drafts. See, e.g., Exhibit C, Harris Declaration, at ¶ 5; Exhibit D, Kiesler Declaration, at ¶¶ 6-7.  These declarations, as well as the decided cases, spell out the reasons for protecting the confidentiality of such documents.  See, e.g., Exhibit C, Harris Declaration, at ¶¶ 6-9; Exhibit D, Kiesler Declaration, at ¶¶ 4, 8.

Accordingly, defendants' claim of deliberative process privilege and their objection to production of these documents should be sustained.   Such a ruling can hardly interfere with plaintiffs' preparation and presentation of their case, in view of the more than 13,780 pages of documents defendants have already produced.   Since plaintiffs have received the latest products of the government's deliberative processes, they have not been denied anything they need or can fairly claim to need for their case.

**III.     Defendants continue to object to the production of documents regarding lead abatement programs in the District of Columbia on various grounds.**

Defendants continue to object to the production of documents responsive to Plaintiff's Second Request for Documents, Request Number 2, which is for "[a]ll documents that identify children ages two through five years old who were identified in the course of any lead abatement program administered by the District of Columbia since 2000."  Pl. Memo. at 10.

First, defendants have a standing objection to the production of documents that predate January 1, 2003, for the reasons explained in Section I above.

Second, the request is not relevant to this lawsuit. The present class action relates to the District's Child Find obligations under the IDEIA. It is a huge stretch to suggest that the District's lead abatement programs are relevant to providing special education services to preschoolers. At most, this request is marginally relevant, and that is outweighed by the burdensomeness of the request, as we now show.

The request is overly burdensome, as explained by Risk Assessor Joseph Younger of the District Department of the Environment ("DDOE") in his declaration, attached here as Exhibit E. Simply put, the District's records concerning lead abatement are not designed to identify children—and definitely not children of a particular age—living in properties subject to abatement.

Mr. Younger is responsible for coordinating retrieval, copying, and as appropriate, redaction of relevant program records in response to Freedom of Information Act requests, subpoenas, and other official requests for District lead-based paint records. Id. at ¶ 3. As Mr. Younger explains in his declaration, the DDOE Lead-Based Paint Management Program maintains two types of records for its program. Id. at ¶ 4. One set of records consists of investigation reports which are on-site investigations that have been conducted by District agencies or their contractors to determine the nature, severity, and location of lead-based paint hazards in a property. Id. These records are maintained primarily by their case number (either the "EBL number" assigned by the Department of Health, or by the "FSC number" in the case of investigations conducted on behalf of Child and Family Services Agency ("CFSA")). Id. If no EBL number or FSC number is

assigned, then records are filed by address.  Id. at ¶ 5.  The program focuses on the

oversight of remediation of lead hazards in properties.  Therefore, whether or not children

are residing in a property is incidental and may not be a part of the file at all.  Id. at ¶ 5.

The other files maintained by the Lead-Based Paint Management Program are for

its certification and abatement program.  Id. at ¶ 6.  These files are for abatement permit

files and for applications and credentials for individuals who apply to the program for

certification to conduct lead-based paint activities.  Id.  The abatement permit files are the

only records maintained by DDOE that show whether abatement has been performed at a

given property.  Id.  Abatement permit records are maintained by address and are not

linked with the investigation reports maintained by DDOE.  Id.  Abatement records do

not consistently document whether children reside in the property, their ages, or

identities.  Id.

To provide specific information on children who may have been exposed to lead

at a property subject to abatement would require a DDOE staff person to review both

types of records maintained by DDOE—over 2,000 files and records which, on average

contain approximately 60 pages of documentation.  Id. at ¶ 7.  Mr. Young estimates that

it would take a minimum of 1,500 hours (which is 45 minutes per record and file) of staff

time to retrieve the records, sort and compile the information, copy relevant records and

files, and re-file the records and files.  Id.

Clearly, requiring DDOE to perform such a search in response to plaintiffs'

request would be burdensome and would drain DDOE's already strained resources for

minimal return.  As such, this Court should not compel defendants to respond to this

request.

