# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DL, *et al.*, | ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 05-1437 (RCL) |
| DISTRICT OF COLUMBIA, *et al.*, | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF PHYLLIS HARRIS

I, Phyllis Harris, do hereby declare and state as follows:

1. I am the Deputy Chancellor for Special Education of the District of Columbia Public Schools ("DCPS").

2. Prior to joining DCPS last year, I was the Executive Director of the Oakland, California Unified School District, and before that, the Executive Director of the Oakland Special Education Local Plan Area. I have also been a principal and teacher in the California public schools. I earned my doctorate from Girton College of the University of Cambridge in Cambridge, England. A copy of my resume is attached hereto as Exhibit A.

3. In 2007, a Comprehensive Child Find Guide—Policy and Procedures ("Manual)" and a Memorandum of Agreement ("MOA") between DCPS and various other agencies of the District of Columbia were completed. Copies are attached hereto as Exhibits B and C. I understand that copies of these documents have been furnished to the plaintiffs in the above-captioned case.

4. I also understand that the defendants have objected to producing earlier drafts of these documents and documents relating to their formulation during the process of deliberation that preceded their formulation, as violative of the deliberative process privilege. This Declaration supports that objection.

5. Both these documents were the product of substantial efforts and collaboration by various agencies of the District government. DCPS developed the proposed Manual with review by, and input from, the District of Columbia Department of Human Services ("DHS") and the District of Columbia Office of the Superintendent of Education ("OSSE").

6. I am advised that this review and input included the furnishing of advice, recommendations, opinions and evaluations by the reviewing agencies, while numerous persons within DCPS furnished similar review and input before DCPS, as the decision maker, completed the proposed Manual.

7. Likewise, the proposed MOA included the review and input of advice, recommendations, opinions and evaluations by a number of other District Agencies, including DHS, the Department of Health ("DOH"), the Child and Family Services Agency ("CFSA"), the Department of Mental Health ("DOH"), and OSSE, as well as by persons at DCPS. Lawyers at each of these departments and agencies furnished their advice, recommendations, opinions, and evaluations before the respective departments and agencies gave their approval of the proposed MOA.

8. My years of governmental service in the State of California and now in the District of Columbia have given me extensive experience in governmental decision-making and policy-making. I have become aware of the importance of the deliberative process in governmental decision-making and policy-making, as well as the need for confidentiality and privacy in that process. I am convinced that an essential requirement of the deliberative process is the assurance that participants in the process, including advisers to the decision-makers and policy-makers, are able to engage in the free and candid exchange of views, opinions, recommendations, and information necessary to sound decision-making and policy-making.

9. Such exchange of views, opinions, recommendations and information would be severely restricted and lack value if its contents were subject to outside scrutiny, whether during or after the occurrence of the decision-making and policy-making process.

10. As a governmental decision-maker and policy-maker, I have relied on frank and uninhibited advice and recommendations, whether from other governmental officials, or, as they were in some cases, persons outside the government. The knowledge by governmental decision-makers and policy-makers that their deliberations, and the advice, opinions and recommendations furnished to them and relied on by them may be scrutinized by outsiders, particularly in the course of adversarial litigation, would have a chilling effect on those charged with governmental decision-making and policy-making and their advisers. It would not be conducive to sound decision-making and policy-making.

11. I have personally examined the Manual and the MOA involved in the above-captioned case and was involved in the decision to complete them in their present form. I understand that the drafts and other documents which are the subject of the defendants' objections under the deliberative process privilege were all created prior to the decision to complete the Manual and the MOA in their present forms. These drafts and other documents were all part of the deliberative process

of the decision-makers, both at DCPS and the other District departments and agencies, of whom I was one, leading up to the decision to complete the Manual and the MOA in their present form.

12. I am satisfied that the plaintiffs' efforts to compel production of these drafts and other documents will invade the deliberative process and the mental processes of the decision-makers at DCPS and the other District agencies.

13. In my judgment, based on my experience in government, the District government cannot function effectively without the assurance that its deliberative process on matters presented to it for decision, essential to its decision-making, are protected from disclosure to outsiders, before and after its decisions are made.

14. In my further judgment, based on my experience in government, the District government cannot function effectively without the assurance that documents such as the drafts and other documents relating to the Manual and the MOA essential to its decision-making are protected from disclosure to outsiders, both before and after its decisions are made.


I declare under penalty of perjury that the foregoing is true and correct.

**Executed on : February 20, 2008** _____.

/s/ **Phyllis Harris**
Phyllis Harris
DCPS Deputy Chancellor
For Special Education

Declaration Exhibit A

# PHYLLIS B. HARRIS, PH.D.

1555 LAKESIDE DRIVE, OAKLAND, CA 94612        510 891-0205 (H)  213 278-9611 (C)

phyllispbh@sbcglobal.net

*Researcher, Innovator, Change Agent:  schools, curriculum, organization, fiscal management and operations*

## EDUCATION

| | |
|---|---|
| • UNIVERSITY OF CAMBRIDGE, GIRTON COLLEGE, Cambridge, England | PH.D., EDUCATION RESEARCH/PUBLIC POLICY |
| • CLAREMONT GRADUATE UNIVERSITY, Claremont, CA, | Postgraduate Study in Organizational Thought and Education Administration |
| • CALIFORNIA STATE UNIVERSITY /UNIVERSITY OF CALIFORNIA, Los Angeles, CA, | Postgraduate Study, Joint Program in Special Education |
| • UNIVERSITY OF CALIFORNIA, LOS ANGELES, CA, | Independent Studies in Art History, Art of Interviewing, Documentary Film Production, Sculptor |
| • CITY COLLEGE, CITY UNIVERSITY, New York, NY, | MS in Ed. Specialization:  Developmental Reading |
| • HUNTER COLLEGE, New York, NY, | B.A. *cum laude* International Economics/minor in Elementary Education |

## CERTIFICATION

- ASSOCIATION OF CALIFORNIA SCHOOL ADMINISTRATORS, SUPERINTENDENTS ACADEMY CERTIFICATE
- CALIFORNIA PROFESSIONAL ADMINISTRATION CREDENTIAL (TIER I AND II)
- CALIFORNIA CROSS-CULTURAL, LANGUAGE, AND ACADEMIC DEVELOPMENT CERTIFICATE
- SENIOR ASSOCIATE, CALIFORNIA SCHOOL LEADERSHIP ACADEMY
- CALIFORNIA MULTIPLE SUBJECT TEACHING CREDENTIAL
- STATE OF NEW YORK LIFE MULTIPLE SUBJECT TEACHING CREDENTIAL

## PROFESSIONAL ADMINISTRATIVE EXPERIENCE

**Executive Director/Executive Officer (Cabinet Member)**  Oakland Unified School District  Oakland, CA        2003-current
**Director, Oakland Special Education Local Plan Area (SELPA)**  *Administrative unit for federal and state funding*

- *Managed over 975 employees at 140 sites including 34  charter schools*
- *Executive control exercised over $75 million budget including 50  contracts with nonpublic schools and agencies, six major Interagency contracts, and numerous negotiated contracts with vendors/consultants*
- *Took over the department when it was running a $34 million deficit in 2003; by June 2006 the deficit was down to $13 million surpassing the Financial Crisis Management and Assessment Team goals for the state Fiscal Recovery Plan by over 3 years*
- *Increased departmental income by $1.8 million through fees for service plan with charters and effective Medi-Cal billing*
- *Managed transportation system for disabled students with outside company, negotiated 5 year contract for $35 million over the term of the contract*
- *Opened and developed two new schools—New Tilden an integrated PreK–Grade 2 for 260 students and Hillside Academy a hybrid partnership with Seneca Nonpublic Schools handling 60 mental health secondary students*
- *Created tri-partnership program with the Berkeley Bread Project and OUSD Adult Education to train 18-22 year old disabled youth in culinary arts and café operations*
- *Created Professional Development Academy  to train new teachers and veteran teachers at Summer Institutes with yearlong follow up*
- *Worked with parent advisory committees including the Community Advisory Committee for Special Education governance*
- *Co-chaired statewide committee on Interagency for California Special Education Directors*
- *Member of Bay Area Consortium on Nonpublic Schools and Agencies*
- *Testified before the Advisory Commission to the State Board of Education on Charter Schools*
- *Participated in numerous statewide conferences for special education/general education issues as discussant, panelist, or presenter.*
- *Trained over 250 site administrators (including charter directors) in special education law, policy and procedures*

**Director, Teacher Support and Development**, Oakland Unified School District, Oakland, CA        2001-2003
- *Managed over 30 staff with executive control over $4.5 million budget*
- *Designed and implemented support for 850 teachers in 106 schools*
- *Conceptualized, designed, and directed Summer Training Institute for Teachers—professional development academy training new and experienced teachers in curriculum, equity, and pedagogy.*
- *Reconceptualized and implemented Career Ladder Paraprofessionals Project, Title II Teacher Quality Enhancement Programs, California PreIntern Program, Intern Partnerships  with ten Bay Area universities and the CA Beginning Teacher Support and Assessment Program.*
- *Designed and directed the National Board Certification Support Program for Oakland teachers.*
- *Co-Principal Investigator developed a five-year, 7.5 million-dollar National Science Foundation Math/Science Partnership grant.*
- *Coordinated Human Resources teacher recruitment and retention. Worked on career education for paraprofessionals to meet the requirements of NCLB, develop future teachers from a diverse population that represents the Oakland community.*
- *Writer and administrator of district plan for California Senate Bill 2042 to ensure all teachers meet the new induction standards for teacher performance and complete a  Professional Teaching Credential.*
- *Coordinated and designed interventions that result in all teachers meeting No Child Left Behind (NCLB) requirements by 2005-2006.*
- *Presenter, panelist, and discussant in state and national conferences and symposiums on NCLB, alternative certification, teacher induction, and National Board Certification.*

**Principal, Washington Accelerated Learning Center /Middle School**, Pasadena Unified School District, Pasadena, CA
- *Washington ALC and Middle school served 1000 students (87% minorities) in the distressed urban NW quadrant of Pasadena.*
- *Designed academic program based on the principles of Levin's Accelerated Schools, the pedagogy of Lev Vygotsky and the leadership principles of Thomas Sergiovanni.*
- *Academic SAT results in Reading, Math and Science were higher than the district and state averages.*
- *Had six winning teams in Odyssey of the Mind statewide and sent one team to the nationals.*
- *Only school in the country where 5th grade students worked with NASA and the Jet Propulsion Lab under a special grant as one of six sites in the nation-students worked with astronauts on Shuttle orbits and camera study of the earth. .*

**New Teacher Resource and Support Coordinator**, Pasadena Unified School District, Pasadena, CA
- *Designed and implemented a new teacher support system for K-12 with 150 teachers in 32 schools.*
- *Wrote monthly newsletter on current research, curriculum and pedagogy. Distributed by request to all school administrators, mentor teachers and central office leadership*
- *Designed and implemented intensive two week Professional Development Academies for veteran teachers in social constructivist pedagogy.*
- *Delivered professional development for site administrators and teachers in diversity training, time management, classroom management, creating and recreating instructional materials and classroom resources, and pedagogy.*
- *Trained School Leadership Teams for the Los Angeles County Office of Education.*

**Marketing Director and Chief Financial Officer**, M.S. Software, Inc., Los Angeles and Palm Springs, CA
- *Developed marketing strategies for The Electric Pencil, the first word processing software for microcomputers.*
- *Primary liaison for technical and sales support with over 300 computer stores throughout the country.*
- *Handled all fiscal operations, pension funds and corporate management operations.*

## TEACHING EXPERIENCE

| | |
|---|---|
| **Adjunct Lecturer** | Chapman University, Orange, CA, Satellite Campus |
| **Guest Lecturer** | Claremont Graduate University, Claremont California |
| **Teacher** | Field Elementary School, Pasadena Unified School District, Pasadena, California |
| **Teacher** | International Schools, Rome and Florence, Italy |
| **Adjunct Lecturer** | LaGuardia Community College, City University of New York |
| **Supervising Reading Specialist** | Public School #3, Yonkers Board of Education, Yonkers, New York |
| **Teacher** | Emerson School, Yonkers Board of Education, Yonkers, New York |

## RELATED EXPERIENCE
- *Research Assistant, Learning Partnership Project, Secondary Schools, Hertfordshire LEA and University of Cambridge.*
- *Co-researcher, Site Visitation Team, Inverness Research Associates. Research: California Initiative on School Restructuring SB 1274*
- *Program Quality Review Trainer and Consultant, Tri-District Consortium Pasadena, Alhambra and Glendale.*
- *Support Director, Teach for America, Pasadena for 50 corps members*
- *Teaching Specialist, Teach for America Institutes and National Faculty.*

## PROFESSIONAL AFFILIATIONS
- *Director of the Oakland Special Education Local Plan Area, California State SELPA organization 2003-2007*
- *Advisory Board Member for the following colleges and universities: Patten University, St. Mary's College, Holy Names College, and University of California, Berkeley Extension 2001-2003*
- *American Association of University Women, Association of California School Administrators, American Education Research Assn.*
- *Bay Area Consortium for Urban Education, District Representative and Speaker*
- *California School Leadership Academy, Advisory Board, Member 1993-1995*
- *Los Angeles Annenberg Metropolitan Project, Task Force on Public Engagement, 1996-1997*
- *Oakland Education Cabinet, Co-Chair Subcommittee on Higher Education, 2001-2002*
- *Phi Delta Kappa, Pasadena Chapter, Board Member, Foundation 1992; Vice-President, Programs, 1993-1994; Vice-President, Projects, 1994-1995*
- *Stuart Foundation, Advisory Board on 1274 Assessments, July 1994 California School Restructuring*
- *University of Southern California LEAD Group—Reform Change Agents' Task Force. 1996-1997*

## PUBLICATIONS/PAPERS

2003   *Creating a Support Infrastructure for Inner City Induction that Leaves No Teacher Behind.* Paper delivered at UC Santa Cruz/New Teacher Center Symposium "Transforming the Profession through Teacher Induction", San Jose, California, 3 February 2003.

