## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

DL,[1/] *et al.*, on behalf of themselves
and others similarly situated,

        Plaintiffs,

        v.

THE DISTRICT OF COLUMBIA, *et al.*

        Defendants.
_____

Civil Action No. 05-1437 (RCL)

## PLAINTIFFS' REPLY TO DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

### INTRODUCTION

Defendants boast that they have produced 13,780 pages of documents in response to plaintiffs' discovery demands. Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion to Compel (hereafter "Def. Opp."), p. 1. However, defendants do not explain when this production occurred. Defendants' Tenth Supplemental Production (*see* Def. Ex. A (Document Index), pp. 39-42), which was produced on January 30, 2008, the eve of plaintiffs' original deadline to file this motion to compel, contained over 600 pages of documents responsive to Plaintiffs' First Set of Requests for Production of Documents (Pl. Ex. A), served on December 28, 2005, that were all in defendants' custody long before their production. Defendants' Eleventh Supplemental Production (*see* Def. Ex. A, pp. 43-51), produced on March 6, 2008, just four days before defendants' opposition brief was due, contained over 6,000 pages of documents responsive to Plaintiffs' First, Second, and Third Sets of Requests for Production of Documents (Pl. Exs. A, B, C). These documents were also in defendants'

---

[1/] Pursuant to Local Rule 5.4(f)(2), minors are identified by their initials.

control months, even years, before their production.

Defendants correctly assume (Def. Opp. 2) that plaintiffs want defendants to continue producing documents as they are found. Yet, plaintiffs also expect defendants to conduct immediately a thorough search. Defendants' history of "rolling" document production, described in plaintiffs' Memorandum in Support of Plaintiffs' Motion to Compel Defendants' Responses to Plaintiffs' First, Second, and Third Sets of Requests for Production of Documents and Plaintiffs' First Set of Interrogatories ("Pl. Mem."), pp. 4-5, and culminating in the January 30 and March 6 production, demonstrates that defendants have not conducted such a search. This is not surprising since, as discussed below (pp. 15-18), it appears that defendants' counsel only recently began instructing defendants on how to interpret plaintiffs' document requests.

As plaintiffs have previously discussed (Pl. Mem. 1-6), defendants' responses to plaintiffs' discovery requests have been wholly inadequate and resulted in significant delays to plaintiffs' prosecution of this case. Plaintiffs' Exhibit L, updated in Plaintiffs' Exhibit S (attached) to reflect defendants' March 6 production, demonstrates that there is still substantial responsive material that defendants have not yet produced. Of the documents that defendants have produced, many were available months or years before defendants produced them.

Plaintiffs address below each of the specific arguments raised in defendants' opposition brief. This discussion, as well as the detailed description of defendants' discovery failures demonstrated in Plaintiffs' Exhibit S, make clear that defendants' arguments are without merit. Accordingly, plaintiffs ask that the Court grant their motion to compel and award expenses pursuant to Rule 37(a)(5)(a).[2]

---

[2]Defendants request (Def. Opp. 6-7) that the Court refer the parties' discovery disputes to a Magistrate Judge for "some good old-fashioned head-knocking" as "a good antidote to [plaintiffs'] adventurous discovery demands." Plaintiffs do not consent to this request. Plaintiffs believe that the Court can resolve the clear-cut issues underlying plaintiffs' motion to

**I**

## THE COURT SHOULD REJECT DEFENDANTS' OBJECTION TO PRODUCING DOCUMENTS THAT PRE-DATE 2003

Plaintiffs have requested discovery beginning in 2000 and continuing through the present in order to obtain information over a reasonable period of time to prove their policy, pattern, and practice claims. *See* Pl. Mem. 14-18. In General Objection 1, defendants refused to produce documents that were created prior to January 1, 2003, arguing that they are irrelevant and, in any rate, too burdensome to produce. Neither ground for defendants' refusal is valid.

### A. PLAINTIFFS NEED DOCUMENTS PRE-DATING JANUARY 1, 2003

Plaintiffs need documents for at least a five-year period before the filing of the complaint, starting from 2000, to understand fully defendants' activities and practices related to their compliance with the free appropriate public education ("FAPE") and Child Find requirements of federal and District of Columbia law. Plaintiffs' class action is based on a policy, pattern, and practice claim seeking systemic injunctive relief in order to remedy defendants' numerous and pervasive failures with respect to special education for preschool children in the District of Columbia. To prevail, plaintiffs have the burden of establishing that defendants' violations were "standard operating procedure" and not merely isolated or sporadic. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977). In order to support the relief that plaintiffs seek, plaintiffs have the burden of establishing that defendants' failures are numerous, systemic, pervasive, and repeated, and that the injunctive relief they seek is necessary and narrowly tailored to the violations. For this reason, much of the discovery plaintiffs have sought consists of aggregate data on identifications, screenings, evaluations, eligibility determinations, IEP meetings, and educational placement determinations. Two to three years is too

---

compel far more expeditiously.

short a period of time to allow plaintiffs to gather sufficient information so that plaintiffs and their experts can draw reliable conclusions. *Cf. Cooper v. Southern Co.*, 390 F.3d 695 (11th Cir. 2004) (plaintiffs in a putative class action had failed to establish a pattern and practice discrimination claim because, in part, of the deficiencies in their expert reports and statistical analyses, which failed to include sufficient information about plaintiffs' facts and circumstances).

