UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
DL,[1] *et al.*, on behalf of themselves            )
and others similarly situated,                      )
                                                    )
                    Plaintiffs,                     )
                                                    )
              v.                                    )          Civil Action No. 05-1437 (RCL)
                                                    )
THE DISTRICT OF COLUMBIA, *et al.*                  )
                                                    )
                    Defendants.                     )
_____)

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFFS REQUEST FOR FEES AND EXPENSES**

**INTRODUCTION**

On July 25, 2008, plaintiffs' filed their Motion for an Award of Litigation Costs, Including

Attorneys' Fees and Out-of-Pocket Expenses, for Plaintiffs' Motion to Compel Discovery. In support,

they submitted records setting forth the work and expenses of plaintiffs' counsel through July 18, 2008.

Defendants responded by challenging both the hourly rates that plaintiffs seek for the work performed

by plaintiffs' counsel and the reasonableness of the hours. Defendants' Opposition to Plaintiffs'

Request for Fees and Expen[s]es (hereafter "Def. Opp."). This brief replies to defendants' opposition.

In addition, plaintiffs are submitting a complete account of their fees and out-of-pocket

expenses, including those incurred in preparing the original motion and supporting documentation, and

in addressing defendants' opposition after July 18, 2008. Plaintiffs' supplemental time and expense

records are attached as Plaintiffs' Exhibits 22 and 24, respectively, and are summarized in Plaintiffs'

Exhibits 21 and 23. Plaintiffs' Exhibit 20 summarizes these fees and expenses, as well as the amounts

---

[1] Pursuant to Local Rule 5.4(f)(2), minors are identified by their initials.

1

requested in plaintiffs' initial application.  In total, plaintiffs' request $287,146.17 for their counsel's

work and expenses on the motion to compel.

**I**

**PLAINTIFFS' UPDATED *LAFFEY* MATRIX PRODUCES REASONABLE RATES**

In their opening brief (pp. 5-8), plaintiffs requested an award of fees based on the schedule of

hourly rates developed in *Laffey v. Northwest Airlines*, 572 F. Supp. 354 (D.D.C. 1983) ("the *Laffey*

matrix"), updated through May 31, 1989, by *Save Our Cumberland Mountains v. Hodel*, 857 F.2d

1516, 1525 (D.C. Cir. 1988), and further updated to the present using the Legal Services component

of the Consumer Price Index - All Urban Consumers (hereafter "Legal Services Index").  *See* Pl. Ex. 3.

Citing this Court's recent attorneys' fees decision in *Miller v. Holzmann*, D.D.C., 2008 WL

3319032 (Aug. 12, 2008)(Lamberth, J.) defendants contend (Def. Opp. 2) that plaintiffs' updating

method "ignores the requirement that 'rates used in calculating the lodestar should accord with those

'*prevailing in the community*'" (emphasis in original).  Defendants argue (*ibid.*) that the Court should

apply the *Laffey* matrix maintained by the U.S. Attorney's Office (Pl. Ex. 13)("hereafter the USAO

*Laffey* matrix"), which updates the original *Laffey* matrix using the All-Items Consumer Price Index for

Washington, D.C., Maryland, Virginia (hereafter "all-item DC-CPI").

**A.    PLAINTIFFS' ARE ENTITLED TO USE UPDATED *LAFFEY* MATRIX RATES**

The Court of Appeals for this Circuit held in *Covington v. District of Columbia*, 57 F.3d 1101,

1107 (1995), that "a fee applicant's burden in establishing a reasonable hourly rate entails a showing

of at least three elements: the attorneys' billing practices; the attorneys' skill, experience, and

reputation; and the prevailing market rates in the relevant community."  The court further held that

"[i]n order to demonstrate this third element, plaintiffs may point to such evidence as an updated

2

version of the *Laffey* matrix or the U.S. Attorney's Office matrix, or their own survey of prevailing market rates in the community." *Id.* at 1109.

The Affidavit of Bruce J. Terris (Pl. Ex. 1)(hereafter "Terris Aff.") describes plaintiffs' counsel's billing practices, and skill, experience, and reputation in the area of complex federal litigation.[2] Defendants only dispute whether plaintiffs' method for updating the *Laffey* matrix reflects "the prevailing market rates in the relevant community." *See* Def. Opp. 2.[3]

## B.   PLAINTIFFS' UPDATED *LAFFEY MATRIX* PRODUCES MORE ACCURATE RATES FOR THE WASHINGTON, D.C. MARKET THAN THE USAO *LAFFEY* MATRIX

In further support of their own "updated version of the *Laffey* matrix," plaintiffs submit the Declaration of Dr. Michael Kavanaugh ("Kavanaugh Decl.")(Pl. Ex. 14).   In it, Dr. Kavanaugh considers both the Legal Services Index that plaintiffs use to update the *Laffey* matrix and the all-item DC-CPI used to create the USAO *Laffey* matrix, and concludes (para. 10): "In my opinion, the Legal Services Index is a better measure of the change in prices for legal services in Washington, D.C., than the all-item DC-CPI."   In support of this conclusion, Dr. Kavanaugh explains in detail  (paras. 11-12) that "[t]he all-item DC-CPI includes items that are not relevant to the market for legal services and these other items are given much more weight than legal services," whereas "the Legal Services Index measures price changes only for legal services."   He further explains (para. 13) that "[t]he specific components of a CPI, to the extent they are available, are the better resource to update an industry's prices."

---

[2]Defendants note (Def. Opp. 2, n. 1) that the *Laffey* matrix was intended to apply in fee-shifting cases involving complex federal litigation, but do not "quibble" that the *Laffey* matrix should apply to this fees application.

[3]Defendants agree with plaintiffs that the Court should apply "the current *Laffey* rate for the experience level of the attorney at the time the work was performed." Def. Opp. 3, n. 4.

In *Miller v. Holzmann*, *supra*, 2008 WL 3319032, at *11, this Court rejected Dr. Kavanaugh's methodology, stating, as its sole reason, that his matrix "reflects national inflation trends," and therefore "does not comply with [the] mandate for geographic specificity." While it is true that plaintiffs' method for updating the *Laffey* matrix relies upon national legal services data, no data are available to determine directly the change in legal services prices for the District of Columbia. The only legal services index of the Department of Labor is national. Therefore, the question is whether an index relating solely to the District Columbia, but which relies largely on market prices having nothing to do with legal services, more accurately predicts price changes in the District of Columbia than a national index which includes only legal services prices.

Dr. Kavanaugh explains that in an all-item CPI, like the index used by the U.S. Attorneys' Office, the legal services component is relatively small in comparison to the other items used to estimate the cost of living. Kavanaugh Decl., para. 11. He notes that in the 2007 CPI for all urban consumers, legal services account for less than 0.3%, whereas food prices account for about 16%. *Ibid.* Thus, "[a]djusting legal fees using this CPI would give 53 times more weight to food markets than to the markets for legal services." *Ibid.*

Dr. Kavanaugh also explains that the industry-specific component of a CPI is better than the all-items CPI at predicting the effects of inflation and market imbalances on prices in that industry. Kavanaugh Decl., para. 13. This is because "[o]ften for a specific good or service, market imbalances are the stronger of the two forces and can accentuate or negate the effects of inflation on a particular price (e.g., billing rates for legal services)." *Id.*, para. 14. One example of market imbalances negating inflation may be seen in the market for electrical components and parts (e.g., computers) over the last 30 years, where "computer prices have declined while prices generally have increased due to inflation."

