Plaintiffs'
Exhibit
17

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. RICHARD F. MILLER, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 1:95CV01231 (RCL) |
| BIL HARBERT INTERNATIONAL CONSTRUCTION, INC. et al., | ) ) ) | |
| Defendants. | ) ) ) | |

DECLARATION OF STEPHEN L. BRAGA

Stephen L. Braga hereby deposes and says:

1.      I have been asked to review the facts surrounding the above-captioned litigation and to offer my opinion as to the reasonableness of the Relator's fee request under 31 U.S.C. § 3730(d)(1).  I believe that I am qualified to offer such an opinion, to assist this Court in making its fee determination, for the following reasons:

a)      I graduated, with honors, from the Georgetown University Law Center in 1981 and I have been continuously employed in the legal profession in Washington, D.C. since that time.  I am a member in good standing of the District of Columbia Bar and have been so since 1982.  I, thus, know and understand the Washington D.C. legal market quite well.

b)      After graduation from Georgetown, I spent a year clerking in this very District Court for the Honorable Thomas A. Flannery.  I, thus, know and understand the way this District Court operates quite well.

1

c)     Upon completion of my clerkship, I began the practice of law in the District at a then-leading litigation boutique called Miller, Cassidy, Larroca & Lewin. I began as an associate at Miller, Cassidy, then became a partner, and I was ultimately elected as one of the managing partners of the firm, which included the task of setting hourly rates for the firm's attorneys. My area of practice throughout my entire tenure at Miller Cassidy, from September 1982 through December 2000, was in litigation. I, thus, know and understand litigation, and the setting of hourly rates for handling it, quite well.

d)     In January of 2001, most of Miller Cassidy merged into the Washington Office of Baker Botts LLP. I went along with that merger and I am presently a partner in the Trial Department of the Washington D.C. office of Baker Botts LLP. I am also a co-chair of Baker Botts' Special Investigations/White Collar Criminal Defense Practice Group firmwide. Once again, throughout my tenure at Baker Botts, my area of practice has been in litigation. I, thus, know and understand the dynamics of practicing litigation at a large law firm quite well.

e)     In the practice of litigation since 1982, I have been involved in numerous cases of all types, big and small, civil and criminal, in various federal and state courts around the country. The majority of my time spent in those cases over the years has been in litigating complex civil cases in federal district courts. For example, at present, I am lead trial counsel for Marathon Oil in two major cases: 1) an MDL consolidation of over 75 cases in the United States District Court in Manhattan concerning billions of dollars worth of product liability and environmental claims against every major oil company in the country over the use of MTBE as an additive in gasoline, see In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, MDL No.

2

1358 (S.D.N.Y.)(Scheindlin, J.); and 2) a major class action in the United States District Court in Huntington, West Virginia concerning alleged property damage to the underground storage tanks at gasoline stations as a result of contaminated gasoline. See Loudermilk Services, Inc., et al. v. Marathon Petroleum Company LLC et al., Civil Action No. 3:04-0966 (S.D.W.Va.)(Chambers, J.). In my career to date, I have tried approximately twenty cases to conclusion, most of them jury trials, and have litigated many others to a resolution short of trial either through settlement and/or a dispositive judicial ruling. I, thus, know and understand what it takes to litigate a complex civil case through motions practice, discovery, pretrial preparation and trial quite well.

      f)      Over the years, I have also worked specifically on a number of both False Claims Act cases and attorney's fee requests under statutory provisions such as 42 U.S.C. § 1988 and the FOIA. See, e.g., United States v. TDC Management Corp., 288 F.3d 421 (D.C. Cir. 2002); Morgan v. District of Columbia, 824 F.2d 1049 (D.C. Cir. 1987). In many respects, litigation over allegedly "false" claims also strongly parallels the litigation of issues that commonly arise in my white collar criminal defense practice as well. I, thus, know and understand the particular dynamics of both the substantive legal framework and the fee shifting nature of this statute quite well.

      g)      In 1993, I began teaching as an Adjunct Professor of Law at the Georgetown University Law Center, where I primarily teach Legal Ethics on a semester-long basis. In teaching this class, I regularly research and lecture on the subject of attorney's fees and the ethical obligation that they be "reasonable."[1] I, thus, know and understand the parameters of what constitutes a "reasonable attorney's fee" quite well also.

