Plaintiffs'
Exhibit
18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. RICHARD F. MILLER, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:95CV01231 (RCL) |
| BILL HARBERT INTERNATIONAL CONSTRUCTION, INC. et al. | ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF STEVEN K. DAVIDSON

### BACKGROUND AND EXPERIENCE

1.      My name is Steven K. Davidson.  I received a Bachelor of Arts degree in 1982 (summa cum laude and Phi Beta Kappa) and a Master of Arts in 1983, both from Boston University.  I received my J.D. degree from Northwestern Law School in 1985.  I am a member of the Bars of the District of Columbia (since 1987) and Virginia (since 1985) and numerous federal district courts and circuit courts of appeal.

2.      I am currently a partner in the law firm of Steptoe & Johnson LLP in Washington, D.C.  I joined the firm's Washington, D.C. office as an associate in 1985 and have been a partner of the firm since 1993.  I have been a resident in the D.C. office since 1985.  Since 2001, I have been the head of Steptoe's commercial litigation, insolvency and creditor's rights group.  During my years at Steptoe, I have had a wide variety of firm management responsibilities.  For example, I have served as a member of our Executive Committee – an elected group that

essentially manages the firm's affairs and sets policy; the Professional Advancement Committee
– an elected group that makes recommendations to the firm's partnership on the professional
advancement of the firm's attorneys, including advancement to partner; and the Strategic
Planning Committee. My sustained involvement in the management of a large law firm has
given me a depth of experience with all of the issues facing a provider of legal services – issues
both internal to the firm itself and inherent in the lawyer-client relationship.

3.      Most of my client-service experience at Steptoe & Johnson has been as a civil
litigator, though I have done some white collar criminal defense work as well. I have appeared
in federal courts, state courts and before various arbitral bodies, in matters covering a wide
variety of subjects. My practice focuses primarily on the litigation, negotiation, arbitration, and
mediation of a wide range of complex commercial disputes and torts (particularly cross-border
disputes), as well as bankruptcy, white collar criminal defense, government contracts, and
insurance coverage matters. I have particularly been involved in supervising, as the lead
attorney, a number of what are commonly referred to as "complex cases." This means that in
addition to being analytically complex, the cases are also large in size in terms of the amount of
documents and other information that has to be handled in the course of the litigation. A case we
are handling for Motorola, Inc., as an example of these kinds of cases, was featured in a cover
story in a recent *American Lawyer* publication. A copy of the article is attached hereto as
Exhibit A.

4.      I have handled numerous jury and bench trials in district, state and bankruptcy
courts. I have also handled various proceedings before arbitral bodies organized by, among
others, the International Centre for Resolution of Investment Disputes, the International Chamber
of Commerce, and the Zurich Chamber of Commerce.

- 2 -

5.      In most of these large matters over the years, I have been not only the lead partner in providing services to the client, but also the partner responsible for billing. I have reviewed many hundreds of invoices and submitted them to clients, and I have dealt with any client questions that arose about those billings. In addition, I have consulted with a number of my partners over the years about billing questions involving clients for whom they were responsible. I have also been responsible for negotiating rates with clients on matters based here in D.C. and throughout the world. As a result, I have become quite familiar with the applicable rates lawyers charge for a variety of civil cases.

## COMPENSATION FOR EXPERT SERVICE

6.      I am being compensated for my services as an expert witness on the basis of charging my standard hourly rate. My hourly rate is $585.00 per hour. One associate with an hourly rate of $375.00 supported me in locating materials and reviewing the pleadings and other documents provided to us for my use in forming my expert opinion.

7.      In forming my opinion on what would constitute a reasonable fee for the attorney services in this case, I have reviewed the time records of the legal professionals at both Wiley Rein and WilmerHale. I have also reviewed the docket sheet and key pleadings and orders in the case. I have also conferred with Robert Bell and other WilmerHale attorneys on multiple occasions.

8.      I will now turn to some specific issues that arise when the Courts are required to assess the reasonableness of attorneys' fees and expenses. In a fee-shifting context, a reasonable fee is usually determined by looking first at the rates charged for the attorneys' services and the number of hours dedicated to the client matter. The product of these two numbers gives the

- 3 -

"lodestar," which is the starting point for determining a reasonable fee under a fee-shifting statute. The lodestar, assuming that both the rate charged and the hours committed reflect consideration of any relevant factors, is presumed to be a reasonable fee for the services provided. Notwithstanding this presumption, there are additional factors which may weigh on whether the lodestar does in fact result in a reasonable fee. As discussed below, it is my opinion that both the rates charged and the hours recorded are extremely reasonable for a case of this magnitude.

9.      In addition to the number of hours and the rates charged, the reasonableness of the records attesting to the hours spent is also assessed. The courts have articulated standards for the degree of detail necessary to substantiate the claims for hours spent. In my opinion, the records submitted by WilmerHale for both its own services and those of Robert Bell and the legal professionals at Wiley Rein satisfy the court-articulated standards for fee petitions.

10.      I understand that WilmerHale is petitioning for an enhancement of the lodestar due to the quality of representation as reflected in the extraordinary success of the case. Based on my experience as a litigator of many complex cases in the District of Columbia and elsewhere, and as I discuss in the body of this report, it is my opinion that *United States ex rel. Miller v. Bill Harbert Int'l Construction et al.* contains a number of the relevant factors suggested by the courts in allowing for the award of an enhancement of the lodestar to achieve a fee that is reasonable and otherwise is the kind of case deserving of an enhancement to the lodestar.

- 4 -

## LEVEL OF DETAIL IN TIME DESCRIPTIONS

11.    In my opinion, the time descriptions are more than adequate to inform the court of the work that was done and whether the time spent was reasonable.  Most law firms, including WilmerHale and Wiley Rein, use a computerized billing system in which timekeepers or their assistants enter "time descriptions" regularly for each day.  The system organizes these entries, associating each timekeeper with an appropriate hourly billing rate and generating a monthly billing statement to be sent to the client.  It is this billing statement that WilmerHale has provided as the factual support for its fee petition.

12.    The most prevalent practice among large firms in preparing time descriptions is to have all of the activities of the timekeeper for a day describing services performed for a particular client in a single entry for that day.  The computer billing program then organizes the entries in the client billing statement so that all the entries for every timekeeper for a day are listed together, starting with the first day of the month, followed by entries for each ensuing day.  This "block billing" procedure was used by WilmerHale and Wiley Rein.

13.    Unless a client specifies in negotiating the engagement with a law firm that each task for the day have a specific time allocation associated with it, the practice of having a time description that covers all of the activities of the timekeeper for a single day in a single entry is the way most comparable firms handle time descriptions.  Based on my experience, it is my opinion that the time-recording process used by WilmerHale and Wiley Rein were both reasonable and customary.

14.    It is also my opinion that the time descriptions themselves are adequate under any court-imposed standards for detailed recordkeeping.  I have not reviewed every time description

in detail, but my general examination of the records supports my opinion that they are sufficiently detailed to inform the reader of the tasks undertaken.

## REASONABLENESS OF RATES AND TIME SPENT IN GENERAL

### A.    WilmerHale Rates

15.    The ethics rules and opinions require that the rates an attorney charges for his or her service be reasonable. They do not impose any limits on either rates or rate increases, so long as the resulting rate is reasonable. Although Mr. Bell has been representing Mr. Miller on this matter for 12 years, it is my understanding that WilmerHale has not received any compensation for this case. While I have looked at the work performed since 1995 to the present, I have only looked at the current rates charged by WilmerHale, not the historic rates charged over the course of the representation. Using current rates to compensate for the delay in payment until the conclusion of the case in fee-shifting contexts is common, and a reasonable way for the courts to compute fully compensable fees at the end of a long-running case.

16.    In my opinion, the rates charged by WilmerHale all appear to be well within reasonable bounds, taking into account my knowledge of the fees that large, highly regarded law firms that have the capability to handle major litigation charge their clients. My years of experience in the management of my own firm in setting rates puts me in a position to be aware of rates generally in the market. In my judgment, the rates charged by WilmerHale for all timekeepers are comparable to the prevailing market rates and are well within the reasonable range of rates for a law firm such as WilmerHale undertaking matters of the magnitude and complexity of those involved here. For example, the rate for Mr. Bell, $650 per hour, is not near the top rates for D.C. partners, where rates of $700 per hour are not uncommon, and rates in the

- 6 -

$850-$1,000 per hour are charged for highly skilled attorneys in some practice areas. The rate

for Bob Cultice, $625 per hour, is also not near the top rates for partners of Mr. Cultice's

qualifications – he is a 1978 law school graduate and a Co-Chair of WilmerHale's Litigation

Department. The rates for Jennifer O'Connor ($510 per hour) and Jonathan Cedarbaum ($495

per hour) are also within the prevailing market rates for similarly situated junior partners at firms

comparable to WilmerHale. In addition, the associate rates charged by WilmerHale (between

$275 and $485 per hour) are also at prevailing market rates.

17.    The rates charged were the standard rates at WilmerHale for these kinds of

matters. At all times the rates were within the bounds of what is customary in the Washington,

D.C. marketplace.

18.    While information on rates charged by other large Washington, D.C. law firms is

not readily available to the public, there are some sources of information on both rates generally

and specific rates charged by some firms on specific matters. I have consulted both types of

information in reaching my conclusion that the rates charged by WilmerHale were reasonable

and consistent with the customary market rates for the District of Columbia metropolitan area.

19.    One source for information on market rates generally is local and national

publications that survey firms on rates. For example, *The National Law Journal* publishes an

annual survey of billing rates. The results of the 2006 survey were released earlier this year. I

reviewed this published survey. The rates charged by WilmerHale for all of its timekeepers in

this case are well within the range reported for other large firms with offices in the District of

Columbia. A copy of the survey is attached hereto as Exhibit B.

20.    A second source of information on rates that I consulted to assess the

reasonableness of the WilmerHale rates is the widely used *Laffey* matrix, as updated using the

nationwide legal services component of the Consumer Price Index produced by the Bureau of

Labor Statistics of the Department of Labor.  The *Laffey* matrix consists of a chart delineating

"reasonable market rates for the DC market" established by the U.S. District Court for the

District of Columbia in *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C. Cir. 1984) after an

extensive survey of rates in Washington, D.C.  The matrix, established in 1982, updated in 1989

and updated annually thereafter, has been accepted as evidence of reasonable market rates for

complex litigation in the District of Columbia by D.C. courts, avoiding repetitive and wasteful

litigation over market rates.  *See, e.g., Blackman v. District of Columbia*, 59 F. Supp. 2d 37, 43

(D.D.C. 1999).  In *Salazar v. District of Columbia,* 123 F. Supp. 2d 8, 14 (D.D.C. 2000), the

United States District Court for the District of Columbia performed a thorough examination of

the matrix and the methodology employed for adjusting the 1989 rates to account for inflation.

The *Salazar* Court found that use of the nationwide legal services component of the Consumer

Price Index is the best indicator of the effect of inflation on rates for legal services in the District

of Columbia.  In using the *Laffey* matrix to form my opinion of the reasonableness of the

WilmerHale rates, I used the matrix as updated by the methodology approved by the Court in

*Salazar.*

21.    Using the updated *Laffey* matrix for all WilmerHale timekeepers, the WilmerHale

lodestar for the work undertaken in this case would be $8,505,688.70 – only a $909,667.30

difference or less than 10% of the $9,415,356 lodestar using WilmerHale customary billing rates.

A chart comparing the rates charged by WilmerHale in this case and the rates that would be

applied were the court using the updated *Laffey* matrix is produced below:

- 8 -

| Name | Total Hours | Rate - WH | Total WH Lodestar | Rate - Salazar | Total Salazar Lodestar |
|---|---|---|---|---|---|
| Robert Cultice (1978) | 634.60 | 625.00 | $396,625.00 | 645.00 | $409,317.00 |
| Robert Bell (1980) | 1651.30 | 650.00 | $1,073,345.00 | 645.00 | $1,065,088.50 |
| Howard Shapiro (1985) | 119.10 | 750.00 | $89,325.00 | 645.00 | $76,819.50 |
| Jonathan Cedarbaum (1996) | 2086.20 | 495.00 | $1,032,669.00 | 536.00 | $1,118,203.20 |
| Jennifer O'Connor (1997) | 2739.10 | 510.00 | $1,396,941.00 | 475.00 | $1,301,072.50 |
| Yaa A. Apori (1999) | 65.10 | 485.00 | $31,573.50 | 475.00 | $30,922.50 |
| David Bowsher (1999) | 75.20 | 485.00 | $36,472.00 | 475.00 | $35,720.00 |
| Colin Rushing (1999) | 810.10 | 485.00 | $392,898.50 | 475.00 | $384,797.50 |
| Laura Terry (1999) | 162.40 | 485.00 | $78,764.00 | 475.00 | $77,140.00 |
| Michael Gottleib (2003) | 2330.80 | 385.00 | $897,358.00 | 329.00 | $766,833.20 |
| Monika Moore (2003) | 193.00 | 385.00 | $74,305.00 | 329.00 | $63,497.00 |
| Greg Reece (2003) | 2667.50 | 385.00 | $1,026,987.50 | 329.00 | $877,607.50 |
| Stephen Smith (2003) | 762.30 | 385.00 | $293,485.50 | 329.00 | $250,796.70 |
| Matthew Baumgartner (2004) | 1492.10 | 350.00 | $522,235.00 | 268.00 | $399,882.80 |
| Ashley Baynham (2004) | 742.30 | 350.00 | $259,805.00 | 268.00 | $198,936.40 |
| Monya Bunch (2004) | 2290.60 | 350.00 | $801,710.00 | 268.00 | $613,880.80 |
| Kevin Heffel (2005) | 328.80 | 315.00 | $103,572.00 | 268.00 | $88,118.40 |
| Allison Murphy (2006) | 832.10 | 275.00 | $228,827.50 | 268.00 | $223,002.80 |
| Mary Beth Caswell (paralegal) | 874.50 | 210.00 | $183,645.00 | 146.00 | $127,677.00 |
| Milton Shook (paralegal) | 563.00 | 210.00 | $118,230.00 | 146.00 | $82,198.00 |
| Nancy Tillotson (paralegal) | 2151.90 | 175.00 | $376,582.50 | 146.00 | $314,177.40 |
| **Total** | **23,572.00** | | **$9,415,356.00** | | **$8,505,688.70** |

22.     I conclude that WilmerHale's rates during the representation were reasonable and appropriate for firms comparable to WilmerHale and offering the same kinds of capabilities for comparable types of work. I see no reason why they should not be honored by this court.

