# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **DL**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 05-1437 (RCL)** |
| | ) | |
| **DISTRICT OF COLUMBIA**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## MEMORANDUM OPINION &
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.    INTRODUCTION

This case concerns the District of Columbia's obligations, under both federal and local law, to provide special education to some of our most vulnerable citizens at a very early and critical stage in their lives. In the first few years of a child's life, there exists a narrow window of opportunity in which special education, tailored to the child's particular needs, can work a miracle. "[S]omewhere in the neighborhood of 75 to 80 percent" of the disabled children who are found in the community and served by quality early intervention programs will go on to kindergarten alongside every other ordinary five-year-old—without needing further supplemental special education. Trial Transcript, Dunst Testimony, 115:4–116:15, Apr. 6, 2011. So that's what's at stake here.

The named plaintiffs in this lawsuit—former preschool-age children in the District with various disabilities—filed suit in July 2005, alleging that defendants had engaged in a pattern and practice of failing to provide special education and related services to them and other children, in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), implementing

regulations, the Due Process Clause of the Fifth Amendment, and District of Columbia law. Am. Compl. [61] ¶1–2. Plaintiffs sought declaratory and injunctive relief, reimbursement for funds expended by them to obtain education services denied them by defendants' legal violations, and "compensatory education." *Id.* at 33–35.

In August 2006, the Court certified a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. Order [58] 1, Aug. 25, 2006. The plaintiff class is defined as:

> All children who are or may be eligible for special education and related services, who live in, or are wards of, the District of Columbia, and (1) whom defendants did not identify, locate, evaluate or offer special education and related services to when the child was between the ages of three and five years old, inclusive, or (2) whom defendants have not or will not identify, locate, evaluate or offer special education and related services to when the child is between the ages of three and five years old, inclusive.

*Id.*

Toward the end of discovery, the parties filed cross-motions for summary judgment. In August 2010, the Court ruled upon those motions and concluded, among other things, that defendants "denied a [free appropriate public education ("FAPE")] to a large number of children aged 3 to 5 years old, in violation of § 1412(a)(1)(A) of the IDEA." *DL v. District of Columbia*, 730 F. Supp. 2d 84, 95 (D.D.C.2010). However, this ruling applied only for the period 2007 and earlier, which were the only years for which data was available. *Id.*

The Court scheduled a bench trial for April 2011 solely on the issue of defendants' liability for the period 2008 to the trial date, while also ordering the parties, within 30 days after issuance of the Court's decision on the merits presented at trial, to propose a procedure for addressing class members' claims for individual relief. Order [201] 2, Sept. 22, 2010.

The parties appeared before this Court for a bench trial on April 6–7, 2011. The parties presented several witnesses and a number of exhibits. At the Court's direction, each party submitted Proposed Findings of Fact & Conclusions of Law [254, 256] on June 3, 2011.

Based on all of the evidence presented, the Court makes the following findings of fact and conclusions of law and will, consistent with them, enter judgment in favor of plaintiffs and against defendants.

## II. FINDINGS OF FACT

### A. Credibility of Plaintiffs' Experts

1. Plaintiffs retained Dr. Carl J. Dunst as an expert to study and provide statistical analysis of the District of Columbia's Child Find-related obligations as they relate to preschool children, ages three through five. Direct Testimony of Dr. Carl J. Dunst [209-1] 3, Mar. 16, 2011.

2. Dr. Dunst holds a Bachelor's degree in Education from Temple University, a Master's degree in Early Childhood Special Education from the George Washington University, and a Doctorate in Developmental Psychology from the George Peabody College at Vanderbilt University. *Id.* at 1.

3. Dr. Dunst has worked as an early intervention practitioner, has directed an IDEA Part C early intervention and an IDEA Part B preschool special education program, and has taught numerous courses on infant and preschool development, assessment, and intervention practices. *Id.*

4. Dr. Dunst was the Principal Investigator of a seven-year study funded by the U.S. Department of Education, Office of Special Education Programs ("OSEP") called the Tracking, Referral and Assessment Center for Excellence ("TRACE"). *Id.* at 2. TRACE investigated Child Find-related practices in IDEA Part C early intervention and IDEA Part B preschool

special education programs in all 50 states, the District of Columbia, and other jurisdictions, and researched and developed evidence-based practices for improving Child Find-related activities. *Id.* He has also been the Principal Investigator or Co-Principal Investigator at two other OSEP-funded research and training centers that focus on early childhood intervention practices. *Id.*

5.      Dr. Dunst is currently a Research Scientist and Co-Director at the Orelena Hawks Puckett Institute in Asheville, North Carolina, which conducts research, evaluation, and intervention development and training in Part C, Part B, Early Head Start, Head Start, Even Start, childcare and preschool practices. *Id.*

6.      Due to his extensive experience, Dr. Dunst is a recognized expert in infant and early childhood assessment practices, family systems intervention practices, infant and early childhood intervention practices, family-centered help-giving practices, and Child Find, referral, and outreach practices. *Id.* at 3.

7.      Dr. Dunst has received a number of awards from a variety of professional organizations for his research and practice. *Id.* He has an extensive list of publications in prominent journals, reports, and books about Child Find-related policies and practices. *See* Carl J. Dunst, Recent Publications (2001–2011), Pls.' Ex. 211 at 1–5.

8.      Based on Findings Nos. 1–7, this Court finds that Dr. Dunst is a qualified expert in analyzing the District of Columbia's Child Find-related obligations, as they relate to preschool children, ages three through five.

9.      This Court finds that Dr. Dunst testified credibly, demonstrated specific knowledge of the relevant literature, and explained clearly how his conclusions were based on both his research and personal experience in the field.

10.      Plaintiffs retained Dr. Leonard A. Cupingood as an expert to study and provide statistical analysis of the timeliness of defendants in determining the eligibility for special

education and related services of children ages three through five with suspected disabilities. Direct Testimony of Dr. Leonard A. Cupingood [209-2] 2, Mar. 16, 2011.

11.    Dr. Cupingood holds a Bachelor's degree in Mathematics from Rutgers University and a Master's and a Doctorate in Statistics from Temple University. *Id.* at 1.

12.    He has extensive experience in conducting statistical analysis in a variety of litigation matters, including employment discrimination cases and audits of insurance companies regarding claims processing. *Id.* at 1–2. Dr. Cupingood has provided deposition and trial testimony both as a database expert and as a statistician. *Id.* at 1.

13.    Dr. Cupingood is a member of the American Statistical Association and has published several statistics-based articles in reputable journals. *Id.* at 2; *see also* Leonard A. Cupingood, Updated CV, Pls.' Ex. 213 at 2–3.

14.    Based on findings Nos. 10–13, this Court finds that Dr. Cupingood is a qualified expert in statistics and that he provided credible and compelling testimony during trial regarding defendants' Child Find-related obligations, including the timeliness of defendants in determining the eligibility for special education and related services of children ages three through five with suspected disabilities.

15.    This Court also finds that Dr. Cupingood provided credible testimony regarding the number of preschool-age children who were referred each year for special education services.

16.    This Court also finds that although there was an error in labeling Table 2 of Dr. Cupingood's Direct Testimony, Cupingood Direct Testimony [209-2] 10, this error was minor and had no effect on Dr. Cupingood's calculations regarding the timeliness of eligibility determinations summarized in Tables 1–6.

17.    Ruth Anderson Wilcox testified concerning her three-year-old son, DW, who experienced delays in evaluation and provision of special education services from the District of

Columbia, during the 2010–11 school year. Direct Testimony of Ruth Anderson Wilcox [209-3] 8, Mar. 16, 2011. Ms. Wilcox stated that in September 2010, within three weeks after her son began his first day of school at Randle Highlands Elementary School, she asked defendants to provide her son with an initial evaluation for special education services. *Id.* at 2. Upon receiving an oral referral for an evaluation, DCPS policy and guidelines require an LEA to assist a parent with completing a written referral. OSSE Part B Initial Evaluation/Reevaluation Policy [255-12], Pls.' Ex. 237 at 12. Defendants did not assist Ms. Wilcox with submitting a written referral for an evaluation until December 2010. Wilcox Direct Testimony [209-3] 4. Ms. Wilcox testified that defendants asked her to not date her written referral form because they "did not know when the evaluation would take place." *Id.* "At some point, someone other than [Ms. Wilcox] wrote December 14 on the form," as the date of the purported consent. *Id.* DW did not receive a psychological evaluation until February 1, 2011. *Id.* at 7. DW therefore did not receive an initial evaluation within 120 days from the date DW was referred for an evaluation or assessment. D.C. Code 38-2561.2(a).

