**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ***D.L.***, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 05-1437 (RCL) |
| v. | ) |
| | ) |
| **DISTRICT OF COLUMBIA**, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION**
**FOR CLASS CERTIFICATION AND REINSTATEMENT OF FINDINGS**
**OF LIABILITY AND ORDER GRANTING RELIEF**

On June 4, 2013, Plaintiffs moved for an order recertifying their injunctive and declaratory relief claims pursuant to Federal Rule of Civil Procedure ("Rule") 23(b)(2) and "reinstating" liability and injunctive relief *a priori*, in essence, according to them, "return[ing] the parties to their respective positions prior to appeal." *See* Pls' Mot. [Dkt. No. 358] at 55.[1] But nothing in the opinion from the Court of Appeals vacating the previous liability finding provides for Plaintiffs' automatic entitlement to reinstatement of liability. *See D.L. v. District of Columbia*, 713 F.3d 120, 129 (D.C. Cir. 2013) ("We remand the case to the district court for reconsideration of whether a class, classes, or subclasses may be certified, and *if so*, thereafter to *redetermine* liability and appropriate relief." (emphasis added)). Furthermore, this is not the case it was prior to appeal: The District of Columbia's ("District's") system for identifying, locating, evaluating, and providing services to three- through five-year-olds who may be eligible for special education under IDEA ("child find system") has demonstrated marked improvement, and the operative legal landscape has dramatically changed.

---

[1] Plaintiffs' Motion also requests that the Court "postpone" consideration of their individual claims for compensatory education and reimbursement.

Plaintiffs' motion here fails on nearly every count it raises.  The four new sub-classes proposed by Plaintiffs do not satisfy Rule 23(a).  Commonality, the issue on which the Court of Appeals spoke most clearly, remains lacking.  In the context of the IDEA, where the harm alleged is "necessarily child specific," *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 498 (6th Cir. 2012), Plaintiffs would need to have identified a (singular) District policy or practice causing class- or sub-class wide harm.  *D.L.*, 713 F.3d at 129 (requiring identification of a "uniform policy or practice that affects all class members").  They have not done so.  Each of the subclasses purports to be centered on a variety of policies and procedures (including ones that are no longer in use by Defendants), the amalgamation of which, Plaintiffs claim, "tie[s] together the common claims of all subclass members."  Pls' Mot. for Class Cert. [Dkt. No. 358] at 34. But the combination of various policies is not sufficient to establish commonality in the manner the Court of Appeals (reading *Wal-Mart*) supposed:   *Only* a "uniform policy that affects all class [or sub-class] members," *D.L.*, 713 F.3d at 128, could conceivably provide the "glue" binding the class (or sub-class) members' claims.  *Wal-Mart*, 131 S. Ct. at 2552.

So, too, with typicality.  Absent a *singular* policy or practice underlying each proposed sub-class, Plaintiffs fail to establish commonality and also to show that their claims are typical of the sub-classes they seek to represent.  To the same end, the claims of the named Plaintiffs— each of which aged out of the Part B program years ago—cannot fairly be presumed to be typical of children subject to the District's current Part B program today, given that, beginning in 2009, the program was completely revamped and vastly improved.

Finally, adequacy of representation is defeated as to both named Plaintiffs and class counsel.  As Plaintiffs freely concede, the claims of the individual class members are moot, and they lack standing to seek injunctive relief regarding a system to which they will never be subject

to in their lifetimes.  Class counsel, on the other hand, admittedly lacks the financial resources to adequately represent the class.  *See Salazar v. District of Columbia*, No. 93-452, Doc. No. 1811-1 (Apr. 10, 2013) (noting that counsel's firm will soon "run out of operating funds").

Rule 23(b) certification also fails.  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2557 (2012) (citation omitted).  Because each of Plaintiffs' proposed sub-classes seeks to challenge multiple, independent policies, any combination of which could have caused a given sub-class member's alleged injury, *effective* relief within each sub-class would necessarily mean multiple, independent injunctions.  That result would run afoul of the Supreme Court's express requirement for (b)(2) certification:  "a single injunction or declaratory judgment would provide relief to each member of the class."  *Id.*

Further, the proposed sub-classes are not sufficiently definite to permit certification.  Each of Plaintiffs' proposed sub-classes is so unfocused and shifting that its contours are insufficiently defined.   Each of the foregoing deficiencies in Plaintiffs' proposal for re-certification—failure to comply with Rule 23(a) and (b) as well as failure to proffer a sufficiently definite class definition—provides a wholly independent basis for the denial of their Motion.

Additionally, no cause exists for the Court to postpone consideration of Rule 23(b)(3) certification until a later date, as Plaintiffs cannot satisfy the requirements of Rule 42 to justify bifurcation of the issue.  Rather, the Court should address the matter, and given Plaintiffs' failure to raise the issue and its past willingness to abandon claims for individual relief, it should find that Plaintiffs have waived (b)(3) certification as to any class or sub-classes.

Finally, the Court should not "reinstate" liability on Defendants, and it cannot issue a structural injunction on the current record.  Quite simply, this is not the case it was prior to appeal.  At this stage and under present circumstances, even if Plaintiffs' 23(b)(2) class were re-certified, "reinstating" liability would severely prejudice defendants, especially where, as here, the Court's findings of fact never identified any illegal policy or practice that purportedly affected all class members.  But, more importantly, issuing a generic structural injunction on stale evidence would constitute a gross abuse of discretion given the strength and success of the District's current Part B program.  In vacating liability the Circuit gave no indication that *reinstatement* of liability would be appropriate here, only that it could be "redetermined," based on the new sub-classes, provided that Plaintiffs could put forth ones that complied with Rule 23, which they have not been able to do.

## RELEVANT BACKGROUND

Certain aspects of the history of this case are uniquely relevant to the instant motion and bear repeating here.

## I.   PROCEDURAL HISTORY RELEVANT TO CLASS CERTIFICATION

Named Plaintiffs D.L., F.D., H.W., J.B., T.F., T.L., and X.Y., filed this case in 2005, seeking to reform the District's child find system.  *See* Compl. [Dkt. No. 1].  They sought systemic declaratory and injunctive relief, except in so far as they requested compensatory education and reimbursement for individuals whom the system had failed.  *See id*.  Their request for systemic relief was premised on the certification of a proposed class consisting of:

> All children who are or may be eligible for special education and related services, who live in, or are wards of, the District of Columbia, and (1) whom defendants did not identify, locate, evaluate or offer special education and related services to when the child was between the ages of three and five years old, inclusive, or (2) whom defendants have not or will not identify, locate,

> evaluate or offer special education and related services to when the
> child is between the ages of three and five years old, inclusive.

*Id.* at 26.  On August 25, 2006, the Court accepted their proposal verbatim and certified their claims.  Or. Granting Cert. Mot. [Dkt. No. 57].

The case proceeded as a class action for years thereafter, through exhaustive and burdensome discovery imposed on the District and correspondingly heavy motions practice, eventually resulting in partial summary judgment for Plaintiffs through 2007, *see* Or. Re. Mot. for Summ. J. [Dkt. No. 197], and, following a two-day bench trial, a finding of liability in their favor through April 6, 2011, *see* Memo. Op. & Final Or. [Dkt. No. 294-95].  Owing primarily to the manner in which the case had been prosecuted *ab initio*, the Court made no finding of liability with respect to any particular District policy or practice; rather the judgment in favor of Plaintiffs, reflected in the Court's Memorandum Opinion and Final Order dated November 16, 2011, announced only generic, systemic violations of applicable law.  *See id.*  The Court then entered broad declaratory relief and a "structural injunction," imposing on Defendants various "numerical requirements" as well as fifteen separate "programmatic requirements" governing distinct parts of the District's child find system.  Final Or. [Dkt. No. 295] at 2-7.

On April 12, 2013, those findings and the relief associated therewith were overturned by the District of Columbia Circuit as products of litigation that had been improperly predicated on an invalid class.  *See D.L. v. District of Columbia*, 713 F.3d 120 (D.C. Cir. 2013).  After vacating this Court's Certification Order as well as the orders finding liability and issuing relief to the class, the Court of Appeals "remand[ed] the case to the district court for reconsideration of whether a class, classes, or subclasses may be certified, and if so, thereafter to redetermine liability and appropriate relief."  *Id.* at 129.  The following passage of the opinion reflects the majority's view of the class certification issue on remand:

The plaintiffs appeared to recognize the problem with the currently certified class when, after *Wal-Mart* was issued, they moved to add four sub-classes consisting of children whom the District had failed to: (1) identify or locate for services; (2) provide with a timely initial evaluation; (3) provide with a timely eligibility determination; and (4) provide with a "smooth and effective" transition from Part C to Part B. *See* Plaintiffs' Mm. Of Law in Support of Their Mot. for Class Re-Cert. In effect, the plaintiffs were suggesting that they could show as to each subclass that the harm caused by the District's failures stemmed from a policy or practice that would provide a basis for the requested injunctive and declaratory relief. The district court never reached this question. Nor do we.

*Id.* at 128. That very question—whether plaintiffs can, in fact, show as to each subclass that the harm caused by the District's failures stemmed from a policy or practice that would provide a basis for the relief they seek—is now before the Court. *See* Pls' Mot. [Dkt. No. 358].

## II. THE DISTRICT'S CHILD FIND SYSTEM

The District's child find system was indeed performing unsatisfactorily at the time Plaintiffs filed suit in 2005. At the time that the Court issued its Memorandum Opinion and Final Order extending liability through April 6, 2011, however, the system already had improved dramatically. The percentage of three- to five-year-olds served under the IDEA had gone from 2.97% in 2007 to 4.62% in 2010, and had reached 7% at the time of trial in April 2011. *See* Memo. Op. Re. Mot. for Summ. J. [Dkt. No. 198] at 15-16; Pls' Resp. to Ct. Or. [Dkt. No. 209] Att. 1 at 9; Decl. of Dr. Nathanial Beers [Dkt. No. 279-1]. The number of referrals of children for evaluation had also increased each year, from 528 in 2008 to 728 in 2009 and 1,195 for the partial year 2010, and the percentages of children timely processed (evaluation and eligibility determination) went from 41.44% in 2008 to 68.43% in 2009 and to 55.23% in 2010. *See* Pls' Resp. to Ct. Or. [Dkt. No. 209] Att. 2 at 7-8. Even the Court acknowledged Defendants'

progress since the filing of the Complaint, though it expressed concern with the durability of the reform. *See* Memo. Op. [Dkt. No. 294] at 8-9.

