**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DL, *et al.*, on behalf of themselves and others similarly situated, )<br>)<br>)<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>THE DISTRICT OF COLUMBIA, *et al.*, )<br>)<br>Defendants. )<br>) | Civil No. 05–1437 (RCL) |

## MEMORANDUM OPINION

Pending before the Court are the plaintiffs' Motion for Class Certification and Reinstatement of Findings of Liability and Order Granting Relief [358]; the plaintiffs' Motion to Amend the First Amended Complaint [359]; and the defendants' Motion to Dismiss for Lack of Jurisdiction [365]. Upon consideration of these motions, the oppositions thereto, and all replies, the Court GRANTS IN PART and DENIES IN PART the plaintiffs' Motion for Class Certification and Reinstatement of Findings of Liability and Order Granting Relief; GRANTS the plaintiffs' Motion to Amend the First Amended Complaint; and DENIES the defendants' Motion to Dismiss for Lack of Jurisdiction.

## BACKGROUND

Plaintiffs—residents of the District of Columbia and former preschool-age children with various disabilities—filed suit in 2005, alleging that the District failed to provide them a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Act ("IDEA" or "the Act").

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). In exchange for federal funding, the IDEA requires that states and the District of Columbia "establish policies and procedures to ensure . . . that free appropriate public education [FAPE] . . . is available to disabled children." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005) (internal quotations omitted); *see also* 20 U.S.C. § 1412(a)(1)(A). Under the IDEA, "[s]chool districts may not ignore disabled students' needs, nor may they await parental demands before providing special instruction." *Reid*, 401 F.3d at 518. Instead, the IDEA imposes an affirmative obligation on school systems to "ensure that all children with disabilities residing in the State ... regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated." *Id.* at 519 (internal quotations omitted); § 1412(a)(3)(A). The District's laws implementing the IDEA require that once a potential candidate for special education services is identified, the District must conduct an initial evaluation and make an eligibility determination within 120 days. D.C. Code § 38-2561.02(a). The duties to identify, evaluate, and determine eligibility for disabled children are collectively known as the "Child Find" obligation.

Children under three years of age who are identified, evaluated, and determined eligible may receive early intervention services under Part C of the IDEA. For these children, the Act requires a "smooth and effective" transition from Part C's early intervention services to Part B's preschool special education programs. 20 U.S.C. § 1412(a)(9). A smooth and effective transition is one that (1) begins no less than 90 days prior to the child's third birthday; (2) does not include a disruption in services between Part C and Part B services; and (3) involves Part B

personnel.  Pls.'s Mot. for Class Cert. and Reinstatement of Findings of Liability and Order

Granting Relief [hereinafter Pls.'s Class Cert. Mot.], Ex. 6 (Expert Report of Carl J. Dunst, May

11, 2009), at 14 [hereinafter Dunst Report]; 34 C.F.R. § 303.209.  The transition process must

include a conference between the child's family and school officials to determine eligibility for

Part B services and to develop a transition plan and an Individualized Education Program

("IEP").  The goal is "a seamless transition between services" under Parts C and B of the Act.

34 C.F.R. § 303.209.

When executed properly, the early intervention mandated by the IDEA "can work a

miracle," allowing an estimated 75–80% of disabled children to enter "kindergarten alongside

every other ordinary five-year-old—without needing further supplemental special education."

*DL v. District of Columbia*, 845 F. Supp. 2d 1, 5 (D.D.C. 2011).

The plaintiffs allege that the District has denied this miracle to a large number of disabled

children.  Specifically, the plaintiffs aver that the District has engaged in a practice of failing to

identify disabled children, failing to evaluate and make eligibility determinations for identified

children, and failing to provide a smooth and effective transition from Part C to Part B special

education services.  And because they allege that the District's failure is pervasive and systemic,

plaintiffs sought to represent a class of children who, like themselves, were denied special

education services by the District.

In August 2006, this Court certified a plaintiff class pursuant to Federal Rule of Civil

Procedure 23(b)(2), defining the class as

> All children who are or may be eligible for special education and related services,
> who live in, or are wards of, the District of Columbia, and (1) whom defendants
> did not identify, locate, evaluate or offer special education and related services to
> when the child was between the ages of three and five years old, inclusive, or (2)
> whom defendants have not or will not identify, locate, evaluate or offer special

education and related services to when the child is between the ages of three and
five years old, inclusive.

*DL v. District of Columbia*, 237 F.R.D. 319, 324 (D.D.C. 2006).

Following extensive discovery on the District's IDEA performance through 2007, the
parties filed cross motions for summary judgment. The parties did not dispute that "the systems
in place to serve the birth-to-five population in the District of Columbia were inadequately
designed, supported, and facilitated across many years." *DL v. District of Columbia*, 730 F.
Supp. 2d 84, 96 (D.D.C. 2010). The District's systemic failure to comply with the IDEA
resulted in yearly citations for noncompliance from the federal Office of Special Education
Programs ("OSEP"). *Id.* at 97. Finding no genuine dispute that the District's attempts to
identify, evaluate, and determine eligibility for disabled children were inadequate, the Court
granted summary judgment on liability as to the plaintiff class's Child Find claim. *Id.*

Additionally, the parties agreed that "the procedures used by [the District] to screen
children exiting Part C were in many cases not necessary and delayed provision of preschool
special education." *Id.* at 98. Moreover, these screening procedures "were unreliable and were
not always aligned with accepted practices in the field." *Id.* The Court therefore granted
summary judgment on liability as to the plaintiff class's Part C to Part B transition claim. *Id.*

As the data available at the time of summary judgment was limited to the period before
2007, summary judgment and the initial findings as to the District's liability were limited to that
time period. On April 6 and 7, 2011, the Court held a bench trial to determine the District's
liability for the period of 2008 through the trial date.

Based on evidence presented at trial, the Court found that the District provided special
education services to less than 6% of its total child population, despite statistical projections that
the District should identify and serve at least 12%. *DL*, 845 F. Supp. 2d at 10. Of those disabled

children who were identified, the District failed to provide timely evaluations to 25–45% and timely eligibility determinations to 56.75%. *Id*. at 11. As for transitions from Part C to Part B services, the District provided smooth and effective transitions for 8.22% of children in 2008, 30.25% in 2009, and between 38–79% in 2010-2011. *Id*. at 12. The Court noted the District's efforts to reform its special education services in response to this litigation, but found that even given those reforms, the District's policies were inadequate to meet its obligations under the IDEA. *Id*. at 15–17. Indeed, notwithstanding its reform efforts, the District was cited by the federal OSEP for noncompliance for each of the four years prior to trial. *Id*. at 17. Thus, the Court found that the District's failure to institute adequate Child Find practices resulted in the denial of a FAPE to a substantial number of disabled children and that the District failed to comply with its legal duty to provide a smooth and effective transition to a significant portion of disabled children. *Id*. at 21–23. The Court also found that the District demonstrated bad faith or gross misjudgment by knowingly failing to comply with the IDEA and therefore violated Section 504 of the Rehabilitation Act, which prohibits discrimination in programs receiving federal funding.[1] *Id*. at 23; 29 U.S.C. § 749(a).

