## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No.  05-1437 |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM OPINION

Plaintiffs in this class action challenge the District of Columbia's alleged failure to implement policies, procedures, and practices to ensure its compliance with its duties under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a); and District of Columbia law.

Plaintiffs now move the Court for partial summary judgment as to the District's liability through 2007 with respect to each subclass's claims. Plaintiffs also seek judgment pursuant to Rule 52(c) of the Federal Rules of Civil Procedure on the District's liability for the period from January 1, 2008, through April 6, 2011, with respect to each subclass's claims.

The District moves the Court to exclude the expert reports and testimony of Drs. Carl Dunst and Leonard Cupingood. Defs.' Mot. to Exclude,, and to grant summary judgment in its favor as to the claims of all plaintiffs from March 22, 2010 to the present.

## I.  BACKGROUND

### A. Statutory Scheme

Plaintiffs—residents of the District of Columbia and former preschool-age children with various disabilities—filed suit in 2005, alleging that the District failed to provide them a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Act ("IDEA").

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). In exchange for federal funding, the IDEA requires that states and the District of Columbia "establish policies and procedures to ensure . . . that free appropriate public education [FAPE] . . . is available to disabled children." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005) (internal quotations omitted); *see also* 20 U.S.C. § 1412(a)(1)(A). Under the IDEA, "[s]chool districts may not ignore disabled students' needs, nor may they await parental demands before providing special instruction." *Reid*, 401 F.3d at 518. Instead, the IDEA imposes an affirmative obligation on school systems to "ensure that all children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated." *Id*. at 519 (internal quotations omitted); 20 U.S.C. § 1412(a)(3)(A). The District's laws implementing the IDEA require that once a potential candidate for special education services is identified, the District must conduct an initial evaluation and make an eligibility determination within 120 days. D.C. Code § 38-2561.02(a). The duties to identify, evaluate, and determine eligibility for disabled children are collectively known as the "Child Find" obligation.

Children under three years of age who are identified, evaluated, and determined eligible may receive early intervention services under Part C of the IDEA. For these children, the Act requires a "smooth and effective" transition from Part C's early intervention services to Part B's preschool special education programs. 20 U.S.C. § 1412(a)(9). A smooth and effective transition is one that (1) begins no less than 90 days prior to the child's third birthday; (2) does not include a disruption in services between Part C and Part B services; and (3) involves Part B personnel. Pls.'s Mot. for Class Cert. and Reinstatement of Findings of Liability and Order Granting Relief, Ex. 6 (Expert Report of Carl J. Dunst, May 11, 2009), at 14; 34 C.F.R. 303.209. The transition process must include a conference between the child's family and school officials to determine eligibility for Part B services and to develop a transition plan and an Individualized Education Program ("IEP"). The goal is "a seamless transition between services" under Parts C and B of the Act. 34 C.F.R. 303.209.

When executed properly, the early intervention mandated by the IDEA "can work a miracle," allowing an estimated 75–80% of disabled children to enter "kindergarten alongside every other ordinary five-year-old—without needing further supplemental special education." *DL v. District of Columbia*, 845 F. Supp. 2d 1, 5 (D.D.C. 2011) ("2011 Opinion").

## B. Procedural History

The plaintiffs allege that the District has failed in its obligations to a large number of disabled children. Specifically, the plaintiffs aver that the District has engaged in a practice of failing to identify disabled children, failing to evaluate and make eligibility determinations for identified children, and failing to provide a smooth and effective transition from Part C to Part B special education services. And because they allege that the District's failure is pervasive and

systemic, plaintiffs sought to represent a class of children who, like themselves, were denied special education services by the District.

In August 2006, this Court certified a plaintiff class pursuant to Federal Rule of Civil Procedure 23(b)(2), defining the class as:

> All children who are or may be eligible for special education and related services, who live in, or are wards of, the District of Columbia, and (1) whom defendants did not identify, locate, evaluate or offer special education and related services to when the child was between the ages of three and five years old, inclusive, or (2) whom defendants have not or will not identify, locate, evaluate or offer special education and related services to when the child is between the ages of three and five years old, inclusive.

*DL v. District of Columbia*, 237 F.R.D. 319, 324 (D.D.C. 2006), ECF No. 57.

Following extensive discovery on the District's IDEA performance through 2007, the parties filed cross motions for summary judgment. The parties did not dispute that "the systems in place to serve the birth-to-five population in the District of Columbia were inadequately designed, supported, and facilitated across many years." *DL v. District of Columbia*, 730 F. Supp. 2d 84, 96 (D.D.C. 2010) ("2010 Opinion"). The District's systemic failure to comply with the IDEA resulted in yearly citations for noncompliance from the federal Office of Special Education Programs ("OSEP"). *Id.* at 97. Finding no genuine dispute that the District's attempts to identify, evaluate, and determine eligibility for disabled children were inadequate, the Court granted summary judgment on liability as to the plaintiff class's Child Find claim. *Id.*

Additionally, the parties agreed that "the procedures used by [the District] to screen children exiting Part C were in many cases not necessary and delayed provision of preschool special education." *Id.* at 98.  Moreover, these screening procedures "were unreliable and were not always aligned with accepted practices in the field." *Id.* The Court therefore granted summary judgment on liability as to the plaintiff class's Part C to Part B transition claim. *Id.* The Court also

found that, at least through 2007, defendants had violated the Rehabilitation Act by demonstrating "bad faith or gross misjudgment" in failing to bring themselves into compliance with the IDEA. *Id.* at 100.

As the data available at the time of summary judgment was limited to the period through 2007, summary judgment and the initial findings as to the District's liability were limited to that time period.

On April 6 and 7, 2011, the Court held a bench trial to determine the District's liability for the period of 2008 through the trial date. Based on evidence presented at trial, the Court found that the District provided special education services to less than 6% of its total child population, despite statistical projections that the District should identify and serve at least 12%. 2011 Opinion at 10. Of those disabled children who were identified, the District failed to provide timely evaluations to 25–45% and timely eligibility determinations to 56.75%. *Id.* at 11. As for transitions from Part C to Part B services, the District provided smooth and effective transitions for 8.22% of children in 2008, 30.25% in 2009, and between 38–79% in 2010-2011. *Id.* at 12. The Court noted the District's efforts to reform its special education services in response to this litigation, but found that even given those reforms, the District's policies were inadequate to meet its obligations under the IDEA. *Id.* at 15–17. Indeed, notwithstanding its reform efforts, the District was cited by the federal OSEP for noncompliance for each of the four years prior to trial. *Id.* at 17. Thus, the Court found that the District's failure to institute adequate Child Find practices resulted in the denial of a FAPE to a substantial number of disabled children and that the District failed to comply with its legal duty to provide a smooth and effective transition to a significant portion of disabled children. *Id.* at 21–23. The Court also found that the District demonstrated bad faith or gross misjudgment by knowingly failing to comply with the IDEA and therefore violated Section 504 of the

Rehabilitation Act, which prohibits discrimination in programs receiving federal funding. *Id.* at 23; 29 U.S.C. § 749(a).

Given these findings, the Court granted the plaintiff class declaratory relief and imposed a structural injunction enjoining the District to comply with its legal obligations under the IDEA. *Id.* at 24–30.

Two months after the April 2011 trial, and before this Court issued its final decision, the Supreme Court decided *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), which clarified the proper interpretation of the commonality requirement for class certification under Rule 23(a)(2). *Wal-Mart* involved a putative class of one and a half million women, all current or former employees of Wal-Mart, alleging that "the discretion exercised by their local supervisors over pay and promotion matters violate[d] Title VII by discriminating against women." 131 S. Ct. at 2546. Noting that the pay and promotion decisions were made by thousands of geographically-dispersed managers, the Court held that "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored.*" *Id.* at 2552 (emphasis in original). To establish commonality, the Court held that a class must present a common contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551.

