UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br> Defendants. | Civil Case No. 05-1437 |

## **MEMORANDUM OPINION**

Currently before the Court are two separate motions *in limine*, each relating to the admissibility of plaintiffs' Exhibit 1. First, plaintiffs filed a motion *in limine* [455] requesting that their Factual Summary (Exhibit 1) be considered at trial as evidence, or in the alternative, as a brief, demonstrative, or proposed findings of fact. Defendants opposed the plaintiffs' motion and issued their own cross motion *in limine* [460] to exclude plaintiffs' Factual Summary for use at trial for any purpose. Additionally, defendants have argued that if the Court were to rule the Factual Summary is admissible, then the defendants should be given the opportunity to depose and cross examine the individual who created it.

Upon consideration of the motions, oppositions, replies, the entire record in this case, and the applicable law, the Court will GRANT plaintiffs' motion *in limine* [455] requesting that their Factual Summary be considered as evidence at trial and DENY defendants' cross-motion *in limine* [460] for exclusion. Moreover, the Court will permit the defendants to depose prior to trial the attorney who drafted the Factual Summary regarding its creation and will require that attorney to

serve as the Factual Summary's sponsoring witness at trial, subject to defendants' cross-examination.

## I. BACKGROUND

### A. Statutory Scheme and Underlying Claims

The parties currently dispute the admissibility of plaintiffs' Exhibit 1, the significance of which is lost without reference to the plaintiffs' underlying claims and the lawsuit's complex procedural history. This lawsuit began in 2005, when plaintiffs—residents of the District of Columbia and former pre-school age children with various disabilities—filed a complaint alleging that the District failed to provide them a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Act ("IDEA"). In exchange for federal funding, the IDEA imposes an affirmative obligation on school systems to "ensure that all children with disabilities . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located and evaluated." 20 U.S.C. § 1412(a)(3)(A). Children who are identified and determined eligible may then receive early intervention services under Part C of the IDEA. Moreover, the Act requires a "smooth and effective" transition from Part C's early intervention services to Part B's preschool special education program. 20 U.S.C. § 1412(a)(9). The transition process must include a conference between the child's family and school officials to determine eligibility for Part B services and to develop a transition plan and an Individualized Education Program ("IEP"). The goal is "a seamless transition between services" under Parts C and B of the Act. 34 C.F.R. 303.209.

From the beginning, plaintiffs have alleged that the District has failed in its obligations to a large number of disabled children. Specifically, plaintiffs claim that the District has engaged in a practice of failing to identify disabled children, failing to evaluate and make eligibility

determinations for identified children, and failing to provide a smooth and effective transition from Part C to Part B special education services. In addition to the IDEA, plaintiffs also brought claims under local D.C. law, which implements the IDEA, *see* D.C. Code § 38-2561.02(a), and the Rehabilitation Act, which provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

On remand from the D.C. Circuit's opinion in *DL v. District of Columbia*, 713 F.3d 120 (D.C. Cir. 2013), the Court has certified four separate sub-classes pursuant to Federal Rule of Civil Procedure 23(b)(2). *See DL v. District of Columbia*, 302 F.R.D. 1, 18 (D.D.C. 2013). Mirroring the plaintiffs' core allegations and the IDEA's basic structure, the sub-classes are broken down as follows: children who did not or will not (1) be identified and/or located; (2) receive an initial evaluation within 120 days of referral; (3) receive a determination of eligibility within 120 days of the date of referral; and (4) have a smooth and effective transition from Part C to Part B by the child's third birthday. *Id.*

After the Court certified the four sub-classes, plaintiffs and defendants each moved for summary judgment on various claims. In evaluating these motions, the defendants' potential liability was further divided into distinct time periods based upon the date of the first bench trial (April 6, 2011) and the date in which the District issued "comprehensive, deliberate policies" to meet its relevant legal obligations (March 22, 2010). *See* Mem. Op. 42, ECF No. 444. For more information on the significance of these dates and the nature of these claims, refer to Memorandum Opinion [444].

