## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DL, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Civil Case No. 05-1437** |
| ) | |
| DISTRICT OF COLUMBIA, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION

Currently before the Court is the defendants' Motion to Decertify Subclass 1 [467]. The plaintiffs in this case are residents of the District of Columbia and former preschool-age children with various disabilities who allege that the District of Columbia ("the District") has failed to provide them a free and public education ("FAPE") in violation of the Individuals with Disabilities Act ("IDEA"). In November 2013, the Court issued a Memorandum Opinion [389] that certified four plaintiff subclasses, the first of which the District presently claims no longer satisfies the commonality requirement of Federal Rule of Civil Procedure 23(a)(2). Upon consideration of the motion, plaintiffs' opposition, defendants' reply, and the entire record herein, the Court will DENY defendants' Motion to Decertify Subclass 1.

### I.  BACKGROUND

This lawsuit is rooted in the District's alleged failures to meet its affirmative obligations set out in the IDEA. Essentially, the IDEA is designed to ensure that all children with disabilities ages 3 to 21 have available to them "a free appropriate public education that emphasizes special

education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). To achieve its central goal, the IDEA imposes discrete and limited duties onto states and the District of Columbia—duties that plaintiffs claim the District has not satisfied and have come to form the basis of the divisions between the four certified subclasses.

To make education universally available to disabled children ages 3 to 21, the IDEA and the District's laws that implement the IDEA require a series of piecemeal, though coordinated, procedures and policies. First, the District has a duty to "identify and locate every handicapped" child residing in the city. 34 C.F.R. 104.32. Next, D.C. Code and the IDEA require that the District evaluate these identified children, 20 U.S.C. § 1414(a)-(c), and coordinate efforts to determine whether or not they are eligible for disability services. 20 U.S.C. § 1414(a)-(c); 5 D.C.M.R. 3003.1. To make the eligibility determination, the District must convene a team that includes parents and teachers to review, among other things, the results of the evaluations, in order to determine whether a given child is disabled and requires special education and related services. 20 U.S.C. § 1414(d). Taken together, the District's duties to identify, locate, evaluate, and provide an eligibility determination to disabled children are known as the "Child Find" obligation. *See, e.g.*, Mem. Op. 2, ECF No. 389.

Once eligibility is determined, the District is required to offer special education and related services. The District must participate with parents, educators, and other professionals to draft an Individualized Education Program ("IEP"), tailored to meet the unique needs of the disabled child, and provide the child with a FAPE. 20 U.S.C. § 1414(d). Lastly, in order to ensure that disabled children ages 3 to 21 are afforded a FAPE, the law serves children under the age of 3 through a program entitled the IDEA Part C. Part C requires the District to provide disabled children ages

zero to three with "appropriate early intervention services" and to develop an Individual Family Service Plan. 20 U.S.C. § 1435. The law requires that children moving from Part C into preschool programs designed for three year olds receive a "smooth and effective transition" by their third birthday. 20 U.S.C. § 1412(a)(9).

The merits of the present lawsuit have mainly focused on whether or not the District has fulfilled these obligations; that said, the lawsuit's procedural history has been guided, at least in part, by important issues relating to class certification. After this lawsuit was filed in 2005, in August 2006 this Court certified a plaintiff class pursuant to Federal Rule of Civil Procedure 23(b)(2), defining it as:

> All children who are or may be eligible for special education and related services, who live in, or are wards of, the District of Columbia, and (1) whom defendants did not identify, locate, evaluate or offer special education and related services to when the child was between the ages of three and five years old, inclusive, or (2) whom defendants have not or will not identify, locate, evaluate or offer special education and related services to when the child is between the ages of three and five years old, inclusive.

*DL v. District of Columbia*, 237 F.R.D. 319, 324 (D.D.C. 2006); *see also* Memorandum Order 3-4, ECF No. 389.

