## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DL, *et al.*, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>THE DISTRICT OF COLUMBIA, *et al.*,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 05-1437 (RCL)

## PLAINTIFFS' MOTION FOR AN AWARD OF LITIGATION COSTS, INCLUDING ATTORNEYS' FEES AND RELATED EXPENSES

Plaintiffs hereby move for an award of litigation costs, including attorneys' fees and related expenses, for their work representing plaintiffs in this case. *See* Corrected Memorandum Opinion & Findings of Fact and Conclusions of Law, dated June 21, 2016 (ECF No. 533), para. 318 ("Plaintiffs have prevailed on both IDEA and Rehabilitation Act claims. Pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I) (IDEA) and [29] U.S.C. § 794a(b) (Rehabilitation Act), the District shall pay plaintiffs' reasonable attorneys' fees and related nontaxable expenses associated with litigating this suit").

The details of the request are described in the accompanying documents. In general, this motion requests an award related to work on this case through June 22, 2016. This motion is supported by the accompanying memorandum and supporting affidavits and exhibits.

Pursuant to Local Rule 7(m), plaintiffs have addressed with counsel for defendants the relief sought in this motion. Defendants do not consent.

Respectfully submitted,

/s/ *Bruce J. Terris*
BRUCE J. TERRIS (D.C. Bar No. 47126)
TODD A. GLUCKMAN (D.C. Bar No. 1004129)
TERRIS, PRAVLIK & MILLIAN, LLP
1121 12th Street, N.W.
Washington, DC 20005
(202) 682-2100

MARGARET A. KOHN (D.C. Bar No. 174227)
Attorney at Law
619 Pennsylvania Avenue, S.E.
2nd Floor
Washington, DC 20003
(202) 544-1200

CYRUS MEHRI (D.C. Bar No. 420970)
Mehri & Skalet, PLLC
1250 Connecticut Avenue, N.W., Suite 300
Washington, DC 20036
(202) 822-5100

September 28, 2016                *Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DL, *et al.*, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>THE DISTRICT OF COLUMBIA, *et al.*,<br>　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)　　Civil Action No. 05-1437 (RCL)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION
FOR AN AWARD OF LITIGATION COSTS, INCLUDING
ATTORNEYS' FEES AND RELATED EXPENSES**

BRUCE J. TERRIS (D.C. Bar No. 47126)
TODD A. GLUCKMAN (D.C. Bar No. 1004129)
TERRIS, PRAVLIK & MILLIAN, LLP
1121 12th Street, N.W.
Washington, DC 20005
(202) 682-2100

MARGARET A. KOHN (D.C. Bar No. 174227)
Attorney at Law
619 Pennsylvania Avenue, S.E.
2nd Floor
Washington, DC 20003
(202) 544-1200

CYRUS MEHRI (D.C. Bar No. 420970)
Mehri & Skalet, PLLC
1250 Connecticut Avenue, N.W., Suite 300
Washington, DC 20036
(202) 822-5100

September 28, 2016　　　　　　　*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................ iii

TABLE OF EXHIBITS ...................................................................... vii

INTRODUCTION ...............................................................................1

ARGUMENT .......................................................................................6

I.     PLAINTIFFS ARE ENTITLED TO AN AWARD OF FEES BASED ON REASONABLE HOURLY RATES ....................................................6

     A.     PLAINTIFFS ARE ENTITLED TO FEES BASED ON MARKET RATES FOR COMPLEX FEDERAL LITIGATION ...............................8

     B.     PLAINTIFFS ARE ENTITLED TO FEES BASED ON PREVAILING MARKET RATES FROM THE LSI *LAFFEY* MATRIX .........................................................................................8

     C.     THE LSI *LAFFEY* MATRIX RATES REFLECT THE PREVAILING MARKET RATES FOR COMPLEX FEDERAL LITIGATION IN THE WASHINGTON, D.C., MARKET ....................11

         1.     The Laffey Matrix Rates Are Best Updated Using the LSI ..........11

         2.     The USAO Matrix 2015-2017 Is Based on an Unknown Rates Survey, Not Rates for Complex Federal Litigation ............14

         3.     Market Data Demonstrate that the LSI *Laffey* Matrix Produces Rates that More Closely Reflect the Market than the USAO Matrix 2015-2017 ......................................................17

         4.     Firm Size Is Irrelevant to the Selection of the Appropriate Rates Matrix to Use ..................................................................21

             (a)     *Blum and Save Our Cumberland Mountains* Rejected Firm Size as a Basis for Determining Rates ...............................................................................21

             (b)     The Market for Complex Federal Litigation Is Not Divided between Large and Small Firms .........................26

             (c)     The Distinction between Large and Small Firms Is

Inconsistent with the *Laffey* Matrix.................................27

     5.    Case Complexity Is Irrelevant to the Selection of the Appropriate Index to Use to Update the *Laffey* Matrix ...............29

II.    PLAINTIFFS SEEK FEES FOR HOURS REASONABLY EXPENDED BY THEIR LEAD COUNSEL.........................................................................32

III.    PLAINTIFFS' CO-COUNSEL ARE ALSO ENTITLED TO FEES FOR THEIR REASONABLE HOURS AT PREVAILING MARKET RATES .........33

IV.    THE STATUTORY CAP ON FEES IN IDEA CASES DOES NOT PRECLUDE THE REQUESTED AWARD OF FEES AND EXPENSES ..........36

V.    PLAINTIFFS ARE ENTITLED TO AN AWARD OF REASONABLE LITIGATION EXPENSES ...............................................................................40

    A.    EXPENSES GENERALLY ...................................................................40

    B.    EXPENSES RELATED TO EXPERT WITNESSES RECOVERABLE UNDER THE REHABILITATION ACT ..................41

    C.    EXPENSES RELATED TO EXPERT WITNESSES RECOVERABLE UNDER OTHER LAW ..............................................43

CONCLUSION........................................................................................................44

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*American Lands Alliance v. Norton,*
  525 F. Supp. 2d 135 (D.D.C. 2007) ........................................................ 29, 30, 31

*Arlington Central School District Board of Education v. Murphy,*
  548 U.S. 291 (2006) ........................................................................................ 41

*Barnes v. District of Columbia,*
  272 F.R.D. 135 (D.D.C. 2011) ....................................................................... 44

*Berke v. Federal Bureau of Prisons,*
  942 F. Supp. 2d 71 (D.D.C. 2013) ............................................................. 41, 42

*Blackman v. District of Columbia,*
  633 F.3d 1088 (D.C. Cir. 2011) ..................................................................... 36

*Blackman v. District of Columbia,*
  677 F. Supp. 2d 169 (D.D.C. 2010), affirmed on other grounds,
  633 F. 3d 1088 (D.C. Cir. 2011) ......................................................... 8, 28, 29, 34

*Blum v. Stenson,*
  465 U.S. 886 (1984) ................................................................................. *passim*

*Brown v. Barnhart,*
  2005 WL 2563174 (D.D.C. 2005) .................................................................. 34

*Covington v. District of Columbia,*
  57 F.3d 1101 (D.C. Cir. 1985), certiorari denied, 516 U.S. 1115 (1996) ...................... *passim*

*DL v. District of Columbia,* 256 F.R.D. 239 (D.D.C. 2009) ........................................... 11, 12, 31

*Electronic Privacy Information Center v. Department of Homeland Security,*
  2016 WL 3919810 (D.D.C. 2016) .................................................................... 16

*Eley v. District of Columbia,*
  793 F.3d 97 (D.C. Cir. 2015) ................................................................. 6, 7, 8, 29

*Goldring v. District of Columbia,*
  416 F.3d 70 (D.C. Cir. 2005) ......................................................................... 41

*Heller v. District of Columbia,*
  832 F. Supp. 2d 32 (D.D.C. 2011) ........................................................ 12, 21, 22, 27

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983) ........................................................................................4, 32

*Interfaith Community Organization v. Honeywell International, Inc.,*
   426 F.3d 694 (3d Cir. 2005) ...................................................................................9

*Jordan v. U.S. Department of Justice,*
   691 F.2d 514 (D.C. Cir. 1982) .............................................................................34

*K.N. v. Passaic City Board of Education,*
   2011 WL 5157280 (D.N.J. 2011).........................................................................41

*Laffey v. Northwest Airlines,*
   572 F. Supp. 354 (D.D.C. 1983), affirmed in part and reversed in part on other
   grounds, 746 F.2d 4 (D.C. Cir. 1984), overruled in part on other grounds, *Save
   Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988)(*en
   banc*) ...............................................................................................................*passim*

*Library of Congress v. Shaw,*
   478 U.S. 310 (1986) .............................................................................................25

*Makray v. Perez,*
   159 F. Supp. 3d 25 (D.D.C. 2016) .......................................................... 15, 16, 26

*Mason v. Maine Dept. of Corrections,*
   387 F. Supp. 2d 57 (D. Me. 2005) .......................................................................41

*Missouri v. Jenkins,*
   491 U.S. 274 (1989) .............................................................................................11

*M.M. v. School District of Philadelphia,*
   142 F. Supp. 3d 396 (E.D. Pa. 2015).....................................................................41

*M.P. ex rel. Independent School District,*
   2007 WL 844688 (D. Minn. 2007) .......................................................................41

*Muldrow v. Re-Direct, Inc.,*
   397 F. Supp. 2d 1 (D.D.C. 2005) ................................................................... 30, 31

*Perdue v. Kenny A. ex rel. Winn,*
   559 U.S. 542 (2010) ...............................................................................................4

*Queen Anne's Conservation Ass'n v. U.S. Dept. of State,*
   800 F. Supp. 2d 195 (D.D.C. 2011) .............................................................. 29, 30

*Ryan P. ex rel. Christine P. v. School District of Philadelphia,*
   2008 WL 724604 (E.D. Pa. 2008).........................................................................41

iv

*Salazar v. District of Columbia*,
123 F. Supp. 2d 8 (D.D.C. 2000) ................................................................. *passim*

*Salazar v. District of Columbia*,
30 F. Supp. 3d 47 (D.D.C. 2014) ........................................................................ 6

*Salazar v. District of Columbia*,
750 F. Supp. 2d 70 (D.D.C. 2011) ................................................................ 6, 12

*Salazar v. District of Columbia*,
809 F.3d 58 (D.C. Cir. 2015) ...................................................................... *passim*

*Salazar v. District of Columbia*,
991 F. Supp. 2d 39 (D.D.C. 2014) ............................................................ 6, 7, 19

*Save Our Cumberland Mountains v. Hodel*,
857 F.2d 1516 (D.C. Cir. 1988)(*en banc*) ................................................. *passim*

*Save Our Cumberland Mountains v. Hodel*,
622 F. Supp. 1160, 1162, 1165 (D.D.C. 1985), reversed on rates issue, 826 F.2d 43
(D.C. Cir. 1987), reserved *en banc* on rates issue, 857 F.2d 1516 (D.C. Cir. 1988). ............ 23

*Student Public Interest Research Group of New Jersey, Inc. v. AT&T Bell
Laboratories*,
842 F.2d 1436 (3d Cir.1988) ............................................................................. 9

*Trout v. Ball*,
705 F. Supp. 705 (D.D.C. 1989) ............................................................... 10, 25

**Federal Statutes**

20 U.S.C. 1415(i)(3)(B)(i)(I) ............................................................................. 4

20 U.S.C. 1415(i)(3)(B)(ii)(C) ............................................................................ 8

28 U.S.C. 1821 ................................................................................................ 44

28 U.S.C. 1920 ................................................................................................ 44

28 U.S.C. 1961 ................................................................................................ 45

29 U.S.C. 794 .................................................................................................. 41

29 U.S.C. 794a(b) ............................................................................................. 4

Consolidated Appropriations Act of 2003, Pub. L. No. 108-7, § 144, 117 Stat. 11 .................... 36

Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, 123 Stat. 697 ........................................ 36

**State Statutes**

D.C. Code Ann. §§ 32-1308(b)(1), 32-1308.1(m)(1) ................................................................13

**Rules**

Federal Rule of Civil Procedure 26......................................................................................43, 44

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|:---:|:---|
| 1 | Affidavit of Bruce J. Terris |
| 2 | Terris, Pravlik & Millian, LLP ("TPM") Timekeeper Chart |
| 3 | Resumes of TPM Attorneys |
| 4 | Summary of Fees and Expenses (Period 1 and Period 2) |
| 5 | TPM Summary Time by Category for Main Case (Period 1) (This document is identical to the corresponding document filed with plaintiffs' 2012 Fee Application as ECF No. 325-9, except that the rates, and corresponding totals, have been updated to reflect current rates) |
| 6 | TPM Time Records by Category for Main Case (Period 1) (This document was filed with plaintiffs' reply[1] in support of their 2012 Fee Application as ECF No. 348-2)[2] |
| 7 | TPM No Charge Time Records by Category (Period 1) (This document was filed with plaintiffs' 2012 Fee Application as ECF No. 325-16) |
| 8 | TPM Summary of Expenses (Period 1) (This document was filed with plaintiffs' 2012 Fee Application as ECF No. 325-14) |
| 9 | TPM Reductions of Time and Expenses from Plaintiffs' Reply in Support of Plaintiffs' 2012 Fee Application (Period 1) |
| 10 | TPM Summary of Additional Reductions of Time and Expenses (Period 1) |
| 11 | TPM Summary of Time by Billing Client and Category (Period 2) |
| 12 | TPM Time Records by Category (Period 2) |
| 13 | TPM No Charge Time Records (Period 2) |

---

[1] As described in the Second Affidavit of Bruce J. Terris, dated October 4, 2012, (ECF No. 348-3)(paras. 2-4), this exhibit, which was provided with plaintiffs' reply brief, shows plaintiffs' time with three digits after the decimal point. Plaintiffs had previously filed a similar version of the document with two digits after the decimal point. The revised exhibit was provided in response to the District's objection, but did not affect the amount of fees that were being requested. *Ibid.*

[2] To avoid confusion, plaintiffs have removed the exhibit sticker from the 2012 filing and replaced it with an exhibit sticker for this filing, identifying it as exhibit 6. Plaintiffs have done the same with other exhibits that were previously filed with plaintiffs' 2012 Fee Application, which are being re-filed in identical form here. All such documents continue to have the ECF file stamp from the 2012 filing.

