## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| D.L., *et al.,* | |
| Plaintiffs, | |
| v. | Civil Action No. 05-1437 (RCL) |
| DISTRICT OF COLUMBIA, *et al.,* | |
| Defendants. | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
## FOR AN AWARD OF LITIGATION COSTS, INCLUDING
## ATTORNEYS' FEES AND RELATED EXPENSES

Plaintiffs seek $10,010,956.00 in attorney's fees and costs, a sum that is grossly excessive in a myriad of different ways. Defendants ask the Court to reduce this figure to a reasonable amount by doing the following.

First, the Court should reduce the hourly rates for plaintiffs' fees. Plaintiffs request rates derived from a version of the familiar *Laffey* Matrix updated by the national Consumer Price Index for Legal Services (Enhanced *Laffey* Matrix).[1] Enhanced *Laffey* Matrix rates are inappropriate for a host of different reasons, and the Court should decline to apply them. Instead, for reasons explained below, and supported by a declaration from a recognized expert in the field, the Court should apply 2012 *Laffey* Matrix rates to the reasonable fees incurred in period 1, and it should apply current USAO Matrix rates for period 2.

---

[1] This Matrix was introduced in *Salazar v. District of Columbia*, 123 F.Supp.2d 8, 13-14 (D.D.C. 2000).

Second, the Court should reduce significantly the amount of the requested fees. Plaintiffs' invoices reveal substantial overbilling throughout this litigation and an absence of billing judgment to correct for the improper invoices. Defendants provide the Court with numerous and specific examples from the billing records themselves, as well as a declaration from an experienced practitioner in complex federal litigation who evaluated plaintiffs' invoices. His conclusion is that any paying client would find much in the invoices unreasonable and refuse to pay for those legal services. Accordingly, defendants ask the Court to use its discretion and make a substantial percentage reduction in plaintiffs' fees.

Finally, the Court should decline to award a number of plaintiffs' costs that are excessive or simply unavailable to them by statute. This, too, justifies exercise of the Court's discretion for a further reduction in any award of fees to plaintiffs.

## ARGUMENT

### I.   <u>USAO Rates Should Apply.</u>

Plaintiffs bear the burden of proving entitlement to the fees they seek, including the reasonableness of their requested hourly rates. *See Salazar v. District of Columbia*, 809 F.3d 58, 64 (D.C. Cir. 2015) (plaintiffs must show "propriety of the rates [ ] sought").  A reasonable rate is one that produces a "fee that is sufficient to induce a capable attorney to undertake the representation of meritorious civil rights case," not "to provide a form of economic relief to improve the financial lot of attorneys." *Perdue v. Kenny A.*, 130 S. Ct. 1662, 1672-73 (2010) (quotations and citations omitted). Plaintiffs seek an award of fees at Enhanced *Laffey* rates, which

mark a roughly 15 to 30 percent increase, depending on experience level, over the rates established by the more accurate and reliable USAO Matrix. But plaintiffs have not carried their burden of justifying their request for four reasons: (1) IDEA cases such as this are a submarket of complex federal litigation where reimbursement for fees is routinely approved at or below USAO Matrix rates; (2) plaintiffs' claims also fall within a submarket of complex federal litigation involving institutional reform against the District within which USAO Matrix rates are the norm; (3) USAO Matrix rates more accurately reflect the market for complex federal litigation than plaintiffs' Enhanced *Laffey* rates; and (4) plaintiffs' failure to provide evidence that practitioners have *received*, as opposed to billed, attorney's fees at their proposed rates is fatal to their request. For these reasons, argued in turn, the Court should decline plaintiffs' request for Enhanced *Laffey* rates and calculate plaintiffs' hourly rates based on those derived from the USAO Matrix.

A.  **IDEA Cases Are a Submarket of Federal Complex Litigation In Which USAO Rates Are Presumptively Sufficient Compensation For Even the Most Complex Legal Work; Plaintiffs Do Not Provide Evidence That Overcomes This Presumption.**

This case is an IDEA lawsuit; plaintiffs seek the vast majority[2] of their attorney's fees under 20 U.S.C. § 1415(i)(3), the IDEA fee-shifting provision. This

---

[2] Plaintiffs purport to base at least a portion of their request for attorney's fees on Section 501 of the Rehabilitation Act. However, as explained in Part V of this Opposition, plaintiffs' Rehabilitation Act claims, on which they prevailed during part of period I *only*, are derivative of their IDEA claims, in so far as they add no substance to the education-specific rights afforded under the Act. Even if the Court allows the Rehabilitation Act to supply plaintiffs a separate basis for an award of attorney's fees, it can only apply to the time billed prior to March 22, 2010, after which plaintiffs were not prevailing parties on their Rehabilitation Act claims.

provision, which must serve as the "starting point" of the Court's analysis, *Price v. District of Columbia*, 792 F.3d 112, 114 (D.C. Cir. 2015), requires that any award of attorney's fees to a prevailing IDEA plaintiff be "based on the rates prevailing in the community … for the kind and quality of services furnished," 20 U.S.C. § 1415(i)(3)(C), and must be reduced if the hourly rate requested "unreasonably exceeds" the rate for "similar services [provided] by attorneys of reasonably comparable skill, reputation, and experience," *Id.* § 1415(i)(3)(F)(ii). *Eley v. District of Columbia*, 793 F.3d 97, 99-100 (D.C. Cir. 2015). Recently, the Circuit determined that legal services for IDEA litigation form a "submarket in which attorneys' hourly fees are generally lower than the rates in either [the USAO Matrix or the Enhanced *Laffey* Matrix]." *Salazar*, 809 F.3d at 64 (discussing *Eley, supra*). Therefore, in order to show that a proposed hourly rate is reasonable, a prevailing IDEA plaintiff, such as plaintiffs here, must provide evidence of rates customarily charged by attorneys who practice *in this submarket. Joaquin v. District of Columbia*, 2016 U.S. Dist. LEXIS 134753 at *6-7 (D.D.C. Sept. 28, 2016) (Lamberth, J.) ("applicant may demonstrate [either] that IDEA proceedings qualify as complex federal litigation … [or] that rates customarily charged by IDEA practitioners in the District are comparable [to those sought]").[3]

---

[3] For the reasons contained in Part I.D of this Opposition, plaintiffs have failed to supply any evidence tending to show that IDEA litigation generally, or this IDEA action in particular, "qualif[ies] as federal complex litigation." *Joaquin, supra*. This is despite plaintiffs' concession that "individual IDEA claims may involve complex or non-complex litigation." Terris Aff. at 84, n. 17.

Plaintiffs have failed to do so. In fact, as they explain in their Motion, plaintiffs "chose to ignore entirely" any attorney's fee cases arising under the IDEA. *See* Terris Aff. at 84, n. 17. And, although the Circuit declined to decide the issue, *see Eley*, 793 F.3d at 105 (Kavanaugh, J., concurring), the weight of district court precedent demonstrates that USAO Matrix rates are more than sufficient to attract competent counsel to handle IDEA cases. *See, e.g., Joaquin*, U.S. Dist. LEXIS 134753 at *9-13 (finding on plaintiff's direct evidence IDEA case sufficiently complex to warrant *Laffey* rates; basing award on 2015-16 USAO Matrix); *Snead v. Dist. of Columbia*, 139 F. Supp. 3d 375, 379 (D.D.C. 2015) ("since *Eley*, however, courts in this jurisdiction have interpreted the decision as strongly suggesting that IDEA matters are infrequently comparable to complex federal litigation, and therefore, full *Laffey* rates should not be awarded in such cases"). Of significance, in the District, the USAO Matrix also serves as the basis for compensating class counsel, such as plaintiffs' counsel here, in institutional reform cases arising under the IDEA. *See, e.g., Blackman v. District of Columbia*, 677 F. Supp. 2d 169, 175-76 (D.D.C. 2010); Exs. 1-2 (attorney's fees-related documents from *Blackman, supra*, and *Petties v. District of Columbia*, No. 95-cv-0148). Because plaintiffs declined to provide any IDEA-specific evidence to rebut this presumption that USAO Matrix rates afford sufficient compensation in even the most complex IDEA cases, the Court should reject their request for Enhanced *Laffey* rates. The Court, instead, should use the rates established by the USAO Matrix.

B.     **The Market for Complex Federal Litigation Involving the District of Columbia Is USAO Matrix Rates.**

Plaintiffs' claims here may be viewed as falling within a discernible category of federal complex litigation involving institutional reform sought against the District of Columbia. These cases are distinguishable from typical complex federal litigation matters in numerous respects, including their high-profile nature, public interest appeal, and prospect for ongoing involvement of class counsel and associated opportunity for post-judgment fee awards. Fee awards in such institutional reform cases historically have been based on the rates maintained under the USAO Matrix, acknowledging the fact that the cases are pursued by attorneys and firms of the highest caliber.

For example, in *LaShawn A. v. Bowser*, No. 89-cv-1754 (TFH), a class action lawsuit seeking reform of the District's child welfare system, the parties executed an agreement explicitly stating that attorney's fees "will be calculated using the [USAO] *Laffey* matrix in effect at the time of service of plaintiffs' fee application[.]" *See* Ex. 3, *LaShawn* Attorney's Fees Settlement Agreement, at ¶ 4.B.[4] Likewise, in *Evans v. Bowser*, 76-cv-293 (ESH), an institutional reform class action challenging the District's system of care for individuals with intellectual and developmental disabilities, the parties routinely resolved fees for staff attorneys at two non-profit public interest firms (Center for Public Representation and University Legal Services) and a partner at the Washington D.C. offices of Holland & Knight using then- current USAO Matrix rates. *See* Ex. 4, *Evans* Attorney's Fees Letters, at 2, 7,

---

[4] Lead Counsel in *LaShawn* received a ten percent bonus to her rate. *See id.*

12-15, 17-20 (correspondence reflecting billing rates from 2011-2015 at USAO Matrix). So too, in class action litigation surrounding the District's arrest of demonstrators during the 2002 IMF-World Bank protests, Robert Deso, then a partner at Deso & Buckley, and Mark Tuohey, while a partner in the District offices of Vinson & Elkins LLP, and later Brown Rudnick LLP, represented individual District of Columbia employees while requesting and receiving compensation at the rates maintained by the USAO Matrix, regardless of those attorneys' billing and compensation rates in other matters. *See* Ex. 5, Decl. of Mark Tuohey (Tuohey Decl.); Ex. 6, Decl. of Robert Deso (Deso Decl.).[5] Finally, as discussed above, in *Blackman-Jones v. District of Columbia*, 97-cv-1629 (PLF), a pair of consolidated IDEA class action lawsuits brought against the District, class counsel the Bazelon Center and Steptoe & Johnson sought and were awarded attorney's fees at the *Laffey* rates set by USAO, despite the fact that the USAO rates were lower than those customarily billed to commercial clients. *Blackman*, 677 F.Supp.2d at 175-76 (D.D.C. 2010); *see also* Ex. 1, *Blackman-Jones* Attorney's Fee Petition Summary (summary of attorneys' fees loadstar in 2014 application). Similarly, in *Petties v. District of Columbia*, 95-cv-0148 (PLF), another class action lawsuit under the

---

[5] In fact, both Mr. Tuohey and Mr. Deso state, based on their considerable experience, that USAO Matrix rates are sufficient to attract capable counsel to complex civil rights litigation. *See* Tuohey Decl. at ¶ 4; Deso Decl. at ¶ 5. Mr. Deso further confirms that *Barham/Chang* was but one of numerous instances where he litigated with or against the District while accepting USAO Matrix rates as compensation. *Id.* at ¶ 4.