IV.    **Complaints to the CARE Center**

Plaintiffs seek all complaints[4] made to the CARE Center.[5] Pl. Memo at 12.[6] But, as indicated in the depositions of Genevieve Johnson and Chanda Whitaker of Early Childhood at the CARE Center, the CARE Center receives very few complaints, and most of those complaints are by telephone.[7] Exhibit F, Deposition Excerpt of Genevieve Johnson, at 85-90; Exhibit G, Deposition Excerpt of Chanda Whitaker, at 39-41. Notably, Ms. Johnson has recently produced two written complaints she received in January of 2008. Exhibit A, at Bates Stamp 9062-9063.

Ms. Whitaker and Ms. Genevieve Johnson both indicated in their depositions that phone calls regarding complaints or issues that arise with children at the CARE Center are referred to their supervisor, Zondra Johnson, or to the child's case manager for resolution. Exhibit F, Genevieve Johnson Deposition, at 86-87; Exhibit G, Whitaker Deposition, at 39. Although no logs are kept of such calls, the case manager may write notations in the case files of the children in the case manager's notes section. Exhibit F, Genevieve Johnson Deposition, at 87-90.

Because of the voluminous records at the CARE Center, it would be burdensome to go through each student file to determine if a parent called with a complaint, especially given the testimony that very few complaints are received. See Exhibits F and G; see also Exhibit H, Declaration of Gayle Amos, which also was filed with the Defendants'

---

[4] Note that plaintiffs do not seek due process hearing complaints, but rather letter complaints. Pl. Memo. at 12.

[5] Early Childhood at the CARE Center provides Part B services to children ages 2.8 to 5 years old who are not attending a DCPS pre-school program.

[6] Plaintiffs did not request this specific type of document until September 17, 2007, over two years after they brought suit.

[7] In her deposition, Zondra Johnson also indicates that her staff forwards complaints to her, and that there have been very few complaints. Pl. Memo, Exhibit K, at 177. She states that most of the complaints are oral. Id.

prior Opposition to Plaintiffs' Initial Motion to Compel (addressed in detail in Section V

below).  Here again, the marginal relevance of such documents is outweighed by the

burden of the search to obtain them.

**V.        Production of documents relating to children who are not plaintiffs.**

To address the burdensomeness of plaintiffs' requests regarding individual

student records, defendants previously obtained a declaration from the then DCPS

Assistant Superintendent for Differentiated Learning Gayle Amos, dated July 31, 2006.

Exhibit H.  During her time at DCPS, Dr. Amos monitored and supervised the DCPS

Office of Special Education ("OSE"), which includes the Early Childhood identification

of children ages 3 to 5 years who have special education needs, the program at issue in

this case.  Exhibit H, at ¶¶ 2-3.  In sum, Dr. Amos indicated that providing specific

documentation for every child who has gone through the eligibility process for ages 3 to

5 years from January 1, 2000, through the present would be unduly burdensome.  Id. at ¶

4.  One and a half years ago, Dr. Amos estimated that producing all such documents

would require hundreds of hours of staff time and would involve searching for documents

at several locations due to the large number of students that fall into this category and the

large volume of student records for each child.  Id. at ¶¶ 10, 13.  The burden has only

increased with the passage of time, the addition of more students and the increase in the

volume of student records. [8]

Each student's file may contain such documents as evaluations, anecdotal notes,

progress reports, report cards, Individualized Educational Programs, medical records, and

psychiatric reports; as time passes, the volume of documents in each folder increases.  Id.