2001   *Target Setting: The response of LEAs and Primary Schools.* Doctoral Dissertation, University of Cambridge., Faculty of Education. Supervised by Prof. David H. Hargreaves

1999   *The Battle for Raising Standards: Can improvement be mandated?* London: ECER Publications. Paper delivered at European Conference on Educational Research, Lahti, Finland, 26 September 1999

1999   *The Battle for Raising Standards: Can improvement be mandated?* Paper delivered at the British Education Research Association Conference in Brighton, England, 1 September 1999.

1999   *A seriously happy place. The story of Washington Accelerated Learning Center, Pasadena, California.* In Bowring-Carr and West-Burnham (Eds.) *Managing Learning for Achievement.* London: Pitman Publishing.

1992   *Bella Arte: An Introduction to the Italian Renaissance.* California: Cosimo & Company. Educational game designed for the development of prereading and early reading through the art of the Italian Renaissance.

# Declaration Exhibit B

**District of Columbia**
**Office of the State Superintendent of Education**



**Comprehensive Child Find Guide**
**Policy and Procedures**

District of Columbia Public Agencies

D.C. Public Schools
D.C. Infants and Toddlers with Disabilities
Department of Mental Health
Department of Human Services
Child and Family Services
Department of Health

August 2007, Draft

## WHAT IS CHILD FIND?

Child Find is a continuous process of public awareness activities, screening, and evaluation designed to locate, identify, and refer all children with disabilities as early as possible. Child Find targets children ages birth through 3 years old in need of early intervention services (Part C); children ages 2.8 through 21 in need of special education and related services (Part B); and their families under the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. §§ 1400, et seq. (IDEA). Children must meet eligibility criteria according to the IDEA and state guidelines to receive services. The IDEA requires all states and the District of Columbia to have a "comprehensive Child Find system" to assure that all children who are in need of early intervention or special education services are located, identified and referred.

According to the IDEA, the State Education Agency (SEA), with the assistance of the Local Education Agency (LEA), has the overall responsibility for implementing Child Find. Further, the lead agency for Parts B and C in each state is responsible for planning and implementing a comprehensive Child Find System. In the District of Columbia, the Office of the State Superintendent of Education (OSSE) is the SEA; the D.C. Public Schools (DCPS) system is both the LEA and the lead agency for Part B, and the Department of Human Services (DHS) is the lead agency for Part C. Both lead agencies collaborate to implement a comprehensive Child Find System to identify children birth through 21 in need of special education and related services. The OSSE ensures that the comprehensive Child Find System is consistent with the IDEA and meets the requirements to identify children with special needs.

The Child Find System of the District of Columbia is a collaboration between the SEA and other agencies responsible for administering the various education, health, and social service programs relevant to children birth through 21 who are disabled and in need of special services. Those agencies are: DCPS, Early Care and Education Administration Infants and Toddlers with Disabilities Division (ITDD) of DHS, DHS, Department of Health (DOH), Department of Mental Health (DMH), and the Child and Family Service Administration (CFSA). Together these agencies take steps to ensure that:

- there will not be unnecessary duplication of efforts by the various agencies involved in the District's Child Find System, and

- the District of Columbia SEA will make use of the resources available through each public agency in the District to implement the Child Find System in an effective manner.

As indicated above, the District of Columbia Early Intervention Program (Part C) is housed in DHS. Part C funds are used to: (1) improve collaboration in order to identify and evaluate infants and toddlers with suspected disabilities and/or delays, (2) make referrals to other agencies with available services for such children, and (3) conduct periodic follow-up reviews to determine if the eligibility status of infants or toddlers previously deemed ineligible has changed. The OSSE agrees that the Part C lead agency will participate in the comprehensive Child Find System to implement Child Find activities for infants and toddlers with disabilities.

2

5744

This agreement does not alter or diminish the responsibility of the SEA to ensure compliance with the Child Find requirements.

The District of Columbia's early intervention system is responsible for identifying and providing services to children between the ages of birth and age 3 who are eligible to receive such services due to developmental delays or documented physical or mental conditions that have a high probability of resulting in delay.

Under 34 CFR § 303.321, the OSSE (as the SEA) is responsible for ensuring that a comprehensive Child Find System is in place that assures:

1. All infants and toddlers in the District eligible for early intervention services are identified, located, and evaluated for eligibility determination and provided with service planning as appropriate;

2. An effective method is developed and implemented to determine which children are receiving needed early intervention services; and

3. A mechanism is in place to identify the potential number of children who may not be receiving needed services.

## WHAT IS INCLUDED IN A COMPREHENSIVE CHILD FIND SYSTEM?

A comprehensive Child Find System includes at least six major components:

1. Definition of Target Population;
2. Public Awareness;
3. Screening, Referral and Intake;
4. Eligibility Determination;
5. Tracking; and
6. Interagency Coordination.

## TARGET POPULATION

In accordance with federal regulations, the District of Columbia assumes responsibility for the location, identification and evaluation of all children from birth through age 21 that require special education and related services. All children who are suspected of having a disability and who are in need of special education are part of the Child Find process in the District of Columbia.

As the LEA, DCPS is responsible for identifying, locating, and evaluating all children in the District who may require special education services including those children who: (1) have documented disabilities; (2) advance from grade to grade; (3) have been enrolled by their parents in private elementary or private secondary schools, including religious schools located

5745

in the District; (4) have become wards of the state; and/or (5) are highly mobile, such as migrant and homeless children.

## PUBLIC AWARENESS

The District of Columbia SEA ensures that an effective statewide public awareness program to inform the families of potentially eligible infants and toddlers of the existence of early intervention system and how to access these services is in place. Public awareness and Child Find are linked components in both the Part B and Part C systems. Effective public awareness efforts reach out to potential referral sources, engage and inform them about early intervention and special education services, and alert them to their responsibilities related to referral.

An effective public awareness program focuses on both internal and external audiences providing for involvement of, and communication with major organizations throughout the District that have a direct interest in the Child Find System. Internal Audiences include all appropriate District agencies that are working with early intervention. External Audiences include the medical community and members of formal organizations interested in early intervention (e.g., advocates; public and private service providers; parent/legal guardians; civic, business and professional organizations, churches; child care educators and teachers).

OSSE requires local school districts to annually assist in Child Find by conducting the following activities prior to November 1 each year:

1. Publishing one public notice in local newspapers that describes the DCPS' responsibility to provide special education and related services to children ages 3 through 21. The notice must also describe this agency's responsibility to refer infants and toddlers suspected of having a disability to the state Part C early intervention system.

2. Airing one public notice on local radio and/or television stations, during general viewing/listening hours, which describes DCPS' responsibility to provide special education and related services to children ages 3 through 21.

3. Placing posters/notices in all administrative offices of each building operated by DCPS that describes the District's responsibility to provide special education and related services to children ages 3 through 21.

4. Providing written information through general distribution to the parents/guardians of students enrolled in the district which describes the district's responsibility to provide special education and related services to children ages 3 through 21.

5. Requiring Charter schools to display posters/notices in all administrative offices of each building operated by the agency that describes the agency's responsibility to provide special education and related services to children ages 3 through 21.

5746

The local school district shall conduct an annual census of all children ages 3 through 21 with disabilities or who are suspected of having a disability and who reside or attend school in the district. The census shall include:

1. the name of the child;

2. the parent or guardian's name and address;

3. the birth date and age of the child;

4. the disabling condition(s) of the child; and

5. the services provided to the child with disabilities.

Local school districts must aggregate all census data as of December 1 of each year and report the data to the OSSE by December 15. This data must include the number of children ages 3 through 21 with disabilities, within each disability category, that have been identified, located, and evaluated. The data must also provide the number of children with disabilities ages 3 through 21 who are receiving special education services as specified on an IEP or on an Individualized Family Service Plan on December 1 of each year by their age, disability category and placement.

The DC Infants and Toddlers with Disabilities Division participates in Child Find by implementing the following public awareness activities:

1. collaboration with Part B on community events;

2. public service ads (i.e., radio, television, media);

3. radio talk shows;

4. television commercials;

5. health fairs; and

6. contracts with area hospitals to implement Child Find.

The OSSE monitors the implementation of the Child Find requirements. Such reviews will include:

1. approval of the local Memorandum of Agreement documentation; and

2. a review of data from the annual census reported by each agency. All data collected and used to meet Child Find requirements is subject to confidentiality requirements of 34 CFR § 300.610 and § 303.460.

5747

## SCREENING, REFERRAL AND INTAKE

The Child Find process begins with a telephone call to the DC Early Care and Education Administration, Infants and Toddlers with Disabilities Division or the District of Columbia Central Assessment Referral and Evaluation (C.A.R.E.) Center. Inquiries may come from health care providers, day care providers, hospital social workers, or social service agencies; however, anybody may call for information. However, the parent or guardian of the child in need of service must speak to the C.A.R.E. Center Education Specialist. Parents may call, or the Education Specialist will call them upon request.

### Early Intervention (Part C)

To make a referral for a child birth through age 2 years of age, please contact the DC Early Care and Education Administration, Infants and Toddlers with Disabilities Division at: (202) 727-5371, and speak to the intake assistant or the Child Find coordinator. Referral sources may also call the Child Find hotline at: (202)727-8300, and leave a voice message that will be returned on the next business day. Spanish translation is available for early intervention services. A complete referral includes the following information:

- ✓ date of the referral;

- ✓ child's name, gender, and date of birth;

- ✓ parent(s) or primary caregiver's name(s);

- ✓ address and all appropriate telephone numbers;

- ✓ reason for referral; and

- ✓ name, address, and telephone number of the individual making the referral if different from the primary caregiver(s).

### Early Childhood (Part B)

To initiate the Part B eligibility process for a child 2.8 years or older, a call must be placed with the C.A.R.E. Center at: 202-671-0882. The parent or guardian of the child in need of services must speak to the C.A.R.E. Center Education Specialist. Parents may call the C.A.R.E. Center directly or the Education Specialist may call upon request. Parents may also leave a message on the Child Find Hotline, by calling: (202) 671-0861. A C.A.R.E. Center staff member will return the call and schedule an appointment if warranted. The following information is needed when the parent speaks to the Education Specialist:

- ✓ child's name, gender, date of birth, and grade;

- ✓ parent(s) or primary caregiver's name(s);

5748

- ✓ address and all appropriate telephone numbers;

- ✓ reason for referral; and

- ✓ name, address, and telephone number of the individual making the referral if different from the primary caregiver(s).

The C.A.R.E. Center Education Specialist explains the registration and screening process by telephone to each parent. In order to register a preschool aged child at the C.A.R.E. Center, the child must be age 2.8 to 4.11 years old, and live in the District of Columbia. If a child is already five years old and meets criteria to register for kindergarten, parents will be directed to register their child at their neighborhood school. The parent will be asked what their concerns are regarding the child's development. If parents have no developmental concerns and are simply inquiring about preschool, they will be advised to seek a community program such as Head Start.