Moreover, as plaintiffs have explained, defendants' violations with respect to several of the named plaintiffs pre-date January 1, 2003.   Pl. Mem. 16; Am. Compl., paras. 43-44, 54-58, 65-66. Defendants do not dispute this. Def. Opp. 8.  Instead, they argue that the only documents they need produce prior to 2003 are those pertaining to the seven named plaintiffs, and that they may continue to withhold all other responsive documents, including policy, pattern, and practice information, programmatic information, statistical information, and information on defendants' treatment of other class members.

Defendants' position makes no sense.  Plaintiffs need to know what policies and practices defendants followed while they were mistreating the named, as well as unnamed, plaintiffs and violating their FAPE and Child Find rights prior to 2003 and whether these violations continued after that date. The decisions defendants made with respect to the seven individual named plaintiffs did not occur in a vacuum; they are a result of defendants' policies and practices in effect during the time they were violating their FAPE and Child Find rights. *Cf. Waters v. United States Capitol Police Board*, 215 F.R.D. 153, 158 (D.D.C. 2003) (permitting "pattern and practice" discovery because to "permit discovery only of a single decision-maker's prior decisions so atomizes the organization that it ignores the possibility that isolated decisions  are the result of an organizational culture or ethos that encourages

or condones discriminatory behavior").[3/]

Defendants cite four cases that they believe support their position that discovery prior to 2003 is irrelevant.  Def. Opp. 7-8.  These cases further support plaintiffs' position.

In all four cases, which were individual employment discrimination cases, not pattern and practice class cases, the courts ruled that discovery for two to three years prior to the discriminatory acts complained of was reasonable.  The courts tied the discovery period to the discriminatory allegations in the complaint, not the date the complaint was filed.  For example, in *Hardrick v. Legal Services Corp.*, 96 F.R.D. 617, 619 (D.D.C. 1983), this Court limited discovery in an individual employment discrimination case for a two year period prior to plaintiff's termination because, unlike in this case, defendants' "practices and procedures" were not "remotely involved in this case."  In *Obiajulu v. City of Rochester, Dep't of Law*, 166 F.R.D. 293, 296 (W.D.N.Y. 1996), the court permitted discovery dating back to 1992, two years prior to plaintiff's employment termination in 1994.  In *Finch v. Hercules*, 149 F.R.D. 60, 65 (D. Del. 1993), the court permitted discovery extending to "two years of information prior to plaintiff's dismissal," which was the discriminatory act complained of.  In *Glenn v. Williams*, 209 F.R.D. 279, 282 (D.D.C. 2002), the court limited discovery to three years prior to the discrimination complained of because the two plaintiffs were not even employed by the same department or supervisors before that time.  *Ibid.*

_____

[3/]Defendants argue (Def. Opp. 9) that "an additional persuasive reason" for withholding documents pre-dating 2003 is that "[s]ince [plaintiffs] do not seek monetary damages, their argument for even going back to the beginning of the applicable statute of limitations—which may be deemed to be three years * * * —disappears."  The question is not whether the discovery plaintiffs seek is reasonable in light of a non-existent damages claim, but rather whether it is reasonable in light of plaintiffs' actual pattern and practice claim.

As in these cases, plaintiffs here asked only for discovery beginning two to three years prior to the discriminatory acts complained of. In this case, defendants' violations began in 2002 at the latest. Am. Compl., paras. 43-44. Thus, discovery beginning in 2000 is reasonable and consistent with these decisions. Moreover, these cases apply *a fortiori* to a pattern and practice class action, like this case. Defendants cite no case to the contrary.

## B.    DISCOVERY PRE-DATING 2003 WOULD NOT BE UNDULY BURDENSOME TO PRODUCE

In their opening brief, plaintiffs pointed to three cases allowing discovery for periods much longer than what plaintiffs seek here. Pl. Mem. 17. All three cases involved pattern and practice claims, and the courts in each case rejected the defendants' arguments that a longer discovery period would be burdensome. *See American Society for Prevention of Cruelty to Animals v. Ringling Brothers & Barnum & Bailey Circus*, 233 F.RD. 209, 215 (D.D.C. 2006) (ten years reasonable); *Concerned Citizens of Belle Haven v. Belle Haven Club*, 223 F.R.D. 39, 45 (D. Conn. 2004) (30-year period not burdensome on its face); *Carroll v. Sisco*, E.D. Mo., No. 4:00CV00864, 2007 WL 209924, at *2 (Jan. 23, 2007) (10-year period not burdensome).

Rather than cite a single case to the contrary, defendants assert that producing documents before 2003 would be unduly burdensome because their files are so disorganized that they could not possibly locate these documents. Def. Opp. 9.

First, it is no excuse for defendants' discovery failures that their files are disorganized. If this excuse were permitted, it would encourage parties to avoid discovery obligations by failing to maintain records and files in an orderly fashion.

Second, plaintiffs are not asking defendants for perfect production. They are only asking what the discovery rules require, namely, that defendants make reasonable efforts to respond to plaintiffs'

discovery requests by conducting a thorough search.  By categorically refusing to produce any documents prior to 2003,[4] defendants have fallen far short of this discovery standard.  They have not even tried.

Third, contrary to defendants' assertion (Def. Opp. 8), plaintiffs have not requested "the records of hundreds of other children" in addition to the seven named plaintiffs.  As discussed below (pp. 13-14), with the exception of a limited number of sample student files that defendants have already agreed to provide, plaintiffs' requests regarding unnamed class members have been limited to requests for aggregate data and policies affecting the entire class.