4

*Id.*, para. 15.  In contrast, "[m]arket imbalances have recently accentuated inflation in the market for fossil fuels," where, over the past 10 years, "fuel prices have increased within the D.C. metropolitan area by 5.7% per year while all items have increased by 3.2% per year.  Thus, if the all-items data were used to calculate the change in fuel cost for this 10-year period, it would underestimate the change by 25%."  *Id.*, para. 16.  According to Dr. Kavanaugh, "when a specific index is used the net effect of both [market imbalances and inflation] is captured. * * *  That is why it is more accurate to use a specific index rather than a broad index when updating a particular price (e.g., billing rates for legal services)."  *Id.*, para. 14.  Dr. Kavanaugh further explains how the national legal services data actually relates not only to the country as a whole but specifically to the District of Columbia (para. 19):

> In my opinion, resource mobility and low-cost communication combine to make the market for legal services in complex federal litigation in Washington, D.C., a national market not a local market.  In other words, Washington, D.C., area law firms compete with law firms in other areas such as New York, Philadelphia, Chicago, Dallas, and San Francisco.  The geographic extent of the market for complex legal services provides another reason to use the legal services component of the CPI.  It more accurately reflects the conditions of competition.

The National Law Journal's most recent survey of nationwide billing rates, published in December 2007  (Pl. Ex. 15) (hereafter "2007 NLJ survey"), supports Dr. Kavanaugh's opinion.  For example, hourly billing rates for partners in District of Columbia law firms start at $300 (at Hogan & Hartson) to $510 (at Covington & Burling), and go up to $675 (at Arent Fox) to $1000 (at Wilmer Cutler Pickering Hale and Dorr).  In comparison, the hourly rates for partners in New York firms start at $300 (at GreenbergTraurig) to $635 (at Curtis, Mallet-Prevost, Colt & Mosle), and go up to $675 (at Epstein Becker & Green) to $1000 (at Greenberg Traurig).  In Chicago, the hourly rates for partners start at $300 (at Brinks Hoffer Gilson & Lione) to $450 (at Jenner & Block), and go up to $650 (at Brinks Hoffer Gilson & Lione) to $900 (at Jenner & Block).  A full comparison of hourly billing rates in Washington, D.C., New York, Philadelphia, Chicago, Dallas, and San Francisco – for partners

and associates – is attached as Plaintiffs' Exhibit 16.  This table shows that the average billing rates for

major firms in Washington, D.C., are similar to the average rates for major firms in the five other cities.

**C.    MARKET DATA SUPPORTS PLAINTIFFS' UPDATED *LAFFEY* MATRIX**

In *Covington v. District of Columbia, supra*, 57 F.3d at 1109, the Court of Appeals for this

Circuit held:

> To supplement any matrix that has been offered, plaintiffs may also provide surveys to update
> the matrix; affidavits reciting the precise fees that attorneys with similar qualifications have
> received from fee-paying clients in comparable cases; and evidence of recent fees awarded by
> the courts or through settlement to attorneys with comparable qualifications handling similar
> cases.

In an earlier decision, the same court held (*National Ass'n of Concerned Veterans v. Secretary of*

*Defense*, 675 F.2d 1319, 1326-1327 (D.C. Cir. 1982)):

> Evidence submitted by attorney fee applicants in prior cases may also be relied on in compiling
> an attorney fee application. There is no requirement that each attorney develop all of the
> evidence for the hourly rate he seeks from scratch. The probativeness of such prior submissions
> will depend on the comparability of the attorneys in terms of skill, the nature of the cases and
> the currency of the information.

Plaintiffs submit the declarations of two local attorneys, Stephen J. Braga ("Braga Decl.")

and Steven K. Davidson ("Davidson Decl.") (Pl. Exs. 17, 18).  These declarations were previously

submitted to this Court in *Miller v. Holzmann*, Civ. No. 95-1231.  There, the Court described Mr.

Braga's qualifications and opinions at length (2008 WL 3319032, at *7):

> Stephen L. Braga, now a partner at Baker Botts – like WilmerHale, a large, international law
> firm – has practiced complex, civil litigation in the District since 1982. Since 1993, Braga has
> also instructed law students on the subject of attorneys' fees as an adjunct professor at the
> Georgetown University Law Center.  Beyond arguing that "[u]nder basic economic principles,"
> Wilmer Hale's standard rates must be considered competitive within the D.C. market, Braga
> compares rates for four Wilmer Hale partners with those charged by his own firm and other
> large, D.C. litigation firms for partners with similar backgrounds and litigation experience. He
> asserts that Robert Cultice, Jennifer O'Connor, and Jonathan Cedarbaum could command higher
> hourly rates, and that Robert Bell's rate "appears to be set right where it should be in the
> Washington legal market."  Braga concludes that Wilmer Hale's established rates "fall squarely

6

within the prevailing market rates in the District of Columbia for experienced counsel to handle complex civil litigation." (citations omitted)

Mr. Braga stated that "WilmerHale is seeking compensation for its lawyers' time at hourly rates ranging from $750 (for the Washington Co-Chair of its Litigation Department) to $275 (for its most junior associate). Pl. Ex. 17, para. 6, p. 9. Specifically, he noted that WilmerHale was seeking $625 per hour for Robert Cultice (a 1978 law graduate), $510 per hour for Jennifer O'Connor (a 1997 law graduate), $650 per hour for Robert Bell (a 1980 law graduate), and $495 per hour for Jonathan Cedarbaum (a 1996 law graduate). *Id.*, pp. 9-12. By way of comparison, he noted that two litigators in his own firm, Kirk Van Tine (a 1978 law graduate) and Jay Alexander (a 1986 law graduate), bill at rates of $700 and $625 per hour, respectively. *Id.*, pp. 10-11.

The Court also described Mr. Davidson's qualifications and opinions at length (2008 WL 3319032, at *8):

> Steven K. Davidson, currently a partner at Steptoe & Johnson – another large, international law firm – has practiced commercial litigation in the District since 1985. As a member of his firm's Executive Committee, he has assisted with setting professionals' billing rates. Davidson offers an opinion based not only on anecdotal knowledge of his and competitor firms' standard billing rates but also on two external sources. First, The National Law Journal's 2006 annual survey of billing rates indicates that Wilmer Hale's rates are comparable to those reported by other large firms with D.C. offices. Second, Wilmer Hale's rates also align with those delineated in the Laffey matrix, as updated by relator's economist using the nationwide legal services component of the Consumer Price Index, a methodology approved in *Salazar v. District of Columbia*, 123 F. Supp. 2d 8 (D.D.C. 2000)(Kessler, J.). Davidson thus concludes that Wilmer Hale's rates "are comparable to the prevailing market rates and [ ] well within the reasonable range of rates for a law firm such as WilmerHale undertaking matters of the magnitude and complexity of those involved here." (citations and footnote omitted)

In addition to the portions of his declaration cited by the Court, Mr. Davidson stated that, for D.C. partners, "rates of $700 per hour are not uncommon, and rates in the $850-$1,000 per hour [range] are charged for highly skilled attorneys in some practice areas." Pl. Ex. 18, para. 18.

Mr. Davidson also noted that "[u]sing the updated *Laffey* matrix [based on Dr. Kavanaugh's

methodology] for all WilmerHale timekeepers, the WilmerHale lodestar for the work undertaken in this case would be $8,505,688.70 – only a $909,667.30 difference or less than 10% of the $9,415,356 lodestar using WilmerHale customary billing rates." Pl. Ex., para. 21. Mr. Davidson used this comparison to argue that WilmerHale's customary billing rates were reasonable because they were very close to the updated *Laffey* matrix. Plaintiffs cite it for the inverse proposition: namely, that plaintiffs' updated *Laffey* matrix is reasonable because it produces rates that are similar to the customary billing rates of a local firm, WilmerHale, that handles complex federal litigation.