---

[1] In the year 2000, I also served as a member of the District of Columbia Bar's Legal Ethics Committee.

3

h)     The balance of my educational and professional background are fairly summarized on the accompanying resume.  In addition to what is recited on that resume, I have also been honored to be selected as: 1) one of "The Best Lawyers in America" in the areas of Commercial Litigation, Legal Malpractice Law, Professional Malpractice Law and White Collar Criminal Defense (by American Lawyer Media); 2) one of the Best Lawyers in Washington (by Washingtonian Magazine); 3) a Washington D.C. Super Lawyer (by Law & Politics); and 4) one of the Top Ten Criminal Defense Lawyers (by United States Lawyer Rankings).

2.     In the course of forming my opinion in this matter, I have reviewed certain documents from the underlying case file.  Those documents include, but are not limited to: a) the Docket Sheet as of the entry of judgment on August 10, 2007; b) numerous Orders, Memorandum Opinions, and other Rulings by United States District Judge Royce C. Lamberth; c) numerous Memorandum Opinions, Reports and Recommendations and other Rulings by the Magistrate Judge John Facciola; d) the Joint Pretrial Statement, and the exhibits thereto; e) the Relator's Confidential Disclosure Statement; f) two Relator share letters from Robert Bell to Carolyn Mark; g) Wiley Rein LLP's billing reports, including the itemized daily time entries, from June 1995 to September 1999; and h) WilmerHale's billing reports, including the itemized daily time entries, from September 1999 to July 2007.  I was afforded the opportunity to review whatever documents I desired from the WilmerHale files for this case and/or the public court file.  It was not practicable for me to endeavor to review every piece of paper in the file.

4

3.    In the course of forming my opinion, I have also communicated and met with various attorneys from WilmerHale about the nature of the case, their firm's work on it and the billings for which WilmerHale is seeking an award of fees in this case. The majority of those communications were with Robert Bell and Rebecca Gelfond.  I was afforded the opportunity to speak with whichever attorneys I desired to speak with from WilmerHale about the firm's work on this case.  Once again, it was not practicable for me to endeavor to speak with everyone at WilmerHale who ever worked on the case.

4.    Finally, in the course of forming my opinion, I have also had the opportunity to conduct whatever legal research I desired to conduct concerning the issues raised by WilmerHale's request for fees in this case.  In the course of that research, I reviewed the provision of the False Claims Act which provides, inter alia, that a successful qui tam Relator "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs.  All such expenses, fees, and costs shall be awarded against the defendant." 31 U.S.C. § 3730(d)(1).

5.    Based on the foregoing document reviews, communications and legal research, I have become generally familiar with both the factual and legal background for this litigation, as well as its overall course and conduct.  I have also become quite specifically familiar with the work performed first by Wiley Rein and thereafter by WilmerHale in the course of representing the qui tam Relator in connection with this matter.

6.    Upon consideration of all of the preceding premises, my professional opinion in this matter is as follows:

5

Hours Expended:  I have been informed that Relator's counsel is seeking compensation for 24,626.50 hours worth of time (1,054.50 hours by Wiley Rein and 23,572 hours by WilmerHale) that its lawyers and nonlegal staff worked on this case. Obviously, that is an extraordinary amount of time, but this was an extraordinary case. There are very few cases that last twelve years from start-to-finish in this District Court, and that involve the protracted effort evidenced by this record.

The Court is obviously familiar with the underlying facts of this case, which it tried.  It goes without saying that this was a complicated case from the Relator's perspective.  It is always difficult to discover and to prove fraud, especially when it is hidden through Swiss bank accounts and companies located in foreign jurisdictions.  It is also always difficult to discover and to prove a conspiracy, which by its very nature is secretive.  See Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999)("conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct evidence").  Thus, the nature of Relator's claims and the nature of the underlying facts combined to make this a complicated, fact intensive litigation from the outset.