## B.     Wiley Rein Rates

23.     Only one Wiley Rein fee earner, Michael Sturm, whose time is being sought in the fee application, is being billed at his current hourly rate. The remaining Wiley Rein fee earners are being charged at the updated *Laffey* matrix. As to Mr. Sturm, he is a Wiley Rein partner and a 1987 Harvard Law School graduate. His rate is $495 per hour, which is far below the updated *Laffey* matrix of $645 and is below what I would consider the prevailing market rate for a lawyer of Mr. Strum's experience.

### C.    Amount of Time in General

24.    I have not made an effort to ascertain the reasonableness of each and every

individual time entry or specific task performed. Rather, I made an overall assessment as to

whether the approach of relator's counsel was appropriate and whether the magnitude of

the work effort was reasonable given the nature and demands of this hard fought,

complex litigation. It is my opinion that both the total amount of time, and the staffing

by individual timekeepers was extremely reasonable.

25.    In addition, the billing judgment exercised by WilmerHale reduced the amount of

fees sought in an extremely fair and reasonable manner. Indeed, the reductions described in Mr.

Bell's declaration total approximately $2.3 million and demonstrate that a careful, thorough

review of the bills has been done to ensure that no unnecessary fees are being charged here. In

my opinion, no further reductions would be warranted or justified.

## QUALITY OF REPRESENTATION

26.    Based on the Wiley Rein and WilmerHale bills I reviewed, it appears as if

approximately 21,000 hours of attorney time were spent on the case through trial. An additional

approximate 3,600 hours were undertaken by paralegals. The overwhelming majority of this

work was performed in 17 months – from Magistrate Facciola's March 9, 2006 decision

resolving several years' worth of outstanding motions until the completion of the trial and post-

trial motions through July 31, 2007.[1] Of the 24,600 or so hours that I examined, roughly 22,750

fall within this 17-month period. In all of 2005, only 150 hours are sought. In 2006,

approximately 10,500 hours were billed, after the exercise of billing judgment. To gear up a

---

[1] I understand that counsel at WilmerHale will submit a supplemental fee application at a later date. This opinion is limited to the work undertaken through July 31, 2007.

case to this level in this short period is very impressive, even for a firm with the resources of WilmerHale. There was a staggering amount of work to do. The ability of the firm to commit the talented and tireless human resources to this case to meet the extremely rigorous schedule set by the court is extraordinary.

27.    When, after very little activity for years, the April 2006 scheduling order launched the case onto an extremely fast track, Mr. Bell called on his colleagues in the Litigation Department to assist him. Ms. O'Connor, then a first-year litigation partner, assumed the lead for the day-to-day direction of the work effort. Mr. Cedarbaum, who only became a partner as of January 2007, assumed the lead in the case's extensive motions practice. An able crew of second and third-year associates was assigned to the case. These individuals performed extraordinarily well in the face of extremely trying circumstances. The pace of the case allowed for no learning curve. In my opinion, the team of individuals for whom WilmerHale is seeking compensation performed outstandingly. In shouldering the tasks they were given, and handling them both efficiently and effectively, both Ms. O'Connor and Mr. Cedarbaum, and the junior associates under their supervision, performed at a level well above their experience based on seniority. In fact, I understand both from my interviews with WilmerHale attorneys and from my knowledge of the reputations of several of the attorneys representing defendants that Ms. O'Connor was significantly junior to many of the opposing counsel she was dealing with in this case, especially the opposing lead counsel.

28.    The spring and summer of 2006 were consumed with discovery. There were over 500 boxes of documents produced directly by the defendants or by the Civil and Antitrust Divisions to review and organize. The WilmerHale team was at a significant disadvantage since the defendants both knew what was in their own documents and had been privy to the documents

produced during the course of the criminal investigation. The WilmerHale team was seeing for the first time the hundreds of boxes produced eight months before trial. It is a mark of true excellence that this young team was able to triage the massive production and cull the significant documents needed to prove their case in such a short period of time. Within this extremely short period, WilmerHale reviewed the contents of many, many boxes and culled the universe of documents down to 320,000 pages that went into an electronic database created for the case. In my experience, most firms would budget both more people and more time to review the documents produced in this case. Here, the schedule did not allow for what would be a more standard or typical amount of time to complete these difficult and time-consuming tasks.

29.    By September 2006, the WilmerHale team was ready to participate in 40 depositions and interview multiple other witnesses in locations across the country and the globe. The deposition total includes five expert depositions (two retained by plaintiffs and three for defendants). The schedule was so truncated that on average the Plaintiffs were taking or defending a deposition approximately every other day for six weeks.

30.    In addition, there were two evidentiary hearings before the Magistrate in December 2006.

31.    All of this was within nine months of the Magistrate's March 2006, 57-page decision on the 14 pending motions that commenced discovery. This work effort, which directly led to the successful result, is, in my opinion, extraordinary.

32.    Thus, within the space of one year, an exceedingly complex, document-intensive case that had lain dormant for 10 years was ready for trial. After the briefing of the nearly 50 motions *in limine* (almost all decided in plaintiff's favor) the jury trial

- 12 -

began on March 19, 2007. There were 32 trial days over a seven-week period. Thirty-one (31) live witnesses appeared, and an additional 10 witnesses' testimony was presented by deposition. Five hundred and thirty-nine (539) exhibits were admitted into evidence.

33.    During this period, the lawyers at WilmerHale worked exceedingly hard for their client. For example, during the three-month period between February and April 2007, Ms. O'Connor billed 1,063.90 hours, including 397.70 in March alone. The chart reproduced below reveals the enormous concentration of work effort by the WilmerHale attorneys. Forty-five per cent (45%) of the time billed in the 17 months between March 2006 and July 2007 was billed in the three-month period of February to April 2007. In my opinion, this was indeed an extraordinary effort for the WilmerHale team and the lodestar alone, which only shows hours multiplied by rate, but not the compressed time period those hours were worked, would not adequately represent a reasonable fee for the results obtained.

US1DOCS 6367410v1



34.     After a full week of deliberations, the jury returned with a $34.4 million

verdict, trebled to $103.2 million. In my experience, this size of a verdict from a jury in

the District of Columbia is rare and demonstrates exceptional success. In fact, I

understand this verdict to be one of the three largest jury verdicts in False Claims Act

history, and one of the four largest jury verdicts to that point nationwide in 2007.

Record-breaking results are by definition extraordinary. It is my opinion that the

WilmerHale team achieved a level of success that is extraordinary. The verdict achieved

is significantly greater than what one could reasonably have expected given the historical

jury verdicts in False Claims Act cases, particularly in light of the extremely short

deadlines and the level of opposition mounted by experienced defense counsel from the

equally capable law firms representing the defendants.

35.    In my opinion, it is very difficult for a client to find a firm like WilmerHale to commit the kind of resources needed to mount a legal challenge against adversaries like those present in this case without payment on a regular basis, and without a guarantee of payment at all.  It is not within the normal prudent business planning for a firm to take on a case representing a single plaintiff without the resources to pay hourly fees and without the information necessary to build his case within his control.  It is the defendants in a case like this that control the documents, have access to the witnesses, and have the ability to make the issues of proof extremely difficult, time-consuming, and costly for a firm taking on a case such as this.  In my opinion, for a firm like WilmerHale, which could have just as easily been retained by one of the defendants, to make the commitment to take a case such as this and commit the resources for what would undoubtedly be a long battle, is unusual.

36.    In my experience, if a fee award is limited to a firm's lodestar with no enhancement in the extraordinary cases like the one presented here, the prospects of firms like WilmerHale taking on such work (which, in this case, had a significant benefit to the public good) would be remote.  Firms like WilmerHale are otherwise fully committed with clients who pay their normal hourly rates on a regular basis.  Without an enhancement, there would be no reason to take on a case that was highly contentious and likely to go to trial, with only the prospect of being paid at some point in the future at normal hourly rates.

- 15 -

## EFFICIENCIES

37.     Another factor relevant to the award of an enhancement here is one touched on briefly above by me – the billing efficiencies and use of more junior lawyers.

38.     In examining the time records of WilmerHale, it is clear that the majority of the time billed on the case, including through trial, was incurred by relatively junior lawyers.  Specifically, following the entry of the scheduling order in 2006 and during the period March 2006 through July 2007, paralegals and lawyers with 11 years or less of experience, billed 91% of the hours sought by WilmerHale.  The chart reproduced below reflects this distribution of work.



39.    This type of staffing is not normal or typical in a case of this complexity and magnitude. Indeed, it would not be at all unusual for such a case to be staffed by two mid-level partners with 20 years or so of experience and a senior partner with 30 years or so of experience (more like the staffing by the Defendants) and two or more senior associates, and two or more mid-level associates, along with the junior associates employed on the WilmerHale team. Indeed, if one assumed this more typical staffing, the rates charged by the attorneys assuming the roles of Ms. O'Connor and Mr. Cedarbaum would likely be at least $100 more per hour; the attorneys assuming the roles of Mr. Reece and Mr. Gottlieb would increase by $85 per hour from $385 an hour to $470 (from mid-level to senior associates) for the time incurred and the attorneys assuming the roles of Mr. Baumgartner, Ms. Baynham and Ms. Bunch would increase by $70 per hour from $350 an hour to $420 an hour (from junior associates to mid-level associates) for the time incurred. This alone resulted in a savings of $1,224,135.50.

40.    In addition, WilmerHale's team consisted of essentially five full-time associate equivalents during the period following the entry of the scheduling order. In my experience, this is an unusually low number of associates employed to complete the necessary work through trial. In a case of this magnitude (including the completion of a lengthy trial), a firm would more typically employ at least two more full-time associate equivalents. Using a blended rate of WilmerHale's associates at $350 per hour and assuming two additional associates at 200 hours per month for 15 months, this would result in a cost of additional $2.1 million.

41.    The $3,324,135.50 in additional fees I have described in the preceding paragraphs results in a total expenditure of fees that I would more typically expect to see in a case that involved the massive discovery and lengthy trial of this one.

42.    An additional factor bears on the enhancement of the lodestar – the continued involvement of Mr. Bell in this case.  From my own experience, the presence of an attorney who is intimately familiar with the case from its inception is invaluable and results in substantial savings.  Among other things, the continued involvement of a lawyer like Mr. Bell can eliminate or reduce the need for some factual research (since Mr. Bell would know the answer to many of the questions sought to be researched), can save significant time and effort in preparing witnesses and otherwise provides highly valued continuity.

43.    Thus, given the complexity and difficulty of this case, the atypical use of junior lawyers (and fewer lawyers overall) and the continued involvement of Mr. Bell, an enormous savings, not reflected in the lodestar, has been achieved in this case.

## ASSISTANCE TO THE GOVERNMENT

44.    Another factor which I believe to be extraordinary here is the level of assistance the WilmerHale team has provided to the Government's prosecution of this case and the resulting public benefit achieved.  As stated in the declaration of Keith V. Morgan, WilmerHale played an "essential" and "vital role" in achieving the result obtained by the Government.

45.    At the same time, the declaration of Mr. Morgan reflects that the fact that the Government and WilmerHale worked to minimize duplication of effort as much as

- 18 -

possible. As such, even though the Government fully participated in this case, there is no reason to reduce the WilmerHale fee simply because lawyers for two clients were involved in the case.

46.     The statements by the Government in support of WilmerHale's efforts are not at all typical and reflect the extraordinary contribution the WilmerHale team provided for the public benefit.

47.     In my view, the lodestar would not adequately reflect this contribution from WilmerHale. Indeed, this factor further confirms my view that an enhancement is necessary as a potential incentive to attract firms of the quality of WilmerHale to take on important and difficult cases like this one.

*****

48.     As discussed herein, there a number of factors which bear on the question of whether there should be an enhancement of the lodestar. I have attempted to quantify some of them; others are not readily susceptible to precise monetization. Those that I have not monetized are still nonetheless critical to determining in what amount the Court should apply an enhancement to the lodestar.

**CONCLUSION**

49.     All of the conclusions and opinions stated above are based on my over 20 years of experience in private practice – a litigation practice predominantly involving sizeable matters requiring the management of teams of professionals and support staff. During my years of practice, I have litigated with counsel for other parties that were from large metropolitan law firms (particularly those based in Washington, D.C.) as my adversaries and as my co-counsel. These collective experiences have, I believe, given me a good understanding of the practices of large law firms in serving their clients.

50.     All opinions expressed by me in this Declaration have been stated within a reasonable degree of professional certainty.

Steven K. Davidson

Washington, D.C.
September 18, 2007

- 20 -

# Exhibit A to Davidson Declaration



AN ALM SUPPLEMENT • WINTER 2007

# FOCUSEUROPE

**PLUS:**
Competition Heats Up in Eastern Europe
London Gets Hedge-y
Paris's Elite Boutiques

# Serious Money

Inside the fight to
recover Motorola's and
Nokia's missing billions
from Turkey's notorious
Uzan family.