18.    This Court finds Ms. Wilcox's testimony credible and compelling.

**B. Credibility of Defendants' Expert**

19.    Maxine Freund is a professor at the Graduate School of Education and Human Development at the George Washington University. She has a doctorate in education with specialization in atypicality in infancy and early childhood. Testimony of Maxine Freund [210-2] 1, Mar. 16, 2011. Defendants retained Dr. Freund as an expert to examine and testify about the District of Columbia's early childhood and early intervention special education programs. *Id.*

20.     After analyzing the District of Columbia's past and present special education policies and practices, Dr. Freund submitted her expert report.  Freund Expert Report [178-11] 3, Ex. 9 to Pls.' Mot. Partial Summ. J. [178].

21.     Dr. Freund's expert report concluded that the District of Columbia's Child Find activities have been "troubled and largely unsuccessful in meeting the obligations of IDEA Parts C . . . and B . . . ."  *Id.* at 1.  This troubled history is due in part to frequent changes in leadership and long period of vacancies in key leadership positions at the Part B program.  *Id.* at 3; Freund Direct Testimony [271-9] ¶2.  Dr. Freund believed the District's policies "to be problematical, misaligned[,] and in need of improvement."  E-mail from Maxine Freund to Ellen Efros, OAG, Pls.' Ex. 232 at 4, Aug. 18, 2009.  In preparing the report, Dr. Freund said that she was provided "incomplete documents, drafts, unsigned MOUs, and identified practices that did not benefit the systems involved in Child Find."  *Id.*

22.     Defendants' counsel believed that prior drafts of Dr. Freund's report described an even worse situation.  Ellen Efros, the chief attorney at the Equity Section of the District of Columbia's Office of the Attorney General ("OAG"), noted than an initial draft of the report "shred[ded]" the District of Columbia, was "worse [for defendants] than the Dunst Report," and would be "extraordinarily difficult to defend."  *Id.* at 2, 3.  Ms. Efros also believed that Dr. Freund's report "prove[d] Plaintiffs' case" and determined that "everything [in the District of Columbia] is dysfunctional, and that even the proposals going forward either are not to be trusted or are not sufficient."  *Id.* at 1.  Tameria Lewis, the Assistant Superintendent for Special Education, believed that if Dr. Freund's report was submitted as evidence, there would be "no point in a trial as our own witness will be providing clear evidence to proove [*sic*] the Plaintiffs['] case with only minimal and very qualified statements about progress we are making or committing to in the near future."  *Id.*  In contrast, Dr. Richard Nyankori, the former Deputy

Chancellor for Special Education for DCPS, disagreed, and was "increasingly concerned by the OAG['s] response to [Dr. Freund's] work." *Id.* at 3.

### C. Provision of a "FAPE"

23.     Each December, OSSE and all other jurisdictions are required to provide to OSEP "child count" data, which includes the number of preschool-age children enrolled in Part B special education services.  Dunst Direct Testimony [209-1] 8.  OSEP collects and compares these data with the U.S. Census Bureau's annual population estimates to determine the percentage of preschool-age children enrolled in Part B services.  *Id.*

24.     Plaintiffs' expert, Dr. Dunst, provided statistical analysis of these data, which provide the means to compare the percentage of preschool-age children enrolled in Part B services in the District of Columbia with the number of children enrolled nationally and in each jurisdiction. *Id.*

25.     In 2008, approximately 5.68% of children ages three to five nationwide received Part B special education services.  "Table 1-14.  Percentage of children ages 3 through 5 served . . . , Pls.' Ex. 205 at 2.  Currently, about 6% of three- to five-year-old children nationwide are identified as having developmental delays that qualify them for Part B special education services. Early Stages Family Care Manual [271-21] 42, Pls.' Ex. 152.

26.     By contrast, in 2008, the District of Columbia identified and provided Part B services to 2.72% of children ages three through five, which was the lowest rate in the country and lower than the percentage reported for the previous year (2.9%).  Dunst Direct Testimony [209-1] 8–9.  In 2009, defendants provided Part B services to 3.30% of children ages three through five and, in 2010, to 4.62% of preschool-age children.  *Id.* at 9.

27.     On March 9, 2011, defendants stipulated "that the District currently provides special education and related services under [the IDEA] . . . to less than 6% of its population of children aged 3 through 5 years . . . ." Defs.' Stipulation [206] 1, Mar. 9, 2011.

28.     Based on the most recent estimates available at the time of trial, the District of Columbia still lags behind most other states in identifying and providing a FAPE to preschool-age children. Dunst Direct Testimony [209-1] 9.

29.     In the District of Columbia, large percentages of preschool-age children experience many different risk factors associated with disabilities and significant developmental delays, including, but not limited to, poverty, teenage pregnancy, HIV/AIDS, single-parent households, economic hardship, and poor housing. *Id.* at 11–12. More children in the District of Columbia experience multiple risk factors than in any other state. *Id.* at 12. Specifically, 59% of children in the District experience three or more risk factors, while 6% experience eight or more risk factors. Trial Transcript, Dunst Cross Testimony, 76:16–23, Apr. 6, 2011.

30.     In its February 8, 2011 Family Care Manual, the staff of the District's Early Stages Center acknowledged that, in light of these risk factors, the District's projected identification rate (that is, the percentage of preschool-age children that the District of Columbia is expected to identify and evaluate for Part B services) is about 12%. Family Care Manual [271-21] 42, Pls.' Ex. 152. In other words, it is likely that 12% of preschool-age children in the District have developmental or physical disabilities that qualify them for Part B services. Dunst Direct Testimony [209-1] 12; Trial Transcript, Dunst Cross Testimony, 79:13–19, Apr. 6, 2011. The 12% figure is based on a comparison between the District of Columbia and two U.S. cities (Atlanta and Detroit) with similar demographic predictors of disabilities. 30(b)(6) Beers Dep., 61–62, Mar. 1, 2011. At trial, Dr. Dunst explained that "at least 10% but more likely 12%" of preschool-age children in District are "potentially eligible" for Part B preschool education, with

"85 to 90 percent of those children" actually being found eligible. Dunst Direct Testimony [209-1] 12; Dunst Cross Testimony, 79:13–82:3, Apr. 6, 2011. This suggests that, on the low end, the District should expect to be serving 8.5% of its preschool-age population with Part B services.

31.     As of March 2011, the District of Columbia has failed to identify and offer a FAPE to the 8.5% of preschool-age children that are expected to be eligible for Part B services.

32.     Assuming that the District of Columbia creates an effective and sustainable Child Find system, and that the necessary policy and procedural changes described in Findings Nos. 82–97 are implemented, the most statistically reasonable and defensible forecast suggests that "the District will reach 6 percent [of preschool-age children served] in 2012, 8 percent in 2013, 10 percent in 2015, and 12 percent in 2016." Dunst Direct Testimony [209-1] 30–33. However, as the pool of potentially eligible children decreases, statistically "it will not be possible [for the District] to maintain the kinds of increases in the number of children identified as have been found in the past few years." *Id.* at 15; Trial Transcript, Dunst Cross Testimony, 93:16–95:2, Apr. 6, 2011.

### D.  Initial Evaluations and Eligibility Determinations

33.     As a condition of receiving federal funding under the IDEA, the District must provide an Annual Performance Report ("APR") that details the percentage of children referred for Part B services that received a timely initial evaluation and eligibility determination. Dunst Direct Testimony [209-1] 16. Beginning in November 2010, Early Stages began reporting on its "Scorecards" the percentage of preschool-age children that received timely initial evaluations. *Id.* at 17.

34.     Plaintiffs' experts, Drs. Dunst and Cupingood, provided statistical analysis of these data. *Id.* at 16–17; Cupingood Direct Testimony [209-2] 3.

35.     With respect to all children ages 3 through 21 referred for services under Part B, the District of Columbia reported that 45.2% received a timely initial evaluation in 2007–2008, 66.56% received timely initial evaluations in 2008–2009, and 75.09% received timely initial evaluations in 2009–2010. *See* Part B APR [FY] 2007 (2007–2008), Pls.' Ex. 156; Part B APR [FY] 2008 (2008–2009), Pls.' Ex. 157; Part B APR [FY] 2009 (2009–2010), Pls.' Ex. 158; Maisterra Direct Testimony [210-3] 6.  In other words, 44.8% did not receive timely initial evaluations in 2008–2009, and 24.91% did not receive timely initial evaluations in 2009–2010.

36.     The District reported that 77% of its initial evaluations for children ages three to five for Part B were timely in October 2010, 50% were timely in November 2010, and 53% were timely in December 2010.  Early Stages Scorecard, Pls.' Ex. 181; Early Stages Scorecard, Pls.' Ex. 182.  This decrease within a span of three months indicates that the District is unable to show consistent and stable improvements in providing timely initial evaluations to the preschool-age population.  Dunst Direct Testimony [209-1] 17.