By year's end 2012, the District's child find system had progressed further still. The percentage of pre-school-aged children served under the IDEA increased markedly to 8.78% exceeding the national average as well as the relevant numerical benchmark set by the Court. *See* Defs' Dec. 1, 2012 Report [Dkt. No. 356-1] at 1. So too the percentage of children timely processed grew, reaching 87.56%. *Id.* And the number of children "smoothly and effectively" transitioned from the Part C Program (infants and toddlers with disabilities) to the Part B Program (all children with disabilities) increased dramatically to 73.61% from 13.16% the previously year. *Id.* Defendants also demonstrated substantial, if not outright, compliance with the "programmatic requirements" imposed by the Court. *See id.* at 2-6.

Since that time, Defendants' performance only continues to improve. As of July 1, 2013, the percentage of three- to five-year-olds served under the IDEA is 8.83%. *See* Office of the State Superintendent on Education ("OSSE") Report, attached as Exhibit 1. Furthermore, as reflected in the data submitted by OSSE to the federal Office of Special Education Programs ("OSEP") for the period of January 1- March 31, 2013, the percentage of children receiving timely evaluations and eligibility determinations was 96.91%. *Id.* For the same period, 100% of eligible Part C graduates received timely transitions to the Part B Program. *Id.* Each of those figures exceeds the pertinent numerical benchmark set by the Court in its Final Order dated November 11, 2011. *See* Final Or. [Dkt. No. 295] at 2-4.

## ARGUMENT

Plaintiffs have moved this Court to recertify their injunctive and declaratory relief claims pursuant to Rule 23(b)(2), "postpone" their individual claims for compensatory education and

reimbursement, and "reinstate" liability and injunctive relief.  *See* Pls' Mot. [Dkt. No. 358].  It is

Plaintiffs' burden to justify these requests.  *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160

(1982) (class certification); *Halkin v. Helms*, 690 F.2d 977, 1006 (D.C. Cir. 1982) (equitable

relief).  On the *present* record and according to *governing* law, they have failed to carry their

burden with respect to each, and their Motion must be denied accordingly.

I.  PLAINTIFFS HAVE NOT PROPOSED CLASSES CAPABLE OF CERTIFICATION
    UNDER FED. R. CIV. P. 23

Rule 23 enumerates the criteria for the certification of a class action under the Federal

Rules of Civil Procedure, and the party seeking certification at all times bears the burden of

demonstrating "actual, not presumed" compliance.  *See Falcon*, 457 U.S. at 160.  Generally, to

warrant certification, a proposed class must comply with all four prerequisites of Rule 23(a) and

fit one of the categories of Rule 23(b).  1 Newberg on Class Actions § 1:2 (5th Ed. 2013).

Additionally, the putative class must be sufficiently "definite," *i.e.*, ascertainable by reference to

objective criteria, *see Bynum v. District of Columbia*, 217 F.R.D. 43, 46 (D.D.C. 2003)

(Lamberth, C.J.) (class membership must be determinable "simply by reading the definition"),

and class counsel must meet the requirements of Rule 23(g).  For the reasons set forth herein,

Plaintiffs have failed to demonstrate compliance with Rule 23 in each of the foregoing regards.

A.  Plaintiffs Have Not Demonstrated Compliance With Rule 23(a)

Rule 23(a) expressly limits class actions to those cases in which the proposed class

representative demonstrates that:

> (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law or fact common to the
> class; (3) the claims or defenses of the representative parties are
> typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the
> interests of the class.

*Id.* at (a)(1)-(4).   Certification of a class is only proper "if 'the trial court is satisfied, after a rigorous analysis, that [each of the four] prerequisites of Rule 23(a) have been [met].'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Falcon, supra*).

As the Court of Appeals rightly acknowledged, the crux of the class certification issue in this case is commonality under Rule 23(a)(2).  *See D.L.*, 713 F.3d at 126-28 (vacating certification order for failure to satisfy commonality requirement).   Even with the benefit of hindsight, however, Plaintiffs have failed to propose a single class (or combination of sub-classes) that satisfies the commonality requirement in the manner that *D.L.* (interpreting *Wal-Mart*) requires.   But Plaintiffs' Certification Motion is deficient under Rule 23(a) in yet further respects: Plaintiffs have failed to demonstrate that their claims are typical of the putative class or that they will adequately represent the class as required by Rule 23(a)(3) and (a)(4), respectively. These arguments are addressed in turn.

1. Rule 23(a)(2): Plaintiffs Have Failed To Propose A Single Class That Satisfies The Commonality Requirement In The Manner *Wal-Mart* Requires

Rule 23(a)(2) provides that a class action is only an appropriate litigation device where "there are questions of law or fact common to the class."  Since *Wal-Mart*, the showing of commonality required under Rule 23(a)(2) is a common contention that, if proven or disproven, will resolve an issue central to the claims of every class member.   As the Court of Appeals summarized:

> [U]nder Rule 23(a)(2), the plaintiffs' claims must depend upon a common contention that is of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.  This does not mean merely that class members have all suffered a violation of the same provision of law, for what matters to class certification is not the raising of common questions, but, rather the capacity of a class-wide

> proceeding to generate common *answers* apt to drive the resolution
> of the litigation.

713 F.3d at 125 (quotations omitted to *Wal-Mart*, 131 S. Ct. at 2551). Thus, the Court of Appeals explained, to present a common question of *that* nature in the context of *this* case (i.e. where the harm alleged is "necessarily child specific," *Jamie S. v. Milwaukee Pub. Sch.,* 668 F.3d at 498), Plaintiffs would need to identify a (singular) District policy or practice causing class- or sub-class- wide harm. *See e.g., id.* at 127 ("the district court identified no single or uniform policy or practice that ridges all their claims").[2] Nothing short of that showing could provide the "glue" binding the class (or sub-class) members' claims. *Wal-Mart*, 131 S. Ct. at 2552.

Plaintiffs' proposal falls far short of this requirement. Rather than identifying a *singular* policy or practice underlying any of their proposed sub-classes, they now seek to challenge four general administrative functions within the District's broader child find system, *i.e.*, "identification, evaluation, eligibility determination, and transition." *See e.g.*, Pls' Mot. [Dkt. No. 358] at 21. But within each proposed sub-class—within each general administrative function—they point to an amalgamation of District policies and procedures, any combination of which may (or may not) have injured any particular putative sub-class member. This approach is hardly distinguishable from that which they have pursued from the outset, flatly ignores the

---

[2] There can be no doubt that a *singular* policy or practice, rather than an amalgamation of multiple, disparate policies or practices, is what the Court of Appeals intended. *See id.* at 127-28 ("in view of *Wal-Mart*'s interpretation of Rule 23(a)(2) commonality . . . '[t]he plaintiffs' claims appear to be based on multiple, disparate failures to comply with the [District's] statutory child find obligations rather than a truly systemic policy or practice which affects them all'"), 128 ("the plaintiffs were suggesting that they could show as to each subclass that the harm caused by the District's failures stemmed from a policy or practice that would provide a basis for the requested injunctive and declaratory relief), (quoting *Jamie S., infra*, alterations in original), 129 ("[t]he District's challenge to the certified class thus does not rule out the possibility of classes or subclasses that are designed around a policy or practice that links the class as a whole"),130-31 (Edwards, J., concurring) (*Wal-Mart* surely does not foreclose a class action to challenge a city policy that effectively precludes protected parties from even being considered for benefits that would otherwise be available . . . the District Court [should] understand that it will be free to certify a class or sub-class if it determines that a *single policy or practice* effectively forecloses disabled children in that class or subclass from pursuing IDEA benefits"), 131 (Edwards, J., concurring) ("[a]n illegal policy or practice affecting all class members would provide the 'glue' necessary to litigate otherwise individualized claims as a class").

instruction of the Court of Appeals, *see* fn. 2, *supra* (and corresponding text), and, in any event, clearly does not comport with *Wal-Mart's* commonality standard.  Indeed, as discussed in greater detail below, there are a plethora of reasons why any single child might not be identified, evaluated, determined eligible for services, or transitioned appropriately, but without "some glue holding the alleged *reasons* . . . together," commonality under Rule 23(a)(2) is lacking.  *Id.* at 2552.  Plaintiffs' pending request for re-certification fails Rule 23(a)(2) as to each proposed sub-class, and their Motion must be denied without more.

i.   Sub-Class 1: Identification

Commonality is lacking for Class 1 because the named Plaintiffs have not shown that all the purported failures to identify preschool children shared a common contention within the meaning of *Wal-Mart*.  As a common contention, Plaintiffs offer only that "by failing to have policies and procedures to ensure the identification of disabled children, defendants violate IDEA[.]"  Pls' Mot. [Dkt. No. 358] at 14.  The general reference to "policies and procedures" is fatal for Plaintiffs' position in that it is the same generalized approach rejected by the D.C. Circuit.  *Wal-Mart* is not satisfied merely by proffering "the bottom-line liability question in any individual plaintiff's IDEA claim."  *Jamie S.*, 668 F.3d at 497.  "Child-find inquiries, like other aspects of the IDEA, are necessarily child specific."  *Id.* at 498; *see also Dykes v. Dudek*, 2011 WL 4904407 (N.D. Fla. Oct. 14, 2011) (declining to certify class of "individuals with developmental disabilities who are eligible to receive Medicaid" after *Wal-Mart*).

There is no reason to think, and Plaintiffs have never proven, that *all* failures to "identify" eligible three- through five-year-olds share anything meaningful in common other than the bottom-line conclusion that these children were not identified.  Aside from the fact that there are many parts in the administrative machinery by which children are identified, there is the

fact that the identification requirement applies to children with a great variety of disabilities and in a great variety of factual settings.  The disabilities span "sensory, emotional, physical, cognitive or language" disabilities, Pls' Mot. to Cert. [Dkt. No. 5] at 1, in children who may be in widely-disparate socioeconomic circumstances within the District, or may even be wards of the District located somewhere else.