Given these findings, the Court granted the plaintiff class declaratory relief and imposed a structural injunction enjoining the District to comply with its legal obligations under the IDEA. *Id*. at 24–30.

Two months after the April 2011 trial, and before this Court issued its final decision, the Supreme Court decided *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), which clarified the proper interpretation of the commonality requirement for class certification under Rule

---

[1] Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

23(a)(2). *Wal-Mart* involved a putative class of one and a half million women, all current or former employees of Wal-Mart, alleging that "the discretion exercised by their local supervisors over pay and promotion matters violate[d] Title VII by discriminating against women." 131 S. Ct. at 2546. Noting that the pay and promotion decisions were made by thousands of geographically-dispersed managers, the Court held that "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id*. at 2552 (emphasis in original). To establish commonality, the Court held that a class must present a common contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 2551.

Based in part on the *Wal-Mart* decision, the District sought to decertify the class, arguing that the plaintiff class improperly "bundled together [in their Complaint] multiple different allegations of a variety of different provisions of the IDEA, the Rehabilitation Act, and local District of Columbia law" and "amalgamat[ed] . . . a variety of provisions of a single statutory scheme." *DL v. District of Columbia*, 277 F.R.D. 38, 42 (D.D.C. 2011). In effect, the District argued that the IDEA could be violated in many different ways, and that it was improper to combine these multiple forms of IDEA violations in one broad class. The plaintiffs responded by seeking to recertify the class as four distinct subclasses, each consisting, respectively, of disabled children that the District failed to (1) identify; (2) timely evaluate; (3) determine eligible; and (4) provide a smooth and effective transition from Part C to Part B services. This Court denied the District's motion, holding that each member of the plaintiff class had suffered a common injury, namely "denial of their statutory right to a free appropriate public education."

*Id*. at 45.  Moreover, this Court held that the plaintiffs presented the common question whether class members received a FAPE and noted that the class members' "differing allegations only represent the differing ways in which defendants have caused class members' common injury." *Id*.  The District appealed.

On appeal, the United States Court of Appeals for the District of Columbia Circuit reversed this Court's certification of the plaintiff class, holding that

> After *Wal–Mart* it is clear that defining the class by reference to the District's pattern and practice of failing to provide FAPEs speaks too broadly because it constitutes only an allegation that the class members "have all suffered a violation of the same provision of law," which the Supreme Court has now instructed is insufficient to establish commonality given that the same provision of law "can be violated in many different ways." *Wal–Mart,* 131 S.Ct. at 2551. In the absence of identification of a policy or practice that affects all members of the class in the manner *Wal–Mart* requires, the district court's analysis is not faithful to the Court's interpretation of Rule 23(a) commonality.

*DL v. District of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013).  The Circuit therefore vacated the class certification order and remanded the case to this Court "for reconsideration of whether a class, classes, or subclasses may be certified, and if so, thereafter to redetermine liability and appropriate relief."  *Id*. at 129.

On remand, the plaintiffs filed a motion seeking certification of four subclasses and a motion to amend the complaint to reflect the subclasses.  For its part, the District opposes each of the plaintiffs' motions and seeks to dismiss the complaint for lack of jurisdiction.  The Court will consider each of these motions in turn.

## I.    CLASS CERTIFICATION
### A.  <u>Legal Standard</u>

Class litigation is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979).  Lest the exception swallow the rule, Federal Rule of Civil Procedure 23 imposes

prerequisites to class certification that "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982). Thus, under Rule 23(a), the party seeking certification must demonstrate that

> (1) the class is so numerous that joinder of all members is impracticable [numerosity];
> (2) there are questions of law or fact common to the class [commonality];
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and
> (4) the representative parties will fairly and adequately protect the interests of the class [adequacy].

Fed. R. Civ. P. 23(a); *see also Wal-Mart*, 131 S. Ct. at 2551. ("A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]"). In addition to meeting each of these prerequisites, the class must fit at least one of the three "types" described in Rule 23(b). Here, plaintiffs seek certification under 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).[2]

Once a class is certified, Rule 23 provides district courts with "ample tools" to manage the class. *Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997). One such tool is the ability to certify subclasses that must independently meet the requirements of Rule 23 and are treated as separate classes. Fed. R. Civ. P. 23(c)(5); *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 848

---

[2] In the Complaint, the plaintiffs seek individual and compensatory damages; however, the plaintiffs maintain that "[t]he principal purpose of this litigation has been to obtain injunctive and declaratory relief." Pls.'s Class Cert. Mot. at 35 n.11. In the class certification motion, the plaintiffs' ask that this Court consider only whether the subclasses can be certified under Rule 23(b)(2) for liability and injunctive relief, after which the plaintiffs may move for certification of a Rule 23(b)(3) class for monetary damages. There is no question that certification of hybrid classes is permitted under Rule 23. *See, e.g.*, *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997) (holding that a district court "may adopt a 'hybrid' approach, certifying a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief, effectively granting (b)(3) protections including the right to opt out to class members at the monetary relief stage."). The Court will consider the plaintiffs' motion for (b)(3) certification if it is filed. The plaintiffs should carefully consider whether a (b)(3) can be maintained under Rule 23 prior to filing the motion.

(5th Cir. 2012) (remanding to district court for "a rigorous analysis regarding whether the class claims of each of the subclasses meets the requirements of Rule 23").  Certification of subclasses is particularly suitable in a case such as this, where each subclass "consists of smaller groups of children, each of which has separate and discrete legal claims pursuant to particular federal and state constitutional, statutory, and regulatory obligations of the defendants." *Marisol A*., 126 F.3d at 378.  In the end, "as long as each subclass is homogeneous, in the sense that every member of the subclass wants the same relief, and each subclass otherwise satisfies the requirements for certifying a class, so that each could be the plaintiff class in a separate class action, there is no objection to combining them in a single class action." *Johnson v. Meriter Health Servs. Employee Ret. Plan*, 702 F.3d 364, 368 (7th Cir. 2012).

### B.  The Proposed Subclasses

Plaintiffs propose certification of the following subclasses:

**SUBCLASS 1**: All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards of, the District of Columbia, and were not or will not be identified and/or located for the purposes of offering special education and related services;

**SUBCLASS 2**: All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards of, the District of Columbia, and did not or will not receive a timely initial evaluation for the purposes of offering special education and related services;

**SUBCLASS 3**: All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards of, the District of Columbia, and did not or will not receive a timely determination of eligibility for special education and related services; and

**SUBCLASS 4**: All children with disabilities, as defined by the IDEA, who lived in or will live in, or are or will be wards of, the District of Columbia, and who participated or will participate in early intervention programs under Part C of IDEA, and who participated or will participate in preschool programs under Part B, and who did not or will not have a "smooth and effective" transition from Part C to Part B by the child's third birthday.