Based in part on the *Wal-Mart* decision, the District sought to decertify the class, arguing that the plaintiff class improperly "bundled together [in their Complaint] multiple different allegations of a variety of different provisions of the IDEA, the Rehabilitation Act, and local District of Columbia law" and "amalgamat[ed] . . . a variety of provisions of a single statutory

scheme." *DL v. District of Columbia*, 277 F.R.D. 38, 42 (D.D.C. 2011). In effect, the District argued that the IDEA could be violated in many different ways, and that it was improper to combine these multiple forms of IDEA violations in one broad class. The plaintiffs responded by seeking to recertify the class as four distinct subclasses, each consisting, respectively, of disabled children that the District failed to (1) identify; (2) timely evaluate; (3) determine eligibility; and (4) provide a smooth and effective transition from Part C to Part B services. This Court denied the District's motion, holding that members of the plaintiff class had suffered a common injury, namely "denial of their statutory right to a free appropriate public education." *Id*. at 45. Moreover, this Court held that the plaintiffs presented the common question whether class members received a FAPE and noted that the class members' "differing allegations only represent the differing ways in which defendants have caused class members' common injury." *Id*. At the same time, the Court extended the Court's liability through the trial date of April 6, 2011. 2011 Opinion at 1. The District appealed.

On appeal, the United States Court of Appeals for the District of Columbia Circuit reversed and remanded this Court's certification of the plaintiff class, holding:

> After *Wal–Mart* it is clear that defining the class by reference to the District's pattern and practice of failing to provide FAPEs speaks too broadly because it constitutes only an allegation that the class members "have all suffered a violation of the same provision of law," which the Supreme Court has now instructed is insufficient to establish commonality given that the same provision of law "can be violated in many different ways." *Wal–Mart*, 131 S.Ct. at 2551. In the absence of identification of a policy or practice that affects all members of the class in the manner *Wal–Mart* requires, the district court's analysis is not faithful to the Court's interpretation of Rule 23(a) commonality.

*DL v. District of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013). The Circuit therefore vacated the class certification order and remanded the case to this Court "for reconsideration of whether a

class, classes, or subclasses may be certified, and if so, thereafter to redetermine liability and appropriate relief." *Id*. at 129.

On remand, plaintiffs sought certification of four subclasses for their claims for declaratory and injunctive relief under Rule 23(b)(2), as well as reinstatement of the Court's previous findings of liability and order granting relief. Pls.' Mot. to Certify Class and for Reinstatement of Findings of Liability and Order Granting Relief, ECF No. 358. The Court granted plaintiffs' request for the certification of subclasses, certifying four classes. Briefly, the classes include children who did not or will not: (1) be identified and/or located; (2) receive an initial evaluation within 120 days of referral; (3) receive a determination of eligibility within 120 days of the date of referral; and (4) have a "smooth and effective" transition from part C to Part B by the child's third birthday. *DL v. District of Columbia*, 302 F.R.D. 1, 18 (D.D.C. 2013) ("2013 Opinion"). However, the Court denied plaintiffs' request for reinstatement of the Court's previous findings of liability, stating that "[r]einstatement of the prior liability and remedial orders would [ ] be plainly inappropriate." *Id.* The Court stated:

> The Court has made findings of fact regarding the District's IDEA performance through April 2011, but it is clear that much has changed since that time. As such, the Court will, as specified in a separate order issued this date, commence proceedings to make findings of fact on the District's IDEA compliance with respect to each subclass since April 2011. The Court will then, as instructed by the Circuit, redetermine liability and the appropriate remedy.

*Id.* at 19.

The parties then conducted discovery: Fact discovery closed on August 29, 2014, and expert discovery closed on September 26, 2014.

## II.   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DEFENDANTS' LIABILITY THROUGH 2007

Plaintiffs move the Court for partial summary judgment as to the defendants' liability through 2007 with respect to each subclass's claims.

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party's evidence is to be believed, and all reasonable inferences from the record are to be drawn in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 255 (1986). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

### B. Analysis

As noted above, this Court previously granted summary judgment in favor of plaintiffs. *See* 2010 Opinion. Plaintiffs rely on these findings in arguing for summary judgment in their favor. The District argues that this would be inappropriate because upon decertifying the single class, the D.C. Circuit vacated this Court's orders finding liability and ordering relief. Furthermore, this Court previously declined to automatically reinstate liability after the D.C. Circuit remanded the case.

While automatic reinstatement would have been inappropriate, plaintiffs are not precluded from moving for summary judgment on remand. As this Court stated, "[e]ach of the claims asserted

by the subclasses was part of the initial complaint" and has been "since the inception of this case." 2013 Opinion at 22. "The district therefore conducted discovery, deposed and cross examined witnesses, and made motions to this court knowing that these four claims were the subject of this case." *Id.* The four new subclasses merely correspond to four separate duties that have been the subject of the plaintiffs' claims from the beginning and were indeed stated in their Amended Complaint. First Am. Compl., ECF No. 61 at 24–27, 29–31. The District has not explained why this changes the substance of plaintiffs' complaint or its answer.

Of course, on remand the plaintiffs are again held to the standards of Rule 56 and must demonstrate an absence of material fact as to *each of the individual subclass claims*. Indeed, the District seems to concede that plaintiffs would be entitled to the relief they seek for this period if "the facts and analysis justifying [the previously granted] summary judgment to Plaintiffs' now-decertified class . . . are legally sufficient to justify summary judgment as to *each* of Plaintiffs' subclass claims." Defs.' Opp'n to Pls.' Mot. S.J. 2.

1.  IDEA Claims

The IDEA, in conjunction with implementing regulations and the D.C. Code and Regulations, sets forth duties and processes schools must follow in offering special education services to children with disabilities. Pursuant to these laws and regulations, the District is required to put in effect policies and procedures to ensure that all children with disabilities who are in need of special education and related services are identified, located, and evaluated. 20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. 300.125(a). The IDEA also requires that defendants ensure a "smooth and effective transition" from Part C to Part B services for disabled infants and toddlers by their third birthday. 20 U.S.C. § 1412(a)(9). Plaintiffs have the burden of proving a violation of the IDEA. *See Schaffer v. Weast*, 546 U.S. 49, 51 (2005).

In its prior grant of summary judgment, this Court analyzed the District's compliance with each of the four obligations at issue under the IDEA with respect to each of the four duties. After extensive discovery, the Court set forth material undisputed facts supporting its conclusion that there was no genuine dispute that the District's attempts to identify, evaluate, determine eligibility of, and transition disabled children were inadequate through and including 2007. These facts are sufficient to establish the District's liability under the IDEA on each subclass's claim.

### a. Identifying children

In 2010, this Court found no genuine issue of material fact on the issue of the District's failure to identify children. This Court held: "There is no genuine dispute that defendants' attempts to find disabled children in the District . . . were inadequate. Further, there is no genuine dispute that defendants actually failed to find these disabled children." 2010 Opinion at 97.

The Court reasoned that "[t]he parties agree that, at least through and including the year 2007, 'defendants' refusal to accept and act on referrals made by primary referral sources was impeding identification of children eligible for preschool special education.'" *Id.* at 96. The parties also agreed that "[d]efendants h[ad] pursued the same Child Find activities for several years without achieving a significant increase in the number of preschool-age children served under Part B." *Id.*

Thus, plaintiffs have already shown and the Court has already found that there is no material dispute: Prior to 2007, the District failed to adequately identify children pursuant to its duties under the IDEA.

### b. Initial evaluations and eligibility determinations

Similarly, this Court held: "[T]here is no genuine dispute that defendants' initial evaluations were inadequate." *Id.* at 97.

11

The parties agreed that in 2001, OSEP determined that the District had not met the requirement for timely evaluations under their Compliance Agreement, and thus designated the District as a "high risk grantee." *Id.* at 96. OSEP thus attached special conditions to the District's federal grant for that year, including requirements to ensure that the District conducted timely evaluations. *Id.* The parties agreed that OSEP cited the District for their failure to comply in each subsequent year through and including 2008. *Id.*

Relatedly, the Court found no genuine issue of material fact as to the issue of eligibility determinations.

> Plaintiffs assert that [f]rom 2000 through 2008, 62.02% of all children ages 3 through 5 received an eligibility determination within 120 days of referral. Plaintiffs further assert that [f]rom 2000 through 2008, only 65.80% of children ages 3 through 5 deemed eligible for special education received an eligibility determination within 120 days of referral. Defendants challenge these two assertions solely on the basis that they are based on Dr. Cupingood's testimony, which they argue is inadmissible. The Court held in a separate order issued this same date, however, that Dr. Cupingood's testimony is admissible as expert testimony. The Court therefore agrees with plaintiffs' assertions.