3

Ultimately, the Court granted summary judgment on a number of issues. First, the Court granted summary judgment for plaintiffs' IDEA and D.C. law claims as to the period through 2007 but denied summary judgment for all of plaintiffs' Rehabilitation Act claims. *Id.* at 42. Additionally, the Court granted plaintiffs' motion for partial judgment under Rule 52(c)—which allows a court to enter partial judgement against a party that has been fully heard on an issue—for its claims under the IDEA and D.C. law from 2008 through April 6, 2011. *Id.* at 19. With respect to the defendants, the Court granted the motion for summary judgment on all of the second plaintiff subclass's claims under the IDEA and D.C. law after March 22, 2010 and all claims under the Rehabilitation Act for all subclasses after March 22, 2010. *Id.* at 36-37, 41. Remaining for trial are plaintiffs' claims under the Rehabilitation Act for the period prior to March 22, 2010 as to each plaintiff subclass, and plaintiffs' claims under the IDEA and D.C. law from April 6, 2011 to present as to the first, third, and fourth plaintiff subclasses. *Id.* at 43.

As the Memorandum Opinion [444] has made clear, benchmarks and statistical analyses remain highly relevant in this case. In 2011, this Court found that in order to comply with the IDEA's mandates, the District was required to meet certain numerical benchmarks. Specifically, "on the low end, the District should expect to be serving 8.5% of its preschool-age population with Part B services;" *DL v. District of Columbia*, 845 F. Supp. 2d 1, 10 (D.D.C. 2011), the District should "ensure that at least 95 percent of all preschool children" receive a timely eligibility determination; *id.* at 26, and lastly, the District should "ensure that at least 95 percent of all Part C graduates that are found eligible for Part B receive a smooth and effective transition by their third birthdays." *Id.*

Although that Order has since been vacated and is in no way controlling in this case, "the facts and statutory framework" underlying its basic conclusions remain unchanged. Mem. Order.

35, ECF No. 444; *id.* at 37 ("It is worth repeating that the Court's order has since been vacated, but that the facts and statutory background underlying its conclusion are still relevant."). It is possible that these benchmarks shift in light of newly discovered information; nevertheless, statistics and statistical analyses will remain crucial in guiding the Court's legal conclusions.

### B. Plaintiffs' Exhibit 1: Factual Summary

Plaintiffs' Exhibit 1, the Factual Summary, relates to the calculations and metrics used to gauge the District's compliance with the requirements of the IDEA—the central inquiry and fundamental dispute of this litigation. Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 9, ECF No. 455 ("The effectiveness of the District's policies is measured statistically."); Defs.' Opp'n to Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 3, ECF No. 460 ("Plaintiffs' counsel then set about to discredit Defendants' reporting by devising an alternative approach to how special education statistics ought to be calculated and reported."). Indeed, "[t]he effectiveness of the District's policies is measured statistically . . . [and] [t]o determine the accuracy of the District's statistics, it is necessary to review the underlying data on a child-by-child basis." Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 9.

The Factual Analysis at issue is derived from the plaintiffs' "Sample Analysis," a document relied upon in the testimony of plaintiffs' experts and the focal point of the District's previous motion to exclude plaintiffs' expert reports. *Id.* at 1; Defs.' Opp'n to Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 4. Essentially, the Sample Analysis cross-referenced the District's own statistical conclusions about the effectiveness of its policies with certain raw data from the District's Special Education Data System ("SEDS") and Early Stages database. After first shaping the plaintiffs' expert testimony, the Sample Analysis provided the structure and framework for the plaintiffs' Factual Summary. In creating the Factual Summary, the plaintiffs claim to have

"stripped the analyses and conclusions" of the Sample Analysis, leaving the current exhibit with "only facts." Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 5.

The plaintiffs constructed the Sample Analysis by sifting through and compiling data retrieved in a series of discovery requests. First, plaintiffs requested that the District produce its rates of enrollment, timely eligibility determinations, and timely transitions from Part C to Part B. Pls.' Opp'n to Defs.' Mot. to Exclude the Expert Reports 1, ECF No. 431; Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 3. The District did so, reporting for example, that its enrollment percentage metric as of November 30, 2013 stood at 8.82%, its evaluation and eligibility determination metric for the three months prior to November 30, 2013 was 97.29%, and its transition metric for that period was 96.88%. Def. District of Columbia's Objections and Resps. to Pls.' First Post-Trial Set of Requests for Produc. of Docs. and Set of Interrogs. 18, ECF No. 422-27. Notably, each of the District's reported results was comfortably above the benchmark set by the Court's previous, though now vacated, Order. *See DL v. District of Columbia*, 845 F. Supp. 2d 1 (D.D.C. 2011).