With this group of children serving as the plaintiff class, the Court relied on statistical analyses and compliance metrics to find that the District's policies were inadequate to meet its obligations under the IDEA. *See* Mem. Op. 4-5, ECF No. 389 (citing *DL v. District of Columbia*, 845 F. Supp. 2d 1, 10-17 (D.D.C. 2011). The Court found, in effect, that the District's failure to institute adequate Child Find practices resulted in the denial of a FAPE to a substantial number of disabled children and that the District failed to comply with its legal duty to provide a smooth and effective transition to a significant portion of disabled children. *DL*, 845 F. Supp. 2d at 21-23. Moreover, the Court found that the District demonstrated bad faith or gross misjudgment by knowingly failing to comply with the IDEA and therefore violated section 504 of the

Rehabilitation Act, which prohibits discrimination in programs receiving federal funding. Ultimately, the Court issued a structural injunction, which included programmatic requirements and numerical goals that would remain in effect until the District demonstrated sustained compliance. *Id.* at 25-34.

After the trial but before this Court issued its final decision, the Supreme Court decided *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), which clarified the proper interpretation of the commonality requirement for class certification under Rule 23(a)(2). In *Wal-Mart*, the Court held that class certification under Rule 23(a)(2) was inappropriate for a putative class of one and a half million women, all current or former employees of Wal-Mart who alleged that "the discretion exercised by their local supervisors over pay and promotion matters violate[d] Title VII by discriminating against women." 131 S. Ct. at 2546. In its ruling, the Court emphasized that the pay and promotion decisions impacting women were not dictated by a uniform corporate policy but were made by thousands of geographically-dispersed managers. The Court found that "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.* at 2552 (emphasis in original). Therefore, to establish commonality, a class must present a common contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551.

Immediately following the *Wal-Mart* decision, the defendants in this case sought to decertify the consolidated plaintiff class that was originally certified in 2006, arguing that the single and undivided group improperly "bundled together [in their Complaint] multiple different allegations of a variety of different provisions of the IDEA, the Rehabilitation Act, and local

District of Columbia law" and "amalgamat[ed] . . . a variety of provisions of a single statutory scheme." *DL v. District of Columbia*, 277 F.R.D. 38, 42 (D.D.C. 2011). Essentially, although all members of the class were denied a FAPE, they were not denied a FAPE for the *same reason*. The District looked to *Wal-Mart* to argue that because any one of a myriad of proven legal violations and administrative shortcomings could have been the underlying reason for the denial of a disabled child's FAPE, the class could not demonstrate commonality. In other words, it was improper to combine multiple forms of IDEA violations in one broad class because there was no one, discrete true/false issue central to the validity of plaintiffs' claims as *Wal-Mart* unambiguously requires. For example, some members of the broad class would have been denied a FAPE because the District failed to have an effective policy to identify them, while others because the District failed to have an effective policy to perform timely eligibility determinations.

In response to defendants' motion to decertify the single, broad class, plaintiffs sought to recertify the class as four distinct subclasses, each consisting, respectively, of disabled children that the District failed to (1) identify; (2) timely evaluate; (3) determine eligible; and (4) provide a smooth and effective transition from Part C to Part B services. *Id.* at 47 (citing Pls.' Mem. 5, ECF No. 217-2. Ultimately, this Court denied the District's motion, holding that each member of the plaintiff class had suffered a common injury, namely "denial of their statutory right to a free appropriate public education." *Id.* at 45. Moreover, this Court held that the plaintiffs presented the common question whether class members received a FAPE and noted that the class members' "differing allegations only represent the differing ways in which defendants have caused class members' common injury," *id.*, that is, the "denial of their statutory right to a free appropriate public education." *Id.*

Subsequently, the District appealed the Court's order denying decertification in the United States Court of Appeals for the District of Columbia Circuit and ultimately prevailed. The Court of Appeals vacated the Court's original class certification order and remanded the case for further proceedings, holding:

> After *Wal-Mart* it is clear that defining the class by reference to the District's pattern and practice of failing to provide FAPEs speaks too broadly because it constitutes only an allegation that the class members "have all suffered a violation of the same provision of law," which the Supreme Court has now instructed is insufficient to establish commonality given that the same provision of law "can be violated in many different ways." *Wal-Mart*, 131 S. Ct. at 2551. In the absence of identification of a policy or practice that affects all members of the class in the manner *Wal-Mart* requires, the district court's analysis is not faithful to the Court's interpretation of Rule 23(a) commonality.

*DL v. District of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013).