| Exhibit No. | Description |
|---|---|
| 14 | TPM Summary of Expenses (Period 2) |
| 15 | Affidavit of Jeffrey S. Gutman |
| 16 | Affidavit of Margaret A. Kohn |
| 17 | Affidavit of Cyrus Mehri |
| 18 | Affidavit of Dr. Carl J. Dunst |
| 19 | Carl J. Dunst's Fees and Expenses Related to His 2010 Deposition and the 2011 and 2015 Trials, which are Being Requested pursuant to F.R.C.P. Rule 26, 28 U.S.C. 1920, and 28 U.S.C. 1821 |
| 20 | Affidavit of Dr. Leonard A. Cupingood |
| 21 | Leonard A. Cupingood's Fees and Expenses Related to his 2010 Deposition and the 2011 and 2015 Trials, which are Being Requested pursuant to F.R.C.P. Rule 26, 28 U.S.C. 1920, and 28 U.S.C. 1821 |
| 22 | U.S. Department of Commerce, Bureau of Labor Statistics, Legal Services Component of the Consumer Price Index |
| 23 | *Laffey* Matrix Updated Using Legal Services Index ("LSI *Laffey* Matrix") |
| 24 | USAO Matrix 2015-2017 |
| 25 | USAO *Laffey* Matrix 2014-2015 |
| 26 | Affidavit of Carolyn Smith Pravlik |
| 27 | Declaration of Michael Kavanaugh |
| 28 | Affidavit of Michael P. Downey |
| 29 | Affidavit of Bruce MacEwen |
| 30 | Affidavit of Daniel Rezneck, filed in *Laffey v. Northwest Airlines* |
| 31 | *Laffey* Matrix Data from *Laffey* Affidavit of Daniel Rezneck |
| 32 | 1982 Martindale-Hubbell Law Directory Listings for *Laffey* Matrix Firms (excerpted) |
| 33 | Declaration of Joseph A. Yablonski, filed in *Broderick v. Ruder*, No. 86-1834 (D.D.C.) |
| 34 | Yablonski, Both & Edelman Website |
| 35 | Affidavit of L. Thomas Galloway, filed in *National Wildlife Federation v. Watt*, No. 82-0320 (D.D.C.) |
| 36 | Testimony of Ward Bower from *Palmer v. Rice* (excerpted) with Biography |

| Exhibit No. | Description |
|---|---|
|  | from Altman Weil, Inc., website |
| 37 | Affidavit of David N. Webster, filed in *Chewning v. Edwards* |
| 38 | ALM Legal Intelligence, 2010 Survey of Law Firm Economics (excerpted) |
| 39 | D.C. Code Ann. §§32-1308(b)(1), 32-1308.1(m)(1) |
| 40 | 2012-2013 Range of Firm Billing Rates Table:  Comparison of LSI *Laffey* (Plaintiffs') Updated *Laffey* Matrix, All-Items CPI (USAO) Updated *Laffey* Matrix, and Washington, D.C. Rates for 2012-2013, filed in *Salazar v. District of Columbia*, No. 93-452 (D.D.C.)[3] |
| 41 | 2012-2013 Average Law Firm Billing Rates Table, filed in *Salazar v. District of Columbia*, No. 93-452 (D.D.C.) |
| 42 | 2012-2013 Percentage Difference in Billing Rates Tables:  All-Items CPI *Laffey* Update v. Law Firm Average and LSI (Plaintiffs') *Laffey* Update v. Law Firm Average, filed in *Salazar v. District of Columbia*, No. 93-452 (D.D.C.) |
| 43 | Thomson Reuters/Westlaw Legal Billing Report, August 2015 (excerpted) |
| 44 | Thomson Reuters/Westlaw Legal Billing Report, December 2015 (excerpted) |
| 45 | Thomson Reuters/Westlaw Legal Billing Report, May 2016 (excerpted) |
| 46 | U.S. Department of Commerce, Bureau of Labor Statistics, All-Items, Regional Component of the Consumer Price Index |
| 47 | 2015-2016 Range of Firm Billing Rates Table: Comparison of LSI *Laffey* Matrix, USAO Matrix 2015-2017, USAO *Laffey* Matrix, and Washington, D.C. Rates for 2015-2016 |
| 48 | 2015-2016 Average Firm Billing Rates Table: Comparison of LSI *Laffey* Matrix, USAO Matrix 2015-2017, USAO *Laffey* Matrix, and Washington, D.C., Rates Data for 2015-2016 |
| 49 | 2015-2016 Percentage Difference between 2015-2016 Market Data and 2016-2017 Rate Matrices |
| 50 | Declaration of Mark N. Bravin, filed in *McKesson Corp. v. Islamic Republic of Iran*, No. 82-0220 (D.D.C.) (excerpted) |

---

[3] Plaintiffs previously filed exhibits 40 to 42 in *Salazar v. District of Columbia*, Civ. No. 93-452. As with Plaintiffs' Exhibit 6, plaintiffs have removed the exhibit stamps from the filings in *Salazar* and replaced them with exhibit stamps from this filing.  All such documents retain the ECF file stamp at the top of the page.

| Exhibit No. | Description |
|---|---|
| 51 | Declaration of Julie Goldsmith Reiser, filed in *Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of America*, *N.A.*, No. 12-02865 (S.D.N.Y.) (excerpted) |
| 52 | Declaration of Paul D. Clement, filed in *Osterweil v. Bartlett*, No. 09-825 (N.D.N.Y.) |
| 53 | Declaration of Mark F. (Thor) Hearne II, filed in *Biery v. United States*, No. 07-693L (Fed. Cl.), with Exhibit A (excerpted) and Exhibit E |
| 54 | Declaration of Steven K. Davidson, filed in *Makray v. Perez*, No. 12-0520 (D.D.C.), with Exhibits A and B |
| 55 | Supplemental Declaration of Steven K. Davidson, filed in *Makray v. Perez*, No. 12-0520 (D.D.C.) |
| 56 | Declaration of John P. Relman, filed in *Makray v. Perez*, No. 12-0520 (D.D.C.) |
| 57 | Declaration of Megan Cacace, filed in *Hardin v. Dadlani*, No. 11-02052 (D.D.C.) |
| 58 | Landowners' Memorandum in Support of Motion for Attorney Fees and Litigation Expenses, filed in *Campbell v. United States*, No. 13-00324 (Fed. Cl.) (excerpted) |
| 59 | E-mail from Meghan Largent to Carolyn Smith Pravlik (Sept. 20, 2016) |
| 60 | Declaration of Cyrus Mehri, filed in *Brown v. Medicis Pharmaceutical Corp.*, No. 13-01345 (D.D.C.) (excerpted) |
| 61 | Declaration of David K. Colapinto, filed in *Citizens for Responsibility and Ethics in Washington v. U.S. Department of Justice*, No. 12-1491 (D.D.C.), with attachment |
| 62 | Declaration of Jeffrey L. Light, filed in *Westfahl v. District of Columbia*, No. 11-2210 (D.D.C.) |
| 63 | Fee Affidavit of Tamara L. Miller, filed in *Westfahl v. District of Columbia*, No. 11-2210 (D.D.C.) |
| 64 | Declaration of Jessica Ring Amunson, filed in *Prunty v. Vivendi*, No. 14-02073 (D.D.C.), with Exhibit A (excerpted) |
| 65 | Affidavit of Robert Corn-Revere, filed in *Young v. Sarles*, No. 14-1203 (D.D.C.) |
| 66 | Affidavit of Anthony T. Pierce |
| 67 | Affidavit of Nathan Lewin |

| Exhibit No. | Description |
|:---:|:---|
| 68 | Affidavit of Barry Coburn |

## INTRODUCTION

This class action relates to the District of Columbia's ("the District" or "defendants") failure to provide, and failure timely to provide, special education and related services to three-to-five-year-old children in violation of the Individuals with Disabilities Education Act ("IDEA"), the Rehabilitation Act, and District law.

The Court is familiar with the lengthy history of this case. Plaintiffs have prevailed four times. The Court granted plaintiffs summary judgment in 2010 (ECF Nos. 197, 198), plaintiffs prevailed after trial in 2011 (ECF Nos. 294, 295), then, after appeal, prevailed on summary judgment for some claims in 2015 (ECF Nos. 444, 445), and prevailed on all remaining claims after trial in 2016 (ECF Nos. 521, 533). This Court has found that the District violated the IDEA, the Rehabilitation Act, and District law for all four subclasses in this case until March 22, 2010 (ECF No. 521, p. 2), that the District violated the IDEA and District law for subclasses 1, 3, and 4 through November 12, 2015 (ECF No. 521, pp. 1-2), and that the District violated the IDEA and District law for subclass 2 through April 6, 2011 (ECF No. 491).

Plaintiffs' counsel have obtained excellent results for the subclasses of pre-school aged children with disabilities whom they represent. In its recent decisions, this Court has described the serious and extended violations by the District, the District's efforts to fight liability for years, and how this lawsuit has caused the District to improve its program.

First, in its recent decision regarding the Rehabilitation Act, this Court stated (Memorandum Opinion, dated May 18, 2016 (ECF No. 519), pp. 16-18):

> Plaintiffs offer several pages of evidence to demonstrate defendants ceased their allegedly unlawful behavior in direct response to this lawsuit. See Pls.' Opp'n to Defs.' Mot. to Dismiss 7-9, ECF No. 516. For example, they reference an email from the Mayor's office to a staff member at the Office of State Superintendent of Education ("OSSE") in 2007 stating, "Relating to the class action lawsuit on Child Find, I am forwarding to you the draft Child Find policy manual currently being review [sic] for

submission to the Court as part of the District's response to the suit." *Id*. at 7 (citing Pls.' Trial Ex. 113, p. 1). A separate email in 2008 from staff at DC Public Schools to OSSE stated, similarly, "Location. This is currently the most critical issue since most of our planning for *DL* hinges on securing a good location for the CARE Center." *Id.* (citing Pls.' Trial Ex. 115, p. 1). Yet another states, "I had hoped to be operational in a new Child Find site this month so as to demonstrate to the Court that we are well on our way to totally re-engineering our Child Find." *Id*. (citing Pls.' Trial Ex. 116, p. 1).

The evidence goes beyond emails, however. For example, plaintiffs cite to the District's Family Care manual, which states "The discovery period of the lawsuit ended in November 2009, so it was crucial that DCPS have demonstrated its commitment to increase the identification rate, increase the timeliness of evaluations, and increase placement options for families by that deadline." *Id*. at 8 (citing Pl. Trial Ex. 72, p. DL2014 204). In light of these statements and the District's failure to meaningfully address them in their briefing, the Court finds that the District voluntarily changed its conduct during this litigation in an effort to escape liability * * *.[1]

In addition to ceasing its allegedly wrongful behavior as a direct response to this litigation, the District's period of prior non-compliance with the Rehabilitation Act spans over a decade. * * * Indeed, the Court has previously found that up until five years ago, the defendant had 'demonstrated bad faith or gross misjudgment, by knowingly failing to provide a FAPE to eligible preschool-age children and by failing to bring themselves into compliance with their Child Find obligations.' * * * Somewhat strikingly, evidence of these violations stretch back to at least 1997, when 'OSEP began to inform the DCPS of its ongoing failure to identify, locate, and provide Part B services to eligible children ages three through five. * * *

---

[1] Although not cited by the Court, plaintiffs' underlying briefing highlighted the following e-mail communication between the District's counsel and Tameria Lewis, then the Assistant Superintendent of Special Education at OSSE, in which, <u>seven years ago</u>, the District's counsel stated that plaintiffs' complaint has merit (Plaintiffs' Opposition to Defendants' Motion to Dismiss the "Second Claim" of the Second Amended Complaint (ECF No. 516), pp. 8-9 (citing Plaintiffs' Trial Ex. 119, p. 1)):

E-mail from Tameria Lewis to Ellen Efros (Office of the Attorney General), August 19, 2009: "I know Richard [Nyankori, then the Deputy Chancellor for Special Education for DCPS] and I both feel very challenged in that we both feel the complaint has merit. Where are people on trying to settle? That feels to me like the only viable option at this point."

Return e-mail from Ms. Efros, *id*., p. 1: "<u>We all know the complaint has merit</u>, BUT we do not go to trial until 2010 and we would hope substantial progress will have been made by then so that the Court will not order broad-sweeping remedial relief" [emphasis added].

* * * For the ten years that these claims have been pending, the District has fought liability under the Rehabilitation [Act] for the period before March 22, 2010 time and again.  Indeed, the defendant argued against a finding of liability twice at the summary judgment phase * * *.

Moreover, in its recent post-trial decision, this Court stated (Corrected Memorandum Opinion & Findings of Fact and Conclusions of Law (ECF No. 533, "Corrected Opinion"), para. 54):

> The Court also previously found, * * * and finds again, that the District has improved, and that its improvement, including reforms to the District's Child Find-related policies, procedures, and practices, and the organization of the Early Stages Center, occurred during and because of this lawsuit.

In other words, despite recognizing its violations of the relevant statutes, the District has dragged this lawsuit out for over 11 years and, as described below, heavily litigated this case over that period.

Despite its improvements, the District still has not fixed its problems.  The Court stated that "despite the District's efforts, it is failing to identify preschool-age disabled children for the purposes of offering them special education and related services, failing to timely determine the eligibility of preschool-age children for special education and related services, and failing to provide a smooth and effective transition from the early intervention program under Part C of the IDEA to preschool special education and related services under Part B by the child's third birthday."  Corrected Opinion, para. 55.  The Court further explained (*id*., p. 129):

> The District's lack of effective Child Find and transition polices is particularly troubling in light of the intense scrutiny and seemingly constant admonishment it has received over the last decade.  In 2011, this Court stated, "Defendant's persistent failure to live up to their statutory obligations, a failure that works a severe and lasting harm on one of society's most vulnerable populations—disabled preschool children—is deeply troubling to this Court." * * * Moreover, as discussed, OSEP informed OSSE in 2015 that it "needs intervention in implementing the requirements of Part B of the IDEA" for the "ninth consecutive year," which is the longest period in the country.  * * * Although OSEP's long-running "needs intervention" determination does not deal exclusively with the statutory obligations at issue in this litigation, it contributes to the overarching narrative

3

that the District requires strong, outside involvement to produce even minimally acceptable results.  And critically, this litigation has been ongoing for more than ten years, providing the District with ample time and robust incentives to come into full compliance with the law.  It is for these reasons that a structural injunction is necessary.

Accordingly, this Court issued another injunction requiring the District to make improvements.

Order, dated May 18, 2016 (ECF No. 521).

In that order, this Court stated that plaintiffs are the prevailing parties in this case and set

a timetable for submission of a fee application (ECF No. 521, paras. 30-31):

> 30.  Plaintiffs have prevailed on both IDEA and Rehabilitation Act claims.  Pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I) (IDEA) and [29] U.S.C. § 794a(b) (Rehabilitation Act),[2] the District shall pay plaintiffs' reasonable attorneys' fees and related nontaxable expenses associated with litigating this suit.
>
> 31.  Pursuant to Federal Rule of Civil Procedure 54(d)(2), plaintiffs' claim for attorneys' fees and related nontaxable expenses must be made by a motion and submitted to this Court no later than 14 days, herein, or in accordance with a timeframe set in a separate court order.[3]

Plaintiffs hereby request that they be awarded their reasonable fees and expenses.