IDEA, the plaintiffs sought reimbursement of their attorney's fees at USAO *Laffey* rates. *See* Ex. 2, Mot. for Attorney's Fees in *Petties*, at 8-10.[6]

There are exceptions to this general practice, as plaintiffs will undoubtedly point out. In the case of *Salazar v. District of Columbia*, 93-cv-452 (GSK), class counsel (who also represents plaintiffs here) has been awarded fees at Enhanced *Laffey* rates. *See*, *e.g.*, *Salazar*, 809 F.3d at 63-65. Even in *Salazar*, however, plaintiffs' counsel do not receive these enhanced rates for all work performed on the case. To the contrary, counsel is paid under a tiered rate structure, within which the Enhanced *Laffey* rates only apply to a portion of the services rendered. *See* Ex. 9, *Salazar* Consent Decree, at ¶¶ 64-65 (establishing tiers for attorney's fees, including one that is approximately one-fourth of the LSI-enhanced rate for all work assisting individual class members).[7] This outlier notwithstanding, as the foregoing shows, the market for complex federal litigation involving the District, particularly in the institutional reform context, is more closely aligned with the rates established by the USAO Matrix. Plaintiffs have failed to provide any evidence to the contrary,

---

[6] Other examples include *Jones v. District of Columbia*, 07-cv-1206 (EGS), a class action lawsuit challenging differential treatment of cost-of-living adjustments for workers' compensation recipients, Ex. 7, Revised Billing Statement (confirming counsel seeking attorneys' fees at *Laffey* rates); *Adgerson v. District of Columbia*, 11-cv-1772 (RLW), a lawsuit challenging the constitutionality of the District's interpretation on the Interstate Compact on the Placement of Children, a national foster care agreement, Ex. 8, *Adgerson* Attorney's Fees Letter (Arnold & Porter stating its position that "the *Laffey* Matrix calculation is accurate" for an award of fees); and this case, in which the Court previously declined plaintiffs' invitation to award fees at Enhanced *Laffey* rates over those supplied by the USAO Matrix, *DL v. District of Columbia*, 256 F.R.D. 239, 243 (D.D.C. 2009).

[7] Invariably, a significant portion of work performed in *Salazar* is billed to the District at the lowest rate. *See* Ex. 10 (*Salazar* fee petition).

which is reason enough for the Court to reject their request for Enhanced *Laffey* rates.

### C.   USAO Matrix Rates Most Accurately Reflect the Market for Complex Federal Litigation Generally.

Plaintiffs spend the bulk of their fee petition arguing in various ways that the Enhanced *Laffey* rates they propose accurately reflect the "market for complex federal litigation in Washington, D.C." As explained above, plaintiffs' argument is based on the erroneous assumption that this broader litigation market is relevant despite the fact that IDEA claims as well as structural reform cases against the District form distinct, lower-priced submarkets where, at most, USAO rates generally apply. Even if the Court rejects that reasoning, plaintiffs' contention that Enhanced *Laffey* rates, as opposed to those supplied by the current USAO Matrix, more accurately reflect the actual cost of the litigation services rendered by their counsel is objectively suspect because: (1) much of the work performed by plaintiffs' counsel in this case was not particularly complex; (2) the methodology underlying the current USAO Matrix is far superior at estimating the cost of relevant legal services than the Enhanced *Laffey* approach; and (3) plaintiffs' "market data" is flawed in critical respects that undermine their conclusions.

#### 1.   Much of the work performed by plaintiffs' counsel in this case was not "complex."

Plaintiffs begin their "market" analysis by referring to paragraphs 16-38 and 44-78 of the Affidavit of Bruce Terris (Terris Affidavit) [537-1] by way of arguing that this was a "complex case." Plaintiffs' generalization notwithstanding, much of

the work performed by their counsel in both periods of this litigation was relatively straightforward. For example, the Court has already determined that certain categories of tasks that plaintiffs' counsel performed—tasks for which they billed a considerable amount of time—were "not particularly complex." Among these, the Court included "drafting discovery motions to compel, negotiating with the District in a discovery dispute, and drafting a fee petition." 256 F.R.D. at 243. Of course, plaintiffs engaged in categorically similar tasks during period II. *See, e.g.,* Terris Aff. [537-1] at ¶¶ 46 ("work on the first post-trial fee application"), 51 ("reviewed documents, met with the District, and developed a discovery plan"), 52 ("met with District staff, learned more about the District's databases, negotiated [discovery-related] issues with the District"), 53 ("served three discovery requests … [and] work[ed] through discovery issues"), 55 (fielded "a deluge of telephone calls" from parents of potential class members), 56 ("review[ed] the District's SEDS database," and "drafted an analysis of the facts [derived therefrom]"), 57 ("revised [the] analysis" based on additional documents "and provided the analyses to [experts]"). These sorts of tasks were not complex in period I, and the Court should carry that conclusion forward to its consideration of period II. *Cf. LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (1996) (discussing law of the case doctrine).

Using lower market rates as compensation for the services rendered in period 2 makes particular sense given the shift in plaintiffs' litigation strategy during that period. As plaintiffs consistently acknowledge, after remand and certification of their subclasses, they changed their focus from seeking out systemic deficiencies in

education policy and practice to scrutinizing and categorizing individual children's educational records. *See e.g.* Pls.' Reply Re. Mot. in Limine Re. Pls.' Factual Summ. [464] at 2 (describing period 2 strategy as assessing "the effectiveness of the District's policies" as an analysis of "the District's reported percentages," and "the special education files for individual children"). Although these sorts of tasks may be complex on the spectrum of work performed by educational professionals, on the spectrum of legal services performed by competent litigation counsel, they surely are not. *See* Pls. Opp. to Defs.' Mot. To Exclude [431] at 13 (describing the review as "a commonplace task for lawyers" and not "the type of technical or scientific assessment that requires special expertise"). Even plaintiffs' own evidence recognizes this distinction between complex and non-complex work in the context of customary billing practices. *See* Coburn Aff. [537-68] at ("[l]itigation matters that are not complex typically command a lower hourly rate in the market place"). For these reasons, the Court's prior conclusion that USAO Matrix rates are sufficient for all but the most complex matters should strongly caution against the Enhanced *Laffey* rates plaintiffs seek here. *See* 256 F.R.D. at 243 ("in the typical case the standard [USAO Matrix] has garnered approval").

> ### 2. The assumptions and methodology underlying the current USAO Matrix are far superior at reflecting the cost of relevant legal services to those underlying the Enhanced *Laffey* rates.

The current USAO Matrix has shifted away from the original *Laffey* framework, and it thus differs in critical respects from the Enhanced *Laffey* (or former USAO *Laffey*) approach. *See* Pls.' Mot. at 26; Ex. 11, Declaration of Dr.

Laura Malowane (Malowane Declaration) at ¶¶ 5-10. But the central question for this Court in choosing one over the other is unchanged: Which of the proposed matrices' underlying assumptions "carries more logical force." *Eley*, 999 F. Supp. 2d at 154. For at least three main reasons, outlined by Dr. Malowane in her Declaration, the assumptions and methodology underlying the USAO Matrix not only "carr[y] more logical force," but are also designed to produce more accurate and reliable estimates of the cost of complex federal litigation.

First, the USAO Matrix is based on more current and reliable survey data than any other fee matrix. As Dr. Malowane explains, the 2011 Survey of Law Firm Economics (SLFE) that serves as the starting point for the USAO Matrix was a statistical analysis of "hundreds of lawyers in the Washington, DC area," and incorporated specific safeguards to ensure the survey results were sufficiently reliable, including (among other things) thresholds for acceptable sample sizes. Malowane Decl. at ¶ 14, n. 7.[8] The *Laffey* Matrix, on the other hand, was originally derived from data collected and verified informally by a single attorney in 1989,

---

[8] Plaintiffs quote at length the court's opinion in *Makray v. Perez*, 159 F. Supp. 3d 25 (D.D.C. 2016), which endeavors to disparage the methodology of the 2011 SLFE survey. Pls.' Mot at 28-30. The *Makray* Court's criticism is inapposite because it does not compare the features of the 2011 SLFE with the survey parameters used to gather the data for the Enhanced *Laffey* rates. Additionally, the conclusions the *Makray* Court draws are not based on any specialized or expert evidence, only the court's own sense of what makes for quality statistical surveying. For example, the *Makray* opinion reasons, as plaintiffs point out, that the 2011 SLFE must not "fairly reflect[ ] the rates charged by attorneys engaged principally in complex federal litigation," because it includes "rates charged by attorneys across all practice areas." *Id.* at 51. The court does not, however, provide any support for this inference, and evidence shows that it is easily refuted by comparison to other relevant data points. *See* Malowane Decl. at ¶¶ 17-20, 23-34.

Decl. of Joseph A. Yablonski [537-33], which methodology is inherently unreliable, for reasons too numerous to count, *see* Malowane Decl. at ¶ 15. For example, there is no way to know how Mr. Yablonski selected his sample, whether his sample size was statistically significant, or (in turn) whether it was even remotely representative of the target population. *See id.* at ¶¶ 13 (discussing features of a "proper survey"), 15 (noting flaws in *Laffey* data). Aside from the inherent risks associated with using this data at all, the Enhanced *Laffey* approach has no mechanism for self-correction over time:  Unlike the USAO Matrix, which is based on 2011 (*i.e.*, much more recent) data that will be refreshed as new data becomes available, the original 1989 *Laffey* data has never changed and will not ever do so. *Id.* at ¶¶ 6, 7, 12. This is important because "[t]he more years [a] matrix continues without updating its original data source, the more previous years' forecasting errors may be compounded." *Id.* at ¶ 12.