---

[8] Dr. Amos' declaration was prepared when plaintiffs' first filed their motion to compel, and the passage of
time has only added to the burdens explained in her declaration.  See Exhibit H.

at ¶ 8.  A conservative estimate for the pages of documents in each student's file (ages 3 to 5) is about 100 pages.  Id. at ¶ 7.  Student records are not all centrally located; rather, Early Childhood records may be housed at the CARE Center, at Shaw Junior High School, 925 Rhode Island Ave., N.W.; individual Head Start programs; the DCPS Central Office, at 825 North Capitol St., N.E.; and the individual local schools.  Id. at ¶ 10.  The already difficult task of gathering such records is further complicated even more because the majority of students from January 1, 2000, through the present have passed through the 3 to 5 year age range, and their records would have been transferred to the local schools that they attend.  Id. at ¶ 11.

The large volume of documentation that the plaintiffs seek to compel defendants to produce and the burden of production can be further explained and quantified as follows.  From January 1, 2003, through January 1, 2006, DCPS made special education eligibility determinations for 1,538 students within the age range of 3 years to 5 years.[9] Id. at ¶ 5; see also Exhibit A, at Bates Stamp 03870.  Thus, it can be estimated that from January 1, 2000, through the present, at least 3,332 students within the age range of 3 years to 5 years had eligibility determinations.  Exhibit H, at ¶ 5.  Given that there are approximately 3,332 students who have been determined eligible for special education services (Id. at ¶ 6) and that each student has a file with approximately 100 pages of documents (Id. at ¶ 7), production for these students would generate roughly 333,200 pages of material.  Id. at ¶ 9.  According to Dr. Amos, to gather and produce these records would require DCPS to devote a significant number of staff and amount of staff time, and would drain DCPS' already strained resources.  Id. at ¶ 12.  The numbers

_____

[9] DCPS does not have statistical information regarding the number of children living in the District of Columbia between the ages of 3 and 5 years because mandatory schooling does not begin until age five. Exhibit H, at n. 1.

provided by Ms. Amos make clear that the production as contemplated by the plaintiffs would dramatically disrupt the daily workflow at the DCPS OSE to the detriment of the children in special education.

Such a request by plaintiffs is unduly burdensome. Our showing meets the requirements of this Court for supporting a claim of undue burden. See Alexander v. F.B.I., 186 F.R.D. 21, 34 (D.D.C. 1998); see also Association of Am. Physicians and Surgeons, Inc. v. Clinton, 837 F. Supp. 454, 458, n. 2 (D.D.C. 1993); Martin v. Potomac Elec. Power Co., 1990 U.S. Dist. LEXIS 11688 at 5 (D.D.C. 1990).

As demonstrated above, plaintiffs simply cannot show a need for such documents that outweighs this burden on DCPS, especially in light of the District's agreement to produce such records for a list of 24 students supplied by plaintiffs. Without waiving their objection as to burdensomeness (See Exhibit H and arguments above), defendants have agreed to provide some documents with regard to children who are not named class members. Specifically, defendants agreed to produce cumulative information (previously produced in redacted form) and records of the 24 children identified in Plaintiff's Third Request for Documents, Request Number 4. Exhibit A, Bates Stamp 7368-7409, 7410-7444, 7445-7457, 7458-7609, 7785-9050, 9615- 12255.[10]

## VI.    **Plaintiffs' Exhibit L is misleading and inaccurate.**

Plaintiffs' Exhibit L is misleading and inaccurate. As defendants demonstrate, many of the documents requested have been provided. See, e.g., Exhibit I, Responses 13 and 41.[11] Others do not exist, or have not been found after search. See, e.g., Exhibit I, Responses 23, 26 and 35. Still others reflect discovery requests which have not actually

---

[10] Defendants are still gathering all documents on the 24 students, but have already produced a significant amount of such records.
[11] Defendants' responses correspond to the numbered listings in Plaintiffs' Exhibit L.

been made, but seem to reflect what the plaintiffs now wish they had demanded.  See, e.g., Exhibit I, at Responses 10 and 42.  Plaintiffs' Exhibit I also does not take account of the fact that defendants have objected to production of many of those document, for example, as prior to a proper temporal limitation.  See, e.g., Exhibit I, at Responses 1-2.