After the registration and screening process is explained to the parent, an appointment is made for the parent to bring the child to the C.A.R.E. Center, where a comprehensive developmental interview will be conducted with the parent. Simultaneously, the child will be administered a developmental screening, which will be performed by one of our qualified special education staff (special educator, speech pathologist, occupational/ physical therapists or psychologist). Screenings are conducted twice a week.

Parents are required to supply proof of residency, the child's birth certificate, and the child's health certificate, including immunizations and dental records. Proof of residency includes one of the following: Parent/Guardian Verification- W-2 or 1099; or current pay stub; or TANF, Medicaid, SCHIP, SSI, Housing Assistance or other programs; or Court Order for DC Ward; or Waiver Form by DC Office of Finance and Revenue; or Military Housing Orders. Or families or caregivers may submit two of the following:

- Parent/Guardian's motor vehicle registration;

- Current motor vehicle permit;

- Current lease or rental agreement with receipts or cancelled checks; or

- Utility bills (not telephone) with receipts for payments or cancelled checks.

Families are also asked to bring any evaluations that were conducted with the child within the current year.

A week prior to the appointment, a confirmation letter (including required proof of residency information) is sent to the parent. That letter also includes the time for families to return in the afternoon, preferably without the child present. At that time, the parent meets with a multidisciplinary team (MDT) that will include a special education teacher and may also include the following practitioners, depending on the child's needs: school

psychologist, speech and language pathologist, occupational therapist, and physical therapist. The results of the screening will be reviewed.  If the screening and record review indicates that the child is not eligible for special education services, other community resources may be suggested.  If the screening results indicate that further evaluations and/or review of reports are needed to determine eligibility, the team, along with the parent, will develop a student evaluation plan (SEP).  This plan begins with the parent's signed consent to proceed with review of previous evaluations and/or administration of new evaluations in the child's areas of need.

## School Aged Students (5-21 Years of Age)

Child Find for school aged students 5 – through 21 years old attending a local District of Columbia school begins when the Student Support Team (SST) Process is completed and the local school SST team suspects the child of having a disability.

The SST chairperson, will forward the student information to the special education coordinator or the principal's designee.  The special education coordinator must receive informed consent from the parent to proceed.  When the informed consent is given, a Student Evaluation Plan (SEP) is developed to identify the assessments/evaluations needed based on the review of students screening information provided by the SST.

When the evaluation process is completed, the MDT will invite the parent or guardian to a meeting to discuss the results of the evaluations and any additional information the parent provided. The MDT must find evidence that the student has a disability, and that the disability impacts on the student's ability to succeed academically and to access the general education curriculum.

If the student is identified as a student to receive special education services because there is an impact on the student's ability to access the general education curriculum, then the MDT will proceed to schedule an Individualized Education Program (IEP) meeting or may proceed with the development of an IEP immediately after the eligibility meeting.

Once the student has been found eligible and an IEP has been developed, the parent must sign consent for the initial placement into special education. The MDT will provide a prior notice and copies of all of the student's documentation. If the parent refuses to sign the consent for initial placement into special education, then the local school cannot provide services.

To the maximum extent possible, a student's placement must be the Least Restrictive Environment (LRE) where the child can receive services.  The LRE favors inclusion in general education classrooms whenever possible.

If a student has been determined ineligible for special education services, the MDT must complete the prior notice form and provide a copy to the parent. The student is then referred back to the SST and the documentation will be reviewed for an intervention support process. The team is also responsible for determining if the student is eligible for services

5750

under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. If the student does qualify for Section 504 services, the SST is responsible for the development and implementation of the Section 504 plan. As this Manual pertains to Child Find duties under the IDEA, it will not discuss Section 504 obligations in detail. Please see the Rehabilitation Act for further information.

Parents may call the DCPS Child Find Hotline on (202) 671-0861, located in the C.A.R.E. Center.

## School Aged Students Attending Private/Religious Schools

Students who are 5 – 21 years of age and are placed by their parents in private and religious schools in the jurisdiction of the District of Columbia and are suspected of having a disability and in need of special education or related services are eligible for referral. These referrals can be made to the Private Religious liaison by parents or guardians in cooperation with Administrators and staff of the Private/Religious schools.

Before a student is referred for special education services, a Pre-Referral Process should be implemented at the attending school. This process will ensure appropriate identification of students with disabilities. During the Pre-Referral Phase, documentation of strategies used in the general education classroom as well as sample work products will provide valuable information to support the process. Copies of strategies that can be used during the Pre-Referral phase are available upon request.

When the private-religious school or parent determines that Special Education services may be warranted, the following steps should be implemented to initiate the referral process:

1. Contact the C.A.R.E. Center to obtain a referral packet. The C.A.R.E. Center hotline is: (202) 671-0882;

2. Complete the referral packet. Parents and the Private-Religious School should collaborate on this;

3. Return the completed packet to:

    DCPS Liaison, Private-Religious Programs
    C.A.R.E. Center
    c/o Shaw Junior High School
    925 Rhode Island Avenue, NW
    Washington, DC 20001.

The referral packet will be logged in with the date that it was received, and reviewed to ensure that it is complete. Incomplete packets will be returned to the sender. Areas that need to be completed or corrected will be highlighted.

5751

A parent or legal guardian who lives in the District of Columbia must first register, and prove District residency using residency guidelines.

If the student lives in another jurisdiction but attends a private or religious school in the District of Columbia, the parent must bring the following documents:

- a valid unexpired motor vehicle operator's permit or other official non-driver identification in their name and jurisdiction,

- the child's birth certificate or proof of legal guardianship, and

- Proof of Enrollment in a District of Columbia Private-Religious School.

The timeline begins after a completed referral packet is submitted, and the parent has signed the front page giving DCPS consent with a DCPS LEA at the C.A.R.E. Center.

**The same process is followed for determining eligibility of children in private or religious schools as for children in local schools. See above section at page 8.**

If the student is found eligible for special education services and the parent chooses to decline the IEP and to continue enrollment for the child in a Private-Religious School, an Individual Service Plan (ISP) will be developed outlining the services the child will receive under the DCPS Private-Religious School Agreement.

If a parent has concerns about evaluations, identification, or placement, the parent may: (1) contact the private/religious liaison at the C.A.R.E. Center or at the Private-Religious school organization, or (2) request mediation or a Due Process Hearing if the student is a District of Columbia resident.

If a parent has concerns about services that a child will or will not receive under the terms of the D.C. Public Schools Private-Religious Agreement, the parents may contact the Parents' Special Education Service Center to discuss their concerns at: (202) 471-4272, rather than requesting mediation or a Due Process Hearing,

Parents may call the Child Find Hotline at: (202) 671-0861.

## Primary Referral Sources

Primary referral sources are informed about the referral process and procedures through the public awareness brochure and numerous presentations. This information is also available through any participating state agency. Primary referral sources include:

1. Hospitals,

2. Physicians,

5752

3. Parents,

4. Child-care programs,

5. Local educational agencies (including special education),

6. Public health facilities,

7. Social service agencies, and

8. Health care providers.

## ELIGIBILITY DETERMINATION

### Early Childhood (Part B)

The MDT, including the parent, reconvenes after the evaluations and reviews are completed. At that time, a determination is made as to whether the child is eligible for special education services. Eligibility is based on the results of standardized testing, as well as the judgment of the professionals who review the data. If the child is eligible for services, an IEP meeting is scheduled to be held within 30 days (the development of the IEP in many cases can be developed immediately after determination is made). The IEP that is developed will be in effect for one school year. The child will be offered a DCPS placement that best meets his or her educational needs, including door-to-door transportation.

### Evaluation Procedures, 34 CFR § 300.304

DCPS shall ensure, at a minimum, that the following requirements are met:

A. Tests and other evaluation materials used to assess a child under Part B of the Act are selected and administered so as not to be discriminatory on a racial or cultural basis, are provided and administered in the child's native language or other mode of communication, unless it is clearly not feasible to do so, and materials and procedures used to assess a child with limited English proficiency are selected and administered to ensure that they measure the extent to which the child has a disability and needs special education, rather than measuring the child's English language skills, and

B. A variety of assessment tools and strategies are used to gather relevant functional and developmental information about the child, including information provided by the parent, and information related to enabling the child to be involved in and progress in the general curriculum (or for a preschool child, to participate in appropriate activities), that may assist in determining whether the child is a child with a disability and the content of the child's IEP.

11

C. Any standardized tests that are given to a child have been validated for the specific purpose for which they are used and are administered by trained and knowledgeable personnel in accordance with any instructions provided by the producer of the tests. If an assessment is not conducted under standard conditions, a description of the extent to which it varied from standard conditions (e.g., the qualifications of the person administering the test or the method of test administration) must be included in the evaluation report.

D. Tests and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient.

E. Tests are selected and administered so as best to ensure that if a test is administered to a child with impaired sensory, manual, or speaking skills, the test results accurately reflect the child's aptitude or achievement level or whatever other factors the test purports to measure, rather than reflecting the child's impaired sensory, manual, or speaking skills (unless those skills are the factors that the test purports to measure).

F. No single procedure is used as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child.

G. The child is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities.

H. In evaluating each child with a disability, the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified.

I. Technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors, are used.

J. Assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are used and are conducted in a nondiscriminatory way. The MDT will ensure that evaluation and tests materials and procedures are not racially or culturally discriminatory or biased. Tests and all other evaluation materials are administered in the child's native language or mode of communication, unless it is clearly not feasible to do so. However, in various situations, the MDT must always obtain accurate and information that is reliable in order to make informed decisions regarding whether

12

5754

the child has a disability and the effect of the disability on the child's education performance.

The bilingual teams will be responsible for the bilingual (Spanish) assessments. The assessment coordinator for the C.A.R.E. Center will be responsible for assigning all bilingual assessments.

## Determination of Needed Evaluation Data, 34 CFR §300.305

As part of an initial evaluation (if appropriate) and as part of any reevaluation under Part B of IDEA, a group that includes the individuals described in 34 CFR § 300.344 (the MDT team), and other qualified professionals, as appropriate, shall review existing evaluation data on the child, including evaluations and information provided by the parents of the child, current classroom-based assessments and observations, and observations by teachers and related services providers. On the basis of that review, and input from the child's parents, the group shall identify what additional data, if any, are needed to determine:

A.  whether the child has a particular category of disability, or in case of a re-evaluation of a child, whether the child continues to have such a disability;

B.  the present levels of performance and educational needs of the child;

C.  whether the child needs special education and related services, or in the case of a reevaluation of a child, whether the child continues to need special education and related services; and

D.  whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the IEP of the child and to participate, as appropriate, in the general curriculum.

The group making these decisions may conduct its review without a meeting. This public agency shall provide for the administration of tests and other evaluation methods as may be needed to produce the data identified above. If the determination of the group is that no additional data are needed to determine whether the child continues to be a child with a disability, this agency shall notify the child's parents of that determination and the reasons for it, and of the right of the parents to request an assessment to determine whether, for purposes of services under the Individuals with Disabilities Education Act, the child continues to be a child with a disability. If the parent requests assessment, even though the determination has been made that no additional data are needed, this agency must grant the request if the issue is continued eligibility under Part B of IDEA.

## Criteria for Determination of Eligibility

The following disability categories are recognized by IDEA and present specific symptoms that should be documented and presented to the MDT team upon consideration of eligibility for Special Education and related services:

5755

A. Autism,

B. Deaf/Blindness,

C. Emotional Disturbance,

D. Hearing Impairment and Deafness,

E. Mental Retardation,

F. Multiple Disabilities,

G. Orthopedic Impairment,

H. Other Health Impairments,

I. Specific Learning Disabilities,

J. Speech or Language Impairment,

K. Traumatic Brain Injury,

L. Visual Impairment/Blind, and

M. Developmental Delay



Several conditions may be diagnosed by other professionals such as physicians, psychologists, etc. that are not specified by IDEA. These may include such conditions as diabetes, sickle cell anemia, leukemia, etc. Students who present significant learning problems by virtue of the condition may demonstrate eligibility for special education under one or more of the disabilities identified above.

As allowed under 34 CFR § 300.8 implementing IDEA, the District of Columbia also defines a child with a disability to include children ages birth through 6 who have been properly identified with a developmental delay.

No child may be determined to be eligible if the determinant factor for that eligibility determination is lack of instruction in reading, math, or limited English proficiency.

Children with disabilities who are not eligible for special education and related services under IDEA may be entitled to services and protections under Section 504 of the Rehabilitation Act of 1973. This agency may not use IDEA funds to serve students found eligible under Section 504 but not eligible under IDEA.