Accordingly, since documents that pre-date 2003 are relevant and not unduly burdensome to produce, and since courts even in individual cases have ordered a longer period of discovery than plaintiffs seek here, Objection 1 should be overruled.

## II

### THE COURT SHOULD REJECT DEFENDANTS' OBJECTION REGARDING THE DELIBERATIVE PROCESS PRIVILEGE

Defendants devote three pages of their opposition brief and submit two separate declarations in support of their claim that certain documents that they have withheld are protected by the deliberative process privilege.  Def. Opp. 9-12; Def. Exs. C (Decl. of Dr. Phyllis B. Harris) and D (Decl. of Laura Kiesler).

---

[4]Defendants claim that "plaintiffs concede that defendants have produced documents that pre-date 2003 when it was not burdensome to do so." Def. Opp. 7, n. 3.  Plaintiffs have merely stated that "[a]ny argument by defendants that it would be unduly burdensome to produce information from the requested time period is also belied by the fact that defendants have produced at least some documents that pre-date 2003 * * *."  Pl Mem. 18, n.6.  Plaintiffs have never accepted defendants' claim that producing other such documents would be unduly burdensome.

As plaintiffs previously noted (Pl. Mem. 20-21), defendants' written responses to plaintiffs' document requests contained only a general objection to requests seeking information protected by defendants' "deliberative process privilege for intra-agency and inter-agency communications." Defendants' General Objection 3 to Plaintiffs' First, Second, and Third Document Requests, Pl. Ex. D, F, H. Despite this objection, defendants did not identify or describe any specific information withheld based on this claim of privilege or produce a privilege log. During the January 18, 2008 deposition of Zondra Johnson, defendants' counsel indicated that defendants were withholding prior drafts of documents based on the deliberative process privilege. *See* Pl. Ex. K, pp. 39-40. Again, defendants did not produce a privilege log.

It was not until almost 6 p.m. on February 4, 2008, the same day that plaintiffs' motion to compel was due, that defendants' counsel sent an e-mail describing the documents being withheld. *See* E-mail from Eden Miller, attached as Plaintiffs' Exhibit T. That e-mail states:

> The District objects to providing the following documents pursuant to the deliberative work product privilege, the attorney client privilege, and the attorney work product privilege, as well as on the basis of undue burden:
>
> 1.  Any and all drafts of the August, 2007, Draft Office of the State Superintendent of Education Comprehensive Child Find Guide not previously produced to opposing counsel (5743-5778), as well as all emails with edits and discussions about the Draft Guide;
>
> 2.  Any and all drafts of the August, 2007, Draft Memorandum of Agreement ("MOA") regarding Child Find not previously produced to opposing counsel (5779-5796), as well as all emails with edits and discussions about the Draft MOA; and
>
> 3.  Any and all drafts of the Interagency Collaboration and Services Integration Commission MOA, dated fall of 2007, not previously produced to opposing counsel (7672-7713), as well as all emails with edits and discussions regarding the MOA.

Defendants' e-mail does not constitute a privilege log for purposes of Rule 26, which requires parties to describe the documents being withheld "in a manner that * * * will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5). First, the e-mail does not clearly state which of the documents are being withheld based on "deliberative work product privilege" rather than one of the other grounds listed (i.e., "attorney client privilege," "attorney work product privilege," or "undue burden").

Second, even assuming that defendants intended to claim the deliberative process privilege as a grounds for withholding all three categories of documents, their description of those documents is too broad for plaintiffs to assess whether the privilege applies. For example, defendants state (Pl. Ex. T) that they withheld prior drafts of documents "as well as all emails with * * * discussions about" those documents. This description would include not only e-mails commenting on prior drafts of a particular document, but also e-mails discussing the document after it was finalized. However, "[t]he deliberative process privilege does not shield documents that simply state or explain a decision the government has already made or protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). Since defendants have failed to provide a detailed privilege log describing the withheld documents as required by Rule 26 or otherwise justify their invocation of this privilege, the Court should overrule their objection and compel a response to plaintiffs' document requests. *See, e.g., Lohrenz v. Donnelly*, 187 F.R.D. 1, 7 (D.D.C. 1999) (J. Lamberth) ("A bald assertion of these privileges clearly cannot suffice under the federal rules. Therefore, to the extent that plaintiff is withholding any responsive documents under assertions of * * * privilege, these documents must be produced" (citation omitted)).

# III

## THE COURT SHOULD ORDER DEFENDANTS TO PRODUCE ADDITIONAL DISCOVERY REGARDING CHILDREN IDENTIFIED THROUGH THE DISTRICT'S LEAD ABATEMENT PROGRAMS

Document Request 2 in Plaintiffs' Second Set of Requests for Production of Documents (Pl. Ex. B) seeks "[a]ll documents that identify children ages two through five years old who were identified in the course of any lead abatement program administered through the District of Columbia since 2000." In addition to defendants' general objection to the production of documents pre-dating 2003, defendants contend (Def. Opp. 13) that "the request is not relevant to this lawsuit" and "[a]t most, this request is marginally relevant, and that is outweighed by the burdensomeness of the request."