      Taking the two declarations together, the Court concluded (2008 WL 3319032, at *8):

> Relator's evidence demonstrates that Wilmer Hale's established billing rates – those charged to all litigation clients – align with the established rates of lawyers of reasonably comparable skill, experience, and reputation in the D.C. legal community. Thus, the Court will accord these rates a presumption of reasonableness. (citations and footnote omitted)

Plaintiffs submit that just as this Court found WilmerHale's rates to be reasonable based on comparison to other Washington, D.C. firms engaged in complex federal litigation, it should also find plaintiffs' requested rates, which are lower than those of WilmerHale, also to be reasonable.

      Plaintiffs' Exhibit 19 compares plaintiffs' updated *Laffey* matrix (Pl. Ex. 3), the USAO *Laffey* matrix (Pl. Ex. 13), the rates that WilmerHale sought in *Miller* that were approved by this Court (*see* Davidson Decl., para. 21), and billing rate data from Washington, D.C. firms reported in the 2007 NLJ survey (Pl. Ex. 15). This exhibit demonstrates that the same WilmerHale rates that this Court accorded a presumption of reasonableness are very similar to the rates proposed in plaintiffs' update of the *Laffey* matrix. For example, plaintiffs' updated *Laffey* matrix would compensate Bruce J. Terris, Carolyn Smith Pravlik, and Kathleen L. Millian, all partners with more than 20 years legal experience, at $681 per hour, a figure that is well within WilmerHale's $625-$750 per hour range for partners with the same experience, and significantly less than the $850-$1000 per hour range that Mr. Davidson stated

(Pl. Ex. 18, para. 18) is "charged for highly skilled attorneys in some practice areas" in Washington, D.C.  The hourly rate that plaintiffs seek for Emily A. Benfer, $241, is slightly below the $275-$315 per hour range that WilmerHale sought for associates with similar experience.  Similarly, the $348 rate that plaintiffs seek for Alexander R. Karam, Janice D. Gorin, and S. Shina Majeed (prior to 2007) is slightly below the $350-$385 range that WilmerHale sought for associates with similar experience. Only the rates that plaintiffs seek for S. Shina Majeed's work in 2007 ($502 per hour) and for paralegals ($282 per hour) are above the WilmerHale rates.

The exhibit also demonstrates that the Washington, D.C. rates reported in the 2007 NLJ survey are comparable to plaintiffs' updated *Laffey* matrix.  For example, plaintiffs' top rate of $681 falls squarely in the middle of the range of top rates, from $300 to $1000, shown in the survey.  *See* Pl. Ex. 19.  This is also true for the experience levels corresponding with the 1st to 3rd and 4th to 7th years out of law school.  *See ibid.*  Only plaintiffs' rate for the 8th to 10th year experience level, at $502, is higher than the range of rates used by other Washington, D.C. firms, but that range, $400 to $485, only considers rates for attorneys in their 8th year out of law school.  *See id.*, n. 9.

For the foregoing reasons, plaintiffs have met their burden of showing that their requested rates are reasonable.  *See Covington v. District of Columbia*, *supra*, 57 F.3d at 1110.

**D.    THE CASE LAW IS NOT INCONSISTENT WITH DR. KAVANAUGH'S TESTIMONY**

This Court in *Miller* stated (2008 WL 3319032, at *11 & n. 28) that "Kavanaugh's alternative methodology has achieved only limited acceptance in this District," citing two cases "approving" – *Smith v. District of Columbia*, 466 F. Supp. 2d 151, 156 (D.D.C. 2006), and *Salazar v. District of Columbia*, 123 F. Supp. 2d 8, 13-14 (D.D.C. 2000) – and three cases "declining to adopt" – *Yazdani v. Access ATM*, 474 F. Supp. 2d 134, 138 (D.D.C. 2007), *American Lands Alliance v. Norton*, 525 F.

9

Supp. 2d 135, 148-149 (D.D.C. 2007), and *Muldrow v. Re-Direct, Inc.*, 397 F. Supp. 2d 1, 3-4 & n. 3 (D.D.C. 2005). While it is true that these cases declined to adopt the *Laffey* matrix as updated in *Salazar*, none of them analyzed Dr. Kavanaugh's methodology, let alone rejected it.

In *Yazdani v. Access ATM*, this Court refused to adopt either what it called the "Updated Laffey Matrix" (taken from *Salazar*, based on Dr. Kavanaugh's testimony) or the USAO *Laffey* matrix. Citing a prior decision of this Court, it explained (474 F. Supp. 2d at 138):

> [A]s recently noted by this court in *McDowell v. District of Columbia*, No. 02-CV1119, 2006 WL 1933809, at *2 (D.D.C. July 11, 2006), decisions in which the "Updated Laffey Matrix" has been applied are those in which there exists a "significant evidentiary record." In this case, there is no significant evidentiary record. The sole issue was whether or not defendant's removal from the Superior Court to the District Court was timely. The record, therefore, consists solely of the evidence collected by plaintiff to show that defendant's removal was untimely. In this case, all that plaintiff needed was a copy of the proof of service of the pleadings upon defendant. This hardly qualifies as a "significant evidentiary record." The court thus agrees with defendant that neither of the *Laffey* rates should be applied.

Focusing on the "evidentiary record," the Court in *Yazdani* confused the evidence supporting the plaintiff's claim on the merits (which the Court found to be minimal) and the evidence that the plaintiff offered to support its version of the *Laffey* matrix (which the Court did not discuss). It was this latter type of evidence – or rather the lack thereof – that informed this Court's decision in *McDowell v. District of Columbia*, *supra*, 2006 WL 1933809, at *2:

> Claiborne claims an hourly rate of $475 under the fee schedule established in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), as updated by this court's decisions in *Salazar v. D.C.*, 123 F. Supp. 2d 8, 13-14 (D.D.C. 2003) and *McDowell v. District of Columbia*, No. 00-594, 2006 U.S. Dist. LEXIS 4756, at *18 (D.D.C. June 5, 2001). Citing *Salazar* and *McDowell*, Claiborne seeks a significant premium over the *Laffey* rates as published by the U.S. Attorney's Office. The difference between those cases, however, and the case at bar is that those decisions were based on a significant evidentiary record. In other words, the parties in those cases presented the court with an evidentiary basis for awarding an hourly fee higher than that used in the U.S. Attorney's Office matrix. In this case, no such argument was made and therefore the court will rely on the U.S. Attorney's Office version of the *Laffey* matrix. (footnotes omitted)

10

Thus, neither *Yazdani* nor *McDonnell* considered the kind of evidence in support of using the national legal services index that plaintiffs have presented here.

In *Muldrow v. Re-Direct, Inc.*, this Court described the case as "a relatively straightforward negligence suit" and concluded that the "plaintiff's attorneys have not successfully demonstrated 'the complexity of the case they handled' as required under *Covington*" (citation omitted). 397 F. Supp. 2d at 4. Declining to grant the plaintiff's request for *Laffey* rates, the Court recognized that the *Laffey* matrix was originally created to reflect "prevailing rates in the community for lawyers of comparable skill, expertise and reputation <u>in complex federal litigation</u>" (emphasis added). *Laffey v. Northwest Airlines*, *supra*, 572 F. Supp. at 372. Although the Court in *Muldrow* did mention in a footnote (397 F. Supp. 2d at 3, n. 3) that the plaintiffs had "updated the rates from the 1981-82 version [of the *Laffey* matrix] using a methodology approved by this Court" (citing *Salazar v. District of Columbia*, *supra*, 123 F. Supp. 2d at 13-14), the proper method for updating the *Laffey* matrix was not an issue in the case since the Court rejected any use of *Laffey* rates and therefore the update approved in *Salazar,* based on Dr. Kavanaugh's methodology, was also not at issue.