Against the foregoing backdrop, Relator's counsel was appropriately zealous in pursuing Relator's allegations, and the defendants pursued a no holds barred defense of their conduct.  A review of the 883 entries on the 120-page Docket Sheet as of the date of judgment fairly evidences this point.  For example, there were 250 motions

6

filed in the case, and 165 judicial orders entered.[2]  There is nothing necessarily wrong with such a defense, but it has an obvious impact on how protracted, time-consuming and expensive the litigation of the case becomes for Relator's counsel as well.  As the Supreme Court has recognized, "[t]hose who elect a militant defense in the face of a statute allowing attorney's fees if they are defeated must take into account the time and effort they extract from their opponents.  It was . . . [defendants'] right to contest every aspect of this claim, but they cannot now disclaim the consequences of their actions."  City of Riverside v. Rivera, 477 U.S. 561, 580 n.11 (1986).  Or, in other words, defendants "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response".  Id.

Magistrate Facciola's March 9, 2006 Report And Recommendation And Memorandum Opinion amply reveals how complicated this case was.  The first two sentences of that opinion read as follows: "This case was referred to me for full case management.  There are so many motions dealing with so many different topics that a brief word of introduction is in order."  (Emphases added).  Later, the Magistrate entered a Moratorium Order barring the filing of any further motions in the case.  Magistrate Facciola is one of the "superstars" in this District Court.  He is intelligent, hard-working, diligent and personable.  The fact that he felt the need to comment on how "many motions" had been filed on "so many different topics," and then later to bar the filing of any further motions altogether, speaks more eloquently about the all-out nature of this litigation than any words I can author.

---

[2]  According to Relator's counsel, there were over 500 boxes of documents produced in the case and 42 depositions were taken, a number of them in foreign countries.  There were also more than 500 exhibits admitted into evidence at trial, through the testimony of 41 different witnesses (31 live and 10 via deposition).

Nonetheless, even in the hardest fought cases, where both sides are exercising maximum effort to zealously represent their clients, as they ethically must, there will be hours expended on tasks which will be duplicative, inefficient or otherwise wasteful. Litigation is an art, not a science, and it is in the nature of the art that the tasks associated with it cannot be handled only as -- and when -- needed. See generally In re Agent Orange Product Liability Litigation, 611 F.Supp. 1296, 1306 (E.D.N.Y. 1985). There is thus always, necessarily some time spent in litigation for which compensation should not be sought. In the private sector, such time is not charged to the client through the exercise of "billing judgment" by the partner sending out the bill.

I have been informed that the number of hours for which WilmerHale is seeking compensation on this fee petition reflects an approximately 20% reduction in the total number of hours reflected on its internal time records for this case.[3] Such a one-fifth reduction of the time charged, which excludes the time related to claims against Bill Harbert, which was separately excised, is a dramatic exercise of billing judgment by that firm. In the face of such a conservative calculation, there should obviously be no need for any more particularized inquiry into the specifics of any individual time entries. But if such a particularized inquiry was necessary, I have personally read all of the individual time entries for which compensation is being sought, and they seem eminently reasonable to me individually and well within the zone of reasonableness in the aggregate for a complicated civil case of this size.

---

[3] Cf. Copeland v. Marshall, 641 F.2d 880, 903 (D.C.Cir. 1980)(en banc)(endorsing judicial application of a percentage reduction approach to eliminate excess hours); McKenzie v. Kennickell, 645 F.Supp. 437, 442 (D.D.C. 1986)(rejecting government's "invitation to undertake a line by line examination of the fee request and 'pleading by pleading examination of the copious files in this case,'" and using percentage reduction approach instead).

In sum, in view of the foregoing, it is my opinion that the number of hours for which WilmerHale is seeking an award of fees in this case reflects a fair expenditure of time, after an appropriate exercise of billing judgment to reduce the total amount of hours actually expended, to reasonably prosecute this action.

<u>Hourly Rates</u>:    I have been informed that WilmerHale is seeking compensation for its lawyers' time at hourly rates ranging from $750 (for the Washington Co-Chair of its Litigation Department) to $275 (for its most junior associate).  The rates specifically addressed by way of declaration for the attorneys most prominently involved in this litigation are: Robert Cultice - $625 per hour; Jennifer O'Connor - $510 per hour; Robert Bell - $650 per hour; and Jonathan Cedarbaum - $495 per hour.