## By Ben Hallman

Motorola counsel Steven
Davidson and Howard Stahl
of Steptoe & Johnson

# Turkish Bath

How a huge investment by Motorola and Nokia in one of Turkey's most prominent families turned into what one lawyer calls a "world war of litigation."

**BY BEN HALLMAN**

At first blush, the claim filed last February by Libananco Holdings Company Ltd. against Turkey is a typical case in the World Bank court responsible for mediating investment disputes. Like most claims in the court—the International Centre for the Settlement of Investment Disputes, or ICSID—the Libananco arbitration claim features an energy company squaring off against a developing nation. Libananco owned about 65 percent of two Turkish utilities that were seized by Turkish regulators in 2004; the company wants its investment back.

Scratch the surface, though, and the case bleeds intrigue.

Libananco, represented by Stuart Newberger, a veteran international arbitration partner at Crowell & Moring, is seeking $10 billion for its lost investment. There are political dimensions, too—Cyprus and Turkey are engaged in long-simmering near-war. But what has the insular group of lawyers who practice in the international arbitration space abuzz are the players that they allege are directing the drama. According to Turkish and U.S. lawyers familiar with the case, Turkish scholars, press reports, and other political experts, Libananco is controlled by the Uzan clan, who a U.S. federal court has

ruled defrauded Motorola Credit Corporation and Nokia Corporation of billions of dollars. Libananco, situated in the popular tax haven of Cyprus, with mysterious ownership, and known ties to the Uzans, has the family's fingerprints all over it, they say. "I am certain of it," says Howard Stahl, a 58-year-old Steptoe & Johnson partner, who has spent the last four years leading a worldwide fight to reclaim Motorola's lost investment. "It's the way they do business."

When Mototola and Nokia agreed in 1998 to loan the family $2.7 billion to build a wireless phone company in Turkey, it was seen as a smart move. The Uzans owned a sprawling business empire and were in line to receive just the second state license to operate a mobile network in the country, all but guaranteeing a healthy share of an underserved and booming market. The deal also stipulated that the Uzans would buy Motorola and Nokia parts and equipment.

The Uzans themselves seemed attractive business partners: urbane, educated Turkish oligarchs with deep ties to the country's business and political elite. Kemal Uzan (pronounced ooze-on), the patriarch, was a civil engineer who made the family's first fortune in construction in the 1960s. In the 1990s,



Steptoe & Johnson's
Steven Davidson (left)
and Howard Stahl have
gone to court in 15
countries to seize
Uzan assets.



**The urbane and wealthy Cem and Hakan Uzan seemed like promising business partners —at first.**

Cem and Hakan Uzan, Kemal's sons, both educated in the United States, helped grow the Uzan empire to include more than 200 businesses, including a popular satellite television station, utilities, and several banks. Mobile phones were the next frontier. Motorola's $2 billion loan, along with a smaller $700 million loan from Nokia Corporation, would help pay for the vast infrastructure such an enterprise requires.

Motorola and Nokia's instincts about the Turkish market were on the money. The number of cell phone subscribers in Turkey has mushroomed to an estimated 43.6 million in 2005, from 1.7 million in 1998, according to the United Nations's International Telecommunications Union, an organization for global telecommunications coordination. And the Uzans did use the money—some of it, at least—to build Telsim Mobil Telekomunikasyon Hizmetleri AS, a cellular phone company that today commands about 25 percent of the Turkish market.

cally, has been lawyers" who "wear their adversaries down," Stahl says—and in this multifront campaign they fought back with a who's who of legal hotshots: Carter Phillips from Sidley Austin; Floyd Abrams from Cahill Gordon & Reindel; Robert Serio from Gibson, Dunn & Crutcher; and Nathan Lewin of Lewin & Lewin. The Uzans' chief counsel is R. Stan Mortenson, a Baker Botts partner who has represented the family for nearly 20 years. Mortenson did not respond to repeated requests to comment for this story. Phillips, Abrams, and Serio either did not return calls or declined to comment.

Despite their high-priced legal talent, however, the Uzans made a significant miscalculation. In 2002 Motorola filed a fraud lawsuit against the leading members of the family, including Kemal, Hakan, and Cem, in federal court in New York. The Uzans counterattacked, winning an injunction from a Turkish court that said the U.S. court did not have the jurisdictional right to try them. Wielding this ruling, the Uzans refused to contest the case at trial and ordered their lawyers, who had already appeared on behalf of the family in proceedings up until that point, to disengage. (Rakoff said the injunction had no merit. The injunction was later overturned on appeal by a Turkish judge, who said it was "illegal" and "creates doubt about the trustworthiness of the judge" who issued it.)

On July 31, 2003, Rakoff ordered a $4.2 billion judgment against the Uzans, which included $2.1 billion in punitive damages. (Swallowing their doubts about jurisdiction, the Uzans appealed the ruling. In 2005, punitive damages were reduced to $1 billion. That ruling is also being appealed.)

By not participating in the trial, the Uzans never had the

**According to Motorola's investigators and federal court judge Jed Rakoff, the company's loan to the Uzans paid for a billionaire's wish list of personal goodies that included private jets, yachts, and lavish apartments.**

But as investigators for Motorola later discovered, and as New York federal judge Jed Rakoff later held, the loan also paid for a billionaire's wish list of personal goodies for the Uzans, including private jets, yachts, and lavish apartments.

As described in Judge Rakoff's ruling, the Uzans funneled more than $1 billion from Telsim into other family-owned businesses, offshore shell companies, and personal accounts, even as they were doing everything they could to delay debt payments on the Motorola/Nokia loans. Steptoe's Stahl, who led the ensuing fight to recover the money for Motorola, describes the scheme as "the greatest fraud in the history of the world," one that led to a "world war of litigation." Since 2002, when the companies finally got wise to the Uzans' fraud, Stahl and partner Steven Davidson, along with Ropes & Gray partner Jason Brown, who represents Nokia, have appeared in court in 15 countries, including Israel, Switzerland, and Bermuda.

The Uzans have a litigious reputation—"their army, histori-

chance to dispute in court the charges brought against them. A lawyer involved in the case who asked to not be identified says the Uzans doubted that any U.S. court judgment would ultimately be enforceable against them in Turkey. But the Uzans likely didn't realize how damaging the negative publicity from the case would be at home, where descriptions of their lavish spending routinely made front-page news. Furthermore, decades of influence peddling and court manipulation at home had bought the Uzans confidence in their invincibility, according to court documents, interviews with the lawyers involved, and Turkish press reports. The decision to swindle Motorola and Nokia and to hold back their lawyer army at the U.S. trial grew out of that sense of invulnerability, these sources say.

Accounts differ about what prompted previously acquiescent Turkish authorities to investigate the family (the election of a new moderate Islamist government that promised to crack down on corruption is one factor), but shortly before Rakoff's

# FLIGHT RISK

The Bombardier Global Express jet seats more than 30, cruises at just below sonic level, and can fly more than 6,000 miles without refueling. A new one isn't cheap—it goes for around $40 million—but, especially when someone else is footing the bill, the Global Express makes the perfect ride for an elusive billionaire on the go. The tale of one Global Express jet shows how the Uzans spent some of the money they took from Motorola and Nokia, and the extraordinary lengths to which the two companies went in order to recover it.

In 1999 a company called Hawk Aviation Ltd., incorporated on the Isle of Man, a lightly regulated tax haven in the Irish Sea, ordered a Global Express jet from Bombardier Inc. Hawk records show that Antonio Luna Betancourt, a Mexican national who was a longtime associate of the Uzan clan of Turkey, was a director of Hawk, and that Cem and Hakan Uzan, Kemal Uzan's two sons, were owners. According to *Forbes*, the Uzans at the time were one of the 500 wealthiest families in the world, but they didn't pay for the jet out of their own pocket. That

kind of thinking isn't what made them rich in the first place.

Instead, the Uzans diverted funds from Telsim, a telecom company in Turkey financed with more than $2 billion from Motorola Credit Corporation and Nokia Corporation, to two other Uzan-run offshore companies in the Caribbean: Brampton N.V. on the island of Curacao, and E.M.S. Management Systems in Switzerland. In turn, these shell companies paid the manufacturer and the titular owner, Credit Suisse Group, more than $30 million. Rather than purchase the jet directly, Motorola lawyers say, Hawk entered into a lease/buyback arrangement with Credit Suisse. (Later, in New York federal court, Motorola counsel Howard Stahl of Steptoe & Johnson said the deal was a "totally bogus, sham money-laundering transaction" arranged to disguise Uzan ownership of the plane; lawyers for Credit Suisse said it was a legitimate business arrangement.)

On a cold February day in 2003, private investigators tracked the Global Express to an airport in Berlin. Time was of the essence—airplanes, after all, are a mobile asset. Federal district

court judge Jed Rakoff, who was hearing the fraud case against the Uzans, had already issued a ruling that appointed a receiver to seize Hawk assets. Stahl dispatched one of his London-based partners, Thomas Sprange, to Berlin with a copy of an order from an Isle of Man

**When private investigators found that a plane leased with Telsim funds had landed in Berlin, Steptoe & Johnson used rulings from the courts of three countries to impound the plane.**

court based on Rakoff's ruling. Sprange quickly obtained an arrest warrant on the jet from a German court. Less than a day after it touched down, local law enforcement clamped a boot on the front wheel, locking the plane in place.

After the plane was flown to a Connecticut airport, the con-

flict over who owned the Global Express landed in Judge Rakoff's courtroom. Stahl and Davidson argued on behalf of Motorola; Cravath, Swaine & Moore partners Richard Clary and Richard Stark on behalf of Credit Suisse. They said the arrangement was a lease, much the same as if one were to lease a car. Rakoff didn't seem to buy that argument. He said the deal looked "as is so often the case in so-called structural financing agreements, that what's really going on economically is a loan, a secured loan." Credit Suisse and the Cravath partners did not return calls seeking comment.

Requiring funds from a Credit Suisse sale of the jet to be deposited into a court registry, Rakoff ruled that Motorola's evidence "supports an inference, at this stage, that Credit Suisse was facilitating a transaction by the defendants [the Uzans] that sought to place their funds outside the reach of the plaintiffs [Motorola and Nokia]."

Eventually, Credit Suisse and the two telecom companies agreed out of court to sell the plane and divide the proceeds.
—B.H.

---

ruling, the government accused the family of looting Imar Bank, one of the financial institutions they owned. The Uzans, except for Cem, who was not implicated in the bank scam, fled.

For most families, bilking two global telecom companies, allegedly doing the same to thousands of investors in Turkey, and then seeing their empire crumble into dust, would be enough. But the Uzans are the trick birthday candles of the litigation world. The Uzans, it seems, hope to use Libananco to make a comeback.

W
estern investors were first burned by the family in 1993, when the Uzans bought Cukurova Elektrik A.S., a Turkish utility company, and replaced the board of directors with friends and family. Once in charge, the Uzans deposited Cukurova's cash balances in non–interest bearing accounts at Imar Bank (the

same bank that would later fold). As a result of this action, the utilities' stock dropped to 18 cents a share, a new low. Franklin Templeton Investments' Emerging Markets Fund, a U.S.–based mutual fund that had invested in the utility, lost $15 million on Cukurova. "It was one of our worst investment experiences in emerging markets," Templeton manager Mark Mobius told *Forbes* in 2003. Although he received sympathy from Turkish regulators, Mobius adds in a recent interview, the Uzans used their close ties to the country's leadership to fight off efforts to investigate the family. Frustrated, Mobius decided to cut his losses and sell out. Turkey's Capital Markets Board sued the family for fraud in 1995, but the matter is still languishing in Turkey's slow-moving courts.

Motorola and Nokia have never revealed whether they were unaware of the Uzans' unsavory history or simply chose to ignore it; neither company responded to multiple interview requests for this story. But as it turned out, a time share



Crowell & Moring's Stuart Newberger represents Libananco in an arbitration against Turkey.

**Fearing "the deck was stacked against them," in the words of their lawyer, the Uzans boycotted the trial in New York. It was a fatal mistake.**

in Fallujah might have been a better investment.

When they first started having trouble making payments, the Uzans told Motorola and Nokia they would repay the investment by building Telsim into a powerful telecom business, and then selling out, according to Davidson, the Steptoe lawyer. The Uzans told Motorola they had received numerous inquiries and preliminary offers for Telsim, always suggesting that a sale of the company—and repayment of the loan—was just around the corner. "We are confident that our desire to execute a strategic transaction will result in success for Telsim within a reasonable period of time," Hakan Uzan, Telsim's chief executive, wrote Keith Bane, then president of Motorola, in an e-mail in 2001. But this was untrue, said executives from alleged suitors such as Deutsche Telekom AG in depositions presented at trial. In each instance in which a deal was supposedly in the works, negotiations broke off when Telsim refused to open its books. In his ruling, Rakoff said the intent of the Uzan stall tactics was to "lull plaintiffs into a false sense of security."

In 2001 Telsim missed a $728 million loan payment. Motorola had seen enough and declared the loan in default. Under the terms of the deal, contract disputes were to be brought before the Zurich Chamber of Commerce in Switzerland, so Motorola and Nokia filed a $2 billion claim against Telsim there. But investigators soon turned up enough evidence of wrongdoing to convince the companies that the Uzans themselves were liable for the breach of contract, which led to the fraud claim in federal district court in New York.

Fortunately for Motorola and Nokia's lawyers, the Uzans left an electronic paper trail. A report that was prepared by a PricewaterhouseCoopers LLP auditor for Motorola and was later accepted as part of Rakoff's ruling suggests they treated Telsim like a personal ATM machine. Of the $1 billion they siphoned off, approximately $133 million went to offshore shell companies like Brampton N.V., a shell company in the Caribbean, and Hawk Aviation Ltd., on the Isle of Man. Another $522 million was laundered into the control of other Uzan companies through reimbursements for fraudulently overstated expenses, and at least $450 million was transferred directly to Uzan entities in Turkey. Ultimately, as much as $300 million found its way into the Uzans' personal bank accounts, the report says.