37.     Unless there are significantly more resources put in place, the District of Columbia will be strained by the increased number of children identified for special education and related services, which will cause further delays in providing timely initial evaluations.  Trial Transcript, Dunst Cross Testimony, 104:23–105:11, Apr. 6, 2011.  Therefore, "it will be some time before the District is able to achieve 100 percent timeliness as required by the IDEA." Dunst Direct Testimony [209-1] 17.

38.     From 2008 through 2010, the District provided timely eligibility determinations to 56.75% of the referred preschool-age children.  Cupingood Direct Testimony [209-2] Table 3. Specifically, the District provided timely eligibility determinations to 41.44% of preschool-age children in 2008, 68.43% in 2009, and 55.23% in 2010.  *Id.* at 8.  In other words, 58.56% of preschool-age children did not receive timely eligibility determinations in 2008, 31.57% did not

receive timely eligibility determinations in 2009, and 44.77% did not receive timely eligibility determinations in 2010.

39.     These statistics indicate that there has been and continues to be considerable variability rather than stability in the percentage of timely eligibility determinations for preschool-age children.  Dunst Direct Testimony [209-1] 18.

40.     Under District of Columbia law, defendants must provide an initial evaluation to all children identified as potential candidates for special education and related services within 120 days of the date that the student was referred for an evaluation or assessment.  D.C. Code 38-2561.2(a) (formerly D.C. Code 38-2501(a)).  The District of Columbia is the only jurisdiction that gives itself 120 days to provide an evaluation, which is 30 days more than Delaware, Maryland, and New Jersey, and 60 days longer than other states.  Dunst Direct Testimony [209-1] 16.  Nevertheless, the District has never achieved 100% timely eligibility determinations within 120 days.  *Id.* at 18.

**E.  Transition from Part C to Part B**

41.     In its Annual Performance Reports, the District provided data on the percentage of District of Columbia preschool-age children exiting Part C early intervention who were found eligible for Part B preschool special education and who received timely transitions by their third birthdays.  *Id.*

42.     The District of Columbia reported that 62% of all eligible children exiting Part C received timely transitions in 2007, 8.22% received timely transitions in 2008, and 30.25% received timely transitions in 2009.  *See* Part B APR [FY] 2007 (2007–2008), Pls.' Ex. 156; Part B APR [FY] 2008 (2008–2009), Pls.' Ex. 157; Part B APR [FY] 2009 (2009–2010), Pls.' Ex. 158; Maisterra Direct Testimony [210-3] ¶17.  In other words, 43% of all eligible children

exiting Part C did not receive timely transitions in 2007, 91.78% did not receive timely transitions in 2008, and 59.75% did not receive timely transitions in 2010.

43. From January through March 2010, the District of Columbia reported that 38% of all eligible children exiting Part C received timely transitions. Early Stages Scorecard, Pls.' Ex. 179. The District also reported that 17% of eligible children received timely transitions in July 2010, 30% received timely transitions in November 2010, and 62% received timely transitions in December 2010. *See* Early Stages Scorecard, Pls.' Ex. 180; Early Stages Scorecard, Pls.' Ex. 181; Early Stages Scorecard, Pls.' Ex. 182.

44. From October 1, 2010, through the end of February 2011, the District of Columbia provided timely transitions to 79% of all eligible children. Trial Transcript, Beers Cross Testimony, 175:16–22, Apr. 6, 2011. Defendants have never offered 100% timely transitions to eligible preschool-age children, as required by federal and District of Columbia law.

45. The fluctuation in the percentage of timely transitions offered to eligible preschool-age children in the District of Columbia indicates that it will be some time before defendants will be able to achieve and maintain 100% compliance with the IDEA's timely transition requirement. Dunst Direct Testimony [209-1] 19.

**F. Violations of Section 504—2008 to the Present**

46. From 2008 to October 2009, the District of Columbia's special education policies and practices were inadequately designed, supported, and implemented. Freund Expert Report [271-10] 12. The District did not have a comprehensive Child Find system, which contributed to its failure to identify, place, and track the expected number of children for either Part C or Part B Child Find services. *Id.* at 2.

47.     Defendants pursued the same ineffective special education practices of previous years, without achieving significant increases in the percentage of preschool-age children served, the percentage of timely initial evaluations and eligibility determinations, or the percentage of timely transitions.  Dunst Direct Testimony [209-1] 27.

48.     The District's public awareness and outreach efforts and professional development and training of its staff did not facilitate the identification, placement, and tracking of the expected number of children for either Part C or Part B Child Find services.  Freund Expert Report [271-10] 2.  Defendants engaged in several public awareness activities, including the yearly distribution of newspaper announcements, radio public service notices, and the drafting of posters and written pamphlets that described to parents and guardians the District's special education responsibilities.  Dunst Direct Testimony [209-1] 21.  None of these public awareness activities, by themselves, have been found nationally to be effective Child Find strategies.  *Id.*  With respect to outreach, the District continued to send "mixed messages" to potential referral sources.  *Id.*  While nearly all of the District's documents describing outreach, Child Find, and referrals explained that referrals for special education services could be made by various professionals and programs, defendants acknowledge that a referral for Part B preschool education must come from the parent or guardian of the child.  *Id.*  "This practice is likely one reason why so few 3 to 5 year olds in the District were identified or enrolled in preschool education during that period and in previous years."  *Id.* at 22.

49.     Defendants continued to rely on the same ineffective intake and screening procedures originally implemented at the Care Center in 2006.  *Id.*  The screening procedures were unreliable, informal, unstructured, and lacked the conditions necessary to identify and evaluate preschool-age children for special education services.  *Id.*  Accordingly, special education services for many preschool-age children were delayed.  *Id.*

50.     As of June 2009, the District's decision to centralize screenings and evaluations of preschool-age children at the Early Stages Center did not increase the number of timely evaluations and eligibility determinations due to the inconvenience of having to travel to the Early Stages Center. *Id.* at 22–23.

51.     As a result, in 2007 and 2008, defendants lagged behind the average national rate for identifying and offering Part B services to preschool-age children. *Id.* at 9.

52.     Since at least 1997, OSEP has worked with and informed the DCPS of its ongoing failure to identify, locate, and provide Part B services to eligible children ages three through five. 63 Fed. Reg. 41,370, 41,371 (Aug. 3, 1998).

53.     On March 16, 1998, OSEP entered into a Compliance Agreement with DCPS mandating full compliance with Part B of the IDEA. *Id.* According to this agreement, DCPS was required, *inter alia*, to "ensure and document that no later than three years after the effective date of this agreement . . . [a]n initial evaluation that meets the requirements of sections 614(a)(1), (b), and (c) of Part B of [the] IDEA is completed for all children with disabilities [*i.e.*, that it is conducted within the 120-day timeframe established by District of Columbia law]" and that "[a] Child-Find system is established which identifies and locates all children with disabilities . . . ." *Id*. at 41,374.

54.     In 2001, OSEP determined that DCPS had not met these and several other requirements detailed in the Compliance Agreement. *See* Letter from Patricia J. Guard to Paul L. Vance, Pls.' Ex. 188. Based on this determination, OSEP designated DCPS as a "high risk" grantee and attached Special Conditions to its FY 2001 grant under Part B. *Id.* Among the Special Conditions were requirements to ensure that DCPS conduct timely initial evaluations. *Id.*

55.     In each successive year, OSEP cited defendants for their failure to comply with the Special Conditions related to providing timely initial evaluations and extended the Special Conditions into the following fiscal year.  *See* Letter from Stephanie S. Lee to Paul L. Vance, Pls.' Ex. 189; Letter from Lee to Vance, Pls.' Ex. 190; Letter from Lee to Clifford Janey, Pls.' Ex. 191; Letter from Troy R. Justesen to Janey, Pls.' Ex. 192; Letter from Hudson La Force III to Janey, Pls.' Ex. 193; Letter from Guard to Michelle Rhee, Pls.' Ex. 194; Letter from William W. Knudson to Deborah Gist, Pls.' Ex. 195.

56.     On June 3, 2009, OSEP decided to withhold 20% of the District's FY 2009 funds due to defendants' failure to abide by the terms of the Compliance Agreement.  Letter from Guard to Kerri L. Briggs, Pls.' Ex. 196.  OSEP explained its decision by stating:

> Given the nature of the noncompliance noted in this letter and that D.C. has had Special Conditions placed on its grant award under Part B of the IDEA since 2001, the Department has concluded that D.C. would be unable to correct its problems in one year.  D.C. previously entered into a compliance agreement with the Department under the IDEA from 1998–2001, and it did not result in compliance.  We therefore feel compelled to take a more serious enforcement action based on the magnitude of the noncompliance with the requirements of Part B of the IDEA and the length of that noncompliance.  The Department has significant concerns about D.C.'s inability to correct areas of longstanding noncompliance that directly affect the appropriate provision of special education and related services to D.C.'s children with disabilities.  As a result, . . . the Department intends to withhold 20 percent of D.C.'s [FY] 2009 funds reserved for State-level activities . . . until D.C. has sufficiently addressed the areas in which it "needs intervention."