Indeed, Plaintiffs concede this fact as they identify "public awareness and outreach activities" as but one component of the many identification policies and procedures used by the District to comply with its IDEA obligations.  Pls' Mot. [Dkt. No. 358] at 17.  Moreover, Plaintiffs acknowledge that the public awareness and outreach activities—which themselves are but one component of identification—are comprised of multiple separate policies, any one of which could be an independent basis of why a child was not identified.  *Id.*  Specifically, they cite to the following: (1) failures to provide for publication of printed materials targeting parents and guardians regarding services[3], (2) failures to provide for distribution of tailored materials targeted at primary referral sources[4], (3) failures to have a system to track primary referral sources[5], (4) a *former*[6] policy under which referral from primary sources could not be accepted

---

[3] In support of this purportedly current policy, Plaintiffs cite to Dr. Dunst's trial testimony discussing the "District's Child Find Program from 2008 to June 2009[.]"  Pls' Mot. [Dkt. No. 358] at 27.  This is not evidence of a current policy.  It completely predates the successful administrative overhaul overseen by Dr. Beers, which began in late 2009.

[4] Plaintiffs cite to two pieces of evidence in support of their contention that this is a current policy, Dr. Dunst's Recommendations for Creating an Effective Child Find System and his 2009 expert report discussing policies in place in 2007 and 2008.  Pls' Mot. [Dkt. No. 358] at 27.  Evidence submitted at trial and in the District's post judgment reporting established that the District already provides printed materials targeted at primary referral sources to inform them of the preschool special education services available from DCPS and how to make a referral.  *See e.g.*, 4/6 Trial at 196:23; Dkt. No. 333-1 at 2-3; Dkt. No. 356-1 at 2-3.

[5] Plaintiffs cite to testimony from their expert discussing data systems in 2008 and 2009, not the data systems used by the District currently.  *Compare* Pls' Mot. [Dkt. No. 358] at 27. *with* Dkt. 333-1 at 7-9, Dkt. No. 356-1 at 6.

[6] Plaintiffs acknowledge that this is not a current policy.  Class certification here would be certainly be improper if based on policies that no longer exist.

and acted on, and (5) failures to implement tracking systems capable of identifying all children with suspected disabilities[7].  *Id.*  Not only do Plaintiffs rely on antiquated evidence and policies that no longer exist to support their position, they do not even attempt to argue that any one of the multiplicity of identification policies at play is a "uniform [identification] policy or practice that affects all class members[,]" *D.L.*, 713 F.3d at 129, as to do so is impossible.  The fact that so many separate, independently operating policies exist at the identification process underscores the fact that no commonality exists under proposed Class 1.  *See also Lightfoot v. District of Columbia*, 273 F.R.D. 314 (D.D.C. 2011) (refusing certification where plaintiffs sought "to conflate a wide variety of practices and impute them to the class as a whole by collecting them under a single, unilluminating umbrella of 'systemic' failures").

    ii.  Sub-Class 2: Timely Evaluations

    Plaintiffs' second proposed class suffers from the same failures regarding commonality in that they persistently rely on indefinite and generalized "policies and procedures" without articulating the "particular policy or practice that link(s) all claims" of the class members.  *D.L.*, 713 F.3d at 129.  Instead, they assert that commonality exists because "members allege that [Defendants failed] to put policies and procedures in place to ensure timely evaluations of all preschool-aged children[.]"  Pls' Mot. [Dkt. No. 358] at 30.  This assertion—which lacks identification of *any* "uniform policy or practice that affects all class members[,]" *D.L.*, 713 F.3d at 129—is patently insufficient to comport with the D.C. Circuit's mandate.

    Again, Plaintiffs cite to multiple, different policies and procedures (most of which are past procedures, *see* Dkt. Nos. 333-1; 356-1) that affect different class members rather than a "particular policy or procedure" that is "uniform" to all class members.  *Id.*  Specifically, they

---

[7] *See* n. 5, *supra.*

identify the following: (1) use of the same intake and screening procedures[8] to process all referrals and (2) use of informal and unstructured play-based observations as part of the screening process,[9] Pls' Mot. [Dkt. No. 358] at 31-32, yet they do not claim—as doing so is impossible—that *both or even one* of those two policies  resulted in all children failing to receive timely evaluations.  Indeed, Plaintiffs' citation to "expert testimony regarding the necessary components [plural] of a comprehensive Child Find system that would ensure timely evaluations," Pls' Mot. [Dkt. No. 358] at 32, is a conspicuous concession that multiple components of a system are necessary to ensure timely evaluations.  In other words, there is not a single policy or procedure that has resulted in failure to timely evaluate all purported class members – and Plaintiffs point to none.

As a result, there is no "glue" holding together putative Class 2.  *Wal-Mart*, 131 S.Ct. at 2552.  To certify this class, the Court must identify a "particular policy or practice that link[s] all claims" of the purported class members.  *D.L.*, 713 F.3d at 129.  Yet, Plaintiffs' proffered common claims continue to "be based on multiple, disparate failures to comply with the [District's] statutory child find obligations [here regarding evaluation] rather than a truly systemic policy or practice which affects them all[.]"  *Id.* at 128 (quoting *Jamie S.*, 668 F.3d at 504-05).  Plaintiffs' obligation on remand was to identify some single policy or practice that was common to all class members, but they have chosen to assert that a variety of failures resulted in a common systemic deficiency.  This is contrary to the holding of the Court of Appeals.  *Id*. Commonality does not exist among members of Class 2, and it should not be certified.

---

[8] Plaintiffs' evidence of this purportedly "common" and supposedly current policy of Defendants comes from a 2009 expert report from Plaintiffs regarding policies and procedures that were in place in 2007 and 2008.  As was demonstrated at trial and in Defendants' reports to the Court, this policy no longer exists.

[9] Plaintiffs' evidence in support of this purportedly "common" and supposedly current policy of Defendants comes from a 2009 expert report discussing policies in place in 2007 and 2008 and from Plaintiffs' Child Find expert's written testimony discussing policies in place in 2008 and 2009.  This is not evidence of a current policy.

### iii.  Sub-Class 3: Timely Eligibility Determinations

Plaintiffs' proposed Class 3, regarding the failure to make timely eligibility determinations, lacks commonality for the same reasons as do the other proposed classes.  They continue to rely on multiple policies and procedures and assert that they establish commonality collectively.   Specifically, Plaintiffs assert that the following policies and practices are implicated by Class 3: (1) the "practice of 'regularly conduct[ing] unnecessary multi-disciplinary evaluations [MDE] of children with identified conditions and disabilities' to determine eligibility[;]"[10] (2) "the District's failure to consider available diagnostic assessments by professionals from other credible programs and organizations that were sufficient to establish eligibility without an MDE[;]"[11] (3) "inadequate 'decision-making guidelines for determining when a child does and does not need an MDE for eligibility determination'[;]"[12] (4) "the use of a centralized location for assessments that is inconvenient for parents[;]"[13] and (5) the use of a purportedly inadequate data system.[14]

Plaintiffs assert in conclusory fashion that these various policies "tie together the common claims of all subclass members."  Pls' Mot. [Dkt. No. 358] at 34.  But, again, even if

---

[10] Again, Plaintiffs' evidence in support of this purportedly "common" and supposedly current policy of Defendants comes from a 2009 expert report discussing policies in place in 2007 and 2008 and from Plaintiffs' Child Find expert's written testimony discussing policies in place in 2008 and 2009.  This is not evidence of a current policy.

[11] This supposedly "common" and current policy comes from Plaintiffs' expert's 2009 report discussion policies in place in 2007 and 2008.

[12] This supposedly "common" and current policy also comes from Plaintiffs' expert's 2009 report discussion policies in place in 2007 and 2008.

[13] Plaintiffs' evidence in support of this purportedly "common" and supposedly current policy of Defendants comes from a 2009 expert report discussing policies in place in 2007 and 2008 and from Plaintiffs' Child Find expert's written testimony discussing policies in place in 2008 and 2009.  This is not evidence of a current policy, as the District currently operates the main facility—which is centrally located—and a satellite office east of the Anacostia River that is directly adjacent to a Metro stop.  Dkt. No. 333-1 at 5.

[14] As evidence on this point, Plaintiffs cite to use their expert's discussion of the ENCORE data system, but this cannot be common among all class members nor can it be evidence of a common policy of Defendants sufficient to justify forward looking injunctive relief.   In 2009, the District mandated use of the SEDS data system by all schools, and all schools were transitioned to this system by the end of the 2010-2011 school year.  Dkt. No. 331-8.

these policies still existed, which they do not, their amalgamation is not sufficient to establish commonality without a "uniform policy or practice that affects all class members." *D.L.*, 713 F.3d at 128.  Plaintiffs' motion fails to claim that any one of the five policies they chose to identify is the reason for every class member's failure to receive a timely eligibility determination.  This is because the IDEA process is too complicated, involving too many moving parts, to permit certification of the expansive class definitions sought by Plaintiffs.  Commonality does not exist for Class 3; certification should therefore be denied.

      iv.  Sub-Class 4: Smooth And Effective Transitions

      The final class proposed by Plaintiffs is one centered on the purported failure to ensure smooth and effective transition of children from Part C to Part B.  *See* 20 U.S.C. § 1412(a)(9).  As with the other proposed classes, Plaintiffs have failed to provide "identification of a policy or practice that affects all members of the class in the manner *Wal-Mart* requires[.]"  *D.L.*, 713 F.3d at 126.  They attempt to satisfy commonality by identifying multiple policies and procedures that may apply in the course of transitioning a child from one administrative regime to another, without establishing that any one policy or practice affected all proposed class members.

      Instead, Plaintiffs again point to multiple policies that are at play in the past failures to provide timely transitions.  First, Plaintiffs cite to a policy of "'not us[ing] the assessment results provided by Part C to determine eligibility for Part B' and instead 'starting the eligibility determination over from scratch,' which delayed eligibility determinations and prevented smooth and effective transitions[.]"[15]  Pls' Mot. [Dkt. No. 358] at 36.  Second, they identify a supposed "lack of coordination between Part C and Part B programs that 'utilizes agreed upon transition assessment practices and a method for sharing and accepting information that would establish

---

[15] Plaintiffs' evidence in support of this purportedly "common" and supposedly current policy of Defendants comes from a 2009 expert report discussing policies in place in 2007 and 2008.  This is not evidence of a current policy.

eligibility for a child who is in obvious need for special education[.]'"[16]  *Id.*  Finally, Plaintiffs assert that "defendants' [2007 and 2008] misunderstanding and misapplication of the definition of eligibility for Part B services" contributed to some children's failure to receive a smooth and effective transition.[17]  *Id.*

*Wal-Mart* and *D.L.* require Plaintiffs to identify "a particular policy or practice that link[s] all claims" of the class members, *D.L.*, 713 F.3d at 129, and they have failed here. Plaintiffs do not, and cannot, argue that any one of these policies—much less all three—was the common cause of the injury to all class members.  Nor could they, as the IDEA itself requires different parts of a complex administrative system to work together, in that it requires a "smooth and effective" transition from the Part C program administered by the District's Office of the State Superintendent of Education to the Part B program administered by DCPS.  Subsection (9) of Section 1412(a) does not speak to a unitary, simple function but instead to a complicated set of related but distinct requirements that two agencies administer.