## C. **Rule 23 Analysis**

Certification of the proposed subclasses is proper only if this Court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart*, 131 S. Ct. at 2551. In addition, the Court must determine whether the subclasses can be properly certified under Rule 23(b)(2). The Court will also briefly address the District's argument that the subclasses are not sufficiently definite and the plaintiffs' request for reinstatement of the Court's prior liability determinations and remedial order.

### i. *Numerosity*

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable." The plaintiffs "need not provide the exact number of potential class members in order to satisfy this requirement," and "numerosity is presumed at a level of 40 members." *Bynum v. District of Columbia*, 214 F.R.D. 27, 33 (D.D.C. 2003). Aside from class size, plaintiffs must demonstrate Rule 23(a)(1)'s core requirement that joinder is impracticable. Demonstrating impracticability of joinder "does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007).

The first subclass includes all disabled children in the District who have not been and will not be identified as candidates for special education services under the IDEA. In just one year, 2008, the plaintiffs' expert estimates that the District failed to identify at least 1,152 disabled children. Pls.'s Class Cert. Mot., Ex. 3 (Tr. Transcript, Apr. 6, 2011), at 79–82; Pls.'s Class Cert. Mot., Ex. 2 (Direct Testimony of Carl J. Dunst, Mar. 16, 2011), at 8. The second subclass, children who did not and will not receive initial evaluations within 120 days of referral, numbered at least 514 in 2010. Pls.'s Class Cert. Mot., Ex. 4 (Early Stages Scorecard); Pls.'s

Class Cert. Mot., Ex. 5 (Direct Testimony of Dr. Leonard A. Cupingood, Mar. 15, 2011) [hereinafter Cupingood Testimony], table 6. Subclass three, children who did not and will not receive eligibility determinations within 120 days of referral, included at least 1,057 children in 2008 through 2010. Cupingood Testimony at 8, table 3. The final subclass, children who did not and will not receive a smooth and effective transition from Part C to Part B services, included 163 children in 2008. Dunst Rep. at 16.

In just the limited timeframes highlighted above, every subclass far exceeds the threshold number of 40. Moreover, pursuit of individual actions on behalf of the class members would be impracticable. Several of the relevant factors to impracticability—"financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members," *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)—are present here.

The IDEA ensures a free and appropriate education to the District's youngest and most vulnerable pupils, many of whom are "indigent and unable to obtain legal services." Pls.'s Class Cert. Mot. at 20. This litigation is thus an example of the "[e]conomic reality . . . that petitioner's suit [must] proceed as a class action or not at all." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974). Moreover, the class seeks prospective relief for future class members, whose identities are currently unknown and who are therefore impossible to join. *See, e.g., Olson v. Brown*, 284 F.R.D. 398, 408 (N.D. Ind. 2012) ("[F]uture members make joinder inherently impracticable because there is no way to know who they will be" and "the inherently transitory nature of the class members makes their joinder in a single, non-class suit impossible, since only a portion of the class will have standing to bring their claims at any one time.") And class litigation of these claims is an efficient use of judicial resources and provides a uniform

redress of the plaintiffs' common grievances. Accordingly, the Court finds the numerosity requirement of Rule 23(a)(1) satisfied.

### ii. Commonality

Commonality—the "crux" of the Supreme Court's *Wal-Mart* decision and the basis of the Circuit's opinion—exists when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In *Wal-Mart*, the Supreme Court clarified that it is not common *questions* that matter so much as the "capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2155 (internal citation omitted) (emphasis in original). The search for commonality is complicated because "at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." *Love v. Johanns*, 439 F.3d 723, 729–30 (D.C. Cir. 2006) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998)). Courts must therefore be careful to avoid certification based on superficial commonalities (e.g., that all plaintiffs are residents of the District of Columbia) or the mere assertion that class members have suffered a violation of the same provision of law (e.g., that all plaintiffs the have suffered an IDEA violation). *Wal-Mart*, 131 S. Ct. at 2551. Rather, to satisfy Rule 23(a)(2), the resolution of the common question of law or fact must "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* In other words, class members must have suffered the same injury *for the same reason*, such as a uniform policy or practice that is illegal. *Id.* This is especially key in cases such as this where plaintiffs allege widespread wrongdoing by a defendant because a "uniform policy or practice that affects all class members," *DL*, 713 F.3d at 128, bridges the gap between individual claims of harm and the "existence of a class of persons who have suffered the same injury as that individual," *Wal-Mart*, 131 S. Ct. at 2553.

Applying these principles, the Circuit held that the class previously certified in this case lacked commonality because the "harms alleged to have been suffered by the plaintiffs here involve different policies and practices at different states of the District's Child Find and FAPE process" and were linked together only by violation of the same provision of law, the IDEA. *DL*, 713 F.3d at 127. As originally certified, then, the class was overbroad, based upon "multiple, disparate failures to comply with the District's child find obligations," rather than a "common true or false question that can be answered for each of these . . . different claims of harm." *Id*. at 128. The Circuit explained

> For some plaintiffs, for example, the alleged harm suffered is due to the failure of the District to have an effective intake and referral process; for others the alleged harm is caused by the District's failure to offer adequate and timely education placements to implement individual education plans ("IEPs"); for still others, the cause is the absence of a smooth and effective transition from early intervention programs to preschool programs.[3]

*Id*.

Subclasses divided according to specific IDEA violations solves the broadness problem; indeed, plaintiffs' proposal directly tracks the specific harms identified by the Circuit.[4] Each

---

[3] This echoes the holding of the Seventh Circuit in *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481 (7th Cir. 2012), a case cited in the Circuit's opinion and relied upon by the District. As in the present case, the district court in *Jamie S.* certified a broad class of disabled children who suffered violations of the IDEA. The Seventh Circuit, based on *Wal-Mart*, reversed, stating:

> To illustrate the commonality problem in the certified class, consider two hypothetical students within the class: one has a disability and would be eligible for special education but has never been identified as being disabled nor gone through the IEP process; another was identified as disabled and received a timely IEP meeting, but the child's parents did not attend the IEP meeting and were not notified of their right to do so. Both scenarios involve violations of the IDEA, but what common question can be answered that would assist the court in determining MPS's liability for each? On the plaintiffs' theory, that question is something like this: Did MPS fulfill its IDEA obligations to each child? But while that generic question is surely a part of both children's claims, it must be answered separately for each child based on individualized questions of fact and law, and the answers are unique to each child's particular situation.

*Jamie S.*, 668 F.3d at 498.