*Id.* at 97 (quotations omitted). The District did not dispute—then or now—that it failed to timely make initial evaluations and eligibility determinations through 2007. These two subclasses have therefore met their burden under Rule 56.

### c. Transitions

Finally, the Court specifically held that at least through and including the year 2007, "defendants failed to comply with their obligation to ensure a smooth and effective transition for disabled children from Part C to Part B, in violation of § 1412(a)(9) of the IDEA." *Id.* at 98. This Court stated:

> There is no genuine dispute that defendants failed to ensure effective transitions from Part C to Part B, as an overwhelming majority of disabled children in certain years did not have an individualized education plan and enrollment in preschool

special education by their third birthdays. There is no genuine dispute that the
District's procedures to facilitate these transitions were inadequate.

*Id.* The Court explained this holding by noting several undisputed facts. The parties agreed that:

- Defendants' actions "didn't result in effective transitions for children into Part B from Part C."
  *Id.* at 98.

- For the 2004-05 school year, only 17% of the eligible children referred by Part C to Part B had
  an individualized education plan developed and implemented by their third birthdays. *Id.*.

- For the 2006-07 school year, 4% of Part C graduates were enrolled in preschool special
  education by their third birthdays. *Id.*

- At least through and including the year 2008, the District's "most significant challenge . . .
  [was] getting children through this [transition] process in a timely manner with the least amount
  of disruption to the child and family." *Id.*

- At least through and including the year 2007, "the procedures used by defendants to screen
  children exiting Part C were in many cases not necessary and delayed provision of preschool
  special education." *Id.*

- At least through and including the year 2007, "the screening procedures used by defendants
  with preschool children were unreliable and were not always aligned with accepted practices
  in the field." *Id.*

Clearly the Court thoroughly considered the fourth subclass's claims relating to transitions and

determined that then, as now, there were no genuine disputed facts. As such, this subclass of

plaintiffs is entitled to summary judgment on their claims.

### 2. District of Columbia Law

District of Columbia law incorporates the federal FAPE and Child Find obligations.

All local education agencies (LEA) in the District of Columbia shall ensure,
*pursuant to the Individuals with Disabilities in Education Act (IDEA)*, that all
children with disabilities, ages three to twenty-two, who are residents or wards of
the District of Columbia, have available to them a free appropriate education
(FAPE) and that the rights of these children and their parents are protected.

D.C. Mun. Regs. tit. 5, § 3000.1 (emphasis added). As the law states and this Court previously

noted, this D.C. law creates the same standards as those in federal law. The Court found above that

the District's policies to identify, evaluate, determine eligibility, and transition failed to comply

with its obligations under federal law. Therefore, the Court finds that at least through and including the year 2007, the District's actions constituted violations of the D.C. law as to each subclass.

3.  Rehabilitation Act Claims

Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The implementing regulations state: "A recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. 104.33. In order to state a claim under Section 504 of the Rehabilitation Act, a plaintiff must show that "something more than a mere failure to provide the 'free and appropriate public education' required by the IDEA has occurred." *Walker v. District of Columbia*, 157 F. Supp. 2d 11, 35 (D.D.C. 2001). Generally, plaintiffs who show either "bad faith or gross misjudgment" can prevail under Section 504 for IDEA violations. *Id.* Liability is not imposed where "state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals." *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982).  The Court should grant summary judgment for plaintiff on their Section 504 claims if they show "bad faith or gross misjudgment" by defendants *as to each subclass.*

However, the Court did not make such findings in its earlier opinion and it is not equipped to do so today. While the Court previously analyzed the District's four distinct obligations under the IDEA, its findings of liability under the Rehabilitation Act were based on the District's general history of procedural and statistical failures. In fact, plaintiffs specifically noted that they were not

14

trying to prove "that defendants demonstrated 'bad faith or gross misjudgment' in denying a FAPE

to a specific class member;" rather, they sought to prove "the longstanding, gross departures from

accepted educational practice within defendants' Child Find system that have resulted, and

continue to result, in the *systematic denial of FAPE to the entire plaintiff class*." 2010 Opinion at

99 (citing plaintiffs' motion) (emphasis added). Accordingly, the Court made only general findings

of bad faith rather than tying it to specific procedures or policies:

> There is no genuine dispute that defendants knew, based on communications with
> OSEP, that they were not in compliance with their legal obligations, yet they failed
> to change their actions. There is no genuine dispute that defendants' relative
> provision of services under the IDEA was lower than that of every state in the
> country, and in most cases significantly lower. There is no genuine dispute that
> defendants' failures were a departure from accepted educational practices
> throughout the country. All of these facts show defendants' bad faith or gross
> misjudgment.

*Id.* at 100. The Court concluded that "these facts show defendants' bad faith or gross misjudgment"

and granted plaintiffs' motion for summary judgment on liability as to plaintiffs' claims under the

Rehabilitation Act. *Id.* But the Court did not consider—and was not asked to consider—whether

the District's actions reached "bad faith or gross misjudgment" *as to each subclass*.

The plaintiffs concede this in a footnote of their reply brief. Pls.' Reply in Further Support

of Pls.' Mot. S.J. 5 n.1. However, they argue that "[a]s discussed herein, the Court made more than

sufficient findings of facts to establish violations of the Rehabilitation Act as to each of the four

subclasses. Therefore, the Court can easily point to the material facts that establish the District's

liability on each subclass's Rehabilitation Act claim." *Id.* The Court disagrees: This is no easy

task. Because this issue—as applied to the four subclasses or duties, specifically—was not

previously briefed in this case, and plaintiffs fail to elaborate on this footnote in their pending

motions, the Court declines to grant plaintiffs' motion for summary judgment on this issue.

Because the plaintiffs have not made it clear there is no genuine issue of material fact relating to whether the District displayed "bad faith or gross misjudgment" as to each subclass, plaintiffs' motion for summary judgment on Rehabilitation Act claims will be denied.

### III.   PLAINTIFFS' MOTION FOR JUDGMENT UNDER RULE 52(C) AS TO DEFENDANTS' LIABILITY FOR THE PERIOD FROM JANUARY 1, 2008, THROUGH APRIL 6, 2011

Plaintiffs also move for judgment on partial findings under Rule 52(c) of the Federal Rules of Civil Procedure on defendants' liability for the period from January 1, 2008, through the date of the previous trial, April 6, 2011, with respect to each subclass's claims.

### A. Rule 52(c) Standard

Rule 52(c) of the Federal Rules of Civil Procedure provides, in pertinent part, that:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 52(c); *see also Nkpado v. Standard Fire Ins. Co.*, 697 F. Supp. 2d 94, 98 n.4 (D.D.C. 2010) (quoting Advisory Committee Notes to Rule 52(c)) (1991 amendment to the rule "authorizes the court[ ] to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence.").

When considering a Rule 52(c) motion, "a district court may not draw any special inferences in favor of the non-movant"; rather, "the court must weigh the evidence, resolve any conflicts in it, and decide where the preponderance lies." *United States ex rel. Ervin & Assocs. v. Hamilton Secs. Grp., Inc.*, 298 F. Supp. 2d 91, 92–93 (D.D.C. 2004) (citations omitted). In so doing, the trier of fact "retains, the authority, if not the obligation, to draw reasonable inferences from the facts found." *Id.* at 93 n.3.

**B. Analysis**

1. IDEA and D.C. Law Claims

The District argues that it was not fully heard on all issues relevant to a finding of liability as to plaintiffs' subclass claims from January 1, 2008 through April 6, 2011. Furthermore, it argues that the findings issued by the Court in 2011 are not dispositive of plaintiffs' individual subclass claims. *See* Defs.' Opp'n to Pls.' Mot. S.J. 4–11.

a. *"Fully heard"*

The District has already been fully heard on the issue of their liability under the IDEA and related D.C. law claims. The Court issued findings of fact and conclusions of law on these issues after a full trial on the merits. *See* 2013 Opinion at 19 (the Court stating it "has made findings of fact regarding the District's IDEA performance through April 2011"). Indeed, the District concedes this. *See* Defs.' Opp'n to Pls.' Mot. S.J. 4 (noting that the Court previously "made findings against Defendants that relate to the period of January 1, 2008 to April 6, 2011, and those findings address, in certain respects, the four categories of procedural harms underlying Plaintiffs' subclasses").