Next, plaintiffs requested certain corresponding data from SEDS and the Early Stages database, which the District provided in the form of Excel Spreadsheets listing the childrens' identifying information, dates of first case openings, dates of referrals, and dates of eligibility determinations. Pls.' Opp'n to Defs.' Mot. to Exclude the Expert Reports 1, ECF No. 431; Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 3. In addition, plaintiffs requested direct access to the District's relevant databases to review actual student records, as opposed to the summary information provided in the District's spreadsheets. *Id.* Basically, plaintiffs sought to review the actual student records of the children the District identified as enrolled, as receiving timely eligibility determinations, and as receiving smooth and effective transitions to determine whether

they agreed with the District's official characterizations. In other words, plaintiffs wanted access to the students' records to double-check the District's conclusions that at the end of 2013, 8.82% of the District's children were enrolled and over 95% had received timely eligibility determinations and smooth and effective transitions. *Id.*; Defs.' Opp'n to Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 2 ("Plaintiffs instead elected to try their hand at undermining the statistics reported by the District to the United States Department of Education's Office of Special Education Programs (OSEP)."). If, for example, the District identified a certain student as having received a smooth and effective transition, the plaintiffs would use their access to the databases to identify and analyze the facts the District used to come to that conclusion.

After negotiating the terms of plaintiffs' access, the parties agreed that the District would produce SEDS files for three random samples of 100 children whom the District had identified as enrolled, 100 children whom the District had identified as having timely received eligibility determinations, and 100 children whom the District had identified as being smoothly and effectively transitioned. Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 3-4. Furthermore, the parties agreed that the samples were sufficiently large such that errors in the District's categorization of children in the spreadsheets that were identified within each sample would apply to the entire population from which the sample was chosen. *Id.*

Once it acquired the SEDS files, plaintiffs produced the first draft of the Sample Analysis, a 28-page document describing facts and conclusions relating to the children in the three samples. Importantly, the Sample Analysis made assertions that directly challenged the District's underlying conclusions and consequently its statistical results. For example, one section titled, "Children who do not meet the District's own enrollment criteria," listed children that the plaintiffs claimed the District had erroneously identified as enrolled. Pls.' Sealed Ex. List, No. 2, at 3, ECF

No. 456-2. Another section recorded the details of "children whom the District considers to have received a timely determination of eligibility or non-eligibility, but who actually received an untimely outcome." *Id.* at 4.

After constructing the first version of the Sample Analysis, plaintiffs provided a copy to defendants, requesting that they provide "all documents that contradict, modify, supplement, or further explain the issues relating to the children that are described in the Sample Analysis." Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 5 (citing Gluckman Decl. ¶ 4). The District provided those documents and the plaintiffs incorporated the updated information into a newly revised Sample Analysis—a document that served as the "foundation" for plaintiffs' expert testimony. Defs.' Mot. to Exclude the Expert Reports and Test. Of Carl Dunst and Leonard Cupingood 5, ECF No. 427; *see also* Defs.' Opp'n to Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 4.

After the Sample Analysis was permitted to be used as part of plaintiffs' expert testimony, plaintiffs sought to admit the report's underlying content as evidence in the form of the Factual Summary. Defs. Opp'n to Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 5 ("Plaintiffs attempt to strip all objectionable material from the [Sample Analysis], and rename it a 'Factual Summary.'") To do so, plaintiffs carried forward the Summary Analysis's basic format and eliminated all conclusory statements. Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 5. What remains are the District's various characterizations of a given child and the facts in the source files relevant to that characterization.

Needless to say, reviewing and cataloguing these files was a massive and laborious undertaking. All in all, plaintiffs condensed information contained in 1,312 documents, *id.* at 11, an endeavor that "took months of work by multiple individuals." *Id.* at 12. Moreover, plaintiffs additionally "reviewed, but did not cite in the Factual Summary, thousands of pages of materials

relating to children for whom plaintiffs determined, after review of the documents, that they did not dispute the District's characterization of the children." *Id.* These documents were primarily sourced from SEDS or Early Stages database and included information such as letters to parents, communications logs, and student history summaries. *Id.* at 11.