In 2013 and on remand from the Court of Appeals, this Court was to reconsider whether a "class, classes, or subclasses may be certified," *id.* at 129, and in doing so, determined certification was appropriate for each of the four proposed plaintiff subclasses. Mem. Op. 24-25, ECF No. 389. The Court found that all four subclasses satisfied Rule 23(a)'s commonality requirement, as well as class certification's various other requirements, and ultimately certified the subclasses as follows:

> **SUBCLASS 1**: All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards of, the District of Columbia, and were not or will not be identified and/or located for the purposes of offering special education and related services;

> **SUBCLASS 2**: All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards of, the District of Columbia, and did not or will not receive a timely initial evaluation for the purposes of offering special education and related services;

> **SUBCLASS 3**: All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards of, the District of Columbia, and did not or will not receive a timely determination of eligibility for special education and related services; and

**SUBCLASS 4**: All children with disabilities, as defined by the IDEA, who lived in or will live in, or are or will be wards of, the District of Columbia, and who participated or will participate in early intervention programs under Part C of IDEA, and who participated or will participate in preschool programs under Part B, and who did not or will not have a "smooth and effective" transition from Part C to Part B by the child's third birthday.

*Id.*

When evaluating the substance of Rule 23(a), this Court's Memorandum Opinion [389] devoted the majority of its analysis to Rule 23(a)'s commonality requirement, mindful that it served as the "crux" of both the Supreme Court's *Wal-Mart* decision and the more recent Circuit decision that vacated this Court's original class certification order. *DL v. District of Columbia*, 713 F.3d 120, 127 (D.C. Cir.) (citing *Wal-Mart Stores, Inc. v. Dukes*, 131, S. Ct 2541, 2552 (2011)). At the outset of its commonality discussion, this Court's memorandum opinion acknowledges that the search for commonality is complicated because "at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." Mem. Op. 12, ECF No. 389 (quoting *Love v. Johanns*, 439 F.3d 723, 729-30 (D.C. Cir. 2006)). As such, courts must be careful to ensure that class members have suffered the same injury *for the same reason*, such as a uniform policy or practice that is illegal. *Id.* (citing *Wal-Mart*, 131 S. Ct. at 2551. This condition "is especially key in cases such as this where plaintiffs allege widespread wrongdoing by a defendant because a uniform policy or practice that affects all class members bridges the gap between individual claims of harm." *Id.* (citations omitted).

Mindful of these difficulties, this Court found that dividing the plaintiff class into subclasses according to specific IDEA violations partially resolves the problems of breadth the Circuit identified on appeal. Specifically, in reversing the Court's original 2006 class certification, the Circuit elaborated on its statement that no "common true or false question . . . can be answered for each of [the plaintiffs'] different claims of harm," *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013), with the following:

For some plaintiffs, for example, the alleged harm suffered is due to the failure of the District to have an effective intake and referral process; for others the alleged harm is caused by the District's failure to offer adequate and timely education placements to implement individual education plans ("IEPs"); for still others the cause is the absence of a smooth and effective transition from early intervention programs to preschool programs.

*Id.*

The plaintiffs' four proposed subclasses remedied this defect in part because they "directly track[ed] the specific harms identified by the Circuit." Mem. Op. 13, ECF No. 389. Put differently, this Court found that each subclass alleges a uniform practice of failure that harmed every subclass member in the same way. For example, the third subclass sought to litigate the common question of whether the District fulfilled its statutory duty to perform timely eligibility determinations for disabled children. *See id.* at 14. As of the November 2013 order, therefore, this Court found that the first subclass, like the three others, presents a true or false question common to all members of the class and dispositive of its claim.

In addition to providing direct analysis under Rule 23(a), this Court also highlighted two ways in which class certification in this case is distinguishable from that in *Wal-Mart*. First, unlike *Wal-Mart* where the Title VII claims at issue depended upon "the reason for [each] particular employment decision," *id.* (citing *Wal-Mart*, 131 S. Ct. at 2552), resolution of the claims in this case turn on objective, statutorily-defined obligations that lack the amorphous quality of Title VII decisions. *Id.* This Court noted that where there is a statutory duty to act—as in the case of the IDEA—there is a "significant difference between challenging the inadequacy or complete failure to enact policies and procedures and alleging an erroneous application of a policy to individuals." *Id.* at 14-15. Second, in contrast to *Wal-Mart*, where individual decisions were made by independent managers in over 3,000 stores, in the present case, the development and administration of the District's IDEA procedures are centralized in two closely-related agencies,

the District of Columbia Public Schools and the Office of State Superintendent of Education. Consistent with *Wal-Mart*'s assertion that commonality could be demonstrated if plaintiffs had brought common claims of "discriminatory bias of the part of the same supervisor," *id.* at 15 (citing *Wal-Mart*, 131 S. Ct. at 2551), the administration of the IDEA in the District is highly centralized and within the purview of a single decisionmaker.