Specifically, they request the lodestar amount of fees—the number of hours that they reasonably

expended on the litigation multiplied by a reasonable hourly rate.  *See Hensley v. Eckerhart*, 461

U.S. 424, 433 (1983)("The most useful starting point for determining the amount of a reasonable

fee is the number of hours expended on the litigation multiplied by a reasonable hourly rate");

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 546, 551 (2010)(describing the lodestar method).

---

[2] Those provisions state (1) IDEA (20 U.S.C. 1415(i)(3)(B)(i)(I)): "In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs * * * to a prevailing party who is the parent of a child with a disability"; and (2) Rehabilitation Act (29 U.S.C. 794a(b)): "In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

[3] A subsequent order (ECF No. 536) extended that deadline to September 28, 2016, the date of this filing.

Plaintiffs address below reasonable hourly rates (Section I), the time spent by lead counsel, Terris, Pravlik & Millian ("TPM") (Section II), the time spent by co-counsel, Jeffrey Gutman, Margaret Kohn, and Cyrus Mehri (Section III), the IDEA fee cap (Section IV), and expenses (Section V).

The accompanying Affidavit of Bruce J. Terris ("Terris Aff.," Pl. Ex. 1) and the other supporting affidavits and exhibits describe the details of plaintiffs' request, such as the timeframes and categories of work. In general, plaintiffs request (1) fees and expenses for the period through November 16, 2011 ("Period 1"), which was previously fully briefed (ECF Nos. 325, 326, 343, 348, 349, 353, 354, 355), but not ruled upon (ECF No. 366), and (2) fees and expenses for the period from November 17, 2011, to June 22, 2016 ("Period 2"). Plaintiffs have supported their application with extensive exhibits, but they have endeavored to simplify them and the issues to the extent possible.[4]

Plaintiffs request $10,010,956.00 in fees and expenses for all counsel. *See* Pl. Ex. 4. This is a substantial sum of money. However, this case has been pending for over 11 years, and has been heavily litigated, twice in this Court and once in the court of appeals. Plaintiffs' counsel have effectively represented plaintiffs through extensive discovery and motions practice, complex and detailed factual and legal issues, and, during Period 1, serious discovery problems. The District will undoubtedly contend that this request is excessive, but plaintiffs submit that it is reasonable.

---

[4] With regard to Period 1, to the extent possible, plaintiffs have attempted to adhere to the prior time and expense exhibits to avoid confusion or additional effort by the District since the fees and expenses for that period were previously addressed.

**ARGUMENT**

## I. PLAINTIFFS ARE ENTITLED TO AN AWARD OF FEES BASED ON REASONABLE HOURLY RATES

In determining prevailing market rates for complex federal litigation, such as this case, courts in this jurisdiction rely on the "*Laffey* Matrix," a schedule of hourly rates developed in *Laffey v. Northwest Airlines*, 572 F. Supp. 354 (D.D.C. 1983), affirmed in part and reversed in part on other grounds, 746 F.2d 4 (D.C. Cir. 1984), overruled in part on other grounds, *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988)(*en banc*). *See, e.g., Salazar v. District of Columbia*, 809 F.3d 58, 64-65 (D.C. Cir. 2015)("*Salazar V*"[5]). Plaintiffs request that this Court award them fees based on the reasonable hourly rates from the *Laffey* Matrix updated to the present using the LSI. This update of the matrix and its rates have been referred to as the LSI *Laffey* rates, the LSI-Updated *Laffey* Matrix, the LSI-Adjusted *Laffey* Matrix, and the LSI *Laffey* Matrix, among other things. We refer to it here as the LSI *Laffey* Matrix since that is the label used by the court of appeals in *Salazar V* and *Eley v. District of Columbia,* 793 F.3d 97 (D.C. Cir. 2015).

In *Salazar V*, the District argued that the plaintiffs, represented by the same counsel as plaintiffs here, should be awarded fees based on the *Laffey* Matrix maintained by the United States Attorney's Office ("USAO") which was updated using the All-Items CPI instead of the

---

[5] The court of appeals decision is the fifth fees-related decision in the *Salazar* case. The earlier decisions are: *Salazar v. District of Columbia*, 123 F. Supp. 2d 8 (D.D.C. 2000)("*Salazar I*"); *Salazar v. District of Columbia*, 750 F. Supp. 2d 70 (D.D.C. 2011)("*Salazar II*"); *Salazar v. District of Columbia*, 991 F. Supp. 2d 39 (D.D.C. 2014)("*Salazar III*"); *Salazar v. District of Columbia*, 30 F. Supp. 3d 47 (D.D.C. 2014)("*Salazar IV*"). In each *Salazar* district court decision, this Court awarded fees based on the hourly rates in the *Laffey* Matrix updated to current rates using the Legal Services Index ("LSI"), which is a component of the Consumer Price Index ("CPI"). *Salazar III and IV* were the district court decisions under appeal in *Salazar V*. In *Salazar V*, the court of appeals affirmed fee awards based on the LSI update of the *Laffey* Matrix. 809 F.3d at 64-65.

component limited to legal services, which is the LSI.[6,7]  809 F.3d at 64.  The court of appeals

affirmed the district court award of fees based on the LSI *Laffey* Matrix stating (*id.* at 65):

> With these numbers and submissions in the record, the district court's point that "the LSI-adjusted matrix is probably a *conservative* estimate of the actual cost of legal services in this area," does not appear illogical. *See Salazar III,* 991 F.Supp.2d at 48 (citation and internal quotation marks omitted). The District, neither below nor on appeal, rebuts this logic with relevant arguments. The District makes much about the fact that this prolonged litigation is depleting public funds in a case in which Plaintiffs no longer need to pay [sic] LSI updated *Laffey* rates to "attract competent counsel." Appellant Br. at 49.  But as the district court correctly noted, and as we have made clear, "fees should be neither lower, nor calculated differently, when the losing defendant is the government." *Salazar III,* 991 F.Supp.2d at 49 (quoting *Copeland v. Marshall,* 641 F.2d 880, 896 (D.C.Cir.1980) (en banc)).[1]
>
> > [1]The District's argument that other courts within this Circuit have applied the USAO update to the *Laffey* Matrix is not compelling. The cases cited by the District are district court cases, not binding precedent for this Court or the trial court we review.

In support of this fee application, plaintiffs present the same type of evidence that their

counsel presented in *Salazar III and IV.*  Terris Aff., para. 90.[8]

---

[6] The USAO no longer maintains its *Laffey* Matrix.  It replaced its *Laffey* Matrix in 2015 with another matrix, which is based on different data than the *Laffey* Matrix.  *See* Pl. Ex. 24, n. 2.  The new USAO Matrix is addressed in Sections C(1) and (2) below and is attached as Plaintiffs' Exhibit 24.  We refer to the new USAO Matrix as the USAO Matrix 2015-2017.  We refer to the prior USAO Matrix as the USAO *Laffey* Matrix.  The USAO *Laffey* Matrix is attached as Plaintiffs' Exhibit 25.

[7] The All-Items CPI measures the rate of price change across "'100,000 commodities including food, fuel, and housing' for a given geographic area."  *Eley v. District of Columbia, supra,* 793 F.3d at 101.

[8] The evidence presented here is not the exact same evidence as presented in *Salazar* because that evidence related to rates for an earlier time period.  Terris Aff., para. 90.  Plaintiffs seek an award here based on current rates, which are the rates for the 2016-2017 *Laffey* period.  *See* p. 11 below.  Since this period began in June 2016, plaintiffs have used rates evidence from earlier periods to demonstrate that the LSI *Laffey* Matrix rates are at or below the prevailing market rates for complex federal litigation in Washington, D.C.  *See* Section C(3) below.

A.   **PLAINTIFFS ARE ENTITLED TO FEES BASED ON MARKET RATES FOR COMPLEX FEDERAL LITIGATION**

The IDEA, 20 U.S.C. 1415(i)(3)(B)(ii)(C), states:

Fees awarded under this paragraph shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished.

Class action suits under the IDEA have been treated as complex federal litigation for purposes of awarding fees.  *See Blackman v. District of Columbia*, 677 F. Supp. 2d 169, 173 (D.D.C. 2010), affirmed on other grounds, 633 F. 3d 1088 (D.C. Cir. 2011)(District agreed that case was complex federal litigation).  This IDEA class action is no different.  Indeed, in their opposition to plaintiffs' 2012 fee application, the District argued that plaintiffs should be compensated based on the USAO *Laffey* Matrix, which is an acknowledgement that this case is complex federal litigation.[9]  Defendants' Opposition to Plaintiffs' Motion for an Award of Litigation Costs, Including Attorneys' Fees and Related Expenses (ECF No. 343), p. 10.  *See also* Defendants' Opposition to Plaintiffs' Request for Fees and Expences [sic] (ECF No. 126), p. 2, n. 1.

Plaintiffs demonstrate that this is a complex case below (p. 32).

B.   **PLAINTIFFS ARE ENTITLED TO FEES BASED ON PREVAILING MARKET RATES FROM THE LSI *LAFFEY* MATRIX**

In *Covington v. District of Columbia*, 57 F.3d 1101, 1108-1109 (D.C. Cir. 1985), certiorari denied, 516 U.S. 1115 (1996), the court of appeals set forth three criteria for determining the market rates for plaintiffs' counsel in complex federal litigation under fee-shifting statutes.  "First, in cases in which prevailing attorneys request rates which are greater than those they normally charge, the attorneys must offer some evidence that they charge

---

[9] In *Eley v. District of Columbia, supra*, 793 F.3d at 100, 105, and *Salazar V*, 809 F.3d at 64, the court of appeals reiterated that the *Laffey* Matrices apply to complex federal litigation.

reduced rates for public-spirited or non-economic reasons."   57 F.3d at 1107.   Plaintiffs' lead

counsel, TPM, charges reduced rates for public-spirited reasons.   Terris Aff., para. 8.   TPM is a

public interest law firm that represents groups and individuals who largely go unrepresented.

*Ibid*.   In the relatively rare case in which the firm bills the client for its work, the firm charges

below-market rates in order to enable clients to afford their services.   *Ibid*.   In *Salazar I*, 123 F.

Supp. 2d at 12, this Court found that TPM meets the first *Covington* element.   *See also Interfaith*

*Community Organization v. Honeywell International, Inc.*, 426 F.3d 694, 703 (3d Cir.

2005)("ICO was represented at trial by Terris, Pravlik & Millian * * *, a Washington, DC public

interest firm that specializes in complex environmental cases. We have held that public-interest

law firms that typically charge clients below-market fees, or no fees at all, are nonetheless

entitled to compensation based on prevailing market rates in the relevant community"); *Student*

*Public Interest Research Group of New Jersey, Inc. v. AT&T Bell Laboratories*, 842 F.2d 1436,

1439-1440 (3d Cir.1988)(same).

In *Save Our Cumberland Mountains v. Hodel, supra*, 857 F.2d at 1524 (*en banc*), the

Court of Appeals for the District of Columbia Circuit held:

> [T]he prevailing market rate method heretofore used in awarding fees to traditional for-
> profit firms and public interest legal services organizations shall apply as well to those
> attorneys who practice privately and for profit but at reduced rates reflecting non-
> economic goals.

Recently, the court of appeals affirmed fee awards based on the prevailing market rates for

complex federal litigation to TPM.   *Salazar V*, 809 F. 3d at 64-65.   Thus, TPM satisfies the first

*Covington* criterion and plaintiffs should be awarded fees for the services of TPM at prevailing

market rates.[10]

"Second, prevailing parties must offer evidence to demonstrate their attorneys' experience, skill, reputation, and the complexity of the case they handled." *Covington v. District of Columbia, supra*, 57 F.3d at 1108. The Terris Affidavit (paras. 8-12) and the resumes of the lawyers at TPM (Pl. Ex. 3) who have worked on this case establish that they have excellent credentials. The Terris Affidavit (paras. 16-38, 44-78) further demonstrates that this was a complex case, vigorously litigated by both parties.

"Third, plaintiffs must produce data concerning the prevailing market rates in the relevant community for attorneys of reasonably comparable skill, experience, and reputation." *Covington v. District of Columbia, supra*, 57 F.3d at 1108. As indicated above, in determining prevailing market rates in complex federal litigation, courts in this jurisdiction rely on the *Laffey* Matrix.[11] In *Covington,* the court of appeals held that in order to demonstrate reasonable hourly rates, "plaintiffs may point to such evidence as an updated version of the *Laffey* matrix or the U.S. Attorney's matrix, or their own survey of prevailing rates in the community." *Covington v. District of Columbia, supra*, 57 F.3d at 1109. Plaintiffs request an award using the hourly rates

---

[10] The same applies to co-counsel, Jeffrey Gutman (Affidavit of Jeffrey Gutman, Pl. Ex. 15, para. 1), and Margaret Kohn (Affidavit of Margaret Kohn, Pl. Ex. 16, para. 8). Cyrus Mehri seeks his standard hourly rate, which is in line with the prevailing market rates for complex federal litigation. Affidavit of Cyrus Mehri, Pl. Ex. 17, para. 6; *see* Pl. Exs. 40-42, 47-49.

[11] The original *Laffey* Matrix provided Washington, D.C., market rates for complex federal litigation for the period from June 1, 1981, through May 31, 1982. Subsequently, the matrix was updated through May 31, 1989, at the urging of the court of appeals in its *en banc* decision in *Save Our Cumberland Mountains v. Hodel, supra*, 857 F.2d at 1525, in connection with a settlement reached on remand in that case. *See Trout v. Ball*, 705 F. Supp. 705, 709, n. 10 (D.D.C. 1989)(the updated matrix developed in *Save Our Cumberland Mountains v. Hodel* "does provide an updated and accurate schedule of attorney fees in this District"); *Salazar I*, 123 F. Supp. 2d at 13.

from the *Laffey* Matrix updated to the 2016-2017 rates period using the LSI. *See Missouri v. Jenkins,* 491 U.S. 274, 283-284 (1989)(approving the use of current hourly rates in fee awards).