Second, the USAO Matrix uses an inflation index that better captures the pricing changes of the market for federal litigation. From their respective starting points, both the USAO Matrix and plaintiffs' Enhanced *Laffey* Matrix are adjusted for inflation on an annual basis. Pls.' Mot. at 12-13. For this purpose, the USAO Matrix relies upon a Producer Price Index for Offices of Lawyers (PPI-OL), Malowane Decl. at ¶ 7; the Enhanced *Laffey* Matrix uses the Consumer Price Index for Legal Services (CPI-LS), *id.* at ¶ 9. Both indices are based on national data. *See id.* at ¶ 23. Otherwise, plaintiffs' representation that there are only "slight differences" in these indices, Pls. Mot. at 26 (citing Kavanaugh Decl. ¶ 12), could not

be farther from the truth, Malowane Decl. at ¶¶ 23-33. For example, the CPI-LS measures generic, flat-fee consumer legal services (*e.g.*, wills, uncontested divorces), where the PPI-OL index measures inflationary rates in various areas of legal practice, many of which are federal complex litigation, including constitutional, environmental, and bankruptcy law, *see id.* at 23, and accounts for all types of billing that are commonly used in litigation practice, including hourly rates, contingency arrangements, and discounts, among others. *Id.* at ¶¶ 29-34; *see also* Ex. 12, Declaration of Wallace Christensen (Christensen Declaration) at ¶¶ 11-37 (describing array of common billing practices). Because of the nature of what it measures, the PPI-OL also more accurately captures pricing changes in Washington D.C. *See* Malowane Decl. at 23-27. These differences are neither "slight" nor meaningless; to the contrary, where the Court is obliged to select rates that apply to the relevant market as well as the relevant community of practice, 20 U.S.C. § 1415(i)(3)(C), it would border on irresponsible to employ a matrix whose sampling methodology produces data that is inferior in both respects.

Finally, the USAO Matrix more closely aligns billing rates to attorneys' years of experience. The USAO Matrix employs a total of nine individual experience categories, Pls.' Ex. 24 [537-24], but the Enhanced *Laffey* Matrix has only five, Pls.' Ex. 23 [537-23]. As Dr. Malowane explains, evidence indeed suggests that attorney billing rates rise with experience, with one source reporting marked increases from 21 to 30 years. Malowane Decl. at ¶ 22. Despite this, the Enhanced *Laffey* Matrix includes about half of the experience categories of its counterpart and sets the

maximum compensation at 20 years. As a result, "the USAO Matrix [ ] more accurately capture[s] an individual attorney's fees." Malowane Decl. at ¶ 21. For these reasons, the Court should base plaintiffs' fee award on USAO Matrix hourly rates.

### 3. Plaintiffs' "market data" is flawed in critical respects that undermine their conclusions regarding the efficacy of the Enhanced *Laffey* Matrix.

Plaintiffs contend, as a fall back, that "market data" supplied in connection with their fee petition "show[s] that the [Enhanced] *Laffey* Matrix produces rates that more closely approximate the market than the USAO Matrix." Pls.' Mot. at 31. In sum, the "market data" plaintiffs supply, which is summarized as Exhibit 47 through 49 to their fee petition, mostly consists of select billing rates in bankruptcy matters as depicted in Westlaw Legal Billing Reports, and is supplemented by rates derived from fee applications and exhibits filed in other matters as well as three affidavits from attorneys at local law firms. *See* Terris Aff. [357-1] at ¶¶ 88-89 (discussing process of selecting and compiling data from Plaintiffs' Exhibits 43-45 and 50-68). Not surprisingly, this data yields the conclusion that both the USAO Matrix and the Enhanced *Laffey* Matrix provide lower than average rates (although the latter is closer). On the whole, however, plaintiffs' analysis of this market is flush with methodological problems that call into question its overall reliability. *See, e.g.*, Malowane Decl. at ¶ 16. Additionally, each specific category of data plaintiffs offer is flawed in critical respects, and plaintiffs' assessment of it is faulty in at least one systemic way.

For starters, data reflecting hourly rates in bankruptcy proceedings is particularly unreliable, not only because the rates tend to be the highest rates among all other areas, *Id.* at ¶¶ 37, 18, but also because billing practices in this particular field do not accurately reflect the pressures normally exerted on work done for fee-paying clients in litigation generally, Christensen Decl. at ¶ 22 ("rates submitted to the Bankruptcy Trustee do not reflect the rate pressures exerted on work done for commercial clients," in that there is "no consideration of a discounted rate," no "internal reduction of the time billed," and "no contemporaneous review of invoices"); *accord* Malowane Decl. at ¶ 37 ("in bankruptcy cases there is not an opposing party or paying client that forces attorneys into offering customary discounts"). These factors necessarily skew plaintiffs' "market" in favor of higher rates, an effect that is compounded by the fact that rates derived from bankruptcy proceedings make up approximately two-thirds of the data on which plaintiffs rely. *See id.* (discussing source of data in Plaintiffs' Exhibits 47 and 48). Additionally, plaintiffs elected to exclude, without explanation, the rates for all practitioners with titles other than "partner" or "associate," Terris Aff. [537-1] at ¶ 88(a)(ii), which further distorts their results because it eliminates several instances of attorneys with more modest billing rates, *see e.g.* Pls.' Ex. 44 [537-44] at 4 (biller W. Gregory Mott, listed as "Of Counsel" at Ogletree, Deakins, Nash, Smoak & Stewa, with graduation date of 1991 and rate of $380); Pls.' Ex. 45 [537-45] at 4 (biller Steven Kaiser, listed as "Counsel" at Cleary Gottlieb Steen & Hamilton LLP, with graduation date of 1995 and rate of $205).

The same is true for the hourly rates plaintiffs derive from fee applications and exhibits filed in other matters and from attorneys at local law firms who agreed to serve as plaintiffs' affiants, although for these, plaintiffs are not nearly as forthcoming about their methodology and logical assumptions. For example, Exhibit 47 [537-47] reports the billing rate for an attorney with 20 or more years of experience at Relman, Dane & Colfax as $825, yet Exhibit 57 [537-57], the alleged source of this data, depicts other attorneys in the same experience category with billing rates ranging from $575 to $700. *See* Malowane Decl. at ¶ 38, fn. 24. Plaintiffs offer no explanation for this omission. Likewise, plaintiffs use Exhibit 60 [537-60] to extrapolate billing rates for partners, associates, and paralegals at Mehri & Skalet, Pls.' Ex. 47 [537-47] at 1; the same Exhibit, however, also reports rates across the same categories of professionals at Valli, Kane & Vagnin, yet plaintiffs elected not to include billers from this firm in their analysis, *compare* Pls.' Ex. 60 [537-60] at 6, *with* Pls.' Ex. 47 [537-47]. Notably, the rates for professionals at Valli Kane were markedly lower across all categories than for their counterparts at Mehri & Skalet. *See* Pls.' Ex. 60 [537-60] at 6. Again, plaintiffs offer no explanation for excluding these, and none is immediately apparent.

Beyond these specific faults, the various hourly rates described in plaintiffs' Exhibits 50 to 68 have no bearing whatsoever on the rates that are actually awarded by courts or paid by clients; they only reflect the amount of the request. *See infra* at I.D; Malowane Decl. at ¶ 40. And, with respect to the affidavits plaintiffs sought out specifically for the purpose of their Motion, the rates reported

by the affiants are for "complex federal litigation," which is largely unhelpful without some explanation of the type of matters or work that qualifies, in each affiant's particular case, as sufficiently "complex" to bill at those rates. *See* Pls.' Ex. 66 [537-66] at ¶ 3 ("hourly rates … for complex federal litigation"); Pls.' Ex. 67 [537-67] at ¶ 12 ("my hourly rate for complex federal litigation"); Pls.' Ex. 68 [537-68] at ¶¶ 5-7 (discussing "complex federal litigation" and matters that are "not complex," without defining the distinction). That is in addition to the fact that plaintiffs do not explain how they selected these particular affiants; there is no reason to assume their selections were random, and thus no reason to assume the results are representative of the market on the whole (instead of, for example, only the highest billing attorneys within the market). *See* Malowane Decl. at ¶ 13, 15-16 (discussion selection bias).

Plaintiffs' unreliable data set and imprecise analysis stands in marked contrast to the market analysis proposed by Dr. Malowane, which starts with the most recent broader national[9] SLFE data. *See* Malowane Decl. at ¶¶ 17-20. As explained, the SLFE uses a methodology that controls for selection bias and only reports outcomes where a sample size meets a statistically significant threshold. *Id.* at ¶ 14, n. 7; Pls.' Ex. 38 [537-38] at 5-11 (introduction to 2010 SLFE). According to Dr. Malowane's assessment of the data from this study, the USAO Matrix rates exceed the national average rates charged by attorneys engaged in litigation

---

[9] As Dr. Malowane highlights, plaintiffs' own expert, as well as plaintiffs themselves, take the position that the market for federal litigation is national. Malowane Decl. at ¶ 17, n. 10 (citing Pls.' Ex. 27; Pls.' Mot. at n. 15).

(generally) and approximately align with the top 10 percent of rates reported by all litigators. *Id.* at ¶ 18. The USAO Matrix also produces rates that exceed the rates reported within the submarket for bankruptcy litigation, the specific area on which plaintiffs largely rely and one of the highest paying submarkets according to the SLFE. *See id.* at ¶¶ 19-20. Faced with these results, the Court should not choose plaintiffs' self-serving and unreliable market analysis to define the relevant market for plaintiffs' counsel's services. Rather, the Court should use USAO Matrix rates.

### D.   Plaintiffs Failed to Carry Their Burden to Present Evidence that Lawyers Collect Attorney's Fees at the Enhanced Rates Requested.

As successful IDEA claimants seeking attorney's fees under the Enhanced *Laffey* Matrix, plaintiffs must provide the Court with "evidence that [their] 'requested rates are in line with those prevailing in the community for similar services,' *i.e.*, IDEA litigation," *Eley*, 793 F.3d at 104 (quoting *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995)), or, as discussed above, institutional reform litigation against the District. Such evidence may be found in "(1) surveys [that] update [the matrix]; (2) affidavits reciting the precise fees that attorneys with similar qualifications have *received* from fee-paying clients in comparable cases; and (3) evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases." *Eley, supra* (internal quotations marks omitted) (emphasis added). Plaintiffs have failed as to the first category of evidence, for the reasons explained immediately above; as to the latter two, plaintiffs likewise have not carried their burden.