Defendants invite the Court to compare Plaintiffs' Exhibit L with Defendants' Exhibit I.  The Court will see at a glance how unreliable Plaintiffs' Exhibit L is as to what has been produced and what has not been produced.  Defendants respectfully submit that it is a frail reed indeed on which to base any findings of noncompliance by defendants with proper discovery demands.  Defendants will produce to the Court any documents referred to in our Exhibit I in response to Plaintiffs' Exhibit L so that the Court may decide which of those competing exhibits more accurately and reliably sets forth the state of discovery in this case.

## VII.  **Miscellaneous**

Some of plaintiffs' complaints about not receiving information are simply disingenuous.  For example, plaintiffs allege that they did not receive a complete answer to their Interrogatory Request 2, which seeks names, titles, and contact information, specifically stating that Zondra Johnson, who signed the Interrogatory Response, was not listed.  Pl. Memo. at 35.  She was obviously contacted, since she signed the response.  Pl. Memo., Exhibit G.  Moreover, as indicated in the Response itself, her contact information as well as that of several others, is included in Defendants' Initial Disclosures, attached here as Exhibit J.  Plaintiffs already have the information they try to compel here.

Also noteworthy is that some of plaintiffs' numerous documentary requests read like trust indentures, challenging the reader to understand them.  For example, they cite

the following request as part of their denigration of defendants' responses (Pl. Memo. at

11):

> All documents that refer or relate to the number of program
> slots or placements available each year since 2000 for
> children ages two years through five years for the following
> categories: (1) inclusion, preschool classroom slots, where
> the child with a disability is placed in a regular education
> class with his or her typically developing age peers in the
> majority and where, in addition to the regular teacher, there
> is a special-education teacher or where a child with a
> disability is supported full time in a general education class
> with a dedicated aide; (2) self-contained special education
> slots or placements where a child is removed from the
> general school population and placed in a small controlled
> setting with a special-education teacher and possibly other
> support staff for most of the school day; (3) combination
> slots or placements that combine inclusion and pull-out
> services some of the time; and (4) the equivalent of those
> categories in earlier years when different terms were used
> to describe the different levels of program intensity.

The Request defies comprehension. It is so convoluted, vague and ambiguous as to be

incoherent, and it is not alone. No such Request satisfies the test of clarity under Rule 34.

Additionally, plaintiffs continue to seek documents which defendants have

already indicated that they do not have, such as certain correspondence between DCPS

and the U.S. Department of Education. Pl. Memo. at 27-28, and at Exhibit L. But it is

worth mentioning that defendants already provided plaintiffs with a declaration from

Karen Griffin of DCPS Office of Special Education, explaining that she had searched her

files extensively but could not find some of the requested documents, attached here as

Exhibit K, which also was filed with the defendants' prior Opposition to plaintiffs' initial

Motion to Compel.

Plaintiffs attribute defendants' allegedly slow response to their draft partial

settlement proposal as a reason for reinitiating discovery (Pl. Memo at 3); what plaintiffs

fail to acknowledge is that the parties' motions to compel discovery had been put on hold for purposes of settlement. During that period DCPS went through a complete change in management, and OSSE greatly expanded its functions, to include among other things Child Find responsibilities. DCPS Chancellor Michelle Rhee has put a new management team in place, and State Superintendent of Education Deborah Gist has done the same at OSSE. Because of these significant changes in both DCPS and OSSE, a whole new set of program people from both DCPS and OSSE had to review and provide input regarding the draft partial settlement proposal. This change in staff has also impacted on document discovery.

A little more patience by plaintiffs would contribute more to the resolution of this case than a motion to compel, which, if granted, will swallow up the time of many persons who can be more usefully employed in reforming and reconstructing the school system. Plaintiffs' Motion to Compel also represents an avoidable intrusion on the time of this Court, given defendants' willingness to produce vast amounts of documents. Defendants have drawn the line only on a few points, where we concluded the law and the facts support our position. Retracing the laborious course of discovery in this action and sorting out the essential from the trivial is a task with which neither this Court or a U.S. Magistrate Judge should be burdened. Nevertheless, defendants are willing to participate in it if the Court deems it necessary, although it is a sideshow from the more important task of trying to bring this case to resolution either by settlement or trial.