For further information regarding responsibilities under Section 504, the reader is

14

referenced to the document entitled "Student Access" published by the Department of Elementary and Secondary Education, the regulations for Section 504 of the Rehabilitation Act of 1973, and/or to the United States Department of Education, Office for Civil Rights.

## English as a Second Language (ESL)

English as a Second Language (ESL) students ages 3 through 21 will be referred to the C.A.R.E. Center and assigned to the bilingual teams. All evaluation procedures will be followed in accordance with IDEA 34 CFR§ 300.304.

## Criteria for Initial Determination of Eligibility for Specific Disabilities

### Autism Spectrum

"Autism" is a developmental disability significantly affecting verbal or nonverbal communication and social interaction, generally evident before age 3, which adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.

The term does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disability as defined in this document.

A child who manifests the characteristics of autism after age 3 could be diagnosed as having autism if the criteria above are satisfied.

### Criteria for Initial Determination of Eligibility

A child displays autism when:

A.  Through evaluation that includes a review of medical records, observation of the child's behavior across multiple environments, and an in-depth social history, the following behaviors are documented:

1.  Disturbances of speech, language-cognitive, and nonverbal communication: The child displays abnormalities that extend beyond speech to many aspects of the communication process. Communicative language may be absent or, if present, language may lack communicative intent. Characteristics may involve both deviance and delay. There is a deficit in the capacity to use language for social communication, both receptively and expressively.

2.  Disturbance of the capacity to relate appropriately to people, events, or objects: The child displays abnormalities in relating to people, objects, and events. There is a deficit in the capacity to form relationships with

5757

people. The capacity to use objects in an age appropriate or functional manner may be absent, arrested, or delayed. The child may seek consistency in environmental events to the point of exhibiting rigidity in routines.

B.  The condition adversely affects the child's educational performance.

C.  The autism is not a result of an emotional disability as defined in this document.

Other behaviors which the child may exhibit include:

A.  Disturbance of developmental rates and sequences: The child may also exhibit delays, arrests, or regressions in physical, social, or learning skills. Areas of precocious skill development may also be present, while other skills may develop at normal or extremely depressed rates. The order of skill acquisition frequently does not follow normal developmental patterns.

B.  Disturbances of responses to sensory stimuli: The child's behavior may also range from being hyperactive to being unresponsive to people and objects in their environment and can alternate between these two (2) states over periods ranging from hours to months. Disturbances may be apparent in auditory, visual, olfactory, gustatory, tactile, and kinesthetic responses. The child may respond to stimulation inappropriately and in repetitive or non-meaningful ways.

## Deaf/Blindness

"Deaf/Blindness" means concomitant hearing and visual impairments, the combination of which causes such severe communication and other developmental and educational needs that they cannot be accommodated in special education programs solely for children with deafness or children with blindness.

## Criteria for Initial Determination of Eligibility

A child is deaf/blind when:

A.  both visual and hearing impairments are present; and

B.  the impairments together cause severe communication, developmental, and educational needs.

5758

**Emotional Disturbance**

"Emotional Disturbance" is a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

    A. an inability to learn that cannot be explained by intellectual, sensory or health factors;

    B. an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

    C. inappropriate types of behavior or feelings under normal circumstances;

    D. a general pervasive mood of unhappiness or depression; and,

    E. a tendency to develop physical symptoms or fears associated with personal or social problems.

The term includes schizophrenia, but does not apply to children who are maladjusted unless it is determined they have an emotional disturbance.

**Criteria for Initial Determination of Eligibility**

A child displays an emotional disturbance when:

    A. through evaluation procedures that must include observation of behavior in different environments, and an in-depth social history the child displays one of the following characteristics:

        1. an inability to learn that cannot be explained by intellectual, sensory or health factors;

        2. an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

        3. inappropriate types of behavior or feelings under normal circumstances;

        4. a general pervasive mood of unhappiness or depression; and,

        5. a tendency to develop physical symptoms or fears associated with personal or social problems.

    B. the characteristic(s) must have existed to a marked degree and over an extended period of time. In most cases, an extended period of time would be a range from two (2) through nine (9) months depending upon the age of the

5759

child and the type of behavior occurring. For example, a shorter duration of disturbance that interrupts the learning process in a younger student might constitute an extended period of time. Difficulties may have occurred prior to the referral for evaluation; and

C.  the emotional disturbance adversely affects the child's educational performance.

NOTE: Manifestations of an emotional disturbance can be observed along a continuum ranging from normal behavior to severely disordered behavior. Children who experience and demonstrate problems of everyday living and/or those who develop transient symptoms due to a specific crisis or stressful experience are not considered to have an emotional disturbance.

## Hearing Impairment and Deafness

"Hearing Impairment" is impairment in hearing, whether permanent or fluctuating, that adversely affects a child's educational performance, but is not included in the following definition for deafness.  "Deafness" means a hearing impairment that is so severe that the child is impaired in processing linguistic information through hearing, with or without amplification that adversely affects a child's educational performance.

### Criteria for Initial Determination of Eligibility

A child displays a Hearing Impairment when:

A.  a hearing impairment has been diagnosed by an audiologist; and

B.  the hearing impairment adversely affects the child's educational performance.

## Mental Retardation

"Mental Retardation" is significantly sub-average general intellectual functioning existing concurrently with deficits in adaptive behavior manifested during the developmental period that adversely affects a child's educational performance.

### Criteria for Initial Determination of Eligibility

A child displays mental retardation when:

A.  the child performs 2.0 Standard Deviations below their peers of equivalent age, ethnic, and cultural background when measured by a standardized instrument of cognitive ability;

18

B.  the child displays adaptive behavior consistent with measured cognitive ability.  Adaptive behavior refers to the effectiveness with which a student meets the standards of personal independence and social responsibility expected of his/her age and cultural group. There should be a significant positive correlation between the student's intellectual ability and adaptive behavior. If not, the team must give careful consideration to other evaluative information and utilize professional judgment to determine the student's level of cognitive and adaptive functioning; and,

C.  the disability adversely affects the child's educational performance.

### Professional Judgment

A child may also be deemed eligible if the child displays, through formal and informal assessment, a significant discrepancy even though the deviations do not fall below the criterion range. In such cases, sufficient data must be present in the evaluation report to document the existence of a significant discrepancy.

### Multiple Disabilities

"Multiple Disabilities" means concomitant impairments (such as mental retardation and blindness, mental retardation-orthopedic impairment, etc.); the combination of which causes such severe educational needs that they cannot be accommodated in special education programs solely for one of the impairments. The term does not include deaf/blindness.

### Criteria for Initial Determination of Eligibility

A child displays multiple disabilities when:

A.  concomitant impairments occur; and,

B.  the impairments together cause severe educational needs.

### Orthopedic Impairment

"Orthopedic Impairment" means a severe orthopedic impairment that adversely affects a child's educational performance. The term includes impairments caused by congenital anomaly (e.g., club foot, absence of some member, etc.) impairments caused by disease (poliomyelitis, bone tuberculosis, etc) and impairments from other causes (e.g., cerebral palsy, amputations and fractures or burns that cause contractures).

### Criteria for Initial Determination of Eligibility

A child displays a physical impairment when:

19

    A. an orthopedic impairment has been diagnosed by a licensed physician; and,

    B. the physical impairment adversely affects the child's educational performance.

## Other Health Impairment

"Other Health Impairment" means having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment that is due to chronic or acute health problems, such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, and sickle cell anemia, and adversely affects a child's educational performance.

### Criteria for Initial Determination of Eligibility

A child displays health impairment when:

    A. a health impairment has been diagnosed by a licensed physician, licensed psychologist, licensed professional counselor, or licensed clinical social worker; and,

    B. the health impairment adversely affects the child's educational performance.

## Specific Learning Disability

"Specific Learning Disability" is a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations. The term includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. The term does not include learning problems that are primarily the result of visual, hearing, or motor disabilities, of mental retardation, of emotional disturbance, or environmental, cultural, or economic disadvantage.

### Criteria for Initial Determination of Eligibility

A child has a specific learning disability when:

    A. the child does not achieve commensurate with his or her age and ability levels in one or more areas listed in B below if provided with learning experiences appropriate for the child's age and ability level;

    B. the child displays observable characteristics that indicate deficits in basic psychological processing. The team finds a child has a severe discrepancy

5762

between achievement and intellectual ability in one or more of the following areas. A severe discrepancy is defined as 1.5 Standard Deviation between cognitive and academic areas: basic reading skills, mathematics reasoning, reading comprehension, listening comprehension, written expression, oral expression, and mathematics calculation.

C. the child's severe discrepancy and processing deficits are not PRIMARILY the result of:

    1. a visual, hearing, or motor disability;

    2. mental retardation;

    3. emotional disturbance; or

    4. environmental, cultural or economic disadvantage.

## Professional Judgment

A child may also be deemed eligible if the child displays, through formal and informal assessment, evidence of a learning disability even though a severe discrepancy is not present as defined in B above. In such cases, sufficient data must be presented in the evaluation report to document the existence of a specific learning disability.

## Speech or Language Impairment

"Speech or Language Impairment" is a communication disorder, such as stuttering, impaired articulation, language impairment or a voice impairment that adversely affects a child's educational performance.

## Criteria for Initial Determination of Eligibility – Language

A language disorder is present when:

A. the child consistently exhibits inappropriate use in any of the structures of language (e.g., morphology, syntax, semantics, and pragmatics) as measured by language sampling or other clinical tasks;

B. the child's language functioning is significantly below the child's abilities as measured by two (1.5) or more standardized language assessments. Significantly below is defined as two (2) Standard Deviations below the mean for children 3 to 21 years of age.

C. the language disorder adversely affects the child's educational performance; and,

D. the language disorder is not a result of dialectal differences or second language influence.

## Professional Judgment

A child may also be deemed eligible if the evaluation documents through formal and informal assessment that a language deficit is present even though the standard scores do not meet the criteria in B above. In such cases, sufficient data must be presented in the evaluation report to document the existence of the language deficit.

## Criteria for Determination of Initial Eligibility – Articulation and Phonology

A speech disorder, which includes articulation and/or phonology, is present when:

A. the student exhibits a delay of correct sound production based on accepted normative data. The child's articulation and phonology is evaluated based on a single word test and/or a sentence/phrase repetition task and a connected speech sample;

B. consideration must be given to the type of error recorded (substitutions, omissions, distortions and/or additions). These errors may be described as single sound errors or errors in phonological patterns;

C. an articulation and phonology disorder may also be present if multiple errors in the child's speech compromise intelligibility and/or listener perception even though the recorded errors are considered within normal developmental guidelines;

D. the articulation and phonology disorder adversely affects the child's educational performance; and,

E. the articulation and phonology disorder is not a result of dialectal differences or second language influence. The evaluation report must include sufficient data to document the existence of the articulation and phonology disorder and if, during the collection and analysis of the data, the child's language abilities appear to be impaired, a language evaluation will need to be completed prior to a designation of language disorder.

## Criteria for Initial Determination of Eligibility – Fluency

A fluency disorder is present when:

A. the child consistently exhibits one or more of the following symptomatic behaviors of dysfluency:

1. sound, syllabic, or word repetition;

5764

    2.  prolongations of sounds, syllables, or words;

    3.  blockages; or,

    4.  hesitations;

B.  the child's fluency is significantly below the norm as measured by speech sampling in a variety of contexts. A significant discrepancy is defined as five (5) or more dysfluencies per minute or a 10% dysfluency rate and distracting to the listener; and

C.  the fluency disorder adversely affects the child's educational performance

### Professional Judgment

A child may also be deemed eligible if the evaluation documents through formal and informal assessment that a fluency deficit is present even though the criterion in B above is not met. In such cases, sufficient data must be presented in the evaluation report to document the existence of the fluency deficit.

### Criteria for Initial Determination of Eligibility – Voice

A voice disorder is present when:

A.  the child consistently exhibits deviations in one or more of the parameters of voice: pitch, quality, or volume;

B.  the child's voice is discrepant from the norm as related to his/her age, sex, and culture and is distracting to the listener;

C.  the voice disorder is not the result of a temporary problem such as: normal voice changes, allergies, colds, or other such conditions; and,

D.  the voice disorder adversely affects the child's educational performance.

### Traumatic Brain Injury (TBI)

"Traumatic Brain Injury" is an acquired injury to the brain caused by an external physical force, resulting in total or partial functional disability or psychosocial impairment, or both, that adversely affects a child's educational performance. The term includes open or closed head injuries resulting in impairments in one or more areas, such as, cognition, language, memory, attention, reasoning, abstract thinking, judgment, problem solving, sensory, perceptual and motor abilities, psychological behavior, physical functions, information processing and speech. The term does not include brain injuries that are congenital or degenerative or to brain injuries induced by birth trauma.