Plaintiffs have already explained that "the documents sought by this request are relevant because long-term studies of children exposed to lead early in life have associated lead poisoning with the need for special education services due to impaired neurobehavioral functioning." Pl. Mem. 10 (citing Schwarz J., *Societal Benefits of Reducing Lead Exposure*, Environ. Res. 66:105-24 (1994)). Defendants respond (Def. Opp. 13) that "[t]he present class action relates to the District's Child Find obligations * * *. It is a huge stretch to suggest that the District's lead abatement programs are relevant to providing special education services to preschoolers." This response misinterprets plaintiffs' request. Request 2 is only concerned with the District's lead abatement programs insofar as they identify children ages two through five years old who have been exposed to lead; it does not seek information about the general operation and activities of the lead abatement programs themselves. Since defendants have advanced no reason why plaintiffs' actual request is not relevant, defendants' objections should be rejected.

10

In support of their argument that the request is overly burdensome, defendants rely entirely upon the declaration of Joseph Younger, Risk Assessor of the District Department of the Environment ("DDOE"), and its description of the records maintained by DDOE's Lead Based Paint Management Program.  *See* Def. Opp. 13-14; Def. Ex. E (Decl. of Joseph Younger).   Based on this description, defendants conclude (Def. Opp. 13) that "the District's records concerning lead abatement are not designed to identify children—and definitely not children of a particular age—living in properties subject to abatement."  Mr. Younger estimates (Def. Ex. E, para 8) that "it would take a minimum of 1,500 hours * * * of staff time to retrieve the [DDOE] records, sort and compile the information, copy relevant records, and re-file the records."

Defendants do not claim that District agencies other than DDOE do not have documents responsive to plaintiffs' request.  Mr. Younger states (Def. Ex. E, para. 4) that DDOE's investigation reports are maintained "primarily by their case number (either 'EBL number' assigned by the Department of Health, or by 'FSC number' in the case of investigations conducted on behalf of Child and Family Services Administration ('CFSA'))."  Based on this description, it is clear that agencies like the Department of Health and CFSA have records of children identified through the District's lead abatement programs.  Defendants have neither disclaimed the existence of such records nor explained why it would be unduly burdensome to produce them.  Accordingly, the Court should reject defendants' objection as to the burdensomeness of plaintiffs' request.  *See, e.g., Mitchell v. National R.R. Passenger Corp.*, 208 F.R.D. 455, 458  n. 4 (D.D.C. 2002) ("[T]he party opposing discovery must make a specific showing, supported by declaration, as to why the production sought would be unreasonably burdensome").

IV

**THE COURT SHOULD COMPEL DEFENDANTS TO CONDUCT A THOROUGH
SEARCH FOR COMPLAINTS TO THE CARE CENTER**

Document Request 5 in Plaintiffs' Second Set of Requests for Production of Documents (Pl. Ex. B) asks for "all letters of complaint that have been received about the CARE Center received by defendants." Although plaintiffs made this request on September 17, 2007, defendants did not produce any documents in response until March 6, 2008, almost six months later, and then only produced two documents. *See* Def. Ex. A (Document Index), Bates Nos. 9061, 9062-9063. Even if defendants are correct (Def. Opp. 15) that "the CARE Center receives very few complaints, and most of those complaints are by telephone," it defies logic that only two written complaints exist since 2004, when the CARE Center opened, and that both are dated January 2008. As plaintiffs have previously noted (Pl. Mem. 30), Zondra Johnson testified at her deposition that CARE Center staff discarded all complaints from families, despite plaintiffs' document requests asking for them. *See* Pl. Ex. K, p. 179. The only reasonable conclusion is that defendants have destroyed documents likely to be relevant to this litigation since the start of this litigation in 2005, and then attempted to obscure this fact by producing two documents after plaintiffs filed their motion to compel.

As for the existence of documentation of parents' telephone calls complaining about the CARE Center, defendants misquote their own employees. Citing the November 13, 2007 deposition testimony of CARE Center employee Genevieve Johnson, defendants state (Def. Opp. 15) that "[a]lthough no logs are kept of such calls, the case manager may write notations in the case files of the children in the case manager's notes section." Yet according to Ms. Johnson's actual testimony (Def. Ex. F, p. 87), "now in the case file there is a form * * * that[ ] logs in when a parent may call, * * * what the complaint was * * *. It's written in the file about that and usually it goes to the case manager about the complaint in

the case log."  When asked when this method of record keeping began, Ms. Johnson responded
(*id.*, p. 89):  "I'm for certain it began in January of this year [2007] or maybe a little bit of last year
[2006]."  Based on this testimony, it is clear that defendants would not have to review every page of
what they describe (Def. Opp. 15) as "the voluminous records of the CARE Center" in order to find
records of parents' complaints in 2007-2008 and maybe part of 2006.  On the contrary, all defendants
would have to look for is the specific form that Ms. Johnson identified in her deposition.[5]

**V**

**THE COURT SHOULD COMPEL DEFENDANTS TO RESPOND TO PLAINTIFFS'
REQUESTS REGARDING UNNAMED CLASS MEMBERS**

Plaintiffs have not requested, as defendants claim (Def. Opp. 16), the "individual student
records" of all unnamed plaintiffs or "specific documentation for every child who has gone through the
[DCPS] eligibility process."  Accordingly, the declaration of Gayle Amos (Def. Ex. H), explaining the
time defendants would need to produce the records for all preschool children determined eligible for
special education services from 2000 to the present, is irrelevant.