Only *American Lands Alliance v. Norton* involved a dispute as to which method for updating the *Laffey* matrix should be used: the USAO method (producing what the court refers to as "the standard Laffey matrix") or the method adopted in *Salazar*. Citing *Muldrow,* the Court noted that "[w]hile the Court in *Salazar* did not ultimately base its decision solely on the complexity of the case [citation omitted], in at least one case, another member of this Court declined to increase attorney fee awards from the standard Laffey Matrix rates due to the relative simplicity of the litigation." 525 F. Supp. 2d at 149.[4/]  The Court in *American Lands* went on to state (*id.* at 149-150):

---

[4/]In fact, in *Muldrow*, the Court was only asked to consider the applicability of the *Laffey* matrix as updated in *Salazar*, not the USAO *Laffey* matrix.

> [T]he defendants cite to numerous cases in which members of this Court have endorsed the standard Laffey Matrix. [citations omitted]  Because of this history, and the Circuit's approval of the Laffey matrix when properly adjusted to the year for which compensation is sought, *see, e.g.*, *Covington*, 57 F.3d at 1109; *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc), this Court is reluctant to depart from the standard matrix absent a strong showing that such a departure is justified by the nature and complexity of the litigation.

Thus, in *American Lands*, like *Muldrow*, this Court did not follow the *Salazar* methodology because of the lack of complexity of the case.[5/]

Thus, none of the three cases cited by this Court in *Miller* as "declining to adopt" Dr. Kavanaugh's methodology discussed that methodology at all.  The same is true of *Pleasants v. Ridge*, 424 F. Supp. 2d 67, 71 n. 2 (D.D.C. 2006) and the other decisions cited in *Miller v. Holzmann*, *supra*, 2008 WL 3319032, at *8, n. 29, to demonstrate that, "[l]ike its colleagues, this Court has frequently employed the USAO matrix in calculating fee awards."  The record on none of these cases included the expert testimony of an economist supporting an alternative updating method and there is no indication that arguments resembling those of Dr. Kavanaugh's were even presented to the Court.

**E.     DEFENDANTS HAVE NOT PRODUCED ANY REBUTTAL EVIDENCE**

The Court of Appeals for this Circuit has stated that "the defendant may challenge the plaintiffs'

--------------------------------------------------

[5/]In addition to being inapposite, *American Lands* also misstates this Circuit's standard for updating the *Laffey* matrix.  It is true, as the Court noted earlier in its decision (525 F. Supp. 2d at 142-143), that once it has chosen to apply the *Laffey* matrix, then "[u]sing this matrix as a guide, the Court must then exercise its discretion to adjust this sum upward or downward to arrive at a final fee award that reflects 'the characteristics of the particular case (and counsel) for which the award is sought.'"  *Falica v. Advance Tenant Servs., Inc.*, 384 F. Supp. 2d 75, 78 (D.D.C. 2005)(quoting *Laffey v. Northwest Airlines, Inc.*, *supra*, 572 F. Supp. at 361).  However, this adjustment was never meant to be accomplished through the Court's  method for updating the *Laffey* matrix.  As this Court made clear in *Salazar v. District of Columbia*, *supra*, 123 F. Supp. 2d at 15, the correct updating method is the one that produces a *Laffey* matrix that "more accurately reflects the prevailing rates for legal services in the D.C. community."  Thus, the relative complexity of the case should play no part in the Court's choice of an updating method. Plaintiffs are not aware of any other decision to hold otherwise.

application for attorneys' fees, but the Government's burden in rebuttal is not without demands."
*Covington v. District of Columbia*, *supra*, 57 F.3d at 1109.  The court then stated that (*id.* at 1109-1110):

> Once the fee applicant has provided support for the requested rate, the burden falls on the Government to go forward with evidence that the rate is erroneous. And when the Government attempts to rebut the case for a requested rate, it must do so by equally specific countervailing evidence. Although there may be occasions in which the applicant's showing is so weak that the Government may without more simply challenge the rate as unsubstantiated, in the normal case the Government must either accede to the applicant's requested rate or provide specific contrary evidence tending to show that a lower rate would be appropriate.  (quoting *National Ass'n of Concerned Veterans v. Secretary of State*, *supra*, 675 F.2d at 1326).

We have shown above that plaintiffs' methodology is supported by the expert testimony of Dr. Kavanaugh, whose testimony has been adopted by two decisions of this Court.  Moreover, as we have further shown above, his testimony is consistent with the rates in the real world.  Defendants have not offered any contrary evidence to show that the USAO *Laffey* matrix is more appropriate than plaintiffs' updated *Laffey* matrix, much less "equally specific countervailing evidence" to rebut plaintiffs' requested rates.  Accordingly, the Court has no factual basis in this case to adopt the USAO *Laffey* matrix.[6]

## II

## PLAINTIFFS' CLAIMED HOURS ARE REASONABLE

Defendants' blanket reference (Def. Opp. 2) to "slightly over 700 hours of attorney time spent litigating plaintiffs' second motion to compel" is misleading.  This number approximates the total number of hours that plaintiffs' counsel spent on 10 distinct tasks that spanned a period of over two

---

[6]However, in light of this Court's decision in *Miller*, albeit based on an entirely different record, plaintiffs recognize that the Court may nonetheless award fees based on the USAO *Laffey* matrix rates.  Therefore, plaintiffs are submitting calculations based on USAO *Laffey* matrix rates in Plaintiffs' Exhibits 25 and 26.

years, including negotiation efforts, briefing two separate motions to compel, and preparing plaintiffs'

initial application for fees.  Terris Aff., para. 12; Pl. Ex. 6.  Moreover, it does not reflect plaintiffs'

elimination of 50 percent of the fees requested for plaintiffs' initial brief in support of their second

motion to compel.  Terris Aff., para. 9.[7/]  As explained in more detail below, the total number of hours

for which plaintiffs' counsel seek compensation is reasonable in light of defendants' behavior in this

litigation.

## A.     NEGOTIATION REGARDING DISCOVERY

This Court recently held in *Miller v. Holzmann*, *supra*, 2008 WL 3319032, at *14, *19, that a

fees petitioner "need only show that the hours for which he seeks compensation were expended in

pursuit of a successful resolution of the case in which fees are being claimed" and that "settlement

efforts, by their nature, are directed toward successful resolution of the case" (internal quotation marks

and citations omitted).  Defendants do not dispute that plaintiffs are entitled to recovery for their efforts

to resolve discovery disputes without the Court's assistance.  Def. Opp. 3-4.  Instead, defendants make

three objections regarding the form of plaintiffs' time records under this subcategory.

First, defendants argue (Def. Opp. 3) that plaintiffs' time records "are not set-out in

chronological order."  However, defendants are incorrect.  Plaintiffs' time records arrange the entries

alphabetically by attorney and then list each attorneys' entries chronologically.  *See* Pl. Ex. 6, pp. 1-7.

Defendants could have asked for these records in a different format, but they did not.  If the records

were arranged chronologically without regard for the attorney performing the work, defendants could

complain that they were not able to sort out how much time each attorney spent on a particular task.

[7/]Contrary to defendants' assertion (Def. Opp. 3, n. 5), a 50-percent reduction in fees is hardly an
"exceedingly small concession."  Given the extent of defendants' discovery failures and the
amount of work required to address those failures adequately in a motion to compel, any further
reduction would be unjustified.  *See* Terris Aff., para. 12(f).

Under the current organization, the Court and defendants can readily ascertain how much time each attorney spent on each category and subcategory of work by reviewing the Summary of Fees and Expenses set forth in Plaintiffs' Exhibits 4. They can then review the specific work of that attorney in the category and subcategory, arranged chronologically, by reviewing the time records in Plaintiffs' Exhibit 6.