The propriety of hourly rates sought for a fee award, like this one, turns on "the prevailing market rates in the relevant community." <u>Blum v. Stenson</u>, 465 U.S. 886, 895 (1984).  Those are the rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." <u>Id</u>. at 895 n. 11.  In this case, that would be the prevailing rates in the Washington, D.C. legal community for lawyers handling complex civil litigation, with criminal issue overtones.

WilmerHale is a leading District of Columbia law firm and the rates for which it is seeking compensation are the standard rates that it charges to its fee-paying clients.  Under basic economic principles, law firms set their standard hourly rates at a point designed to capture the then-prevailing competitive market rate for their legal services in their community.  A law firm will try not to set its rate too high for the market or else clients will take their legal work to one of the firm's competitors which is offering a lower rate, and a law firm will try not to set its rates too low for the market or else it

will be undercompensating itself for its services compared to those same competitors. This direct connection between a traditional law firm's setting of its standard hourly rates and the prevailing market rate in its legal community is why the courts have repeatedly recognized that private counsel's standard billing rates (such as WilmerHale's rates here) are highly relevant to – and ordinarily the <u>best evidence</u> of – the prevailing market value rate for the attorney's services. See, e.g., Laffey v. Northwest Airlines, Inc., 746 F.2d 4, 18 (D.C.Cir. 1984); National Association of Concerned Veterans v. Secretary of Defense, 675 F.2d 1319, 1324 (D.C.Cir. 1982); Covington v. District of Columbia, 57 F.3d 1101, 1103 (D.C.Cir. 1995).

Notwithstanding the preceding point, I have also compared the specific hourly rates identified for the key WilmerHale attorneys to my own firm's hourly rates, because Baker Botts definitely competes in the same market with WilmerHale -- and vice versa -- for complex civil litigation. Such comparisons doubly reinforce the strength of the principle that the rates typically charged by a firm are the "best evidence" of the prevailing market rates, because such evidence from two firms is being comparatively considered. Those comparisons reveal the following:

Robert Cultice: Mr. Cultice's hourly rate appears to be low for the prevailing market rate in Washington. For example, Mr. Cultice's professional background and litigation experience appear to be fairly similar to mine, yet his hourly rate of $625 is lower than mine of $650. In addition, we have one litigator (Kirk Van Tine) in our Washington office who graduated from law school in 1978, like Mr. Cultice, and who presently bills at $700 per hour. Finally, the one litigator in our Washington

office who bills at the same rate as Mr. Cultice, has much less seniority than he does (Jay Alexander/Class of 1986).

Jennifer O'Connor: Ms. O'Connor's hourly rate of $510 also appears to be low to me for her seniority level and background experience. Ms. O'Connor is a 1997 law school graduate, who clerked for Judge Judith Rogers on the United States Court of Appeals for the District of Columbia Circuit after completing law school. Such "valuable clerkship experience" is well recognized as an enhancement factor in the determination of an attorney's reasonable hourly rate. See Blum v. Stenson, 465 U.S. at 890 n. 4.[4] Based upon the hourly rates of younger partners at Baker Botts with similar seniority levels and clerkship experiences, and my dealings with similarly situated young partners at other large litigation firms in the District of Columbia, I believe that Ms. O'Connor could command a higher hourly rate than $510 in the Washington legal market.

Robert Bell: Mr. Bell's hourly rate appears to be set right where it should be in the Washington legal market. Mr. Bell graduated from law school one year ahead of me, clerked for Judge Flannery one year ahead of me and has been engaged in the private practice of law for exactly the same number of years as I have (after spending one non-private practice year gaining invaluable experience clerking at the Supreme Court for Justice Byron White). His hourly rate is $650 per hour, and so is mine. The marketplace could hardly more clearly indicate that $650 per hour is the prevailing rate for lawyers at our level of experience and ability.

Jonathan Cedarbaum: Mr. Cedarbaum's hourly rate of $495 is subject to the same type of hourly rate analysis as that discussed above for Ms. O'Connor. Mr.

---

[4] In addition, Ms. O'Connor has valuable background experience working in the Executive Branch, including the White House, for a number of years as well.