While stringing Motorola and Nokia along, the Uzans continued to steal, Rakoff found in his ruling, at times using their investors' fear of competition to their advantage. In March 2000, for example, Hakan told Nokia that if the company could not restructure their agreements immediately, Telsim would buy switching equipment from rival Siemens AG. "Please believe me that I want to wrap up this issue with Nokia despite the technical capacity of Siemens," he wrote in an e-mail to a Nokia executive. "Have them approve this matter (the cash advance issue)." The "cash advance issue" was $25 million that the Uzans demanded to match a sum that Siemens had supposedly paid Telsim for the right to be the sole provider of switching equipment. Nokia, fearing competition, complied. In actuality, Siemens had not paid Telsim a dime—but it soon did. Hakan told both companies they were the sole provider of switching equipment, then pocketed the money. Net gain from fraud: $50 million.

In the U.S. court, the Uzans attempted similar tactics. After Judge Rakoff ordered the family to deposit 73.5 percent of Telsim's shares in escrow, the Uzans, according to Motorola lawyers, pressured three Telsim distributors to obtain an injunction from a Turkish court prohibiting any transfer of Telsim stock outside of Turkey. But they didn't reveal they had won this injunction to Rakoff until after he slapped a contempt order on them for not complying with his order to deposit the shares in the registry.

The Uzans, represented by Baker Botts's Mortenson, contended that the case shouldn't be in a U.S. court at all: The appropriate venue for contract disputes was a Swiss arbitration court, as specified by contract, they said. But Motorola and Nokia countered that while the Swiss court was the proper

forum for a claim against Telsim—and they filed a $2 billion claim there—the U.S. was an appropriate venue for a fraud claim against the family, since the Uzans owned property in New York and had used New York financial institutions to perpetrate their fraud. Judge Rakoff took the same view.

In an affidavit read to the court at an early 2003 hearing on the contempt order, Hakan Uzan said that "none of the defendants (my brother Cem included) accepts that this court has jurisdiction over us, and certainly no jurisdictional claim of this court is comparable, in our opinion, to that of our native Turkish courts." Having decided that the U.S. court lacked jurisdiction, the Uzans decided to pull out of the case, days before the trial was scheduled to begin on February 18, 2003.

Nathan Lewin, who represented the family in an appeal of the $4.2 billion Rakoff ruling, says the family had a "reasonable basis" for their decision to not participate in the initial trial. "They thought the deck was stacked against them," he says. Lewin traveled to Istanbul to meet the Uzans when he took their case. "They had been described as underworld figures," he says. "But I found them to be educated, impressive people." (He hasn't spoken with the family since the appeal of Rakoff's ruling was rejected in 2004.)

The Uzans also fought tooth and nail against Motorola/Nokia attempts to investigate Telsim. One of the more outlandish examples came when Motorola and Nokia investigators were scouring Turkish records to determine what had happened to the loans. The family claimed that the executives from the companies were trying to kill them, and in 2002 the Uzans won an indictment in a criminal court in Beykoz, a suburb of Istanbul, against Christopher Galvin, then the chief executive of Motorola, and Keith Bane, the former president of Motorola. In the New York contempt hearing, a clearly skeptical Rakoff asked Hakan Uzan what basis he had for the accusation. Hakan Uzan responded that family members had received threatening phone calls and seemed to be under surveillance: "People have come to ask about where we buy food for our airplane. People have come to ask where we go, when we land, where we travel to, where we stay. . . . The combination of all of these and the fact that it was in the press that they had hired these Kroll people [the private investigators hired to track the Uzans' assets], I added the two things up together." Rakoff called the charges "materially false" in his ruling. (The Turkish court acquitted the executives, but then an appeals court "annulled" the judgment because some of the complainants' witnesses had not testified. The matter is still pending.)

During the trial in Judge Rakoff's courtroom, which lasted just one day, the Uzans' lawyers sat in the viewing gallery, not the defense table. In light of the evidence Motorola and Nokia lawyers presented, Rakoff's ruling against the family on July 31, 2003, was not a shock. The Uzans perpetrated a huge fraud, Rakoff said in a scathing 173-page ruling that reads like a cross between a true crime novel and a how-to guide to money laundering. "Having fraudulently induced the loans, they have sought to advance and conceal their scheme through an almost endless series of lies, threats, and chicanery," he wrote.

Had the Uzans participated in the trial, their defense would likely have gone something like the following, based on arguments Cem Uzan made in a 2006 lawsuit against Telsim. The company could not meet its debt obligations because of a "confluence of unforeseeable events," including "a precipitous economic and financial meltdown in Turkey, an unprecedented, massive devaluation of the Turkish lira, and the collapse of the global cellular telecommunications market," as well as a dearth of available buyers for Telsim. (The later seizure of the company by Turkish authorities prevented any chance the family had

> **"Having fraudulently induced the loans, [the Uzans] have sought to advance and conceal their scheme through an almost endless series of lies, threats, and chicanery," Judge Rakoff wrote.**

to pay back the money.) In court filings in the New York case, the family maintained that by declaring the loan in default, Motorola and Nokia had violated the vendor financing contracts that called for the settling of disputes before Swiss arbitrators. The Uzans didn't win this argument either. In 2005 Motorola and Nokia won a $2 billion arbitration ruling against Telsim.

The question remains: How were two wealthy, sophisticated, international corporations like Motorola and Nokia fooled for so long? Perhaps it was simply hard for them to come to terms with the fact that they had been fleeced, as Judge Rakoff suggested in his ruling. Once the companies had committed vast amounts of money, he wrote, they were "psychologically predisposed to credit defendants' further lies rather than admit they had been swindled and faced huge losses." Franklin Templeton fund manager Mark Mobius offers another theory. Perhaps, he says, each company failed to do the kind of due diligence that such a huge investment would seem to warrant because each assumed the other had already done so. Undoubtedly, he says, "Motorola and Nokia should have looked more closely at who they were getting in bed with."

Motorola and Nokia had their ruling, the Uzans had faith in their invincibility—but in the complicated world of global litigation, both were trumped by the Turkish government. Shortly before Rakoff's July 2003 ruling, Turkish regulators working for the Savings Deposit and Investment Fund, the Turkish equivalent of the Federal Deposit Insurance Corporation, announced that they were investigating the actions of the Uzan-owned Imar Bank. That investigation uncovered an alleged fraud that, if true, dwarfs what the Uzans pulled over on Motorola and Nokia. The regu-

lators say the Uzans stole more than $6 billion from depositors in the bank. To repay the depositors, the Turkish government seized Imar in late 2003, and the rest of the Uzans' far-flung business empire in early 2004.

So, while Motorola and Nokia lawyers battled with the Uzans on a series of fronts to seize assets to satisfy the Rakoff judgment—property in a swank London neighborhood, penthouse apartments in New York's Trump Tower, a $40 million jet in Germany, and a luxury yacht in Israel—they were stuck fighting with the Turkish government to satisfy the Swiss arbitration award. After Telsim was seized by the Turkish government, Motorola lawyers Stahl and Davidson hatched a plan to seize roaming fees from Telsim customers in 13 countries. That operation continued until 2005, when British-based mobile operator Vodafone Group Plc bought Telsim for $4.55 billion. To recover money from the sale, Motorola and Nokia filed an arbitration claim against Turkey before ICSID. In 2005 the Turkish government settled with Motorola for $900 million, and Nokia for $340 million.

The Uzans never met a litigation tactic they didn't like. Taking a page from their adversaries' playbook, the Uzans orchestrated an ICSID claim of their own, according to lawyers familiar with the case. In the two years before their businesses were expropriated by the Turkish government, the

Under Cypriot law, ownership of a corporation is determined by who owns the majority of seats on the board of directors, not who controls the most company stock, he says. Two of the three Libananco directors are Cyprus natives. Unless the opposition can prove fraud in the establishment of Libananco, the company's claim will go forward, he says. Furthermore, the seizure of the utilities had nothing to do with the alleged fraud at Imar Bank, he says. Newberger says the investigation into the utilities was launched before the Imar Bank scandal, and was part of a "political vendetta" by Recep Tayyip Erdogan, the Turkish prime minister, against Cem Uzan, who had started an opposition political party. Newberger would not comment on whether the Uzans exercise any control over the company.

Lucy Reed, a Freshfields Bruckhaus Deringer partner in New York who is representing the Turkish government, declined to comment.

Stahl says the Libananco case is "typically Uzan," and characteristic of a family that "litigates everything." The notion of pulling the strings of a business in an offshore business haven, such as Cyprus, bears the Uzan hallmark, he says. The Uzans are now underground, thought to be hiding in Jordan, where they have close connections to the king.

And the litigation grinds on. In February 2006, describing the Uzan-engineered embezzlement at Imar Bank as "one of

## Is Libananco a fully independent Cypriot company—or a tool of the Uzan family? The answer will determine whether Libananco can pursue its arbitration claims against Turkey.

Uzans sold off parts of two profitable hydroelectric utilities to Libananco, the Cypriot company. In February 2006 Libananco filed a claim with ICSID alleging that the government of Turkey had illegally seized the assets of the utilities in violation of the multilateral investment Energy Charter Treaty, which both Turkey and Cyprus have signed. Hal Eren, a Washington, D.C., lawyer with an international arbitration practice who has been following the current case, says Motorola's use of the arbitration court was a "signal" to the Uzans to also use ICSID. Under ICSID rules, establishing jurisdiction is the first test the case will face. Whether the case continues will likely hinge on if the arbitral court believes Libananco's claims that it is a fully independent Cypriot company with a valid claim against a sovereign country. If it thinks Libananco is a tool of the Uzans—who as Turkish nationals are not eligible to use the court—the court may dismiss the case. And that may hinge on what Libananco is willing to reveal. The company says it has three directors, but it has not revealed the names of any investors. One of the directors, Ali Cenk Turkkan, is a Turkish national who lives in Amman. Turkkan is also an old friend of the Uzans.

Newberger, the Crowell & Moring partner who is representing Libananco, says that even if the Uzans are orchestrating the case, that fact would not invalidate Libananco's claims.

the worst in world banking history," a Turkish court sentenced the only Uzan they could find, Bahattin Uzan, Kemal's brother, to 17 years' imprisonment for embezzlement. (Cem Uzan was not implicated in the Imar scandal, and still lives in Turkey.) In May, Cem Uzan filed suit against Telsim, his former company, in a New York state court, seeking the $2.9 billion he needs to pay off Motorola and Nokia. (A lawyer familiar with the case says the case is likely to be thrown out on jurisdictional grounds.)

As for Motorola and Nokia, a lawyer who has followed the drama says that despite the claims by Steptoe attorneys that they are continuing to go after Uzan assets, the settlement with the Turkish government essentially marked the end of the case. Under the terms of the settlement, Motorola and Nokia agreed to not pursue Uzan assets in a number of jurisdictions, including, crucially, Turkey. "Publicly they say they are enforcing [the Rakoff ruling], but in reality the $1 billion they collected made them whole. From a business standpoint, there is no reason for the lawyers to go around trying to find Uzan assets anymore," the lawyer says. But Stahl says he believes the Uzans still have billions socked away in hard-to-reach places, and he is continuing to try to enforce the Rakoff ruling.

One billion dollars down, $2 billion to go.

Exhibit B to Davidson Declaration

# THE NATIONAL LAW JOURNAL

## IN FOCUS

**S1–S12**

MONDAY, DECEMBER 11, 2006

# BILLING

# Edging up again

Firms are steadily increasing hourly billing rates across the board.

By Sandhya J. Bathija
STAFF REPORTER







IT SEEMS A YEAR doesn't go by without law firms bumping up rates.

And this year isn't any different. Billing rates for law firm attorneys show a steady increase from last year for both partners and associates.

This year, 139 firms answered questions on billing rates as part of

The National Law Journal's 2006 survey of the nation's 250 largest law firms. The surveys were sent to roughly 300 firms. The firms provided low and high rates for partners and associates. Of these firms, 104 provided low and high rates last year also, with 88 increasing the partner high rate, eight decreasing it and eight keeping it the same.

Seventy of them increased the partner low rate, 19 decreased it and 15 kept it the same.

As for the associates, 73 firms increased the low rate, 15 decreased it and 16 kept it the same. And 77 firms increased the associate high rate, 18 decreased it and nine kept it the same.

And for the first time last year, we asked the firms to provide their average and median billing rates for partners and associates, as well as firmwide. Forty-eight firms that provided partner and associate average billing rates last year did so this year. Of those firms, 43 reported higher partner average rates this year, and 44 reported higher associate average rates.

Forty firms reported firmwide average rates this year and last. Of those, 37 reported higher averages this year.

Forty firms that reported partner and associate median billing rates last year did so this year. Of those firms, 35 reported higher partner median rates this year, and 33 reported higher associate rates.

Thirty firms reported firmwide median rates this year and last. Of those, 23 reported higher medians this year.

The increase is partly due to inflation and supply and demand, said Joseph Altonji of the management consulting firm Hildebrandt International.

"It's the demand for a really good lawyer, and it costs to hire really good people," he said. "Since these costs are going up, the firms have to pass that cost on." And for sophisticated transactions, clients are willing to pay, Altonji said.

Washington-based McKee Nelson reported this year's highest rates across the board for partners and associates but the firm declined to comment on its rates. The highest rate billed out by a

partner at the firm is $875 an hour, which is low compared to last year's $1,000 rate billed out by Benjamin Civiletti, who specializes in internal investigations and corporate defense at Venable of Washington. Venable did not participate in the billing survey this year, but last year said the rate was used only for the most "extraordinary work."