*Id.*

57.     On June 16, 2009, defendants asked OSEP to reverse its decision to withhold funds, noting that OSSE was "a new agency with new leadership resolute in its commitment to correcting the identified areas of noncompliance . . . ."  Letter from Briggs to Andrew J. Pepin, Pls.' Ex. 197.  OSEP declined to reverse its decision, stating that:

> [T]he Department can no longer delay more serious enforcement action because of new leadership or a new agency.  DC has a long history of turnover in the

administration of the school system as a whole and in the administration of its special education program in particular. In the last three years, there have been four special education directors. In prior years when we have declined to take more serious enforcement action because new leadership had just arrived, the District continued to fail to meet many of the basic requirements of Part B of the IDEA. While the State organization and leadership changes, deficiencies in addressing the needs of children with disabilities remain, and many continue to be denied the free appropriate public education which they are entitled to under Part B of the IDEA.

Letter from Pepin to Briggs, Pls.' Ex. 198.

58.     OSEP also declared its great reluctance to enter into another agreement with defendants: "We have entered into agreements with DC before with little result. For example, every year since [FY] 2001 . . . DC has assured the Department that it will meet all grant terms and conditions and all applicable requirements, but it has not carried out its commitments." *Id.* Nevertheless, OSEP and OSSE entered into a Memorandum of Agreement "to establish benchmarks and reporting requirements . . . to bring the OSSE into substantial compliance with the IDEA" and "to resolve their dispute over the status of State-level funds withheld by the Department from the [FY] 2009 Part B grant award." Pls.' Ex. 160. According to the Memorandum of Agreement, *id.*, OSSE would only receive the withheld funds after it reported on specific dates that it had met the corresponding benchmarks for the reporting period. Among these benchmarks, OSSE was required to show timely initial evaluations and placements to children with disabilities. *Id.*

59.     Defendants did not meet these benchmarks. In their six subsequent progress reports, the District reported providing initial evaluations and placements to 65.4%, 70%, 68%, 73%, 70%, and 60% of children with disabilities, which fell below the benchmarks of 75%, 80%, 85%, 90%, 95%, and 100%, respectively. Memorandum of Agreement Progress Report ("MAPR") #1, Pls.' Ex. 199; MAPR #2, Pls.' Ex. 200; MAPR #3, Pls.' Ex. 161; MAPR #4, Pls.' Ex. 162; MAPR #5, Pls.' Ex. 163; MAPR #6, Pls.' Ex. 226.

## G. Inadequacy of Policies and Changes as a Result of Lawsuit

60.     In July 2009, the DCPS hired Dr. Nathaniel Beers as Executive Director of the Early Stages Center.  Freund Direct Testimony [271-9] ¶4.  Defendants believed that Dr. Beers was "uniquely situated to lead the effort to address shortcomings in [the District's] child find system which is the key issue in the DL litigation . . ." and that "getting Dr. Beers in to lead early stages may be [the] difference between winning or losing [the] case."  E-mail from Tameria Lewis, OSSE, to Richard Nyankori, DCPS, Pls.' Ex. 227.  Dr. Beers was instructed to "prepare as best . . . [as] possible to improve the chances of a successful outcome for the District relative to [this] case."  30(b)(6) Beers Dep., 9, Mar. 1, 2011.

61.     From June 1, 2009 to October 5, 2009, the District of Columbia restructured and reorganized the Early Stages Center (previously the Care Center) to serve as the primary facility for providing Part B screenings, evaluations, and eligibility determinations for children ages three through five in the District of Columbia.  Defs.' Supplemental Resps. Pls.' Second Set Interrogs., Appx. 1, Pls.' Ex. 143.

62.     The restructuring of the Early Stages Center and changes to the District's Child Find policies occurred because of pressures placed by this lawsuit on the District of Columbia to abide by their Child Find-related obligations, including increasing their identification rate of children with disabilities and the timeliness of evaluations.  Family Care Manual [271-21], Pls.' Ex. 152; *see also* E-mail from Ayo Bryant, Mayor's Office, to Margaret McLeod, OSSE, Pls.' Ex. 219; E-mail from Neela Rathinasamy, DCPS, to Tameria Lewis, OSSE, Pls.' Ex. 218; E-mail from Phyllis Harris, Deputy Chancellor, DCPS, to Eric Lerum, Pls.' Ex. 215; E-mail from Rathinasamy to Richard Schackell, DCPS, Pls.' Ex. 221; E-mail from Beth Colleye, OSSE, to Amy Maisterra, OSSE, Pls.' Ex. 228.

63.    OSSE proposed regulatory changes to their special education policies that were scheduled for public comment in October 2009.  Freund Expert Report [271-10] 6–7.  Among the changes was the addition of language that recommended that the planning for a child's transition from Part C to Part B begin 12 months, rather than 90 days, prior to the child's third birthday.  *Id.* at 7.  These changes also resulted from this litigation.  Memorandum, Pls.' Ex. 234 at 2, 3.

64.    Despite these reforms, the District of Columbia continues to struggle to comply with their legal obligations to provide special education and related services.  *See* Findings Nos. 65–81.

65.    Defendants' expert witness testified that a "continuity of leadership is an important prerequisite to a well-functioning Part B Child Find system . . . ."  Freund Direct Testimony [271-9] ¶4.

66.    The District of Columbia "has a long history of turnover in the administration of the school system as a whole and in the administration of its special education program in particular.  In the last three years, there have been four special education directors."  Letter from Andrew J. Pepin to Briggs, Pls.' Ex. 198.

67.    Since 2008, District of Columbia staff and Local Education Agencies ("LEAs") have failed to adhere to their Child Find-related responsibilities, due to a general lack of consistent oversight, training, and monitoring.  Maisterra 30(b)(6) Dep. 163.  These failures are also a function of an "entrenched" level of noncompliance and misunderstanding of the District's Child Find-related obligations among all levels of the staff and leadership.  *Id.* at 231–32.

68.    Dr. Nathaniel Beers acknowledged that "it would take at least three to five years" to ensure that the recent reforms to the District's special education policies and to the Early

Stages Center are "stabilized and headed in the appropriate trajectory." Trial Transcript, Beers Cross Testimony, 9:3–5, Apr. 7, 2011.

69.     On May 13, 2011, Dr. Richard Nyankori resigned as the Deputy Chancellor for Special Education. Pls.' Ex. 238. In a memorandum to the DCPS staff, Dr. Nyankori explained that Dr. Beers would replace him as the chief (formerly known as Deputy Chancellor) of special education and that Heather Elliott would replace Dr. Beers, as the Executive Director of Early Stages. *Id.* These significant personnel changes are a continuation of prior leadership and staffing changes, which have contributed to defendants' failure to comply with their Child Find-related obligations. Freund Expert Report [271-10] 3.

70.     In May 2010, Jerri Johnston-Stewart, the Program Manager at OSSE, explained that "[t]he new policies and procedures implemented by the Part B Early Stages Center have negatively impacted Part C families transitioning out of the Early Intervention Services . . . . Many of these families and organizations have or are requesting to file state complaints. Parent/Community dissatisfaction with the provision of services currently provided by the Part B Early Stages has implications of future dissatisfaction and prospective litigation against the Part C program." E-mail from Jerri Johnston-Stewart, OSSE, to Alison Whyte, Pls.' Ex. 233. For instance, as of November 2010, defendants acknowledged that at least four parents per day contacted the Early Stages Center to report that a Child Find Field Coordinator had failed to return their calls regarding providing their children with an evaluation or an eligibility screening. E-mail from Carole Pratt to Sean Compagnucci, Pls.' Ex. 225. Furthermore, community based Head Start programs are unable consistently to access services from DCPS even though both the IDEA and Head Start federal law require coordination and timely provision of services. E-mail from Johnston-Stewart to Whyte, Pls.' Ex. 233.

71.     On June 3, 2010, OSEP determined, for the fourth consecutive year, that the District of Columbia "needs intervention" in complying with the requirements of Part B of the IDEA.  Letter from Alexa Posny to Kerri L. Briggs, Pls.' Ex. 159.  OSEP made its determination after noting, *inter alia*, defendants' failure to provide valid and reliable FY 2008 data for early childhood transition rates and their failure to comply with the Special Conditions related to providing timely initial evaluations and re-evaluations.  *Id.*

72.     The District continues to struggle with "friction between [the Part] C and [Part] B teams."  E-mail from Amy Maisterra, OSSE, to Jerri Johnston-Stewart, OSSE, Pls.' Ex. 235.  *See also* E-mail from Nathaniel Beers to Maisterra, Pls.' Ex. 231.

73.     For four consecutive years, OSEP has cited DCPS's failure to provide valid and reliable data for early childhood transition.  *See, e.g.*, Letter from Posny to Briggs, Pls.' Ex. 159; *see also* E-mail from Kerda DeHaan, OSSE, to Sharon Walsh, OSSE, Pls.' Ex. 229.