> v. Plaintiffs' Sub-Classes Fail To Account For The Variety Of Disabilities Of The Putative Class Members, Which Is Itself Evidence That There Is No Commonality Under *Wal-Mart*

Plaintiffs' also subclasses fail to account for the conditions of the putative class members, or how the IDEA process addresses their unique disabilities.  As the Seventh Circuit noted:

> [I]dentifying disabled students who might be eligible for special education services is a complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria.  Every step of the child-find inquiry and IEP process under the IDEA is child specific and requires the application of trained and particularized professional education judgment.

---

[16] Plaintiffs' evidence in support of this purportedly "common" and supposedly current policy of Defendants comes from a 2009 expert report discussing policies in place in 2007 and 2008.  This is not evidence of a current policy.

[17] Plaintiffs' evidence in support of this purportedly "common" and supposedly current policy of Defendants comes from a 2009 expert report discussing policies in place in 2007 and 2008.  This is not evidence of a current policy.

*Jamie S.*, 688 F.3d at 496.   Plaintiffs here describe themselves as having "sensory, emotional, physical, cognitive, developmental, or language disabilities."   Pls' Proposed 2d Am. Compl. [Dkt. No. 359-1] at ¶ 2.   Yet they do not address, much less resolve, how their proposed classes account for this variation.   *Cf. Blackman*, 633 F.3d at 1094 (Brown, J., concurring) ("a degree of cohesion will exist in almost any putative class.   But this does not mean it is prudent to generalize to such a degree, especially when IDEA operates from the premise that each child will have unique disabilities and presumes that each program will be personalized").

It may be possible for some of the individual members to fairly assert one or more of these disabilities.   It is difficult to credit, however, that the obvious variety characterizing each of these disabilities may be glossed over by using the term "disability" as a common characteristic of all members of the would-be subclass.   Again, the onus is on Plaintiffs to identify the "glue" binding the IDEA claims of a child with a speech impediment living in Northwest DC with that of a child suffering from cognitive delay and living in the Southeast.   *See Wal-Mart*, at 2552. This has not—and cannot—be done, if for no other reason, than because their individual circumstances make their claims inherently unique.

> i.   Plaintiffs' Reliance On *McReynolds* And *Gray* Is Misplaced; Both Decisions Further Underscore Lack Of Commonality Here

Plaintiffs cite several opinions from other circuit courts of appeals in support of their request for certification of sub-classes.   Those decisions—*McReynolds* and *Gray*—are indeed instructive.   But they underscore, not excuse, the Plaintiffs' lack of commonality.

In *McReynolds v. Merrill Lynch*, for example, the Seventh Circuit (per Posner, J.) reviewed a lower court's denial of class certification pursuant to Rule 23(c)(4) and (b)(2) of a plaintiff-class consisting of some 700 African-American *Merrill Lynch* employees alleging that two employment policies resulted in an unlawful disparate impact on their advancement.   672

F.3d 482, 483 (7th Cir. 2012).  Even a cursory review of the *McReynolds* opinion reveals that the class it approved was markedly different from those which Plaintiffs propose here.  *Id.* at 488-89. To be sure, the *McReynolds* plaintiffs had identified two *specific*, universally-applicable employment policies that they sought to challenge, and each of the putative class members asserted an injury flowing directly from the policies (i.e. from the same action of the defendant). *Id.*  Thus, in *McReynolds*, each of the putative class members were not only allegedly harmed by the defendant (their employer), but they were harmed (if at all) for the same reason.  *Id.* at 489. That is not to say that they suffered precisely the same injury or to the same extent (indeed, damages could be appropriately determined on an individual basis).  *Id.* at 492.  But for each putative class member, the alleged injury stemmed from precisely the same action—being subjected to one or both of defendants' unconstitutional policies, which they all were during the course of their employment.  *Id.* at 489.  The question of the policies' constitutionality was therefore "common" under *Wal-Mart*, and class certification was therefore appropriate under Rule 23.  *Id.*

Unlike the class in *McReynolds*, Plaintiffs' proposed sub-classes present no single common contention.  Unlike *McReynolds*, whether Defendants' numerous policies and practices governing identification, evaluation, eligibility determinations, and transition from Part C to Part B violate the IDEA says absolutely nothing about whether or how any particular putative sub-class member was harmed or by whom or in what manner, *i.e.*, by which *specific* administrative mechanism or *specific* policy or *specific* procedure.  Plaintiffs' "common contentions" therefore are precisely the sort of superficial issues rejected by *Wal-Mart* and in fact differ little (if at all) from those rejected by the Court of Appeals.  It bears repeating that whether all class members were harmed (even in the same way) or "suffered a violation of the same provision of law,"

without more, is plainly not enough.  *See id.* at 2551 (explaining that it does not suffice under Rule 23(a)(2) to recite questions like: "Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get?"); *D.L.*, 713 F.3d at 128 ("*Wal-Mart* instructs that holding that the District has violated the IDEA as to each class member is not enough . . .").

*Gray v. Hearst Comm., Inc.*, also cited by Plaintiffs, does not help their cause.  444 Fed. Appx. 698 (4th Cir. 2011).  In *Gray*, the Fourth Circuit upheld a lower court's certification of a plaintiff-class consisting of advertisers who had entered into advertising contracts with the defendant, a publisher and distributor of regional telephone directories.  *Id* at 699.  The crux of the plaintiffs' claim was that the defendant had induced the advertising contracts with false misrepresentations as to the extent/scope of the distribution of its directories.  *Id.* at 700. Importantly, the defendant freely conceded that its representations regarding distribution (and corresponding business obligations) were uniform across the plaintiff-class, *i.e.*, each class member was promised the same thing at the time of contracting with the defendant.  *See id.* at 701-02.  On those facts, the Fourth Circuit concluded that class certification of the plaintiffs' claims for breach of contract and related business torts was appropriate because a determination of whether the defendant's actual distribution of telephone directories diverged from its representations regarding distribution would resolve liability as to each class member in a single stroke.  *Id.* at 701.  Of course, that conclusion depended upon the fact that "the putative class members all assert[ed] injury from [exactly] the same action (i.e. failure by [the defendant] to follow its standard distribution practice)."  *Id.*

Compare the sub-classes proposed by Plaintiffs here.  Again, unlike the class in *Gray*, even within Plaintiffs' sub-classes they do not allege that the harm they each claim to have

suffered flows from the same action by Defendants.   By way of illustration, consider the "common question" proposed by Plaintiffs within each sub-class:   "Whether defendants' policies, procedures, and practices regarding identification of disabled children for the purposes of offering special education and related services fail to ensure that pre-school aged disabled children are identified."  Pls' Mot. [Dkt. No. 358] at 28.[18]  While it is true that such a broad, generic question relates in some way to each individual putative sub-class member, the *reason* each individual sub-class member was not identified (or evaluated, or determined eligible for services, or transitioned appropriately) will ultimately need to be resolved separately for each plaintiff based on an individualized assessment of the child's circumstances. No singular action or practice is identified.   There is no "glue," and there is thus no commonality under Rule 23(a)(2).

> ## 2. Rule 23(a)(3): Plaintiffs Have Failed To Demonstrate That Their Claims Are Typical Of The Putative Class(es)

Rule 23(a)(3) requires that a class action may be maintained only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  *Accord Johnson v. District of Columbia*, 248 F.R.D. 46, 53 (D.D.C. 2008) ("The typicality requirement is satisfied if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members").   In essence, this typicality requirement "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart*, 131 S. Ct. at 2550.   Named Plaintiffs' here are not

---

[18] Each of Plaintiffs' proposed sub-classes uses a slight variation of this exact question, referring to it as "common" in each instance.  *See* Pls' Mot. [Dkt. No. 358] at 31, 33, 35.  Plaintiffs also refer to the "common question," within each sub-class, of "Whether defendants have grossly departed from accepted educational practices and have knowingly failed to comply with their obligations under IDEA . . . ."  *See id.* at 28, 31, 33, 25.  Of course, as noted above, whether all class members "suffered a violation of the same provision of law," the Rehabilitation Act or the IDEA, for example, without more, is plainly not enough to demonstrate commonality.  *See id.* at 2551.

appropriate representatives of any class or sub-class they propose; their claims are not typical of the putative class (or sub-class) members in any meaningful sense.

Plaintiffs' proposed sub-classes fail to satisfy Rule 23(a)'s typicality requirement for largely the same reasons they fail to show commonality in the manner *Wal-Mart* requires. *See id.* at 2551 n.5 ("the commonality and typicality requirements of Rule 23(a) tend to merge"). Indeed, within each sub-class, Plaintiffs' claims are only typical in so far as one accepts that every single child who is failed by one of four general administrative functions within the District's child find system was harmed for the same *reason* or in the same way.    That proposition is untenable.  *See supra* at 9-18.  As with IDEA claims generally, each class members' alleged harm necessarily turns on its own merits, *see Jamie S.*, 668 F.3d at 498, not on whether he or she was not identified, evaluated, determined eligible, or transitioned, in a general sense.[19]

This is especially true given the passage of time and corresponding change in the District's child find system.  Although typicality may be found when class members suffer a variety of injuries, the cause of the injuries must be a common wrong.  *In re Prudential*, 148 F.3d at 312.  Plaintiffs were each born between 1998 and 2002, *see* Compl. [Dkt. No. 1] at 3-14, and suffered injuries as a result of an administrative regime in place when they were three- to five-years old.  The District's Part B Program has changed significantly since that time, *see supra* at

---

[19] The Sixth Circuit's analysis in *Young v. Nationwide Mutual Ins. Co.*, on which Plaintiffs principally rely in support of a finding of typicality here, in fact emphasizes the fundamental flaw in their proposed sub-classes.  693 F.3d 532 (6th Cir. 2012).  In *Young*, the Court was satisfied that commonality and typicality existed for classes of insurance policy-holders to pursue class claims against their insurers for recovery of alleged overpayments.  *Id.* at 542-43.  But the finding of commonality and typicality in *Young* was appropriate because the plaintiffs had identified, "a single practice or course of conduct on the part of each Defendant," which, if implemented by the defendants, would have prevented both the harm alleged by the plaintiffs as well as the harm of the class members *generally*, nuances in their individual claims notwithstanding.  *See id.* at 543.  In other words, the "single practice or course of conduct" in *Young* affected every class member, and whether it was implemented (or not) weighed directly on the liability question for each class member's claim.  *See id.*  The class representatives' claims were thus typical in a meaningful sense.  Unlike the plaintiffs in *Young*, Plaintiffs' here have not identified any *single* policy or practice that, if implemented (or not implemented) would have prevented the harm alleged in each sub-class.