[4] In fact, the proposed subclasses parallel the District's argument to the Circuit. There, the District argued that the original class improperly combined "failures in four distinct administrative functions: (1) identification of a child as one potentially needing services, (2) location of that child, (3) evaluation for potential services, and (4) if necessary, provision of services." *DL*, 713 F.3d at 126.

proposed subclass poses the question whether the District's policies were adequate to fulfill a specific statutory obligation under the IDEA. Stated differently, each subclass alleges a uniform practice of failure that harmed every subclass member in the same way. Specifically, the first subclass seeks to litigate whether the District fulfilled its statutory duty to have effective policies and procedures to identify disabled children; the second subclass asks whether the District fulfilled its obligation to timely evaluate identified children; the third subclass questions whether the District performed its duty to provide timely eligibility determinations; and the fourth subclass seeks resolution of whether the District provided smooth and effective transitions between Part C and Part B services as required by the IDEA. Every subclass thus presents a true or false question that is dispositive of its respective claim.

Two distinctions between the present claims and those in *Wal-Mart* further underscore the commonality in the proposed subclasses.

First, the Title VII claims at issue in *Wal-Mart* depended upon "the reason for [each] particular employment decision," *Wal-Mart*, 131 S. Ct. at 2552, and the Court emphasized that each store manager was permitted to use "their own subjective criteria when selecting candidates," *id.* at 2546. Absent a uniform policy of discrimination, the Court found it impossible to establish the same discriminatory bias among managers from over 3,000 stores throughout the entire country. By contrast, resolution of the present claims turns on objective, statutorily-defined obligations that lack the amorphous quality of Title VII decisions. The plaintiffs do not seek to litigate the merits of individual, fact-specific IDEA claims—whether a particular IEP was sufficient, for instance—but whether the District generally met its statutory obligations to disabled children under the IDEA. Where there is a statutory obligation to act, there is a significant difference between challenging the inadequacy or complete failure to enact

policies and procedures and alleging an erroneous application of a policy to individuals. For this reason, even after *Wal-Mart*, courts have properly certified classes challenging uniform practices of failure or inaction. *See, e.g.*, *Parsons v. Ryan*, 289 F.R.D. 513, 521 (D. Ariz. 2013) (finding commonality in class of state inmates alleging deliberate indifference to medical needs "where all inmates are subjected to Defendant's actions or lack thereof, because they have the sole responsibility for health care policy"); *Brooklyn Ctr. for Independence of the Disabled v. Bloomberg*, 290 F.R.D. 409 (S.D.N.Y. 2012) (finding commonality for a class challenging a "City-wide policy and [the city's]alleged failure to take into account the needs of disabled citizens" despite the fact "the class members have diverse disabilities and will not all be affected by the alleged omissions in . . . the same way").

Second, the fact that the development and administration of the District's IDEA procedures are centralized in two closely-related agencies—District of Columbia Public Schools ("DCPS") and the Office of the State Superintendent of Education ("OSSE")—distinguishes this case from *Wal-Mart*. A critical reason why the absence of a general policy was fatal to commonality in *Wal-Mart* is that the plaintiff class sought to challenge "literally millions of employment decisions" made by the independent managers of more than 3,000 stores. *Wal-Mart*, 131 S. Ct. at 2552. The Court indicated that some part of the class could successfully demonstrate commonality if there were common claims of "discriminatory bias on the part of the *same supervisor*." *Id*. at 2551. This case is analogous to that scenario: disabled children in the District are subject to failures and inadequacies caused by the same agency. The OSSE has final responsibility for developing and ensuring compliance with the District's IDEA policies, which are implemented by DCPS. In 2009, and as a direct result of this litigation, the OSSE and DCPS reorganized the District's Early Stages Center. *DL*, 845 F. Supp. 2d at 15. The Center, directed

by Dr. Nathaniel Beers, oversees the vast majority of screenings, evaluations, and eligibility determinations, and controls 95% of all transitions from Part C to Part B. Pls.'s Class Cert. Mot., Ex. 11 (Trial Tr., Apr. 6, 2011), at 169–70, 200. IDEA practices in the District, unlike the thousands of managers in *Wal-Mart*, are highly centralized and within the purview of a single decisionmaker.

Thus, because each subclass presents a common contention that can be resolved with "one stroke," and given the factual distinctions from *Wal-Mart*, this Court finds the commonality requirement satisfied.

### iii. Typicality

The third prerequisite for class certification—typicality—shifts the focus from the characteristics of the class to the preferred qualities of the class representatives. Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A named plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to a claim of another class member's where his or her claims are based on the same legal theory." *Stewart v. Rubin*, 948 F. Supp. 1077, 1088 (D.D.C. 1996) *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997). The Rule requires that the named plaintiffs' claims be typical, not identical, and as such, this Court has found the typicality requirement satisfied where "at least one named plaintiff has a claim relating to each challenged practice for which relief is [sought]." *Id*. That standard is easily met here.

As to the first subclass, named plaintiffs D.L. and J.B. allege that, despite being explicitly informed of their disabilities, the District failed to identify them as potential candidates for special education services. Sec. Am. Comp. ¶¶ 7–15, 41–42.[5] For example, the District received

---

[5] The Court will grant the plaintiffs' Motion to Amend the First Amended Complaint, see Section III, *infra*, and thus cites to the Second Amended Complaint.

notice of D.L.'s "significant behavioral and emotional problems" in June 2004, but did not identify D.L. as an IDEA candidate until more than a year later in August 2005. *Id.* ¶¶ 6, 9, 15. The claims of named plaintiffs T.F. and H.W. are typical of the second subclass as both allege that they did not receive initial evaluations within 120 days of referral as required by the IDEA and D.C. law. *Id.* ¶¶ 65–73, 27–30. T.F., for instance, alleges that despite a referral for an evaluation in September 2003, the District failed to evaluate him until July 2005. *Id.* ¶¶ 66, 73. The claims of the third subclass are typified by the claims of named plaintiffs D.L., H.W., J.B., and T.F., who all allege that the District failed to provide timely eligibility determinations. *Id.* ¶¶ 14–15, 29–30, 45–50, 74. Finally, named plaintiffs X.Y. and T.L. both allege that the District failed to provide a smooth and effective transition from Part C to Part B services. *Id.* ¶¶ 23–24, 34–38. In X.Y.'s case, the District properly convened a transition meeting when X.Y. was two years, eight months old, but failed to ensure that he was transitioned to the Part B program, causing a one-year disruption of services after X.Y.'s third birthday. *Id.* ¶¶ 23–25.

For each subclass, there is a sufficient nexus between the claims of the named plaintiffs and the claims of the class. The Court therefore finds the typicality requirement satisfied.