The Court previously rejected the District's argument that the new subclasses would have warranted a different litigation strategy, finding that "[s]ince the inception of this case, the plaintiffs have alleged that the District failed to meet its statutory obligations to (1) identify disabled children; (2) timely evaluate identified children; (3) make timely eligibility determinations; and (4) provide smooth and effective transitions from Part C to Part B services." 2013 Opinion at 22. "The district therefore conducted discovery, deposed and cross examined witnesses, and made motions to this court knowing that these four claims were the subject of this case." *Id.* For the same reasons, the Court today holds that the District has been "fully heard" on

17

the issue of their liability under IDEA and related D.C. law claims as to each individual subclass, as Rule 52(c) requires.

The District also contends that fact discovery was not closed for the period before 2011, as demonstrated by plaintiffs' requests for documents allegedly pertaining to that time period. Defs.' Opp'n 5–6. Plaintiffs counter that the District itself has prohibited discovery on pre-2011 issues. Pls.' Reply 11. Regardless of the parties' conduct during discovery, this Court reopened discovery on post-2011 issues only. After the D.C. Circuit vacated and remanded to this Court, this Court "commence[d] proceedings to make findings of fact on the District's IDEA compliance with respect to each subclass *since April 2011*," 2013 Opinion at 19 (emphasis added), suggesting that discovery prior to 2011 was indeed closed.

b. *Dispositive of claims*

The District argues that the prior findings are not dispositive of the plaintiffs' claims. The District argues that a more thoroughly developed record—one that includes evidence subsequent to the 2011 trial—would demonstrate that "policies that were implemented prior to trial in 2011 were, indeed, well designed, thoughtfully implemented over time, and are now functioning effectively." Defs.' Opp'n 9. Post-trial evidence may indeed suggest "that new policies and procedures that took effect in 2010 would quickly lead to considerable progress for the District's Child Find system." *Id.* at 8.

That is beside the point. As already explained, the District was *fully heard* on the issue of its liability through the trial date, and this Court made specific findings that the District failed to implement policies that should have ensured these outcomes. *See generally* 2013 Opinion. What is at issue is not whether the policies enacted in 2010 produced results "over time." Defs.' Opp'n to Pls.' Mot. S.J. 8. The question before the Court is whether the District's policies were

successfully *implemented*, thus ensuring that the District met the required conditions. It is not enough that the policies may have been effective in the future. Indeed, the District concedes that the IDEA "holds states accountable for ensuring that the framework they create *is implemented* at the local level." *Id.* And unfortunately for them, this Court previously found that the District did *not* implement successful policies at least through the 2011 trial date.

The District suggests that such a holding would amount to holding the District strictly liable for procedural violations. *Id.* But this Court never sought to demand perfection, and instead found that the District failed to provide required services to significant numbers of preschool-aged disabled children.

### c. Analysis

The Court specifically extended its findings, finding the District liable under the IDEA as to each plaintiff subclass. The Court found that "defendants failed to identify and provide timely initial evaluations to all preschool-age children with disabilities in the District of Columbia, in violation of 20 U.S.C. §§ 1412(a)(3)(A) and 1414(a)(1)(C)." 2011 Opinion at 22. "[D]efendants failed to offer timely eligibility determinations to all preschool-age children with disabilities in the District of Columbia, in violation of 20 U.S.C. § 1414(b)(4)." *Id.* Finally, "[D]efendants failed to comply with their obligation to ensure a smooth and effective transition for disabled children from part C to Part B, in violation of 20 U.S.C. § 1412(a)(9)." *Id.* at 32.

The Court also found the District liable under D.C. law through at least the trial date as to each plaintiff subclass, after noting that "local law creates the same standards as those in federal law." *Id.* at 21. The Court held that "from 2008 to April 6, 2011 (the first day of trial), defendants failed to identify and provide timely initial evaluations to all preschool-age children with disabilities in the District of Columbia, in violation of District of Columbia law, 5 D.C.M.R. §§ 3000.1, 3002.1(d),

D.C. Code 38-2561.2(a)." *Id.* at 22. Additionally, "from 2008 to April 6, 2011 (the first day of trial), defendants failed to offer timely eligibility determinations to all preschool-age children with disabilities in the District of Columbia, in violation of District of Columbia law, 5 D.C.M.R. §§ 3000.1, 3002.1(d)." *Id.*

2. *Rehabilitation Act claims*

For substantially the same reasons stated in Part II(B)(3) of this Opinion, the Court denies partial judgment on the issue of plaintiffs' Rehabilitation Act claims. The Court has never made specific findings on this issue as it pertains to each individual subclass, instead holding that the District's general policies were so obviously ineffective as to rise to "bad faith or gross misjudgment" as required by the statute. *See, e.g., id.* at 23 (finding a Rehabilitation Act violation based on the fact that the District's "special education policies were a gross departure from accepted educational practices" and that the District knew its actions were legally insufficient and did nothing). Because plaintiffs have not shown why each class is entitled to judgment on their Rehabilitation Act claims, partial judgment is denied as to all claims under the Rehabilitation Act.

## IV.   DEFENDANTS' MOTIONS TO EXCLUDE EXPERT REPORTS AND TESTIMONY

The District has moved to exclude the testimony of Drs. Dunst and Cupingood, plaintiffs' expert witnesses, pursuant to Federal Rule of Evidence 702. Defs.' Mot. to Exclude at 3.

### A. Legal Standard

An expert opinion is excluded if it fails to satisfy the criteria for admissibility set out in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Courts take a flexible approach to deciding Rule 702 motions and have broad discretion in determining whether to admit or exclude expert testimony." *H & R Block, Inc.*, 831 F. Supp. 2d 27, 30 (D.C. Cir. 2011) (quotations omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152–53 (1999) (noting that the trial judge has substantial discretion in determining whether an expert's testimony is reliable), superseded by statute on other grounds, 11 Del. C. § 4209(d)(2003), as recognized in *Rivera v. State*, 7 A.3d 961, 972 (Del. 2010). "In general, Rule 702 has been interpreted to favor admissibility." *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 10 (D.D.C. 2011) (citing *Daubert*, 509 U.S. at 587; Fed. R. Evid. 702 Advisory Committee's Note (2000) ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.")). "The adversarial system remains the 'traditional and appropriate' mechanism for exposing 'shaky but admissible evidence.'" *Id.* (citing Fed. R. Evid. 702 Advisory Committee's Note (2000) (quoting *Daubert*, 509 U.S. at 596)). "In considering Rule 702 motions, the court assumes only a 'limited gate-keep[ing] role' directed at excluding expert testimony that is based upon 'subjective belief or unsupported speculation.'" *Harris v. Koenig*, 815 F. Supp. 2d 6, 8 (D.C. Cir. 2011) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 135–36 (D.C. Cir. 1996)).

Under Rule 703, the facts or data underlying an expert's opinion "need not be admissible in evidence in order for the opinion or inference to be admitted" if the facts or data are "of a type reasonably relied upon by experts in the particular field." Fed. R. Evid. 703; *see also H & R Block*, 831 F. Supp. 2d at 30. In addition, such "facts or data that are otherwise inadmissible" may be

disclosed by the proponent of the opinion if their probative value substantially outweighs any prejudicial effect. *Id.*

Additionally, the gatekeeping requirement is substantially relaxed when the judge will serve as factfinder in a trial. *H & R Block*, 831 F. Supp. 2d at 30 (quoting *Whitehouse Hotel Ltd. P'ship v. Comm'r of Internal Revenue*, 615 F.3d 321, 330 (5th Cir. 2010)) (holding that, without the danger of "tainting the trial by exposing a jury to unreliable evidence," the importance of the court's role as gatekeeper is greatly reduced); *Window Specialists, Inc. v. Forney Enterprises, Inc.*, No. CV 11-1610 (RMC), 2014 WL 2592300, at *5–6 (D.D.C. June 10, 2014). This is because "[w]here the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such decisions [regarding reliability] prior to hearing the testimony is lessened." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) (citing *United States v. Brown*, 415 F.3d 1257, 1268–69 (11th Cir. 2005)); *see also United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013). This is not to say that expert testimony in this situation need be any less reliable; it simply means that "the court can hear the evidence and make its reliability determination during, rather than in advance of trial." *In re Salem*, 465 F.3d at 777.