## II. LEGAL STANDARD

Plaintiffs seek to admit their Factual Summary under three different theories: Rule 1006 of the Federal Rules of Evidence (FRE 1006), the residual hearsay exception, or in the alternative, as a brief, demonstrative, or proposed finding of fact. The Courts finds the Factual Summary admissible under FRE 1006, which it will now discuss.

FRE 1006 states:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Recently, in *United States v. Fahnbulleh*, the D.C. Circuit further articulated the requirements the admit evidence under FRE 1006. 752 F.3d 470 (D.C. Cir. 2014). Essentially, for a summary of documents to be admissible: "the documents must be so voluminous as to make comprehension by the jury difficult and inconvenient; the documents themselves must be admissible; the documents must be made reasonably available for inspection and copying; the a summary must be accurate and nonprejudicial; and the witness who prepared the summary should introduce it." *Fahnbulleh*, 752 F.3d at 479.

9

## III. ANALYSIS

### A. Admissibility of Plaintiffs' Summary Document

Although the District puts forth contrary arguments, the Court finds the plaintiffs' Exhibit 1 is admissible under FRE 1006 as a summary document. Defendants argue that plaintiffs' exhibit cannot be admitted under FRE 1006 because it is incomplete, inaccurate, and argumentative. But defendants seem to overlook that the rule permits a summary to omit certain facts, so long as those facts are clearly identified. *See, e.g., United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2011) ("A summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case."). Moreover, in terms of accuracy, defendants will have an opportunity to cross-examine the exhibit's authors regarding their methods and the Factual Summary's alleged errors or contrivances, a determination discussed more fully in subsection III(B). Lastly, there is nothing in FRE 1006 that prevents plaintiffs from summarizing the facts that underpin the defendants' core conclusions. In combination, these legal principles and the District's opportunity for cross-examination defeat any objections defendants raise to the admissibility of plaintiffs' Factual Summary.

First, the defendants claim the document "lacks the necessary characteristics of a summary—namely, an objective and fair representation of the records it purports to summarize." Defs.' Opp'n to Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 6, ECF No. 460. They argue that after reviewing files of more than 300 children, plaintiffs "cherry-picked records . . . to present to the Court." *Id.* at 7. In their view, such a technique can be neither fair nor objective because it is incomplete.

Defendants, however, fail to appreciate that even though Exhibit 1 does not provide a summary for every child in each of the District's 100-children samples, the omitted information is

simply outside of the scope of what plaintiffs seek to summarize. Plaintiffs constructed the document as a "summary of the relevant facts contained in the files of children who should not be considered enrolled, to have timely received an eligibility determination, or to have been smoothly and effectively transitioned, or whose files demonstrated another issue related to the District's enrollment, eligibility determination, or transition practices." Reply in Supp. of Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 9 (citing Seffel Decl. ¶ 11). It does not purport to be a comprehensive summary of thousands of pages of the SEDS files, but rather of the facts that are seemingly inconsistent with the District's conclusions and characterizations. Such a summary does not require a discussion of every child when the plaintiffs explicitly agree with District's conclusions "with regard to any child not described in the Factual Summary." *Id.* Indeed, plaintiffs did not "cherry-pick" files to support their arguments as the defendants claim; instead, they reviewed the entire record for every child in each sample and provided a high-level summary of where and how the childrens' files potentially do not line up with the District's conclusions. Accordingly, the summary is entirely complete.

Second, defendants argue that because "[p]laintiffs' Factual Summary contains documented errors, has not been tested for accuracy through examination of its author(s), and because it relies on inaccurate and untested criteria (creating inaccurate calculations), the document should be excluded." Defs.' Opp'n to Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 12. Here again, however, plaintiffs describe how the Factual Summary was created: they "reviewed the files and wrote down facts [they] believed were relevant." Reply in Supp. of Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 9, ECF No. 463. The plaintiffs' lawyer simply conducted a manual comparison by cross-referencing "the data provided by the District in their spreadsheets to the information and documents available in the child's SED files." *Id.* (citing Pls.'