After this Court certified all four subclasses on remand in November 2013, it more recently ruled on both parties' summary judgment motions and left a number of subclass 1's claims to be determined at the upcoming trial currently scheduled for November 2015. Specifically, subclass 1's claims under the Rehabilitation Act for the period before March 22, 2010 and its claims under IDEA and D.C. law from April 6, 2011 to the present remain, *see* Mem. Op. 43, ECF No. 444, making the present motion for class decertification crucial to a number of this case's unsettled issues.

## II. LEGAL ANALYSIS

In their current motion, defendants seek to decertify plaintiff subclass 1 by focusing on Rule 23(a)'s commonality requirement. Defs.' Mot. to Decertify Subclass 1 1. As is appropriate, the District looks to the relevant standard set out in *Wal-Mart* and makes two basic arguments. First, in defendants' view, subclass 1 is too broad to warrant continued certification, and second, the plaintiffs have not tied the subclass to any specific government action or inaction, a determination that would be fatal to the subclass's enduring viability. Of course, this lawsuit has matured since 2013 when the subclass was originally certified; however, contrary to defendants' theory, discovery has neither yielded nor failed to yield any information that now renders certification improper. For the reasons stated below, the Court finds that any changes in the record or developments in discovery are insufficient to alter the Court's previous determination that

plaintiffs have shown that subclass 1 satisfies the various and rigorous requirements of class certification.

## A. Class Decertification

After a class is initially certified, Rule 23 expressly grants courts the discretion to revisit the propriety of continued class certification in later stages of litigation. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). Indeed, the Supreme Court has described certification orders as "inherently tentative," and, as such, the district court "remains free to modify [such orders] in the light of subsequent developments in the case." *Gen. Tel. Co. of the SW. v. Falcon*, 457 U.S. 147, 160 (1982). Indeed, courts have noted that "usual reluctance to entertain motions for reconsideration simply does not apply." *Slaven v. BP Am., Inc.* 190 F.R.D. 649, 651 (C.D. Cal. 2000). Moreover, "[a]s the proponent of continued class certification, Plaintiffs [retain] the burden of establishing that each of the requirements for class certification . . . are met." *Lightfoot v. District of Columbia*, 246 F.R.D.326, 332 (D.D.C. 2007) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

## B. Enrolled Children Versus Identified and Located Children

The Court rejects the District's first argument, which asserts that because subclass 1 incorporates students who are unenrolled yet were identified and located, it is overly broad and unfit for certification. *See, e.g.*, Defs.' Mot. 6 ("[B]oth children are subclass 1 members under Plaintiffs' logic, yet only one was injured as a result of not being identified by the District."). In the Court's view, this argument misstates the way in which plaintiffs use the enrollment figures. Plaintiffs use these figures to approximate the overall effectiveness of the District's policies to identify and locate disabled children, not to demarcate subclass 1.

As the defendants put it, the subclass no longer simply includes those students that the District did not identify or locate for the purposes of offering special education and related services, but has been broadened to encompass children not enrolled in special education for reasons that "have nothing to do with the District's obligation to locate and/or identify" them. *Id.* at 5. More specifically, the District highlights plaintiffs' contention that the District's serving between 7.0 and 7.35 percent of preschool children in 2014 indicates that it failed to identify and provide special education services to between 243 and 315 children. *Id.* In defendants' view, the plaintiffs' use of these enrollment numbers supports their assertion that the plaintiffs "now perceive the composition of subclass 1 as relating to enrollment, not identification." *Id.* Accordingly, because many children who are or were unenrolled were in fact identified and located, the class becomes overly broad and therefore deficient under Rule 23(a)'s commonality analysis.