Plaintiffs' Exhibit 23 sets forth the requested LSI *Laffey* Matrix rates. The rates in the *Laffey* Matrix were updated using the methodology described in the Terris Affidavit (para. 82). This is the same methodology used to produce the LSI *Laffey* Matrix affirmed in *Salazar V. Ibid*. These calculations are set forth in Plaintiffs' Exhibit 23. The LSI *Laffey* Matrix rates for 2016-2017 are as follows (Pl. Ex. 23, p. 4):

| Years out of Law School | Hourly Rate |
|---|---|
| 20th+ | $826 |
| 11th – 19th | $686 |
| 8th – 10th | $608 |
| 4th – 7th | $421 |
| 1st – 3rd | $342 |
| Paralegals/Law Clerks | $187 |

C.   **THE LSI *LAFFEY* MATRIX RATES REFLECT THE PREVAILING MARKET RATES FOR COMPLEX FEDERAL LITIGATION IN THE WASHINGTON, D.C., MARKET**

1.   **The Laffey Matrix Rates Are Best Updated Using the LSI**

Defendants have frequently contended in fee litigation that the All-Items CPI update of the USAO *Laffey* Matrix produces rates that are a more accurate reflection of the actual cost of litigation in the District of Columbia than the LSI update.[12] *See, e.g., DL v. District of Columbia,*

------

[12] The District and others often refer to the LSI *Laffey* Matrix as the "enhanced *Laffey* matrix." There is nothing "enhanced" about the LSI *Laffey* Matrix. As discussed in subsection 3 below, the LSI update produces hourly rates that are more closely aligned with the current rates for complex federal litigation in the Washington, D.C., marketplace than the USAO Matrix 2015-2017 or the USAO *Laffey* Matrix.

256 F.R.D. 239, 242 (D.D.C. 2009); *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 41 (D.D.C. 2011); *Salazar II*, 750 F. Supp. 2d at 74.

Several recent events appear to have mooted the issue of whether the All-Items CPI or the LSI update of the *Laffey* Matrix produce rates more reflective of the Washington, D.C., market for complex federal ligation.  First, in *Salazar V*, the court of appeals affirmed the district court's conclusion that "the LSI-adjusted matrix is probably a *conservative* estimate of the actual cost of legal services in this area" (emphasis in original).[13]  809 F.3d at 65.

Second, the USAO is no longer updating its matrix with the All-Items CPI.  Instead, it is using the Producer Price Index – Offices of Lawyers Index ("PPI-OL").  Pl. Ex. 24, n. 2.  Like the LSI, the PPI-OL is a national index that is specific to legal services.  Declaration of Michael Kavanaugh, Pl. Ex. 27 ("Kavanaugh Decl."), para. 12.  There are only slight differences in the sampling that is used to measure the rate of change in the price of legal services between these two indices.  *See id*., para. 12.  The Bureau of Labor Statistics has maintained the LSI since 1987 and the PPI-OL since 1997.  *Id*., para. 17.  For the time frame that they overlap, these two indices report rates of price change for legal services that are comparable, with the PPI-OL higher than the LSI in 12 of the 19 years.  *Ibid*.  This means that when the same hourly rate is adjusted with the LSI or the PPI-OL, the resulting hourly rate is about the same.[14, 15]  *Ibid*.

---

[13] The USAO Matrix 2015-2017 fails to inform the public of the *Salazar V* decision.  *See* Pl. Ex. 24, n. 9.  Instead, note 9 to the USAO Matrix 2015-2017 informs the public that the LSI *Laffey* Matrix is flawed and disfavored.

[14] As a result of this change, plaintiffs do not present here the arguments that they presented in their 2012 Fee Application (ECF No. 325-01) demonstrating that LSI is a better index for updating the *Laffey* Matrix than the All-Item CPI.  In the event that defendants present evidence in support of the USAO *Laffey* Matrix updated with All-Items CPI in opposition to this application, in spite of the USAO having switched to the PPI-OL, plaintiffs will present evidence in their reply brief demonstrating that the LSI is a better index for this purpose.

(continued…)

Third, in 2015, the District adopted the LSI *Laffey* Matrix for other cases.  The District

adopted for prevailing plaintiffs in cases enforcing local worker protections laws fees "computed

pursuant to the matrix approved in *Salazar v. District of Columbia*, 123 F. Supp. 2d 8 (D.D.C.

2000), and updated to account for the current market hourly rates for attorney's services."  D.C.

---

Plaintiffs continue to use the LSI instead of the PPI-OL because they are adjusting the rates in
the 1989 update of the *Laffey* Matrix, which was done in conjunction with *Save Our Cumberland
Mountains*, and the PPI-OL does not date back to 1989 whereas the LSI does.  Kavanaugh Decl.,
para. 18; Terris Aff., para. 82.  Dr. Kavanaugh explains in his affidavit that it is a better practice
to adjust values using a single index than to switch indices in the adjustment calculations.  Pl. Ex.
27, para. 18.  Also, since the rates of change under the LSI and PPI-OL are virtually identical,
using the LSI instead of the PPI-OL is a distinction without a real difference.  *See id*., paras. 17-
18.

[15] Although both of these indices reflect the rate of change nationally, use of a national index is
consistent with the Washington, D.C., marketplace for complex federal litigation.  Dr.
Kavanaugh explains how the national legal services data in the LSI and the PPI-OL actually
relate not only to the country as a whole but specifically to the District of Columbia (Pl. Ex. 27,
paras. 14, 15):

> In my opinion, resource mobility and low-cost communication combine to make the
> market for legal services in complex federal litigation in Washington, D.C., a national
> market not a local market.  * * *  In other words, Washington, D.C., area law firms
> *compete* with law firms in other areas such as New York, Philadelphia, Chicago, Dallas,
> and San Francisco.  * * *  The geographic extent of the market for complex legal services
> provides another reason why the LSI or the PPI-OL produces adjusted rates that are more
> reflective of the marketplace than the All Items Regional CPI.  They more accurately
> reflect the conditions of competition in the Washington, D.C., marketplace. [emphasis in
> original]

Dr. Kavanaugh's opinion is shared by legal marketplace experts Michael Downey and
Bruce MacEwen.  They both explain that firms from around the country come into the
Washington, D.C., marketplace to handle cases in the federal courts and Washington firms
handle cases in other marketplaces.  Affidavit of Michael Downey, Pl. Ex. 28 ("Downey Aff."),
para. 14; Affidavit of Bruce MacEwen, Pl. Ex. 29 ("MacEwen Aff."), para. 9.  According to Mr.
MacEwen, the national character of the Washington, D.C., legal market is reflected by the
presence of more offices of the National Law Journal's top firms in Washington, D.C., than in
any other city.  *Id.*, para. 8.  This is because a Washington, D.C., presence is more important for
a firm than any other location.  *Ibid*.  Since local and non-local firms are competing in the same
markets, their rates must be competitive.  Kavanaugh Decl., para. 20; Downey Aff., paras. 13-16;
MacEwan Aff., paras. 8-9, 11.

Code Ann. §§32-1308(b)(1), 32-1308.1(m)(1)(Pl. Ex. 39).  The matrix approved in *Salazar* is the LSI *Laffey* Matrix.  *Salazar I*, 123 F. Supp. 2d at 15.

As we show below, the LSI *Laffey* Matrix is much more reflective of the actual market for complex federal litigation in Washington, D.C., than the USAO Matrix 2015-2017.

## 2.   The USAO Matrix 2015-2017 Is Based on an Unknown Rates Survey, Not Rates for Complex Federal Litigation

As described more fully below (pp. 27-28), the *Laffey* Matrix was established from data on rates for complex federal litigation and has been recognized in its updated form as providing the prevailing market rates for complex federal litigation in Washington, D.C.  *See, e.g., Salazar V*, 809 F.3d at 64.  The USAO Matrix 2015-2017, the new USAO matrix, is no longer based on the data establishing the *Laffey* Matrix.[16]  The USAO Matrix 2015-2017 is based on data from the 2010 and 2011 Surveys of Law Firm Economics conducted by ALM Legal Intelligence.  Pl. Ex. 24, n. 2.  It is the burden of the proponent of the USAO Matrix 2015-2017 to demonstrate that the matrix presents the prevailing market rates for complex federal litigation in Washington, D.C.[17]  *See Salazar V*, 809 F.3d at 65.

---

[16] As discussed above (p. 12), the issue between the LSI *Laffey* Matrix and the USAO *Laffey* Matrix was the index used to update the rates.  *See Salazar V*, 809 F. 3d at 64.  Since the USAO Matrix now uses the PPI-OL, which is virtually identical to the LSI, but has changed the underlying data, the issue between the two matrices now focuses on the underlying data.

[17] The District informed plaintiffs that it intends to argue that the applicable prevailing market rates are those in the USAO Matrix 2015-2017.  Affidavit of Carolyn Smith Pravlik, Pl. Ex. 26 ("Pravlik Aff."), para. 1.  Plaintiffs asked the District to provide the surveys that underlie the matrix.  *Ibid*.  The District responded that it does not have the surveys and that plaintiffs should contact the USAO.  *Ibid*.  Plaintiffs did so and were informed that the USAO does not have the surveys, but that they were available for purchase from ALM.  *Ibid*.  When plaintiffs inquired whether it was obvious from the two surveys what data were used to create the matrix, they were informed that that information would have to come from the USAO's expert, Laura Malowane.  *Ibid*.  On July 13, 2016, plaintiffs submitted a FOIA request to the Department of Justice seeking the surveys.  *Id*., para. 4.  To date, despite inquiries, plaintiffs have neither received a response to the FOIA request, nor received the surveys from the District.  *Ibid*.

(continued…)

As this Court stated recently in *Makray v. Perez*, 159 F. Supp. 3d 25, 39 (D.D.C. 2016):

> At a minimum, *Salazar* [*V*] confirms that, at least in cases qualifying as "complex federal litigation," the *Salazar*/LSI Matrix likely provides a conservative estimate of the prevailing market rate for attorneys practicing in the District of Columbia. Thus, where the parties do not dispute that a fee applicant is entitled to reimbursement using a *Laffey* matrix, and where the fee applicant presents evidence tending to show that the *Salazar*/LSI Matrix more closely approximates the prevailing market rate for the services rendered to the prevailing plaintiff, a defendant must do more than make the discredited argument that this rate is higher than necessary to attract competent counsel, see infra Part III.B.1.a., to rebut the plaintiff's requested rate and instead must show that the requested rate is unreasonably high.

The Court then found that the 2011 ALM Legal Intelligence Survey presented by the Department

of Labor's expert, Laura Malowane (*id*. at 51):

> "provides data of actual billing rates of attorneys in the Washington, DC area, from law offices of all sizes and types." While this data has the advantage of capturing reported rates charged by attorneys in this jurisdiction, the declaration provided by DOL leaves some doubt as to whether this survey fairly estimates the prevailing rate for experienced attorneys engaging in complex federal litigation. Most notably, the inclusion of rates charged by attorneys across all practice areas significantly undermines the degree to which this survey fairly reflects rates charged by attorneys engaged principally in complex federal litigation.[18]

The Court continued (*id*. at 52):

> Consistent with the opinion of DOL's own expert offered in *Biery*, survey data reflecting rates charged by attorneys at national law firms fairly estimates the prevailing rate for attorneys engaged in complex federal litigation in this jurisdiction. Accordingly, evidence

---

Plaintiffs also checked with several libraries to inquire whether they have the surveys. Pravlik Aff., para. 2. The Supreme Court library informed plaintiffs that it had both surveys. *Ibid*. However, the Supreme Court library later informed plaintiffs that the 2011 survey was checked out by staff in May 2013 and not returned. *Ibid*. After making a staff inquiry, the Supreme Court library has deemed the 2011 survey to be lost. *Ibid*. Plaintiffs have reviewed the 2010 ALM Survey and address it below. Plaintiffs also unsuccessfully tried to review the 2011 ALM Survey at other libraries. *Id*., para. 3.

[18] The 2010 ALM Survey referenced in the USAO Matrix 2015-2017, which plaintiffs were able to access at the Supreme Court library (Pravlik Aff., para. 2), includes rates for many practice areas. Pl. Ex. 38, p. 9. Moreover, the data for the South Atlantic region in the 2010 ALM Survey, of which Washington, D.C., is a part, are primarily for lawyers that practice in the General Law category. *See id*., pp. 13, 15.

of rates charged by all attorneys in the District of Columbia, regardless of the nature of their experience or practice, does little to suggest that reimbursement for services in connection with successful complex federal litigation at LSI-adjusted rates is unreasonable.

Plaintiffs have no way of determining whether the 2011 ALM Legal Intelligence Survey, addressed in *Makray,* is the same or some part of the surveys underlying the USAO Matrix 2015-2017. If they are the same or similar, based on *Makray,* defendants will not be able to show that the USAO Matrix 2015-2017 is a set of rates for complex federal litigation in Washington, D.C.[19]

Perhaps the difficulty of meeting this burden is what caused the federal government to agree to the hourly rates in the LSI *Laffey* Matrix in *Electronic Privacy Information Center v. Department of Homeland Security*, 2016 WL 3919810, *3 (D.D.C. 2016), rather than argue in favor of the USAO Matrix 2015-2017.

Even if it is assumed that the USAO Matrix 2015-2017 presents rates for complex federal litigation, based on the market data addressed in the next section, it is very unlikely that defendants would be able to show that the USAO Matrix 2015-2017 presents prevailing market rates. The data show that the LSI *Laffey* Matrix rates are more closely aligned with the market than the USAO Matrix 2015-2017 rates.

---

[19] In her declaration in the *Makray* case, Dr. Malowane, the DOL expert, states that the 2011 ALM survey data is for the "Washington, DC metro area." *Makray v. Perez*, D.D.C., Civ. No. 12-cv-0520, ECF No. 88-1, para. 12. She does not describe what constitutes the "Washington, DC metro area," but, presumably, if the survey had been limited to Washington, D.C., Dr. Malowane would not have stated that it was for the "metro area." In order to have any validity for this purpose, the survey needs to be limited to Washington, D.C., and related only to the market for complex federal litigation.

**3.      Market Data Demonstrate that the LSI *Laffey* Matrix Produces Rates that More Closely Reflect the Market than the USAO Matrix 2015-2017**

Market data show that the LSI *Laffey* Matrix produces rates that more closely approximate the market than the USAO Matrix 2015-2017, assuming *arguendo* that that matrix is based on the market for complex federal litigation.   The USAO Matrix 2015-2017 significantly understates prevailing market rates.

In order to make this evaluation, plaintiffs' counsel collected market data for the period from January 2015 to the present from a number of sources – all sources recognized by the court of appeals in *Covington v. District of Columbia, supra*, 57 F.3d at 1109 – comprising affidavits from attorneys familiar with the marketplace, affidavits and other materials from fee applications in other cases, and surveys.   The details of the efforts to collect these data from the various sources are described in detail in Mr. Terris' affidavit.   *See* Pl. Ex. 1, para. 88.