1. **Plaintiffs fail to provide affidavits reciting the precise fees that attorneys with similar qualifications have in fact received from fee-paying clients in comparable cases.**

As to the second category of evidence, plaintiffs failed to provide affidavits reciting the precise fees that attorneys with similar qualifications have *received* from fee-paying clients in comparable cases. *See also Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1326 (D.C. Cir. 1982) (requiring a fee applicant to state how his attorney "actually billed his time in other cases during the period … for which he seeks compensation from defendant. The rate is not what he would have liked to receive, or what the client *paid* in a single fortunate case, but what on average counsel has in fact *received*." (emphasis added)). Among the more than a dozen affidavits attached to plaintiffs' petition, not one is sufficiently specific to meet this standard.

First, none of the affidavits involves requests for fees in comparable cases. Plaintiffs did not provide the Court with affidavits from any cases under the IDEA, nor any from institutional reform litigation against the District of Columbia. As discussed above, IDEA litigation is a submarket of complex federal litigation in which the most complicated cases, such as class actions like *Blackman-Jones* and *Petties*, allow prevailing parties to recover at the rates set by the USAO Matrix. Additionally, defendants demonstrated above that plaintiffs in institutional reform litigation against the District overwhelmingly recover attorney's fees at USAO Matrix rates. Because plaintiffs failed to provide affidavits suggesting that Enhanced *Laffey* rates are customary *in these types of cases*, they have not

demonstrated the second type of evidence that may otherwise be relevant to the Court.

Second, the affidavits plaintiffs submitted are largely generic and superficial. In addition to the numerous reasons plaintiffs' whole body of evidence is statistically unreliable, *see supra* at 16-18, none of the affidavits plaintiffs submit as Exhibits 66 through 68 indicates any familiarity with the history of the litigation, plaintiffs' counsel's billing rates, plaintiff's counsel's business operations[10], their billing practices, the amount of attorney's fees sought or received by plaintiffs' counsel in other litigation against the District, or any in-depth understand of the Enhanced *Laffey* rate structure. *See* Pierce Aff. [537-66] at ¶ 5 (testifying that he required representations from plaintiffs' counsel to even find out what Enhanced *Laffey* rates are); Lewin Aff. [537-67] (speaking only to his familiarity with his own firms' billing rates and the contents of the *Heller* decision); Coburn Aff. [537-68] at ¶ 11 (indicating that he only "reviewed background information on the experience of the attorneys primarily involved in this litigation"). In fact, plaintiffs' affiants did not even look at, let alone consider in detail, plaintiffs' billing records submitted with their Motion. These affidavits

---

[10] Here, defendants use "operations" to refer to plaintiffs' counsel's overhead, the types of legal matters they handle, the clients they represent, their customary billing practices, their billing software, and their realization rates. The Affidavit of Nathan Lewin, [537-67] purports to address firm overhead, *id.* at ¶¶ 7, 10-11, but does not indicate that the affiant actually knows anything about the overhead of plaintiffs' counsel's firm; the Court should not consider such generalizations for purposes of determining an appropriate billing rate.

should be rejected summarily as insufficiently probative to sustain an award of Enhanced *Laffey* rates.

Third, plaintiffs' reliance on standard billing rates greatly inflates their request. In January 2017, the Georgetown University Law Center for the Study of the Legal Profession released its 2017 Report on the State of the Legal Market (attached as Exhibit 13). In detailing the "largely irreversible" decline of law firms' realization rates over the past decade, Ex. 13 at 2, the report concluded that law firms' "standard rates have long since ceased to have any real significance for most clients. Like 'rack rates' in hotels, standard rates in law firms have effectively become nominal rates that are arbitrarily set and are almost never paid by any significant client." *Id.* at 6; *cf.* Christensen Decl. at ¶¶ 13-23. In other words, the amounts law firms bill differ from the fees they actually *collect* from paying clients. *See also* Malowane Decl. at ¶¶ 42-45 (explaining that reliance on billing rates in "misleading"). This is so for the countless reasons thoroughly explained in Mr. Christensen's Declaration. Christensen Decl. at ¶¶ 13-37. As defendants' expert reports, firms working for corporate or other paying clients generally can expect to recover (or realize) 83 percent of their published billings rates; however, based on his thorough review of a portion of plaintiffs' invoices, *see infra* at Part II.A.1., Mr. Christensen opines that plaintiffs' counsel here could reasonably expect to collect considerably less in light of the serious deficiencies in their bills. *See* Christensen Decl. at ¶¶ 24-37, 136-38, 139 ("Giving the Plaintiffs the benefit of the doubt on the

charges I did not review in detail, I am of the opinion that it would be reasonable to apply a 70 percent realization rate to those charges").

In seeking Enhanced *Laffey* rates, plaintiffs' filing totally ignores this well established fact of law firm billing practice. But the Court should not be blind to business reality. *See CREW v. US DOJ*, 80 F. Supp. 3d 1, 5 (D.D.C. 2015) (noting that clients rarely pay standard billing rates for a variety of reasons). None of the affidavits plaintiffs supply speaks to the amount of fees "received," *Eley*, 793 F.3d at 104; instead, they focus almost entirely on amounts billed or charged. *See* Bravin Decl. [537-50] at ¶ 6 (describing the rates "applied in billing its clients"); Goldsmith Decl. [537-51] at ¶¶ 7-8 (indicating that the rate requested were "billing rate[s]" for "contingent cases" and thus not the rates received from paying clients); Clement Decl. [537-52] at ¶ 24 (indicating that the amounts sought are amounts "billed at 2011 rates");[11] Hearne Decl. [537-53] at ¶¶ 5, 7, 11, 25 (discussing only amounts billed and charged to clients); Davidson Decl. [537-54] at ¶¶ 5, 8, 13, 14 (testifying to familiarity with billing rates, "hourly rates typically charged by firms[,]" "rates charged or sought by firms[,]" "rates that are charged for defense work in the employment field");[12] Supplemental Davidson Decl. [537-55] at ¶¶ 16-17 (confirming that lawyers in complex litigation "have accepted *Laffey* rates" but beyond that discussing "average billing rates" only); Relman Decl. [537-56] at ¶¶ 14-21

---

[11] The Clement Declaration does indicate that his law firm "bills and collects" for one of its associates.

[12] In his fifteen page declaration, Mr. Davidson identifies only one instance where he asserts a lawyer was "awarded" a fee at Enhanced *Laffey* rates. Davidson Decl. at ¶ 18.

(outlining only the amounts billed and charged by the firm); Cacace Decl.[537-57] at ¶¶ 14-15 (describing the amounts her law firm "customarily charges to its paying clients" and her own "billing rate"); Email from Meghan Largent [537-59] (confirming for plaintiffs' counsel the amount "requested"); Mehri Decl. [537-60] (lacking content regarding hourly rates received from paying clients); Light Decl. [537-62] at ¶¶ 6-8 (testifying that while his retainer agreement reflects rates at Enhanced *Laffey* rates, those clients also receive discounts in the form of hourly caps, pro bono representation, or contingency fee arrangements and further that once a court awarded him Enhanced *Laffey* rates); Miller Aff. [537-63] at ¶¶ 11-12 (indicating that she handles cases on a contingency basis and at discounted rates but that her retainer agreement "bases its customary hourly rate" on Enhanced *Laffey* rates; notably, it does not affirm that she receives payment at the Enhanced *Laffey* rates); Amunson Decl. [537-64] at ¶¶ 11, 14-16 (discussing only rates billed or charged); Corn-Revere Aff. [537-65] at ¶ 10 (identifying only a billing rate); Pierce Aff. [537-66] at ¶ 3 (describing only the amounts Akin Gump and other law firms in Washington, D.C. charge); Lewin Aff. [537-67] at ¶¶ 12-13 (identifying only a billing rate and an amount "charged"); Coburn Aff. [537-68] at ¶¶ 5, 15 (testifying only as to his own hourly billing rate and billing rates generally).[13]

---

[13] The Colapinto Declaration [537-61] does indicate that one of its clients "has been charged and paid fees … at the hourly standard market rates[,]" *id.* at ¶ 12; however, it also goes on to state that it "discounts its hourly rate" and has a "policy of regularly charging clients reduced fees, or working purely on a contingency/fee shifting basis[,]" *id.* at ¶¶ 14-15. This demonstrates that a single client paying the standard rate is the exception rather than the rule.

Quantity is not an adequate substitute for content. Whatever rates lawyers elect to bill or charge their clients is irrelevant for purposes of this analysis. The question is what do they "receive" or collect from paying clients, as the Circuit has clearly instructed. *Eley*, 793 F.3d at 104. The affidavits proffered by plaintiffs fail on this point. Because the affidavits lack evidence—except for a single anecdotal instance, *supra* at n. 13—that lawyers in fact realize fees at Enhanced *Laffey* rates, plaintiffs fall far short of their burden of establishing entitlement to such rates.

### 3. Plaintiffs fail to provide evidence of recent fees awarded by the court or through settlement to attorneys with comparable qualifications handling similar cases.

Plaintiffs' evidence under the final method of proving entitlement to their preferred rates—"evidence of recent fees awarded by the court or through settlement to attorneys with comparable qualifications handling similar cases"—is equally unavailing. *Id.* Plaintiffs identify only three cases in which a court awarded Enhanced *Laffey* rates, and none constitutes a "similar case[.]" *Eley*, 793 F.3d at 104.

First, plaintiffs cite to *Salazar*. As noted above, however, *Salazar* is unique. *See supra* at I.B. The *Salazar* consent decree provides for Enhanced *Laffey* rates for only a portion of the work done by plaintiffs' counsel. No such agreement by the parties binds defendants here. Moreover, *Salazar* is not a case under the IDEA, and as the D.C. Circuit noted in *Salazar V*, IDEA cases constitute a "submarket in which attorneys' hourly fees are generally lower than the rates in either [the Enhanced *Laffey* Matrix or the USAO Matrix]." *Salazar*, 809 F.3d at 64. In short,

25

whatever animated the Circuit's decision in *Salazar* is irrelevant here; the case is inapposite in more ways than one.