**VIII.    Email Retention**

Although defendants' counsel did not make a request to the client agencies, <u>in haec verba</u>, that defendants produce emails (Pl. Memo. at 31), the undersigned counsel

did ask defendants to produce *any relevant documents*, which includes emails.

Moreover, the collection of specific requests available for in camera inspection,

referenced at page 4 above, contain requests for emails.  In fact, some emails have been

produced.  See, e.g., Exhibit A, Bates Stamp 9061-9065, 9084-9184.  In her deposition,[12]

former Director of DCPS Early Childhood Zondra Johnson—the same person plaintiffs

point to in their motion to suggest that emails have not been produced—stated that she

searched for emails "[f]or the topics in which [she] was requested to search" but that "it

was [her] judgment that there were no E-mails related to the topic[s]."  Pl. Memo.,

Exhibit K, Transcript of Ms. Johnson, at 27.

She went on to explain that most of her communications—like those of the people

she works with—are by telephone, not email—"[w]e like the telephone.  We're not E-

mail people."  Id. at 35.  She goes on to say that, "I use the telephone, sir.  I think it is

more personable to respond in person than E-mails."  Id. at 53.  She reiterates this with

regard to her colleagues at the Part C Program in the Department of Human Services—

"We very, very seldom, sir, talk via E-mail."  Id. at 57; see also id. at 54.  It is not

surprising that there are few emails relevant to this case given the working habits of the

people involved.

In her deposition, Ms. Johnson references a city-wide email retention policy.  Id.

at 11, 13-18.  That draft policy—which required email retention for six months, not 90

days—while announced to all District employees, was never put into effect.  See attached

Exhibit L, Washington Post Article regarding District Email, dated November 6, 2007.

---

[12] Please note that Ms. Johnson's deposition transcript has not yet been signed by Ms. Johnson, and still may be corrected by Ms. Johnson.

Prior to that, the Office of the Chief Technology Office's ("OCTO")[13] practice, though not a written policy, was to delete emails over one year old. Currently, the Mayor has ordered all District employees to retain their emails indefinitely until a policy can be finalized.[14] Exhibit L.

Although defendants believe that they have been diligently providing all relevant documents, out of an abundance of caution the undersigned counsel have requested a formal litigation hold on any emails with any possible relevance to this case, as well as making a sweeping request to OCTO for an email search for relevant emails regarding this case.[15]

Defendants note that, even if some emails were lost during the usual course of defendants' business, this Court may not impose sanctions because any lost electronic information was due to regular email deletions, not to a willful or deliberate destruction of emails to avoid discovery in this case. Federal Rule of Civil Procedure 37(e) states that "[a]bsent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good faith operation of an electronic information system."

## IX.    Plaintiffs should not be awarded attorney's fees or sanctions for their Motion to Compel.

Plaintiffs should not be awarded attorney's fees, even if their motion to compel is granted in whole or in part. Federal Rule of Civil Procedure 37(a)(5) sets the standard for an award of expenses, including attorney's fees, when a motion to compel is granted or granted in part and denied in part. It provides in relevant part:

---

[13] OCTO is the central information technology and telecommunications agency in the District.
[14] Ms. Johnson has been notified about the Mayor's new instructions.
[15] The general counsel at OCTO is currently working with the undersigned attorneys to refine the search.

> … the court must, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the **court must not order this payment** if:
>
>     *    *    *
>
> (ii) the opposing party's nondisclosure, response or objection was **substantially justified**; or (iii) other circumstances make an award of expenses unjust.
>
>     *    *    *
>
> If the motion is granted in part and denied in part, the court . . . may, after affording an opportunity to be heard, apportion the reasonable expenses for the motion. [Emphasis added].