5765

**Initial Eligibility Criteria for Traumatic Brain Injury**

A child has a traumatic brain injury when:

   A.  a traumatic brain injury/head injury has been diagnosed by a licensed physician or through a neuropsychological assessment; and,

   B.  the student's educational performance is adversely affected by deficits in acquisition, retention, and/or generalization of skills. Students with a brain injury may have rapidly changing profiles, therefore, educational assessment should include current documentation of the student's functional capabilities and indicate deficits in one or more of the following areas:

      1.  building or maintaining social competence;

      2.  performance of functional daily living skills across settings;

      3.  the ability to acquire and retain new skills, and,

      4.  the ability to retrieve prior information.

**Professional Judgment**

A child may also be deemed eligible if the child displays characteristics of TBI even though a medical diagnosis of head injury has not been made by a physician. In such cases, substantial data to document the medical basis for a head injury must be present in the evaluation report.

**Visual Impairment/Blindness**

Visual Impairment, including blindness, means impairment in vision that, even with correction, adversely affects a child's educational performance. The term includes both partial sight and blindness.

**Criteria for Initial Determination of Eligibility for Visual Impairment**

A child displays a visual impairment when:

   A.  a visual impairment or a progressive vision loss has been diagnosed by an optometrist or ophthalmologist;

   B.  visual acuity has been determined to be:

      1.  visual impairment:  20/70 to 20/200 in the better eye with best correction by glasses;

5766

2. blindness: 20/200 or less in the better eye after best correction by glasses or a visual field measuring 200 or less; and,

C. the visual impairment adversely affects the child's educational performance.

## Learning Disabilities

### Determination of Eligibility for Children with Learning Disabilities, 34 CFR § 300.307

To determine if a student is to found to have a learning disability and is eligible for specialized instruction and/or related services, the MDT must compare evaluation data and document that:

The determination of whether a child suspected of having a specific learning disability is a child with a disability must be made by the child's parents and a team of qualified professionals that must include:

A. the child's regular teacher, or if the child does not have a regular teacher, a regular classroom teacher qualified to teach a child of his or her age; for a child of less than school age, an individual qualified by the DHS to teach a child of his or her age;

B. at least one person qualified to conduct individual diagnostic examinations of children, such as a school psychologist, speech-language pathologist, or remedial reading teacher;

C. at least one team member other than the child's regular teacher shall observe the child's academic performance in the regular setting; and,

D. in the case of a child of less than school age or out of school, a team member shall observe the child in an environment appropriate for a child of that age.

## Developmental Delay

Developmental delay is a categorical disability for children ages 3 through 6 who are experiencing delay(s), as measured by appropriate diagnostic instruments and procedures, in one or more of the following areas: physical development, cognitive development, communication development, social or emotional development, or adaptive development, and who need special education and related services.

### Criteria for Initial Eligibility for Young Children with a Developmental Delay

A child has a developmental delay when:

25

5767

For children ages 3 through 6 (not kindergarten age eligible):

    A.  The child's development is at or below 1.5 Standard Deviations, or equivalent levels, of the mean in any TWO areas of development OR at or below 2.0 Standard Deviations, or equivalent levels, in any ONE area of development. Areas of development that can be used to determine eligibility include physical, cognitive, communication, social/emotional or adaptive.

    B.  The child needs special education and related services.

Children kindergarten age eligible may continue eligibility as Developmental Delay if they were identified as such prior to attaining kindergarten age eligibility.

## Evaluation Procedures to Determine Eligibility for Specialized Instruction and Related Services

After receiving or making a referral for a child that is suspected of having a disability under the Individuals with Disabilities Education Act, the following steps should take taken in order to make an eligibility determination:

1. Convene a Student Support Team meeting to determine whether the child should be evaluated further. If evaluations have already been completed for the child the team can consider whether a determination can be made based on those evaluations or if further evaluation is necessary. If further evaluations are necessary, the team should refer the student to an evaluator to complete the evaluation within the 120-day time period.

2. After the evaluations are completed, the MDT team convenes to determine eligibility based upon the evaluation results as well as anecdotal information provided by the child' teachers and/or parents/guardians

3. The determination of ineligibility must be documented within the notes taken at the MDT meeting if the student is found ineligible for Special Education and related services.

4. If the student is found eligible, an IEP must be developed for the student that specifies the amount of time the student should receive special education and related services, including goals and objectives for the student to achieve during the implementation of the IEP.

5768

## Part C Criteria for Initial Eligibility for Young Children with a Developmental Delay

For children ages birth through age 2 years, a child has a developmental delay when:

A. The child's development is at or below 2.0 Standard Deviations, or equivalent levels, of the mean in one or more areas of development including physical, cognitive, communication, social/emotional or adaptive.

B. There is a documented disability including:

  1. Autism,

  2. Deaf/Blindness,

  3. Emotional Disturbance,

  4. Hearing Impairment and Deafness,

  5. Mental Retardation,

  6. Multiple Disabilities,

  7. Orthopedic Impairment,

  8. Other Health Impairments,

  9. Specific Learning Disabilities,

  10. Speech or Language Impairment,

  11. Traumatic Brain Injury,

  12. Visual Impairment/Blind, and

  13. Young Child with a Developmental Delay.

## Professional Judgment

A child may also be deemed eligible when:

A. The evaluation report documents through formal and informal assessment that a significant deficit exists and a child is eligible for services even though the standard scores, or equivalent levels, do not meet the stated criterion levels in A above; or,

5769

B. The team may determine that a child, who is functioning above the stated criterion level and because of intensive early intervention, is eligible for services based on expected regression if services were to be terminated.

## Legal Reference for Evaluation And Determination Of Eligibility

### Initial Evaluation, 34 CFR § 300.301

This agency shall conduct a full and individual initial evaluation, in accordance with 34 CFR § 300.301 and 34 CFR § 300.304, before the initial provision of special education and related services to a child with a disability. This may or may not include additional testing as determined by the evaluation team members.

### Determination of Eligibility, 34 CFR § 300.306 Report to Parents

Upon completing the administration of tests and other evaluation materials, a group of qualified professionals, which includes the parent of the child, must determine whether the child is a child with a disability. This agency will provide a copy of the evaluation report which documents the determination of eligibility to the parent.

A child may not be determined to be eligible for special education if the determinant factor for that eligibility determination is lack of instruction in reading or math or Limited English Proficiency, or if the child does not otherwise meet the eligibility criteria.

This agency will evaluate a child with a disability before determining that the child is no longer a child with a disability. As part of that evaluation process, the group must determine whether additional data is needed and, if so, shall identify what additional data is needed. Assessment to obtain that data must then be conducted. An evaluation is not required before the termination of a student's eligibility under Part B of the Individuals with Disabilities Education Act due to graduation with a regular high school diploma, or exceeding the age eligibility for a free appropriate public education (FAPE) under State law (age 21).

### Procedures for Determining Eligibility and Placement, 34 CFR § 300.306

In interpreting evaluation data for the purpose of determining if a child is a child with a disability, and the educational needs of the child, this agency shall draw upon information from a variety of sources, including aptitude and achievement tests, parent input, teacher recommendations, physical condition, social or cultural background, and adaptive behavior, and ensure that information obtained from all of these sources is documented and carefully considered.

5770

If a determination is made that a child has a disability and needs special education and related services, an Individualized Education Program (IEP) will be developed for the child. 34 C.F.R. § 300.324.

### Evaluation Timelines, 34 CFR § 300.301

This agency shall provide the parent with a Notice of Intent to Evaluate as soon as possible, but within thirty (30) calendar days of the date of referral for evaluation. Delays beyond this time may be permitted for just cause (school breaks for summer or holidays, student illness, etc.) and documented in the student's record.

The District of Columbia Public Schools shall assess or evaluate a student who may have a disability and who may require special education services within 120 days from the date that the student was referred for evaluation or assessment.

Reevaluation timelines are specified in the following section on reevaluation.

### Parent Request for Evaluation, 34 CFR § 300.301

Parents may request an evaluation for their child. If this agency receives such a request, it shall accept the request and proceed with the evaluation process in accordance with the timelines and requirements set forth in this section.

### Evaluation and Procedures, 34 CFR § 300.304

This agency shall develop a written Evaluation Report for all initial evaluations and for any reevaluations in which additional data was collected.

The evaluation report must include a statement of whether the child has a specific disability as defined in 34 CFR § 300.8.

The LEA shall ensure that a full and individual evaluation is conducted for each child being considered for special education and related services in order to determine (1) if the child is a "child with a disability" under this Chapter; and (2) the educational needs of the child.

The IEP team shall conduct an initial evaluation of a child within a reasonable time of receiving a written referral and parental consent to proceed and within timelines consistent with Federal law and local law.

To conduct an evaluation, the IEP team shall draw upon information from a variety of sources, including aptitude and achievement tests, parent input, teacher recommendations, physical condition, social or cultural background, and adaptive behavior. As part of an initial evaluation (if appropriate) and as part of any reevaluation, the IEP team, including other qualified professionals, as appropriate, shall review existing evaluation data on the child, including:

5771

1.  evaluations and information provided by the parents of the child;

2.  current classroom-based assessments and observations;

3.  observations by teachers and related service providers; and

4.  the present levels of performance and educational needs of the child

The team shall also consider:

1.  whether the child has a particular category of disability under this Chapter or, in the case of a reevaluation of a child, whether the child continues to have such a disability;

2.  whether the child needs special education and related services, or in the case of a reevaluation of a child, whether the child continues to need special education and related services; and

3.  whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the IEP of the child and to participate, as appropriate, in the general curriculum.

## Reevaluation, 34 CFR § 300.303

This agency ensures that the IEP of each child with a disability is reviewed annually and in accordance with 5 DCMR §Chapter 3007, that a reevaluation of each child, in accordance with 34 CFR § 300.304, is conducted if conditions warrant a reevaluation, or if the child's parent or teacher requests a reevaluation, but at least once every three years. For the required triennial evaluation, this agency ensures that under no circumstances will the reevaluation exceed three years. For parent or district requested reevaluations, evaluation timelines specified previously in this section will be followed.

## TRACKING

The OSSE, as the SEA, shall ensure that DCPS and DHS maintain the records of children between the ages of 0 and 21 who have been evaluated and have received eligibility determinations for special education services under the IDEA. DHS (Part C) shall track children 0 to 3 years old (until the children transition to DCPS or age out), and DCPS shall track children 2.8 through 21 years old. Currently, DCPS tracks such students in the ENCORE Database System, as well as maintaining school records for each student.

5772

## Transition to Special Education from Part C to Part B

The purpose of transition planning for children in the Part C early intervention program is to ensure that eligible children and their families experience a smooth and effective transition from the Part C program to the DC Public Schools Early Childhood program.

- ✓ Part B receives child specific information from the Part C system on those children who have been determined eligible and are receiving early intervention services through an electronic database on a monthly basis. This electronic database facilitates the exchange of Child Find information between Part B and Part C and also serves the purpose of maintaining these data and other child specific information in order to track children receiving early intervention services over time to ensure that they are timely evaluated and provided a FAPE by age 3.

- ✓ The Part C office will schedule a transition conference to discuss the referral/transition of a child to Part B. The Part C office will schedule the transition conference sufficiently early, at least 90 days prior to the child's third birthday, to ensure that an eligible child will receive a FAPE no later than their third birthday. The Part C dedicated service coordinator will set up and facilitate the meeting and complete the transition plan. During the transition meeting, the DCPS early childhood representative (ECR) completes the transition conference meeting notes page detailing the discussion and plan. Parents may exercise their right to decline DCPS representation at the transition conference.

- ✓ The DCPS ECR will discuss options for continued delivery of services (including various DCPS model programs as well as Head Start) and document parent's interests and plans in writing. The DCPS ECR will discuss the referral process for accessing Part B services and the responsibility of the C.A.R.E. Center.

- ✓ Staff from the Part C office will be available to accompany the parent to visits to programs.

- ✓ Part C and Part B ensures that the child's early intervention providers are part of the transition decision making process and that the child's birth to 3 information, including the child's Individualized Family Service Plan are used in the decision-making process.