Plaintiffs have made only one, limited request for individual student records of unnamed class
members.  Plaintiffs' Third Set of Requests for Production of Documents (Pl. Ex. C), Document
Request 4 (seeking "[a]ll case files * * * corresponding to the following [24] student identification
numbers").  Defendants do not oppose this request.  Def. Opp. 18.  However, although plaintiffs made
the request on September 28, 2007, defendants did not produce any documents in response until
March 6, 2008 (*see* Def. Ex. A (Document Index), Bates Nos. 7785-9050, 9615-12255), and admit

---

[5]Defendants also cite the declaration of Gayle Amos (Def. Ex. H) to support their claim that
it would be unduly burdensome to review each student file at the CARE Center.  However,
Ms. Amos did not specify the number of records maintained at the CARE Center; instead, she
stated only that some student records are located there.  *See* Def. Ex. H, para. 10.

(Def. Opp. 18, n. 10) that they are "still gathering all documents."

Plaintiffs' remaining requests for documents related to unnamed class members are limited to requests for aggregate data. *See, e.g.,* Plaintiffs' First Set of Requests for Production of Documents (Pl. Ex. A), Document Requests 20-28 (seeking "data or information about" intake requests, screenings, referrals, and evaluations; "information about the number of [preschool] children" found eligible for, found ineligible for, or receiving special education services; and "the reasons why any [preschool] children" referred to DCPS were found ineligible or did not receive special education services). Defendants have produced some documents in response to these requests. *See, e.g.,* Def. Ex. A (Document Index), Bates Nos. 4677-4717 (DCPS Information from ENCORE). Nonetheless, as demonstrated by Plaintiffs' Exhibit S (*see* pp. 14-15 below), there are at least five categories of documents related to these requests for which defendants have not provided a complete response. *See* Pl. Ex. S, Nos. 30, 32, 34, 36, 37.

## VI

### DEFENDANTS' EXHIBIT I MISREPRESENTS DEFENDANTS' HISTORY OF DOCUMENT PRODUCTION

In support of their motion to compel, plaintiffs submitted Plaintiffs' Exhibit L, a table enumerating 42 categories of documents responsive to plaintiffs' document requests and believed to be in defendants' possession, but not produced in discovery. In response, defendants have submitted their own table, Defendants' Exhibit I, which purports to show that plaintiffs' submission is "misleading and inaccurate." Def. Opp. 18.

In order to evaluate the information contained in Defendants' Exhibit I, plaintiffs have created a third table, attached as Plaintiffs' Exhibit S, so that the Court may make a side-by-side comparison of the parties' contentions.

Some general comments about Defendants' Exhibit I are warranted here.  First, it bears noting that in 16 of 42 responses, defendants take credit for documents produced on March 6, 2008, over one month after Plaintiffs' Exhibit L was prepared and submitted in support of this motion to compel.  *See* Pl. Ex. S, Nos. 1, 3, 7, 11-15, 17, 20, 27, 29-33.  Second, although defendants have produced some documents in response to plaintiffs' requests, they have not produced all the responsive documents that plaintiffs  reasonably believe would be found by a thorough search.  *See, e.g., id.*, Nos. 13, 41.  Third, defendants' claim that some requested documents do not exist is simply incredible, since each of those documents was referenced specifically in deposition testimony or in other documents produced by defendants.  *See, e.g., id.*, Nos. 2, 8, 18, 19, 23, 35.  Defendants' claim that some documents, also specifically referenced elsewhere, cannot be found only demonstrates that defendants have not conducted a thorough search.  *See, e.g., id.*, Nos. 6, 21, 26, 36.  Finally, regarding those categories that defendants claim (Def. Opp. 18-19) "reflect discovery requests which have not actually been made,"defendants have simply misconstrued plaintiffs' description of the documents requested.  *See, e.g., id.*, Nos. 3, 10, 14, 18, 19.

Upon further review plaintiffs have found a few errors in Plaintiffs' Exhibit L, which have been corrected in Plaintiffs' Exhibit S.  *See id.*, Nos. 23, 30, 33, 39, 40, 42.

## VII

### THE COURT SHOULD COMPEL DEFENDANTS TO PRODUCE E-MAILS

Defendants make several arguments as to why their search for and production of relevant e-mails in response to plaintiffs' document requests has been sufficient.  All of these arguments only serve to highlight defendants' discovery failures.

First, defendants claim (Def. Opp. 21-22) that "[a]lthough defendants' counsel did not make a

request to client agencies, <u>in haec verba</u>, that defendants produce emails * * *, the undersigned counsel did ask defendants to produce *any relevant documents*, which includes emails" (emphasis in original). Defendants claim that this instruction was sufficient since "some emails have been produced." *Ibid.* (citing Bates Nos. 9061-9065, 9084-9184). Yet as plaintiffs have previously noted (Pl. Mem. 27), up until very recently, defendants had produced only 17 e-mails from Part C staff and none from Part B staff. Defendants provided plaintiffs with the vast majority of the e-mails produced to date on March 6, 2008, one month after plaintiffs filed their motion to compel and four days before defendants' filed their opposition. *See* Def. Ex. A (Document Index), Bates Nos. 7785-13785. Defendants have yet to explain why it took so long to produce these documents, most of which were dated between December 2006 and November 2007.