Second, defendants allege (Def. Opp. 3) that "plaintiffs do not explain whether this [sub]category encompasses 'negotiation' on both plaintiffs' First and Second Motions to Compel." This statement is incorrect. Plaintiffs' counsel has explained that the work covered by this subcategory "began in February 2006, after defendants made it clear that they would engage in 'rolling' document production, and continued up until the date plaintiffs' filed their Second Motion to Compel." Terris Aff., para. 12(a). This subcategory also contains a small number of entries, totaling 9.56 hours of work, involving counsel's negotiation attempts after they filed their second motion to compel. *See* Pl. Ex. 6, pp. 1-2, 4.[8]

Finally, defendants complain (Def. Opp. 4) that "it is virtually impossible to determine what was actually being done because of the inadequacy of plaintiffs' billing records." However, these billing records, in conjunction with plaintiffs' description of them (Terris Aff., para. 12(a)), can be divided easily into several subgroups. Plaintiffs' counsel spent a total of 11.23 hours preparing for and participating in a meet and confer session with defendants' counsel in March 2006 (Pl. Ex. 6, pp. 1, 5)[9]

[8] These efforts included writing letters to defendants regarding documents identified during Zondra Johnson's deposition on February 13, 2008 (Pl. Ex. 6, pp. 1-2, 4) and defendants' Eleventh Supplemental Document Production (*id.*, p. 1), which plaintiffs received just four days before defendants' opposition to this fees application was due.

[9] This meeting was mistakenly described as occurring in "February 2006" in Mr. Terris' affidavit. Pl. Ex. 1, para. 12(a).

and an additional 2.53 hours for a second session in February 2007 (*id.*, p. 6). Plaintiffs' counsel also spent a considerable amount of time preparing detailed letters to defendants regarding the inadequacy of their discovery responses and repeated requests for specific documents that plaintiffs had previously identified as relevant but had not received – 17.10 hours prior to plaintiffs' first motion to compel (*id.*, pp. 3-4) and 61.41 hours prior to their second motion to compel (*id.*, pp. 2-7). Plaintiffs submitted copies of these letters as Plaintiffs' Exhibit J to their second motion to compel. The Court and defendants can ascertain how much time each attorney spent on each letter by reviewing the time records in Plaintiffs' Exhibit 6 that correspond to each letter's transmission date.

**B.    PLAINTIFFS' FIRST MOTION TO COMPEL**

Defendants charge (Def. Opp. 4) that "plaintiffs have made no attempt to explain the relevance of any of the work done in this category to the motion upon which they ultimately succeeded." This kind of explanation should not be necessary, since defendants themselves can discern the similarities between the two motions by conducting a simple side-by-side comparison. Nonetheless, plaintiffs submit the Supplemental Affidavit of Bruce J. Terris (hereafter "Terris Supp. Aff."), attached as Plaintiffs' Exhibit 12, to make the connection between these two motions explicit.

In his affidavit, Mr. Terris explains that some of plaintiffs' first motion to compel – particularly the discussion of plaintiffs' entitlement to documents pre-dating 2003 and documents related to the class – was helpful in the preparation of plaintiffs' second motion. Terris Supp. Aff., para. 17(a). This can be seen by comparing sections of Parts I and II of plaintiffs' first motion with Part I, sub-parts B, C, and H of the second motion. *Ibid.* He further explains that Plaintiffs' Exhibit 10 to the first motion – listing 37 documents and categories of documents that plaintiffs had identified as relevant but defendants had not produced – served as a starting point for the creation of Plaintiffs' Exhibit L to the

16

second motion. *Id.*, paras. 15(b), 17(c). The Court's Order of June 27, 2008 (Docket No. 108) directed defendants to produce "all documents enumerated in Plaintiffs' Exhibit L." Thus, plaintiffs' work on the first motion was directly relevant to the second.

Defendants make much of the fact that this Court denied plaintiffs' first motion to compel without prejudice. Def. Opp. 3, n. 5 & 4. However, as plaintiffs stated in their initial brief (p. 2), the Court dismissed both parties' motions to compel without prejudice – on the same day that it granted class certification and denied defendants' motions to dismiss – in the hopes that the parties would work towards a settlement of the entire case. *See* Docket No. 59. Although the Court did not rule on the merits of plaintiffs' motion to compel (*ibid.*), the Court's Order granting class certification indirectly overruled defendants' objection to producing documents related to plaintiffs' class allegations. Terris Supp. Aff., para. 15(d). Thus, plaintiffs did "succeed," at least in part, on their first motion to compel.

In any event, the first motion to compel was integrally related to the second motion. Both motions were largely based on the same kind of conduct of defendants'. Plaintiffs should not be denied compensation for their work on the first motion because the Court hoped that the parties would be able to resolve the dispute. The fact that no agreement could be reached because defendants continued to violate their discovery obligations is obviously no reason to deny compensation to plaintiffs for the first motion which was just as meritorious as the second.

## C.    PLAINTIFFS' SECOND MOTION TO COMPEL

Defendants' opposition to the number of hours plaintiffs' claim for the preparation of their second motion to compel (Def. Opp. 4-5) begins with a list of "entries" that supposedly represent the fees that plaintiffs seek for their initial brief, revised initial brief, and reply brief. Yet instead of listing the actual amount that plaintiffs seek for their initial brief, defendants ignore plaintiffs' exercise of

billing judgment and list the pre-reduction amount. *See* Terris Aff., para. 9. Moreover, defendants make no mention of the fact that plaintiffs were forced to expend a considerable amount of time revising an otherwise complete initial brief because defendants produced over 600 pages of responsive documents the evening before plaintiffs' motion was due. *See id.*, para. 15(g).

Defendants claim (Def. Opp. 5) that plaintiffs are seeking $95,944.03 "for preparing plaintiffs' opening brief." This calculation is baffling. Even assuming defendants' proposition – that the Court should consider plaintiffs' initial briefing on two separate motions to compel as one "opening brief" – it would be $31,107.26 for the first initial brief, $40,713.05 for the second initial brief, and $10,909.73 for the revised second initial brief, for a total of $82,730.04. *See* Pl. Ex. 4. However, plaintiffs submit that the two motions should be considered separately.

As discussed above, there was some overlap in plaintiffs' first and second motions to compel. Nevertheless, there were some parts of the first motion that plaintiffs could not use in the second, such as the sections of plaintiffs' first motion regarding class certification issues that became largely irrelevant after the Court issued its August 26, 2006 Order. Terris Supp. Aff., para. 17(a).

Moreover, substantial additional work was required to prepare the second motion. Before plaintiffs filed their first motion to compel, they had served only one set of discovery requests on defendants. *Id.*, para. 15. Between the date that the Court dismissed plaintiffs' first motion to compel without prejudice (August 25, 2006) and the date that plaintiffs filed their second motion to compel (February 4, 2008), plaintiffs served three additional sets of requests. *Id.*, para. 16. Thus, plaintiffs had to address considerably more issues in the second motion than in the first. Moreover, whereas plaintiffs' first motion addressed only two of defendants' general objections to plaintiffs' discovery requests, the second motion addressed nine categories of defendants' objections. *Id.*, para. 17(b).

As discussed above, plaintiffs also submitted Plaintiffs' Exhibit L in support of their second motion. After the initial preparation of that exhibit required considerable work, plaintiffs were forced to spend additional time revising it due to defendants' last-minute production of responsive documents. Terris Aff., para. 12(g). Plaintiffs were forced to revise the exhibit once again – which they resubmitted as Plaintiffs' Exhibit S – in response to defendants' March 6, 2008 production of over 6,000 pages of documents (just four days before defendants' opposition was due), the repeated citation of those newly produced pages in defendants' opposition brief, and defendants' mischaracterization of the information contained in the exhibit. Terris Supp. Aff., para 17(d).