Cedarbaum is a 1996 law school graduate, who also went on to clerk after completing law school but he did so for two years: one year for Judge David Tatel on the United States Court of Appeals for the District of Columbia Circuit and then another year for Justice David Souter at the Supreme Court.[5]  Based upon the hourly rates of younger partners at Baker Botts with similar seniority levels and clerkship experiences, and my dealings with similarly situated young partners at other large litigation firms in the District of Columbia, I believe that Mr. Cedarbaum could command a higher hourly rate than $495 in the Washington legal market.  Of course, seniority-wise, Mr. Cedarbaum is only one year junior to Ms. O'Connor so their hourly rates should be reasonably comparable to each other's as well.

In sum, in view of the foregoing and my knowledge of similar hourly rate structures employed by other competing large law firms in the District of Columbia, it is my opinion that the above-specified hourly rates for which WilmerHale is seeking an award of fees in this case fall squarely within the prevailing market rates in the District of Columbia for experienced counsel to handle complex civil litigation, and are in a few cases -- as identified above -- actually below that market level.  In addition, it is my opinion that the hourly rates for WilmerHale's Associates and Counsel are also reasonably within the same range as those at Baker Botts and other large litigation firms here in town.

<u>Multiplier Enhancement</u>:   The Supreme Court has indicated that an upward adjustment to a fee request can be made when "the success was 'exceptional'" and "the quality of service rendered was superior to that one reasonably should expect in

---

[5] In addition, like Ms. O'Connor, Mr. Cedarbaum has valuable background experience working in the Department of Justice for several years as well.

DC01:482920.1

light of the hourly rates charged." <u>Blum v. Stenson</u>, 465 U.S. at 899.    The <u>Blum</u> Court recognized that it would be a "rare case" that would meet these criteria.    This seems to be such a case.

Exceptional Result:    As best I can tell, the Plaintiffs' verdict in this case represents the second largest False Claims Act judgment based on a jury award in history, and the largest ever in the District of Columbia.    Such an historical verdict should, in and of itself, be deemed "exceptional."    In addition, though, long before the record jury verdict, the Relator's efforts in this case resulted in the Government's successful prosecution of five criminal cases based on these facts, resulting in four guilty pleas and one conviction.    The Relator's efforts also resulted in a number of separate civil settlements as well.    Adding these prior criminal and civil resolutions into the analysis only reinforces the conclusion that this was an exceptionally productive False Claims Act case, with substantial public benefit.

Superior Quality: WilmerHale is an outstanding law firm, which routinely delivers first-rate legal services to its clients.    But what strikes me the most about that firm's efforts in this case are the following two statements from the Declaration of Keith V. Morgan, Deputy Chief of the Civil Division in the United States Attorney's Office: "The availability of Relator's counsel from WilmerHale was <u>essential</u> in meeting the <u>overwhelming demands</u> of discovery and ultimately of the trial in this matter.    Indeed, attorneys and support staff from WilmerHale played a <u>vital</u> role in getting this case ready for trial and ultimately successfully trying it."    (Emphasis added).    As Your Honor knows, perhaps better than anyone, the Civil Division of this United States Attorney's Office has historically (and appropriately) viewed itself as a co-equal peer with the best

13

litigation departments in the District of Columbia. That Office could, and would, go toe-to-toe in litigating any case against any private law firm as equals, and the Office employs some of the most talented trial attorneys in the city. The fact that the Civil Division of the United States Attorney's Office is willing to recognize that WilmerHale's role in this case was both "essential" and "vital" to the successful preparation and trial of this "overwhelming" case speaks volumes. It both points out again the "exceptional" nature of the case (and its result), and also highlights the fact that WilmerHale's attorneys went above and beyond the call of duty to provide truly superior service in the handling of this extraordinary case -- a case which the United States Attorney's Office apparently could not have handled alone.[6] When this Court broke the bottleneck which had (understandably) developed in this case while it sat on Judge Bryant's docket by setting an expedited schedule which compressed discovery, pretrial and trial proceedings into an eleven-month schedule, all-out litigation hell began. What followed from WilmerHale's attorneys was far more than standard hourly rate legal service in the face of such difficulties; what followed was superior "above and beyond the call of duty" lawyering.