The high number this year is still very high compared with most firms, Altonji said. But in big cities like New York, Chicago and Los Angeles, there are definitely still a handful of partners billing out at $1,000 or even slightly more, he said.

McKee Nelson also reported the highest rate billed by an associate at $575 an hour, also low compared to last year's associate high at Dorsey & Whitney, a reported $835. Dorsey reported an associate high of $430 this year.

McKee Nelson further reported the highest average and median rates for partners: $725 and $720, respectively. Three firms—Curtis, Mallet-Prevost, Colt & Mosle; Schulte Roth & Zabel; and Thacher Proffitt & Wood—reported partner averages in the $600s. All three are New York-based. It should be noted, however, that many of the largest and highest-billing firms declined to participate in this year's billing survey.

Among the lowest reported partner and associate rates this year were those at Philadelphia-based Marshall, Dennehey, Warner, Coleman & Goggin. Associates bill out at $130 to $275, and partners between $145 and $350. This is still an increase from last year, when associates billed between $130 and $230 and partners, between $140 and $275.

"The rates are increasing because we are doing more high-end work in securities and mass tort litigation," said Thomas Bond, the firm's senior partner and director of client development and relations.

The lower-end numbers at the firms are due to rates for younger lawyers and lawyers who do commodity work, such as in insurance law.

"A lot of lawyers are capable of doing that work," Altonji said. "But over time, it spreads and lawyers who are doing more sophisticated work can raise rates. For the big transactions, rates aren't going to be an issue and the best lawyers are going to get to do the deal."

Finally, some firms reported on their use of variations on the billable hour, such as discounted rates and blended rates, and on their use of alternative billing methods, such as fixed or flat fees and contingency fees. As in past years, most firms reported higher percentages of revenues obtained from variations than from alternative methods.

## The numbers

**Nationwide sampler.** S2

**Associate class rates.** S5

**Alternative methods.** S9

S2

# Firm-by-firm sampling of billing rates nationwide

The National Law Journal asked the respondents to its 2006 survey of the nation's 250 largest law firms to provide a range of hourly billing rates for partners and associates. The firms that supplied this information—including some firms that are not in the NLJ 250—are listed below in alphabetical order. We also asked firms to provide average and median billing rates; several firms provided this information as well. The number after a firm's name indicates the total number of attorneys at the firm. The city listed below the name of a firm is the location of its principal or largest office.

## A B C

**Adams and Reese (301)**
(New Orleans)
Partners $215-$470 (average $347)
(median $270)
Associates $165-$250 (average $191)
(median $190)
Firmwide (average $267) (median $235)

**Andrews Kurth (404)**
(Houston)
Partners $380-$745
Associates $180-$400

**Arent Fox (288)**
(Washington)
Partners $375-$610
Associates $215-$405

**Armstrong Teasdale (268)**
(St. Louis)
Partners $255-$425 (average $347)
(median $342)
Associates $135-$275 (average $227)
(median $225)
Firmwide (average $278) (median $270)

**Baker, Donelson, Bearman, Caldwell & Berkowitz (454)**
(Memphis, Tenn.)
Partners $220-$500
Associates $135-$310

**Ballard Spahr Andrews & Ingersoll (488)**
(Philadelphia)
Partners $320-$680
Associates $190-$390

**Barnes & Thornburg (421)**
(Indianapolis)
Partners $245-$455 (average $333)
Associates $170-$285 (average $212)
Firmwide (average $260)

**Bass, Berry & Sims (214)**
(Nashville, Tenn.)
Partners $230-$495
Associates $150-$245

**Bell, Boyd & Lloyd (256)**
(Chicago)
Partners $310-$690
Associates $215-$300

**Best Best & Krieger (196)**
(Riverside, Calif.)
Partners $275-$450 (median $375)
Associates $145-$335 (average $186)
(median $225)
Firmwide (average $211)
(median $240)

**Blackwell Sanders Peper Martin (310)**
(Kansas City, Mo.)
Partners $265-$395 (average $302)
(median $320)
Associates $155-$255 (average $200)
(median $195)
Firmwide (average $241)
(median $270)

**Blank Rome (460)**
(Philadelphia)
Partners $325-$735
Associates $220-$495

**Bond, Schoeneck & King (160)**
(Syracuse, N.Y.)
Partners $200-$425 (average $252)
(median $285)
Associates $140-$305 (average $177)
(median $175)
Firmwide (average $231) (median $275)

**Briggs and Morgan (165)**
(Minneapolis)
Partners $250-$475 (average $357)
(median $360)
Associates $185-$275 (average $214)
(median $205)
Firmwide (average $319) (median $325)

**Brinks Hofer Gilson & Lione (151)**
(Chicago)
Partners $275-$625 (average $465)
(median $460)
Associates $200-$390 (average $280)
(median $285 )
Firmwide (average $381) (median $390)

**Broad and Cassel (173)**
(Orlando, Fla.)
Partners $235-$425 (average $339)
(median $325)
Associates $155-$295 (average $217)
(median $210)
Firmwide (average $272) (median $265)

**Brown Raysman Millstein Felder & Steiner (248)**
(New York)
Partners $450-$740 (average $495)
(median $350)
Associates $250-$400 (average $325)
(median $370)
Firmwide (average $385)
(median $465)

**Brown Rudnick Berlack Israels (208)**
(Boston)
Partners $505-$870
Associates $275-$495

**Bryan Cave (783)**
(St. Louis)
Partners $315-$665 (average $476)
Associates $150-$460 (average $289)
Firmwide (average $331)

**Buchalter Nemer (139)**
(Los Angeles)
Partners $325-$550 (average $432)
(median $445)
Associates $215-$450 (average $256)
(median $275)
Firmwide (average $344)
(median $350)

**Buchanan Ingersoll & Rooney (573)**
(Pittsburgh)
Partners $210-$750
Associates $140-$375

**Buckingham, Doolittle & Burroughs (171)**
(Akron, Ohio)
Partners $230-$425 (average $296)
(median $295)
Associates $185-$290 (average $220)
(median $215)
Firmwide (average $240)
(median $240)

**Bullivant Houser Bailey (191)**
(Portland, Ore.)
Partners $225-$450 (average $288)
(median $285)
Associates $175-$300 (average $204)
(median $195)
Firmwide (average $254)
(median $230)

**Burr & Forman (188)**
(Birmingham, Ala.)
Partners $250-$400 (average $324)
(median $325)
Associates $160-$315 (average $218)
(median $215)
Firmwide (average $234) (median $245)

**Butzel Long (217)**
(Detroit)
Partners $220-$490 (average $290)
Associates $165-$270 (average $202)
Firmwide (average $243)

**Carlton Fields (242)**
(Tampa, Fla.)
Partners $285-$545 (average $383)
(median $390)
Associates $190-$375 (average $233)
(median $233)
Firmwide (average $293) (median $290)

**Cooley Godward Kronish (541)**
(Palo Alto, Calif.)
Partners $425-$795 (average $539)
Associates $240-$585 (average $371)
Firmwide (average $431)

**Covington & Burling (645)**
(Washington)
Partners $470-$760
Associates $210-$490

**Cozen O'Connor (501)**
(Philadelphia)
Partners $185-$750 (average $325)
(median $310)
Associates $130-$495 (average $218)
(median $210)
Firmwide (average $245) (median $235)

**Curtis, Mallet-Prevost, Colt & Mosle (196)**
(New York)
Partners $570-$700 (average $625)
(median $652)
Associates $250-$510 (average $390)
(median $380)
Firmwide (average $508) (median $465)

## D E F

**Davis Wright Tremaine (405)**
(Seattle)
Partners $285-$655 (average $399.34)
(median $395)
Associates $130-$370 (average $251.72)
(median $250)
Firmwide (average $350.51) (median $350)

**Day, Berry & Howard (251)**
(Hartford, Conn.)
Partners $335-$620
Associates $200-$440

**Dickinson Wright (226)**
(Detroit)
Partners $250-$520
Associates $155-$260

**Dickstein Shapiro (360)**
(Washington)
Partners $400-$700 (average $530)
(median $535)
Associates $210-$415 (average $315)
(median $340)
Firmwide (average $300)
(median $300)

**Dinsmore & Shohl (308)**
(Cincinnati)
Partners $220-$440 (average $323)
(median $320)
Associates $145-$240 (average $185)
(median $180)
Firmwide (average $252)
(median $233)

**Dorsey & Whitney (600)**
(Minneapolis)
Partners $300-$650 (average $431)
Associates $180-$430 (average $273)
Firmwide (average $360)

**Duane Morris (581)**
(Philadelphia)
Partners $300-$705 (average $436)
(median $435)
Associates $200-$425 (average $283)
(median $279)
Firmwide (average $379) (median $374)

**Dykema Gossett (341)**
(Detroit)
Partners $235-$580
Associates $170-$330

**Eckert Seamans Cherin & Mellott (227)**
(Pittsburgh)
Partners $195-$525 (average $343)
(median $340)
Associates $145-$250 (average $190)
(median $190)
Firmwide (average $287)

**Edwards Angell Palmer & Dodge (516)**
(Boston)
Partners $300-$675
Associates $150-$440
Firmwide (average $466)

**Epstein Becker & Green (378)**
(New York)
Partners $300-$650 (average $468.29)
Associates $160-$395 (average $270.32)
(median $260)
Firmwide (average $434.34)

**Fenwick & West (234)**
(Mountain View, Calif.)
Partners $465-$750 (average $570)
(median $575)
Associates $245-$475 (average $355)
(median $395)
Firmwide (average $430) (median $450)

**Fisher & Phillips (187)**
(Atlanta)
Partners $300-$440
Associates $175-$320

**Foley & Lardner (981)**
(Milwaukee)
Partners (average $517) (median $513)
Associates (average $356) (median $360)
Firmwide $240-$810 (average $446)
(median $440)

**Ford & Harrison (171)**
(Atlanta)
Partners $290-$445
Associates $210-$370

**Fowler White Boggs Banker (227)**
(Tampa, Fla.)
Partners $280-$500 (average $350)
(median $335)
Associates $170-$275 (average $225)
(median $220)
Firmwide (average $315) (median $315)

**Fox Rothschild (381)**
(Philadelphia)
Partners $265-$525
Associates $195-$335

**Fredrikson & Byron (209)** (Minneapolis)
Partners $250-$525
Associates $175-$275

**Frost Brown Todd (376)** (Cincinnati)
Partners $205-$435 (average $287)
(median $280)
Associates $140-$280 (average $181)
(median $180)
Firmwide (average $220) (median $240)

# G H I

**Gardere Wynne Sewell (282)**
(Dallas)
Partners $345–$665 (average $446) (median $450)
Associates $205–$400 (average $273) (median $270)
Firmwide (average $381) (median $345)

**Gardner Carton & Douglas (195)**
(Chicago)
Partners $275–$650 (average $433) (median $425)
Associates $200–$350 (average $278) (median $250)
Firmwide (average $376) (median $395)

**Gordon & Rees (509)**
(San Francisco)
Partners $325–$450
Associates $200–$325

**GrayRobinson (190)**
(Orlando, Fla.)
Partners $200–$500
Associates $140–$200

**Greenberg Traurig (1,667)** (Miami)
Partners $270–$850 (average $460)
Associates $160–$450 (average $289) (median $290)
Firmwide (average $381) (median $395)

**Harris Beach (182)** (Rochester, N.Y.)
Partners $250–$425
Associates $140–$275

**Hiscock & Barclay (160)** (Syracuse, N.Y.)
Partners $220–$375 (average $269) (median $250)
Associates $160–$250 (average $183) (median $180)
Firmwide (average $243) (median $250)

**Hodgson Russ (229)**
(Buffalo, N.Y.)
Partners $225–$625 (average $310) (median $315)
Associates $150–$300 (average $201) (median $195)
Firmwide (average $272) (median $275)

**Hogan & Hartson (1,043)**
(Washington)
Partners $300–$775 (average $550) (median $550)
Associates $150–$485 (average $350) (median $350)
Firmwide (average $450) (median $475)

**Holland & Knight (1,102)**
(New York)
Partners $250–$710 (average $396) (median $390)
Associates $165–$400 (average $232) (median $225)
Firmwide (average $344) (median $350)

**Holme Roberts & Owen (206)**
(Denver)
Partners $260–$575
Associates $185–$390

**Howard Rice Nemerovski Canady, Falk & Rabkin (102)**
(San Francisco)
Partners $440–$750
Associates $250–$420

**Husch & Eppenberger (331)**
(St. Louis)
Partners $200–$410 (average $285.35) (median $275)
Associates $130–$250 (average $170.27) (median $165)
Firmwide (average $235.18) (median $230)

**Ice Miller (249)**
(Indianapolis)
Partners $275–$425 (average $352) (median $345)
Associates $185–$310 (average $218) (median $220)
Firmwide (average $293) (median $220)

# J K L

**Jackson Lewis (375)**
(White Plains, N.Y.)
Partners $290–$525
Associates $190–$395

**Jenkens & Gilchrist (268)** (Dallas)
Partners $340–$610 (average $420)
Associates $220–$390 (average $270)

**Jenner & Block (467)** (Chicago)
Partners $410–$800 (average $513) (median $495)
Associates $230–$395 (average $292) (median $285)

**Jones, Walker, Waechter, Poitevent, Carrère & Denègre (208)** (New Orleans)
Partners $200–$425
Associates $135–$210

**Kelley Drye & Warren (375)** (New York)
Partners $375–$750
Associates $230–$475

**Knobbe Martens, Olson & Bear (193)**
(Irvine, Calif.)
Partners $335–$625
Associates $205–$340

**Lane Powell (367)** (Seattle)
Partners $275–$490 (average $328) (median $330)
Associates $205–$295 (average $236) (median $237)
Firmwide (average $273) (median $270)

**Lathrop & Gage (264)**
(Kansas City, Mo.)
Partners $220–$375
Associates $140–$220

**Lewis, Rice & Fingersh (165)**
(St. Louis)
Partners $225–$410
Associates $135–$290

**Littler Mendelson (527)**
(San Francisco)
Partners $205–$605
Associates $160–$400

**Locke Liddell & Sapp (378)**
(Houston)
Partners $360–$850 (average $471) (median $460)
Associates $190–$390 (average $244) (median $260)
Firmwide (average $373) (median $410)

**Loeb & Loeb (340)**
(Los Angeles)
Partners $425–$825
Associates $215–$475

**Lord, Bissell & Brook (328)**
(Chicago)
Partners $305–$665 (average $448) (median $450)
Associates $200–$375 (average $272) (median $260)
Firmwide (average $368) (median $355)

**Lowenstein Sandler (250)**
(Roseland, N.J.)
Partners $335–$645
Associates $185–$375

**Luce, Forward, Hamilton & Scripps (178)**
(San Diego)
Partners $320–$725 (average $440)
Associates $205–$425 (average $265)

SEE 'NATIONWIDE' PAGE S4



# Prickly
# by nature.

(But no more than we need to be.)