74.     Despite developing a new Special Education Data System ("SEDS") in May 2008, defendants have struggled to maintain, analyze, and provide reliable data that reflects the number of children served with special education services.  Dunst Direct Testimony [209-1] 25–26.  The database extracts provided to both Drs. Dunst and Cupingood contained duplicate, incomplete, and inconsistent information for preschool-age children.  *Id.*; Cupingood Direct Testimony [209-2] 3–6.

75.     The Early Stages Center's own data management system relies on this same incomplete and inaccurate data collected by SEDS.  Dunst Direct Testimony [209-1] 25.

76.     The District of Columbia's special education policies are hampered by budget cuts and funding concerns.

77.     The District will need more funding, resources, and staff members as they expand the number of children identified and served with special education services.  Beers Direct Testimony [210-1] ¶43.

78.     Budget cuts and shortages have led to a District-wide hold on hiring, causing extended vacancies in key positions, such as Part B Child Find coordinators, responsible for providing LEAs with training and technical assistance to ensure compliance with Child Find requirements.  Maisterra 30(b)(6) Dep. 49–50.

79.     There are increased costs associated with the transportation of students with special needs and with tuition for nonpublic placements, which "continue to drain a substantial portion of [the] DCPS budget, leaving far less for much-needed programming and critical resources."  E-mail from Amy Maisterra, OSSE, to Tameria Lewis, OSSE, Pls.' Ex. 231.

80.     In 2010, approximately 2,700 students with disabilities were enrolled in nonpublic placements, at a projected yearly cost of $283 million for tuition and transportation.  *Id.* at 3. These costs have forced DCPS to explore cost-cutting options, including the reintegration of students with disabilities in public schools.  *Id.*  DCPS subsequently experienced setbacks in its reintegration efforts, when several parents of students with disabilities complained about the lack of communication, the abrupt nature of the reintegration efforts, the unwelcomed pressure from overzealous placement personnel, and the disregard for the individual needs of students.  *Id.*  In response to this criticism, DCPS issued a public apology and expressed its intention to "revamp the faulty reintegration plan."  *Id.* at 3–4.

81.     The District has provided no assurances that the Child Find budget will continue to receive even the same level of funding as in past years, despite acknowledging that defendants will need more money than in past years if more children are expected to be served with special education services.  Beers 30(b)(6) Dep. 260–61.   "Even with additional funds, DCPS must still

address nearly $50 million in lost revenues or increasing costs FY 12." DCPS Press Release, Pls.' Ex. 224.

82.     Based on his experience and research regarding effective Child Find practices, Dr. Dunst believes that the District of Columbia should take the steps listed in paragraphs 83–97 to ensure that an effective and sustainable Child Find system is implemented, so that all eligible preschool-age children are offered special education and related services.   Dunst Direct Testimony [209-1] 30.

83.     Defendants should maintain and regularly update a list of primary referral sources, including physicians, hospitals, and other health providers; day care centers, child care centers, and early childhood programs; District of Columbia departments and agencies; community and civic organizations; and advocacy organizations.   Defendants should also develop a system to track frequency of contacts with referral sources to ensure that outreach occurs on a regular basis.  *Id.* at 30–31.

84.     Defendants should develop and publish printed materials targeted to parents and guardians that inform them of the preschool special education and related services available from DCPS, the benefits and cost-free nature of these services, and how to obtain the services.  These materials should be written at an appropriate reading level and be translated into the primary languages spoken in the District.  These materials should be distributed to all primary referral sources (*e.g.*, medical professionals and child care staff), public and public charter schools, public libraries, Income Maintenance Administration Service Centers, public recreation facilities, and other locations designed to reach as many parents or guardians of preschool children who may be eligible for special education and related services as possible.  *Id.* at 31.

85.     Defendants should develop, publish, and distribute tailored printed materials targeted at primary referral sources to inform them of the preschool special education and related

services available from DCPS, the benefits and cost-free nature of these services, and how to make a referral. These materials should be used in conjunction with regular contacts with primary referral sources to increase the usefulness of the materials. *Id.*

86. Defendants should ensure that Early Stages outreach staff (*e.g.*, the Child Find Field Coordinators) contact primary referral sources or a staff member in the primary referral source's office who are instrumental in making referrals at least once a month until a referral relationship is established and then every three months thereafter. The initial meetings should be face-to-face whenever possible when pursuing referrals from new referral sources and then less frequently thereafter, using the method of contact preferred by the referral sources (*e.g.*, e-mail, texting, and telephone calls). *Id.* at 31–32.

87. Defendants should accept both oral and written referrals at the start of the eligibility determination process, make multiple attempts using different forms of communication (*e.g.*, telephone, postal mail, and electronic mail) to contact the parent or guardian of a referred child, and, upon obtaining the consent of the parent or guardian, provide feedback to the referral source regarding the outcome of the referral in a timely manner. *Id.* at 32.

88. Defendants should assign each family served by Early Stages a single staff member to act as its "case manager" throughout the screening, evaluation, eligibility determination, and IEP process to ensure that families have the necessary information to understand the purposes and functions of all aspects of the Early Stages process and procedures. *Id.*

89. Defendants should maintain a central location that accepts formal and informal referrals; conducts initial meetings, screenings, assessments, eligibility determinations, IEP

development, and offers of placement; and permits parents to register their children with DCPS. *Id.*

90.     Defendants should open a satellite location for Early Stages in Southeast, D.C., that is able to perform the same functions of the central location in order to better serve an area that has been recognized as underserved, high risk, and a potential source of a large number of referrals. *Id.*

91.     Defendants should open additional satellite sites to perform the same functions in other wards or use a mobile evaluation unit that is able to perform these functions at multiple locations throughout the District as more children are located who may be in need of preschool special education. *Id.*

92.     Defendants should conduct regular screenings of preschool-age children in each ward of the District, and especially in wards in which children experience multiple risk factors. *Id.*

93.     Defendants should use existing data (*e.g.*, medical records and reports of prior assessments) at the time of referrals to the extent possible to eliminate unnecessary and duplicative screenings and assessments for eligibility determination purposes. *Id.* at 33.

94.     Defendants should accept all children exiting Part C who have identified disabilities or significant developmental delays as presumptively eligible for Part B in order to ensure that they do not experience a disruption in services. *Id.*

95.     Defendants should maintain a reliable data-sharing system between Part C and Part B to ensure that Early Steps receives an ongoing monthly report of all children who will be aging out of Part C within the following six months in order to ensure timely transition meetings. *Id.*

96.     Defendants should maintain a reliable database system for tracking children through the Child Find process: from referral to eligibility determination and, if eligible, IEP development placement and provision of identified services. *Id.*

97.     Defendants should maintain a reliable system for tracking the number and type of placements available for preschool special education and related services throughout the year and expanding the number and types of placement as needed. *Id.*

## III.    CONCLUSIONS OF LAW

### A.  Background

98.     This matter is a class action brought on behalf of a class of children who reside in or are wards of the District of Columbia, and either were not identified, located, evaluated, and offered special education and related services when they were between the ages of three and five years old, inclusive, or have not been identified, located, evaluated, and offered special education and related services when they are between the ages of three and five years old, inclusive, despite being eligible for such services. Am. Compl. [61] 1–2.

99.     Defendants are the District of Columbia, Kaya Henderson, in her official capacity as the Interim Chancellor of the District of Columbia Public Schools ("DCPS"), and Hosanna Mahaley Johnson,  in her official capacity as the Acting State Superintendent of Education.

100.    As Interim Chancellor, Ms. Henderson is responsible for the administration of DCPS, including the implementation of District of Columbia and federal laws related to special education, such as Part B of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*; D.C. Code 38-174(a), (c)(3).

101.    As Acting State Superintendent, Ms. Johnson supervises the Office of the State Superintendent of Education ("OSSE"), serves as the chief state school officer for the District of Columbia, and represents the District in all matters before the United States Department of

Education. OSSE, and therefore Ms. Johnson, are also responsible for administering the Early Intervention Program, which provides early intervention services in accordance with Part C of the IDEA. D.C. Code 38-2601.01(a).

102.    The rights which plaintiffs seek to enforce arise under provisions of the IDEA, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and District of Columbia law. This Court has jurisdiction over plaintiffs' remaining claims pursuant to 28 U.S.C. §§ 1331 and 1367.

103.    In its August 2010 Memorandum Opinion [198], this Court dismissed plaintiffs' claims under Section 1983 to enforce the IDEA and Section 504 of the Rehabilitation Act. *DL*, 730 F. Supp. 2d at 89–93. Plaintiffs subsequently moved voluntarily to dismiss their claims under the "stay put" provision of the IDEA, 20 U.S.C. § 1415(j), the Due Process Clause, U.S. CONST. amend. V, and District of Columbia regulations regarding a free appropriate public education ("FAPE") for "highly mobile children," 5 D.C.M.R. § 3002.1(e). *See* Joint Motion [200] 2, Sept. 15, 2010. The Court granted plaintiffs' motion. Order [201] 1, Sept. 22, 2010.