6-7, and their claims cannot fairly be presumed typical of three- to five-year-olds who may not be identified, evaluated, determined eligible, or transitioned appropriately today.  Their injuries have no common origin, and their claims are thus not typical in any meaningful sense.

> 3. Rule 23(a)(4): Plaintiffs Have Failed To Demonstrate That They Will Adequately Represent The Putative Class(es)

Rule 23(a)(4) provides that class certification is only appropriate if "the representative parties will fairly and adequately protect the interests of the class."  Generally speaking, the adequacy-of-representation requirement means "that (1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel."  *Bynum*, 217 F.R.D. at 47 (internal quotations and citation omitted).[20]  This requirement in particular must be stringently applied because members of the proposed class may be bound by the outcome of class litigation even though they are unaware of the proceedings.  *See Albertson's Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463-64 (10th Cir. 1974); *accord* 1 Newberg on Class Actions § 3:51 (5th Ed. 2013) (discussing Due Process concerns implicated by class action litigation in context of typicality requirement).  And when a named plaintiff's claim is moot, it makes his representation presumptively inadequate unless the defendant has procured mootness of the plaintiff's claim as part of its underlying strategy.  *See Culver v. City of Milwaukee*, 277 F.3d 908, 912 (7th Cir. 2002).

Plaintiffs here are not adequate class (or sub-class) representatives.  As an initial matter, none of them have live IDEA claims, a fact that they freely concede.  *See* Pls' Opp. to Defs' Mot. to Dismiss [Dkt. No. 369].  And as noted above, the injuries they claim to have suffered occurred nearly a decade ago as a result of an administrative regime that is no longer in place.

---

[20] Concerns about the adequacy of class counsel are addressed *infra* at 33-34 (discussing 23(g) requirements) and are not repeated here.

*See supra* at 6-7.  The reality is that the named Plaintiffs have nothing at all to gain or lose from the future outcome of this case: They have no interest in any possible class relief since their individual claims have long been moot; they cannot demonstrate any cognizable interest in the equitable remedy they seek because at ages 10 through 15 they are in no danger of losing special education services to which they are entitled under the District's IDEA Part B Program. Plaintiffs are little more than "curious onlooker[s]," *Culver*, 277 F.3d at 912, and they cannot adequately prosecute the interests of the unnamed members of the class (or sub-classes) they seek to represent.[21]

### B.  Plaintiffs Have Not Demonstrated Compliance With Rule 23(b)(2)

*Wal-Mart* addressed Rule 23(b)(2), holding that it did not authorize a class to seek individualized backpay awards.  131 S.Ct. at 2557.  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Id.* (quoting Nagareda, 84 N.Y.U. L. Rev. at 132).  A (b)(2) class thus may be certified "only when a single injunction or declaratory judgment would provide relief to each member of the class," and may not be "when each individual class member would be entitled to a *different* injunction or declaratory judgment."  *Id.*  "[T]he relief sought must … affect the entire class at once."  *Id.* at 2558.  Plaintiffs have not satisfied this requirement.

---

[21] Defendants have indeed pointed to the named Plaintiffs' lack of standing as but one of several jurisdiction grounds to dismiss this case.  *See* Defs' Motion to Dismiss [Dkt. No. 365].  There is no injunctive or declaratory relief this Court could give the seven named Plaintiffs under the umbrella of a class action to "redress" ongoing injuries.  *See Chang v. United States*, 783 F. Supp. 2d 83, 85-86 (D.D.C. 2010 ("The existence of a policy, by itself . . . cannot substitute for a showing that a plaintiff faces a real threat that the policy will again be applied *to him*." (emphasis in original)).

1.  Contrary To What Rule 23(b)(2) Requires Under *Wal-Mart*, No Indivisible Injunction Will Remedy All Class Members' Claims

Plaintiffs seek to certify four classes of Plaintiffs, seeking to re-impose the systemic injunction issued by the Court in November 2011, and subsequently vacated by the D.C. Circuit. Obviously, living in an alternative universe, Plaintiffs incredibly state that "nothing has occurred since trial that should cause the Court to reconsider its … injunctive relief." See Pls' Motion [Dkt. No. 358] at 52-55.  The 2011 injunction, which created a sweeping and intricate structural remedy, does not justify (b)(2) certification because it is neither indivisible nor designed to resolve the claims of the class members of the four putative classes "in one stroke."  *Wal-Mart*, 131 S. Ct. at 2551; *see also Casa Orlando Apartments, Ltd. v. Fed Nat'l Mortg. Ass'n*, 624 F.3d 185, 198 (5th Cir. 2010) ("[Rule 23(b)(2)] seeks to redress what are really group as opposed to individual issues.  The uniformity of the injury across the class is what renders the notice and opt-out provisions of (b)(3) unnecessary").

Stripped of the technical terms, Plaintiffs' claim is that Defendants have done nothing right insofar as the IDEA is concerned for preschool children with disabilities, a fact which they contend justifies entry of a comprehensive, multifaceted, and open-ended injunction. Consequently, Plaintiffs assert that the District's overarching "obligation to each disabled child in the District" makes (b)(2) certification appropriate here.  They are wrong.  As the Seventh Circuit correctly observed in *Jamie S:*

> That the plaintiffs have superficially structured their case around a claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final.

668 F.3d at 499 (citing *Wal-Mart*).   In other words, as applied to Plaintiffs' proposal, the injunctive relief for which (b)(2) certification is sought does not remedy any policy or practice that was common to all class members and, as such, caused each individual child to suffer the same IDEA violation.   Rather, the 2011 injunction seeks to create structural changes where IDEA violations of different types would occur infrequently.[22]  But, it is not enough for all class members to be within the same system and subject to alleged deficiencies within that system when a single injunction cannot provide relief to all class members.  *See M.D. v. Perry*, 675 F.3d 832, 838-45 (5th Cir. 2012).

The proposed classes little resemble what the Supreme Court and the D.C. Circuit have recognized as appropriate (b)(2) classes.   In *Wal-Mart*, the Court emphasized that the "prime examples" are "[c]ivil rights cases against parties charged with unlawful, class-based discrimination," and in particular "challenges to racial segregation—conduct that was remedied by a single classwide order."   131 S. Ct. at 2557-58 (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997), and citing Rule 23 advisory committee's note).  In *Cobell v. Salazar*, 679 F.3d 909 (D.C. Cir. 2012), similarly, this Court approved a (b)(2) class based on an official's "refus[al] to provide an historical accounting" to a class.  *Id.* at 917.   In these cases, the "final injunctive relief or corresponding declaratory relief" that Rule 23(b)(2) contemplates was truly indivisible (and "final")—an injunction to stop segregating, or to provide a withheld accounting. Classes in such cases are appropriate under Rule 23 (b)(2).

---

[22] The elephant in the room is that the District's Part B program has now been proven to be a durable success, functioning at a higher level than ever before, obviating the need for any structural injunction.  As noted, *supra*, the District's eligibility percentage is 8.83%.  This places it among the top six jurisdictions nationally regarding IDEA eligibility.  *See* IDEAdata—Table B1-16: Percentage of children ages 3 through 5 served under IDEA, Part B, as a percentage of population, by disability category and state:  Fall 2011, https://www.ideadata.org/TABLES35TH/B1-16.pdf.  Additionally, the evaluation and eligibility compliance rate has vastly improved over the years and currently sits at 96.91%.  Finally, the District's Part C to Part B transition rate sits at 100.00 %, far out pacing the transition rates of comparable jurisdictions selected by Plaintiffs' expert on page 17 of Dkt. No. 358-7.

The 2011 injunction was fashioned by the Court to address injury "to all eligible children between the ages of three and five years old, inclusive, who live in, or are wards of, the District of Columbia, and whom defendants did not identify, locate, evaluate, or offer special education and related services[.]"  Memo. Op. [Dkt. No. 294] at ¶ 143.  It was a broad injunction that this Court described as "requiring defendants to do nothing more than comply with their legal obligations[.]"  *Id*. at ¶ 144.  The injunction itself imposed various "numerical requirements" as well as fifteen separate "programmatic requirements" governing disparate parts of the overarching "child find" system.  Final Or. [Dkt. No. 295] at 2-7.  Importantly, the injunction did not remedy any particular policies or procedures that the Court found illegal, as the Findings of Fact made by the Court that form the basis for the injunction do not, in fact, discuss any particular District policies.  *See* Memo. Op. [Dkt. No. 294].

Certifying the proposed four sub-classes pursuant to Rule 23(b)(2) in order to re-impose the 2011 injunction would clearly violate Rule 23.  The 2011 injunction was complex, with numerous distinct requirements, none of which promised, individually or in aggregate, to address *all* the four putative class members' claims.  Fifteen different programmatic requirements covered various aspects of identification, location, evaluation, and provision of services to children with disabilities.  (Dkt. No. 295.)  Even the numeric requirements tacitly recognized that no injunction could satisfy all claims, as the Court did not require—nor could it require—that compliance be perfect as to all children.

 "It is no answer to say that the … remedial order affects the entire class; that order merely establishes a system for eventually providing individualized relief."  *Jamie S.*, 668 F.3d at 499.  Plaintiffs and this Court must "be particularly precise when explaining how the resolution of those claims is central to the validity of each of the [individual class member's claims] in one

stroke." *M.D.*, 675 F.3d at 845.  Plaintiffs have failed to do so, primarily because it would be impossible given the proposed construction and definitions of the four classes.  Plaintiffs' motion should be denied.

      2.  Certification Pursuant To Rule 23(b)(2) Is Inappropriate Where, As Here, No Representative Class Member Has A Live Claim For Injunctive Relief

Rule 23(b)(2) permits certification only when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Certification pursuant to Rule 23(b)(2) should be denied because no named Plaintiff had standing to pursue the requested relief premised on the existence of a certified class.  As Defendants noted in their Motion to Dismiss [Dkt. No. 365] and as Plaintiffs have conceded in their subsequent Opposition [Dkt. No. 369], none of the named Plaintiffs have a live controversy before the Court.  Plaintiffs currently have no injury that is redressable by this Court, and they have no likelihood of facing such an injury in the future.  As a result, there is no injunction that this Court could issue that would apply to the named Plaintiffs, rendering certification inappropriate.