### iv. Adequacy

The final prerequisite to class certification, adequacy, requires a finding that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). There are two criteria for adequacy: "1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997). The District does not allege that there are conflicting interests between the named plaintiffs and the subclasses or that the named plaintiffs appear unable to vigorously litigate this

case; rather, the District argues that because the named plaintiff's claims are moot—an argument this Court rejects, Section II.A, *infra*—they are per se inadequate. The Court disagrees.

In support of its position, the District relies on a case from the Seventh Circuit, holding that although the mootness of a named plaintiff's claim "does not automatically disqualify him from serving as class representative, since it does not make the suit moot . . ., it makes him presumptively inadequate" under Rule 23(a)(4). *Culver v. City of Milwaukee*, 277 F.3d 908, 912 (7th Cir. 2002). But *Culver* is factually distinct from the present case. In *Culver*, the named plaintiff brought suit on behalf of white men who had been allegedly discriminated against by the Milwaukee Police Department. *Id*. at 909. The named plaintiff, whose request for an application was denied, sought to certify a class "not only of other white males whose request for job applications had been turned down but also white males who had somehow succeeded in applying but had not been hired." *Id*. at 910. The district court initially certified one class, but later held that the class had to be divided into two subclasses—those who did not actually apply and those who did—in part because Mr. Culver was not an adequate representative for those who actually completed the application process but were not hired. *Id*. at 911–12. Holding that Mr. Culver was not an adequate representative for *either* class, the Seventh Circuit relied, not only on the mootness of Mr. Culver's claim, but also on the fact that he "pursued the suit in a most lackadaisical manner" and did "nothing to move the case forward except file a flurry of frivolous motions." *Id*. at 912. In other words, Mr. Culver failed to meet the second prong of the test for adequacy: he did not "appear able to vigorously prosecute the interests of the class." *Twelve John Does*, 117 F.3d at 575. The lack of adequacy in *Culver* was buttressed by two additional facts: (1) "no member of the class [had] any interest beyond that of a curious onlooker in pursuing

[the] litigation"; and (2) "the refusal of the class representative's lawyer to cooperate in dividing the class into subclasses." *Culver*, 277 F.3d at 912–13.

By contrast, the named plaintiffs and class counsel in the present case have displayed a strong commitment to resolving this case, responding to all developments in a timely and professional fashion. The named plaintiffs in this case simply do not display the "total lack of interest and unfamiliarity with the suit" that is typically required to reject class certification for lack of adequate representation. *Harris v. Koenig*, 271 F.R.D. 383, 391 (D.D.C. 2010) (internal quotations omitted). The Court therefore finds that Rule 23(a)(4) is satisfied.

The District also argues that class counsel is inadequate under Rule 23(g), which requires appointment of class counsel that will "fairly and adequately represent the interests of the class." The District raises this objection despite acknowledging that "[p]laintiffs' counsel is experienced and knowledgeable in relevant respects," Def.'s Opp'n at 33, but claims that "counsel nevertheless does not satisfy the requirements of the rule because they do not have the financial resources to adequately represent the class," *id*. In support of this claim, the District astonishingly cites an affidavit filed by class counsel Bruce J. Terris in another case, *Salazar v. D.C.*, stating that his firm faced substantial financial hardship as a result of the District's refusal to identify and pay *undisputed* attorney's fees. *Salazar v. District of Columbia*, Civil No. 93-452, Pls.'s Opp'n to Def.'s Mot. for Ext., ECF No. 1811, Ex. 1 (Affidavit of Bruce J. Terris, Apr. 10, 2013); *see also Salaza*r, Order, July 3, 2013, ECF No. 1835, at 3 (invoking "fundamental fairness" to question the District's justification for "denying Plaintiffs . . . the money to which they will ultimately be paid in the future when they urgently need payment now."). The District is a direct cause of the financial hardship that they now argue disqualifies counsel from representing the plaintiff class in this case. The Court rejects this argument as it

runs afoul of this jurisdiction's chutzpah doctrine. *See, e.g.*, *Marks v. Commissioner*, 947 F.2d 983, 986 (D.C. Cir. 1991) (invoking the doctrine in case of fugitives from criminal prosecution arguing that inadequate efforts were made to find and notify them of tax delinquency); *Harbor Ins. Co. v. Schnabel Found. Co., Inc*., 946 F.2d 930, 937 n.5 (D.C. Cir. 1991) ("[Th]e legal definition of chutzpah: chutzpah is a young man, convicted of murdering his parents, who argues for mercy on the ground that he is an orphan."). Class counsel has prosecuted this case with great professional ability and easily satisfies the requirements of Rule 23(g).

> *v. Rule 23(b)(2)*

Rule 23(b)(2) sets forth two basic requirements: (1) the party opposing the class must have "acted, refused to act, or failed to perform a legal duty on grounds generally applicable to all class members," and (2) "final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, must be appropriate." Fed. R. Civ. P. 23(b)(2); 2 William B. Rubenstein, Newberg on Class Actions § 4:26 (5th ed.). As to the first point, each of the four proposed subclasses asserts that the District failed to meet its statutory obligations under the IDEA to ensure identification, timely evaluation, timely eligibility determination, and effective transition from early intervention services to preschool special education services, respectively. On the second requirement, because each class alleges a uniform harm (e.g., not being identified, evaluated, determined eligible, and afforded a smooth and effective transition), injunctive relief requiring the district to perform its statutory duty will "settl[e] the legality of the behavior with respect to the class as a whole," Fed. R. Civ. P. 23(b)(2). Stated in *Wal-Mart* terms, certification of a (b)(2) class in this case is appropriate because the District's conduct is "such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 131 S. Ct. at 2557.

Relying on the Seventh Circuit's opinion in *Jamie S.*, the District argues that injunctive relief such as that previously imposed by this Court "merely establishes a system for eventually providing individualized relief." Def.'s Opp'n to Pls.'s Mot. for Class. Cert. & Reinstatement of Findings of Liability and Order Granting Relief, ECF No. 370, at 27 [hereinafter Def.'s Opp'n] (quoting *Jamie S.*, 668 F.3d at 499). The District's argument—and its reliance on *Jamie S.*—is incorrect. The district court's injunctive remedy in *Jamie S.* established a "hybrid IEP team" of "individuals from diverse professional backgrounds" to evaluate each class member to determine whether there was a denial of FAPE, and if so, to determine whether compensatory services were appropriate. *Jamie S. v. Milwaukee Pub. Sch.*, No. 01-C-928, 2009 WL 1615520, at *28–*35 (E.D. Wis. June 9, 2009) *vacated*, 668 F.3d 481 (7th Cir. 2012). The district court's acknowledgement that the type and scope of compensatory services would be determined based upon the "unique needs and circumstances of [each] class member" *id*. at *33, was fundamentally incompatible with Rule 23(b)(2)'s requirement of indivisible injunctive relief. The Seventh Circuit thus held that (b)(2) certification was inappropriate because the "intricate remedial scheme" amounted to each class member receiving "a different or declaratory judgment against the defendant." *Jamie S.*, 668 F.3d at 499.