Although *Daubert* can be used at the summary judgment stage, the First Circuit has warned of the dangers of excluding expert evidence before trial:

> The fact that *Daubert* can be used in connection with summary judgment motions does not mean that it should be used profligately. A trial setting normally will provide the best operating environment for the triage which *Daubert* demands. . . . [G]iven the complex factual inquiry required by *Daubert*, courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record. Because the summary judgment process does not conform well to the discipline that *Daubert* imposes, the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage.

*Cortes-Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997).

In sum, the District faces a steep burden to exclude expert testimony at this stage in the litigation.

## B. Carl Dunst

The District has moved to exclude the expert report and testimony of Dr. Carl Dunst, plaintiffs' expert witness. The Court previously determined Dr. Dunst to be a "qualified expert in analyzing the District of Columbia's Child Find-related obligations, as they relate to preschool children, ages three to five." 2011 Opinion at 4. The District now argues that Dr. Dunst's expert opinions are inadmissible because they "(1) rest nearly entirely on the analysis of Plaintiffs' counsel, not on their own merit; (2) derive from a methodology that he himself rejects; (3) are inadmissible hearsay; and (4) require an analytical leap from data to conclusion that no reasonable person could credit." Defs.' Mot. to Exclude 4.

As discussed in more detail below, having reviewed the report of plaintiffs' expert, Dr. Dunst, the Court finds that it meets the criteria for admissibility. Dr. Dunst is an accomplished special education expert. His conclusions regarding the effectiveness of the District's policies in meeting its obligations under the IDEA and D.C. law are not based solely on the results of the Sample Analysis data to which the defendants object. *See* Expert Report of Karl Dunst, Def.s' Mot. S.J. Ex. C at 1-2, ECF 1-2, ECF No. 417-23 (noting the numerous documents Dr. Dunst reviewed in coming to his conclusions, including various legal requirements; depositions; the District's communications; findings of fact previously made by this Court; and much more). As for the Sample Analysis itself, the Court finds that Dr. Dunst's use of the analysis as a datum in reaching his conclusions is not unreliable. While the District has identified cogent concerns about the methodology underlying the summary, the Court finds that these concerns go to the weight,

not the admissibility, of his report, especially in a bench trial where there is no concern about jury confusion or prejudice, as noted above.

   1.  Foundation

   The District alleges that Dr. Dunst relied only on Plaintiffs' counsel's analysis of the facts (the "Sample Analysis"), and thus the conclusions he rendered cannot stand independent of the lawyers' analysis. Mot. to Exclude 5. The District asserts that plaintiffs' counsel "unilaterally manufactured analytical assumptions, formulated a litigation-driven methodology, and conducted the analysis reflected in [Dr. Dunst's report] without the consultation or feedback from their programmatic expert." *Id.* The District then provides examples of instances where assumptions underlying the lawyers' analysis were allegedly contrary to Dr. Dunst's opinions. *Id.*

   Plaintiffs' lawyers' role in creating the Sample Analysis was to review files and describe facts relating to, for example, when communications to place and when eligibility determinations were made. The results were thus treated as raw data: Dr. Dunst reviewed the data and plaintiffs' conclusions therefrom, and agreed with those conclusions. Furthermore, Dr. Dunst *did* confer with plaintiffs during and after the preparation of the Sample Analysis. Declaration of Carl Dunst, Jan. 15, 2015 ("Dunst Decl."), Pls.' Opp'n to Defs.' Mot. S.J. Ex. 10 ¶ 2.

   Although the District may be correct that the role of plaintiffs' attorneys was suspect, the Court finds that Dr. Dunst's report is based on a reasonable foundation and is certainly not based in mere "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 593–95. As such, any issue the District has on these grounds goes to the weight of the proffered testimony, not to its admissibility for purposes of Rule 702. The District is free to question the assumptions underlying the analysis at trial.

2.  Valid Methodology

The District also argues that Dr. Dunst failed to "adhere to a demonstrably valid methodology." Defs.' Mot. to Exclude 9. The District claims that Dr. Dunst did not explain to plaintiffs' counsel the "background on the IDEA criteria being researched, along with examples for what the file reviewers should be searching" and "advise and clarify information . . . when questions or issues arose regarding the case files," as he has in other research projects with his own assistants. *Id.* at 12.

However, the Court agrees with plaintiffs that Dr. Dunst's prior research method is not necessarily the only appropriate procedure to analyze the District's data concerning its IDEA compliance. Dr. Dunst said in his declaration that he did not need to explain the task to plaintiffs' counsel because it was clear that their understanding of the issues was adequate for the file review. Dunst Decl. ¶ 4. Dr. Dunst had confidence in the ability of plaintiffs' counsel to summarize and draw conclusions about the data, based on the level of detail in the analysis, his ability to understand the summaries and the categories, his history of communication with counsel, over eight years about this case, and the care evident in the Sample Analysis itself. *Id.* Dr. Dunst also noted that other experts in special education would also reasonably rely on the facts described in the Sample Analysis for the same reasons. *Id.* And importantly, as noted previously, Dr. Dunst *did* discuss the analysis with plaintiffs' counsel.

Dr. Dunst considered the Sample Analysis, and other relevant information, and then formed his own conclusions using his own extensive experience. Although the District alleges that this methodology is contrary to those used in the special education field, Defs.' Mot. to Exclude 11, it does not state which standards it refers to or how the Sample Analysis conflicts. The methodology used here is far different from the serious issues cautioned in *Daubert*, as Dr. Dunst's methodology

constitutes more than subjective belief or unsupported speculation. As such, any issue the District

has on these grounds goes to the weight of the proffered testimony, not to its admissibility for

purposes of Rule 702.[1]

### 3. Hearsay

The District alleges that plaintiffs' lawyers' analysis is inadmissible hearsay: an out-of-

court statement of plaintiffs' lawyers offered as proof of the truth of the file reviews. Defs.' Mot.

to Exclude 12. An expert is entitled to rely on inadmissible evidence in forming his or her opinion,

though the expert "must form his [or her] own opinions by applying his [or her] extensive

experience and a reliable methodology to the inadmissible materials," rather than simply

"transmit" the hearsay to the jury. *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). Here,

the underlying analysis was only part of the foundation of Dr. Dunst's expert report and was

attached as an exhibit. Dr. Dunst used this data as well as several other sources to form his own

opinions, based on his own experience. Though the District quotes Dr. Dunst in an attempt to show

the contrary, his words are taken out of context. Defs.' Mot. to Exclude 12. Because it was

reasonable for Dr. Dunst to rely in part on the lawyers' analysis when forming his expert report,

the admissibility of the Sample Analysis is irrelevant at this stage. *See* Fed. R. Evid. 703.

### 4. Analytical Leap

The District argues that several of Dr. Dunst's conclusions regarding the District's Child

Find policies are defective because "there is simply too great an analytical gap between the data

and the opinion proffered." Defs.' Mot. to Exclude 13 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S.

---

[1] The District also argues that Dr. Dunst's failure to use or review the District's data system and his lack of familiarity with the program precludes him from rendering any expert opinions relating to the data system. Defs.' Mot. to Exclude 11. But it is not clear why Dr. Dunst needed to understand how the database operates in order to analyze the data pulled from it.

136, 146 (1997)). According to the District, Dr. Dunst cannot express an opinion regarding the District's policies because he provides no foundation for his conclusions and he "has no sense of what policies area procedures currently govern Child Find work in the District." *Id.* However, Dr. Dunst explained more thoroughly the foundation for such conclusions in his deposition. *See* Pls.' Ex. 6 at 216:13–217:21 (describing the specific failures of the District's policies and explaining that he evaluated them based on a review of students' Individualized Education Programs, or "IEPs"). Indeed, evidence that the District is failing to identify, evaluate, determine eligibility for, and transition large numbers of students may *necessarily* reflect a failure in policies and procedures.