Sealed Ex. List, No. 1 at 1, ECF No. 456-1); *see also id.* at 6 (quoting Dunst. Dep., Oct. 2, 2014, ECF No. 431-6) ("What was done is essentially something called pattern matching. . . . [Y]ou basically start with the binary outcome, and then you back up and figure out whether or not all the cases that you have . . . fit the same binary outcome."). Given the simple and straightforward nature of the process, it is unclear what more defendants would like to know about the Factual Summary's preparation. Moreover, the Factual Summary does not present facts or information without citing specifically to the documents on which they rely—undercutting defendants' claims that its contents are sufficiently misleading to merit exclusion. *See generally* Pls.' Sealed Ex. List, No. 1, ECF No. 456-1. Finally, the Court will grant defendants the opportunity to examine the exhibit's authors, giving them a full and fair chance to investigate the Factual Summary's accuracy.

Third and lastly, defendants claim that the Factual Summary should be excluded because it is "inappropriately argumentative." Defs.' Opp'n to Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 12. As a matter of law, summaries under FRE 1006 may not "function as pedagogical devices that unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been directly proved." *United States v. Drogas*, 748 F.2d 8, 1 (1st Cir. 1984) (citing J. Weinstein & M. Berger, Weinstein's Evidence § 1006 (1983)). This argument, however, is in large part a re-articulation of defendants' first claim that the Factual Summary is inaccurate because is incomplete. Indeed, defendants allege, once again, that plaintiffs "cherry-picked [*specific* children] . . . to highlight *specific* matters they wish to note within the file." Defs.' Opp'n to Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 12 (emphasis in original).

In analyzing this argument, the Court finds that the Factual Summary is not "bias[ed] or slant[ed]," *id.* at 12, simply because it does not include detailed summaries for every aspect of every child's file. Under these circumstances, a bias would only exist if plaintiffs claimed the

children they highlight are somehow representative of the District's broader 100-children samples. That, of course, is not the case—plaintiffs explicitly state the exact opposite. *See, e.g.*, Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 12 ("[P]laintiffs reviewed, but did not cite in the Factual Summary, thousands of other pages of materials relating to children for whom plaintiffs determined, after review of the documents, that they did not dispute the District's characterization of the children for statistical reporting . . . ."). As discussed, plaintiffs reviewed the entire files and expressly agree that the data omitted from its summary is consistent with the District's ultimate conclusions. There is nothing inherently inappropriate about omitting certain material or information from a summary, provided such material is clearly identified. Moreover, plaintiffs do not claim the contents of their Factual Summary are indisputable, and the Court welcomes defendants' rebuttals.

In making this determination, the Court finds the criteria set forth in *Fahnbulleh* support the Factual Summary's admissibility. First, because there are thousands of pages of primary source files, the underlying documents are sufficiently voluminous that comprehension is difficult and inconvenient. Next, the documents themselves are admissible. Indeed, the childrens' files form the basis for the District's own statistical conclusions and will be crucial to the Court's ultimate findings. Third, the underlying documents are of course available for the defendants' inspection, given that the District created and currently possesses them. Fourth, as previously discussed, the summary is accurate and non-prejudicial because it invariably cites to source documents and identifies all of the material it omits. Lastly, the person who assembled the summary will be subject to examination on its methodology and factual findings, as discussed in subsection III(A).

To conclude, Exhibit 1 summarizes voluminous recordings drawn from thousands of pages of documents and allows the Court to draw its own inferences. Admittedly, the evidence is

somewhat peculiar because the Factual Summary cross-references two documents, each of which the District itself created. There is no reason, however, to exclude the Factual Summary simply because it draws from two sources in a way that lends support to the plaintiffs' arguments and undermines that of the defendant. *Cf. Greycas, Inc. v. Proud*, 826 F.2d 1560, 1568 (7th Cir. 1987) ("The summaries are basically just a matching of the descriptions in the two lists. They made it easier for the judge to compare the descriptions of each pair of items and decide whether they were probably referring to the same piece of machinery, only differently described."). Indeed, because the Factual Summary unfailingly cites to the source documents from which it funnels information, Exhibit 1 does not present new facts or obscure old ones. It merely summarizes that which is already available.