In making this argument, defendants overlook that the enrollment numbers are used to help gauge the effectiveness of the District's efforts to locate and identify disabled children in connection with their IDEA obligations. The Court agrees with the plaintiffs that "[t]he District's enrollment rate does not define the subclass, but is instead a way to measure the effectiveness of the District's policies and practices to the identification of children potentially eligible for special education services." Pls.' Opp'n 5. Indeed, in a recent Order [444], this Court ruled that low enrollment numbers "would suggest that the District has in fact failed in its obligations to locate disabled children." Mem. Op. 35. As they always have, plaintiffs continue to use the enrollment figures as one of many potential ways to approximate the District's success in identifying and locating disabled children—not as a means to define the boundaries of subclass 1.

Although there is reason to believe plaintiffs' suggestion that enrollment figures gauge the District's effectiveness in identifying and locating children, the Court welcomes the District to

submit evidence to diminish that argument. For example, defendants are free to offer evidence to counter plaintiffs' theory by showing that enrollment figures actually do not reasonably approximate identification rates. Moreover, the District may submit evidence to show that its enrollment numbers are in fact high enough to suggest that its policy to identify and locate children has been effectively implemented. Additionally, defendants could ignore the enrollment figures altogether and produce more direct evidence showing the District has in fact effectively identified and located children according to its obligations under the IDEA. Such evidence, however, does not bear on the certification or composition of subclass 1. Indeed, the subclass is presently defined in the same way that it was in 2013 as the following:

> All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards of, the District of Columbia, and were not or will not be identified and/or located for the purposes of offering special education and related services.

Mem. Op. 9, ECF No. 389.

The enrollment metrics are used to help answer the underlying question that unites the class, that is, whether or not the District has an effective policy to locate and identify disabled children. The Court agrees with plaintiffs that using enrollment figures as way to shed light on this inquiry does not alter the definition of the subclass or the common question that unites its members.

### C. Stating a Common True or False Question

Like the first argument, the Court also rejects defendants' second argument, which asserts that the individual claims of subclass 1's members do not tie to any one specific form of government action or inaction. The District claims the subclass falls short of Rule 23(a)'s commonality requirement because the members of a subclass do not suffer the same injury *for the same reason*. Defs.' Mot. 6 (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). Contrary to defendants' suggestion, the Court finds that if any of the members of subclass 1 have

in fact suffered the harm they allege, it is for one reason alone: the District's failure to implement

an effective policy to locate and identify disabled children under the terms of the IDEA. Indeed,

whether or not such a policy exists presents a common question that unites the entire class and

determines the viability of each and every member's individual claim. Therefore, plaintiffs have

satisfied Rule 23(a)'s commonality requirement.

As it stood before this motion, plaintiff subclass 1 was tied together by the true or false

question of whether the District had "policies and procedures to ensure the identification of

disabled children." Defs.' Mot. 7. Defendants now argue that after discovery, this articulation is

"conclusory" and "amorphous." *Id.* Indeed, discovery has confirmed that the District's efforts to

identify and locate disabled children involve "an array of discrete government practices . . .

including its maintenance of a diverse referral network, Early Stages office hours at United Health

Care clinics across the city, and education and professional development efforts targeted at parents,

among literally countless others." *Id.* Because, even after the benefit of extensive discovery,

plaintiffs have not challenged any of these discrete practices directly, defendants argue that there

is no "true or false question" uniform across the subclass sufficient to satisfy Rule 23(a)(2). *Id.* at

8.

To support this argument and in reply to plaintiffs' brief in opposition, defendants rely on

*Lightfoot v. District of Columbia*, 273 F.R.D. 314 (D.D.C. 2011). The plaintiffs in *Lightfoot* were

former employees of the District of Columbia who challenged policies and procedures that the

District of Columbia used to terminate their employee disability compensation benefits. Plaintiffs

brought an as-applied constitutional challenge under the principles of procedural due process,

alleging that "defendants reduced, suspended, or terminated disability compensation benefits . . .

without affording beneficiaries adequate and timely notice and opportunity to demonstrate a

continuing entitlement to benefits in violation of the Due Process Clause." *Id.* at 317 (citation

omitted). At an early stage in litigation, a plaintiff class was certified under Rule 23(a), with the

members' common issue being whether the District "had policy and practice of failing to provide

members of the Plaintiff class Due Process prior to the termination of their disability compensation

benefits." *Id.*

Later in the litigation, the Court granted defendants' motion to decertify the plaintiff class

because the class could no longer satisfy Rule 23(a)'s commonality requirement and Rule