Plaintiffs' Exhibit 48 is a summary of the data.[20]   It shows, based on the experience levels in the *Laffey* Matrix, the average rate from each of the data sources.[21]   The average rates that are

---

[20] The underlying data are described in Plaintiffs' Exhibit 47.  Plaintiffs' Exhibit 47 is a chart that sets forth the *Laffey* Matrix experience levels, the LSI *Laffey* Matrix rates, the USAO Matrix 2015-2017 rates, the rates data from the source exhibit, and a citation to the source exhibit where the rates information is set forth.  *See* Terris Aff., para. 89.  Plaintiffs' Exhibit 47 includes all of the data collected that could be used for purposes of making the comparison.  *See ibid.* Plaintiffs' Exhibit 48 is a summary of the data set forth in Plaintiffs' Exhibit 47.  *See ibid.*

[21] In the USAO Matrix 2015-2017, the experience levels have changed as compared to the earlier USAO *Laffey* Matrix and the LSI *Laffey* Matrix.  *Compare* Pl. Ex. 24 (USAO Matrix 2015-2017), *with* Pl. Ex. 25 (USAO *Laffey* Matrix) *and* Pl. Ex. 23 (LSI *Laffey* Matrix).  In order to present the comparison in Plaintiffs' Exhibits 47 and 48, plaintiffs presented the USAO Matrix 2015-2017 using the *Laffey* Matrix experience levels, but using the highest USAO Matrix 2015-2017 rate applicable to the experience level for the rates year 2016-2017.  Terris Aff., para. 89(d).  For example, the *Laffey* Matrix has an experience level of 20+ years (Pl. Ex. 23) and the USAO Matrix 2015-2017 has three comparable experience levels – 16-20, 21-30, and 31+ years (Pl. Ex. 24) – each with a separate hourly rate for 2016-2017 – $516, $543, and $581, respectively (*ibid.*).  For the comparison at the 20+ level, plaintiffs used the USAO Matrix 2015-

(continued…)

consistent with the LSI *Laffey* Matrix rates are indicated in red, those consistent with the USAO Matrix 2015-2017 rates are in blue.  Terris Aff., para. 89(f).  Plaintiffs' Exhibit 48 reports data for 24 firms.  The rates for 18 of the firms (or 75%) are aligned primarily with the LSI *Laffey* Matrix with 16 of the firms completely aligned.  Two firms have half of their rates aligned with each matrix. The rates of 4 of the 24 firms (or 16.66%) are aligned completely with the USAO Matrix 2015-2017.

As demonstrated in the following chart, the USAO Matrix 2015-2017 rates are significantly below the average rates from the market data at all experience levels.

| *Laffey* Matrix Experience Levels | Average of Law Firm Averages (from Pl. Ex. 48, p.1) | USAO Matrix 2015-2017 [22] (2016-2017 Rates) | USAO Matrix 2015-2017 Greater (Less) | Average Difference |
|---|---|---|---|---|
| 20th+ | $842 | $581 | -31.00% | |
| 11th – 19th | $684 | $516 | -24.61% | |
| 8th – 10th | $637 | $395 | -38.00% | -29.68% |
| 4th – 7th | $585 | $339 | -42.04% | |
| 1st – 3rd | $433 | $322 | -25.69% | |
| Paralegal | $189 | $157 | -16.76% | |

| *Laffey* Matrix Experience Levels | Average of Law Firm Averages (from Pl. Ex. 48, p. 1) | LSI *Laffey* Matrix [23] (2016-2017 Rates) | LSI *Laffey* Matrix Greater (Less) | Average Difference |
|---|---|---|---|---|
| 20th+ | $842 | $826 | -1.91% | |
| 11th – 19th | $684 | $686 | 0.23% | |
| 8th – 10th | $637 | $608 | -4.56% | -9.36% |
| 4th – 7th | $585 | $421 | -28.02% | |
| 1st – 3rd | $433 | $342 | -21.07% | |
| Paralegal | $189 | $187 | -0.85% | |

2017 rate of $581, which is the highest rate from that matrix applicable to someone at the 20+ level.  *See* Pl. Exs. 47-49.

[22]Pl. Ex. 24.  *See also* p. 17, n. 21 above.

[23]Pl. Ex. 23, p. 4.

These data clearly show that the LSI *Laffey* Matrix produces reasonable hourly rates – in other words, rates that align with the prevailing market rates in Washington, D.C. (*Blum v. Stenson*, 465 U.S. 886, 896, n. 11 (1984)) – and that the USAO Matrix 2015-2017 rates are not reasonable since they are far out of line with prevailing market rates in Washington, D.C.   In other words, the USAO Matrix 2015-2017 does not represent the prevailing market rates in Washington, D.C.[24] *See also* Kavanaugh Decl., paras. 24-26.

Plaintiffs' market data evidence also includes evidence of billing rates from periods prior to 2015.  Terris Aff., para. 90.  The pre-2015 data show rates that are more closely aligned with the rates in the LSI *Laffey* Matrix than the rates in the USAO Matrix 2015-2017.  *See* Pl. Exs. 40-42, 50-53.  Plaintiffs' pre-2015 data includes a 2012 survey of rates for complex federal litigation that was submitted by Arent Fox in *Biery v. United States*, Fed. Cl., Civ. No. 07-693. This comprehensive survey shows rates that are more closely aligned with the rates in the LSI *Laffey* Matrix than the rates in the USAO Matrix 2015-2017.  Pl. Ex. 53, para. 18 and Exhibit E.

Since the pre-2015 data show rates that are comparable to or exceed the LSI *Laffey* Matrix rates for 2016-2017, these data show that the LSI *Laffey* Matrix continues to be a conservative estimate of the prevailing market rates as found by the district court in *Salazar III* and affirmed by the court of appeals in *Salazar V*.

---

[24] As discussed above (p. 14), the USAO Matrix 2015-2017 is not based on rates for complex federal litigation.

Plaintiffs' Exhibits 47-49 also compare the USAO *Laffey* Matrix for 2014-2015 to the market data.  Before making the comparison, plaintiffs updated the 2014-2015 rates to 2016-2017 using the All-Items CPI as the USAO did until it changed its method in 2015-2016.  Terris Aff., para. 89(e).  That comparison shows that the USAO *Laffey* Matrix, as updated, is even further below the average rates from the market data at all experience levels than the USAO Matrix 2015-2017 rates.  *See* Pl. Ex. 49.

Plaintiffs' Exhibits 17, 51-56, 61, and 65-68 are affidavits from complex federal litigators in the Washington, D.C., marketplace who are familiar with the prevailing market rates for complex federal litigation.  Each of these affidavits further confirms that the rates in the LSI *Laffey* Matrix are consistent with or below prevailing market rates for complex federal litigation. For example, Steven K. Davidson of Steptoe & Johnson LLP states that in his expert opinion the LSI *Laffey* Matrix "is a more accurate schedule of hourly rates" and is "consistent with the prevailing market rates."  Pl. Ex. 54, paras. 1, 16, 22.  In addition, Nathan Lewin, whose rate was included in the *Laffey* Matrix, as discussed below (p. 26), testifies that his current rate for complex federal litigation is $750 (Affidavit of Nathan Lewin, Pl. Ex. 67, ("Lewin Aff."), para. 12).  His rate is better aligned with the LSI *Laffey* Matrix rate than the USAO Matrix 2015-2017 rate for a litigator in the 20+ experience level.

Fee-shifting statutes require that the lodestar be based on reasonable hourly rates that reflect the prevailing market rates in the community in order to attract competent counsel to the litigation.  *Blum v. Stenson, supra*, 465 U.S. at 893-894; *Save Our Cumberland Mountains v. Hodel, supra*, 857 F.2d at 1524 (*en banc*).  As demonstrated, the LSI *Laffey* Matrix produces reasonable hourly rates that serve this purpose.[25]

---

[25] The market data summarized in Plaintiffs' Exhibits 47-49 and the LSI *Laffey* Matrix reflect a market where it is assumed that counsel will be compensated whether the case is won or lost. Rates in the fully contingent market would be higher.  As noted by Justice Brennan in his concurring opinion in *Blum v. Stenson* (465 U.S. at 903):

> Lawyers operating in the marketplace can be expected to charge a higher hourly rate when their compensation is contingent on success than when they will be promptly paid, irrespective of whether they win or lose.

*See also* Affidavit of David N. Webster, Pl. Ex. 37, para. 8 ("In a case in which counsel face the risk of receiving no compensation if their clients are unsuccessful, it is traditional that the fee will be larger than if counsel were being compensated on an ongoing basis whether they win or

(continued…)

### 4.   Firm Size Is Irrelevant to the Selection of the Appropriate Rates Matrix to Use

In *Heller v. District of Columbia, supra,* 832 F. Supp. 2d at 46, this Court rejected the plaintiff's request for fees based on the LSI *Laffey* Matrix on the ground that the LSI update reflects the rates of large firms.  The Court said that the plaintiffs failed to establish that such rates are charged by small or boutique firms.  *Ibid.*  The Court found this evidentiary gap to be significant because the market accepts higher rates from large firms than small firms "'presumably because of their greater resources and investments, such as attorneys, librarians, researchers, support staff, information technology, and litigation services'" (citation omitted). *Id.* at 46-47.  As we show below, *Heller* is inconsistent with precedent and the marketplace.

### (a)   *Blum and Save Our Cumberland Mountains* Rejected Firm Size as a Basis for Determining Rates

The firm size basis for fee awards was long ago rejected by the Supreme Court.  In *Blum v. Stenson, supra,* 465 U.S. at 890, 892-893, the Supreme Court considered whether counsel from the Legal Aid Society of New York, a private nonprofit law office representing Medicaid recipients in New York City, should be compensated at prevailing market rates or whether such rates would produce an impermissible windfall to such an organization:

> Petitioner argues that the use of prevailing market rates to calculate attorney's fees under § 1988 leads to exorbitant fee awards and provides windfalls to civil rights counsel contrary to the express intent of Congress.  To avoid this result, petitioner urges this Court to require that all fee awards under § 1988 be calculated according to the cost of providing legal services rather than according to the prevailing market rate.  The Solicitor General, for the United States as amicus curiae, urges the Court to adopt a cost-related standard only for fee awards made to nonprofit legal aid organizations.  He argues that market rates reflect the level of compensation necessary to attract profit-making attorneys, but that such rates provide excessive fees to nonprofit counsel.  Because market rates incorporate operating expenses that may exceed the expenses of nonprofit

lose").  Thus, the rates requested by plaintiffs are substantially below the rates that would be demanded in the market in order to account for the risk of non-payment.

> legal services organizations, and include an element of profit unnecessary to attract non-profit counsel, the Solicitor General argues that fee awards based on market rates "confer an unjustified windfall or subsidy upon legal services organizations." [footnotes and citations omitted]

After noting that "[r]esolution of these two arguments begins and ends with an interpretation of the attorneys' fees statute," the Supreme Court rejected both arguments – and thus that of the court in *Heller*. *Id*. at 893. It found that Congress intended that fee awards be based on prevailing market rates instead of the costs of providing the particular legal services. *Id*. at 895. The Supreme Court made clear that the type of practice or overhead of the plaintiff's counsel was irrelevant (*id*. at 894-895):

> It is also clear from the legislative history that Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization.

It therefore affirmed the award to the Legal Aid Society based on prevailing market rates.

Furthermore, the Supreme Court made clear what was intended by prevailing market rates. It said that "the requested rates are [to be] in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson, supra*, 465 U.S. at 895, n. 11. It did not mention the type or size of the lawyer's practice.

Based on *Blum*, the district court in *Laffey* expressly rejected the use of the size or type of the law firm in setting rates (*Laffey v. Northwest Airlines, Inc., supra*, 572 F. Supp. at 374):

> Defendant's comparison of counsels' actual hourly rates with the rates of other labor law firms of similar size simply misses the mark.

In spite of *Blum*, in reversing the district court, the court of appeals rejected this determination by restricting fee awards for small firms, such as that in *Laffey*, to their own customary billing rates. *Laffey v. Northwest Airlines, supra*, 746 F.2d at 24-25.

22

In *Save Our Cumberland Mountains*, the issue arose as to what rates to use for Joseph A. Yablonski and L. Thomas Galloway – both attorneys in small public interest practice firms without customary billing rates.[26]   The district court awarded fees based on prevailing market rates for these attorneys using the *Laffey* Matrix.   *Save Our Cumberland Mountains v. Hodel, supra*, 622 F. Supp. at 1165.   The court of appeals reversed, holding that under *Laffey* the award must be restricted to the attorney's actual hourly rate, even if that rate is used in some representations but not others.   826 F. 2d 43, 48-50 (D.C. Cir. 1987).   Concurring in the result due to the binding effect of *Laffey*, then Circuit Judge Ruth Bader Ginsburg stated (*id*. at 54):

> This court's "lodestar" determination in *Laffey v. Northwest Airlines, Inc.*, Chief Judge Wald points out, is of questionable consistency with *Blum v. Stenson*, and bears reexamination.  I agree.  I do not believe Congress envisioned one fee calculation regime for legal aid attorneys along with "[t]he highest paid law firm in town,"  Dissent at 60, and another cut-price one for firms such as Bredhoff & Kaiser, and lawyers situated as are Yablonski and Galloway. Thus, were we deciding initially what fee calculation regime is most compatible with congressional intent, I would vote to treat all fee seekers in the *Blum* manner. [citations omitted]

In her concurring and dissenting opinion that paved the way for the eventual *en banc* consideration (*see id*. at 49, 55), then Chief Judge Wald showed the anomalous result created by the panel decision in *Laffey* (*id*. at 58-59):

> Using a pure opportunity cost theory, this argument concludes that Galloway has chosen to practice law for clients who can pay little or no money, and that the cost of his taking a

---

[26]  Joseph A. Yablonski was with Yablonski, Both & Edelman, a three-attorney firm in Washington, D.C., that engaged in complex federal litigation.  Pl. Ex. 34; *Save Our Cumberland Mountains*, 622 F. Supp. 1160, 1162, 1165 (D.D.C. 1985), reversed on rates issue, 826 F.2d 43 (D.C. Cir. 1987), reserved *en banc* on rates issue, 857 F.2d 1516 (D.C. Cir. 1988).  During the course of the *Save Our Cumberland Mountains* case, 1981 through 1985 (826 F.2d at 48), L. Thomas Galloway was with the Center for Law & Social Policy, a public interest law firm, Harmon & Weiss, a private public interest law firm, and Galloway & Greenberg.  Pl. Ex. 35; *Save Our Cumberland Mountains, supra*, 622 F. Supp. at 1162.  Harmon & Weiss, which is now known as Harmon, Curran, Spielberg & Eisenberg, LLP, was then and is now a small public interest law firm.  Terris Aff., para. 86.  Galloway & Greenberg was also a small public interest law firm.  *Ibid*.

statutory fees case to displace a regular client is no more than his highest fee-paying client.  *But opportunity or displacement cost is not the test*; Congress' command, as interpreted in *Blum*, is that all attorneys are to be compensated in statutory fees cases at the prevailing market rate in the relevant community.  Indeed, under the panel's theory, there would have been no reason to exempt legal service organizations from the opportunity cost test, as Blum certainly did.