Second, plaintiffs identify *Electronic Privacy Information Center v. Department of Homeland Security*, 2016 WL 3919810, *3 (D.D.C. 2016), in which the United States agreed—for the first and only time—to pay fees at Enhanced *Laffey* Matrix rates. Pls.' Mot. at 16. But a federal FOIA case is not similar in any meaningful respect to an IDEA class action; at least plaintiffs have not demonstrated otherwise, which again, is their burden, not the District's. As to any agreement to Enhanced *Laffey* rates, defendants would have no basis to know what motivated the United States, but it is noteworthy, in any event, that the court applied a 35 percent reduction to the lodestar, *id.* at *4, followed by steep cuts to account for plaintiff's lack of success and an excessive request for fees-on-fees, *id.* at *5. Ultimately, the court awarded the FOIA plaintiff less than 20 percent of its original fee request, *id.* at *6, suggesting that the question of the appropriate rate was not guiding the United States' strategy in this particular matter. Regardless, the *EPIC* case is an anomaly and does not reflect any judicial analysis regarding the application of the Enhanced *Laffey* Matrix rate.

Finally, plaintiffs cite to *Makray v. Perez,* 159 F.Supp.3d 25 (D.D.C. 2016), a Title VII case in which Chief Judge Howell awarded attorney's fees at Enhanced *Laffey* Matrix rates. *See* Pls.' Mot. at 15-16. In doing so, however, the court was careful to distinguish the *Makray* claims from those under the IDEA, recognizing that IDEA litigation is a submarket that entitles prevailing parties to rates that are

generally lower. *See* 159 F.Supp.3d at 36-38. Although not controlling, this distinction is equally relevant here. Because IDEA litigation constitutes a submarket in which the most complicated matters are awarded fees, at a maximum, using USAO rates, and because Chief Judge Howell exercised care to distinguish IDEA litigation from the type of claims at issue in *Makray*, the decision should not be taken as persuasive evidence supporting plaintiffs' request for Enhanced *Laffey* rates. This is in addition to the analytical problems inherent in the *Makray* decision, which defendants discuss above. *See supra* at 12, n.7.

For all these reasons, plaintiffs have not provided probative evidence to justify their Enhanced *Laffey* rates, and the Court should therefore base plaintiffs' award on USAO Matrix rates.

## II.   2012 USAO *Laffey* Rates with Interest Should be Used for Period 1, and Current USAO Matrix Rates Should Apply for Period 2.

Although plaintiffs structure their fee petition by separating it into two litigation periods, "they seek compensation [for both periods] based on current hourly rates … to account for the delay in payment." Terris Aff. [537-1] at ¶ 84 (citing *Missouri v. Jenkins*, 491 U.S. 274, 283-284 (1989)). The Court should not award fees at current rates for period 1. Instead, it should award fees at 2012 *Laffey* rates with interest.

In *Missouri v. Jenkins* the Supreme Court characterized an award of historical fees at current rates as "an enhancement" that should be awarded when "appropriate[.]" 491 U.S. at 282. "If compensation for delay is necessary to provide a reasonable fee, it may be made 'either by basing the award on current rates or by

adjusting the fee based on historical rates to reflect its present value.'" *West v. Potter*, 717 F.3d 1030, 1034 (D.C. Cir. 2013) (quoting *Perdue*, 130 S.Ct. at 1675)). Here, the Court should award fees from period 1 at 2012 USAO *Laffey* rates and apply interest to adjust the historical fees to reflect their present value.

Historical rates with interest fairly reward plaintiff's counsel's reasonable work from period 1. Because plaintiffs structured their fee petition in two, distinct periods, doing so is administratively straightforward. The Court need only refer to plaintiffs' Exhibit 4 [537-4], make the appropriate reductions, and apply the interest rate.[14] Defendants acknowledge that historical rates with interest result in a smaller award of attorney's fees to plaintiffs' counsel for period 1, but doing so is nevertheless appropriate because the interest awards the "recipient of the value of the use of the [deferred] money." *Copeland*, 641 F.2d at 893. Additionally, defendants are not responsible for any delay in plaintiffs' receipt of fees from 2012 to the present. Rather, if cause for the delay during the early stages must be attributed to any party, it belongs to plaintiffs, given that it was they who structured the original class in a manner that failed to comply with Rule 23.

For these reasons, defendants request the Court award fees from period 1 at 2012 USAO *Laffey* rates with .18 percent interest.

---

[14] Defendants request an interest rate of .18 percent reflecting the interest rate as set by the Federal Reserve on April 30, 2012, the day that plaintiffs filed their initial fee petition. *See http://www.utd.uscourts.gov/documents/int2012.html* (last visited February 10, 2017).

III.   **Plaintiffs' Requested Fees Should Be Reduced Significantly.**

Plaintiffs bear the burden of establishing that their request encompasses time that is reasonably spent. *See Covington*, 57 F.3d at 1107. And "the amount of time *actually* expended is [not necessarily] the amount of time *reasonably* expended." *Copeland*, 641 F.2d at 891 (emphasis in original); *Hensley*, 461 U.S. at 434 ("Hours that are not properly billed to one's *client* … are not properly billed to one's *adversary*." (emphasis in original)). Therefore, parties requesting fee awards are wise to exercise "billing judgment" by "mak[ing] a good faith effort to exclude … hours that are excessive, redundant, or otherwise unnecessary." *Id.* (quoting *Copeland, supra*). When they fail to do so, courts should exercise their discretion to exclude hours not reasonably expended. *See id.* Plaintiffs' fees are unreasonable in numerous ways and should be reduced accordingly.

A.   **Plaintiffs Bill an Unreasonable Number of Hours for Many Tasks.**

1.   **Plaintiffs' invoices are excessive for the work performed.**

Defendants retained Wallace A. Christensen, a veteran trial lawyer with law firm management experience in the District of Columbia, to review a portion of plaintiffs' invoices, provide a detailed analysis of them, and determine whether the time plaintiffs expended on various billed tasks was reasonable. Christensen Decl. at ¶ 7. Mr. Christensen is a former partner at the Washington, D.C., offices of Troutman Sanders, where he specialized in civil litigation. *Id.* at ¶ 2. He has extensive experience regarding issues relating to law firm billing rates and practices and substantial personal knowledge concerning what paying clients

consider reasonable and unreasonable legal expenses. *See id.* at ¶¶ 4-6. The details

of his 38-year legal career are summarized in his Declaration. *Id.* at ¶¶ 1-4.

Focusing specifically on plaintiffs' invoicing for period 2, Mr. Christensen

identifies significant unreasonable inflation in plaintiffs' records that commercial or

paying clients would flatly reject.[15] For example, he recommends reducing the total

amount plaintiffs request for their appellate work in 2011-12 ($540,615) by

$180,204, based on numerous instances of duplication as well as gross redundancy

in plaintiffs' counsel's staffing and preparation. *See id.* at ¶¶ 43-62. Mr. Christensen

also suggests a reduction of approximately $61,155 to account for inefficiencies in

the preparation of plaintiffs' attorney's fees petition in 2012, for which plaintiffs

seek to recover more than $130,000, solely for generating their initial brief, *see id.*

at 63-72.[16] Among other things, this particular reduction accounts for the fact that

_____

[15] Mr. Christian also discusses the appropriate billing rate that should apply to the work performed by plaintiffs' counsel. He explains why plaintiffs' request for Enhanced *Laffey* Matrix rates exceeds what a client would pay, describing why a law firm's stated billing rates are often not the rates at which its attorneys are paid, Christensen Decl. at ¶¶ 11-33, and he specifically notes the wealth of evidence that explains how law firms discount their reported rates for paying clients. *Id.* at ¶¶ 13-20. Based on this, Mr. Christensen opines that, as a starting point, in order to base plaintiffs' award on rates "comparable to their peers," they should receive 90 percent of USAO Matrix rates minus the reductions for the hours he specifically identified in his review as unreasonably expended. *Id.* at ¶ 21. As mentioned above, for the remainder of plaintiffs' time (*i.e.*, the entries Mr. Christensen did not review in detail), Mr. Christensen recommends application of a 70 percent realization rate, which would be conservative based on his analysis. *See* Christensen Decl. at ¶¶ 24-37, 136-38, 139.

[16] This does not include the nearly $200,000 plaintiffs request for preparing the affidavits and exhibits in support of their 2012 fee application, *see* Christensen Decl. at ¶ 63; Mr. Christensen recommends considerable cuts to this figure as well, *id.* at ¶¶ 73-81.

more than one-third of plaintiffs' petition, including the majority of their counsel's legal research and many of their supporting exhibits, were lifted directly from attorney's fees briefing filed by the same attorneys in *Salazar v. District of Columbia*, *see id.* at 64-72, Ex. 9 (redline of 2012 fee petition with lifted passages highlighted). Plaintiffs' counsel have already been compensated for this work, *see, e.g., Salazar v. District of Columbia*, 750 F. Supp. 2d 70 (D.D.C. 2011), and their attempt to double-bill District taxpayers for the same work, at a minimum, should be soundly rejected.

Unreasonable expenses like these span the numerous categories of plaintiffs' invoices that Mr. Christensen examined, including plaintiffs' counsel's class certification briefing, preparation of expert reports, attendance at depositions, and trial and pretrial preparation, among countless others. *See id.* at ¶¶ 34-114. Based on his analysis, Mr. Christensen concludes that nearly 40 percent of the hours billed by plaintiffs' attorneys in period 2 are unreasonable. *Id.* at ¶ 141; *see also Eureka Inv. Corp. v. Chi. Title Ins. Co.*, 743 F.2d 932, 941-42 (D.C. Cir. 1984) (explaining that "special caution" is required when private lawyers seek fees from the government because of the incentives that the public treasury's "deep pocket offers to attorneys to inflate their billing charges and to claim more as reimbursement then would be sought or could be reasonably be recovered from most private parties"). Mr. Christensen's Declaration is thorough and detailed in its analysis, revealing systemic overbilling, overstaffing, and inefficiency throughout plaintiffs' work on this case. It justifies a substantial reduction.

### 2. Plaintiffs should not be reimbursed for block-billed tasks.

A lawyer should not "lump together multiple tasks" when billing because this practice makes "it impossible to evaluate [each task's] reasonableness." *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 971 (D.C. Cir. 2004). In the Opposition to plaintiffs' request for fees in 2012 [343], defendants outlined how plaintiffs' lawyers and paralegals block billed nearly 15 percent of the total time billed in the case. *See id.* at 19-20. Regrettably, plaintiffs continued this objectionable practice during period 2.