The Supreme Court defined the standard of "substantial justification" under the sanctions provisions of the discovery rules in <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988) as follows: "[That element] is satisfied if there is a 'genuine dispute' [citations omitted] or 'reasonable people could differ as to [the appropriateness of the contested action] [citations omitted]."

As stated in Moore's <u>Federal Practice</u> (3rd edit.), Para. 37.23 [2], p. 37-44:

> … the courts have held, consistent with the drafters' intent, that the substantial justification standard is met when a party demonstrates that the dispute about the matter was 'genuine', meaning that reasonable lawyers could disagree about the appropriateness of the disputed position.

However the Court decides plaintiffs' Motion to Compel, it cannot be said that the defendants' position on any of the points at issue was without "substantial justification" under these standards.  In such circumstances, the Rule mandates that the Court "must not" order the payment of the movants' expenses, including attorney's fees.

Moreover, there are other circumstances here that would make an award of expenses, including attorney's fees "unjust."  The financially hard-pressed school system

should not be saddled with such expenses, especially at a time of reform under the new leadership of Chancellor Rhee and her colleagues. This Court has discretion to recognize the needs of the neediest children in the system, those receiving special education services.

It would be paradoxical in the extreme if a suit ostensibly aimed at improving the functioning of the Child Find system were to become a mechanism for the transfer of funds from defendants to plaintiffs' lawyers, however well-intentioned. It was not without reason that for the last 10 years Congress has imposed a fee cap on the attorney's fees to be paid to lawyers in IDEA cases, in recognition that the interests of the special education system outweigh those of the lawyers who bring such cases.

Defendants are beginning to wonder if this case is really about the welfare of preschool age children, as it purports to be. As indicated, defendants have produced over 13,780 pages of documents, covering every issue in this case as pleaded in both the initial complaint and the first amended complaint. Defendants thought that this would be more than sufficient to satisfy any genuine need of plaintiffs for documentation to prove their case, if they have a case. We are now confronted with a massive Motion to Compel, accompanied by a tell-tale request for attorneys' fees, which from the size of plaintiffs' Motion, will undoubtedly run into many thousands of dollars.

The Court is well aware of the attorney's fee cap imposed by Congress on IDEA cases for the last 10 years of D.C. Appropriations Acts—in recent years capping the amount at $4,000.00 in attorney's fees for such an action.[16] The issue as to whether the

---

[16] The current IDEA fee cap can be found at § 819 of <u>District of Columbia Appropriations Act of 2008</u>, 110 Pub. L. 161, 121 Stat. 2764 (2007) (enacted on December 26, 2007 for the fiscal year ending September 30, 2008).

Congressional cap applies to class actions is presently <u>sub judice</u> before Judge Friedman in two cases and has been fully briefed in both. <u>Blackman v. District of Columbia</u>, Civil Action No. 97-1629, and <u>Petties v. District of Columbia</u>, Civil Action No. 95-0148.

We are not suggesting that the present Motion to Compel, brought under a rule designed to deal with genuine discovery abuses, is a disguised attempt to avoid the fee cap. But it may have that effect unless scrutinized with care and with an understanding that it may undermine the effects of the new Mayor of the District government and those now charged with the administration of the school system to meet challenges that have gone unmet for many years.

## <u>CONCLUSION</u>

For the reasons set forth in this memorandum, the Court should deny the Plaintiffs' Motion to Compel Discovery.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General of the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

**/s/ Ellen Efros**
Ellen Efros
Chief, Equity Section 1

**/s/ Daniel A. Rezneck**
DANIEL A. REZNECK [#31625]
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
(202) 724-5691

**/s/ Eden I. Miller**
EDEN I. MILLER [#483802]

Assistant Attorney General

441 Fourth Street, N.W., Sixth Floor South

Washington, D.C. 20001

(202) 724-6614

(202) 727-3625 (fax)

Eden.Miller@dc.gov

March 10, 2008                    ATTORNEYS FOR DEFENDANTS