- ✓ If a child is scheduled to transition from the Part C program to the Part B program, and turns 3 years of age during the summer months, the Part B office will determine if the child is eligible for a FAPE and whether the child requires extended school year services (ESY). If the child is eligible for the provision of FAPE and requires ESY services, the Part B office will ensure the implementation of the IEP no later than the child's third birthday, regardless of the fact that this occurs during the summer months. If it is determined that the child is eligible for FAPE and does not require ESY services, then the IEP will be implemented on the first day of school.

5773

✓ Part B and Part C agree that late referrals to Part C (33 months and older) should be made simultaneously to Part B and Part C (with the consent from the family) with the ultimate goal of ensuring that these children, if eligible, are provided with FAPE by their third birthday.

✓ In cases of children who are referred to Part B at 34 or 35 months of age, the ultimate goal is to ensure that all eligible children are provided with a FAPE no later than their third birthday.  However, a referral for a child who is close to age 3 may result in IEP services initiated after the child's third birthday.

✓ Part B has an assigned transition contact that is the primary person responsible for working with the Part C system on transition as well as one or more individuals who will attend all transition conferences convened by the Part C system.  The Part B office has the capacity to ensure the availability of school personnel to attend transition conference throughout the calendar year – including during the summer months.

## INTERAGENCY COORDINATION ACTIVITIES

Child Find System is a statewide interagency system for referrals.  The following District of Columbia Government agencies support Child Find activities in the city:

A. **Department of Mental Health**:  assists in identification and location of infants, toddlers, and children with suspected disabilities through Parent and Infant Development Program, Therapeutic Nursery Branch and Mental Health centers.  Referrals are made to local school districts and the Part C system.

B. **Department of Health**:  assists in identification and location of infants, toddlers, and children with suspected disabilities through its Primary Care and Prevention Administration, Maternal and Family Health Administration and Health Services for Children with Special Needs.  Referrals are made to local school districts and to the Part C system.

C. **The Child and Family Services Administration**:  assists in the identification of infants, toddlers and children with suspected disabilities. Referrals are made to local school districts and to the Part C system. CFSA also identifies students with disabilities and who are placed within the care and custody of the District of Columbia Youth Services. Special education services are provided for these students within the Division's facilities.

D. **Department of Corrections**: provides for the identification of and special education services to inmates with disabilities under age 21 years, who are placed within its jurisdiction.

5774

## GLOSSARY

**Assessment**

A process, which includes observations, testing and test analysis, used to determine an individual's strengths and weaknesses in order to plan educational services.

**Child Find**

Child Find is a comprehensive system of policies and procedures that the District of Columbia follows to ensure that all children living in the District of Columbia with disabilities and in need of special education and related services are identified, located, and evaluated pursuant to the IDEA, 20 U.S.C. § 1412 (a)(3)(A). DHS delivers Part C Early Intervention services to those children age 0 to 3, and DCPS delivers Part B Special Education services to those eligible children age 3 to 21, 34 CFR § 300.111. Child Find system is coordinated with all other major efforts conducted by public and private agencies responsible for administering the various educational, health and social services relevant to the population that is eligible for Part B and Part C services in locating and identifying children.

**Early Childhood Transition Services**

The processes for exiting the Part C system into Part B or another appropriate program, pursuant to the IDEA, 20 U.S.C. § 1412 (a)(9); 34 CFR § 300.124.

**Evaluation**

A way of collecting information about a child's needs strengths and interests. An evaluation is the process used to determine a child's eligibility for various developmental and educational programs and services 34 CFR § 300.15.

**Individualized Educational Program (IEP)**

A written description of the specialized instruction and related services for a student with a disability that is developed, reviewed and revised in accordance with 20 U.S.C. § 1414; 34 CFR § 300.324.

**Individualized Family Service Plan (IFSP)**

A plan of services designed to assist with any changes that the family wants to see in their child and/or in themselves. An IFSP is federally required for any child who is Part C eligible. 20 U.S.C. § 1436; 34 CFR § 300.24.

5775

**Individuals with Disabilities Education Improvement Act of 2004**

The federal law governing the rights of children with delays and disabilities to receive early intervention and special education services. 20 U.S.C. §§ 1400 et seq.

**Least Restrictive Environment (LRE)**

To ensure, to the maximum extent appropriate, children with disabilities including children in private institutions or other care facilities are educated with children who are non-disabled, and the special classes, separate schooling or other removal of children with disabilities from the regular educational environment occur only if the nature or severity of the disability is such that education in regular classes with the use of supplemental aids and services cannot be achieved satisfactorily. 20 U.S.C. § 1412 (a)(5); 34 CFR § 300.118 and § 300.116.

**Multidisciplinary Team (MDT)**

A group of persons, including parents and other persons knowledgeable about the child that interprets the evaluation data and the placement options. 20 U.S.C. 1436; 20 U.S.C. 1414.

**Part B Eligible**

A child who satisfies District registration and residency requirements and who has been evaluated in accordance with 5 D.C.M.R. §§ 3005-3006 as having one of the following conditions and who, as result of the impairment, needs special education and related services; autism; deaf-blindness; developmental delay; emotional disturbance; hearing impairment, including deafness; mental retardation; multiple disabilities; orthopedic impairment; visual impairment, including blindness; traumatic brain injury.

**Referral**

A parent or primary referral source identifies a child that is suspected of having a disability and may be in need of service. This person fills out the required forms and the child is registered in the District of Columbia Public Schools.[1]

---

[1] Referral as defined in this section is not the same as "Date of Referral" currently utilized by the ENCORE System (current data-based tracking system for DCPS).

5776

**REFERENCES**

District of Columbia Public Schools, Office of Special Education Child Find Reference Guide: DC Child Find (2004).

District of Columbia Municipal Regulations, Title V, Chapter 30.

The Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. §§ 1400 et seq.

Missouri Department of Education, Office of Special Education Child Find, St. Louis Department of Education (2005).

Office of Special Education and Rehabilitative Services Federal Register, Rules and Regulations: 34 CFR Parts 300 and 301: Final Rule (2007). Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities: Vol.71, No.156, Washington, D.C.: U.S. Department of Education.



5777

| |
|---|
| __ Y __ N __ Insufficient 1. Student is three through six years of age. |
| __ Y __ N __ Insufficient 2. Student has not acquired skills or achieved commensurate with recognized performance expectations for his/her age in one of more of the developmental areas. (Check all that apply) |
| __ Cognition          __ Motor development          __ Self-help/adaptive behavior |
| __ Communication          __ Social-Emotional development |
| __ Y __ N __ Insufficient 3a.     And, student demonstrated a measurable, verifiable difference between expected performance and current level of performance documented by: |
| __ Y __ N __ Insufficient a.  Scores of two Standard Deviations or more below the mean in one or more of the five (listed above) developmental areas using norm-referenced instruments and procedures; or |
| __ Y __ N __ Insufficient b. Scores of 1 ½ Standard Deviations below the mean in two or more of the five developmental areas (listed above) using norm-referenced instruments and procedures; |
| __ Y __ N __ Insufficient 3b.  Or, normed scores are inconclusive and the professional judgment of the MDT verifies the existence of significant atypical quality or pattern of development. |
| Supporting Evidence: |
| __ Y __ N __ Insufficient Evaluation information confirms that limited English proficiency was not a determinant factor in the eligibility decision. |

The MDT used the above interpretation of the evaluation data to determine:

- ❏ The student has Developmental Delay and is eligible for specially designed instruction and/or related services (Criteria 1, 2, and 3 MUST all be checked to be eligible); or
- ❏ The student does not have Developmental Delay, or
- ❏ Evaluation data are insufficient to determine eligibility.  Additional assessments and/or data will be obtained in the area(s) as indicated on the Student Evaluation Plan (SEP).  The MDT will reconvene by _____ to review and determine eligibility.

5778

Declaration Exhibit C

DRAFT August, 2007
Privileged and Confidential

MEMORANDUM OF AGREEMENT
BETWEEN
THE DISTRICT OF COLUMBIA PUBLIC SCHOOLS
AND
THE DEPARTMENT OF HUMAN SERVICES
AND
THE DEPARTMENT OF HEALTH
AND
THE CHILD AND FAMILY SERVICES AGENCY
AND
THE DEPARTMENT OF MENTAL HEALTH
[FOR DISCUSSION PURPOSES---THE OFFICE OF THE STATE
SUPERINTENDENT OF EDUCATION]

## I.     INTRODUCTION

This Memorandum of Agreement (MOA) is entered into between and among the District of Columbia Public Schools (DCPS), the Department of Human Services (DHS), the Department of Health (DOH), the Child and Family Services Agency (CFSA) and the Department of Mental Health (DMH) [FOR DISCUSSION PURPOSES—THE OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION] for the purpose of forging a collaborative effort among the aforementioned agencies to improve the public awareness and delivery of services that are rendered to children ages 0 to 5 years old pursuant to the Individuals with Disabilities Education Improvement Act of 2004 (IDEIA), 20 U.S.C. § 1412(a)(3) and (9), also known as "Child Find," and in response to the action ENTITLED D.L. v. District of Columbia, Civil Action No. 05-1437 (RCL).[1]

The Child Find system is a comprehensive system of policies and procedures that the District of Columbia follows to ensure that all children (including infants, toddlers and school-aged children) living in the District of Columbia with disabilities and in need of special education and related services are identified, located and evaluated pursuant to the IDEIA, 20 U.S.C. §1412(a)(3)(A).

**DCPS** is a publicly funded school system whose mission is to ensure that all students acquire the knowledge, skills and values necessary to live rich and fulfilling lives as responsible, productive and enlightened members of a democratic society. As part of that mission, DCPS, through the Office of Special Education (OSE), recognizes its

---

[1] The Court has defined the D.L. class as:

> All children who are or may be eligible for special education and related services, who live in, or are wards of, the District of Columbia, and (1) whom defendants did not identify, locate, evaluate or offer special education and related services to when the child was between the ages of three and five years old, inclusive, or (2) whom defendants have not or will not identify, locate, evaluate or offer special education and related services to when the child is between the ages of three and five years old, inclusive.

August 25, 2006, Memorandum Opinion.

DRAFT August, 2007
Privileged and Confidential

responsibilities in establishing procedures to identify children who are suspected of having disabilities, and to provide services to those children found eligible in accordance with the IDEIA and through OSE.

**DHS**, through the Office of Early Care and Education Administration (ECEA), provides support for and collaborates with other public and private child and family advocacy organizations to formulate an effective continuum of services and care for District children 5 years of age and younger, including those services required by the IDEIA.

**DOH** promotes and protects the health, safety and quality of life of residents, visitors and those doing business in the District of Columbia. DOH is responsible for identifying health risks; educating the public; preventing and controlling diseases, injuries and exposure to environmental hazards; promoting effective community collaborations; and optimizing equitable access to community resources. DOH, through its Maternal and Primary Care and Prevention Administration (MPCA), the Medical Assistance Administration (MAA) and the Center for Policy, Planning and Epidemiology (CPPE), serves children who may be within the target population for this MOA.

**CFSA** has the responsibility to investigate reports of child abuse or neglect and to develop, deliver and provide a comprehensive network of services to such children, and to families of children found who may need to be removed for child abuse or neglect or in other family crises. Such services may be supplied directly through CFSA or contracted out through vendors or community collaborative agencies. As such, CFSA serves children who may be within the target population for this MOA.

**DMH** is responsible for developing a system of care for persons with mental illness in the District of Columbia, including adults, children, youths and their families. DMH operates in accordance with the requirements of the Mental Health Establishment Amendment Act of 2001, which is required to be construed in a manner consistent with all outstanding orders of the United States District Court in <u>Dixon, et al. v. Williams, et al.</u>, Civil Action No. 74-0285, including the Final Plan adopted by the District Court in its April 2, 2001 order (known as the Dixon Plan). DMH's goals include development of a high quality, comprehensive, cost effective and culturally competent mental health services, and mental health supports for children or youth with serious emotional disturbances. DMH comes in contact with children who may be within the target population for this MOA through the School-Based Mental Health Program, the Therapeutic Nursery Program and the Parent and Infant Development Program, as well as through other Mental Health Rehabilitation Services (MHRS) providers.

[FOR DISCUSSION PURPOSES—THE OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION (OSSE) IS THE STATE EDUCATION AGENCY (SEA) FOR THE DISTRICT OF COLUMBIA, AS A RESULT OF RECENTLY ADOPTED LEGISLATION FOR THE DISTRICT OF COLUMBIA AND HAS RESPONSIBILITIES FOR CHILD FIND UNDER THE IDEIA AND 34 CFR 303.321]

## II.   <u>OVERVIEW</u>

5780

DRAFT August, 2007
Privileged and Confidential

The main purpose of this MOA is to improve identification and referral of, and service delivery to, children with disabilities from birth to 5 years old living in the District of Columbia, including members of the D.L. class, who may need early intervention or special education and related services, as well as to promote accountability and interagency cooperation.