Second, defendants argue (Def. Opp. 22) that they conducted a thorough search for relevant e-mails. In support, defendants cite only the deposition testimony of Zondra Johnson that she "searched for emails '[f]or the topics in which [she] was requested to search' but that 'it was [her] judgment that there were no E-mails related to the topic[s]." *Ibid.* (quoting Pl. Ex. K, p. 27).[6] Defendants do not claim to have provided any specific instruction to Ms. Johnson, a layperson, as to how to interpret plaintiffs' requests for e-mails. On the contrary, Ms. Johnson stated (Pl. Ex. K, p. 104) that the only instruction she received from counsel regarding plaintiffs' document requests was, "if you have it, provide it." Under these circumstances, there is no conceivable way that defendants' counsel could

---

[6] In what appears to be an effort to minimize the importance of Zondra Johnson's deposition testimony, defendants state in a footnote (Def. Opp. 22, n. 12) that "Ms. Johnson's deposition transcript has not yet been signed by Ms. Johnson, and still may be corrected by Ms. Johnson." While it is true that the language of Rule 30(e) allows a deponent to make "changes in form or substance" to her deposition testimony, "[t]he focus is to provide an accurate record for trial that will reduce inconsistencies. For that reason, changes under Rule 30(e) are added to the original, and the original remains available to be used for impeachment or further clarification" (citation omitted). *SEC v. Parkersburg Wireless Ltd. Liability Co.*, 156 F.R.D. 529, 536 (D.D.C. 1994).

certify, as required under Rule 26, that defendants response to plaintiffs' request for e-mails was made after a reasonable inquiry. *See, e.g., Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Int'l Union*, 212 F.R.D. 178, 222-223 (S.D.N.Y. 2003) (finding failure to comply with Rule 26 standard where counsel "never gave adequate instructions to their client about the clients' overall discovery obligations"). At best, defendants' most recent eleventh-hour production demonstrates that their search for relevant e-mails has only just begun.

Finally, defendants ask the Court to ignore Zondra Johnson's deposition testimony (Pl. Ex. K, pp. 11, 13-18) that she deliberately deleted e-mails relevant to this case based on her understanding of a District policy providing for automatic deletion of e-mails,[7] to focus instead on the effect that the Office of the Chief Technology Officer's ("OCTO") recent practice of deleting e-mails over one year old may have had on defendants' production. Def. Opp. 22-23. To counteract OCTO's practice, defendants assure the Court that "out of an abundance of caution the undersigned counsel have requested a formal litigation hold on any emails with any possible relevance to this case, as well as making a sweeping request to OCTO for an email search for relevant emails regarding this case." *Id.,* p. 23.

Although defendants do not state when the litigation hold was placed, it could not have been before January 15, 2008, since Zondra Johnson testified on that date (Pl. Ex. K, p. 14) that defendants' counsel had given her no instruction to retain e-mails related to this case. Any litigation hold placed

---

[7]Defendants now claim that Zondra Johnson misunderstood this policy, stating (Def. Opp. 22): "That draft policy—which required email retention for six months, not 90 days—while announced to all District employees, was never put into effect." Yet clearly it was put into effect, since at least one District employee, Zondra Johnson, who is a critical participant in defendants' actions underlying this case, deleted e-mails in accordance with her understanding of it. Plaintiffs have no way of knowing how many other District employees may have acted in a similar manner.

after that date was far too late.  Counsel's failure to request a litigation hold until two and a half years after this suit commenced is reason enough for the Court to impose sanctions under Rule 37.  *See, e.g., United States ex rel Miller v. Holzmann*, D.D.C., Civ. Action No. 95-1231, 2007 WL 781941, at *2, n. 2 (Mar. 12, 2007) (J. Lamberth) (noting that "the government was unreasonable in failing to prevent the destruction of these documents by issuing a litigation hold on the documents" and "[s]uch negligent conduct certainly should be deemed sanctionable" under Rule 37).

Defendants' recent request to OCTO for an e-mail search is a step in the right direction, but this request should have been made when defendants first received notice of plaintiffs' suit.  Since defendants should have known that the OCTO policy would affect defendants' ability to meet their discovery obligations, the Court should not allow defendants to hide behind that policy in considering Rule 37 sanctions.  *See, e.g., Disability Rights Council of Greater Washington v. Washington Metropolitan Transit Authority*, 242 F.R.D. 139, 146 (D.D.C. 2007) ("The good faith requirement of [Rule 37(e)] means that a party is not permitted to exploit the routine operation of an information system to thwart discovery obligations by allowing that operation to continue in order to destroy specific stored information that it is required to preserve" (quoting Fed. R. Civ. P. 37, advisory committee note (2006 amendments)).

## VIII

### DEFENDANTS' MISCELLANEOUS CRITICISMS ARE UNFOUNDED

Defendants provide several miscellaneous "examples" (Def. Opp. 19-21) of flaws in plaintiffs' document requests and motion to compel.  As demonstrated below, these criticisms are either greatly exaggerated or simply unfounded.

Defendants' first example is plaintiffs' complaint that defendants' response to Interrogatory 2

18

"failed to describe each person's involvement with Child Find as the interrogatory requested" and omitted Zondra Johnson, "the very person who is the signatory to the interrogatories." Pl. Mem. 35. After reviewing defendants' response to Interrogatory 2 (Pl. Ex. G), plaintiffs concede that defendants did incorporate the requested information about Zondra Johnson by reference to their initial disclosures. *See* Def. Ex. J (Defendants' Initial Disclosures). However, as plaintiffs previously stated (Pl. Mem. 35), neither document describes the Child Find involvement of the four individuals listed in defendants' response to Interrogatory 2. *See* Pl. Ex. J; Def. Ex. G. Thus, even after correcting for plaintiffs' inadvertent error regarding Zondra Johnson, plaintiffs' complaint about defendants' incomplete response to Interrogatory 2 is correct.