Plaintiffs' second motion to compel resulted in an order directing defendants to respond to all but two of plaintiffs' discovery requests. Docket No. 108. Given the differences in the amount and type of work involved in preparing that motion versus the first, the Court should consider plaintiffs' hours for each motion separately.

**D.     FEES APPLICATION**

Defendants contend that "the preparation of [their] opposition brief required less than 24 hours of attorney time." Def. Opp. 5. However, the amount of time that defendants spent on their eight-page opposition brief is irrelevant. Defendants do not provide any support for their conclusion that plaintiffs' fees application "could have reasonably been accomplished in less than 20 hours." *Ibid.*

As defendants' correctly point out (Def. Opp. 5), plaintiffs have the burden of establishing the reasonableness of the hours and rates they seeks in their fees application. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed"). In contrast, defendants are free to present as much or as little in opposition as they wish. *See, e.g., National Ass'n of Concerned Veterans v. Secretary of State*, *supra*,

19

675 F.2d at 1326.

Unlike defendants' opposition brief, plaintiffs' initial application included a memorandum of law, supporting affidavit, and 10 additional exhibits presenting counsel's qualifications and detailed records of their fees and expenses incurred in this litigation.  *See* Docket No. 110.  While it is true, as defendants note (Def. Opp. 5), that plaintiffs' counsel have filed declarations setting forth their qualifications in other cases, only 4 pages of plaintiffs' supporting affidavit include this type of information; the remaining 10 pages explain the hours, rates, and expenses forming the basis of plaintiffs' fees application in this particular case.  *See* Terris Aff.  Similarly, only 29 pages of plaintiffs' other 10 exhibits deal with counsel's qualifications; the remaining 41 pages consist mostly of time and expense reports that counsel had to create from data contained in their record-keeping system. This system, although computerized, does not eliminate the need for an attorney to review time and expense records carefully for accuracy and adequacy before presenting them to the Court.  *See id.*, para. 13.  Taken together, all of this work was reasonably necessary to meet plaintiffs' "heavy obligation to present well-documented claims."  *National Ass'n of Concerned Veterans v. Secretary of Defense*, *supra*, 675 F.2d at 1324.

Finally, there is no merit to defendants' argument (Def. Opp. 5) that their review of these records has been "hampered" by alleged inadequacies.  Although defendants state (*ibid.*) that "[t]his inadequacy is discussed in more detail below," nowhere in their opposition brief do they give any example of an "inadequate" billing record describing work on this fees application. Nonetheless, if defendants had made any effort to review these records in conjunction with plaintiffs' description of them (Terris Aff., para. 13), they would have had no problem determining what work was performed.  For example, Mr. Terris ("BJT") described his work on 7/22/2008 as "Edit Gutman draft

affidavit." Pl. Ex. 6, p. 18. This entry refers to work on the Affidavit of Jeffrey S. Gutman, submitted as Plaintiffs' Exhibit 10 to this fees application. Similarly, when Ms. Gorin ("JDG") described her work on 7/8/2008 as "Legal research re use of Laffey rates in District of Columbia fee cases; draft section of application regarding Laffey rates" (Pl. Ex. 6, p. 19), it is clear that she was describing her work on what became Part III (pp. 5-9) of plaintiffs' memorandum. Defendants do not explain how they would have been assisted by more detailed time records.

### III

### PLAINTIFFS' BILLING ENTRIES ARE ADEQUATE

Defendants claim (Def. Opp. 6) that "a majority" of plaintiffs' entries contain either block billing, inadequate detail, "or in most cases both." In doing so, defendants misstate the law in this Circuit and misrepresent the content of plaintiffs' time records.

**A.     PLAINTIFFS' TIME RECORDS DO NOT CONTAIN BLOCK BILLING**

Defendants state (Def. Opp. 7) that "in the 19 pages of plaintiffs' Exhibit 6 there are 95 entries that contain block billing to a greater or lesser degree." Defendants do not explain what criteria they used to count entries with block billing or how they arrived at that precise number. Instead, defendants only offer the following two examples (*id.*, p. 6):

> [O]n 2/14/07, SSM billed 2.53 hours for:
>
> Meet and confer with opposing counsel on discovery and database issues; meeting with co-counsel on discovery issues; confer with BJT about discovery issues.
>
> Plts. Exhibit 6 at 6.
>
> On 1/24/08 JDG billed 6.8 hours to:
>
> "Review chart; confer with EAB; draft motion to compel. Plts. Exh. 6 at 14."

Defendants do not mention that, in addition to the portion they quote, the first time slip also states

21

that the general category of work was "Plaintiffs' Discovery" and that the subcategory was "Negotiation re Motion to Compel."  Pl. Ex. 6, p. 6.  All the information on the slip, taken together, makes clear that the work consisted of meetings with opposing counsel, co-counsel, and Mr. Terris regarding discovery that plaintiffs hoped to obtain through negotiation rather than a motion to compel.  As for the second time slip, defendants omit the descriptive category "Plaintiffs' Discovery" and subcategory "Pl 2d Mot to Compel - Initial Br" (*id.*, p. 14), which clarify that the work consisted of reviewing an exhibit – the "chart" – to plaintiffs' second motion to compel, discussing the motion with Ms. Benfer, and drafting the initial brief.

Defendants' main argument (Def. Opp. 6) is that plaintiffs' time records suffer from the same block billing defects that the court of appeals addressed in *Role Models v. Brownlee*, 353 F.3d 962, 971 (D.C. Cir. 2004), where "many time records lump[ed] together multiple tasks, making it impossible to evaluate their reasonableness."  The court explained (*ibid.*):

> For example, one entry indicates that on September 17 Role Models's lead lawyer spent 10.25 hours performing the following six tasks: "Telecon[ference] with R. Alexander; conference with J. Port, K. Dodd, C. Bonat regarding research; review research; draft brief; review bankruptcy materials; revise brief."  Another entry indicates that on October 3 the associate spent 1.25 hours on the following four tasks: "Revise Lis Pendens filing; call bankruptcy attorney (G. Johnson) and leave message; call circuit court regarding procedure for Lis Pendens filing; finalize draft of Lis Pendens filing."  Not only do similarly lumped entries appear throughout the time records, but the two we have mentioned include time spent on bankruptcy matters, which have nothing to do with this appeal.

Thus, the court was concerned with time records that lumped together tasks that were completely unrelated to one another (*i.e.*, *lis pendens* filing and bankruptcy matters).

The two time slips that defendants have selected to demonstrate plaintiffs' alleged block billing presumably are the best illustrations of defendants' allegations of inadequate time records.  However, as these slips show, plaintiffs' counsel have divided their work on plaintiffs' motion to compel using specific subcategories (*e.g.*, "Negotiation re Mot to Compel" and "Pl 2d Mot to Compel - Initial Br").

22

Thus, individual time slips do not lump together unrelated work. Therefore, *Role Models* is inapposite.