Moreover, in reviewing the record in this case, it also appears quite clearly to me that WilmerHale used younger attorneys -- with correspondingly lesser hourly billing rates -- to fill critical roles in the litigation, which ordinarily would have been staffed with more senior counsel. For example, for Ms. O'Connor to handle capably the "lead counsel in discovery" and "co-lead counsel at trial" roles in this case would typically be viewed as being beyond the "skill" or "responsibility" set associated with an

---

[6] In ordinary False Claims Act cases, as the Court is undoubtedly aware, Relator's counsel often participates in the litigation in a much more passive role, as a weak second chair to the Government counsel taking the lead in the case. Indeed, sometimes it seems that Relator's counsel is nothing but an annoyance and a distraction to Government counsel in such cases. But that ordinary situation is as different as night from day to how this case was litigated, once again indicating its extraordinary nature.

14

attorney of her seniority level. The same is true with respect to Mr. Cedarbaum's ably fulfilling the role as "lead motions attorney" in this case, despite the fact that he is a brand new partner at the firm. Thus, both of these attorneys provided services at a level significantly above that contemplated by their standard hourly rates.

Similarly, my review of the records in this case also reveals that WilmerHale employed a relatively small number of dedicated junior associates to work on this case with the assistance of only one senior associate. Ordinarily, traditional law firm staffing would have involved a lesser number of junior associates and a greater number of senior associates. As was the case with Ms. O'Connor and Mr. Cedarbaum discussed above, however, these junior associates rose to the task and commendably performed the duties that would ordinarily have been above their pay grade and thus been performed by more senior associates. Once again here, therefore, WilmerHale's standard hourly rates for these junior associates does not fairly capture the degree of difficulty and level of responsibility at which they performed their services in this case.

Finally, there are many palpable efficiencies which result from having continuity in staffing on any legal matter. Nothing is more potentially disruptive to the smooth flow of work, and to the economically efficient completion of that work for the client, than having different lawyers revolving on and off a case. Yet, as we all know, that frequently happens. The Relator in this case was blessed to have complete continuity of his lead counsel, Robert Bell, from the moment he first raised his allegations of bid rigging against the defendants through the entire twelve years thereafter it took to have his claims resolved by the jury. That is rare indeed in this modern legal world, and the efficiencies that went along with it now deserve extra reward here as well.

DC01:482920.1

In sum, in view of the foregoing, it is my opinion that this is one of those "rare" cases where a multiplier should be applied by the Court, in the sound exercise of its discretion, to enhance the fees awarded to WilmerHale because of the truly "exceptional" results that were obtained as a direct result of that firm's superior legal services in prosecuting the action.

Overall Fee:  Accordingly, on the basis of all of the foregoing factors, it is my considered conclusion that a total fee award of $9,989,707 ($9,415,356 in WilmerHale fees and $599,351 in Wiley Rein fees, less $25,000 in fees previously collected), increased by an appropriate multiplier in the Court's discretion, is a reasonable and just award on the unique facts of this exceptional case. See, e.g., Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866, 875 (9th Cir. 1979)(fee of $1 million for filing petition for certiorari was reasonable given the experience and capabilities of counsel, and the substantial value obtained by the client as a result).

7.      In the interest of complete candor, I must advise the Court that I have professional friendships with a number of partners at WilmerHale, especially those who used to work with me at my former firm, Miller Cassidy, Larroca & Lewin. On the other side of this case, I also have a professional friendship with Charles Leeper, who represents defendants Harbert International, Inc. and Harbert Corporation in this case. None of these friendships is such that they would jeopardize the independence of the opinions I have expressed herein, in either way.

8.      I have charged the Relator my standard hourly rate of $650 for preparing my opinion in this case.

16

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___9/18/07___            _____
                                            STEPHEN L. BRAGA

17

Exhibit 1 to Braga Declaration

Case No. 1:95CV01231 (RCL)

**STEPHEN L. BRAGA**
**3079 Woods Cove Lane**
**Lake Ridge, Virginia 22192**
**Phone: (202) 639-7704 (w)**
**(703) 491-3331 (h)**

---

### EMPLOYMENT EXPERIENCE

Jan. 2001 – Present          Partner, Trial Dept., Baker Botts L.L.P.