Natural selection is brutal. You don't survive without being more than a little tough and resourceful. The forces at work in complex employment litigation can be equally punishing. And when it's your brand, reputation, and bottom line at stake, you need litigators like ours with the same rare genius for success. Nowhere is that more evident than in court, where our talent for securing significant employment class and individual action victories has made us the natural choice to lead the defense for some of the nation's largest companies. **To learn more, please visit us online at www.littler.com.**

## LITTLER MENDELSON, P.C.

500 Attorneys + 38 National Offices = One Integrated Solution

www.littler.com

Employment and Class Action Litigation · Unfair Competition and Trade Secrets · Employee Benefits · Labor Management Relations
HR Risk Management and Corporate Compliance · Workplace Safety · Global Migration

# Billing rates set by law firms across the country

'NATIONWIDE' FROM PAGE S3

## MNO

**Manatt, Phelps & Phillips (299)**
(Los Angeles)
Partners $460-$750 (average $574)
(median $560)
Associates $250-$460 (average $359)
(median $360)
Firmwide (average $490) (median $520)

**Marshall, Dennehey, Warner, Coleman & Goggin (368)** (Philadelphia)
Partners $145-$350
Associates $130-$275

**McAndrews, Held & Malloy (89)**
(Chicago)
Partners $260-$600
Associates $195-$240

**McCarter & English (407)**
(Newark, N.J.)
Partners $310-$625
Associates $190-$330

**McElroy, Deutsch, Mulvaney & Carpenter (230)** (Morristown, N.J.)
Partners $225-$450 (average $250)
(median $235)
Associates $135-$295 (average $180)
(median $165)
Firmwide (average $195) (median $200)

**McKee Nelson (172)**
(Washington)
Partners $595-$875 (average $725)
(median $720)
Associates $355-$575 (average $436)
(median $430)

**McKenna Long & Aldridge (400)**
(Atlanta)
Partners $330-$700
Associates $175-$410

**Michael Best & Friedrich (255)**
(Milwaukee)
Partners $245-$530 (average $341)
(median $335)
Associates $175-$325 (average $225)
(median $225)
Firmwide (average $305) (median $300)

**Miles & Stockbridge (210)**
(Baltimore)
Partners $300-$475
Associates $200-$375

**Miller, Canfield, Paddock and Stone (355)** (Detroit)
Partners $245-$540 (average $398)
(median $405)
Associates $150-$300 (average $215)
(median $210)
Firmwide (average $305)
(median $310)

**Miller & Martin (175)**
(Chattanooga, Tenn.)
Partners $210-$430 (average $313)
(median $320)
Associates $140-$280 (average $185)
(median $180)
Firmwide (average $281)
(median $300)

**Montgomery, McCracken, Walker & Rhoads (133)** (Philadelphia)
Partners $300-$550 (average $402)
Associates $195-$315 (average $248)
Firmwide (average $378)

**Morgan, Lewis & Bockius (1,315)**
(Philadelphia)
Partners $375-$800
Associates $200-$550

**Morris, Manning & Martin (174)**
(Atlanta)
Partners $320-$530 (average $412)
(median $403)
Associates $170-$390 (average $246)
(median $290)
Firmwide (average $322) (median $350)

**Neal, Gerber & Eisenberg (170)**
(Chicago)
Partners $350-$695 (average $463)
(median $430)
Associates $210-$400 (average $300)
(median $300)
Firmwide (average $413) (median $400)

**Nelson Mullins Riley & Scarborough (379)** (Columbia, S.C.)
Partners $215-$600
Associates $175-$300

**Ogletree, Deakins, Nash, Smoak & Stewart (331)** (Greenville, S.C.)
Partners $250-$550 (average $328)
Associates $165-$330 (average $234)
Firmwide (average $289)

## PQR

**Patton Boggs (431)**
(Washington)
Partners $295-$850 (average $480)
(median $570)
Associates $170-$405 (average $305)
(median $325)
Firmwide (average $403) (median $510)

**Pepper Hamilton (445)**
(Philadelphia)
Partners $305-$695
Associates $190-$385

**Perkins Coie (578)**
(Seattle)
Partners $175-$650
Associates $130-$480

**Phelps Dunbar (260)**
(New Orleans)
Partners $175-$400 (average $224)
(median $323)
Associates $125-$190 (average $165)
(median $158)
Firmwide (average $191)
(median $263)

**Phillips Lytle (173)**
(Buffalo, N.Y.)
Partners $225-$410 (average $298)
(median $290)
Associates $130-$285 (average $197)
(median $185)
Firmwide (average $251)
(median $260)

**Pitney Hardin (170)**
(Florham Park, N.J.)
Partners $365-$625 (average $447)
(median $445)
Associates $210-$360 (average $269)
(median $270)
Firmwide (average $353)
(median $355)

**Polsinelli Shalton Welte Suelthaus (276)** (Kansas City, Mo.)
Partners $225-$575
Associates $160-$225

**Powell Goldstein (282)**
(Atlanta)
Partners $300-$575 (average $435.10)
(median $435)
Associates $150-$360 (average $254.44)
(median $245)
Firmwide (average $357.88)
(median $360)

**Preston Gates & Ellis (419)**
(Seattle)
Partners $190-$635 (average $399.41)
(median $395)
Associates $100-$385 (average $236.39)
(median $230)
Firmwide (average $329) (median $325)

**Quarles & Brady (442)**
(Milwaukee)
Partners $240-$550 (average $360)
(median $430)
Associates $185-$310 (average $228)
(median $225)
Firmwide (average $306)
(median $285)

**Reed Smith (1,038)**
(Pittsburgh)
Partners $305-$725 (average $492)
(median $480)
Associates $170-$630 (average $309)
(median $295)
Firmwide (average $322)
(median $310)

**Robinson & Cole (217)**
(Hartford, Conn.)
Partners $270-$550 (average $400)
(median $400)
Associates $175-$400 (average $235)
(median $240)
Firmwide (average $316)
(median $320)

**Roetzel & Andress (208)**
(Akron, Ohio)
Partners $200-$425 (average $255)
(median $275)
Associates $130-$275 (average $180)
(median $190)
Firmwide (average $225)
(median $235)

**Rutan & Tucker (140)**
(Costa Mesa, Calif.)
Partners $310-$515
Associates $200-$335

## STU

**Saul Ewing (238)**
(Philadelphia)
Partners $290-$700 (average $402)
(median $395)
Associates $185-$440 (average $258)
(median $230)
Firmwide (average $336)
(median $345)

**Schnader Harrison Segal & Lewis (174)** (Philadelphia)
Partners $305-$650
Associates $155-$295

**Schulte Roth & Zabel (449)**
(New York)
Partners $580-$800 (average $672)
(median $675)
Associates $225-$550 (average $410)
(median $393)

**Seward & Kissell (142)**
(New York)
Partners $460-$695 (average $589)
(median $590)
Associates $190-$460 (average $300)
(median $290)

**Sheppard, Mullin, Richter & Hampton (424)** (Los Angeles)
Partners $415-$650 (average $504)
(median $495)
Associates $250-410 (average $342)
(median $330)
Firmwide (average $419)
(median $420)

**Shook, Hardy & Bacon (478)**
(Kansas City, Mo.)
Partners $240-$720 (average $374)
(median $358)
Associates $190-$405 (average $238)
(median $225)
Firmwide (average $291)
(median $250)

**Shughart Thomson & Kilroy (170)**
(Kansas City, Mo.)
Partners $210-$410
Associates $165-$225

**Shumaker, Loop & Kendrick (162)**
(Toledo, Ohio)
Partners $185-$450 (average $290)
Associates $165-$345 (average $205)
Firmwide (average $270)

**Sills Cummis Epstein & Gross (180)**
(Newark, N.J.)
Partners $300-$595
Associates $185-$360

**Smith, Gambrell & Russell (191)**
(Atlanta)
Partners $275-$550
Associates $150-$330

**Snell & Wilmer (448)**
(Phoenix)
Partners $265-$625 (average $405)
Associates $160-$360 (average $205)
Firmwide (average $277)

**Steptoe & Johnson PLLC (168)**
(Clarksburg, W.Va.)
Partners $220-$300
Associates $165-220

**Stinson Morrison Hecker (313)**
(Kansas City, Mo.)
Partners $320-$495 (average $310)
(median $310)
Associates $155-$230 (average $185)
(median $180)
Firmwide (average $274)
(median $280)

**Stoel Rives (345)**
(Portland, Ore.)
Partners $270-$475 (average $361)
(median $360)
Associates $160-$400 (average $242)
(median $230)
Firmwide (average $309)
(median $320)

**Strasburger & Price (282)**
(Dallas)
Partners $295-$525
Associates $195-$310

**Sullivan & Worcester (192)**
(Boston)
Partners $400-$650
Associates $220-$450

**Sutherland Asbill & Brennan (477)**
(Atlanta)
Partners $350-$845 (average $477)
(median $475)
Associates $200-$530 (average $270)
(median $265)
Firmwide (average $373)
(median $375)

**Thacher Proffitt & Wood (313)**
(New York)
Partners $525-$775 (average $603)
(median $575)
Associates $265-$485 (average $372)
(median $355)
Firmwide (average $430)
(median $420)

Monday, December 11, 2006    THE NATIONAL LAW JOURNAL/WWW.NLJ.COM    S5

## Billing rates by associate classes

*The following is a sampling of hourly rates charged by law firms that establish billing rates based on associate class. The name of each law firm is followed by its number of attorneys, and the location of its principal or largest office.*

**Thompson Coburn (279)**
(St. Louis)
Partners $255-$525 (average $346)
(median $345)
Associates $150-$345 (average $208)
(median $215)
Firmwide (average $252) (median $255)

**Thompson & Knight (388)**
(Dallas)
Partners $330-$695 (average $428)
(median $450)
Associates $190-$330 (average $265)
(median $260)
Firmwide (average $360) (median $380)

**Ulmer & Berne (179)**
(Cleveland)
Partners $230-$430 (average $303)
Associates $150-$280 (average $202)
Firmwide (average $250)

## V W X Y Z

**Vedder, Price, Kaufman & Kammholz (233)**
(Chicago)
Partners $315-$560 (average $406)
(median $400)
Associates $190-$410 (average $258)
(median $255)
Firmwide (average $339) (median $340)

**Whiteford, Taylor & Preston (155)**
(Baltimore)
Partners $330-$480 (average $401)
(median $400)
Associates $295-$345 (average $278)
(median $295)
Firmwide (average $364)
(median $370)

**Wiggin & Dana (144)**
(New Haven, Conn.)
Partners $276-$510
Associates $185-$355

**Wiley Rein & Fielding (268)**
(Washington)
Partners $375-$700 (average $475)
(median $465)
Associates $225-$395 (average $300)
(median $300)
Firmwide (average $395)
(median $395)

**Williams Mullen (244)**
(Richmond, Va.)
Partners $225-$550
Associates $160-$290

**Winstead Sechrest & Minick (266)**
(Dallas)
Partners $325-$595
Associates $195-$370

**Winston & Strawn (879)**
(Chicago)
Partners $365-$800 (average $513.17)
(median $510)
Associates $190-$605 (average $328.57)
(median $325)
Firmwide (average $357.65)
(median $360)

**Womble Carlyle Sandridge & Rice (520)**
(Winston-Salem, N.C.)
Partners $250-$550 (average $370)
(median $400)
Associates $180-$340 (average $254)
(median $250)
Firmwide (average $350)
(median $350)

**Wyatt, Tarrant & Combs (224)**
(Louisville, Ky.)
Partners $225-$400 (average $322)
(median $320)
Associates $170-$275 (average $207)
(median $190)
Firmwide (average $285)
(median $290)

**Andrews Kurth (404)** (Houston)

| | | | |
|---|---|---|---|
| 1st | $180 | 5th | $300 |
| 2d | $235 | 6th | $305 |
| 3d | $255 | 7th | $330 |
| 4th | $275 | 8th | $365 |

**Brinks Hofer Gilson & Lione (151)** (Chicago)

| | | | |
|---|---|---|---|
| 1st | $215 | 5th | $310 |
| 2d | $240 | 6th | $335 |
| 3d | $260 | 7th | $360 |
| 4th | $285 | 8th | $375 |

**Brown Raysman Millstein Felder & Steiner (246)** (New York)

| | | | |
|---|---|---|---|
| 1st | $250 | 5th | $370 |
| 2d | $270 | 6th | $400 |
| 3d | $300 | 7th | $435 |
| 4th | $350 | 8th | $445 |

**Brown Rudnick Berlack Israels (208)** (Boston)

| | | | |
|---|---|---|---|
| 1st | $275 | 5th | $485 |
| 2d | $360 | 6th | $510 |
| 3d | $405 | 7th | $530 |
| 4th | $455 | 8th | $540 |

**Buchalter Nemer (139)** (Los Angeles)

| | | | |
|---|---|---|---|
| 1st | $190 | 5th | $265 |
| 2d | $215 | 6th | $275 |
| 3d | $235 | 7th | $290 |
| 4th | $255 | 8th | $300 |

**Davis Wright Tremaine (405)** (Seattle)

| | | | |
|---|---|---|---|
| 1st | $175-$235 | 5th | $235-$320 |
| 2d | $190-$260 | 6th | $250-$340 |
| 3d | $205-$275 | 7th | $265-$350 |
| 4th | $220-$300 | 8th | $280-$360 |

**Day, Berry & Howard (251)** (Hartford, Conn.)

| | | | |
|---|---|---|---|
| 1st | $200-$230 | 5th | $275-$360 |
| 2d | $220-$275 | 6th | $295-$385 |
| 3d | $245-$310 | 7th | $315-$410 |
| 4th | $265-$335 | 8th | $325-$430 |

**Dickinson Wright (226)** (Detroit)

| | | | |
|---|---|---|---|
| 1st | $160 | 5th | $200 |
| 2d | $165 | 6th | $220 |
| 3d | $175 | 7th | $230 |
| 4th | $185 | 8th | $240 |

SEE 'ASSOCIATES' PAGE S6



EPSTEIN BECKER & GREEN, P.C.