104.    Plaintiffs and the class they represent bring each of their remaining claims against all defendants.

**B. FAPE Violation**

105.    The IDEA's primary mandate is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d)(1)(A).

106.    20 U.S.C. § 1412(a) makes Part B funding available if the State "has in effect policies and procedures to ensure that . . . [a] free appropriate public education is available to all children with disabilities residing in the State between ages 3 and 21, inclusive . . . ."

107.    The term "free appropriate public education" means special education and related services that:

(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State education agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under [section 1414(d)].

20 U.S.C. § 1401(9).

108.    District of Columbia law incorporates the federal FAPE obligations and requires:

All local education agencies (LEA) in the District of Columbia [to] ensure, pursuant to the Individuals with Disabilities Education Act (IDEA), that all children with disabilities, ages three to twenty-two, who are residents or wards of the District of Columbia, have available to them a free appropriate public education (FAPE) and that the rights of these children and their parents are protected.

5 D.C.M.R. § 3000.1.

109.    5 D.C.M.R. § 3002.1(a) also requires the LEA to provide a FAPE to each child with a disability.

110.    This Court has previously held that, "at least through and including the year 2007, defendants denied a FAPE to a large number of children aged 3 to 5 years old, in violation of § 1412(a)(1)(A) of the IDEA." *DL*, 730 F. Supp. 2d at 95.

111.    Based on paragraphs 23–32 of the above findings of fact, the Court holds that, from 2008 to April 6, 2011 (the first day of trial), defendants failed to provide a FAPE to a substantial number of District of Columbia children with disabilities, ages three to five years old, in violation of 20 U.S.C. § 1412(a)(1)(A) of the IDEA.

112.    This Court has previously held, based upon its determination that defendants had violated § 1412(a)(1)(A) of the IDEA, that "at least through and including the year 2007, defendants' actions constitute violations of District of Columbia law, D.C. Mun. Regs. tit. 5, §§ 3000.1, 3002.1(a), 3002.1(d), and 3002.3(a), because this local law creates the same standards as those in federal law." *Id.* at 24.

113.     Based upon paragraphs 23–32 of the above findings of fact, the Court holds that, from 2008 to April 6, 2011 (the first day of trial), defendants failed to provide a FAPE to District of Columbia children with disabilities, ages three to five years old, in violation of District of Columbia law, 5 D.C.M.R. §§ 3000.1 and 3002.1(a).

**C.  Child Find Violation**

114.     In order to ensure that all children ages 3 to 21 receive a FAPE, the IDEA requires that:

> All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the Sate and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A).  In *NG v. District of Columbia*, 556 F. Supp. 2d 11, 16 (D.D.C. 2008), this Court explained that this "Child Find" obligation requires that:

> [e]very public school system [] identify students who might be disabled and evaluate those students to determine whether they are indeed eligible.  As soon as a child is identified as a potential candidate for services, DCPS has the duty to locate that child and complete the evaluation process.

115.     Under the IDEA and its implementing regulations, jurisdictions receiving funding must ensure that all children identified as potential candidates for special education and related services are provided an initial evaluation within 60 days of receiving parental consent or within an alternative timeframe specified by the statute.  20 U.S.C. § 1414(a)(1)(C).  District of Columbia law extends the 60-day period established by the IDEA to 120 days, beginning from "the date that the student was referred for an evaluation or assessment."  D.C. Code 38-2561.2(a) (formerly D.C. Code 38-2501(a)).

116. Following the initial evaluation, the IDEA and its implementing regulations require defendants, within 120 days, to conduct an eligibility determination into whether a child is disabled and needs special education and related services. 20 U.S.C. § 1414(b)(4); 34 C.F.R. 300.534, 300.306(a).

117. 5 D.C.M.R. § 3002.1(d) incorporates the federal Child Find obligations by requiring "[t]he LEA [to] ensure that procedures are implemented to identify, locate, and evaluate all children with disabilities residing in the District who are in need of special education and related services . . . ."

118. This Court has previously held that, "at least through and including the year 2007, defendants failed to comply with their Child Find duties, in violation of § 1412(a)(3)(A) of the IDEA." *DL*, 730 F. Supp. 2d at 97.

119. Based on paragraphs 23–37 of the above findings of fact, the Court holds that, from 2008 to April 6, 2011 (the first day of trial), defendants failed to identify and provide timely initial evaluations to all preschool-age children with disabilities in the District of Columbia, in violation of 20 U.S.C. §§ 1412(a)(3)(A) and 1414(a)(1)(C).

120. Based on paragraphs 38–40 of the above findings of fact, the Court holds that, from 2008 to April 6, 2011 (the first day of trial), defendants failed to offer timely eligibility determinations to all preschool-age children with disabilities in the District of Columbia, in violation of 20 U.S.C. § 1414(b)(4).

121. This Court has previously held, based upon its determination that defendants had failed to comply with their Child Find obligations under the IDEA, that "at least through and including the year 2007, defendants' actions constitute violations of District of Columbia law, D.C. Mun. Regs. tit. 5, §§ 3000.1, 3002.1(a), 3002.1(d), and 3002.3(a), because this local law creates the same standards as those in federal law." *DL*, 730 F. Supp. 2d at 100.

122.    Based on paragraphs 23–37 of the above findings of fact, the Court holds that, from 2008 to April 6, 2011 (the first day of trial), defendants failed to identify and provide timely initial evaluations to all preschool-age children with disabilities in the District of Columbia, in violation of District of Columbia law, 5 D.C.M.R. §§ 3000.1, 3002.1(d), D.C. Code 38-2561.2(a).

123.    Based on paragraphs 38–40 of the above findings of fact, the Court holds that, from 2008 to April 6, 2011 (the first day of trial), defendants failed to offer timely eligibility determinations to all preschool-age children with disabilities in the District of Columbia, in violation of District of Columbia law, 5 D.C.M.R. §§ 3000.1, 3002.1(d).

**D.  Transition Violation**

124.    The IDEA requires a State to provide assurances to the United States Department of Education that it:

> has in effect policies and procedures to ensure that . . . [c]hildren participating in early intervention programs assisted under [Part C], and who will participate in preschool programs assisted under [Part B], experience a smooth and effective transition to those preschool programs in a manner consistent with section 1437(a)(9) of [the IDEA].  By the third birthday of such a child, an individualized education program or . . . an individualized family service plan has been developed and is being implemented for the child.  The local educational agency will participate in transition planning conferences arranged by the designated lead agency . . . ."

20 U.S.C. § 1412(a)(9).  Section 1437(a)(9), incorporated in this provision, requires a State, as part of its annual application for Part C funding, to explain how:

> (I) the families of such toddlers and children [exiting Part C] will be included in the transition plans . . . and (ii) the [Part C] lead agency . . . will (I) notify the [Part B] local educational agency for the area in which such a child resides that the child will shortly reach the age of eligibility for preschool services . . . ; [and] (II) . . . convene a conference among the [Part C] lead agency, the family, and the [Part B] local educational agency not less than 90 days (and at the discretion of all such parties, not more than 9 months) before the child is eligible for the preschool services, to discuss any such services that the child may receive . . . ."

20 U.S.C. § 1437(a)(9).

125.     This Court has previously held that, "at least through and including the year 2007, defendants failed to comply with their obligation to ensure a smooth and effective transition for disabled children from Part C to Part B, in violation of § 1412(a)(9) of the IDEA." *DL*, 730 F. Supp. 2d at 98.

126.     Based on paragraphs 41–45 of the above findings of fact, the Court holds that from 2008 to April 6, 2011 (the first day of trial), defendants failed to comply with their legal obligation to ensure a smooth and effective transition for disabled children from Part C to Part B, in violation of 20 U.S.C. § 1412(a)(9).

### E.  Section 504 Violation

127.     Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

128.     Section 504 further states that, "[f]or the purposes of this section, the term 'program or activity' means all of the operations of . . . a local educational agency . . . or other school system . . . . " *Id.* § 794(b)(2)(B).

129.     The implementing regulations for Section 504 declare that "[a] recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. 104.33(a).

130.     This Court has previously held that defendants may be liable under Section 504 of the IDEA if defendants show either "bad faith or gross misjudgment" in failing to comply with their legal obligations.  *DL v. District of Columbia*, 450 F. Supp. 2d 21, 23 (D.D.C. 2006).

Specifically, defendants are required to "exercise[] professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals." *Id.*

131.    Based on paragraphs 46–51 of the above findings of fact, the Court holds that, from 2008 to April 6, 2011 (the first day of trial), the District of Columbia's special education policies were a gross departure from accepted educational practices throughout the country.