**C.  Plaintiffs' Proposed Classes Are Not Sufficiently "Definite"**

It is black letter law that the party requesting class certification bears the burden of showing the existence of a class.  *Johnson*, 248 F.R.D. at 51 (citing *Bynum*, 214 F.R.D. at 51).  As a corollary to the rule, courts generally require that a proposed class be definite, *i.e.*, clearly defined "so as to be identifiable as a class."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 20 (D.D.C. 2012) (citation omitted).  The requirement of a clearly defined class is necessary "to ensure that the class is neither amorphous, nor imprecise," *Johnson*, 248 F.R.D. at 52, such that "an individual would be able to determine, simply by reading the definition,

whether he or she is a member," *Bynum*, 214 F.R.D. at 32.  As such, a proposed class definition "must not depend on subjective criteria or the merits of the case or require extensive factual inquiry" to determine individual class membership.  *In re Copper Antitrust Litig.*, 196 F.R.D. 348, 353 (W.D. Wis. 2000); *accord Bynum*, 214 F.R.D. at 31.  Each of Plaintiffs' proposed sub-classes is so unfocused and shifting that its contours are insufficiently defined.

As a threshold matter, Plaintiffs' assertion that the definiteness requirement should not apply to them is incorrect as a matter of law.  Generally speaking, while it is true that the courts of appeals from several circuits have excused a showing of definiteness for 23(b)(2) classes, many courts (including this Court) have engaged in a definiteness analysis in the (b)(2) context, particularly where, as here, simultaneous relief is sought under Rule 23(b)(3).  *See Disability Rights Council of Greater Washington v. Washington Metro. Area Transit Auth.*, 239 F.R.D. 9, 25 (D.D.C. 2006) (certifying the proposed class under Rule 23(b)(2), in part based on finding the class "sufficiently discrete and identifiable"); *Bynum*, 217 F.R.D. at 45-46, 50 (Lamberth, J.) (finding a hybrid 23(b)(2)/(b)(3) class to be sufficiently definite); *Accord In re Monumental Life Ins. Co.*, 365 F.3d 408, 413, 416-17 (5th Cir. 2004).

Plaintiffs also incorrectly assert that "flexibility as to the definiteness requirement" is warranted here, citing as support a partially-dissenting opinion in *Jamie S.*, 668 F.3d at 506 (Rovner, J.).  In fact, the majority opinion in *Jamie S.* denies class certification, at least in part, on the ground that the proposed class was "fatally indefinite."  *Id.* at 493.  *Jamie S.* is indeed on point, though it cautions against a finding of definiteness here.

In *Jamie S.*, the Seventh Circuit Court of Appeals held that a putative class of potentially-eligible disabled students under the IDEA was too broad for certification.  *Id.* at 495.  There, the class' indefiniteness was an "immediately obvious defect" since "[a] significant segment of the

class (of unknown and unknowable size) comprises disabled students who may have been eligible for special education but were *not identified* and *remain unidentified.*" *Id.* (emphasis in original). The majority opinion further emphasized the problem:

> By what standard is class membership to be determined? How is the court to decide whether there was reason to believe *in 2000–2005* that a presently unidentified child was *potentially eligible* for special-education services from MPS? It's not hard to see how this class lacks the definiteness required for class certification; there is no way to know or readily ascertain who is a member of the class.

*Jamie S.*, 668 F.3d at 495. "In short," the Seventh Circuit concluded, "a class of unidentified but potentially IDEA-eligible disabled students is inherently too indefinite to be certified." *Id.*; *see also Adashunas v. Negley*, 626 F.2d 600, 603 (7th Cir. 1980) (denying certification of a class of learning-disabled children because the class was not adequately defined or ascertainable).

In particular, a proposed class that includes "future" members is ill-defined and untenable. *See Edwards v. Schlesinger*, 377 F. Supp. 1091, 1093 (D.D.C. 1974), *rev'd on other grounds sub. nom. Waldie v. Schlesinger*, 509 F.2d 508 (D.C. Cir. 1974). With future class members, of course, "[n]otice, a desirable … element, would be impossible." *Id.*; *see also Davoll v. Webb*, 160 F.R.D. 142, 144 (D. Colo. 1995). Therefore, "a proposed class definition must be precise, objective and presently ascertainable." *In re Copper Antitrust Litig.*, 196 F.R.D. 348, 353 (W.D. Wis. 2000) (internal citation omitted).

Plaintiffs' proposed definitions for each of the new classes are *not* sufficiently definite to make them administratively feasible for the court to determine who is a member of the class. Each of the subclass definitions is overly broad, amorphous and vague. Subclasses 1, 2, and 3

encompass "[a]ll children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards of, the District of Columbia…." Pls' Mot. [Dkt. No. 358] at 7. This part of each definition is not precise, objective or presently ascertainable.

Furthermore, Plaintiffs' proposed definitions for classes 2, 3, and 4 each depend on subjective criteria and require extensive factual inquiry to determine class membership, making these definitions administratively burdensome and not sufficiently definite. Subclass 2 includes children who "did not or will not receive a timely initial evaluation for the purposes of offering special education and related services." Pls' Mot. [Dkt. No. 358] at 7. Determining whether a child received a "timely initial evaluation" requires an individualized inquiry into the facts of that particular child's case. Similar to *Cuming v. S.C. Lottery Comm'n*, which held that potentially thousands of inquiries into when individuals had purchased lottery tickets would be administratively burdensome, the proposed definition for Subclass 2 would require extensive inquiries into when potentially thousands of individual children had received an initial evaluation and, importantly, "when" to meet the requirement of timeliness.. 2008 WL 906705, at *3 (D.S.C. Mar. 31, 2008). In *Cuming*, the court found that the class definition was not sufficiently definite to allow the court to determine whether a particular individual is a member, and further that "the administrative burden of certification outweigh[ed] the efficacy of a class action." *Id.* The same result obtains here.

Likewise, the definitions for class 3 (children who "did not or will not receive a timely determination of eligibility for special education and related services") and class 4 (children who "did not or will not have a 'smooth and effective' transition from Part C to Part B by the child's third birthday") also require individualized factual inquiries that are burdensome and do not

make it administratively feasible for the court to determine who is a member of each class.  *See* Pls' Mot. [Dkt. No. 358] at 17.

Moreover, individuals could not easily ascertain, simply by reading plaintiffs' proposed subclass definitions, whether he or she is a member of the putative subclasses.  How could individuals objectively know whether they received a "timely" initial evaluation or eligibility determination, or a "smooth and effective" transition from Part C to Part B?  These definitions have no independent objective meaning; they are not sufficiently specific to allow individuals to determine whether they fall within the bounds of the class simply by looking at the class definition.

Likewise, terms such as "timely initial evaluation" or "smooth and effective transition from Part C to Part B" – regardless of their usage within the special education field – do not convey sufficient meaning to allow lay persons  outside the field to determine whether they are members of the class by merely reading the definition. *See In re Copper Antitrust Litigation*, 196 F.R.D. at 358-59 (finding proposed class definition problematic where use of certain industry terms of art failed to "convey[] sufficient meaning to enable persons hearing it [outside the industry] to determine whether they [were] members of the class…").

In addition to being vague and not sufficiently definite, class 1 is untenable because it includes children who have not been identified. The definition for class 1 encompasses children who "were not or will not be identified and/or located for the purposes of offering special education and related services." Plaintiffs' Memo at 7.  In *Jamie S.*, where the class encompassed students who may have been eligible for special education but were not identified and remained unidentified, the class was denied certification for being indefinite. 668 F.3d at 495.  Similarly here, class 1 is indefinite because it seeks to include children who were not identified and will

not be identified, and "there is no way to know or readily ascertain who is a member of the class." *Id.*

Comprising "future" members also makes all of plaintiffs' proposed subclasses ill-defined. The Court cannot possibly ascertain at present whether those children who "will not be identified" (class 1) are members of the class. Nor can the Court possibly determine whether children who "will not receive a timely initial evaluation" (class 2), "will not receive a timely determination of eligibility" (class 3), or "will not have a 'smooth and effective' transition from Part C to Part B by the child's third birthday" (class 4) are members of the class. In each case, notice would clearly be impossible. In *Edwards*, the class was not sufficiently definite because it included "future female applicants to the U.S. Air Force… [who] will be denied admission…" 377 F. Supp. at 1093. Likewise here, each of plaintiffs' proposed subclasses is untenable because on their face they are insufficiently definite; class certification must be denied.

### D.   Class Counsel Does Not Meet The Requirements Of Rule 23(g)

Rule 23(g)(1)(A) sets forth specific considerations that must weigh on the determination of class counsel's capacity to adequately represent the class.[23] While Defendants do not dispute that Plaintiffs' counsel is experienced and knowledgeable in relevant respects, counsel nevertheless does not satisfy the requirements of the rule because they do not have the financial resources to adequately represent the class. *See* Rule 23(g)(1)(A)(iv) (quoted in full at fn. 23, *supra*). Plaintiffs' counsel previously notified the court in *Salazar v. District of Columbia*, 729 F. Supp. 2d 257, No. 93-452 (D.D.C. 2010) that their firm faced "substantial [financial] hardship". Pls. Ex. 1, Doc. # 1811-1 (Ap. 10, 2013) (noting that counsel's firm "will run out of

---

[23] Specifically, Rule 23(g)(1)(A) provides that, in appointing class counsel, the Court "must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."

operating funds in September 2013" absent a substantial fee award because there is otherwise "no definite known source of such potential income to the firm"). This does not support a finding that counsel is capable of continuing to "expend hundreds of hours researching legal theories and drafting pleadings and motions," and to thereby sustain its representation of the potential class or subclasses. *See* Pls' Mot. [Dkt. No. 358] at 48. Plaintiffs do not satisfy Rule 23(g)(1); certification should be denied.