By contrast, each of the subclasses in the present case seeks declaratory and injunctive relief that will apply equally to all class members. This is unlike the *Jamie S.* injunction, which required "thousands of individual determinations of class membership, liability, and appropriate remedies." *Jamie S.*, 668 F.3d at 499. The aim of the subclasses here—to rectify the District's systemic failure to comply four specific statutory duties to all class members—fits the prototype of the (b)(2) class, which is the "most frequent[] . . . vehicle for civil rights actions and other

institutional reform cases that receive class action treatment." *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 58–59 (3d Cir. 1994). The Court therefore finds Rule 23(b)(2) satisfied.

### vi. Definiteness

The District asserts that class certification should be denied because the proposed subclasses are fatally indefinite. Definiteness is not mandated by Rule 23 but is a judicial creation requiring that the class be (1) "adequately defined;" and (2) "clearly ascertainable." 1 William B. Rubenstein, ,Newberg on Class Actions § 3:3 (5th ed.). The latter requirement for precise ascertainability of class members is intended to protect absent plaintiffs by enabling notice and to protect defendants "by enabling a final judgment that clearly identifies who is bound by it." *Id*. § 3:7. But in a 23(b)(2) class, notice is not required, Fed. R. Civ. P. 23(c)(2)(A), and defendants are generally bound by any injunction imposed by the court. It is therefore "not clear that the implied requirement of definiteness should apply to Rule 23(b)(2) class actions at all." Newberg § 3:7. For these reasons, the First and Tenth Circuits do not require precise ascertainability for certification of (b)(2) classes. *See Shook v. El Paso Cnty*., 386 F.3d 963, 972 (10th Cir. 2004); *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972). On the other hand, the Fifth, Sixth, and Seventh Circuits have traditionally assessed the definiteness of *all* classes, including (b)(2) classes seeking only injunctive relief. *See, e.g., Romberio v. Unumprovident Corp*., 385 F. App'x 423, 430 (6th Cir. 2009); *Adashunas v. Negley*, 626 F.2d 600, 603 (7th Cir. 1980); *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970). But while these circuits have perfunctorily applied the ascertainability requirement, none of them examined whether the requirement *should* exist in (b)(2) classes.[6] Indeed, the district courts within these

---

[6] Still other circuits have affirmed certification of classes similar to the proposed subclasses in this case without even addressing the ascertainability of the class. *See ,e.g*., *Marisol A. v. Giuliani*, 126 F.3d 372, 375 (2d Cir. 1997) (affirming certification of class consisting of "[a]ll children who are or will be in the custody of the New York City Administration for Children's Services ("ACS"), and those children who, while not in the custody of ACS, are or will be at risk of neglect or abuse and whose status is or should be known to ACS."); *Baby Neal*, 43 F.3d at 54

circuits that have directly considered the issue have applied the requirement "more flexibly in situations where individual notice to class members is not required, such as suits for equitable relief." *Haynes v. Dart*, No. CIV.A. 08 C 4834, 2009 WL 2355393, at *4 (N.D. Ill. July 29, 2009); *see also Stewart v. Cheek & Zeehandelar LLP*, 252 F.R.D. 387, 391 (S.D. Ohio 2008); *Midwest Cmty. Council, Inc. v. Chicago Park Dist.*, 87 F.R.D. 457, 460 (N.D. Ill. 1980) ("Moreover, when, as here, defendants' alleged policies and practices shape the contours of the class, attacks on its definiteness are not entitled to weighty consideration provided all other requirements for class certification are established.").

Because the rationale for precise ascertainability is inapposite in the 23(b)(2) context, this Court agrees with the First and Tenth Circuits that it is not required in cases such as this where only injunctive relief is sought and notice is not required. *See Floyd v. City of New York*, 283 F.R.D. 153, 172 (S.D.N.Y. 2012) ("It would be illogical to require precise ascertainability in a suit that seeks no class damages."). This is consistent with the intent of the drafters of Rule 23(b)(2), who explicitly endorsed its use in cases such as this that challenge widespread illegal practices because the class members are often "incapable of specific enumeration." Adv. Comm. Notes to Rule 23; *see also, e.g.*, *Baby Neal*, 43 F.3d at 58–59 ("[The] injunctive class provision was designed specifically for civil rights cases seeking broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons. . . . [I]njunctive actions, seeking to define the relationship between the defendant and the 'world at large,' will usually satisfy [the requirements of Rule 23(b)(2)]") (internal quotations and citations omitted).

The other component of definiteness, an adequately defined class, "is designed primarily to help the trial court manage the class" by avoiding amorphous or subjective class definitions

---

(finding class certification proper for "all children in Philadelphia who have been abused or neglected and are or should be known to the Philadelphia Department of Human Services.").

that make it "impossible to determine who is or is not a member of the class." *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998). On this point, the District argues that the subclass definitions are "administratively burdensome" because the definitions "depend on subjective criteria and require extensive factual inquiry to determine class membership." Def.'s Opp'n at 31. Although the definitions may appear amorphous at first glance, each has an objective and readily discernible meaning. For example, the second and third subclasses consist of children who did not receive "timely" evaluations or eligibility determinations. But timeliness does not, as the District argues, require "an individualized inquiry into the facts of that particular child's case." Def.'s Opp'n at 31. Rather, it is defined by statute—any evaluation or eligibility determination made more than 120 days from identification is untimely. Likewise, a "smooth and effective" transition between Parts C and B of the IDEA is objectively defined as one that (1) begins no less than 90 days prior to the child's third birthday; (2) does not include a disruption in services between Part B and Part C services; and (3) involves Part B personnel.

Every class definition is sufficiently objective for determination of whether a particular individual is a member of the class. The Court therefore finds that the subclasses are sufficiently definite.

### D. Certified Subclasses

Having found all requirements of Rule 23 satisfied, the Court will certify the following subclasses:

**SUBCLASS 1**: All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards of, the District of Columbia, and were not or will not be identified and/or located for the purposes of offering special education and related services.

**REPRESNTATIVES**: Subclass 1 shall be represented by named plaintiffs D.L. and J.B.

**SUBCLASS 2**: All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards

of, the District of Columbia, and did not or will not receive an initial evaluation within 120 days of the date of referral for the purposes of offering special education and related services.

**REPRESNTATIVES**: Subclass 2 shall be represented by named plaintiffs T.F. and H.W.

**SUBCLASS 3**: All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards of, the District of Columbia, and did not or will not receive a determination of eligibility within 120 days of the date of referral for special education and related services.