The District also argues that Dr. Dunst's other conclusions are unsupported, including his belief that the District should only report children who are actually receiving services, that the District is over-counting "parental delay," and that the District is applying an incorrect definition of "presumptive eligibility" in its transition work. Defs.' Mot. to Exclude 14. Although it is true that Dr. Dunst does not explain the OSEP requirements or how other jurisdictions treat these issues, the Court finds that such questions are within Dr. Dunst's expertise. As a special education expert, he is qualified to express his own opinions regarding whether the District is ensuring identification, timely evaluation, timely eligibility determination, and smooth and effective transitions—and in order to do so, he may also have opinions about the most accurate way to measure the District's success. If the District disagrees with Dr. Dunst's opinions, or finds them inconsistent with federal standards, it may further probe the issue at trial.

5. Conclusory Opinions

Finally, the District argues that Dr. Dunst's opinions must be excluded because they are "largely generalized conclusions that require no expertise to draw." Defs.' Mot. to Exclude at 15.

Basically, the District contends that Dr. Dunst simply compared the results of the lawyers' analysis to this Court's prior injunction and reached conclusions that do not require any expertise. *Id.* But as already mentioned, Dr. Dunst did consult with the lawyers as they performed their data analysis, and thus he has done more than simply compare "apples to apples." Furthermore, rather than failing "to explain why a failure to reach any given benchmark by any specific margin, or to satisfy any particular substantive requirement of the injunction, is or is not indicative of deficient policies or a failure to implement them," *id.*, Dr. Dunst expressed that in his expert opinion, he concurred with "Judge Lamberth's findings of facts and conclusions of law, and injunction . . . [which] appropriately reflect the requirements of IDEA and the need for improvement by the District to comply with the IDEA and OSEP indicators." ECF 422-19 at 7. The Court believes that Dr. Dunst's report will be helpful, as will his testimony regarding how to determine the District's compliance with federal and D.C. law.

6. Conclusion

Having reviewed Dr. Dunst's report as well as his testimony, the Court is satisfied that Dr. Dunst's report and testimony meet the requirements of the Federal Rules of Evidence and relevant case law for the purposes of the summary judgment motion. The District has identified a number of aspects about Dr. Dunst's methodology and conclusions that "go to the weight of the proffered testimony, not to its admissibility." *Crowe v. Marchland*, 506 F.3d 13, 18 (1st Cir. 2007). These alleged defects do not undermine Dr. Dunst's report so overwhelmingly as to render his report wholly irrelevant or unreliable—and therefore inadmissible. While it might be a closer question in the context of a jury trial, since this hearing is not before a jury, "the importance of the trial court's gatekeeper role is significantly diminished . . . because, there being no jury, there is no risk of

tainting the trial by exposing a jury to unreliable evidence." *Whitehouse Hotel Ltd. P'ship*, 615 F.3d at 330. Accordingly, the Court will deny the motion to exclude Dr. Dunst's report.

Thus, the District's motion is denied without prejudice and the Court will hear all the expert testimony at trial. The Court believes that the District's arguments are best addressed at trial with question-specific objections and "the adversary process" of "competing expert testimony and active cross-examination." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998). The District may move to exclude the expert testimony after the testimony is offered at trial or renew its motion to exclude the expert testimony following the bench trial.

### C. Leonard Cupingood

The Court has previously determined Dr. Cupingood to be a "qualified expert in statistic[s]." 2011 Opinion at 8. The District now argues that his report and testimony should be excluded because his conclusions rest entirely on the analysis of plaintiffs' lawyers, he failed to follow any accepted methodology to render opinions on the District's special education data systems, his opinions rest on inadmissible hearsay, and statistical expertise is no longer necessary because the relevant calculations are elementary. Defs.' Mot. S.J. at 17.

1. Foundation

The District argues that Dr. Cupingood "did not analyze—or even understand—Plaintiffs' data; he merely ran numbers as instructed by Plaintiffs' lawyers," serving as plaintiffs' lawyers "calculator." *Id.* at 18. The Court disagrees for largely the same reasons explained in consideration of Dr. Dunst's foundation. This argument is especially unavailing because this expert was retained not for his opinions or knowledge about special education policy, but his statistical expertise. Dr. Cupingood's role was to calculate revised statistics based on the data provided him, a task for which he is qualified.

2.  Methodology

The District argues that Dr. Cupingood failed to follow an appropriate methodology for reviewing special education data systems. It asserts that Dr. Cupingood's opinions regarding the District's data systems should be excluded because he never accessed the database or had any training relating to the database. Therefore, it asserts, "any opinions offered by Dr. Cupingood regarding the databases would concern subjects he knows nothing about." Defs.' Mot. S.J. at 19. But Dr. Cupingood does not need to have any particular understanding of special education policies or databases to assess the data provided to him. Furthermore, it is entirely unclear to the Court why Dr. Cupingood needed to access the database himself rather than rely on the data provided by the District. Dr. Cupingood's expertise is in statistics. If the assumptions underlying the data he used are proven false at trial, his testimony will be weakened—but this is not a reason to exclude his report or testimony.

3.  Hearsay

For the same reasons Dr. Dunst's testimony is admissible regardless of whether the sample analysis is hearsay, Dr. Cupingood's report and testimony are also admissible.

4.  Helpfulness

Finally, the District argues that Dr. Cupingood's opinions should be excluded because his work involved very simple counting and calculations. The District asserts that because plaintiffs' samples consist of small batches of children, only "simple, straightforward calculations" are required and therefore statistical expertise is not required. Defs.' Mot. to Exclude 21. However, the Court finds that Dr. Cupingdoo's report "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Dr. Cupingood used several Excel workbooks, requiring him to match children across spreadsheets using student identifying

information, ECF No. 422-23 at 5–7, drawing conclusions from that data. He then helped select random samples of children—apparently not a straightforward matter, since the District expressed concerns about the methodology, prompting the District to explain Dr. Cupingood's work. *See* Pls.' Ex. 43 (Letter from Chad Copeland to Todd Gluckman, April 24, 2014); Pls.' Ex. 44 (Email from Todd Gluckman to Chad Copeland, April 25, 2014). Then, Dr. Cupingood applied the results of the plaintiffs' analysis to the entire population, making some adjustments to account for population size. Sampling and the application of sample results to the overall population fall within his expertise as a statistician. Indeed, there is not "an implicit requirement in Fed. R. Evid. 702 for the proffered expert to make *complicated* mathematical calculations." *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011). "[W]hat is a simple mathematical computation to one person may be mind-numbingly complicated to another. [I]f these calculations are as simple as defendants suggest they are . . . , then those jurors who are mathematically knowledgeable will immediately so recognize and wonder why the plaintiffs utilized [an expert] to prove the obvious." *Id.* n. 7 (citing *Arnold v. Ambulance Serv. of Bristol, Inc.*, No. 2:06-cv-105, 2007 WL 5117409, *1 (E.D. Tenn. Aug. 21, 2007)). Indeed, it seems contradictory for the District to complain that it was inappropriate for plaintiffs' lawyers to perform a sample analysis using the District's raw data, yet argue that those same lawyers should have performed the necessary statistical calculations rather than employing a statistician to do so.

The Court finds that Dr. Cupingood's report and testimony will ultimately be helpful to the trier of fact, and as such there is no basis for exclusion under Rule 702.

## V.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The District also moves this Court for summary judgment pursuant to Federal Rule 56 as to all of plaintiffs' claims from March 22, 2010 to the present. The District contends that summary

judgment is warranted because its motion "unequivocally and indisputably demonstrates" that its policies and procedures comply with its Child Find and FAPE obligations ever since March 22, 2010 when "comprehensive, deliberative policies" were issued. Defs.' Mot. S.J. 1. In its motion, the District extensively details the policies that it has enacted since 2010. Plaintiffs agree that the District has improved many of its policies, but argue that the District's action is insufficient. Pls.' Opp'n to Defs.' Mot. S.J. 1.

In consideration of the plaintiffs' motion for summary judgment and the District's opposition, the Court has already granted plaintiffs summary judgment on all claims—except for those under the Rehabilitation Act—through April 6, 2011. Therefore, the Court now determines whether it will grant the District summary judgment on its IDEA and D.C. law for the period after April 6, 2011. The Court also considers whether it is appropriate to grant the District summary judgment on plaintiffs' Rehabilitation Act claims for the period beginning March 22, 2010.

### A. Motion for Leave to File Sur-Reply

As an initial matter, plaintiffs have filed for leave to file a sur-reply in response to defendants' reply in further support of their motion for summary judgment. ECF No. 436.