By summarizing voluminous recordings that cannot be conveniently examined in court, the Factual Summary satisfies the threshold requirement of FRE 1006 and responds to the rule's basic rationale. It nearly goes without saying that if the defendants find errors in the Factual Summary, they may provide contradictory evidence. And, indeed, they already have. Defs.' Opp'n to Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 11 (describing an example of what defendants consider to be "pervasive errors" in the Factual Summary). Such findings, however, impact the Factual Summary's persuasiveness not its admissibility. *United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008) ("Even if the calculations are mistaken, the chart is itself admissible, since admissible evidence may be unpersuasive and a defendant has the opportunity to rebut it."). Because the Factual Summary will be admitted under FRE 1006, the Court need not consider the parties' arguments that the exhibit be considered as evidence under the residual hearsay exception, or in the alternative, as a brief, demonstrative, or proposed findings of fact.

### B. Testimony of Attorney Who Created the Factual Summary.

Although the Factual Summary will be admitted as evidence, the Court will require the lawyer who prepared it to testify to the facts surrounding its creation. This Court will adhere to the D.C. Circuit's suggestion that "the witness who prepared the summary should introduce it." *Fahnbulleh*, 752 F.3d at 479.

Plaintiffs make a variety of arguments to support their proposition that cross-examination is unnecessary. First, plaintiffs look to the rules of ethics that discourage lawyers from testifying and rightly point out that such testimony has the potential to "undermine attorney-client communications, present unique opportunities for harassment, disrupt opposing counsel's preparation, . . . and spawn collateral litigation issues of privilege, scope, and relevancy." Reply in Supp. of Pls.' Mot. in Lim. Regarding Pls.' Factual Summ. 21 (quoting *Coleman v. District of Columbia*, 284 F.R.D. 16, 18 (D.D.C. 2012). Second, they argue because the "methods that [the attorney] used are self-evident," cross-examination presents little additional value. *Id.*

While such ethical concerns are generally present in opposing counsel examination, in this case, the apparent downsides are minimal. First, the Factual Summary in no way implicates the attorney-client privilege or otherwise privileged communications. The summarized information was obtained through documents the District provided, not through client interactions. Indeed, anyone—not just the plaintiffs' lawyers—could have analyzed the source information and created the summary. In addition, the proffered testimony will be narrow, relating only to the creation and content of the Factual Summary, which mollifies the Court's general concern over the potential

for harassment of opposing counsel. Lastly, because the nature of the testimony is clearly defined, examination is unlikely to spawn collateral litigation issues of scope and relevancy.

Because the Court has already ruled that any errors or inconsistencies in the Factual Summary speak to its persuasiveness, not its admissibility, it only makes sense that the defendants are given the opportunity to examine the methods and findings of the person who created it. The process's utter lack of automation and reliance on human judgment manifestly supports this conclusion. The Factual Summary is very different from a "chart or calculation" considered in FRE 1006, which more often than not condenses vast amounts of quantitative information. Such processes are automated and mechanical, often leaving almost no room for human judgment, and little reason to permit cross-examination.

Although the plaintiffs' process is clear, *see infra* pp. 10-11, it is a process prone to human error. In the Court's opinion, the Factual Summary's complete reliance on manual rather than automated systems legitimates defendants' real questions of method and accuracy. The Court therefore will permit the defendants to depose Ms. Seffel prior to trial regarding the creation of the Factual Summary and will require plaintiffs to call Ms. Seffel as the sponsoring witness at trial, subject to defendants' cross-examination. The Court recognizes this result is less than ideal but agrees with the defendants that it "is a byproduct of Plaintiffs' litigation choices, and Defendants should not be prejudiced because Plaintiffs chose to adopt this approach." Defs.' Reply in Supp. of Their Cross Mot. in Lim. 7, ECF No. 465.

## IV. CONCLUSION

For the reasons stated herein, the Court will GRANT plaintiffs' motion *in limine* and DENY defendants' cross motion *in limine*. Plaintiffs' Exhibit 1, the Factual Summary, will therefore be admitted as evidence. Furthermore, the Court therefore will permit the defendants to depose the attorney who created the Factual Summary prior to trial regarding its creation and will require plaintiffs to call the attorney as the sponsoring witness at trial, subject to defendants' cross-examination.

A separate order consistent with this Opinion shall issue on this day of October 23, 2015.

_____
Royce C. Lamberth
United States District Judge