23(b)(2)'s requirement for cohesion. First and foremost, the court took exception to plaintiffs'

contention that "whether the Defendants generally applied termination polices and procedures

[were] consistent with the demand of *Mathews*," *id.* at 325 (citation omitted), presents a true or

false question common to the whole class. The Court found that under the plaintiffs' interpretation,

"certification would be appropriate wherever class members allege a harm with some connection

to the Due Process Clause—no matter how disparate the class members' individual injuries may

be and no matter their origins." *Id.* at 325. Echoing some of the defendants' arguments in this case,

the Court in *Lightfoot* found that:

> [L]urking behind the rather vague and conclusory statement that Defendants had a
> 'policy and practice of failing to provide members of the Plaintiff class Due
> Process,' lies a wide variety of more discrete and particularized practices that could
> conceivably serve as the foundation for municipal liability. These include, but are
> not limited to: the failure to provide any pre-deprivation notice; the failure to
> provide a sufficient "grace period" between pre-deprivation notice and actual
> termination; the failure to provide an adequate explanation of the reasons for
> termination decisions; the failure to provide adequate notice of procedural rights;
> the failure to provide claimants with access to case files; and the systematic
> exclusion of reliable medical evidence.

*Id.* at 326.

The Court ruled that for certification to be proper, "[p]laintiffs must first identify a policy or

custom they contend violates due process and then establish that the policy or custom is common

14

to the class." *Id.* (internal quotation marks omitted). Because the plaintiffs failed to do so, the Court in *Lightfoot* ordered the class to be decertified.

Defendants suggest that plaintiffs' argument for commonality is akin to the unsuccessful claim made by the plaintiffs in *Lightfoot* that they were united by a common question. In *Lightfoot*, the plaintiffs' claim that "[d]efendants ha[d] a policy and practice of failing to provide members of the Plaintiff class Due Process" was rightly regarded as vague and conclusory. *Id.* at 326. Unless plaintiffs were to offer an assertion such as "the District failed to provide any pre-deprivation notice," *id.*, a claim that the District's policy failed to afford due process is at a minimum hypothetical. More concrete, verifiable information was needed to establish a "common true or false question [that] . . . can be answered for each of [the plaintiffs'] different claims of harm." *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013). The plaintiffs' claims of commonality were hollow without pointing to a more specific governmental policy that equally and universally affected them. Indeed, the fact that one class member was denied due process would not necessarily bear on whether or not another class member was denied due process, at least in the absence of more specific allegations and information. Defendants now claim that the facts and legal conclusions in the present case are analogous to the failed claims of commonality in *Lightfoot*. Reply in Further Supp. of Defs.' Mot. to Decertify Subclass 1 3 ("[T]he way the Court [in *Lightfoot*] analyzed the viability of continued class certification based on how the parties' claims and defenses came into focus is a perfect fit [in this case].").

The Court disagrees. It is more apt to compare the District's failure to effectively locate children under the IDEA with the District's alleged failure to afford due process by, for example, specifically neglecting to provide any pre-deprivation notice. As opposed to the plaintiffs in *Lightfoot*, plaintiffs in subclass 1 are united by the common question of whether the District's

policies, procedures, and practices fail to ensure that it fulfills its identification and location obligations under the IDEA. This claim is clear, specific, and independently verifiable, unlike the deprivation of due process, which is a general and conclusory statement in the absence of hard facts or a tangible policy. Answering for one class member the question of whether or not the District had an effective identification and location policy effectively answers that same question for all class members. Indeed, determining this question's truth or falsity would "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551.

In coming to this conclusion, the Court is partially guided by the observation that "at a sufficient . . . level of generalization, almost any set of claims can be said to display commonality." *Love v. Johanns*, 439 F.3d 723, 729 (D.C. Cir. 2006). It is equally true, however, that a set of individual claims that *do* satisfy the commonality requirement can be separately described with such specificity that the common and legitimate question uniting them may appear overly broad— or even altogether contrived. *Cf. Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) ("It is not necessary that members of the proposed class share every fact in common. Thus, the district court abused its discretion in finding that commonality was not satisfied" (citations and internal quotation marks omitted)).