Most disturbingly, the panel's theory produces strong disincentives to young lawyers trying to make public interest-type practice work.  Large, wealthy private firms will receive top dollar in statutory fees compensation for the occasional pro bono case they take.  Nonprofit legal services organizations with salaried employees will also receive fees based on the top market rate for lawyers of similar qualifications and experience.  But struggling private-public interest attorneys who purposefully charge their poorer clients for services at cut-rates but who must yet depend upon those rates for their livelihood will receive those same cut-rates as statutory fees.  Clearly, Congress did not intend such an arbitrary disparity when it enacted provisions allowing reasonable attorneys' fees in order to induce high quality representation from the private bar.  Yet, *Laffey* and this panel have brought us to this point of jurisprudential absurdity. [emphasis in original]

In *Save Our Cumberland Mountains*, when overruling the *Laffey* rates issue *en banc*, the

court of appeals first focused on the anomalous result (857 F.2d at 1520):

As Chief Judge Wald and Judge Ruth B. Ginsburg note in their separate opinions, the *Laffey* application of the *Blum* rule produces an anomaly.  The highly paid commercial, for-profit law firm can receive awards equal to its usual handsome rates.  The legal aid attorney, tied to the prevailing market rate analysis of *Blum*, can look to the purely for-profit firm for evidence supporting a market rate calculation and receive the awards consistent with those of "the highest paid law firm in town."  *Save Our Cumberland Mountains*, 826 F.2d at 60 (Wald, C.J., dissenting in part).  But, attorneys whose practice partakes of some elements of each of those two entities will receive fee awards often significantly smaller than those calculated on the common basis of the other two.  That is, privately practicing but public interest motivated attorneys who intentionally charge their poorer clients reduced rates will receive the same reduced rates as statutory fees, even though they must depend upon the received fees for their livelihood.

The court of appeals proceeded to repair the anomaly and overrule *Laffey* (857 F.2d at 1524):

Congress did not intend the private but public-spirited rate-cutting attorney to be penalized for his public spiritedness by being paid on a lower scale than either his higher priced fellow barrister from a more established firm or his salaried neighbor at a legal services clinic.

In short, we conclude that our prior decision in *Laffey v. Northwest Airlines, Inc.*, and the panel decision in this case, which it compelled, are both inconsistent with the Supreme Court's decision in *Blum v. Stenson* which construed those statutes.  We therefore

24

expressly overrule *Laffey* to the extent that it imposes the above discussed different method of determining attorney fees on attorneys situated as Yablonski and Galloway are here. Henceforth, the prevailing market rate method heretofore used in awarding fees to traditional for-profit firms and public interest legal services organizations shall apply as well to those attorneys who practice privately and for profit but at reduced rates reflecting non-economic goals.

Although the court remanded the case to the district court due to the need for an award based on annual historic rates, the court commended the use of the *Laffey* Matrix, as the district court had done earlier, except that it would only be applicable to the year 1983.[27]  It stated (857 F.2d at 1525):

> We do not intend, by this remand, to diminish the value of the fee schedule compiled by the District Court in *Laffey*. Indeed, we commend its use for the year to which it applies. Perhaps the most desirable result of the present litigation would be the compiling of a similar schedule of prevailing community rates for other relevant years.

Thus, the court endorsed use of the *Laffey* Matrix and an update of the *Laffey* Matrix in awarding fees to the small firms of Yablonski and Galloway.[28]  In doing so, the court made clear that the

---

[27] *See* 826 F.2d at 59 (Wald, C.J., dissenting in part)(addressing how the *Laffey* Matrix works only for the year 1983 due to the need for a lodestar based on historic rather than current rates for a federal defendant under *Library of Congress v. Shaw*, 478 U.S. 310 (1986)).

[28] On remand, Joseph Yablonski, as urged by the court of appeals, updated the *Laffey* Matrix for purposes of establishing an historical rates lodestar.  Pl. Ex. 33, para. 3.  However, the fees in that case were settled.  *Ibid*.  In *Trout v. Ball, supra*, 705 F. Supp. at 709, n. 10, this Court found that the 1989 update of the *Laffey* Matrix prepared by Mr. Yablonski and set forth in his declaration provided "an accurate and updated schedule" for the District:

> The attorney fee matrix approved in *Laffey v. Northwest Airlines, Inc.,* 572 F. Supp. 354, 371 (D.D.C. 1983), was embraced by the Court of Appeals for this Circuit in *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc), and updated in connection with that case. Although the updated matrix was never expressly approved by the court because the parties settled the issue of fees, it does provide an accurate and updated schedule of attorney fees in this District. It reveals that the hourly rate for a litigator with Mr. Speiser's experience [35 years] averages $265. *See* Declaration of Joseph A. Yablonski, principal counsel in *Save Our Cumberland Mountains*, attached to Speiser affidavit.

*Laffey* Matrix was appropriate for fee awards to all attorneys engaged in complex federal litigation regardless of the circumstances under which they practice.

Recently, in *Makray v. Perez, supra*, 159 F. Supp. 3d at 52-53, where the defendant argued that the LSI *Laffey* Matrix reflected rates for large firms but was inappropriate for smaller firms, this Court rejected the idea that firm size plays a role in determining the rates to be awarded.  This Court concluded that considering firm size was inconsistent with the court of appeals decisions in *Save Our Cumberland Mountains* and *Salazar V.  Ibid*.

### (b)   The Market for Complex Federal Litigation Is Not Divided between Large and Small Firms

The market for complex federal litigation is a single marketplace comprised of law firms of different sizes, all of which compete against each other.  Downey Aff., para. 16; MacEwen Aff., para. 11.  It is not divided between large and small firms.  *Ibid*.

As shown below (pp. 27-28), the *Laffey* Matrix is a composite of the rates from the complex federal litigation market and thus includes firms of all sizes.  This was the correct approach since the marketplace is not divided by size.  Each of the firms in the marketplace competes against each other to represent those who require the services of litigators experienced in complex federal litigation.  Downey Aff., para. 16; MacEwen Aff., para. 11; *see* Mehri Aff., para. 6.  This can be seen from the original *Laffey* Matrix data.  In that data, Nathan Lewin, a 1960 graduate with the boutique firm of Miller, Cassidy, Larroca and Lewin,[29] had a rate of $250.  Pl. Ex. 30, para. 16(e); Pl. Ex. 31, p. 3; Lewin Aff., paras. 1-2, 4.  His hourly rate of $250 is among the highest rates in the data underlying the *Laffey* Matrix.  Only partners at Caplin & Drysdale had a higher rate ($300) and senior partners at Dickstein, Shapiro & Morin had the

---

[29] At the time, Miller Cassidy had 17 attorneys.  Pl. Ex. 32, pp. 1654B-1656B.

same rate.  Pl. Ex. 31.  By comparison, Daniel A. Rezneck, then of Arnold & Porter, who compiled the data and created the *Laffey* Matrix, had an hourly rate of $200.  Pl. Ex. 30, paras. 1, 9; Pl. Ex. 31, p. 1.

Mr. Lewin explains in his affidavit here that the size of his firm and its overhead were irrelevant in setting its hourly rates.  Lewin Aff., paras. 7, 10.  Thus, as can be seen from Mr. Lewin's affidavit (para. 8), he adjusted his hourly rate upward to account for general yearly increases as he moved from 35-attorney Miller Cassidy to 2-attorney Lewin & Lewin.

Michael Downey and Bruce MacEwen, experts with regard to the legal market, who are both familiar with the Washington, D.C., legal market, as well as the national legal market, state that firm size is irrelevant to the setting of hourly rates.  Downey Aff., para. 17; MacEwen Aff., para. 12.  *See* Lewin Aff., paras. 8-9; Mehri Aff., para. 6.  They also state that overhead is irrelevant to the setting of rates.  *Ibid*.; *see also* Lewin Aff., para. 10.  The *Heller* decision's reliance upon firm size and overhead was based on a presumption that is without factual support.

### (c)    The Distinction between Large and Small Firms Is Inconsistent with the *Laffey* Matrix

In addition to being inconsistent with *Blum* and *Save Our Cumberland Mountains*, *Heller* is based on an erroneous assumption regarding the *Laffey* Matrix.  This Court in *Heller* selected the USAO *Laffey* Matrix updated by the All-Items CPI over the LSI update of the *Laffey* Matrix based on an assumption that the All-Items CPI update reflected rates for small firms engaged in complex federal litigation and the LSI update reflected rates for large firms engaged in complex federal litigation.  These assumptions are erroneous.

The *Laffey* Matrix is a composite of billing rates charged by and awarded to firms of different sizes.  Although the data underlying the matrix include slightly more data from large firms due, in all likelihood, to the fact that large firms held a larger market share for complex

27

federal litigation, it also includes data for sole practitioners, small, and medium firms.  Plaintiffs'

Exhibit 30 is the Affidavit of Daniel Rezneck in *Laffey* and its attached exhibit.  The exhibit sets

forth the data for the *Laffey* Matrix.[30]  Pl. Ex. 30.  The exhibit has 22 entities listed.  *See* Pl. Ex.

31.  In addition to larger firms – *e.g.*, Arnold & Porter, Covington & Burling, and Steptoe &

Johnson – the following were included (*ibid.*):

| Attorney or Firm in *Laffey* Exhibit (Pl. Ex. 31) | Size from 1982 Listing in Martindale-Hubbell[31] (Including Members, Associates and Of Counsel) | Page in 1982 Martindale-Hubbell (Pl. Ex. 32) |
|---|---|---|
| Caplin & Drysdale | 35 | 1162B – 1166B |
| Ewald, Thomas R. | Sole Practitioner | 1311B |
| Hahn, Gilbert T. (Wolf, Amram & Hahn) | 6 | 2048B – 2049B |
| McDonald, Bradley G. | Sole Practitioner | 1630B |
| Miller, Cassidy, Larroca & Lewin | 17 | 1654B - 1656B |
| Miller & Chevalier | 57 | 1657B - 1662B |
| Nussbaum, Owen & Webster | 11 | 1687B - 1688B |
| Seymour, Samuel (Seymour, Seefried & Hoffman) | 4 | 1836B |

Thus, the *Laffey* Matrix reflects the marketplace for complex federal litigation by including firms

of all sizes.  However, as shown above (pp. 21-27), firm size is irrelevant to the rates for

complex federal litigation.[32]

---

[30] For convenience, the exhibit is attached independent of Mr. Rezneck's affidavit as Plaintiffs' Exhibit 31.

[31] The 1982 Martindale-Hubbell Law Directory listings for these firms are set forth in Plaintiffs' Exhibit 32.

[32] In *Blackman v. District of Columbia, supra*, 677 F. Supp. 2d at 176, this Court agreed with the defendant that the rates in the USAO *Laffey* Matrix, based on the All-Items CPI update, should be used instead of the rates sought by the plaintiffs which were slightly lower than the rates in the "enhanced *Laffey* matrix" (LSI *Laffey* Matrix) because the rates were being compared to rates for the "largest and most expensive firms in the community, and plaintiffs have not shown that such expensive representation would be required for this case."  In its papers, the defendant mischaracterized the rates.  It claimed that the rates were from the top 250 national firms and that these rates overstated the market because many firms engaged in complex federal litigation were small and medium firms with lower overhead than the larger firms.  *Blackman v. District of Columbia*, D.D.C., Civ. No. 1:97-cv-01629-PLF, ECF No. 2161, pp. 9-10 and ECF No. 2174, pp. 10-11.  In fact, the rates sought were based on the "enhanced *Laffey* matrix," the defendant's

(continued…)

*      *      *

Thus, the size of counsel's law firm is irrelevant to the determination of the prevailing market rate.   Moreover, even if it were a consideration, as addressed above, firm size is accounted for in the *Laffey* Matrix itself.

### 5.   Case Complexity Is Irrelevant to the Selection of the Appropriate Index to Use to Update the *Laffey* Matrix

In some instances, case complexity has been used to select the USAO *Laffey* Matrix over the LSI *Laffey* Matrix.  *See, e.g., Queen Anne's Conservation Ass'n v. U.S. Dept. of State*, 800 F. Supp. 2d 195, 200 (D.D.C. 2011); *American Lands Alliance v. Norton*, 525 F. Supp. 2d 135, 150 (D.D.C. 2007).   This is an invalid basis for selection of any update to the *Laffey* Matrix.   Not only does it wrongly assume properties of the update indices that do not exist, it also misses the whole point of the *Laffey* Matrix.

The *Laffey* Matrix represents rates for complex federal litigation.   *Laffey v. Northwest Airlines, supra*, 572 F. Supp. at 374-375; Pl. Ex. 30.   Recently, the court of appeals reiterated in both *Salazar V* and *Eley* that the *Laffey* Matrix, regardless of how updated, applies to complex federal litigation.   *Salazar V*, 809 F.3d at 64; *Eley v. District of Columbia, supra*, 793 F.3d 97 at 100, 105.[33, 34, 35]

---

description of the LSI *Laffey* Matrix.   Contrary to the defendant's claim, the "enhanced *Laffey* matrix" is not based on the rates of the "largest and most expensive firms in the community."   As shown above, the *Laffey* Matrix is a composite of billing rates from firms of all sizes.   Therefore, it does exactly what the defendant in *Blackman* argued it should do.   It considers the rates of all types of firms engaged in the practice of complex federal litigation.   However, as shown above (pp. 26-27), such consideration is irrelevant in the marketplace.

[33] Presumably, the USAO *Laffey* Matrix is selected in less complex cases because it produces lower rates, and the less complex the litigation, the lower the rates should be.   However, the decisions do not provide any rationale.

29

[34] In *Queen Anne's Conservation Ass'n v. U.S. Dept. of State, supra*, 800 F. Supp. 2d at 200, and *American Lands Alliance v. Norton, supra*, 525 F. Supp. 2d at 149-150, the Court assumed that in *Salazar I* the Court selected the LSI *Laffey* Matrix based, in part, on the complexity of the case. While the *Salazar* case is complex, this complexity justified use of the *Laffey* Matrix; it had nothing to do with the Court's selection of the appropriate index with which to update the *Laffey* Matrix. The Court selected the LSI *Laffey* Matrix due to the specificity of the index to legal services instead of other services and commodities. *Salazar I, supra*, 123 F. Supp. 2d at 14-15. In addition to finding that the LSI *Laffey* Matrix rates were corroborated by the rates surveys submitted by the plaintiffs, the full extent of the Court's analysis was (*ibid*.):

> [T]he choice of which matrix should be used to set the prevailing hourly rate is a much more difficult issue. Both matrices have been accepted in different cases. Moreover, while the U.S. Attorney's Office Matrix has the distinct advantage of capturing data which is specific to the Washington, D.C., metropolitan area, as opposed to the *Laffey* index which relies on Consumer Price Index data from all over the country, the *Laffey* index has the distinct advantage of capturing the more relevant data because it is based on the legal services component of the Consumer Price Index rather than the general CPI on which the U.S. Attorney's Office matrix is based.
>
> Plaintiffs' expert, Dr. Michael Kavanaugh, explained that the D.C. Metropolitan CPI does not contain a separate component for legal services and that such services are included in a much larger, more generalized category of "other goods and services". Because "economists use as specific an index as possible to determine changes in prices in a part of an industry, such as here changes of prices in legal services in the District of Columbia," Dr. Kavanaugh concluded that "components of the CPI, such as the LSI, are the better resource to update an industry's prices than the general CPI." Kavanaugh Aff. P 9.
>
> Defendants have failed to offer any reasoned, or expert, rebuttal to this explanation. Consequently, the Court concludes that the updated *Laffey* matrix more accurately reflects the prevailing rates for legal services in the D.C. community. n5
>
> > n5 It should also be noted that Dr. Kavanaugh stated that in his opinion, "the market for legal services in complex federal litigation in Washington, D.C., is not a local market". Kavanaugh Aff. P 6.