Even a cursory review of the billing entries from period 2 reveals that plaintiffs routinely block bill. *See* Pls.' Ex. 12 [537-12]. A few of the more egregious examples include:

- 11.817 hours billed by JML as "Edit brief; legal research; phone comm w C Mehri re edits to draft; comm w TAG re ascertainability research; comm w JDP re cite checking; comm w MLH re edits to brief and feedback; comm w J Gutman re feedback; notes re possible edits[.]" *Id.* at 4, entry no. 72.

- 3.1 hours billed by TAG as "Draft letter to clients re oral argument and individual relief; draft cover email to Jeff Gutman and Margy Kohn; call with Margy Kohn; call with BJT; confer with JML[.]" *Id.* at 32, entry no. 581

- 7.3 hours of time billed by ET as "Confer with BJT re timeslip exhibit; confer with CSP re exhibits; confer with JDP re updated exhibits for application; confer with LLB re finalizing affidavit exhibits for Dunst and Cupingood; review affidavits of experts and co counsel; review plaintiffs' brief[.]" *Id.* at 50, entry no. 867.

- 5.817 hours of time billed by PAS as "Email to ARK re expenses challenged by District; review challenged expenses and draft corresponding sections of Second Affidavit of BJT; review and implement BJT edits to Second Affidavit of M Kohn; review and implement BJT edits to rebuttal exhibit to defendants' Exhibit D; review and implement BJT edits to Second Affidavit of J Gutman; additional revisions to rebuttal exhibit defendants' Exhibit D; additional edits

to M Kohn affidavit addressing rebuttal exhibit; memo to BJT re revised Kohn affidavit and rebuttal exhibit[.]" *Id.* at 63, entry no. 1067.

- 7.450 hours of time billed by TAG as "Intergrate [sic] M. Kohn comments to deposition outline; confer with M. Kohn re same; review and edit outline; review exhibits; confer with BJT re deposition[.]" *Id.* at 160, entry no. 2565.

- 6.267 hours of time billed by JML as "Comm w TAG re motion for extension, answer, motion for stay; review def petition and motion for stay; legal research re 23f; notes re petition; review BJT comments re petition; review motion for extension of time[.]" *Id.* at 328, entry no. 5650.

In addition to its general impropriety, plaintiffs' repeated use of block billing presents significant problems because many entries within the block suffer from other defects, such as vagueness, redundancy of work, or consisting of clerical work. As a result, it is impossible for the Court or defendants to determine how much of the block of time reflects time properly devoted to compensable activities and extract the objectionable, non-compensable time. This also justifies a considerable reduction in plaintiffs' total award.

### 3. Many billing entries are impermissibly vague.

Billing records should be kept in "sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended[.]" *Role Models*, 353 F.3d at 970. Defendants lodged this objection to the period 1 billing records when opposing the 2012 fee petition. *See* Opp. [343] at 20-21. Yet plaintiffs continued the practice in period 2. Examples include:

- .250 hours were billed by BJT as "Read relevant case[.]" Pls.' Ex. 12 [357-12] at 7, entry no. 127.

- .167 hours were billed by BJT as "Confer with TAG re new issues[.]" *Id.* at 163, entry no. 2617.

- 1.583 hours were billed by BJT as "Confer with TAG re LES deposition[.]" *Id.* at 176, entry nos. 2852-2853.

- 38.55 hours were billed by JPB as "Excerpt exhibits[.]" *Id.* at 249, entry nos. 4152-4156.

These types of entries simply lack the necessary and appropriate detail to allow the Court and defendants to verify that the work in question was reasonable and necessary, and they too justify a significant reduction in any award of fees.

### 4.   Plaintiffs over-lawyer tasks.

Duplication of work provides grounds to reduce fees. *See Role Models, Inc.*, 353 F.3d at 972. Defendants identified duplication in plaintiffs' bills during period 1 when opposing the 2012 fee petition.[17] *See* Opp. [343] at 21-22. As explained in the Christensen Declaration, however, duplication continued into period 2. For example, plaintiffs seek reimbursement for three attorneys' attendance at meetings, and both Mr. Gluckman and Ms. Seffel billed for time reviewing the same deposition transcripts. Christensen Decl. at ¶ 72. This is but one example of many.

More troubling, though, plaintiffs conducted excessive—and no doubt duplicative—work on various issues in the case. In a prime example, plaintiffs billed 282 hours of time—more than seven 40-hour work weeks—for legal research conducted in connection with their brief before the D.C. Circuit. Christensen Decl. at ¶ 43. In analyzing this, Mr. Christensen noted that a former TPM associate, Mr.

---

[17] Based on defendants' objections in 2012, plaintiffs voluntarily excluded some of this duplication from the fees for which they now seek reimbursement.

Tabesh, spent 136.47 hours of time doing research. *Id.* He also spent ten hours on a memorandum to Mr. Terris regarding his research plus an additional seven hours consolidating his research into an outline plus another nine hours organizing his research specifically for two colleagues who wrote plaintiffs' appellate brief. *Id.* at ¶ 44. Despite these efforts, and despite the fact that plaintiffs enjoyed the benefits of Mr. Tabesh's extensive research and his organization, three other TPM lawyers spent an additional 140.7 hours researching class certification issues. *Id.* at ¶ 45. This type of excessive research is no doubt rife with duplication and raises troubling concerns regarding the volume of billing presented in plaintiffs' fee petition to the District's taxpayers.

### 5.    Plaintiffs improperly bill for clerical tasks.

"Clerical work is not compensable." *Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbitt*, 752 F.Supp2d 1, 9 (D.D.C. 2010) (citations omitted); *Role Models*, 353 F.3d at 973. Plaintiffs include in their fee petition billing records that reflect numerous clerical tasks. For period 1, defendants refer the Court to its earlier briefing that identifies numerous clerical tasks for which plaintiffs seek fees. *See* Opp. [343] at 22-23. In period 2, the problem continues:

- .917 hours of time were billed by ERG as "Assemble invoices in chronological order for TAG and combine invoices into 2 files by expert[.]" [343] at 173, entry no. 2795.

- .133 hours of time were billed by ERG as "Download new SEDS doc production, save, and email LES re location of documents[.]" *Id.* at 128, entry no. 2076.

- 2.517 hours of time were billed by ERG as "Continue downloading SEDS docs cited in sample analysis. *Id.* at 193, entry no. 3157.

- Over 17 hours of time were billed by LLC, ERG, and CAN under the subcategory of "Documents/Database Management." *Id.* at 87, entry nos. 1446-1447; at 286-287, entry nos. 4836-4851.

- Plaintiffs include "case management" as a billable category, when the work consists of nothing more than maintaining and sorting electronically filed documents. *See* Terris Aff. at ¶¶ 38(mm), 75(l), 77(oo), and 78(c).

A paying client would refuse these charges. *See* Christensen Decl. at ¶ 96. The fact that paralegals performed a great deal of the clerical work in question does not alter its impropriety. "[P]urely clerical or secretarial tasks should not be billed at a paralegal rate regardless of who performs them." *Missouri*, 491 U.S. at 288 n. 10. Plaintiffs request should be reduced to account for this error as well.

### B.  Plaintiffs Improperly Bill for Matters In Which They Failed to Prevail.

Plaintiffs' invoice contains time spent on categories of work in which they were not successful. Plaintiffs should not be compensated for this work, which can be broken down into two categories. The first category is plaintiffs' unsuccessful claims, and the second is plaintiffs' unsuccessful litigation strategies. Fees should be denied as to both.

Courts disallow fees related to unsuccessful claims that are reliant on a specific set of facts and a distinct legal theory. *Hensley*, 461 U.S. at 435. Here, plaintiffs advanced three unsuccessful claims that warrant reduction to their overall fee award: claims of subclass 2; Rehabilitation Act claims from March 22, 2010, to the present; and plaintiffs' claim for individual relief. Defendants obtained summary judgment on the first two [444], and plaintiffs abandoned the third. As a result, plaintiffs have no basis to seek fees associated with any work related to

36

those claims. Although the subclass 2 and Rehabilitation Act claims require the Court to use its discretion to make a percentage reduction to plaintiffs' fees, plaintiffs should recover none of the $155,053.31 worth of Enhanced *Laffey* Matrix rate fees requested for their work related to individual relief. The Court should decline to award any fees for these billing entries.

As to the second category, unsuccessful litigation strategies, the Court may—in its discretion—reduce or decline to award fees for unsuccessful work in the case if it is unrelated to plaintiffs' ultimate success. *See Fox. v. Vice*, 563 U.S. 826, 834 (2011). Here, plaintiffs spent considerable time related to two types of work that were unsuccessful: defense of defendants' appeal in 2012-2013 and efforts towards settlement. As to the appeal, defendants acknowledge that plaintiffs voluntarily reduced their fees related to the appeal by 25 percent. *See* Terris Aff. at ¶ 69(a). But that presumes that plaintiffs were merely 25 percent unsuccessful. Defendants prevailed in totality in their appeal, justifying denial of any related appellate fees for plaintiffs.

Second, plaintiffs spent a substantial amount of time on settlement efforts—invariably at their initiation and on their terms. *See* Pls.' Ex. 5 [537-5] at 52; Pls.' Ex. 11 [537-11] at 47-48; Mehri Aff. [537-17] at ¶ 12. But no settlement discussions have ever succeeded in this case given the gulf between the parties' views of the law and the facts. For that reason, the Court should considered plaintiffs as non-prevailing parties as it relates to time devoted to settlement, which justifies exclusion of these fees entirely. *See Cobell v. Norton*, 407 F.Supp.2d 140, 156

(D.D.C. 2005) (denying fees associated with mediation and settlement to a plaintiff who had secured a "stunning" victory).

For these reasons, the Court should exclude or significantly reduce plaintiffs' fees related to the unsuccessful aspects of this litigation.

### C.   Plaintiffs Fail to Exercise Reasonable Billing Judgment.

In their Motion, plaintiffs state they do not seek compensation for $662,729.26, "in an exercise of billing judgment[.]" Pls.' Mot. at 32-33. This amount—reflecting approximately 5.5 percent of plaintiffs' total bill—does not represent an exercise of reasonable billing judgment. An appropriate reduction, as suggested in one of plaintiffs' own exhibits, is closer to 25 percent.

The modest 5.5 percent reduction is unreasonable because rather than reduce for categorical reasons,[18] plaintiffs simply excluded many fees that are demonstrably unreasonable or unrecoverable. For example, Exhibit 7 [537-7] reflects that plaintiffs are not seeking reimbursement for tasks such as "Process ECF Filings" and "Lobbying." Further, the reductions listed under Exhibit 9 [537-9] were made only after defendants objected to them in briefing regarding plaintiffs' 2012 fee petition. In other words, the reductions in Exhibit 9 are simply charges that should never have been requested from defendants in the first place. Finally, Exhibit 13 [537-13] lists the expenses from period 2 that plaintiffs chose to exclude.