To accomplish this, all of the agencies—DCPS, DHS, DOH, CFSA and DMH [FOR DISCUSSION PURPOSES---AND OSSE]—will collaborate on outreach activities designed to identify children in need of services and make such services available to those children through referrals to the Central Assessment Referral and Evaluations (CARE) Center of DCPS.
In addition, the overall goal of the MOA with regard to the two lead agencies—DCPS (through OSE) and DHS (through ECEA)—is to:

    A.    Share accurate, current data that will assist in the identification, evaluation and monitoring of children with disabilities as required under the IDEIA;

    B.    Promote and improve collaborative activities to facilitate the identification and evaluation of children from birth through age 5; and

    C.    Ensure that children participating in early intervention programs (known as "Part C" and pursuant to 20 U.S.C. §§ 1431 et seq.) have smooth and effective transitions to appropriate preschool programs (known as "Part B" and pursuant to 20 U.S.C. §§ 1412 et seq.), if eligible, pursuant to the IDEIA, 20 U.S.C. § 1412(a)(9).

The target population for this MOA includes children living in the District of Columbia from birth to 5 years of age with disabilities and who may need early intervention or special education services pursuant to the IDEIA, including Part C eligible children from birth to 2 years, 9 months, and Part B eligible children between the ages of 2 years, 9 months and 5 years who are Part B eligible and who may or may not be transitioning from Part C to Part B.

The subject agencies hereby agree to the following terms and conditions for execution and implementation of the MOA.

**III.**    **Definitions**

    **A.**    **Assessment**

    A process, which includes observation, testing and test analysis, used to determine an individual's strengths and weaknesses in order to plan educational services.

    **B.**    **Child Find**

5781

As explained in the Introduction Section of this MOA, the Child Find system is a comprehensive system of policies and procedures that the District of Columbia follows to ensure that all children living in the District of Columbia with disabilities and in need of special education and related services are identified, located, and evaluated pursuant to the IDEIA, 20 U.S.C. §1412(a)(3)(A). DHS delivers Part C Early Intervention services to those children aged 0 to 3, and DCPS delivers Part B Special Education services to those eligible children aged 3 to 21. The Child Find system is coordinated with all other major efforts conducted by public and private agencies responsible for administering the various educational, health and social services relevant to the population that is eligible for Part B and Part C services in locating and identifying children.

**C.**     **Early Childhood Transition Services**

The processes for exiting the Part C system into Part B or another appropriate program pursuant to the IDEIA, 20 U.S.C. §1412(a)(9).

**D.**     **Evaluation**

A way of collecting information about a child's needs, strengths and interests. An evaluation is the process used to determine a child's eligibility for various developmental and educational programs and services.

**E.**     **Individualized Educational Program (IEP)**

A written description of the specialized services for a student with a disability that is developed, reviewed and revised in accordance with 20 U.S.C. § 1414.

**F.**     **Individualized Family Service Plan (IFSP)**

A plan of services designed to assist with any changes that the family wants to see in their child and/or in themselves. An IFSP is federally required for any child who is Part C eligible. 20 U.S.C. § 1436.

**G.**     **Individuals with Disabilities Education Improvement Act of 2004 (IDEIA)**

The federal law governing the rights of children with developmental delays and disabilities to receive early intervention and special education services.

**H.**     **Least Restrictive Environment (LRE)**

DRAFT August, 2007
Privileged and Confidential

To ensure that, to the maximum extent appropriate, children with disabilities—including children in private institutions or other care facilities—are educated with children who are non-disabled, and that the special classes, separate schooling or other removal of children with disabilities from the regular educational environment occur only if the nature or severity of the disability is such that education in regular classes with the use of supplemental aids and services cannot be achieved satisfactorily. 20 U.S.C. § 1412(a)(5).

I.      **Multidisciplinary Team (MDT)**

A group of persons, including parents and other persons knowledgeable about the child, which interprets the meaning of the evaluation data and the placement options. 20 U.S.C. § 1436; 20 U.S.C. § 1414.

J.      **Part B Eligible**

A child who satisfies District registration and residency requirements and who has been evaluated in accordance with 5 D.C.M.R. §§ 3005-3006 as having one of the following conditions and who, as a result of the impairment, needs special education and related services: autism; deaf-blindness; developmental delay; emotional disturbance; hearing impairment, including deafness; mental retardation; multiple disabilities; orthopedic impairment; visual impairment, including blindness; traumatic brain injury; other health impairment; learning disabled; and speech or language impairment. All children with disabilities in the District of Columbia aged 3 to 21 are entitled to a free appropriate public education (FAPE). 20 U.S.C. § 1412(a)(1).

K.      **Part B Prior Written Notice**

A written notice provided to the family and other participants early enough to ensure that they will be able to attend any scheduled meeting, and to make them aware of DHS proposals to initiate, change or refuse to change the identification, evaluation or placement of an infant or toddler. 20 U.S.C. § 1439(a)(6).

L.      **Part C Eligible**

Infants and toddlers who have delays in their development and/or have been diagnosed with a condition/disability that has a high probability of causing developmental delays can receive services under the IDEIA, 20 U.S.C. §§ 1431 et seq. Developmental delays of infants and toddlers, birth to 3 years old shall be considered to exist if the infants or toddlers demonstrate a 50% delay in one or more of the five developmental areas.

5783

DRAFT August, 2007
Privileged and Confidential

**M.      Part C Prior Notice**

Notification to parents:

1.     Form letter of invitation sent to parents inviting them to a meeting for a discussion related to a level of eligibility or delivery of services.

2.     Checklist and summary of information provided to parents after discussions and determinations have concluded with either the development of an IEP or notification of ineligibility with the completion of the Prior Notice.  20 U.S.C. § 1415(b)(3).

**N.      Public Awareness**

The District of Columbia's process to create public awareness about early intervention and special education services that are available under the IDEIA Part C and Part B.  The public awareness activities focus on the early identification of children.  The strategies include the preparation and dissemination of information and materials for parents on the availability of early intervention and special education services.

**O.      Transition Conference**

Meeting held for children prior to their third birthdays to begin formal planning for exit from the Part C system into Part B or another appropriate program.  20 U.S.C. § 1412(a)(9).

**IV.    Scope of Services of DCPS and DHS, the Lead Agencies in Child Find**

**A.      DCPS**

DCPS is the lead agency responsible for the identification and education of all eligible students with disabilities within the jurisdiction, beginning at age 3 and continuing through 21 years of age.  In compliance with the IDEIA, DCPS is required to identify all children with disabilities needing special education, and to ensure the seamless transition of eligible children from ECEA (Part C) to DCPS (Part B).

As such, DCPS agrees to:

1.     Compile data regarding the receipt of referrals from parents, physicians, DHS, CFSA and others and the disposition of those referrals;

6

DRAFT August, 2007
Privileged and Confidential

2.  Establish procedures for the process of referral, transition, and provision of services to children 2 years, 9 months and older who may be eligible for special education in compliance with the IDEIA and its implementing regulations 34 CFR § 300. 111;

3.  Begin the transition process by receiving personally identifiable information from DHS of Part C eligible children who have reached the age of 2 years;

4.  Participate in the transition conference meeting with DHS for all Part C eligible children, as the Local Education Agency (LEA);

5.  Collaborate with DOH, CFSA and DMH in receiving information regarding children suspected of having a disability that have been discovered through the CFSA system or contact with DOH or DMH;

6.  Consider data provided by DHS, DOH, CFSA and DMH in developing an Individualized Education Program, if eligible, for the child;

7.  Continue its outreach efforts to publicize Child Find on a regular basis;

8.  Host and coordinate training throughout the year on Child Find outreach, identification, and delivery of services, inviting DOH, DHS, CFSA and DMH to participate and/or attend free of charge;

9.  Participate in health fairs held bi-annually to provide information about Part B services to parents and to identify at-risk infants and toddlers.

**B.    DHS**

DHS is the primary agency responsible for the federal Part C program for infants and toddlers (age 0 through 3 years old) with disabilities under the IDEIA. As a requirement of the IDEIA, the District must ensure that potentially eligible children are identified and evaluated. Those children found eligible must receive appropriate intervention and be transitioned in a timely manner from ECEA to DCPS, or other appropriate programs, in order to ensure the continuation of necessary services by the child's third birthday.

DHS ECEA plans, coordinates and implements the state-based childcare subsidy program for infants and children, coordinates Head Start, offers

5785

DRAFT August, 2007
Privileged and Confidential

parent education services and implements the Part C program for infants and toddlers with delays and disabilities.

As such, DHS, through ECEA, agrees to:

1.  Identify and report all Part C eligible children to the Part B Early Childhood Coordinator at the time the child is 2 years old or at the time of eligibility determination if over age 2 years;

2.  Identify and report all children determined "not eligible" for Part C who have delays and are recommended for therapy services, as well as those who went through the eligibility process and had no concerns identified, to the Part B Early Childhood Coordinator, or designee, on a monthly basis;

3.  Coordinate and monitor the implementation of the identified transition process by Part C providers that are funded by ECEA for all Part C eligible children beginning at age 2 years;

4.  Inform by formal invitation Part B of all transition conferences at least 90 days prior to the child's third birthday to be held with a minimum of 3 weeks notice unless agreed upon by Part B for a date sooner;

5.  Ensure the development of a transition plan during the transition conference that identifies the child's needs and services, and addresses what steps are to be taken to complete transition for the Part C eligible children by age 3 years;

6.  Provide copies of all current, relevant information for Part C eligible children (including such documents as evaluations, assessments, progress reports, IFSPs and medical reports) to Part B and any other pertinent information with consent from the family at the transition conference.  Additional information identified on the transition plan also will be provided to Part B;

7.  Develop and maintain a tracking system for all Part C eligible children through the transition process to completion and at the start of the new program or services;

8.  Identify trends and program needs to the DCPS Early Childhood Coordinator quarterly;

9.  Develop and maintain a database that is able to keep an accurate tracking of all Part C eligible children through the transition process to completion and at the start of the new program or

5786

DRAFT August, 2007
Privileged and Confidential

services.  The database shall include the following information for each Part C eligible child:

  i.  child and parent information (ie, the child's date of birth, the parents' names and address);

  ii.  agency providing services;

  iii.  insurance/funding information;

  iv.  disability, service and health needs;

  v.  record of notifications to family;

  vi.  record of consent and orientation participation;

  vii.  record of Part B meeting notification;

  viii.  record of transition conference date;

  ix.  identification of neighborhood school;

  x.  record of registration (date, ID number, referral to DCPS);

  xi.  record of MDT and IEP meeting dates;

  xii.  record of placement and start date;

  xiii.  record of Part C family placement follow-up; and

  xiv.  record of completion of parent survey;

10. Develop and maintain an integrated database that can facilitate the transition process from Part C to Part B in coordination with DCPS;

11. Continue to employ a Part C Transition Coordinator who maintains the transition database and updates the database on a monthly basis for all eligible children.

  i.  The ECEA Part C Transition Coordinator shall identify all eligible 2 year olds to the Part B Early Childhood Coordinator on a monthly basis using the integrated database, except that children over the

5787

DRAFT August, 2007
Privileged and Confidential

age of 2 and new to ECEA shall be reported at the time of entry into the database;

ii.    The ECEA Part C Transition Coordinator shall complete a bi-monthly mailing of letters to be developed in coordination with the Part B Coordinator to the parents of eligible children for the purpose of guiding the child's family through the transition process;

12.    Continue its outreach efforts to publicize Child Find on a regular basis.  These outreach efforts shall include, but not be limited to, doctors' offices, hospitals, maternity wards, health care clinics, child development centers and day care providers [THROUGHOUT] the District of Columbia. Said outreach efforts shall include, but not be limited to, public service announcements, brochures, leaflets and flyers;

13.    Conduct quarterly trainings on Part C with case managers and social workers from CFSA and provide CFSA with printed outreach materials that the case managers and social workers can distribute to potentially eligible children and their families; and

14.    Participate in health fairs held bi-annually to provide information about Part B services to parents and to identify at-risk infants and toddlers.

**C.    Joint Responsibilities of DHS and DCPS**

In order to accomplish these activities systematically, the collaboration and sharing of information between DCPS and DHS is critical.