Defendants' second argument (Def. Opp. 19) is that "some of plaintiffs' numerous document requests read like trust indentures, challenging the reader to understand them," citing Plaintiffs' Second Set of Requests for Production of Documents (Pl. Ex. B), Document Request 4. Document Request 4 states:

> All documents that refer or relate to the number of programs slots or placements available each year since 2000 for children ages two years through five years for the following categories: (1) inclusion, preschool classroom slots, where the child with a disability is placed in a regular education class with his or her typically developing age peers in the majority and where, in addition to the regular teacher, there is a special-education teacher or where a child with a disability is supported full time in a general education class with a dedicated aide; (2) self-contained special education slots or placements where a child is removed from the general school population and placed in a small controlled setting with a special-education teacher and possibly other support staff for most of the school day; (3) combination slots or placements that combine inclusion and pull-out services some of the time; and (4) the equivalent of those categories in earlier years when different terms were used to describe the different levels of program intensity.

Although defendants quote Request 4 in full, they fail to describe the efforts that plaintiffs made to clarify that request and defendants' own failure to respond. Plaintiffs served Request 4 on defendants

on September 17, 2007. On October 17, 2007, defendants responded by referencing Defendants'
General Objection 10 (Pl. Ex. F, p. 2) to requests "to the extent that they are vague, ambiguous, and/or
not sufficiently particularized to permit defendants to determine what documents are sought and to
make a meaningful response." In a letter to defendants' counsel dated October 23, 2007, plaintiffs
wrote (Pl. Ex. J): "If defendants genuinely do not understand some portion of [this] request[ ],
defendants should provide the documents that are responsive to the portion of the request[ ] that they
do understand * * * [and] contact us immediately as to any portions of the request[ ] that defendants
do not understand so that we can provide any needed clarification." In the same letter, plaintiffs also
wrote (*ibid.*):

> Plaintiffs have requested the documents covered by Document Request 4 in order to
> determine whether defendants have the capacity to provide special education services
> to every child who is eligible to receive them in the District. If defendants do not have
> adequate capacity, this supports the conclusion that defendants are not motivated to
> identify all children needing special education services, let alone offer them services.
> Moreover, this information relates to the remedy because it involves how defendants are
> deciding whether they have the capacity to deliver services and compensatory education
> under the IDEA and Section 504 of the Rehabilitation Act to eligible participants.

Defendants did not request any further clarification of Request 4. Instead, on October 29, 2007,
defendants' counsel responded with a short letter, attached as Plaintiffs' Exhibit U, stating: "We are
giving careful consideration to your letter of October 23, 2007." Defendants did not provide any
additional response until March 10, 2008, and then only in a table attached to their opposition brief.
*See* Def. Ex. I, pp. 7-8. Given this history, even if defendants were correct (Def. Opp. 20) that
Request 4 is unclear, defendants have waived any objection by their failure to seek clarification.

Defendants' third argument (Def. Opp. 20) is that "plaintiffs continue to seek documents which
defendants have already indicated they do not have, such as certain correspondence between DCPS and
the U.S. Department of Education" ("DOE"). In this regard, defendants rely entirely on the declaration

of Karen Griffin (Def. Ex. K). Ms. Griffin's declaration is not credible for the following reasons:

First, it is not believable that Ms. Griffin, DCPS Special Assistant, is the sole employee, among the hundreds of DCPS employees who maintain or possess any documents between DOE and DCPS concerning DCPS's IDEA performance and activities. *Cf.* Def. Ex. K, para. 10 ("[A]s I am the primary DOE contact person, no other DCPS employees would have maintained such documents in their possession"). Since Ms. Griffin does not claim that she was the only DCPS employee in contact with DOE, defendants were required to ask other employees for responsive documents. Their failure to do so demonstrates their cavalier treatment of their discovery obligations.

Second, DCPS is contending that they do not have or have "lost or destroyed" all of these documents, which, under federal law, they are required to submit to DOE. *See* Def. Ex. K, para. 9. The documents plaintiffs identified are not inconsequential documents of a few pages. *See* Pl. Ex. S, No. 13. It is simply not credible that documents of this importance would no longer be in DCPS's possession.

Defendants' fourth complaint (Def. Opp. 21) is that plaintiffs have failed to recognize that changes in DCPS and OSSE staff have "impacted on document discovery." Such delays cannot justify defendants ignoring their legal obligations under the Federal Rules, especially since defendants have not even identified how these changes affected their ability to respond to plaintiffs' discovery requests. In any event, such changes cannot possibly justify delays of many months or even years to respond.

Finally, defendants argue (Def. Opp. 21) that "[a] little more patience by plaintiffs would contribute more to the resolution of this case than a motion to compel, which, if granted, will swallow up the time of many persons who can be more usefully employed in reforming and reconstructing the school system." Plaintiffs have been too patient with defendants' rolling document production.

Defendants are still providing documents in March 2008 in response to document requests made in December 2005. As discussed above (p. 1), defendants produced over 660 pages of responsive documents just before plaintiffs' motion to compel was initially due and another 6,000 pages just before filing their opposition brief. This total of approximately half the pages defendants have produced demonstrates that plaintiffs' motion to compel has been the only effective method for obtaining discovery. Defendants have given plaintiffs no choice but to seek intervention from the Court.

## IX

### PLAINTIFFS ARE ENTITLED TO AN AWARD OF EXPENSES UNDER RULE 37

Plaintiffs have moved this Court "to order defendants' to pay plaintiffs' reasonable expenses incurred in making plaintiffs' Motion to Compel, including attorneys' fees, pursuant to Rule 37(a)(5)(A) of the Federal Rules of Civil Procedure." Pl. Mot. to Compel 1.