Defendants also cite this Court's decision in *Cobell v. Norton*, 407 F. Supp. 2d 140 (D.D.C. 2005)(Lamberth, J.). There, the Court stated that the infirmity of block billing entries "stems from the fact that they represent activities lumped together in a single entry with no indication how much time was spent on each task." *Id.* at 159. Examples of what the Court considered block billing included (*id.* at 159-160):

> "Review recent decisions including Pueblo of San Ildefonso v. U.S.; continue revisions of interim relief; telcoms with Dauphianis, Holt and Peregoy re. same."(10.0 hours) (Gingold-July 31, 1996); "Meet Keith and Rick to prepare for IIM attorney meeting; meet IIM attorneys at NARF; meet Dan Press, Sandy Harris at office; meet Keith for follow-up at NARF calls to Dennis and Dan; Calls to Mildred Cleghorn; draft Cleghorn bio for complaint; review old."(11.9 hours) (Peregoy-June 6, 1996); "Draft briefs; finalize research and redo laches section; provide comments for statutes of limitations; confer generally re: same w/ BP, DG etc."(11 hours) (Harper-August 19, 1998); "Preparation of joint pre-trial statement incl. Meeting with defendants on process to complete it; review of documents to determine if exhibits, discussions of witness list and being determining testimony of witnesses; draft stipulations and review other stipulations."(16 hours) (Harper-May 26, 1999); "Continued preparation of response to dispositive motions: talked to Bob abt. standard for granting motion for summary judgment, PW work, briefing responsibilities. Talked to Keith abt. jurisdiction section; reviewed Thad's response on sampling plan; met."(9 hours) (Babby August 5, 1998); "Research re class cert papers, meet with Cobell, Echohawk, Browning Van Ness, then at NARF w/ prep and followup."(9 hours) (Holt-September 4, 1996).

There is no indication in the records cited by this Court that each related to a single task such as preparing a specific brief. On the contrary, at least one of the records – "Draft briefs; finalize research and redo laches section; provide comments for statutes of limitations; confer generally re: same w/ BP, DG etc."(11 hours)(Harper-August 19, 1998) – appears to contain descriptions of work on multiple briefs.

In *Cobell v. Norton*, this Court stated that the problem with the plaintiffs' records was that (407 F. Supp. 2d at 159) that it "[wa]s left to approximate the amount of time which should be allocated to each task .... [and] cannot determine with a high degree of certainty, as it must, that the billings are

23

reasonable" (quoting *In re Olson*, 884 F.2d 1415, 1428 (D.C. Cir. 1989). The problem identified by the court of appeals in *In re Olson* was (*id.* at 1428):

> The time sheets were itemized on a <u>daily</u> basis, not by the <u>task</u>. Thus, when an attorney billed for more than one task in a day, the court is left to approximate the amount of time which should be allocated to each <u>task</u>. With such inadequate descriptions the court cannot "determine with a high degree of certainty," as it must, that the billings are reasonable. (emphases added)

Here, plaintiffs' records itemized the work done during a particular day on a particular task.

Plaintiffs' records are fully consistent with the requirements of *In re Olson*. Thus, in defendants' first example, the time slip provides the total amount of time spent in three meetings all involving the task of discovery negotiation. Defendants fail to explain why separate entries, one for each meeting, would provide additional information to themselves or the Court concerning the reasonableness of the time spent "with a high degree of certainty." *In re Olson*, *supra*, 884 F.2d at 1428.

This Court addressed the issue of block billing most recently in *Miller v. Holzmann*, *supra*, 2008 WL 3319032, at *24-25. In a footnote, the Court gave the following example (*id.* p. *24, n. 62):

> [O]n October 2, 2006, Jennifer O'Connor billed 13.8 hours in this case. Her time entry reads:
>
> Prepare for Anderson prep session, participate in same; prepare for light prep session, participate in same; conf Ms. Mark et al. re various strategic issues, emails Mr. Reece and Ms. Moore re Nagel issues, review correspondence from defendants re discovery issues, email Mr. Lang re Hemler interview or deposition, finalize and send letter to Mr. Murphy, emails Mr. Cedarbaum re Bilhar motion to compel, emails to Archer deposition, review Wendorff letters of request, review draft protective order and correspondence re same, review email to Ms. Mark re coordination.

This entry contains several unrelated tasks (*e.g.*, preparing for "prep session," reviewing correspondence from defendants "re discovery issues," and "draft protective order"). The Court recognized this as a common problem in the plaintiffs' records, stating that "counsel here routinely documented their time in daily blocks." *Id.*, p. *24, n. 63.

The Court also clarified what it meant by block billing (*Miller v. Holzmann*, *supra*, 2008 WL 3319032, at \*24, n. 63):

> This Court heartily agrees with Judge Kessler that "[i]n examining the fee petition and evaluating the reasonableness of the hours claimed, it is essential for the trial Court to be practical and realistic about how lawyers actually operate in their day-to-day practice." [*Smith v. District of Columbia*, 466 F.Supp.2d 151, 158 (D.D.C.2006)(Kessler, J.).] Indeed, like Judge Kessler, it does not propose that "[w]hen a lawyer writes, for example, that she spent six or eight hours in one day 'researching and drafting' a brief[,]" she should be required to "itemize every case she looked up or every paragraph she labored over." *Id.* But where during that six or eight hours, the lawyer also attends a meeting, makes telephone calls, reviews (unidentified) documents, and responds to and drafts emails, this Court believes she can and should distinguish how much time she spent on these various, disparate tasks.

As we have seen above, plaintiffs' time slips do not lump time from unrelated, "disparate tasks." Therefore, plaintiffs' time records satisfy the requirements of *Miller v. Holzmann*.[10]

## B.    PLAINTIFFS' TIME RECORDS CONTAIN ADEQUATE DETAIL

Out of the 19 pages of time records, defendants attack (Def. Opp. 7) 4 of plaintiffs' time slip descriptions for an alleged lack of specificity. Once again, they fail to mention that, in addition to the portions they quote, these time slips also state additional information about the subcategory of work that was performed. For example, defendants state that the first "category" (it is actually a subcategory) is called "Pl Mot to Compel - Initial," whereas its complete name is "Pl Mot to Compel – Initial Br." This additional information makes clear that the entry describes work preparing plaintiffs' initial brief in support of their motion to compel. The other challenged descriptions are similarly specific when read in the context of their respective, and complete, subcategory names. Thus, "Draft Motion to Compel" and "edit motion to compel," appearing with the subcategory "Pl 2d Mot to Compel - Initial Br" (not "Pl 2d

---

[10]/For the reasons stated above, plaintiffs' records are fully consistent with the holdings of the court of appeals and this Court. However, to ensure no further dispute over this issue, plaintiffs' counsel, as of August 25, 2008, began to provide the time expended on each activity, even when they were performed on the same day and involved a common task (*e.g.*, two meetings on the same day that involved the same brief). *See* Terris Aff., para. 24.

Mot to Compel," as defendants assert (Def. Opp. 7)), describes work performed drafting and editing plaintiffs' initial brief in support of their second motion to compel.[11] It is equally obvious that the description "Legal research re issues raised in defendants['] opposition; draft reply brief," taken together with the subcategory "Pl 2d Mot to Compel - Reply," refers to work preparing plaintiffs' reply brief in support of their second motion to compel.

Defendants rely heavily (Def. Opp. 7) on the court of appeals decision in *Role Models v. Brownlee*, *supra*, 353 F.3d at 971, that "billing entries for 'research and writing for appellate brief' failed to meet a fee applicant['}s 'heavy obligation to present well-documented claims'" (quoting *Kennecott Corp. v. EPA*, 804 F.2d 763, 767 (D.C. Cir. 1986). It is unclear why the court in *Role Models* found this particular description inadequate, since it lists the specific brief associated with the fee applicant's work. In contrast, the time records at issue in *Kennecott v. EPA,* the stated basis for the *Role Models* ruling, contained no such detail. There, the court stated (*id.* at 766-777):

> Our review of petitioners' fee request has been greatly hampered by the inadequacy of the records submitted by petitioners. Petitioners have refused to provide the contemporaneous time logs that were compiled to detail the hours spent on this litigation. Instead, they have provided two other sets of documents. The first is the stack of monthly bills sent by the firm to its clients, which do not separate the work billed on this litigation from other services performed for the same companies.
>
> *            *            *
>
> The second set of documents, which purports to segregate from those monthly bills the work done on this case, contains generalized summaries of work performed during the individual billing periods, summaries that were themselves reconstructed from the contemporaneous time records that have been withheld.