Sept. 1982 – Dec. 2000       Attorney at Miller, Cassidy, Larroca & Lewin, Washington, D.C..
                             Practice included handling all aspects of litigation in the federal and
                             state courts on behalf of the firm's clients, at both trial and appellate
                             levels, with emphasis on white collar criminal and complex civil
                             litigation. Elected to serve as a Managing Partner of the firm in
                             March of 1999.

Aug. 1981 – Aug. 1982        Law Clerk for Judge Thomas A. Flannery of the United States
                             District Court for the District of Columbia

### OTHER LEGAL EXPERIENCE

1993 – Present               Adjunct Professor of Law, Georgetown University Law Center,
                             Washington, D.C.
                             (Civil Litigation Seminar; Evidence, Professional Responsibility)

2000 – Present               Georgetown Supreme Court Institute, Participant in Moot Court
                             Arguments for Counsel in Supreme Court Proceedings

2000                         Member, Legal Ethics Committee, District of Columbia Bar

1992                         Member, Practitioner's Advisory Group to the United States
                             Sentencing Commission

Dec. 1982 – Present          Member of the District of Columbia Bar, and of the practice bars of
                             the following courts: Supreme Court of the United States, United
                             States Court of Appeals for the District of Columbia Circuit, United
                             States Court of Appeals for the First Circuit, United States Court of
                             Appeals for the Second Circuit, United States Court of Appeals for
                             the Seventh Circuit, United States District Court for the District of
                             Columbia, United States Tax Court, District of Columbia Court of
                             Appeals and the Superior Court of the District of Columbia

DC01:284929.2

**LEGAL EDUCATION**

May 1981                 J.D., Magna Cum Laude, Georgetown University Law Center,
                         Washington, D.C.

    Academic:        Overall average – A-; 10.6/12.0

    Honors:          Georgetown Law Journal
                         Staff Member (1979-1980)
                         Editor (1980-81)

                         Legal Research and Writing Fellowship (Academic Year 1980-81)
                         Taught legal research and writing to first-year students

    Activities:      Research Assistant for Professor Dennis Hutchinson (Sept. 1979 –
                         May 1980).  Extensive research into Constitutional Law and
                         Supreme Court legal history for use by the professor.

                         Research Associate – Environmental Law Institute (Jan. 1980 –
                         April 1980).  Researched and wrote five articles on select areas of
                         environmental law for publication in the Institute's Manual – "Air
                         and Water Pollution Control:  Progress and Problems."

                         D.C. Street Law Project (Jan. 1980 – May 1980).  Taught a bi-
                         weekly course in practical law to 30-35 inmates in Maximum
                         Security at Lorton Prison.

                         Georgetown University Criminal Justice Clinic (Aug. 1980 – Dec.
                         1980).  Special Assistant United States Attorney, Misdemeanor
                         Section, United States Attorney's Office for the District of
                         Columbia:  assigned to handle a small misdemeanor caseload for
                         prosecution.  (Jan. 1981 – May 1981).  Student Defense Attorney,
                         defended indigents in misdemeanor cases in the District of
                         Columbia.

                         Independent Research Project (Jan. 1981 – May 1981).  Detailed
                         research, supervised by Professor Dennis Hutchinson, into the
                         private papers of Justices William O. Douglas, Felix Frankfurter and
                         Harlan F. Stone at the Library of Congress.

**OTHER EDUCATION**

May 1978              B.A., <u>Cum Laude</u> in Political Science, Fairfield University, Fairfield, Connecticut

     Academic:     Overall average – 3.62/4.0

     Honors:       <u>ECAC Student Athlete Medal</u>, given for academic and athletic excellence in the Eastern Collegiate Athletic Conference

June 1974            Graduated from Rogers High School, Newport, Rhode Island

     Academic:     Ranked 3rd out of class of 455

     Honors:       Brown University English Award

**PUBLICATIONS**

1984                 "Of All Liars, The Smoothest and Most Convincing Is Memory":  A Critique of the Application of the Recalcitrant Witness Statute to the Nonrecalling Witness, 22 Am. Crim. L. Rev. No. 1 (1984)

1980                 "Identifications," 69 Georgetown Law Journal 284 (1980)

                      "The Exclusionary Rule," 69 Georgetown Law Journal 305 (1980)