# One World
# One Law Firm

Business Law

Health Care and Life Sciences

Labor and Employment

Litigation

Real Estate

ATLANTA • CHICAGO • DALLAS • HOUSTON
LOS ANGELES • MIAMI • NEWARK • NEW YORK
SAN FRANCISCO • STAMFORD • WASHINGTON, DC
WWW.EBGLAW.COM

EBG

S6    THE NATIONAL LAW JOURNAL/WWW.NLJ.COM    Monday, December 11, 2006

# Hourly billing rates for junior to senior associates

'ASSOCIATES' FROM PAGE S5

**Dinsmore & Shohl (306) (Cincinnati)**

| | | | |
|---|---|---|---|
| 1st | $160 | 5th | $200 |
| 2d | $170 | 6th | $210 |
| 3d | $180 | 7th | $215 |
| 4th | $190 | 8th | $225 |

**Fenwick & West (234) (Mountain View, Calif.)**

| | | | |
|---|---|---|---|
| 1st | $245 | 5th | $400 |
| 2d | $285 | 6th | $425 |
| 3d | $320 | 7th | $450 |
| 4th | $360 | 8th | $465 |

**Fox Rothschild (381) (Philadelphia)**

| | | | |
|---|---|---|---|
| 1st | $195 | 5th | $250 |
| 2d | $205 | 6th | $255 |
| 3d | $215 | 7th | $275 |
| 4th | $235 | 8th | $300 |

**Gardere Wynne Sewell (282) (Dallas)**

| | | | |
|---|---|---|---|
| 1st | $195 | 5th | $270 |
| 2d | $205 | 6th | $290 |
| 3d | $230 | 7th | $310 |
| 4th | $250 | 8th | $330 |

**Hiscock & Barclay (160) (Syracuse, N.Y.)**

| | | | |
|---|---|---|---|
| 1st | $160 | 5th | $170 |
| 2d | $160 | 6th | $180 |
| 3d | $170 | 7th | $180 |
| 4th | $170 | 8th | $195 |

**Hogan & Hartson (1,043) (Washington)**

| | | | |
|---|---|---|---|
| 1st | $250 | 5th | $370 |
| 2d | $285 | 6th | $395 |
| 3d | $315 | 7th | $420 |
| 4th | $345 | 8th | $445 |

**Jenkens & Gilchrist (288) (Dallas)**

| | | | |
|---|---|---|---|
| 1st | $205 | 5th | $285 |
| 2d | $230 | 6th | $305 |
| 3d | $250 | 7th | $330 |
| 4th | $270 | 8th | $340 |

**Jenner & Block (487) (Chicago)**

| | | | |
|---|---|---|---|
| 1st | $230–$240 | 5th | $355–$365 |
| 2d | $250–$265 | 6th | $385–$395 |
| 3d | $285–$300 | 7th | $395–$405 |
| 4th | $325–$330 | 8th | $395–$405 |

**Kelley Drye & Warren (375) (New York)**

| | | | |
|---|---|---|---|
| 1st | $260 | 5th | $360 |
| 2d | $245 | 6th | $380 |
| 3d | $310 | 7th | $400 |
| 4th | $340 | 8th | $425 |

(These are New York rates)

**Lewis, Rice & Fingersh (185) (St. Louis)**

| | | | |
|---|---|---|---|
| 1st | $155 | 5th | $250 |
| 2d | $180 | 6th | $270 |
| 3d | $200 | 7th | $280 |
| 4th | $230 | 8th | $290 |

**Locke Liddell & Sapp (570) (Houston)**

| | | | |
|---|---|---|---|
| 1st | $190 | 5th | $280 |
| 2d | $200 | 6th | $300 |
| 3d | $240 | 7th | $320 |
| 4th | $260 | 8th | $340 |

**Loeb & Loeb (240) (Los Angeles)**

| | | | |
|---|---|---|---|
| 1st | $250–$275 | 5th | $375–$400 |
| 2d | $275–$310 | 6th | $400–$425 |
| 3d | $310–$350 | 7th | $425–$450 |
| 4th | $350–$375 | 8th | $430–$475 |

**Manatt, Phelps & Phillips (299) (Los Angeles)**

| | | | |
|---|---|---|---|
| 1st | $250 | 5th | $380 |
| 2d | $290 | 6th | $410 |
| 3d | $320 | 7th | $440 |
| 4th | $350 | 8th | $460 |

**McKee Nelson (172) (Washington)**

| | | | |
|---|---|---|---|
| 1st | $355 | 5th | $500 |
| 2d | $370 | 6th | $520 |
| 3d | $430 | 7th | $550 |
| 4th | $450 | 8th | $575 |

**Miles & Stockbridge (210) (Baltimore)**

| | | | |
|---|---|---|---|
| 1st | $200 | 5th | $240 |
| 2d | $210 | 6th | $250 |
| 3d | $220 | 7th | $260 |
| 4th | $230 | 8th | $275 |

**Montgomery, McCracken, Walker & Rhoads (133) (Philadelphia)**

| | | | |
|---|---|---|---|
| 1st | $195 | 5th | $260 |
| 2d | $205 | 6th | $270 |
| 3d | $225 | 7th | $280 |
| 4th | $245 | 8th | $275–$315 |

**Morris, Manning & Martin (174) (Atlanta)**

| | | | |
|---|---|---|---|
| 1st | $170 | 5th | $305 |
| 2d | $225 | 6th | $315 |
| 3d | $270 | 7th | $340 |
| 4th | $285 | 8th | $350 |

**Neal, Gerber & Eisenberg (170) (Chicago)**

| | | | |
|---|---|---|---|
| 1st | $230 | 5th | $330 |
| 2d | $260 | 6th | $360 |
| 3d | $280 | 7th | $380 |
| 4th | $300 | 8th | $400 |

**Patton Boggs (431) (Washington)**

| | | | |
|---|---|---|---|
| 1st | $230 | 5th | $320 |
| 2d | $250 | 6th | $340 |
| 3d | $265 | 7th | $360 |
| 4th | $290 | 8th | $390 |

**Phillips Lytle (173) (Buffalo, N.Y.)**

| | | | |
|---|---|---|---|
| 1st | $130 | 5th | $175 |
| 2d | $145 | 6th | $185 |
| 3d | $150 | 7th | $195 |
| 4th | $165 | 8th | $210 |

**Pitney Hardin (170) (Florham Park, N.J.)**

| | | | |
|---|---|---|---|
| 1st | $205 | 5th | $235–$265 |
| 2d | $215–$240 | 6th | $270–$285 |
| 3d | $225–$240 | 7th | $275–$290 |
| 4th | $235–$260 | 8th | $280–$325 |

**Robinson & Cole (217) (Hartford, Conn.)**

| | | | |
|---|---|---|---|
| 1st | $175 | 5th | $210 |
| 2d | $180 | 6th | $230 |
| 3d | $190 | 7th | $250 |
| 4th | $200 | 8th | $270 |

**Saul Ewing (238) (Philadelphia)**

| | | | |
|---|---|---|---|
| 1st | $185–$200 | 5th | $220–$265 |
| 2d | $175–$195 | 6th | $210–$310 |
| 3d | $195–$210 | 7th | $215–$270 |
| 4th | $200–$260 | 8th | $255–$290 |

**Sheppard, Mullin, Richter & Hampton (424) (Los Angeles)**

| | | | |
|---|---|---|---|
| 1st | $250 | 5th | $350 |
| 2d | $275 | 6th | $375 |
| 3d | $295 | 7th | $395 |
| 4th | $325 | 8th | $410 |

**Shumaker, Loop & Kendrick (162) (Toledo, Ohio)**

| | | | |
|---|---|---|---|
| 1st | $165 | 5th | $195 |
| 2d | $170 | 6th | $200 |
| 3d | $180 | 7th | $215 |
| 4th | $190 | 8th | $220 |

**Thacher Proffitt & Wood (313) (New York)**

| | | | |
|---|---|---|---|
| 1st | $265 | 5th | $420 |
| 2d | $310 | 6th | $445 |
| 3d | $355 | 7th | $465 |
| 4th | $385 | 8th | $485 |

**Wiley Rein & Fielding (268) (Washington)**

| | | | |
|---|---|---|---|
| 1st | $225 | 5th | $330 |
| 2d | $250 | 6th | $345 |
| 3d | $280 | 7th | $360 |
| 4th | $300 | 8th | $395 |

**Winstead Sechrest & Minick (288) (Dallas)**

| | | | |
|---|---|---|---|
| 1st | $195 | 5th | $280 |
| 2d | $220 | 6th | $295 |
| 3d | $240 | 7th | $310 |
| 4th | $260 | 8th | $325 |



Dean and Professor of Law, **renowned expert on Tort Law**; author of leading casebooks in both Torts and Products Liability.

Co-Reporter for the **American Law Institute's Restatement (Third) of Torts: Products Liability** and recipient of the Institute's "R. Ammi Cutter" award for outstanding performance as a Reporter.

Author of **five books and more than 70 articles** in journals such as the Yale, Columbia, Michigan, NYU and Cornell Law Reviews.

Aaron Twerski could teach anywhere. He teaches at Hofstra Law.

Consultant to numerous legislatures, law reform committees, both plaintiffs and defendants in mass tort litigation, and leading corporations.

An **outstanding teacher**, who has taught at Harvard, Cornell, Boston University, and Michigan law schools, among others.

HOFSTRA UNIVERSITY SCHOOL OF LAW    www.law.hofstra.edu

Monday, December 11, 2006    THE NATIONAL LAW JOURNAL/WWW.NLJ.COM    S7



# Swan Legal Search

### Attorneys Helping Attorneys

Los Angeles | San Francisco | Irvine
Toll Free: (888) 860-1154
www.swanlegal.com

## HONESTY, ETHICS AND SERVICE - PROFESSIONALISM, CANDOR AND COMMITMENT TO EXCELLENCE

## VOTED ONE OF THE TOP 10 LEGAL SEARCH FIRMS IN CALIFORNIA

*We're here every day and every hour working hard.*
*We're with you every step of the way.*
*You can count on SLS.*

Elise Lau, Esq. Lee Kuhn, Esq. Melinda Adams, Esq. Delia K. Swan, Esq. Claudia Trevisan, Esq. Mary "Mo" Lee, Esq.

S8    THE NATIONAL LAW JOURNAL/WWW.NLJ.COM    Monday, December 11, 2006

# INCREASE
# PARTNER INCOME



Juris law firms benefit from income increasing capabilities and resources unavailable to others. While others are digging through outdated reports, Juris dashboards supply instantly digestible information in time to act. While others are analyzing last year's surveys, Juris law firms can make decisions based on immediately available peer group information. Juris unifies front and back office, streamlines work flow, provides anywhere-anytime connectivity and handles all the firm's billing and accounting. It all adds up to increased partner income.

**POWERFUL FEATURES**
**EXPERTISE**
**MARKET LEADERSHIP**
**ACCOUNTABILITY**



# Juris®

The Law Firm Business
and Management Software

[» LEARN MORE]

Juris provides law firms with business intelligence in time to change the outcome. Managing and supervising attorneys will discover the command and control capabilities of Juris product suite technologies. **Contact Juris, Inc. at 877-377-3740 or visit www.juris.com.**

Monday, December 11, 2006                    THE NATIONAL LAW JOURNAL/WWW.NLJ.COM                    S9

# Variations on, and alternatives to, billable hours

*Below is a sampling of firms that provided information about the alternative billing methods they use most often. We asked firms to differentiate between variations on the billable hour (discounted and blended hourly rates) and true alternatives to the billable hour. The percentages denote estimated portions of the firms' revenues obtained through each of these two categories. They are followed by the billing methods that the firms use within those categories. The number after a firm's name indicates its total number of attorneys.*

**Armstrong Teasdale (266).** Variations: 17%—discounted rate, blended rate. Alternatives: 17%—fixed or flat fee, contingency fee.

**Ballard Spahr Andrews & Ingersoll (486).** Variations: 37%—discounted rate, blended rate. Alternatives: 6%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value.

**Blackwell Sanders Peper Martin (310).** Variations: 25%—discounted rate, blended rate. Alternatives: 5%—fixed or flat fee, contingency fee, hybrid fee.

**Bond, Schoeneck & King (160).** Variations: 4%—discounted rate, blended rate. Alternatives: 4%—fixed or flat fee, contingency fee, hybrid fee.