132.    Based on paragraphs 52–59 of the above findings of fact, the Court holds that, from 2008 to April 6, 2011 (the first day of trial), the District of Columbia knew that their actions were legally insufficient, yet failed to bring themselves into compliance with their legal obligations.

133.    Based on paragraphs 23–59 of the above findings of fact, the Court holds that, from 2008 to April 6, 2011 (the first day of trial), defendants demonstrated bad faith or gross misjudgment, by knowingly failing to provide a FAPE to eligible preschool-age children and by failing to bring themselves into compliance with their Child Find obligations under the IDEA, in violation of 29 U.S.C. § 794(a) of the Rehabilitation Act.

### F.  Entitlement to Declaratory Relief

134.    Declaratory relief is warranted when "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality . . . ." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

135.    Based on paragraphs 23–81 of the above findings of fact, the Court holds that, from 2008 to April 6, 2011 (the first day of trial), there has been a substantial controversy of sufficient immediacy and reality due to defendants' failure to identify, locate, evaluate, and offer plaintiffs a free appropriate public education and failure to ensure a smooth and effective transition from Part C to Part B for eligible preschool-age children in the District of Columbia.

136.     This Court therefore will issue a declaratory judgment that extends the holdings of its August 10, 2010 Memorandum Opinion, *DL*, 730 F. Supp. 2d at 94–100, to the period from January 1, 2008 to April 6, 2011 (the first day of trial) and declares that defendants are in violation of the IDEA and District of Columbia law because they have failed and continued to fail to ensure that:

> (a) A free appropriate public education is available to all children with disabilities who reside in or are wards of the District of Columbia between the ages of three and five, inclusive, in violation of 20 U.S.C. § 1412(a)(1)(A) and 5 D.C. Mun. Regs. §§ 3001.1, 3002.1(a);

> (b) All children between the ages of three and five, who reside in or are wards of the District of Columbia who are in need of special education and related services, are identified, located, and evaluated within 120 days of referral, in violation of 20 U.S.C. § 1412(a)(3)(A), D.C. Code § 38-2561.02(a), and 5 D.C. Mun. Regs. §§ 3002.1(d), 3002.3(a); and

> (c) All children participating in Part C early intervention and who will participate in Part B preschool education experience a smooth and effective transition to Part B by their third birthdays, in violation of 20 U.S.C. § 1412(a)(9).

137.     The Court further extends the holding of its August 10, 2010 Memorandum Opinion, *id.* at 21–23, and declares that defendants violated Section 504 of the Rehabilitation Act for the period January 1, 2008 to April 6, 2011 (the first day of trial) because, in violating the IDEA, defendants failed to exercise professional judgment in such a way as not to depart grossly from accepted standards among educational professionals and thus demonstrated bad faith or gross misjudgment.

### G. Entitlement to Injunctive Relief

138.   "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *U.S. v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952).

139.   Injunctive relief may be granted when (a) plaintiffs prevail on the merits; (b) plaintiffs demonstrate irreparable injury if the injunction is not granted; (c) the denial of the injunction would cause greater injury to plaintiffs than granting the order would cause the defendants; and (d) the injunction furthers the public interest. *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987).

140.   This Court finds that reforms to the District of Columbia's Child Find-related policies and procedures, including the restructuring and reorganization of the Early Stages Center, occurred during and because of this lawsuit. *See* Findings Nos. 60–63.

141.   This Court also finds that defendants have not shown clear proof of an intent to permanently alter or abandon their ongoing failure to provide special education and related services to preschool-age children. *See* Findings Nos. 64–81.

142.   This Court has found defendants liable for violating the IDEA, Section 504 of the Rehabilitation Act, federal implementing regulations, and District of Columbia law.

143.   The Court finds that these violations result in irreparable injury to all eligible children between the ages of three and five years old, inclusive, who live in, or are wards of, the District of Columbia, and whom defendants did not identify, locate, evaluate, or offer special education and related services.  Without access to these special education and related services, preschool-age children in the District of Columbia suffer substantial harm by being denied vital educational opportunities that are essential to their development.

144.    A permanent injunction requiring defendants to do nothing more than comply with their legal obligations cannot, by definition, harm defendants.  *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986).  In a case involving a preliminary injunction requiring DCPS to pay the cost of special education placements or related services to private providers, this Court held that:

> While the Court appreciates DCPS's financial straits, it cannot accept defendants' implicit claim that financial hardship justified the risk to the class members that DCPS seeks to impose, a risk that directly results from DCPS's own failure to follow the law.  As the Court stated seven years ago: "[D]ifficult financial constraints do not relieve the District of Columbia from its statutory obligations.  Unless . . . relief is provided by the City Council or, in this case, the Congress, "[t]he Court's role . . . is to enforce existing law, not to recast the statute to ameliorate the District's financial crisis."

*Petties v. District of Columbia*, 238 F. Supp. 2d, 88, 99 (D.D.C. 2002) (quoting *Petties v. District of Columbia*, 881 F. Supp. 63, 70 (D.D.C. 1995)).

145.    The public interest will be served by compelling defendants to offer special education and related services in accordance with applicable law.  In 1975, Congress enacted the IDEA to "ensure that the rights of children with disabilities . . . are protected."  20 U.S.C. § 1400(d)(1)(B).  Therefore, this Court will further the public interest by requiring defendants to provide special education and related services to all eligible preschool-age children.  In the words of the Court of Appeals for the Seventh Circuit: "We also fail to see how enforcing a statute designed to promote the public welfare disserves the public."  *Haskins*, 794 F.2d at 1277.

146.    The Court, therefore, permanently enjoins defendants from further violations of the IDEA and District of Columbia law, and directs the following corrective actions:

## NUMERICAL REQUIREMENTS

147. Defendants shall ensure that at least 8.5 percent of children between the ages of three and five years old, inclusive (hereafter, "preschool children"), who reside in or are wards of the District of Columbia, are enrolled in special education and related services under Part B of the IDEA. Until the target of 8.5 percent is reached, defendants shall:

(a) Increase the number of referrals of preschool children that defendants obtain by 25 percent in the first full year, starting on the first of the next month after the date of this Memorandum Opinion and accompanying Order, and an additional 20 percent each subsequent year; and

(b) Increase the percentage of preschool children in the District of Columbia enrolled in Part B by 1 percent in the first full year, starting on the first of the next month after the date of this Memorandum Opinion and accompanying Order, and an additional 0.5 percent each subsequent year.

148. Defendants shall ensure that at least 95 percent of all preschool children referred for Part B services receive a timely initial evaluation.

(a) Until the target of 95 percent is reached, defendants shall increase the percentage of preschool children referred for Part B services who receive a timely initial evaluation by 10 percent in the first full year, starting on the first of the next month after the date of this Memorandum Opinion and accompanying Order, and an additional 5 percent each subsequent year.

(b) An initial evaluation shall be considered timely if it is completed within the period then-prescribed by federal and local statute. According to local statute, defendants currently have 120 days from the date of referral to provide a timely initial evaluation. "Date of referral" is defined as the date on which defendants

receive a written or oral request for assessment of a preschool child including the child's name and age, the parent's or guardian's name, mailing address or telephone number, and the basis for referral.

149. Defendants shall ensure that at least 95 percent of all preschool children referred for Part B services receive a timely eligibility determination.

    (a) Until the target of 95 percent is reached, defendants shall increase the percentage of preschool children referred for Part B services who receive a timely eligibility determination by 10 percent in the first full year, starting on the first of the next month after the date of this Memorandum Opinion and accompanying Order, and an additional 5 percent each subsequent year.

    (b) An eligibility determination shall be considered timely if it is completed within the period then-prescribed by federal and local law. According to District of Columbia law, defendants have 120 days from the date of referral to make an eligibility determination. "Date of referral" is defined as the date on which defendants receive a written or oral request for assessment of a preschool child including the child's name and age, the parent's or guardian's name, mailing address or telephone number, and the basis for referral.

150. Defendants shall ensure that at least 95 percent of all Part C graduates that are found eligible for Part B receive a smooth and effective transition by their third birthdays.

    (a) Until the target of 95 percent is reached, defendants shall increase the percentage of timely transitions by 10 percent in the first full year, starting on the first of the next month after the date of this Memorandum Opinion and accompanying Order, and an additional 5 percent each subsequent year.

(b) A child's transition will be considered timely if the child receives an IEP listing both the type of placement and a specific location for services (*i.e.*, where the IEP will be implemented) by his or her third birthday.

**PROGRAMMATIC REQUIREMENTS**

151.    Defendants shall maintain and regularly update a list of primary referral sources, including physicians, hospitals, and other health providers; day care centers, child care centers, and early childhood programs; District of Columbia departments and agencies; community and civic organizations; and advocacy organizations. Defendants shall also develop a system to track frequency of contacts with the referral sources to ensure that outreach occurs on a regular basis. *See* Finding No. 83.