E. Class Certification Under Rule 23 Is Inappropriate; It Is No Answer That Plaintiffs Have No Judicial Mechanism To Seek Relief

The decision to certify a class is fraught with risks of unfairness. These include risks to absent class members, who may be bound by the outcome of a class action proceeding even though they are unaware of (or even disagree with) the suit. And, of course, they include risks to opposing parties, who, in view of overly-broad, improper classes, may be forced to respond to sweeping, burdensome discovery and in-court presentations of evidence based on overgeneralizations rather than genuinely common contentions. The problem is compounded further still when the relief that corresponds to the invalid class claims threatens to interpose the federal judiciary in areas of core state executive responsibility. That describes this case.

Certification of Plaintiffs' claims in August 2006 was clearly incorrect. The class then-proffered reached across different legal requirements applicable to different District agencies executing at least four different administrative functions on behalf of children with different disabilities in different factual settings. Plaintiffs have now compartmentalized their clearly invalid class, separating it into four sub-classes, but retaining its core composition. What they propose does not cure the critical flaw: Plaintiffs have sought from the outset to reform a complex administrative system that spans many distinct obligations and many types of children with many different types of disabilities in many different settings. Most importantly, for

purposes of this motion and, indeed, the continuation of this lawsuit as a class action, they have not claimed that the administrative failures they challenge, even divided into the subsets they now propose, stem from any single policy or practice, or any other specific cause.  In other words, they have not shown (nor could they) that all putative sub-class members share a single "common contention," beyond the baseline inquiry of whether each was in fact harmed.  *Wal-Mart*, 131 S. Ct. at 2550-51.  Their proposal thus fails virtually all requirements of Rule 23(a) and likewise fails to comport with Rule 23(b); their claims simply cannot be recertified in the manner they have proposed.

It is no answer that, absent a class action, there may be no judicial mechanism to address certain problems.[24]  In *Amchem*, named plaintiffs argued "that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure."  521 U.S. at 628-29.  This Court previously emphasized that "what's at stake here" is the prospect that the District would, through the mechanism of a class action, be enjoined "to provide special education to some of our most vulnerable citizens."  Memo. Op. [Dkt. No. 294] at 1.  Defendants have never disputed that the stakes are high indeed.  But as the *Amchem* Court explained, the question is not whether plaintiffs propose "the most secure, fair, and efficient" means of achieving their ends, but whether their means comport with Rule 23.  521 U.S. at 628-29.  Plaintiffs' means simply do not, and their Motion must be denied.

## II. PLAINTIFFS HAVE NOT JUSTIFIED THEIR REQUEST TO "POSTPONE" THEIR CLAIMS FOR INDIVIDUAL RELIEF

By failing to seek certification of any individual relief claims, Plaintiffs have waived certification of a (b)(3) class on remand.  Plaintiffs were obligated and failed to bring these

---

[24] And this is not true here, because IDEA itself provides the mechanism for individuals to have their claims resolved.  It is not as if they are left without a remedy.  *See* ***IDEA Enforcement provision

claims previously, thereby waiving their ability to assert them at this later date. *Cf. Democratic Republic of Congo v. FG Hemisphere Associates, Inc.*, 508 F.3d 1062, 1065 (D.C. Cir. 2012) (finding that failure to raise issue effected a waiver). Indeed, Plaintiffs have already expressed a willingness to abandon these claims. *See* Pls' Reply Br. for Re-Cert. [Dkt. No. 285] at 24-5 (noting that "as plaintiffs have previously stated, they agree to dismiss their requests for individual relief"). Such mixed signals unnecessarily complicate and prolong this litigation, especially when named Plaintiffs no longer have live claims for compensatory education or reimbursement. *See* Pls' Opp. to Defs' Mot. to Dismiss [Dkt. No. 369].

Prolonging this litigation through deferring any (b)(3) claims may also result in some of the Plaintiffs aging out of being eligible for certain benefits from the program, mooting their ability to recover. Importantly, Plaintiffs cannot even meet the requirements of (b)(3) certification. Their motion should be denied.

Although Plaintiffs never cite the rule explicitly, their request for delayed consideration of possible (b)(3) certification is a call for bifurcation under Rule 42. *See* Pls. Mot. [Dkt. No. 294] at 46 (citing *Taylor v. District of Columbia Water & Sewer Authority*, 241 F.R.D. 33, 48 (D.D.C. 2007), for the proposition that this court could "bifurcate the action into liability and damages phases"). Courts have the discretion to "bifurcate claims or issues for separate trial to advance judicial economy, to avoid the possibilities of confusion, to further convenience, to avoid delay and prejudice, and to serve the ends of justice." *Am. Nat. Red Cross v. Travelers Indem. Co. of Rhode Island*, 924 F. Supp. 304 (D.D.C. 1996) (citing *Webb v. Hyman,* 861 F. Supp. 1094, 1119 (D.D.C.1994)). None of these factors is applicable in this case. Allowing

bifurcation will delay the case and cause it to drag on further, to the detriment of Plaintiffs' own clients who may no longer be eligible for benefits because of their age at the end of litigation.[25]

Moreover, it would be a waste of resources – of which Plaintiffs' counsel admittedly is running out – to be revisiting the case multiple times.  Class actions "exist[] primarily, if not solely, to achieve a measure of judicial economy, which benefits the parties as well as the entire judicial system." *Allison*, 151 F.3d at 410.  It would be inefficient, however, for the court to decide one certification test at one point and to revisit others, with their attendant evidentiary determinations, later down the road.  Holding "teamsters" hearings likewise would serve only to draw out proceedings and frustrate the purpose of class action rules.  Pls. Mot. [Dkt. No 294] at 46.  Rather than waiting for the outcome of Rule 23(b)(2) certification before approaching other certification questions, it will be more efficient to deal with all such issues at the same time.

Plaintiffs argue, citing *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997), that the Court should certify a hybrid class under both (b)(2) for declaratory and injunctive relief and (b)(3) for monetary relief.  However, *Eubanks* also notes, more applicable here, that courts have the discretion to and "have generally permitted (b)(2) classes to recover monetary relief in addition to declaratory or injunctive relief, at least where the monetary relief does not predominate."  At Plaintiffs' own admission, injunctive and declaratory relief are "the principal purpose of this litigation," making a single (b)(2) class action appropriate for Plaintiffs' needs.  Pls' Mot. [Dkt. No. 358] at 35, n.11.

Plaintiffs similarly refer to *Keepseagle v. Veneman*, 2001 WL 34676944, *14 (D.D.C . Dec. 12, 2001) to illustrate where a court delayed (b)(3) certification; however, the court did this

---

[25] For example, T.F. is currently fifteen years old.  (Amd. Complaint at ¶ 65.)  This case has currently been pending for eight years.  Should the Court certify a class here, while leaving open the door for certification of a (b)(3) class at some indefinite time in the future, it is probable that he will be aged out of the IDEA before this case has been completed.

because it lacked a "developed factual record" and knowledge of whether "monetary damages would overshadow those for declaratory and injunctive relief." *Id.*  That is not the case here, where considerable time has been spent on factual development and certification questions, and injunctive and declaratory relief predominate. Plaintiffs had ample time and evidence to consider whether to certify under (b)(3) and should have done so before trial if at all.

Plaintiffs' mixed signals on their choice slow down this litigation to the detriment of this Court, Defendants, and any potential class members.  This Court should therefore exercise its discretion to prevent further delay, inefficiency, and unnecessary steps toward the resolution of this case by denying Plaintiffs' request for bifurcation.

## III. THE COURT SHOULD NOT REINSTATE LIABILITY AND CANNOT ISSUE A STRUCTURAL INJUNCTION

In conjunction with their request to recertify their injunctive and declaratory relief claims, Plaintiffs have proposed that the Court "reinstate" liability and injunctive relief, according to them, "return[ing] the parties to their respective positions prior to appeal."  *See* Pls' Mot. [Dkt. No. 358] at 55.  But the parties are clearly not in those positions; this is not the case it was prior to appeal.  At this stage and under present circumstances, "reinstating" liability *a priori* would severely prejudice Defendants, and issuing a generic structural injunction on stale evidence would constitute a gross abuse of discretion.  Moreover, in vacating liability—"We remand the case to the district court for reconsideration of whether a class, classes, or subclasses may be certified, and *if so*, thereafter to *redetermine* liability and appropriate relief"—the Circuit gave no indication that reinstatement of liability would be appropriate here.  *D.L.* 713 F.3d at 129 (emphasis added).  These arguments are addressed in turn.

A.  The Court Cannot Reinstate Liability Without Severely Prejudicing Defendants

Reinstating liability would severely prejudice Defendants.  The subdivision of the class would certainly have led to a fundamentally different defense strategy because four distinct classes of Plaintiffs would have permitted Defendants to focus their discovery efforts and trial presentation.  The differences between a broad systemic challenge and four challenges to slightly more focused components of a governmental system should be obvious.  Were Defendants able to address four sets of Plaintiffs, each challenging only a generalized obligation of the District's Part B system, instead of a very broad, systemic class claim, they could, and most likely would, have limited their potential liability exposure by employing defense strategies—including discovery, motions, stipulations, and possible partial settlements—that are unavailable in a broad, systemic challenge.

Further, reinstatement of liability would necessarily require the Court to afford Defendants with additional discovery regarding the new class formations.  Defendants would be entitled to seek discovery, including expert discovery, from Plaintiffs regarding whether any "particular policy or practice that linked all of the claims of the class members[,]" *D.L.*, 713 F.3d at 128, and whether each Plaintiff's injury stemmed from the respective policy that Plaintiffs identified.  A new trial would also be required, permitting Defendants to demonstrate whether any current policy or procedure violates the IDEA and whether a particular policy linked the claims of the respective class members.  Finally, Defendants would necessarily be required to redraft and resubmit proposed findings of fact and conclusions of law should the Court permit Plaintiffs to amend their complaint.  The Court's November 16, 2011, Findings of Fact and Conclusions of Law [Dkt. No. 294] do not account for a post *Wal-Mart* finding of liability.  Importantly, the Court made no factual findings as to which, if any, policy or practice harmed

children, much less that such a policy uniformly harmed putative class members as configured by Plaintiffs' new class definitions.   Without such facts, the Court cannot make the legal conclusion that a remedy of any "particular policy or practice that linked all of the claims of the class members" was appropriate.  *D.L.*, 713 F.3d at 129.  In short, everything would have to be redone. Other than retaining its caption, this would be a new case in its entirety and should be so treated.  There can be no "reinstatement" of liability under the circumstances here.