**REPRESNTATIVES**: Subclass 3 shall be represented by named plaintiffs D.L., H.W., and T.F.

**SUBCLASS 4**: All children with disabilities, as defined by the IDEA, who lived in or will live in, or are or will be wards of, the District of Columbia, and who participated or will participate in early intervention programs under Part C of IDEA, and who participated or will participate in preschool programs under Part B, and who did not or will not have a "smooth and effective" transition from Part C to Part B by the child's third birthday. A transition shall be considered "smooth and effective" if (1) the transition begins no less than 90 days prior to the child's third birthday; (2) the child is provided with an IEP listing both the type of placement and a specific location for services by the child's third birthday; (3) there is no disruption in services between Part C and Part B services; and (4) Part B personnel are involved in the transition process.

**REPRESNTATIVES**: Subclass 4 shall be represented by named plaintiffs X.Y. and T.L.

### E.  Reinstatement of Liability & Injunctive Relief

The plaintiffs move this Court to reinstate its findings of liability and remedial orders. But the Circuit expressly vacated "the class certification order, *and consequently the liability and remedial orders*," and remanded for redetermination of liability and appropriate relief. *DL*, 713 F.3d at 121 (emphasis added). Reinstatement of the prior liability and remedial orders would therefore be plainly inappropriate. Accordingly, the plaintiffs' motion to reinstate liability is denied.

Arguing from the opposite end of the spectrum, the District asserts that it faces no liability at all because "this is not the case it was prior to appeal" and its IDEA compliance has markedly improved. Def.'s Opp'n at 4. But although the Court applauds the District's steps towards fulfilling its obligations to its disabled child residents, "[i]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially

when abandonment seems timed to anticipate suit, and there is probability of resumption," *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952). And this Court has previously found that reforms to the District's IDEA practices "occurred because of pressures placed by this lawsuit." *DL*, 845 F. Supp. 2d at 15. Thus, the Court will not, as the District urges, accept its "protestations of repentance and reform*," Or. State Med.*, 343 U.S. at 333, and forego a reexamination of liability.

As neither extreme presented by the plaintiffs or the District is proper, the Court will impose a solution somewhere in the middle. The Court has made findings of fact regarding the District's IDEA performance through April 2011, but it is clear that much has changed since that time. As such, the Court will, as specified in a separate order issued this date, commence proceedings to make findings of fact on the District's IDEA compliance with respect to each subclass since April 2011. The Court will then, as instructed by the Circuit, redetermine liability and the appropriate remedy.

## II.     MOTION TO DISMISS

The Court now turns to the District's motion to dismiss the plaintiffs' claims for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Article III, § 1 of the Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). Given this limitation, this Court is constitutionally bound to establish its jurisdictional authority to hear this case. *See, e.g.*, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). As the party claiming subject matter jurisdiction, it is the plaintiffs' burden to establish that jurisdiction exists. *Id*. The Court finds that plaintiffs have met this burden.

### A.  <u>Standing & Mootness</u>

Because the named plaintiffs are now between ten and fifteen years old and will therefore never again be subject to the District's inadequate Child Find procedures, the District argues that the plaintiffs lack and standing and that their claims are moot. Def.'s Mot. to Dismiss, ECF No. 365, at 4–5. As a threshold matter, the District's argument misapprehends the distinction between standing and mootness. Standing—the requirement that plaintiffs have suffered a concrete injury caused by the defendant and capable of judicial redress—is "assessed as of the time a suit commences." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009). So long as the named plaintiffs met this requirement at the time that the initial complaint was filed, Article III standing is satisfied. Events subsequent to the filing of the complaint may *moot* the plaintiffs' claims, but the plaintiffs do not lose *standing*. As explained by the Supreme Court, "the doctrine of mootness can be described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotations omitted).

This Court has previously found, and the District does not dispute, that the named plaintiffs had standing at the time the complaint was filed in 2005. The plaintiffs thus still have standing to litigate their claims.

By contrast, the mootness doctrine requires a live controversy "at all stages of review, not merely at the time the complaint is filed." *Alvarez v. Smith*, 558 U.S. 87, 92 (2009) (internal quotations omitted). But this doctrine "is riddled with exceptions." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 n.11 (1980). In *Sosna v. Iowa*, for example, the Supreme Court held that a class action "does not inexorably become moot by the intervening resolution of the controversy as to the named plaintiffs." 419 U.S. 393, 401 (1975). The named plaintiff in *Sosna*

challenged the constitutionality of a one-year durational residency requirement for divorce jurisdiction. *Id*. at 395–96. By the time the case reached the Supreme Court, Ms. Sosna had satisfied the one-year requirement and her individual claim was therefore moot. *Id*. at 399. The Court held that the case was "one in which state officials will undoubtedly continue to enforce the challenged statute and yet, because of the passage of time, no single challenger will remain subject to its restrictions for the period necessary to see such a lawsuit to its conclusion." *Id*. at 400.

The Court limited the *Sosna* holding to cases where the named plaintiff has a live case or controversy at the time the complaint is filed *and* at the time the district court certifies the class. *Id*. at 402. The named plaintiffs in this case had live claims at the time the complaint was filed and at the time of initial class certification; however, that initial certification was vacated by the Circuit. Legally, therefore, no class currently exists, and the District argues that the plaintiffs cannot satisfy *Sosna* because their individual claims were mooted prior to certification of the class. But the Court in *Sosna* wisely predicted that

> There may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion. In such instances, whether the certification can be said to 'relate back' to the filing of the complaint may depend upon the circumstances of the particular case and especially the reality of the claim that otherwise the issue would evade review.

*Id*. at 402 n.11; *see also Basel v. Knebel*, 551 F.2d 395, 397 n.1 (D.C. Cir. 1977) (noting that under Sosna, there are "some circumstances a class action should not be deemed moot even if the named plaintiff's claim becomes moot prior to certification of the class.").

The lengthy and peculiar circumstances of the present case warrant relation back of the subclass certification. This litigation has meandered since 2005. At the time this Court initially certified the class, the named plaintiffs had live and ongoing controversies. It is undisputed that

members of every subclass continue to have live IDEA claims notwithstanding the status of the named plaintiffs' claims. Moreover, the decertification of the larger class and subsequent certification of subclasses are not due to any undue delay by the plaintiffs. Rather, the gap in class certification occurred because "*Wal–Mart*'s interpretation of Rule 23(a)(2) . . . changed the landscape." *DL*, 713 F.3d at 126.

Relation back is also warranted because IDEA claims are inherently transitory. The inherently transitory exception to mootness permits relation back in "any situation where composition of the claimant population is fluid, but the population as a whole retains a continuing live claim." 1 William B. Rubenstein, Newberg on Class Actions § 2:13 (5th ed.). In a case challenging the failure of a state to provide probable cause hearings to arrestees, the Supreme Court explained:

> Our cases leave no doubt, however, that by obtaining class certification, plaintiffs preserved the merits of the controversy for our review. That the class was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction. We recognized in *Gerstein* that "[s]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.

*Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991). IDEA litigation, specifically litigation involving the Child Find obligations that only apply to children aged three to five, is undoubtedly transitory. The Supreme Court has recognized the "ponderous" nature of IDEA claims, *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985), which is demonstrated by the eight-year life of this case. This lengthy review process, coupled with natural age progression, means that the composition of the class may change constantly, but there is no doubt that "the population as a whole retains a continuing live claim." Newberg § 2:13; *see, e.g.*, *M.A. ex rel. E.S. v. Newark Pub. Sch.*, No. CIV.A. 01-3389SRCQ,

2009 WL 4799291, at *10 (D.N.J. Dec. 7, 2009) ("IDEA claims are without question inherently transitory. In other words, an IDEA plaintiff's interest in rectifying the wrong complained of in the complaint—for example, the deprivation of a FAPE in a particular school year—often lapses by mere passage of time. Defendants' provision of an evaluation, eligibility determination and IEP to a named Plaintiff post-filing of the complaint, or alternatively, their inability to do so because a named Plaintiff has graduated or aged out of the school system should not extinguish the class claims or render those Plaintiffs inadequate class representatives.").

Accordingly, the Court finds that the subclass claims are not moot.

### B.  **Exhaustion**

Save one, all of the named plaintiffs have exhausted the administrative remedies available under the IDEA.  The District argues that because one plaintiff, T.L., did not exhaust administrative remedies, the entire complaint must be dismissed for lack of jurisdiction.  The Court disagrees.

Generally, "[a] court has no subject matter jurisdiction over an IDEA claim that has not first been pursued through administrative channels."  *Massey v. District of Columbia*, 400 F. Supp. 2d 66, 70 (D.D.C. 2005); *cf. Cox v. Jenkins*, 878 F.2d 414, 422 (D.C. Cir. 1989) (holding that where plaintiffs failed to exhaust remedies under the Education of Handicapped Act, the predecessor to the IDEA, "the District Court had no authority to hear their suit.").  In *Honig v. Doe*, however, the Supreme Court held that under the IDEA, "parents may bypass the administrative process where exhaustion would be futile or inadequate."  484 U.S. 305, 327 (1988).  And the District has presented no reason for this Court to reconsider its prior opinion excusing exhaustion because it would futile in this case.  *DL v. District of Columbia*, 450 F. Supp. 2d 11, 18–19 (D.D.C. 2006).  Likewise, nothing in the District's motion defeats this Court's prior finding that "even if exhaustion of administrative remedies is required, plaintiffs

have satisfied this requirement" given the Circuit's holding that "only one named plaintiff is required to exhaust his or her administrative remedies in civil rights class actions." *DL*, 450 F. Supp. 2d at 17; *Hartman v. Duffey*, 88 F.3d 1232, 1235 (D.C.Cir.1996) (holding "[t]he district court applied this court's doctrine of vicarious exhaustion—that exhaustion of administrative remedies by one member of the class satisfies the requirement for all others with sufficiently similar grievances . . . . "); *see also, e.g.*, *Foster v. Gueory*, 655 F.2d 1319, 1321–1322 (D.C.Cir.1981) (noting that "each individual plaintiff in a Title VII class action suit need not individually file an EEOC complaint, but ... it is sufficient if at least one member of the plaintiff class has met the filing prerequisite."); *Association for Community Living v. Romer*, 992 F.2d 1040, 1045 (10th Cir.1993) ("[W]e do not hold that every plaintiff in a class action must exhaust the IDEA's administrative remedies. There may be cases where the purposes of the exhaustion doctrine would not be furthered by having even one plaintiff exhaust the IDEA's administrative remedies. Even where exhaustion is necessary, the exhaustion of a few representative claims may be sufficient").

Accordingly, the Court denies the District's motion for the reasons stated in its prior opinion; namely, that exhaustion would be futile, and alternatively, that each subclass has satisfied the exhaustion requirement because all other named plaintiffs have exhausted their remedies.

### III.    MOTION TO AMEND COMPLAINT

Federal Rule of Civil Procedure 15(a)(2) provides that "a party may amend its pleading only with . . . the court's leave" and that "the court should freely give leave when justice so requires." Although the rule is titled "Amendments Before Trial," "courts have not imposed any arbitrary timing restrictions on requests for leave to amend and permission has been granted under Rule 15(a) at various stages of the litigation. These include . . . after a judgment has been entered . . . and even on remand following an appeal."  Charles Alan Wright, Arthur R. Miller et al., *Federal*

*Practice & Procedure*, § 1488 (3d ed.). In keeping with this liberal amendment policy, the

Supreme Court has held that

> In the absence of any apparent or declared reason—such as undue delay, bad faith
> or dilatory motive on the part of the movant, repeated failure to cure deficiencies
> by amendments previously allowed, undue prejudice to the opposing party by
> virtue of allowance of the amendment, futility of amendment, etc.—the leave
> sought should, as the rules require, be 'freely given.'

*Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Firestone v. Firestone*, 76 F.3d 1205, 1208

(D.C. Cir. 1996) ("Rule 15(a)'s liberal standard for granting leave to amend governs once the

court has vacated the judgment.").

The plaintiffs here have not exhibited any "undue delay, bad faith or dilatory motive . . . ,

[or] repeated failure to cure deficiencies by amendments previously allowed," but the District

argues that it would be severely prejudiced should this Court permit amendment of the

complaint. Specifically, the District argues that it would have employed a different litigation

strategy, deposed and cross examined witnesses differently, and sought additional notice and

discovery as to each subclass. The Court finds this argument unconvincing as each of the claims

asserted by the subclasses was part of the initial complaint. Since the inception of this case, the

plaintiffs have alleged that the District failed to meet its statutory obligations to (1) identify

disabled children; (2) timely evaluate identified children; (3) make timely eligibility

determinations; and (4) provide smooth and effective transitions from Part C to Part B services.

The District therefore conducted discovery, deposed and cross examined witnesses, and made

motions to this Court knowing that these four claims were the subject of this case.

Moreover, it would be nonsensical to deny leave to amend the complaint to reflect the

newly-certified subclasses given that (1) irrespective of any amendment to the complaint, this

Court has always had the power to certify subclasses under Rule 23(c)(5) and (2) the Circuit

remanded this case for the explicit purpose of determining whether subclasses were appropriate in light of *Wal-Mart*. Accordingly, the Court will grant the plaintiffs leave to amend the complaint.

## CONCLUSION

For the reasons stated herein, the Court GRANTS IN PART and DENIES IN PART the plaintiffs' Motion for Class Certification and Reinstatement of Findings of Liability and Order Granting Relief; GRANTS the plaintiffs' Motion to Amend the First Amended Complaint; and DENIES the defendants' Motion to Dismiss for Lack of Jurisdiction.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, on November 8, 2013.