As plaintiffs acknowledge, sur-replies are generally disfavored. Nonetheless, they are generally granted "when a party is unable to contest matters presented to the court for the first time in the last scheduled pleading." *Doe v. Exxon Mobil Corp.*, 2014 WL 4746256, at *3 (D.D.C. Sept. 23, 2014) (quoting *Ben-Kotel v. Howard Univ.* 319 F.3d 532, 536 (D.C. Cir. 2003)). "A district court should consider whether the movant's reply in fact raises arguments or issues for the first time, whether the nonmovant's proposed sur-reply would be helpful to the resolution of the pending motion, and whether the nonmovant would be unduly prejudiced were leave to be granted." *Id.* (citations and quotations omitted).

Plaintiffs argue that the District raised new arguments in its reply regarding the plaintiffs' use of expert testimony and statistics and that they should be afforded an opportunity to respond to the new arguments. Relatedly, they argue that the proposed sur-reply would be helpful to the resolution of the District's motion for summary judgment.

However, plaintiffs had ample opportunity to respond to the District's criticisms of plaintiffs' proffered expert testimony or use of statistical data in their opposition to the District's motion to exclude those witnesses. Indeed, plaintiffs' proposed sur-reply merely reiterates the same arguments previously advanced in their opposition to the District's motion for summary judgment or in their opposition to the District's motion to exclude. The Court will consider all of these briefings in deciding the motion for summary judgment, and therefore the plaintiffs proposed sur-reply would not be helpful to the Court.

Accordingly, plaintiffs' motion for leave to file a sur-reply will be denied.

## B. Legal Standard

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" suitable for trial. Fed. R. Civ. P. 56(c). To ascertain whether an issue involves "material" facts, a court must look to the substantive law on which the claim or defense rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if its resolution could establish an essential element of the nonmoving party's challenged claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion," and of identifying the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Id.* at 323. The court must accept the nonmoving party's evidence

as true and must draw "all justifiable inferences" in his favor. *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions, not those of a judge . . . ." *Id.* at 255. Yet "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Id.* at 252.

### C. Analysis

#### 1. IDEA and D.C. Law Claims (Claims 1, 4, and 5)

The IDEA requires the District to put in place "policies and procedures" to effectively meet the Act's various conditions, 20 U.S.C. § 1412(a), including the obligations to identify, locate, and evaluate children with disabilities and to appropriately transition children from Part C to Part B. *Id.* §§1412(a)(3) & (9), 1414. While the District thoroughly details the policies it has enacted since 2010, this Court must also consider the *effectiveness* of these policies in achieving compliance with the IDEA and D.C. law.

The Court must determine whether there is a genuine issue of material fact as to *each* of plaintiffs' subclass claims after April 6, 2011, and considers each in turn.

#### i.   *Identifying/locating children*

Pursuant to the Child Find Policy, D.C. is required to have policies and procedures in effect to ensure that *all* children with disabilities who are in need of special education and/or related services are identified. Under the IDEA, "[s]chool districts may not ignore disabled students' needs, nor may they await parental demands before providing special instruction." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005). Instead, the IDEA imposes an affirmative obligation on school systems to "ensure that all children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education

and related services, are identified, located, and evaluated." *Id.* at 519 (internal quotations omitted); U.S.C. § 1412(a)(3)(A).

The District has extensively detailed the policies and procedures it has in place to meet its obligations to locate these children, but the Court also considers the effectiveness of these policies. Based on the risk factors present in the District of Columbia, this Court concluded in 2011 that "on the low end, the District should expect to be serving 8.5% of its preschool-age population with Part B services." 2011 Opinion at 10. While that Order was vacated and is not controlling in this case, the facts and statutory framework underlying this conclusion remain unchanged. The Court therefore finds that a potential failure to meet those benchmarks is at least sufficient to create a genuine issue of material fact as to the District's liability in this case.

The District contends that its current policies "ensure that District of Columbia preschool children in need of special education and related services are appropriately located, identified, and referred for special education services." Defs.' Mot. S.J. 17. However, plaintiffs have submitted evidence that tends to suggest that the District has not been identifying a sufficient number of children. Plaintiffs put forth calculations based on newer census estimates, demonstrating that the District served between 7.00 and 7.35 percent of preschool age children in 2014. Pls.' Opp'n to Defs.' Mot. S.J. 16. If true, the District failed to identify up to 315 children last year. *Id.* This would suggest that the District has in fact failed in its obligation to locate disabled children.

Although the District argues that using newer census estimates is inappropriate, the Court finds that this is unclear and best addressed at trial. The Court thus finds that there are genuine issues of material fact precluding a grant of summary judgment as to this issue for the period beginning April 6, 2011.

*ii.*     *Evaluating children*

The IDEA and relevant D.C. laws provide that the District must conduct an initial evaluation of a child "to determine whether a child is a child with a disability . . . [and] the educational needs of such child" within 120 days of the date that the child was referred for an evaluation. 20 U.S.C. § 1414(a)(1)(C); 34 C.F.R. 300.301; D.C. Code 38-2561(a); 5-E DCMR § 3005(1). In their Second Amended Complaint, plaintiffs allege that the District has failed to meet the 120 day timeline, including a failure to timely hold evaluations or to "convene timely 'IEP' meetings." Second Am. Compl., ECF No. 398 at ¶¶ 99, 101, 103. Plaintiffs elaborate in their motion for class certification that "the District's policies, procedures, and practices regarding the timely evaluation of disabled children for the purposes of offering special education fail to ensure that preschool-aged disabled children receive timely evaluations." Mot. Class Certif., ECF No. 358 at 20–22.

The District contends that the record "unequivocally demonstrates" that the District's practices ensure compliance with the IDEA as it pertains to timely evaluations. Defs.' Mot. S.J. 18. In support of that statement, the District explains its Evaluation Policy, which is tailored to meet its legal obligations. *Id.* at 19–22.

Plaintiffs, by contrast, present no evidence suggesting that the District has failed to comply with its evaluation obligations. Plaintiffs' experts do not identify a single inadequate policy or procedure in place today as it relates to the evaluation process. Additionally, plaintiffs concede that they "have no data related to this benchmark." Pls.' Opp'n to Defs.' Mot. S.J. 18. They point only to the fact that Sean Compagnucci, the Executive Director of Early Stages, testified that, on average, it takes about 60 days after the referral date to have the first assessments (as opposed to

the completion of all assessments). *Id.* But this is irrelevant and does not suggest a general failure to complete evaluations within 120 days, as mandated.

Because plaintiffs have put forth no evidence tending to suggest that the District has failed in its duties to timely evaluate children with disabilities, there is no genuine issue of material fact. Therefore, the District's motion for summary judgment is granted on claims 1, 4, and 5 (the IDEA and D.C. law claims) as to the second plaintiff subclass for the period beginning April 6, 2011.

    *iii.*    *Determining eligibility*

This Court previously held that the District should provide timely eligibility determinations to at least 95% of all preschool children. Order, ECF No. 295 ¶¶ 2–3. It is worth repeating that the Court's order has since been vacated, but that the facts and statutory background underlying its conclusion are still relevant. Indeed, the law requires that *all* eligibility determinations be timely.

Again, the District points to the procedures and policies in place to ensure that all eligibility determinations are timely, and asserts that plaintiffs have no evidence that the policies are ineffective. Defs.' Mot. S.J. 22–25. The plaintiffs argue that the District incorrectly assesses its own rate of compliance, and that the District's own data demonstrates that the District fails to ensure timely eligibility determinations. Plaintiffs allege that the District uses incorrect referral dates when calculating the number of timely eligibility determinations and drives up its timeliness percentages by over-counting parental delay, among other errors. Pls.' Opp'n to Defs.' Mot. S.J. 19. After correcting for these alleged errors, plaintiffs argue that from December 1, 2012, to November 30, 2013, the District provided timely eligibility determinations to only 80.46% of the 3–5 year old population—resulting in nearly four times as many untimely eligibility determinations than this Court previously determined was acceptable. Although the District critiques plaintiffs' experts' methodology, this again is more appropriately considered at trial,

because the Court does not find plaintiffs' methodology so unreliable as to exclude the reports. The Court now holds that this data creates a genuine issue of material fact as to whether the District's policies are generally insufficient to ensure timely eligibility determinations, as required by law.