In negotiating this standard, the Court is unpersuaded by the District's efforts to show that a systemic failure to locate children under the IDEA is too general a claim to show commonality and merit class certification. Defendants point to numerous programs that must run smoothly to ensure that the District fulfills its statutory obligation to locate disabled children, such as the "maintenance of a diverse referral network, Early Stages office hours at United Heath Care clinics across the city, and education and professional development efforts targeted at parts." Defs.' Mot. 7. In doing so, defendants look to language in *Wal-Mart* to argue that because members of subclass

1 may have not been identified under IDEA for *different reasons*, the subclass lacks the requisite commonality. *Id.* at 6. More specifically, the subclass of disabled children who the District failed to identify would splinter and become unsuited for certification because "[s]ome subclass members' alleged injuries would have been caused by having no contact with a referrer," while others' would have been "due to inconvenience of getting to an evaluation center." *Id.* at 8.

But defendants ignore that many of the component programs they highlight as part of the larger policy to effectively identify children can no doubt themselves be further broken down into other smaller procedures or narrower policies. Just as a myriad of failures can stymie the effective functioning of the District's overall identification and location policy, various failures can also prevent, for example, the District's effective "maintenance of a diverse referral network." Indeed, in the Court's view, the statement that the "District has failed to ensure identification of disabled children" is arguably just as generalized and conclusory as the "District has failed to maintain a diverse referral network." Each policy necessarily entails coordination between various government functions, but that does not mean the underlying cause of the harm depends upon where and how the administrative breakdown occurred. Put differently, the harm flowing from the District's failure to meet its affirmative obligation to locate children is not suited for sub-categorization simply because satisfying that obligation requires the coordination of several governmental functions. Moreover, as plaintiffs note, in many cases it would be impossible for a disabled child to know which of the District's micro-policies was responsible for the District's failure to locate him or her. Crucial to the analysis, if the plaintiffs in subclass 1 were harmed, they allege that it was due to the District's failure to develop and administer an effective policy to identify and locate them. Pls.' Opp'n 17 ("[P]laintiffs do not challenge the legality of individual

determinations.") In the Court's view, this presents a common question amenable to true/false, yes/no disposition, thus satisfying Rule 23(a)'s commonality requirement.

In coming to this determination, it is important to note that if members of subclass 1 had claimed that an otherwise effective policy to identify and locate them was erroneously applied in their specific cases, then yes, defendants would have a very strong argument for decertification. Plaintiffs would likely have to show that the policy was erroneously applied to them for the *same reason*; otherwise, there would be no common question binding them together. To illustrate, determining that the policy to identify disabled children was wrongly or poorly applied for one class member would have little to no bearing on determining whether or not the same policy was erroneously applied as to another class member. But the same is not true for the case currently before this Court. In this case, the question is not about how well or poorly an individual class member's file was handled; it is a question of how well, if at all, the system operated overall. Indeed, the plaintiffs allege that the District does not have an effective policy to locate and identify disabled children. Pls.' Opp'n 2, 17. The truth or falsity of that allegation is common to and dispositive of each and every subclass member's individual underlying claim. In the Court's view, this shared question suffices to show commonality.

The Court rejects the two overarching arguments defendants make to support their motion for decertification: (i) subclass 1 is overly broad; and (ii) subclass 1 is not tied to any specific government action or inaction. First, subclass 1 is not overly broad because contrary to defendants' assertions, it continues to include only those children the District failed to locate and identify, not the entire universe of unenrolled disabled children. Second, the class is united by a single, specific manifestation of government inaction, the failure to maintain an effective policy to identify and locate disabled children in the District of Columbia according to the terms of the IDEA. Plaintiffs

once again have demonstrated that members of subclass 1 suffered the same harm—not being located or identified—for the same reason. Plaintiffs have therefore made a showing to satisfy Rule 23(a)'s commonality requirement and the various other prerequisites for class certification with respect to subclass 1.

### III. CONCLUSION

For the reasons stated herein, the Court will DENY defendants' motion for decertification of subclass 1.

A separate order consistent with this Opinion shall issue on this day of October 23rd 2015.


_____
Royce C. Lamberth
United States District Judge