Thus, the Court made clear that it did not select the LSI update based on the complexity of the case.

[35] In *American Lands Alliance, supra*, 525 F. Supp. 2d at 149, the Court also pointed to *Muldrow v. Re-Direct, Inc.*, 397 F. Supp. 2d 1 (D.D.C. 2005), as supporting the selection of the USAO *Laffey* Matrix over the LSI *Laffey* Matrix based on the complexity of the case. In *Muldrow*, the Court awarded the rates sought, which were the *Laffey* Matrix rates updated using the methodology approved by the Court in *Salazar I*, in other words, the LSI *Laffey* Matrix. 397 F. Supp. 2d at 3, 4-5. The plaintiffs sought and the Court awarded 2005-2006 rates of $596 and $305 for attorneys and $136 for paralegals. *Id*. at 3, 4, n. 3, 4. These are the 2005-2006 rates

(continued…)

In deciding hourly rates for the fees associated with plaintiffs' motion to compel earlier in this case, this Court relied, in part, on *American Lands Alliance* and *Muldrow* to select the USAO *Laffey* Matrix over the LSI *Laffey* Matrix.[36] *DL v. District of Columbia, supra*, 256 F.R.D. at 243. It concluded that the work of moving to compel was not particularly complex and therefore not the type of "complex work that gives rise to use of the enhanced [LSI] *Laffey* matrix." *Ibid*. It further concluded that plaintiffs had not "justified the use of the enhanced *Laffey* matrix by showing the nature and complexity of the work; they simply argue that the enhanced matrix is more accurate." *Ibid*. However, for the reasons discussed above, this Court's reliance on *American Lands Alliance* and *Muldrow* is misplaced. Moreover, the LSI cannot better reflect complexity than the All-Items CPI since complexity is not a feature of either index. The two indices are only distinguishable on specificity (legal services versus 100,000 commodities and services) and geography (national versus regional). *See* Kavanaugh Decl., para. 11-12. In any event, plaintiffs show below (p. 32) that this case overall is complex and justifies use of the LSI *Laffey* Matrix.

---

from the LSI *Laffey* Matrix (*see* Pl. Ex. 23, p. 2)(It is unclear from the decision why the rate of $596 is slightly lower than the LSI *Laffey* Matrix amount of $599). After calculating the lodestar using the LSI *Laffey* Matrix, the Court applied a 25% downward adjustment to address the less complex nature of the case and the disproportionate amount of the fees sought compared to the amount of the judgment. *Muldrow v. Re-Direct, Inc., supra*, 397 F. Supp. 2d at 4-5. Nowhere in the decision does the Court even mention the USAO *Laffey* Matrix.

[36] This Court also relied upon the geographical difference between the two update indices. *DL v. District of Columbia, supra*, 256 F.R.D. at 243. As discussed above (p. 12), the geographical difference is a moot issue since the USAO has opted to use the PPI-OL, which is a national index like the LSI, instead of the All-Items CPI.

*      *      *

In sum, as plaintiffs have shown above, the LSI *Laffey* Matrix best reflects market rates in the District of Columbia and this Court should award fees based on the hourly rates in the LSI *Laffey* Matrix.

## II.   PLAINTIFFS SEEK FEES FOR HOURS REASONABLY EXPENDED BY THEIR LEAD COUNSEL

The Court must determine the amount of time reasonably expended on the litigation. *See Hensley v. Eckerhart, supra*, 461 U.S. at 433.  The extensive work of plaintiffs' lead counsel, attorneys at TPM, is described in paragraphs 16-38 (Period 1) and 44-78 (Period 2) of the Terris Affidavit (Pl. Ex. 1).  The corresponding time records and summaries related to that work are Plaintiffs' Exhibits 5 and 6 for Period 1, and Plaintiffs' Exhibits 11 and 12 for Period 2.

The work described in those exhibits is substantial.  This is complex federal litigation that has been pending for over 11 years.  This Court acknowledged its complexity at the status conference on June 30, 2016.  The work involved, *inter alia*, 6 motions to dismiss, extensive discovery (and, during Period 1, serious discovery violations by the District), 4 summary judgment motions, complex class certification issues that impacted injunctive and individual relief, complex statistical and demographic data, 2 trials, an appeal, and the District's petition to appeal again after this Court certified four subclasses.  *See* Terris Aff., paras. 16-38, 44-78.  In light of the demands of this case, TPM's work was reasonably expended.  *See also* p. 8 above (citing instances where the District has admitted that this case and another IDEA class action are complex federal litigation).

TPM requests $9,194,358.11 in fees related to that work.  To reach that total, TPM has eliminated substantial time in the exercise of billing judgment and to address objections raised by the District in the prior round of briefing.  That includes $67,989.07 in fees marked as "No

32

Charge" during Period 1 (Terris Aff., para. 31; No Charge Time Records, Pl. Ex. 7), $63,710.24 in reductions made in reply to the District's opposition to plaintiffs' 2012 fee application (Terris Aff., para. 32; Reductions with Reply Brief, Pl. Ex. 9), $1,599.74 in additional reductions made now with regard to Period 1 (Terris Aff., para. 33; Supplemental Reductions, Pl. Ex. 10), $40,001.04 related to fees which TPM requested in 2012 in relation to Plaintiffs' Motion to Compel Discovery (Terris Aff., para. 33), $128,037.68 in fees marked as "No Charge" during Period 2 (Terris Aff., para. 68; No Charge Time Records, Pl. Ex. 13), and $361,391.49 in additional reductions made with regard to Period 2 (Terris Aff., paras. 69-70).   This totals $662,729.26 in fees for which plaintiffs are not seeking compensation.  Plaintiffs submit that this is reasonable.

## III.   PLAINTIFFS' CO-COUNSEL ARE ALSO ENTITLED TO FEES FOR THEIR REASONABLE HOURS AT PREVAILING MARKET RATES

In addition to compensation for work performed by TPM, plaintiffs seek compensation for their co-counsel: Jeffrey Gutman, Margaret Kohn, and Cyrus Mehri.  The experience and work of these attorneys is described in detail in their affidavits and contemporaneous time records attached thereto.  *See* Plaintiffs' Exhibits 15 (Gutman), 16 (Kohn), and 17 (Mehri).  Mr. Gutman and Ms. Kohn are entitled to fees at the same rates that TPM requests.  *See* Section I(B) above.  Mr. Mehri seeks his standard hourly rate which is in line with the prevailing market rates for complex federal litigation.  Affidavit of Cyrus Mehri, Pl. Ex. 17 ("Mehri Aff."), para. 6.

**Jeffrey Gutman.**   Jeffrey Gutman, a Professor of Clinical Law at The George Washington University ("GWU") Law School and Director of the Public Justice Advocacy Clinic at GWU Law School, began work on this case in 2003.  Affidavit of Jeffrey S. Gutman, Pl. Ex. 15 ("Gutman Aff."), paras. 1, 5.  Beginning in 2003, Mr. Gutman, with the assistance of law students at GWU, researched a variety of fact and legal issues critical to plaintiffs' claims.

*Id*., paras. 5-27.  Once this lawsuit was filed in July 2005, TPM assumed primary responsibility for the litigation and Mr. Gutman assumed an advisory role, initially assisting with the drafting and editing of briefs and, later, by providing strategic advice during the course of the litigation. *Id*., para. 15.

Mr. Gutman and his clinic provide *pro bono* services and therefore do not charge their clients any attorneys' fees.  Gutman Aff., para. 1.  Therefore, Mr. Gutman and his clinic are entitled to fees at prevailing market rates.  *See* Section I(B) above.  Mr. Gutman requests that his legal clinic be compensated for his work and the work of his law students.  Gutman Aff., para. 28.

Mr. Gutman, who has been at the highest *Laffey* experience level (20+) for all of the time for which he is seeking compensation in this case (Gutman Aff., para. 25), should be compensated at the LSI *Laffey* Matrix rate of $826.  *See* p. 11 above.

The clinic is also entitled to fees for the work of the GWU law students at the prevailing market rate for paralegals under the LSI *Laffey* Matrix.  *See Covington v. District of Columbia, supra*, 57 F.3d at 1105-1107 (awarding attorney's fees under 42 U.S.C. 1988 for law students at a paralegal rate); *Jordan v. U.S. Department of Justice*, 691 F.2d 514, 524 (D.C. Cir. 1982)(fees can be awarded under FOIA for law student work); *Blackman v. District of Columbia, supra*, 677 F. Supp. 2d at 175 (in IDEA class action, awarding attorney's fees at paralegal rates for service of law students); *Brown v. Barnhart*, 2005 WL 2563174, at *1 (D.D.C. 2005)(awarding fees to GWU for work of law students in a Social Security case).

Mr. Gutman requests compensation, on behalf of his clinic, in the amount of $140,225.82, for 95.333 hours for his work during Period 1, 296.75 hours for law student work during Period 1, and 7.25 hours of Mr. Gutman's work during Period 2.  Gutman Aff., paras. 25-

28.   As described in his affidavit (paras. 10, 11, 14, 16, 17, 21, 23), this represents only a percentage of the work that he and his students performed.   He has excluded hundreds of hours of time pursuant to his billing judgment and because he could not access certain contemporaneously created time entries.   *Ibid.*

**Margaret Kohn.**   Margaret Kohn is an extremely experienced IDEA advocate.   Affidavit of Margaret A. Kohn, Pl. Ex. 16 ("Kohn Aff."), paras. 1-8.   Her extensive knowledge of special education law and the relevant operations, policies, and practices of the District have enabled her to provide essential contributions as class counsel.   *Id.*, para. 15.   She was involved in, *inter alia*, the framing of the lawsuit, the factual development of the case, discovery, editing of briefs, settlement negotiations, mediations, and client communications.   *Id.*, paras. 15-22, 27-35.

Ms. Kohn charges reduced rates for public-spirited reasons.   Kohn Aff., para. 8. Therefore, she is also entitled to fees at prevailing market rates.   *See* Section I(B) above.   She has practiced law for nearly 40 years.   Kohn Aff., para. 25.   She should be compensated at the LSI-Adjusted *Laffey* Matrix rate of $826.   *See* p. 11 above.

Ms. Kohn requests compensation for $393,622.04 in fees for 343.44 hours of work during Period 1 and 133.1 hours of work during Period 2.   Kohn Aff., paras. 23-25, 36-37; Pl. Ex. 4.   As described in her affidavit (paras. 11, 23, 36), this is only a percentage of her work since there were many occasions over the course of this case in which she has not billed for her work, and she has made reductions to her recorded time.

**Cyrus Mehri.**   Mr. Mehri is an extremely experienced class action litigator and expert on class certification.   Mehri Aff., paras. 3, 4, 8-11.   He did work on this case related to class certification and settlement.   *Id.*, para. 11-12.   His current hourly rate for all work performed by him on a matter including both class action and pay by the hour matters is $795.   *Id.*, para. 5.

After excluding several hours of time, he requests compensation for his fees in the amount of $21,266.25.  *Id.*, para. 13.

## IV.   THE STATUTORY CAP ON FEES IN IDEA CASES DOES NOT PRECLUDE THE REQUESTED AWARD OF FEES AND EXPENSES

A statutory cap on attorneys' fees in actions brought against the District under the IDEA bars the District from "pay[ing] the fees of an attorney who represents a party in * * * an IDEA proceeding * * * an amount in excess of $4,000."  Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, 123 Stat. 697.[37]  In *Blackman v. District of Columbia*, 633 F.3d 1088, 1092 (D.C. Cir. 2011), the court of appeals found that the "the 'evident intent' of the statute is to address individual IDEA proceedings, not class actions."  The court agreed with the district court that (*id.* at 1092):

> [T]he cap does not preclude the Court from ordering defendants to pay and—more importantly—does not preclude the defendants from paying reasonable attorneys' fees to the plaintiff classes, so long as the total amount paid by the defendants does not surpass the statutory fee cap multiplied by the total number of members of the plaintiff class.

Plaintiffs request an award of $10,010,956.00 in fees and expenses.  *See* Pl. Ex. 4. However, since plaintiffs cannot recoup expert expenses under the IDEA (*see* pp. 41-42 below), those expenses ($121,207.82, *see* pp. 42-43 below) should not be subject to the fee cap. Therefore, for the fee cap to have any relevance to this case, there would need to be fewer than

---

[37] The $4,000 statutory fee cap was first enacted by Congress for fiscal year 2003 (Consolidated Appropriations Act of 2003, Pub. L. No. 108-7, Section 144, 117 Stat. 11) and was re-enacted in subsequent years.  In the Omnibus Appropriations Act, 2009, the fee cap was lifted for actions initiated after the date of the enactment of the Act, but still applied to actions initiated prior to its enactment.  *See* Pub. L. No. 111-8, 123 Stat. 697.

2,473 children in the subclasses (($10,010,956.00-$121,207.82)/$4,000).[38] This Court's findings already show that plaintiffs' subclasses far exceed this number of children. For example:

**Subclass 1 (identification and/or location).** The Court found: "The District Failed to Provide Special Education and Related Services to <u>Thousands of Children</u> Prior to March 22, 2010" (emphasis added). Corrected Opinion, p. 81. For example, "[f]rom 1992 to 2007, the District served, on average, around two to three percent of its pre-school age population," and in 2008 served 3.3 percent, and in 2010 served 5.4 percent (*id.*, paras. 193, 195), rather than the required 8.5 percent (*id.*, para. 56). The Court found: "Through March 22, 2010, the District was still failing to serve hundreds of children annually. In 2010, for example, there were 17,605 three-to-five-year-old children in the District. * * * The District reported that 957 children received special education and related services at that time. * * * To satisfy the 8.5% benchmark in 2010 alone, the District would have needed to provide services to 1,496 children, or 539 additional children." *Id.*, para. 196.