---

[18] As an example, defendants note above that plaintiffs' block billing is pervasive. Additionally, defendants point to the excessive amounts of over-lawyering time spent on tasks such as endlessly researching the same class certification issues. Each of these examples, though not the only two, should justify substantial reductions based on reasonable billing judgment; however, plaintiffs chose not to exercise such judgment.

Once again, however, these consist of fees that never should have been included in the first place: reviews of expenses and invoices, internal communications, attendance of extra personnel at appearances, clerical tasks, and non-work-related travel. Writing off such improper charges does not demonstrate "billing judgment;" rather, it is conduct required by an attorney's ethical responsibilities.

Plaintiffs' billing practices stand in sharp contrast to the examples of reasonable billing judgment that plaintiffs' own affidavits describe. For example, in the Declaration of Megan Cacace [537-57], Ms. Cacace, a partner at Relman Dane & Colfax, stated that she exercised billing judgment in a matter she handled by the following: (1) excluding time from attorneys (including senior partners) other than herself and her associate, to the tune of over half a million dollars in reductions; (2) excluding the work of supporting attorneys from the Washington Lawyers' Committee, notwithstanding their important contributions to the case; (3) excluding all paralegal work other than those with primary responsibilities in the case; (4) excluding all attorney and paralegal time for depositions and hearings, other than the attorney who took or defended the deposition or argued at the hearing; (5) removing all time associated with work on motions where plaintiffs did not at least partially prevail; (6) cutting all attorney and paralegal time for tasks that could be described as "clerical" in nature; (7) excluding travel time; (8) eliminating time spent responding to press inquiries; and (9) exclusion of time required by Ms. Cacace's associate to get up to speed on the case when she joined the law firm. *Id.* at

¶¶ 17-29. This reasonable billing judgment resulted in a nearly 25 percent reduction of her fee petition in that particular case. [537-57] at ¶ 29.

Plaintiffs, on the other hand, include all the time of attorneys and paralegals who billed at least 10 hours on the case, Terris Aff. [537-1] at ¶ 33, a negligible distinction that appears to have resulted in the exclusion of less than half an hour of time. Further, unlike Ms. Cacace, plaintiffs seek fees for work on all motions, regardless of their success.[19] They also seek to recover for clerical tasks, such as "saving new District production document[,]" Pls.' Ex. 12 [537-12] at 129, entry nos. 2079 & 2083, and "assembl[ing] invoices in chronological order[,]" *Id.* at 173, entry no. 2795.[20] Finally, unlike Ms. Cacace's exercise of billing judgment, plaintiffs here seek recovery for all supporting attorneys' work on the case, even though Mr. Gutman had not been significantly involved but for the early stages of the case (and withdrew years ago), and even though Mr. Mehri did little more than review materials related to class certification and *unsuccessfully* encourage the parties to settle.

In totaling plaintiffs' voluntary write-offs, only five percent of their charges are reduced. And, as explained, the majority of those write-offs were not billed properly in the first place. In contrast to the billing judgment exercised by plaintiffs' own affiant, Ms. Cacace, in which she reduced a two million dollar fee petition by

---

[19] Unlike the 2012 fee petition, and apparently only "[t]o simplify matters," plaintiffs now elect to forgo all fees denied by the Court in connection with plaintiffs' 2008 motion to compel.

[20] These are, of course, merely examples; the billing records contain numerous other entries that are clerical in nature.

almost 25 percent, plaintiffs' failure to exercise like billing judgment here justifies an additional, significant reduction of their fees.

**D.**  **Margy Kohn's Fees Should Be Reduced Substantially.**

Billing issues in Ms. Kohn's invoices justify a reduction in her fees. Like her colleagues, Ms. Kohn seeks attorney's fees at Enhanced *Laffey* Matrix rates; however, defendants have demonstrated why 2012 *Laffey* rates plus interest should apply to period 1 while current USAO Matrix rates should apply for period 2. Defendants previously challenged many of Ms. Kohn's billing entries from period 1 [343-5] and reassert those objections here. During period 2, while Ms. Kohn's entries reflect less vagueness in their descriptions and block billing, she continues to bill unrelated matters to this case. For example, below are six entries Ms. Kohn bills for work related to the *Blackman-Jones* lawsuit.

| | | |
|---|---|---|
| 3/19/2014 | Telephone call: with Todd Gluckman re discovery requests for emails, schedule for depositions, SJ motions or not, trial schedule, expert reports, Catania proposal to change 120 days to 60 days, BJ status conference report | 0.5 |
| 3/19/2014 | Attend Status Conference before Judge Friedman in BJ case in order to report to co-counsel info relevant to DL litigation | 2.7 |
| 3/24/2014 | review and edit Notes for Status conference in BJ on March 19 for co-counsel | 0.6 |
| 9/22/2014 | email BJ motion to terminate consent decree and dismiss Jones portion of case to co counsel with exhibits | 0.1 |
| 9/28/2014 | Reviewed BJ motion to terminate and confer with co counsel re definitions of compliance to be used in DL | 0.7 |

| 11/18/2014 | Review Sundram report to Court in BJ for information useful to DL | 0.6 |

This time should be excluded because the issues in *Blackman-Jones*—the timely implementation of Hearing Officer Decisions and Settlement Agreements— are not part of this lawsuit nor are they relevant to it. Additionally, on May 23, 2013, Ms. Kohn billed a tenth of an hour to updating her resume; this should not be recoverable. Finally, the majority of Ms. Kohn's work in this case consists of consultation and review. Given the seventeen TPM lawyers who staffed this case over its lifetime, her additional time appears cumulative and unreasonable. *See*, *e.g.*, *Salazar v. District of Columbia*, 991 F.Supp.2d 39, 53 (D.D.C. 2014) ("This Court has commented previously on the tendency of [TPM] to over-staff their work"); *In re Olsen*, 884 F.2d 1415, 1429 (D.C. Cir. 1989) ("The hourly rates charges are of such magnitude that the attorneys should have been able to decide on the proper strategy without the great number of strategy conferences attended by numerous firm lawyers."). Accordingly, Ms. Kohn's bill warrants a significant reduction.

### E.   Jeffrey Gutman's Fees Should Be Denied.

Professor Jeffrey Gutman requests that the Jacob Burns Community Legal Clinics of The George Washington University receive reimbursement for 399.333 hours of time billed by Professor Gutman and his students related to this case. *See* Pls.' Ex. 15 [537-15]. The Court should exclude all these fees because they are unreasonable and should have been eliminated as an exercise of reasonable billing judgment.

First, Professor Gutman seeks fees at Enhanced *Laffey* Matrix rates. Defendants have already explained why Enhanced *Laffey* Matrix rates are the inappropriate market rate for work in this case; however, it takes on a greater focus regarding Professor Gutman's bills. His requested compensation in this case amounts to less than three weeks of time, when work on this case appears to have begun fourteen years ago in 2003. *See id.* at 10. Of that time, all but seventy-five minutes of it occurred more than five years ago. *Id.* at Attachment 7. Additionally, other than a few hours' worth of newspaper research in 2011, no clinic student has worked on this case since 2007. No justification exists for awarding work done by law students more than a decade ago—for which they received school credit, not to mention practical legal experience—especially when plaintiffs seek current Enhanced *Laffey* Matrix rates for that work.

Additionally, when it comes to the entries themselves, the vast majority of Professor Gutman and his students' bills are frequently deficient. In many instances, they could not be vaguer:

- 9 hours billed by law student Blackshke on February 2, 2004, as "Made more calls; worked on complaint." [537-15] at 13.

- 10 hours billed by law student Altun on March 1, 2004, as "Attended team meetings." *Id.*

- 1 hour billed by Professor Gutman on August 14, 2005, as "Drafting letter to Dan Rezneck." *Id.* at 15.

Professor Gutman also includes time attending hearings and meetings when plaintiffs already bill for other attorneys who attended the same hearings and meetings. *Compare* Pl. Ex. 15 [537-15] at 30 *with* Pl. Ex. 12 [537-12] at 73, entry

nos. 1212, 1216, 1220. Finally, Professor Gutman billed—and had his students bill—in fifteen minute increments, almost certainly inflating the bills. "The problem with this practice is that billing by the quarter-hour, not by the tenth is a deficient practice because it does not reasonably reflect the number of ours actually worked." *ACLU v. U.S. Dept. of Homeland Sec.*, 810 F.Supp.2d 267, 268 (D.D.C. 2011) (quotations and citation omitted).

Given the foregoing, defendants request the Court not award any fees to the Jacob Burns Community Legal Clinics of The George Washington University. In the event the Court does award any fees, the requested amount should be significantly reduced.

### F.   Cyrus Mehri's Fees Should Be Denied.

Mr. Mehri also requests reimbursement for his work in this case. He limited his participation to assisting *amici*, advising on class certification before the Circuit, and repeatedly communicating to defendants his belief that the case should settle. Mehri Aff. [537-17] at ¶¶ 11-12 (describing his role as "limited involvement"). Mr. Mehri seeks over $20,000 for these efforts.

The Court should deny any fees to Mr. Mehri. He was unsuccessful in each of his tasks: Plaintiffs lost on certification grounds before the Circuit, and the case did not settle. Accordingly, Mr. Mehri should receive no fees for his unsuccessful services.

IV.   **Plaintiffs' Costs Are Excessive and Should Be Reduced Significantly.**

Plaintiffs seek an award of $192,357.28 of expenses from period 1 and $69,126.50 of expenses from period 2. *See* Pls.' Ex. 4 [537-4]. The total request of $261,483.78 is excessive and should be reduced significantly.

First, plaintiffs include a large portion of expert fees and expenses in this total, particularly for period 1. *See* Motion at 41-42. As explained below, reimbursement of expert fees and expenses is not available to plaintiffs.