DCPS and DHS shall:

1.    Develop public awareness materials that offer information about available services for children who may have delays or disabilities in the District of Columbia, and provide those materials to, among others, DOH, CFSA and DMH for distribution;

2.    Design and implement public awareness activities that offer information, provide screenings and showcase available services in the District of Columbia;

3.    Develop and implement Child Find activities that lead to identification of children who may have delays or disabilities;

5788

DRAFT August, 2007
Privileged and Confidential

4.   Develop [DISTRICT]wide policies and procedures for identification and referral of children to the Child Find system;

5.   Develop and implement a plan for educating and jointly training DCPS and DHS staff, contract service providers and other agencies such as DOH, CFSA and DMH regarding the Child Find system free of charge to trainees;

6.   Agree annually on a budget for funding of public awareness materials (i.e. brochures, posters, notebooks and media announcements);

7.   Develop and maintain a shared database for the purpose of Child Find and transition from Part C to Part B;

8.   Develop policies and procedures for the implementation of the transition process;

9.   Develop a series of joint letters for the Transition Services Process;

10.  Develop and maintain a joint Transition Training Manual for both families and providers;

11.  Participate in the Transition Conference for all children exiting the Part C system;

12.  Work collaboratively to ensure the completion of the transition process for all eligible children; and

13.  Develop procedures to ensure the privacy and confidentiality of children referred for Child Find and/or transition.

## V.   Scope of Services of DOH, CFSA and DMH

Because DOH, CFSA and DMH may come into contact with children who may be eligible for Part C or Part B services, these agencies agree to assist DCPS and DHS in Child Find outreach and identification activities, such as distributing Child Find information and referring children to DCPS.

A.   DOH agrees to:

1.   Work collaboratively to cause its relevant staff (specifically, the relevant staff of the following DOH offices: MPCA, MAA and CPPE) to be trained on Child Find opportunities, age categories and benefits, as well as procedures for referrals to the DCPS CARE Center.  Such training will commence by _____,

5789

DRAFT August, 2007
Privileged and Confidential

and continue as a component of the core training for the relevant staff. Such training shall not exceed 8 hours per annum;

2.  No later than 12 months after the execution of this MOA, conform at least 80% of its protocols, policies and practices, if any require changing, to encourage the distribution of Child Find outreach materials developed by DHS and DCPS to children within the target population of this MOA with whom DOH, including its vendors or community collaborators, come into contact, commencing with review of protocols, policies and practices to be initiated by MPCA, MAA and CPPE, no later than six months after the execution of this MOA;

3.  Subject to any legal limitations established by statute, regulation, rule or court order, work with DCPS, DHS, CFSA and DMH on information technology (IT) database sharing issues and on reducing confidentiality barriers in order to ensure the identification and exchange of data about children with disabilities from birth to 5 years of age living in the District of Columbia who may need early intervention or special education services pursuant to the IDEIA;

4.  Organize, or participate in, at least two health fairs, immunization fairs or other events at which Child Find information is made available to parents and guardians of children who may need early intervention or special education services; and

5.  Gather information from CPPE regarding at-risk births that may be eligible for Part C services (including such factors as low birth weight and identifiable disabilities like blindness) and send a message or send literature provided to CPPE by DHS or DCPS to the parent(s) or guardian(s) of each identified child.

6.  CPPE will furnish literature provided to CPPE by DHS or DCPS regarding early intervention and special education services to at least 80% of the persons requesting a birth certificate for a child aged 0-3 years at the time of the request;

7.  At least twice a year, MAA will send a message or send literature provided to MAA by DHS or DCPS regarding available early intervention and special education services to at least 80% of the parents and guardians of Medicaid-enrolled children aged 0 to 3 years;

8.  At least once a year, MAA will send a message or send literature provided to MAA by DHS or DCPS to at least 80% of MAA's

5790

DRAFT August, 2007
Privileged and Confidential

pediatric providers, reminding them that early intervention and special education services are available for children with disabilities;

9. At least twice a year, MPCA will send a message or send literature provided to MPCA by DHS or DCPS regarding available early intervention and special education services to at least 80% of the identified parents and guardians of children aged 0 to 3 years; and

10. At least once a year, MPCA will send a message or send literature provided to MPCA by DHS or DCPS to at least 80% of pediatric providers known to MCPA, reminding them that early intervention and special education services are available to children with disabilities.

B. CFSA agrees to:

1. Work collaboratively to cause its social workers, vendors, and community collaborative agencies to be trained on Child Find opportunities, age categories, and benefits, as well as on procedures for referrals to the DCPS CARE Center. Such training will commence by _____, and continue as a component of the core training for social workers, vendors, and collaboratives;

2. Conform its protocols, policies and practices, if any require changing, to encourage the distribution of Child Find outreach materials developed by DHS and DCPS to children within the target population of this MOA with whom CFSA, including its vendors and community collaborators, come into contact, commencing with review of protocols, policies and practices, to be initiated by _____;

4. Work with DCPS, DHS, DOH and DMH on IT database sharing issues and on reducing confidentiality barriers in order to ensure the identification and exchange of data about children with disabilities from birth to 5 years of age living in the District of Columbia whom may need early intervention or special education services pursuant to the IDEIA;

5. Collaborate to obtain cooperation and referrals from the Superior Court, Family Court.

C. DMH agrees to:

1. Work collaboratively to cause its staff—specifically, social workers, psychologists and mental health specialists working in

13

5791

DRAFT August, 2007
Privileged and Confidential

elementary schools as part of DMH's School-based Mental Health Program; DMH staff working in the Parent and Infant Development program and the Therapeutic Nursery Branch program of the DC Community Services Agency; and Mental Health Rehabilitation Services (MHRS) providers who work with children from birth to 5 years of age—to be trained on Child Find opportunities, age categories, and benefits, as well as on procedures for referrals to the DCPS CARE Center. Such training will commence by _____, and continue as a component of the core training for _____;

2.    Conform its protocols, policies and practices, if any require changing, to encourage the distribution of Child Find outreach materials developed by DHS and DCPS to children within the target population of this MOA with whom DMH comes in contact, including DMH staff in the School-Based Mental Health Program and the DC Community Services Agency who work with children and families, and DMH's MHRS providers, commencing with review of protocols, policies and practices, to be initiated by _____;

3.    Work with DCPS, DHS, DOH and CFSA on IT database sharing issues and on reducing confidentiality barriers in order to ensure the identification and exchange of data about children with disabilities from birth to 5 years of age living in the District of Columbia whom may need early intervention or special education services pursuant to the IDEIA;

4.    Participate in bi-annual health fairs in which Child Find information is made available to parents of children who may need early intervention or special education services.

## VI.    Student Records

The subject agencies agree that all student records shall be treated as confidential in compliance with all federal and District of Columbia laws and regulations regarding the confidentiality of student records. The subject agencies will identify procedures to maintain secure record keeping systems and to ensure the confidentiality of all program information. This includes locked filing cabinets with limited access to project staff and, with varying levels of security, limiting access to the database. Confidential information shall only be collected and used for the purposes identified in this MOA, and shall be shared only with those persons needed to complete referrals and ensure the receipt of services by eligible children and their families.

## VII.    Confidentiality and Information Sharing

14

The subject agencies shall adhere to all applicable confidentiality requirements, including, but not limited to, those requirements mandated in:

A.    the Family Educational Records and Privacy Act (FERPA) and 34 C.F.R., Part 99,

B.    the Health Insurance Portability and Accountability Act (HIPAA) of 1996 and 45 C.F.R. §§ 160 and 162,

C.    Section 1902(a)(7) of the Social Security Act, 42 U.S.C. § 1396a(a)(7) and 42 C.F.R. §§ 431.300—431.307, regarding Confidentiality for Medicaid Beneficiaries,

D.    D.C. Code §§ 7-201 and 7-219, regarding Vital Records,

E.    D.C. Code §§ 16-2301, et seq., regarding Family Division Proceedings,

F.    D.C. Code §§ 4-1303.06, regarding Confidentiality of Records and Information, and

G.    D.C. Code §7-1201 et seq., the D.C. Mental Health Information Act.
[FOR DISCUSSION PURPOSES:  H.  THE IDEIA AND ITS REGULATIONS, INCLUDING 34 CFR SECTIONS 300.610 AND 303.460.]
All findings, reports, studies and evaluations developed from sharing participation data will preserve [FOR DISCUSSION PURPOSES: IN CONFIDENCE] the identities of the children and their families.  To the extent required [FOR DISCUSSION PURPOSES: OR PERMITTED ]by law, information released to the participating agencies and the public will only be in aggregate formats, unless project staff as stated in the above section needs specific information and such is allowed by law.

To the extent permitted by law, designated agency staff persons will share and exchange data on other potentially eligible clients to increase the availability of services to children who may eligible for Part B services.

## VIII.    Coordination of Agency Functions and Accountability

To the extent that the respective budgets, appropriations and the legal availability of funding permit, the subject agencies will ensure that their respective budgets contemplate the funding of their responsibilities in this MOA, provided, however, that it is understood and agreed that DHS and DCPS will offer all required training free of charge to DMH, DOH and CFSA [FOR DISCUSSION PURPOSES: AND OSSE], and will also provide DMH, DOH and CFSA [FOR DISCUSSION PURPOSES: AND OSSE]with the public awareness materials for distribution referred to in Section IV.C. free of charge.

DCPS will include a line item for Child Find in its Special Education Budget.

5793

DRAFT August, 2007
Privileged and Confidential

The subject agencies will create a committee with representatives from each agency to meet bi-annually to discuss and correct any problems or concerns with the implementation of this MOA and the overall effectiveness of Child Find activities in the District of Columbia.

## IX.    Duration of MOA

The term of this MOA is for one year from the date of signature of all respective agency directors.

This MOA shall renew automatically for additional one-year terms.

The parties will review this MOA annually.

## X.    Amendment/Modification of the Terms and Conditions

DCPS, DHS, DOH, CFSA and DMH [FOR DISCUSSION PURPOSES: AND OSSE] reserve the right to request, in writing, modification or renegotiation of the terms and conditions of this MOA at any time. With the agreement of all parties, modification to this document shall be made in the form of an amendment dated and signed by the authorized representative of DCPS, DHS, DOH, CFSA and DMH [FOR DISCUSSION PURPOSES: AND OSSE]

Minor modifications may be made by memorandum to the signatories. Should there be disagreement as to whether a proposed modification is "minor," the process for formal modification shall apply (specifically, modification shall be made in the form of an amendment dated and signed by the authorized representative of DCPS, DHS, DOH, CFSA and DMH [FOR DISCUSSION PURPOSES: AND OSSE).

## XI.    Effective Date

This MOA shall be effective upon execution by the respective agency directors.

## XII.    No Money Transferred

This MOA is not a Memorandum of Understanding for procurement of goods or services authorized by D.C. Code § 1-301.01(j) or (k). No entity to the MOA will be transferring money to another entity to this MOA. Each entity shall fund its responsibilities under this MOA.

5794

**DRAFT August, 2007**
**Privileged and Confidential**

**In witness whereof,** the agencies hereto have signed this MOA as of the date and year written below:

**FOR THE DISTRICT OF COLUMBIA PUBLIC SCHOOLS:**

_____          Date  _____
[MICHELLE RHEE
DCPS CHANCELLOR]


_____     Date     _____
DCPS Assistant Superintendent

**FOR THE DEPARTMENT OF HUMAN SERVICES:**

_____          _____  Date
[KATE JESBERG]
DHS Interim Director


_____          _____  Date
Barbara Kamara
DHS Executive Director of
Early Care and Education Administration

**FOR THE DEPARTMENT OF HEALTH:**

_____          _____  Date
Gregg A. Pane, MD
DOH Director

Certified for execution by the Department of Health:

_____          _____  Date
Kenneth B. Campbell
General Counsel for the Department of Health

5795

DRAFT August, 2007
Privileged and Confidential

**FOR THE CHILD AND FAMILY SERVICES AGENCY:**

_____                _____
[SHARLYNN E, BOBO                                     Date
ACTING ]CFSA Director

**FOR THE DEPARTMENT OF MENTAL HEALTH:**

_____                _____
Stephen T. Baron, LCSW-C                              Date
DMH Director

_____                _____
???                                                   Date

**[FOR DISCUSSION PURPOSES:  FOR THE OFFICE OF THE STATE
SPERINTENDENT OF EDUCATION:**

**DEBORAH GIST
STATE SUPERINTENDENT OF EDUCATION DATE]**

5796