Before addressing defendants' arguments as to why the Court should not award expenses, plaintiffs must point out one glaring omission in defendants' opposition brief. Despite quoting the text of Rule 37(a)(5)(A) at length (Def. Opp. 24), defendants fail to quote the section in its entirety. It states:

> If the motion [to compel] is granted–or if the disclosure or requested discovery is provided after the motion was filed–the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:
>
> (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;
>
> (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or
>
> (iii) other circumstances make an award of expenses unjust. (emphasis added)

As discussed above, defendants produced approximately 6,000 pages of responsive documents on

March 6, 2008, one month after plaintiffs filed this motion to compel. On that basis alone, an award of expenses is justified. *See, e.g., Progressive Cas. Ins. Co. v. Cockrell's Marine Railway, Inc.,* E.D.Va., No. 3:07cv254, 2007 WL 3275153, at *2 (Nov. 5, 2007) ("The dictates of Rule 37(a) pertain here. Plaintiff received discovery responses only after Plaintiff filed a motion to compel and the Court scheduled a hearing when no written response came forward. Awarding fees and costs in bringing the Motion to Compel seems appropriate under the circumstances").

This Court has previously noted that "the language of [Rule 37] is mandatory, dictating that the Court must award expenses upon granting a motion to compel disclosure unless one of the specified bases for refusing to make such an award is found to exist." *Cobell v. Norton*, 226 F.R.D. 67, 90 (D.D.C. 2005) (J. Lamberth). Defendants argue that the Court should not award expenses in the event that plaintiffs' motion is granted because defendants' position was substantially justified and the award of expenses would be unjust.

"The Supreme Court has stated that a party meets the 'substantially justified' standard when there is a 'genuine dispute' or if 'reasonable people could differ' as to the appropriateness of the motion." *Alexander v. FBI*, 186 F.R.D. 144, 147 (D.D.C. 1999) (J. Lamberth) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)); *see also* 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2288 (2d ed. 1994) ("Making a motion, or opposing a motion, is 'substantially justified' if the motion raised an issue about which reasonable people could genuinely differ on whether a party was bound to comply with a discovery rule"). As plaintiffs discussed in their initial brief (Pl. Mem. 4-5), defendants did not produce any documents on the dates that their responses to each document request was due, but instead engaged in an extended period of "rolling" production. Defendants cite no authority to justify such conduct. *See, e.g., Schurosky v.*

23

*Hollywood Entertainment Corp.*, W.D.Wash., No. C05-1125C, 2006 WL 214233, at *2 (Jan. 4, 2006) (awarding expenses based on findings that "[p]laintiff did make a good faith effort to resolve this matter through multiple instances of correspondence with Defendants" and "no 'substantially justified' reason-legal or otherwise-for Defendants' six-week delay in producing the requested information in full").

Defendants' arguments that an award of expenses would be unjust are entirely without merit. Defendants' behavior seriously hindered plaintiffs' attempts to complete discovery, forcing them to reschedule one deposition and rendering them unable to prepare fully for another. *See* Pl. Mem. 5. On at least one occasion, defendants' counsel confirmed possession of specific documents requested by plaintiffs, but then waited 12 days, until the eve of a Court deadline, to produce them. *See* Pl. Mem. 6. Plaintiffs' repeated attempts to obtain timely production from defendants, including several letters to defendants' counsel (*see* Pl. Ex. J ), have all failed. In short, defendants' conduct has seriously delayed the resolution of this case and added substantially and needlessly to the work of plaintiffs' counsel.

Defendants cite no case for the proposition that a more lenient set of discovery rules should apply to them because of their status as a "financially hard-pressed school system * * * at a time of reform." Def. Opp. 24-25. Nor do they explain why the attorneys' fees cap on IDEA cases – created by a specific Act of Congress – should have any bearing on this Court's decision as to whether to award expenses under the Federal Rules.[8/] Notwithstanding defendants' attempts to denigrate plaintiffs'

---

[8/]The day after defendants filed their opposition, Judge Friedman decided that the attorneys' fees cap does not apply to class actions brought under IDEA: "[C]lass counsel is entitled to reasonable attorneys' fees, so long as the District's payment of such fees does not exceed $4000 per plaintiff class member" (emphasis in original). *Petties v. District of Columbia*, D.D.C., Civ. Action No. 95-0148, 2008 WL 651697, at *8 (Mar. 11, 2008).

counsel, the only reason plaintiffs have filed, as defendants describe it (Def. Opp. 25), "a massive Motion to Compel" is because defendants' discovery failures have been massive.  Plaintiffs had no other recourse but to seek the assistance of this Court.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion to Compel and order defendants to pay plaintiffs' reasonable attorneys' fees and expenses incurred in filing plaintiffs' Motion to Compel, pursuant to Rule 37(a)(5)(A) of the Federal Rules of Civil Procedure.

Respectfully submitted,

_____/s/_____
BRUCE J. TERRIS (D.C. Bar No. 47126)
TERRIS, PRAVLIK & MILLIAN, LLP
1121 12th Street, N.W.
Washington, DC 20005
(202) 682-2100

_____/s/_____
JEFFREY S. GUTMAN (D.C. Bar No. 416954)
The George Washington University Law School
2000 G Street, N.W.
Washington, DC 20052

_____/s/_____
MARGARET A. KOHN (D.C. Bar No. 174227)
Attorney at Law
1320 19th Street, N.W., Suite 200
Washington, DC 20036

March 25, 2008