---

[11] Defendants also misstate the number of hours corresponding with each of these descriptions. For example, the total number of hours that plaintiffs described as "Legal research re issues raised in defendants' opposition; draft reply" was 43.77, not 50.64 as defendants claim. *See* Pl. Ex. 6, pp. 16-17. Nonetheless, the amount of time spent on these activities is irrelevant to the question of whether plaintiffs' entries are not adequately descriptive.

Defendants also claim that the court in *Role Models* found that "entries for 'research' and 'writing' were similarly defective." Def. Opp. 7. This statement is misleading because it ignores the context of the ruling. The full sentence cited by defendants reads (*Role Models v. Brownlee, supra,* 353 F.3d at 971): "Similarly inadequate are the numerous entries in which attorneys billed simply for "research" and "writing," or for time spent in teleconferences or meetings – over one hundred in total – the purposes of which are not provided" (emphasis added). Whereas the attorneys in *Role Models* did not provide the purpose of their research and writing activities, plaintiffs' counsel has identified the relevant briefs associated with their work using specific subcategories. Additional description is not necessary since, as this Court stated in *Miller v. Holzmann, supra,* 2008 WL 3319032, at *24, n. 63: "[The Court] does not propose that [w]hen a lawyer writes, for example, that she spent six or eight hours in one day 'researching and drafting' a brief[,] she should be required to itemize every case she looked up or every paragraph she labored over" (internal quotation marks and citation omitted).

Defendants do not state what additional details would be necessary, or even helpful, in determining whether the time spent on the above tasks was reasonable. Since they are in possession of plaintiffs' briefs, they have all the information they need to decide whether the end products justify the amount of time billed for each.

In another case involving the same counsel for defendants and plaintiffs, where defendants' counsel challenged the adequacy of the same timekeeping system of plaintiffs, the district court stated (*Salazar v. District of Columbia, supra,* 123 F. Supp. 2d at 16):

> Defendants further complain that Plaintiffs' counsels' time records are not detailed enough and that they cannot justify all the hours for which compensation is sought. The Court has carefully examined these records (which are explained, summarized, and categorized at great length in Plaintiffs' papers), and concludes that there is simply no merit to Defendants' position. This is the very kind of "nit-picking" which our Court of Appeals has discouraged and criticized.

Finally, defendants contend (Def. Opp. 7): "[T]here are numerous entries that lack sufficient

detail to allow this Court to determine that the work performed was reasonable and necessary. These defects justify at a minimum a reduction in any fees awarded by at least 75%." Defendants do not cite any precedent for such a large reduction. The figure they have selected is far greater than any percentage reduction applied in this Circuit for inadequate detail in billing records.

In *Miller v. Holzmann*, *supra*, 2008 WL 3319032, at \*24, this Court applied a 10-percent reduction for the use of ambiguous time entries. As discussed above, the time records analyzed in that decision were not nearly as detailed as plaintiffs' time records here. Similarly, in *Cobell v. Norton*, *supra*, 407 F. Supp. 2d at 166, this Court applied a 20-percent reduction because "plaintiffs' time entries suffer[ed] in the main from insufficient detail and excessiveness." While the court of appeals approved a 50-percent reduction in *Role Models v. Brownlee*, *supra*, 353 F.3d at 973, the court based its reduction on multiple defects, including "inadequate documentation, failure to justify the number of hours sought, inconsistencies, and improper billing entries." Defendants' arguments, even if valid, do not come close to justifying a reduction of 75 percent.

## IV

## PLAINTIFFS ARE ENTITLED TO CO-COUNSEL'S FEES AND EXPENSES

Defendants do not object to the hours claimed by plaintiffs' co-counsel, but argue that those hours should be reimbursed at the rates set forth in the USAO *Laffey* matrix. Def. Opp. 8. For the reasons set forth in Part I above, plaintiffs' updated *Laffey* matrix is a more accurate reflection of rates prevailing in the Washington, D.C. community for complex federal litigation and therefore co-counsel should be compensated at those rates.

Defendants also do not object to plaintiffs' initial request for $2,655.90 in litigation expenses incurred through July 18, 2008. Def. Opp. 8. Since that date, plaintiffs have incurred additional expenses in the amount of $367.93, as shown in Plaintiffs' Exhibits 23 and 24. These supplemental reports use the

same expense categories described in Mr. Terris' first supporting affidavit (Pl. Ex. 1, para. 20), and have been audited against the original expense documentation in the same manner. *See* Terris Supp. Aff., para. 10. Plaintiffs therefore submit that their total request for $3,141.16 in out-of-pocket expenses should be approved.

## CONCLUSION

For the reasons set forth above and in plaintiffs' opening memorandum, plaintiffs request an award of litigation costs, including attorneys' fees, for their motion to compel in the amount of (*see* Pl. Ex. 20):

| | |
|---|---|
| Attorneys' Fees of Terris, Pravlik & Millian, LLP | $281,349.11 |
| Attorneys' Fees of Co-counsel | $2,655.90 |
| Expenses | $3,141.16 |
| TOTAL | $287,146.17 |

Plaintiffs request that this Court direct defendants to pay this award, plus interest in accordance with 28 U.S.C. 1961 and accruing from the date of this Court's Order, within 30 days of this Court's Order.

A proposed order is attached.

Respectfully submitted,

_____/s/_____
BRUCE J. TERRIS (D.C. Bar No. 47126)
ALEXANDER R. KARAM (D.C. Bar No. 978703)
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC  20005-4632
(202) 682-2100

                               /s/
                        ————————————————

JEFFREY S. GUTMAN
(D.C. Bar No. 416954)
The George Washington
University Law School
2000 G Street, N.W.
Washington, DC 20052
(202) 994-5797

                               /s/
                        ————————————————

MARGARET A. KOHN
(D.C. Bar No. 174227)
Attorney at Law
1320 19th Street, N.W., Suite 200
Washington, DC 20036
(202) 667-2330

*Counsel for Plaintiffs*

September 16, 2008

**LIST OF SUPPLEMENTAL EXHIBITS**

| Number | Description |
| --- | --- |
| 12 | Supplemental Affidavit of Bruce J. Terris |
| 13 | U.S. Attorneys' Office Updated *Laffey* Matrix ("USAO *Laffey* Matrix") |
| 14 | Declaration of Dr. Michael Kavanaugh with Resume |
| 15 | National Law Journal, December 10, 2007 Survey of Nationwide Billing Rates ("2007 NLJ Survey") |
| 16 | Comparison of Firm Billing Rates by City Based on 2007 NLJ Survey |
| 17 | Declaration of Stephen L. Braga |
| 18 | Declaration of Steven K. Davidson |
| 19 | Comparison of Plaintiffs' Updated *Laffey* Matrix, USAO *Laffey* Matrix, WilmerHale Rates, and 2007 NLJ Survey |
| 20 | Summary of Fees and Expenses - Updated through September 15, 2008 (with alternate fees calculations based on USAO *Laffey* Matrix) |
| 21 | Supplemental Summary of Fees by Subcategory and Rate Using Plaintiff's Updated *Laffey* Matrix |
| 22 | Supplemental Time Records of Terris, Pravlik & Millian, LLP by Subcategory |
| 23 | Supplemental Expense Summary by Subcategory |
| 24 | Supplemental Expense Records by Subcategory |
| 25 | Summary of Fees by Subcategory and Rate through July 18, 2008, Using USAO *Laffey* Matrix |
| 26 | Supplemental Summary of Fees by Subcategory and Rate Using USAO *Laffey* Matrix |
| 27 | Additional Resume of Terris, Pravlik & Millian, LLP Attorney |