**Brown Raysman Millstein Felder & Steiner (248).** Variations: 10%—discounted rate, blended rate. Alternatives: 4%—fixed or flat fee, contingency fee, hybrid fee.

**Buchalter Nemer (139).** Variations: 30%—discounted rate, blended rate, other. Alternatives: 3%—fixed or flat fee.

**Bullivant Houser Bailey (191).** Variations: 5%—discounted rate, blended rate. Alternatives: 5%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value.

**Burr & Forman (188).** Variations: 35%—discounted rate, other. Alternatives: 6%—fixed or flat fee, contingency fee, hybrid fee.

**Butzel Long (217).** Variations: 10%—discounted rate, blended rate. Alternatives: 10%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value.

**Curtis, Mallet-Prevost, Colt & Mosle (196).** Variations: 33%—discounted rate, blended rate. Alternatives: 10%—fixed or flat fee, contingency fee.

**Day, Berry & Howard (251).** Variations: 77%—discounted rate, blended rate, other. Alternatives: 23%—fixed or flat fee, contingency fee, hybrid fee.

**Dorsey & Whitney (600).** Variations: 15%—discounted rate, blended rate. Alternatives: 10%—fixed or flat fee, contingency fee, hybrid fee.

**Dykema Gossett (341).** Variations: 82%—discounted rate, blended rate. Alternatives: 18%—fixed or flat fee, contingency fee, hybrid fee.

**Eckert Seamans Cherin & Mellott (227).** Variations: 65%—discounted rate, blended rate. Alternatives: 10%—fixed or flat fee, hybrid fee, contingency fee.

**Fenwick & West (234).** Variations: 20%—discounted rate. Alternatives: 10%—fixed or flat fee.

**Fisher & Phillips (187).** Variations: 5%—Blended rate. Alternatives: 2%—fixed or flat fee.

**Fowler White Boggs Banker (227).** Variations: 25%—discounted rate, blended rate, other. Alternatives: 10%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value.

**Frost Brown Todd (376).** Variations: 72%—discounted rate, blended rate. Alternatives: 4%—fixed or flat fee, contingency fee.

**Harris Beach (182).** Variations: 20%—discounted rate, blended rate. Alternatives: 30%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value.

**Haynes and Boone (456).** Variations: 95%—discounted rate, blended rate, other. Alternatives: 5%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value, other.

**Hiscock & Barclay (160).** Variations: 54%—discounted rate, blended rate. Alternatives: 23%—fixed or flat fee, contingency fee.

**Holme Roberts & Owen (206).** Variations: 5%—discounted rate, blended rate. Alternatives: 10%—fixed or flat fee, contingency fee, hybrid fee.

**Husch & Eppenberger (331).** Variations: 96%—discounted rate, blended rate. Alternatives: 4%—fixed or flat fee, hybrid fee, contingency fee.

**Jenkens & Gilchrist (268).** Variations: 10%—discounted rate, blended rate. Alternative methods: 6%—fixed or flat fee, contingency fee, hybrid fee.

**Jenner & Block (467).** Variations: 50%—discounted rate, blended rate, other. Alternatives: 5%—fixed or flat fee, contingency fee, hybrid fee.

**Lane Powell (187).** Variations: 45%—discounted rate, blended rate. Alternatives: 5%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value.

**Lathrop & Gage (264).** Variations: 10%—discounted rate, blended rate. Alternatives: 15%—fixed or flat fee, contingency fee.

**Lewis, Rice & Fingersh (165).** Variations: 35%—discounted rate, blended rate. Alternatives: 35%—fixed or flat fee, contingency fee, hybrid fee.

**Locke Liddell & Sapp (370).** Variations: 80%—discounted rate, blended rate. Alternatives: 20%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value.

**Loeb & Loeb (240).** Variations: 15%—discounted rate, blended rate. Alternatives: 15%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee.

SEE 'ALTERNATIVES' PAGE S11



## MORRIS DEES JUSTICE AWARD

Skadden and The University of Alabama School of Law are pleased to announce the winner of the 2006 Morris Dees Justice Award

### WILLIAM WAYNE JUSTICE

Senior Judge, U. S. District Court, Eastern District of Texas

*The Morris Dees Justice Award was established to honor Morris Dees for a lifetime of public service.*

www.MorrisDeesAward.com

  SELECTION COMMITTEE

Morris Dees, *Honorary Chair*

*Co-Chairs*

Robert C. Sheehan          Dean Kenneth Randall

*Members*

Mary Bauer                 Marjorie Press Lindblom
Professor Jesse Choper     Susan Butler Plum
Professor Bryan Fair       Theodore M. Shaw
Marcia D. Greenberger      Tisha Tallman
Robert Grey                Vaughn C. Williams

The award ceremony took place in New York City, on November 16, 2006.

*The Morris Dees Justice Award is sponsored by*

**Skadden** & THE UNIVERSITY OF **ALABAMA**
SCHOOL OF LAW

'S10     THE NATIONAL LAW JOURNAL/WWW.NLJ.COM     Monday, December 11, 2006



Monday, December 11, 2006            THE NATIONAL LAW JOURNAL/WWW.NLJ.COM                                    S11

# Law firms offer some alternative billing methods

'ALTERNATIVES' FROM PAGE S9

**Luce, Forward, Hamilton & Scripps (178).** Variations: 10%—discounted rate, blended rate, other. Alternatives: 5%—fixed or flat fee, contingency fees.

**Marshall, Dennehey, Warner, Coleman & Goggin (388).** Variations: 8%—discounted rate, blended rate. Alternatives: 12%—fixed or flat fee, contingency fee, hybrid fee.

**McCarter & English (407).** Variations: 10%—discounted rate, blended rate. Alternatives: 10%—fixed or flat fee, contingency fee, retrospective fee.

**McElroy, Deutsch, Mulvaney & Carpenter (230).** Variations: 5%—blended rate. Alternatives: 2%—fixed or flat fee, contingency fee.

**McKenna Long & Aldridge (400).** Variations: 20%—discounted rate, blended rate. Alternatives: 20%—fixed or flat fee, contingency fee, hybrid fee.

**Michael Best & Friedrich (255).** Variations: 10%—discounted rate, blended rate. Alternatives: 12%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee.

**Miller & Martin (175).** Variations 0.8%—discounted rate, blended rate. Alternatives: 3.5%—fixed or flat fee, contingency fee.

**Morris, Manning & Martin (174).** Variations: 10%—discounted rate. Alternatives: 1%—fixed or flat fee, contingency fee, hybrid fee.

**Neal, Gerber & Eisenberg (170).** Variations: 20%—discounted rate, blended rate. Alternatives: 3%—fixed or flat fee, contingency fee.

**Nelson Mullins Riley & Scarborough (379).** Variations: 10%—discounted rate, blended rate. Alternatives: 10%—fixed or flat fee, contingency fee, hybrid fee.

**Nexsen Pruet Adams Kleemeier (182).** Variations: 15%—discounted rate, blended rate. Alternatives: 10%—fixed or flat fee, contingency fee, hybrid fee.

**Ogletree, Deakins, Nash, Smoak & Stewart (33).** Variations: 94%—discounted rate. Alternatives: 6%—fixed or flat fee, contingency fee, hybrid fee.

**Patton Boggs (451).** Variations: 15%—discounted rate, blended rate. Alternatives: 10%—fixed or flat fee, contingency fee, hybrid fee.

**Pepper Hamilton (445).** Variations: 5%—discounted rate, blended rate. Alternatives: 2%—fixed or flat fee, contingency fee.

**Phelps Dunbar (260).** Variations: 2.5%—discounted rate. Alternatives: 3%—fixed or flat fee, contingency fee.

**Phillips Lytle (173).** Variations: 90%—discounted rate, blended rate. Alternatives: 10%—fixed or flat fee, contingency fee, hybrid fee.

**Polsinelli Shalton Welte Suelthaus (276).** Variations: 15%—discounted rate, blended rate. Alternatives: 10%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value, other.

**Powell Goldstein (282).** Variations: 2%—discounted rate, blended rate. Alternatives: 13%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value.

**Preston Gates & Ellis (49).** Variations: 62%—discounted rate. Alternatives: 19%—fixed or flat fee, contingency fee, hybrid fee, other.

**Reed Smith (1,038).** Variations: 15%—discounted rate, blended rate. Alternatives: 6%—fixed or flat fee, contingency fee, hybrid fee.

**Robinson & Cole (217).** Variations: 30%—discounted rate, blended rate. Alternatives: 20%—fixed or flat fee, hybrid fee, contingency fee.

**Boden, McClosky, Smith, Schuster & Russell (203).** Variations: 20%—discounted rate, blended rate. Alternatives: 15%—fixed or flat fee, contingency fee, hybrid fee.

**Saul Ewing (238).** Variations: 57%—discounted rate, blended rate, other. Alternatives: 10%—fixed or flat fee, contingency fee, hybrid fee.

**Schnader Harrison Segal & Lewis (174).** Variations 10%—discounted rate, blended rate. Alternatives: 9%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value.

**Schulte Roth & Zabel (449).** Variations: 5%—discounted rate, blended rate. Alternatives: 5%—fixed or flat fee, hybrid fee.

**Seward & Kissel (142).** Variations: 10%—discounted rate, blended rate, other. Alternatives: 10%—fixed or flat fee, hybrid fee.

**Sheppard, Mullin, Richter & Hampton (424).** Variations: 2%—discounted rate, blended rate. Alternatives: 2%—fixed or flat fee, contingency fee.

**Shughart Thomson & Kilroy (170).** Variations: 30%—discounted rate, blended rate. Alternatives: 10%—contingency fee.

**Shumaker, Loop & Kendrick (162).** Variations: 10%—discounted rate, blended rate. Alternatives: 5%—fixed or flat fee, contingency fee, hybrid fee.

**Smith, Gambrell & Russell (191).** Variations: 10%—discounted rate, blended rate. Alternatives: 10%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value.

**Snell & Wilmer (448).** Variations: 20%—discounted rate, blended rate. Alternatives: 15%—fixed or flat fee, contingency fee, hybrid fee.

**Stinson Morrison Hecker (313).** Variations: 10%—blended rate. Alternatives: 20%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value.

**Sutherland Asbill & Brennan (477).** Variations: 2%—discounted rate, blended rate. Alternatives: 2%—fixed or flat fee, contingency fee, hybrid fee.

**Thompson & Knight (388).** Variations: 10%—discounted rate, blended rate. Alternatives: 2%—fixed or flat fee, contingency fee.

**Ulmer & Berne (179).** Variations: 40%—discounted rate, blended rate. Alternatives: 5%—fixed or flat fee, contingency fee, hybrid fee.

**Vedder, Price, Kaufman & Kammholz (233).** Variations: 5%—Discounted rate, blended rate. Alternatives: 5%—fixed or flat fee, hybrid fee, retrospective fee.

**Whiteford, Taylor & Preston (155).** Variations: 1%—discounted rate, blended rate. Alternatives: 1%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value.

**Wiley Rein & Fielding (268).** Variations: 20%—discounted rate, blended rate. Alternatives: 5%—fixed or flat fee, contingency fee.

**Winstead Sechrest & Minick (288).** Variations: 4%—discounted rate, blended rate. Alternatives: 7%—fixed or flat fee, contingency fee, hybrid fee.

**Womble Carlyle Sandridge & Rice (520).** Variations: 25%—discounted rate, blended rate. Alternatives: 5%—fixed or flat fee, contingency fee, hybrid fee, retrospective fee based on value. ■



The IRS respects him.
M&A teams depend on him.
Clients place their trust in him.

New England School of Law *prepared him.*

Kevin Kilduff
Partner, Burns & Levinson LLP
New England School of Law Class of 1993

Kevin Kilduff has relied on his New England School of Law education throughout his legal career, as a tax litigator for the IRS in New York, then as a partner at Schnader Harrison Segal & Lewis LLP, Philadelphia, and now as a partner at Burns & Levinson in Boston. Even today, while working with the ever-changing tax code and helping clients in the fast-paced field of mergers and acquisitions, Kevin continues to rely on New England School of Law for help—in recruiting students for positions at his firm.

 New England School of Law         *Inspired Learning*

154 Stuart Street, Boston, MA 02116 • (617) 422-7210  admit@admin.nesl.edu • www.nesl.edu

ABA-accredited                    Member of the Association of American Law Schools



Does DepoNet do Electronic Data Discovery?

"Definitely!"

You can now rely on DepoNet to connect you with the highest caliber of Electronic Data Discovery providers nationwide. We've expanded our capabilities to create a single resource for all of your litigation support needs. As always, we pre-screen our providers and monitor their performance so you can be assured of excellent results.

DepoNet
*Your link to superior litigation support*

• Court Reporting          • Electronic Data Discovery
• Online Repository Services  • Legal Video Services
• Videoconferencing         • Process Service
• Interpretation/Translation

For more information or to find a provider, visit www.deponet.com or call 1-800-DepoNet (337-6638).



# Preparing Students to Function in Litigation and Non-Litigation Advocacy Roles

- Nationally recognized Trial Advocacy Program

- Adjunct faculty of state and federal judges, prosecutors, defense attorneys and attorneys in private practice

- Clinical programs in local government, fair housing, prosecution, defense and patent law

- Externship programs within the judicial system, the Internal Revenue Service, and throughout the public and private sectors

- Student participation in regional, national and intraschool competitions in trial advocacy, international commercial arbitration, negotiation, client counseling, mediation, and arbitration



## The JOHN MARSHALL LAW SCHOOL®
AT WORK • IN CHICAGO
CENTER FOR ADVOCACY AND DISPUTE RESOLUTION

315 S. Plymouth Court, Chicago, Illinois 60604
312.427.2737 ext. 473

jmls.edu