152.    Defendants shall develop and publish printed materials targeted to parents and guardians that inform them of the preschool special education and related services available from DCPS, the benefits and cost-free nature of these services, and how to obtain the services. These materials shall be written at an appropriate reading level and be translated into the primary languages spoken in the District. These materials shall be distributed to all primary referral sources (*e.g.*, medical professionals and child care staff), public and public charter schools, public libraries, Income Maintenance Service Centers, public recreation facilities, and other locations designed to reach as many parents or guardians of preschool children who may be eligible for special education and related services as possible. *See* Finding No. 84.

153.    Defendants shall develop, publish, and distribute tailored printed materials targeted at primary referral sources to inform them of the preschool special education and related services available from DCPS, the benefits and cost-free nature of these services, and how to make a referral. These materials shall be used in conjunction with regular contacts with primary referral sources to increase the usefulness of the materials. *See* Findings No. 85.

154. Defendants shall ensure that Early Stages outreach staff (*e.g.*, the Child Find Field Coordinators) contact primary referral sources or a staff member in the primary referral source's office who are instrumental in making referrals at least once a month until a referral relationship is established and then every three months thereafter. The initial meeting shall be face to face whenever possible when pursuing referrals from new referral sources and then less frequently thereafter, using the method of contact preferred by the referral sources (*e.g.*, e-mail, texting, or telephone calls). *See* Finding No. 86.

155. Defendants shall accept both oral and written referrals at the start of the eligibility determination process, make multiple attempts using different forms of communication (*e.g.*, telephone, postal mail, and e-mail) to contact the parent or guardian of a referred child, and, upon obtaining consent of the parent or guardian, provide feedback to the referral source regarding the outcome of the referral in a timely manner. *See* Findings No. 87.

156. Defendants shall assign each family served by Early Stages a single staff member to act as its "case manager" throughout the screening, evaluation, eligibility determination, and IEP process to ensure that families have the necessary information to understand the purposes and functions of all aspects of the Early Stages process and procedures. *See* Findings No. 88.

157. Defendants shall maintain a central location that: accepts formal and informal referrals; conducts initial meetings, screenings, assessments, eligibility determinations, IEP development, and offers of placement; and permits parents to register their child with DCPS. *See* Findings No. 89.

158. Defendants shall open a satellite location for Early Stages in Southeast, D.C. that is able to perform the same functions of the central location in order to better serve an area that has been recognized as underserved, high-risk, and a potential source of a large number of referrals. *See* Findings No. 90.

159.     Defendants shall regularly assess the need for and, as necessary, open additional satellite sites to perform the same functions in other wards or use a mobile evaluation unit that is able to perform these functions at multiple locations throughout the District as more children are located who may be in need of preschool special education.  *See* Findings No. 91.

160.     Defendants shall conduct regular screenings of preschool-age children in each ward of the District, and especially in wards in which children experience multiple risk factors. *See* Findings No. 92.

161.     Defendants shall use existing data (*e.g.*, medical records and reports of prior assessments) at the time of referrals to the extent possible to eliminate unnecessary and duplicative screenings and assessments for eligibility determination purposes.  *See* Findings No. 93.

162.     Defendants shall accept all children exiting Part C who have identified disabilities or significant developmental delays as presumptively eligible for Part B in order to ensure that they do not experience a disruption in services.  *See* Findings No. 94.

163.     Defendants shall maintain a reliable data-sharing system between Part C and Part B to ensure that Early Stages receives an ongoing monthly report of all children that will be aging out of Part C within the following six months in order to ensure timely transition meetings. *See* Findings No. 95.

164.     Defendants shall maintain a reliable database system for tracking children through the Child Find process: from referral to eligibility determination and, if eligible, IEP development placement and provision of identified services.  *See* Findings No. 96.

165.     Defendants shall maintain a reliable system for tracking the number and type of placements available for preschool special education and related services throughout the year and expanding the number and types of placement as needed.  *See* Findings No. 97.

**MODIFICATION REQUIREMENTS**

166.     The numerical requirements for the percentage of preschool children enrolled in Part B set forth in paragraphs 147–49 above may only be modified by order of the Court upon a showing that the percentage (*i.e.*, 8.5 percent) does not accurately reflect the number of preschool children who reside in or are wards of the District of Columbia expected to be eligible for Part B services and that defendants should expect to enroll through an effective Child Find system.

167.     The programmatic requirements set forth in paragraphs 150–64 above may be modified by order of the Court.  In order to obtain modification by order of the Court, defendants must show that either:

> (a) They have carried out the requirement for a reasonable period of time and it has proven to be effective; or
>
> (b) Another action, to be substituted for the requirement that defendants' wish to modify, would be at least as effective.

**REPORTING**

168.     Defendants shall provide annual reports to plaintiffs and this Court regarding their compliance with the numerical requirements set forth in paragraphs 147–49 above and biannual reports (*i.e.*, every six months) regarding the programmatic requirements set forth in paragraphs 150-64 above.

169.     The accompanying Order shall remain in effect until defendants have demonstrated sustained compliance with the numerical requirements set forth in paragraphs 147–49 above, specifically:

> (a) Percentage of preschool children enrolled in Part B (8.5 percent);
>
> (b) Percentage of timely eligibility determinations (95 percent); and

(c) Percentage of timely transitions from Part C to Part B (95 percent).

170. The period of sustained compliance shall begin after defendants, during a single year ("the baseline year"), meet or exceed all three numerical requirements.

171. Following the baseline year, defendants may show sustained compliance:

(a) In two years if, in the year following the baseline year (Year 1), defendants increase the percentage of preschool children enrolled in Part B to at least 9.5 percent and meet or exceed the other two numerical requirements and, in the subsequent year (Year 2), defendants increase the percentage of preschool children enrolled in Part B to at least 10.5 percent and meet or exceed the other two numerical requirements; or

(b) In three years if, in the three years immediately following the baseline year (Years 1, 2, and 3) defendants meet or exceed all three numerical requirements.

172. If defendants fail to meet any of the numerical requirements in Years 1, 2, or 3, defendants must establish a new baseline year of compliance before being able to show sustained compliance.

173. Years shall be calculated on the basis that the first year shall start on the first of the next month after the date of this Memorandum Opinion and accompanying Order and subsequent years shall start on the anniversary of the first of the next month after the date of this Memorandum Opinion and accompanying Order.

174. The programmatic requirements set forth in paragraphs 150–64 above shall not terminate until the numerical requirements set forth in paragraphs 147–49 above are satisfied.

175. Since preschool children in the District of Columbia will continue to be denied a FAPE as long as defendants are not in compliance with the IDEA and District of Columbia law, the Court shall retain jurisdiction over this matter for purposes of enforcement of individual

relief for a period of three years after the baseline year (*i.e.*, the baseline year used to establish sustained compliance).

176.    Pursuant to this Court's September 2010 Order, Order [201] 2, Sept. 22, 2010, within 30 days after the date of this Order, the parties shall meet and confer, and propose a procedure for addressing class members' claims for individual relief.  If the parties cannot come to an agreement, plaintiffs and/or defendants may submit a motion to the Court as to a procedure for addressing class members' claims for individual relief.

## IV.    CONCLUSION

For the reasons stated above, the Court finds defendants liable for violations of Sections 1412(a)(1)(A), 1412(a)(3)(A), 1412(a)(9), 1414(a)(1)(C), and 1414(b)(4) of the IDEA and corresponding provisions of District of Columbia law, and of Section 504 of the Rehabilitation Act.  The Court further finds that plaintiffs are entitled to the above-specified declaratory and injunctive relief.

The Court acknowledges the reforms undertaken by DCPS in the Early Stages program in recent years, particularly under the able leadership of Dr. Nathaniel Beers.  However, Dr. Beers has resigned from that position, and so the statutory violations persist at the same time as the perennial problem of turnover in the leadership of the District's school system threatens to unwind whatever progress has been made.  It is for this reason that a structural injunction is necessary.  However, at the same time, it is the Court's belief and sincere hope that improvements in the District's system could lead, perhaps in the very near future, to compliance with the law, and so defendants should be given another chance to bring themselves into compliance before more intrusive Court involvement—*e.g.*, the appointment of a special master or monitor—is determined to be necessary.  Defendants' persistent failure to live up to their statutory obligations, a failure that works a severe and lasting harm on one of society's most

vulnerable populations—disabled preschool children—is deeply troubling to this Court. Since defendants have demonstrated their historic inability to keep their promises to the District's disabled preschool children, this Court hereby makes it crystal clear that failing to abide by the Court's Order will earn defendants far more significant court involvement and oversight than is ordered this day.

A separate Order consistent with these findings of fact and conclusions of law shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on November 16, 2011.