Lastly, blind re-imposition of the 2011 liability finding would fail to account for the success of the District's preschool Part B program.  With the arrival of Dr. Beers in 2009, the District's program has been on an undeniably upward trajectory.  As of the filing of this motion, Defendants have not only significantly outpaced the national average for eligibility percentage; they have exceeded the thresholds for IDEA compliance imposed by the Court's 2011 injunction. Liability in 2013 should be based on the status of Defendants' program today.  The current program bears no resemblance to the struggling Part B system that existed at the time this lawsuit was filed.  *See* Exhibit 1.  Defendants' program would suffer prejudice from a liability finding regarding a current system whose success and effectiveness is not, in fact, subject to legitimate question.

Defendants' pretrial litigation strategy and defense of this case, up through and beyond the April 2011 trial, were the product of many, many hours spent reviewing and preparing discovery, drafting numerous filings, and a trial on the merits.  Defendants' time and resources in preparation over the years would be nullified, and Defendants—through no fault of their own— would be required to expend significant time and resources to assemble a new defense, accounting for the revised configuration of the case.  Additional discovery, further briefing, and a second trial on the merits all would be necessary.  Moreover, such a finding of liability in 2013

would harm the effective and durable preschool Part B system that Defendants have in place. As such, the undeniable prejudice to Defendants precludes reinstatement of the 2011 liability finding.

**B.  Reinstating Structural Injunctive Relief Would Constitute An Abuse Of Discretion**

Nor can the Court appropriately reinstate injunctive and declaratory relief as Plaintiffs propose. It is black-letter law that the purpose of an injunction is to prevent future harm, *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928), and the plaintiff bears the burden to show entitlement to the remedy. *Halkin v. Helms*, 690 F.2d 977, 1006 (D.C. Cir. 1982) (citing *W.T. Grant Co., infra*). And of course, "[t]he necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W. T. Grant Co*., 345 U.S. 629, 633 (1953). Furthermore, "[i]njunctive relief granted to a party in a lawsuit must be framed to remedy the harm claimed by the party." *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976) (*citing Hartford-Empire Co. v. United States*, 323 U.S. 386, 410 (1945)). And thus, "[a]n injunction must be narrowly tailored to remedy the specific harm shown." *Id.* (citation omitted).

In the context of institutional reform injunctions, such as that which Plaintiffs now seek, the "well-settled principle [concerning] the nature and scope of [equitable relief] . . . means simply that federal-court decrees must directly address and relate to the [ ] violation itself." *Milliken v. Bradley*, 433 U.S. 267, 281-282 (U.S. 1977) ("*Milliken II*").[26] Indeed, "[b]ecause of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the [law] or does not flow

---

[26] While *Milliken II* specifically addressed institutional reform injunctions in the context of federal constitutional violations, the Supreme Court has since recognized the extension of the *Milliken II* principles to alleged violations of federal statutory law. *See Horne v. Flores*, 557 U.S. 433, 448, n. 3 (U.S. 2009).

from such a violation . . . , or if they are imposed upon governmental units that were neither involved in nor affected by the [ ] violation." *Id.* (citations omitted).

As the Supreme Court explained in *Horne*, the justification for this principle lies at the very core of our system of governance: [I]nstitutional reform injunctions often raise sensitive federalism concerns . . . [and] commonly involve areas of core state responsibility, such as public education." 557 U.S. at 448 (*citing Jenkins, infra*). The preservation of this allocation of power is paramount, *see Shelby Co. v. Holder*, 570 U.S. __ (June 25, 2013) (federalism principle "preserves the integrity, dignity, and residual sovereignty of the States . . . [and] secures to citizens the liberties that derive from the diffusion of sovereign power"), especially where education policy is concerned. *See Mo. v. Jenkins*, 515 U.S. 70, 99 (U.S. 1995) ("[O]ur cases recognize that local autonomy of school districts is a vital national tradition, and that a district court must strive to restore state and local authorities to the control of a school system operating in compliance with the Constitution"); *id.* at 132 (Thomas, J., concurring) ("When [courts] presume to have the institutional ability to set effective educational, budgetary, or administrative policy, [without sufficient "pause" or "justification" they] transform the least dangerous branch into the most dangerous one").

So, while there is no question that, theoretically, this Court possesses the bare authority to shape equitable relief, *see Lemon v. Kurtzman*, 411 U.S. 192, 200 (U.S. 1973) ("[i]n shaping equity decrees, the trial court is vested with broad discretionary power"), doing so under these circumstances would constitute a clear abuse of discretion. *See supra* (*citing, inter alia, Milliken II, Jenkins*). Plaintiffs, none of whom have current viable claims, have primarily relied on stale evidence as the basis for their request for injunctive relief.[27]  *See* Pls' Mot. [Dkt. No. 358] at 52-

---

[27] As a practical matter, and as highlighted elsewhere in this filing, *e.g.*, *supra* at 23-28, none of the named Plaintiffs have live claims for injunctive relief.  Under these circumstances, this fact alone should foreclose their ability to

54 (referring to institutional deficiencies prior to April 2011); *but see* Defs' Mot. to Dismiss [Dkt. No. 365] (establishing named Plaintiffs' lack of standing to seek prospective injunctive relief). But in fashioning appropriate relief, the Court is required to consider the *present* nature and extent of the alleged harm (if any) and narrowly tailor the remedy to the specific harm shown. *See Washburn, Milliken II, supra.* Because the only effective relief that Plaintiffs now seek is injunctive in nature, the focus of the inquiry is on future, not past, harm. *See Swift*, 276 U.S. at 326. And the only supposedly current evidence of any ongoing violation—Plaintiffs' cursory reference to the 2011/12 injunction—is, frankly, not so current at all. *See* Pls' Mot. [Dkt. No. 358] at 54 ("[w]hile defendants reported that they achieved the 8.5 percent identification benchmark for approximately a one-year period between 2011 and 2012, they also reported data that are well short of the benchmarks for the other three numerical requirements).[28] This clearly does not reflect the current *status quo.* *See supra* at 6-7 (explaining that the District's child find system now *exceeds* every pertinent numerical benchmark set by the Court under the prior injunction). And, even if it did, which Defendants expressly deny, it reveals a vastly different administrative regime than that which the Court previously found to warrant the injunctive relief Plaintiffs continue to seek. *See*, *e.g.*, *supra* at 21-23 (citing progress in the District's child find system achieved by year's end 2012).

In essence, Plaintiffs have asked this Court to issue generic equitable relief *a priori,* without any reference whatsoever to the *present* nature and scope of the violation of law they now purport to allege. A federal-court decree to this effect could not possibly be "limited to

---

seek injunctive relief on behalf of the proposed sub-classes. *See Culver*, 277 F.3d at 912 (finding that when a named plaintiff's claim is moot, it makes his representation presumptively inadequate unless the defendant has procured mootness of the plaintiff's claim as part of its underlying strategy, which has not been the case here).

[28] Nor, as a practical matter, is Defendants' performance under a court-ordered injunction an appropriate measure, at least in so far as it does not demark the current parameters of applicable federal law. *See Horne*; *compare* Final Order [Dkt. No. 295; *with* 20 U.S.C. § 1400 *et seq.*

reasonable and necessary implementations of federal law," *Frew*, 540 U.S. at 541, and would thus "exceed [the] appropriate limits" of the federal judicial power. *Milliken II, supra*; *accord Petties v. District of Columbia*, 662 F.3d 564, 571 (D.C. Cir. 2011) (in ruling on 60(b) motion to vacate injunctive relief, trial court erred in failing to inquire "into whether the risk of imminent harm that it found warranted injunctive relief in 1995 — namely, that special education students were in jeopardy of losing special education services to which they were entitled under the IDEA — had been ameliorated, if not eliminated, as a result of changed circumstances"). In short, even assuming *arguendo* that Plaintiffs had standing to seek injunctive relief, *see* Defs' Mot. to Dismiss [Dkt. No 365], Plaintiffs have not carried their burden to show entitlement to the injunctive relief they now seek; the Court simply cannot blindly "reinstate" the structural injunctive relief that it entered nearly two years ago. More than a half-century of federal court precedent, built upon fundamental jurisprudential principles of federalism, comity, and local autonomy, caution against that outcome.

## CONCLUSION

Plaintiffs have sought from the outset to reform a complex administrative regime that spans many distinct legal obligations and many types of children receiving many types of services in many factual settings. On April 12, 2013, the Court of Appeals of this Circuit told them that they had aspired for too much, and offered an opportunity to bring their effort into compliance with the Federal Rules of Civil Procedure. They have defiantly declined the Circuit's guidance, instead requesting that this Court allow them to pursue precisely the same claims, with precisely the same allegations, to seek precisely the same relief. They attempt to disguise their strategy by proposing an overbroad class crudely compartmentalized into four overbroad sub-classes. But the defects with this approach are numerous and obvious. This Court

simply cannot grant the relief they seek. The subclasses they seek to certify do not meet the requirements of Fed.R.Civ.P. 23(b) and there is no basis whatsoever for a reinstatement of liability.  Accordingly, Plaintiffs' Motion must be denied.


Dated:  July 15, 2013                    Respectfully submitted,

                                         IRVIN B. NATHAN
                                         Attorney General for the District of Columbia

                                         ELLEN EFROS
                                         Deputy Attorney General
                                         Public Interest Division

                                          /s/ Grace Graham
                                         GRACE GRAHAM, D.C. Bar No. 472878
                                         Chief, Equity Section

                                         /s/ Chad Copeland
                                         CHAD COPELAND, D.C. Bar No. 982119
                                         Assistant Attorney General
                                         441 Fourth Street, N.W.
                                         Sixth Floor South
                                         Washington, DC 20001
                                         Telephone: (202) 724-6623
                                         Facsimile: (202) 741-8880
                                         Email: chad.copeland@dc.gov

                                         /s/ Matthew R. Blecher
                                         MATTHEW R. BLECHER, D.C. Bar No. 1012957
                                         Assistant Attorney General
                                         441 Fourth Street, N.W.
                                         Sixth Floor South
                                         Washington, DC 20001
                                         Telephone: (202) 442-9774
                                         Facsimile: (202) 730-0586
                                         Email: matthew.blecher@dc.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ***D.L.**, et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 05-1437 (RCL) |
| v. | ) |
| | ) |
| **DISTRICT OF COLUMBIA**, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**ORDER**

Upon consideration of Plaintiffs' Motion for Class Certification and Reinstatement of Findings of Liability and Order Granting Relief, Defendants' Opposition, and the entire record herein, the Court hereby DENIES Plaintiffs' motion.

_____
Date

_____
Hon. Royce C. Lamberth
United States District Court

Copies to:

All Counsel of Record