The District argues that plaintiffs' experts "did not review the current policy, procedures, or practices for evaluation and eligibility determinations" and cannot point to a single policy that is ineffective or problematic. Defs.' Mot. S.J. 23. However, plaintiffs' statistics tend to show that the District's policies—*whatever* they may be—have failed to ensure that eligibility determinations are timely. In this way, plaintiffs have created a genuine issue of material fact without the need to analyze specific policies, and summary judgment is denied for the period beginning April 6, 2011.

    *iv.*    *Timely transitions*

Finally, the District must:

> [E]ffect policies and procedures to ensure that . . . [c]hildren participating in early intervention programs assisted subchapter III [Part C], and who will participate in preschool programs assisted under this subchapter [Part B], experience a smooth and effective transition to those preschool programs in a manner consistent with section 1437 (a)(9) of this title. By the third birthday of such a child, an individualized education program or, if consistent with sections 1414 (d)(2)(B) and 1436 (d) of this title, an individualized family service plan, has been developed and is being implemented for the child.

20 U.S.C. § 1412(a)(9). In 2011, the Court determined that the District should "ensure that at least 95 percent of all Part C graduates that are found eligible for Part B receive a smooth and effective transition by their third birthdays." Order, ECF No. 295 ¶ 4.

Plaintiffs allege that the District has violated the IDEA because "Defendants have failed to ensure a 'smooth and effective transition' for disabled infants and toddlers transitioning from Part C of the IDEA to Part B of the IDEA by their third birthday." Second Am. Compl. ¶ 105.

The District describes in great detail the policies and procedures in place to ensure timely transitions and again argues that plaintiffs have no evidence that any particular aspect of the structural framework is deficient or missing. Defs.' Mot. S.J. 26–34.

Plaintiffs argue that a timely transition occurs only when services actually *begin* by the deadline. Pls.' Opp'n to Defs.' Mot. S.J. 24. Plaintiffs submit evidence that when a child is considered to have a smooth and effective transition only once services have begun, only 69.7% of transitions are timely. *Id.* After reviewing the available data, Dr. Dunst concluded that the District's estimates on timely transitions are thus overstated and many transitions are still untimely. Dunst Rep., Pls.' Opp'n to Defs.' Mot. S.J. Ex. 19 ¶ 24. Though the District alleges that the plaintiffs interpreted "service delivery" under the IDEA as exclusively relating to "related services" (such as speech or occupational therapy, instead of educational services), Defs.' Mot. to Exclude 7–8, the Court finds the distinction irrelevant: *All* services must commence for a transition to be smooth and effective.

For these reasons, the Court thus finds that there are genuine issues of material fact precluding a grant of summary judgment as to this issue, and summary judgment will be denied for the period beginning April 6, 2011.

2. Rehabilitation Act Claims (Claim 2)

Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The implementing regulations state: "A recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. 104.33. In order to state a claim under Section 504 of the Rehabilitation Act, a plaintiff must show that "something more than a mere failure to provide the 'free and appropriate public education' required by the IDEA has occurred." *Walker v. District of Columbia*, 157 F. Supp. 2d 11, 35 (D.D.C. 2001). Generally, plaintiffs who show either "bad faith or gross misjudgment" can prevail under Section 504 for IDEA violations. *Id.* Liability is not imposed where "state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals." *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982). The Court should grant summary judgment for plaintiffs on their Section 504 claims if they show "bad faith or gross misjudgment" by defendants as to each subclass. "Only in the rarest of cases will a plaintiff be able to prove that a school system's conduct is so persistent and egregious as to warrant such a unique remedy [under the Rehabilitation Act] not otherwise provided for by the IDEA itself . . . ." *Walker*, 157 F. Supp. 2d at 13–14, 36.

Applying this standard, the District is entitled to summary judgment as to Claim 2 of the Second Amended Complaint because plaintiffs provide no evidence tending to suggest bad faith or misjudgment in the period beginning March 22, 2010.

Previously, this Court determined that the District violated the Rehabilitation Act because its special education policies were a gross departure from accepted educational practices throughout the country. 2011 Opinion at 23. The District knew its actions were legally insufficient, yet failed to bring itself into compliance with its legal obligations. *Id.* This time, plaintiffs have

not raised an issue of material fact as to whether the District's educational decision-makers have exercised "bad faith or gross misjudgment." Their general allegations about broad violations of the law are unavailing in light of significant evidence that the District's decision-makers have worked hard to improve their special education services. Although the District may still not be in compliance with federal and D.C. law, it is clear that vast improvements have been made— strongly suggesting a lack of bad faith. In the last few years, the District has "thoughtfully and carefully worked to build a system that supports the needs of 3–5 year old children identified for services provided under the IDEA in an effective and sustainable way." Expert Report of Maxine Freund, Defs.' Mot. S.J. Ex. 8 at 2, ECF No. 417-8. Similarly, OSEP has determined that the District has complied with special conditions requirements in two long-term areas of non-compliance, noting the "significant progress" in addressing systemic noncompliance." Ex. 29 at 10–11. As the Blackman-Jones Court Monitor recently noted:

> [T]he current state of special education in the District of Columbia is vastly different than it was when the Consent Decree was entered. The focus on education reform in the District has led to significant structural reforms in local government, including the establishment of a strengthened Office of State Superintendent of Education to carry out the state supervisory role in education. With each year that has passed, the execution of this oversight role has improved and broadened. The quality of monitoring of special education services has improved and become more regular, and more effective strategies for the identification and correction of deficiencies have been developed. . . . All of these are notable accomplishments of the leadership and staff at DCPS and the OSSE that must be acknowledged and applauded.

Report of the Court Monitor on the 2012-2013 School Year 64.

The specific allegations raised by plaintiffs could not support a finding of a violation of the Rehabilitation Act, either. Plaintiffs allege that Dr. Maisterra, who oversees the division responsible for compliance with IDEA, was not aware that the District's enrollment data has been falling for over a year. Pls.' Opp'n to S.J. 38. Additionally, Mr. Compagnucci, the Executive

Director of Early Stages, did not have information on "indicators . . . critical to the questions of how many children are identified and how quickly that is done." *Id.* But again, even if true this does not rise to the level of "bad faith or misjudgment" making this a rare case in which a Rehabilitation Act violation is found.

Unlike before, the District is no longer responding to its failures with indifference and inaction. Although there is a genuine issue of material fact as to whether the District is now in full compliance with its legal obligations, much progress has been made since this lawsuit began— undoubtedly because of the hard work of the District's decision-makers. Plaintiffs have thus failed to present a genuine issue of fact relating to their Rehabilitation Act claims. The Court will grant Defendants summary judgment on the Rehabilitation Act claims for the period after March 22, 2010.

## VI.    CONCLUSION

For the reasons stated in this Opinion, the Court will grant plaintiffs' motion for summary judgment on their IDEA and D.C. law claims as to the period through 2007, but deny summary judgment for plaintiffs' Rehabilitation Act claims. Similarly, plaintiffs' motion for partial judgment pursuant to Rule 52(c) from 2008 through April 6, 2011 will be granted as to plaintiffs' claims under the IDEA and D.C. law, but denied as to all Rehabilitation Act claims.

The Court will deny defendants' motion to exclude opinions and testimony by plaintiffs' witnesses and deny plaintiffs' motion for leave to file a sur-reply in response to defendants' reply in further support of their motion for summary judgment.

Defendants' motion for summary judgment will be denied as to the first, third, and fourth plaintiff subclass's claims under the IDEA and D.C. law. Defendants' motion for summary judgment will be granted as to all of the second plaintiff subclass's claims under the IDEA and

42

D.C. law after March 22, 2010. Defendants' motion for summary judgment will be granted as to all claims under the Rehabilitation Act for all plaintiff subclasses after March 22, 2010. These claims will be dismissed.

Remaining for trial are plaintiffs' claims under the Rehabilitation Act for the period prior to March 22, 2010 as to each plaintiff subclass, and plaintiffs' claims under the IDEA and D.C. law from April 6, 2011 to present as to the first, third, and fourth plaintiff subclasses.

A separate order consistent with this Opinion shall issue on this 10th day of June, 2015.

The Honorable Royce C. Lamberth
U.S. District Court Judge