As an example of more recent data, the Court explained: "When calculating its data appropriately * * *, the District served a high of 8.04% of its preschool-age population in March 2013, a figure which fell nearly monthly to a low of 6.27% in November 2014. * * * In other words, the District failed to provide special education and related services to between 98 and 515 children, varying monthly, since 2013. * * * [A]t any given time, hundreds of children are still not receiving needed special education and related services." *Id.*, para. 57. *See also, e.g., id.* p. 44 ("OSEP has not yet produced its report that identifies the Child Count percentages for the

---

[38] If the $121,207.82 in expert expenses were considered, then, for the fee cap to have any relevance to this case, there would need to be fewer than 2,503 children in the subclasses. As described herein, this Court's findings already show that plaintiffs' subclasses far exceed this number of children.

2014-2015 school year. * * * However, for that year, the District reported to OSEP that it provided IEP's to 1,429 children * * *, which is only 6.19% of the 2014 population of 3-5-year-olds").

**Subclasses 2 (timely evaluations) and 3 (timely eligibility determinations).** The Court found that "The District Failed to Provide Timely Initial Evaluations to <u>over a Thousand Children</u> prior to March 22, 2010" and that "The District Failed to Provide Timely Eligibility Determinations to <u>over a Thousand Children</u> prior to March 22, 2010" (emphases added).[39] Corrected Opinion, pp. 84, 85. The Court found it "undisputed that '[f]rom 2000 through 2008, 62.02% of all children ages 3 through 5 received an eligibility determination within 120 days of referral' * * * [and that] [t]his amounts to over one thousand children who did not receive timely determinations over that period." *Id.*, para. 205. The Court continued: "[t]hose same delays continued through 2010. Dr. Cupingood [plaintiffs' statistical expert] concluded that only 56.75% of preschool-age children received a timely eligibility determination from 2008 through 2010 (41.44% in 2008, 68.43% in 2009, and 55.23% in 2010)." *Id.*, para. 206.

The findings regarding more recent years demonstrate that large numbers of children are still not receiving timely evaluations and eligibility determinations. The Court stated: "Dr. Cupingood found that approximately 20% of children did not receive a timely eligibility determination within the 120-day timeline. * * * That is well above the District's 3% untimely calculation and four times as many untimely eligibility determinations as are permitted under the Court's prior decision." Corrected Opinion, para. 116; *see also id.*, p. 50, n. 4 ("Dr. Cupingood's calculation relates to the period from December 1, 2012, to November 30, 2013. * * * The

---

[39] There is substantial overlap between subclasses 2 and 3. *See* Corrected Opinion, para. 202.

parties agreed that such statistics should essentially be treated as current for purposes of the Court's decision").

**Subclass 4 (smooth and effective transitions).**   The Court found that "The District Failed to Provide Smooth and Effective Transitions to <u>Many Hundreds of Children</u> Prior to March 22, 2010" (emphasis added).   Corrected Opinion, p. 86.   For example, "[t]he District reported the following percentages of children who received smooth and effective transitions, which demonstrate poor performance and substantial variability in the District's results: 17% for the 2004-2005 school year, 37% for the 2005-2006 school year, 40.62% for the 2006-2007 school year, 62% for the 2007-2008 school year, 8.22% for the 2008-2009 school year, and 30.25% for the 2009-2010 school year."   *Id.*, para. 209.   The Court continued: "These low rates of compliance resulted in delays for many hundreds of children over the years. * * * For example, for the 2008-2009 period, the District reported that only six children received a timely transition although 94 were referred. * * * For 2009-2010, the District reported that 113 children did not have IEPs developed and implemented by their third birthdays."   *Id.*, para. 210.   Delays have continued in recent years, where "the data show that almost 30 percent of children are not receiving smooth and effective transitions."   *Id.*, para. 122.

These findings and common sense demonstrate that far more than 2,473 children (including children who had live claims that arose prior to the 2005 filing of the complaint and were still within the two-year limitations period) are subclass members, because they were not identified and/or located, and/or failed to receive timely evaluations, timely eligibility determinations, or smooth and effective transitions.   Corrected Opinion, p. 6 (subclass definitions).   These numbers are conservative because they do not account for children who entered a subclass after this Court's decision or will enter a subclass in the future.   *See ibid.*

(classes include children going forward).  Accordingly, the fee cap does not affect the relief requested herein.

## V.  PLAINTIFFS ARE ENTITLED TO AN AWARD OF REASONABLE LITIGATION EXPENSES

### A.  EXPENSES GENERALLY

This Court stated that "the District shall pay plaintiffs' reasonable attorneys' fees and related nontaxable expenses associated with litigating this suit."  Order, dated May 18, 2016 (ECF No. 521), para. 30.

Plaintiffs request an award of $190,817.28 in TPM's out-of-pocket litigation expenses from Period 1 and $68,938.89 for Period 2.[40]  Terris Aff., paras. 43, 80.  These expenses relate to a variety of miscellaneous categories, such as printing, conference calls, legal research, delivery charges, and experts (which is addressed further below).  A complete list of the categories of expenses and descriptions for both periods is provided in the Terris Affidavit, Pl. Ex. 1, paras. 42, 80-81.  The total amount of TPM's expenses (except for Period 2 expert expenses (*see* pp. 43-44 below), by category, is provided in Plaintiffs' Exhibits 8 (Period 1) and 14 (Period 2).  *See also* Pl. Ex. 4.

Plaintiffs request an award of $1,540.00 in Ms. Kohn's out-of-pocket litigation expenses from Period 1 and $187.61 for Period 2.  *See* Kohn Aff., para. 26, 38.  These expenses relate to photocopying, postage, local transportation, messenger services, and costs related to hiring a law student to prepare a privilege log.  *Ibid.*[41]

---

[40] For Period 1, this amount includes $121,207.82 in expert expenses, which are addressed on pages 41 to 43 below.  For Period 2, this amount includes $1,809.25 in recoverable costs related to experts, which are addressed on pages 43-44 below.

[41] Plaintiffs are not requesting compensation for any expenses accrued by Mr. Gutman or Mr. Mehri.

## B.   EXPENSES RELATED TO EXPERT WITNESSES RECOVERABLE UNDER THE REHABILITATION ACT

In *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291, 293-294 (2006), the Supreme Court held that the fee-shifting provision under the IDEA does not authorize prevailing plaintiffs to be compensated for their expenses related to services rendered by experts. *See also Goldring v. District of Columbia*, 416 F.3d 70, 73-77 (D.C. Cir. 2005).

However, courts have concluded that a prevailing plaintiff may recover expert fees under the Rehabilitation Act. *See, e.g., M.M. v. School District of Philadelphia*, 142 F. Supp. 3d 396, 413 (E.D. Pa. 2015)("Expert fees are not recoverable under the IDEA.  They are recoverable under Section 504 and/or the ADA"); *K.N. v. Passaic City Board of Education*, 2011 WL 5157280, at *15 (D.N.J. 2011)("A plaintiff may be awarded reasonable fees for expert services under Section 504 of the Rehabilitation Act if a plaintiff is a prevailing party"); *Ryan P. ex rel. Christine P. v. School District of Philadelphia*, 2008 WL 724604, *8 (E.D. Pa. 2008)(plaintiffs "correctly note that Section 504 incorporates the remedies available under the Civil Rights Act of 1964, which specifically provides for the taxation of expert witness fees at 42 U.S.C. § 2000e-5(k)('the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs')"). *But see M.P. ex rel. Independent School District*, 2007 WL 844688, at *4 (D. Minn. 2007); *Mason v. Maine Dept. of Corrections*, 387 F. Supp. 2d 57, 64 (D. Me. 2005).

Moreover, in *Berke v. Federal Bureau of Prisons*, 942 F. Supp. 2d 71, 81 (D.D.C. 2013), this Court (Huvelle, J.) explained that the Rehabilitation Act incorporates remedies available under the Civil Rights Act of 1964, which permit recovery of expert fees.  The Court noted that it incorporates those remedies for claims under 29 U.S.C. 794 (Section 504 of the Rehabilitation Act, under which the District is liable (*see* Corrected Opinion, paras. 278-281)), "that are brought

against a 'recipient of Federal assistance or Federal provider of such assistance,'" but not for "claims brought against federal agencies conducting programs or activities."  942 F. Supp. 2d at 82.  The Court did not award the expert fees in *Berke* because the defendant there was a federal agency, not a "recipient of Federal assistance," like the District here.[42]  *Ibid.*

This Court initially found in 2010 that the District violated the Rehabilitation Act through 2007.  *See* Memorandum Opinion, dated August 10, 2010, Doc. 198, pp. 21-23; s*ee also* Corrected Opinion, pp. 3-4.  The Court then found, in 2011, that the District violated the Rehabilitation Act through April 6, 2011.  *See* Memorandum Opinion & Findings of Fact and Conclusions of Law, dated November 16, 2011 (ECF No. 294), paras. 127-133; *see also* Corrected Opinion, p. 4.  After the appeal, the Court found that the District was liable for violating the Rehabilitation Act through March 22, 2010.  *See* Corrected Opinion, paras. 272-281.

Plaintiffs used Dr. Dunst and Dr. Cupingood's Period 1 work to identify deficiencies in the District's program.  Those deficiencies formed the basis for liability under both the IDEA and the Rehabilitation Act.  *See, e.g.*, Memorandum Opinion & Findings of Fact and Conclusions of Law, dated November 16, 2011 (ECF No. 294), para. 133 (Rehabilitation Act conclusions incorporating findings in paragraphs 23-59, which include evidence from Dr. Dunst and Dr. Cupingood).

TPM paid plaintiffs' experts $121,207.82 for their Period 1 work.  *See* Terris Aff., para. 14; Affidavit of Carl J. Dunst, Pl. Ex. 18 ("Dunst Aff."), para. 9 ($55,919.07); Affidavit of

---

[42] *See* Corrected Opinion, paras. 48 (District receives federal financial assistance), 272 (quoting Rehabilitation Act provision related to receipt of federal financial assistance).

Leonard A. Cupingood ("Cupingood Aff."), Pl. Ex. 20, para. 14 ($65,288.75).  Plaintiffs request compensation for this work.

The Rehabilitation Act claims, which were litigated in Period 1, were litigated again during the second trial.  Plaintiffs again used Dr. Dunst and Dr. Cupingood's work to identify deficiencies in the District's program.  Those deficiencies again formed the basis for liability under both the IDEA and the Rehabilitation Act.  *See, e.g.,* Corrected Opinion, paras. 272-281 (Rehabilitation Act conclusions through March 22, 2010, incorporating findings in paragraphs 175-215, which include evidence from Dr. Dunst and Dr. Cupingood).

TPM paid plaintiffs' experts $137,001.26 for work during Period 2.  Terris Aff., para. 15; Dunst Aff, para. 12 ($62,875.85); Cupingood Aff., para. 16 ($74,125.41).  Plaintiffs could request that their award include at least a percentage of that amount to account for work related to the District's conduct through March 22, 2010.  Instead, with regard to Period 2, plaintiffs have conservatively asked only for payment for standard witness attendance and travel costs, which amount to $1,809.25 (*see* p. 44 below).  Otherwise said, for Period 2, TPM paid their experts nearly $140,000, but they are asking for a recovery of less than $2,000.

## C.   EXPENSES RELATED TO EXPERT WITNESSES RECOVERABLE UNDER OTHER LAW

Regardless of the Rehabilitation Act, plaintiffs are entitled to a portion of their payments to plaintiffs' experts pursuant to other law.

First, plaintiffs can recover for the time and expenses that their experts reasonably accrued in preparing for and attending their Period 1 depositions under Rule 26 of the Federal

Rules of Civil Procedure.[43]  *See* Rule 26(b)(4)(E)(i) (opposing party responsible for payment of experts' "reasonable fee[s] spent in responding to discovery"); *Barnes v. District of Columbia*, 272 F.R.D. 135, 137 (D.D.C. 2011).  Second, plaintiffs can recover standard fees and expenses related to their experts' work at their Period 1 depositions and the trials under 28 U.S.C. 1920 ("Taxation of costs") and 1821 ("Per diem and mileage generally; subsistence").

For Period 1, if the Court does not award plaintiffs' expert fees and expenses under the Rehabilitation Act, plaintiffs request the award of the $15,530.50 ($6,501.00 for Dr. Dunst and $9,029.50 for Dr. Cupingood) for work related to their depositions and trial under these rules. Plaintiffs' Exhibits 19 (pp. 1-3) and 21 (p. 1) are tables that show the calculation of this amount.

For Period 2, as described above, plaintiffs are not requesting expert fees and expenses under the Rehabilitation Act, and plaintiffs have already been compensated for work related to their experts' depositions.  However, plaintiffs request under these rules the award of $1,809.25 ($1,338.25 for Dr. Dunst and $471 for Dr. Cupingood) related to their experts' attendance at trial.  Plaintiffs' Exhibits 19 (pp. 4-5) and 21 (p. 2) are tables that show the calculation of this amount.

## CONCLUSION

For the reasons stated above, plaintiffs request an award of litigation costs, including attorneys' fees and related expenses, in the amount of:

| | |
|---|---|
| Attorneys' Fees of Terris, Pravlik & Millian | $9,194,358.11 |
| Attorneys' Fees of Jeffrey Gutman and his law students (payment to The George Washington University) | $140,225.82 |
| Attorneys' Fees of Margaret Kohn | $393,622.04 |

---

[43] Plaintiffs do not request a corresponding amount for Period 2 because the District has already paid for such time.  *See* Order, dated June 10, 2015 (ECF No. 447)(order issued pursuant to consent motion requiring payment of $23,238.96).

| | |
|---|---|
| Attorneys' Fees of Cyrus Mehri (payment to Mehri & Skalet, PLLC) | $21,266.25 |
| Expenses accrued by Terris, Pravlik & Millian | $259,756.17 |
| Expenses accrued by Margaret Kohn | $1,727.61 |
| Total[44] | $10,010,956.00 |

Plaintiffs request that this Court direct the District to pay this award, plus interest in accordance with 28 U.S.C. 1961 accruing from the date of this Court's order, within 30 days of this Court's order.  A proposed order is attached.

Respectfully submitted,

/s/ *Bruce J. Terris*
BRUCE J. TERRIS (D.C. Bar No. 47126)
TODD A. GLUCKMAN (D.C. Bar No. 1004129)
TERRIS, PRAVLIK & MILLIAN, LLP
1121 12th Street, N.W.
Washington, DC 20005
(202) 682-2100

MARGARET A. KOHN (D.C. Bar No. 174227)
Attorney at Law
619 Pennsylvania Avenue, S.E.
2nd Floor
Washington, DC 20003
(202) 544-1200

CYRUS MEHRI (D.C. Bar No. 420970)
Mehri & Skalet, PLLC
1250 Connecticut Avenue, N.W., Suite 300
Washington, DC 20036
(202) 822-5100

September 28, 2016                 *Counsel for Plaintiffs*

---

[44] Plaintiffs' Exhibit 4 shows the totals for Periods 1 and 2, respectively, and this combined total. It also shows reductions made to the amounts sought.