Second, plaintiffs seek reimbursement of expenses that are not recoverable. Because ground transportation, particularly via taxi, is not a reimbursable litigation expense, the Court should deny plaintiffs the $2,425.74 they seek for local transportation. *See Mass. Fair Share v. Law Enforcement Assistance Admin.*, 776 F.3d 1066, 1069 (D.C. Cir. 1985). Plaintiffs also request $10,274.44 in overnight delivery charges; however, overnight delivery is not reimbursable. *See Precision Concrete v. N.L.R.B.*, 362 F.3d 847, 854 (D.C. Cir. 2004) (denying reimbursement of overnight delivery expenses under the EAJA). Plaintiffs also seek $284.24 in support staff overtime from period 1, but "overtime services" are non-reimbursable in this jurisdiction. *See Role Models*, 353 F.3d at 974. Although plaintiffs ask the Court to award $212.98 in telephone charges and taxes, these are also not reimbursable. *See Precision Concrete* 362 F.3d at 854 (D.C. Cir. 2004). Finally, plaintiffs bill defendants for $37,142.11 in Westlaw fees and $1,854.68 in Lexis fees, reflecting their legal research in this case. These costs are built into plaintiffs' overhead and should not be passed along to defendants as an expense here. *See*

Christensen Declaration at ¶ 140; *El-Fadl v. Central Bank of Jordan*, 163 F.R.D. 389, 390 (D.D.C. 1995) (electronic legal research "more properly considered as part of an attorney's fee and not a cost").

Additionally, plaintiffs seek over $36,000 in expenses for black and white printing. These costs appear excessive for several reasons. First, Plaintiffs' own billing records illustrate an effort to keep materials related to this case in electronic format. Additionally, all of the filings in this case, and virtually all discovery, have been done in electronic format. And plaintiffs include in their request significant costs for scanning billed to this case. *See* Pls. Ex. 8 [537-8]. Despite keeping this electronic record, plaintiffs, without explanation, also charged for the cost of printing more than 240,000 sheets of paper. This unexplained duplication of costs is simply not justifiable, and plaintiffs' request that defendants bear those costs is unreasonable.

## V. Plaintiffs' Expert Fees Are Not Reimbursable Litigation Expenses under the IDEA or the Rehabilitation Act.

The parties agree that plaintiffs cannot recover expert fees under the IDEA. Pls.' Mot. at 55. Undeterred, plaintiffs nevertheless request reimbursement in the amount of $121,207.82 for expenses incurred by their two experts during period I of this case. *Id.* at 56. As justification, plaintiffs cite the Court's Order [520] which found the District liable under Section 504 of the Rehabilitation Act up to March 22, 2010, and point to Section 504a of the Act as authorization for the Court to shift expert expenses related to those claims. *Id.* at 55-57. As plaintiffs acknowledge, cases from two district courts support this reasoning, while cases from two others

reject it. *Id.* at 41.[21] However, the Court need not actually address the split because Supreme Court authority provides for no recovery.

In *West Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83 (1991), the Supreme Court held that 42 U.S.C. § 1988 does not authorize a fee-shifting award for expert fees, such that absent such statutory authorization, 28 U.S.C. § 1821 imposes a ceiling on the amount of fees that can be shifted for expert witness services. *Casey*, 499 U.S. at 102. Following this decision, Congress amended 42 U.S.C. § 1988 to provide an explicit authorization for the shifting of expert witness fees; however, as amended, the statute clearly stated that such fees could be paid only "in any action or proceeding to enforce a provision of section 1981 or 1981a." 42 U.S.C. § 1988(c). As plaintiffs' claims fall under neither of these sections, and plaintiffs do not point to any other express statutory authorization, the Supreme Court's reasoning in *Casey* should foreclose recovery of the expert fees they now seek. *See Mason v. Me. Dep't of Corrs.*, 387 F. Supp. 2d 57, 64 (D. Me. 2005) (substantially the same reasoning); *cf. Farmer v. Arabian Oil Co.*, 379 U.S. 227, 235 (1964) ("discretion given district judges to tax costs should be sparingly exercised with reference to expenses not specifically allowed by statute").

---

[21] Plaintiffs also cite Judge Huvelle's decision in *Berke v. Fed. Bureau of Prisons*, 942 F. Supp. 2d 71 D.D.C. 2013), which purports to discuss whether expert fees can be recoverable as part of an individual's Rehabilitation Act claim alleging discrimination by a federal employer. The opinion, however, does not address the Court's decision in *Casey, infra*, nor is there any suggestion that the Mr. Berke's Rehabilitation Act claim was derivative of some other substantive claim (as is the case here). *See id.* at 81-82. For these reasons, the Court should reject as inapposite the *Berke* reasoning, which is, at best, *dicta*.

Even if the Court disagrees with this reasoning, it should reject plaintiffs' request because the Rehabilitation Act added nothing at all to the substance of this case. As the Fifth Circuit has reasoned, "[where] the Rehabilitation Act gives no more to a plaintiff's substantive claim than does [more specific substantive law], the plaintiff may not employ the Rehabilitation Act … merely as a means to collect [ ] fees." *Teresa Diane P. v. Alief Indep. Sch. Dist.*, 744 F.2d 484, 493 (5th Cir. 1984). In this case, plaintiffs cannot seriously contend that Section 504 of the Rehabilitation Act added anything to their substantive right to FAPE, which right was the focal point of this litigation and is already provided for in the IDEA. So too, plaintiffs' special education expert freely conceded that none of his opinions were based on the requirements of the Rehabilitation Act. *See* Ex. 14, April 6, 2011 Trial Transcript at 54:22-25 ("Q: So you didn't base any of your opinions in this case on any knowledge of the requirements of the Rehabilitation Act; is that right? A: That's correct"). And plaintiffs' statistician was only retained to analyze the District's educational databases, such that his contribution could have no logical nexus to any relevant finding under Section 504 given that provision's standard for liability. *See DL*, 730 F. Supp. 2d. at 9 (to establish Rehabilitation Act violation, plaintiffs must prove "something more than a mere failure to provide [FAPE such as] … bad faith or gross misjudgment"). As such, even if the Court is willing to eschew the Supreme Court's reasoning in *Casey*, it still should reject plaintiffs' request for recovery of expert fees. [22]

---

[22] The District does not dispute plaintiffs' request for expert expenses otherwise

## VI.   The IDEA's Statutory Fee Cap Requires that the Court Deny Plaintiffs' Request for Attorney's Fees Unless and Until Plaintiffs Demonstrate Actual Class Membership.

Congress specifically precluded the District from paying fees in excess of $4,000 to "an attorney who represents a party" in an IDEA proceeding initiated prior to March 11, 2009. *See* Pub. L. No. 111-8 (2009), 123 Stat. 697 (2009) (providing that no funds "may be made available … to pay the fees of an attorney who represents a party in or defends an IDEA proceeding which was initiated prior to the date of the enactment of this Act in an amount in excess of $4,000 for that proceeding"). In the class action context, the Circuit has interpreted the IDEA's fee cap statute to preclude an aggregate award of attorney's fees that is greater than $4,000 multiplied by the total number of members of the plaintiff class. *See Blackman v. District of Columbia*, 633 F.3d 1088, 1091-92 (D.C. Cir. 2011).

Plaintiffs do not dispute that the IDEA fee cap statute applies to them. Pls.' Mot. at 50-54. To satisfy it, however, they propose that the Court use an *estimated* total class membership to calculate a *hypothetical* aggregate fee cap to measure against their staggering $10,010,956 request. In support of their estimate of potential class members, plaintiffs cite the Court's various findings regarding the extent of the District's alleged failures to identify, locate, and evaluate children with disabilities and to appropriately transition them from Part C to Part B. *See id.* at 51-53. Regardless of whether these were sufficient to establish a basis for liability,

---

allowable under 28 U.S.C. § 1821. To the extent plaintiffs also seek payment for their expert's time engaging in discovery during period I as provided in Rule 26(b)(4)(E)(i), their claim should be rejected as untimely.

they are invariably unreliable, based as they are on statistical proxies, and should be rejected for purposes of the IDEA's fee cap. Indeed, interpreting a precise statutory cap as allowing more than it expressly admits is particularly risky where, as here, the statutory provision at issue is appropriations legislation, the effect of which must be construed narrowly in light of its "limited and specific purpose of providing funds for authorized programs." *See Calloway v. District of Columbia*, 216 F.3d 1, 9 (D.C. Cir. 2000) (citing *Donovan v. Caroline Stalite Co.*, 734 F.2d 1547, 1558 (D.C. Cir. 1984), for "the established rule [ ] that when appropriations measures arguably conflict with the underlying authorizing legislation, their effect must be construed narrowly. Such measures have the limited and specific purpose of providing funds for authorized programs"). In short, because plaintiffs bear the burden of justifying their request for fees, the Court should require them to demonstrate actual class membership sufficient to satisfy the cap or otherwise deny recovery.[23]

## CONCLUSION

For the foregoing reasons, defendants request that the Court deny plaintiffs' petition for $10,010,956.00, and award plaintiffs only such fees as the Court finds reasonable at the hourly rates set forth in the 2012 USAO *Laffey* Matrix for period 1, and at the hourly rates set forth in the USAO Matrix for period 2.

---

[23] Unlike *Blackman*, where, at the time of decision, the class notice process had begun, here there is no agreement between the parties that the total number of members of the plaintiffs' class exceeds some threshold figure.  633 F.3d at 1092. To the contrary, the District has repeatedly emphasized here that the plaintiff class is too indefinite for its membership to be ascertainable.

DATED: February 11, 2017.                    Respectfully Submitted,

                                             KARL A. RACINE
                                             Attorney General for the District of Columbia

                                             ELIZABETH SARAH GERE
                                             Deputy Attorney General
                                             Public Interest Division

                                             /s/ Chad Copeland
                                             CHAD COPELAND [982119]
                                             Assistant Deputy, Public Interest Division
                                             441 Fourth Street, N.W., Suite 630S
                                             Washington, D.C. 20001
                                             Phone: (202) 724-6623
                                             Email: chad.copeland@dc.gov

                                             /s/ Matthew R. Blecher
                                             MATTHEW R. BLECHER [1012957]
                                             Assistant Attorney General
                                             441 Fourth Street, N.W., Suite 600S
                                             Washington, D.C. 20001
                                             Phone: (202) 442-9774
                                             Email: matthew.blecher@dc.gov

                                             **Counsel for Defendants**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| D.L., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 05-1437 (RCL) |
| DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

**ORDER**

Upon consideration of Plaintiffs' Motion for an Award of Litigation Costs, Including Attorney's Fees and Related Expenses [537], Defendants' Opposition, and the entire record, it is:

**ORDERED** that the Motion is **GRANTED IN PART AND DENIED IN PART**, and it is further

**ORDERED** that, for the reasons stated in the Court's Memorandum Opinion accompanying this Order, Defendants shall reimburse Plaintiffs a total amount of _____, for attorney's fees and related expenses.

**SO ORDERED.**

Dated: _____                    _____
                                          ROYCE C. LAMBERTH
                                          United States District Court Judge